No. 10-7036

## In the
## United States Court of Appeals
## for the District of Columbia Circuit

DICK ANTHONY HELLER, ET AL.,
*Appellants*,
v.

DISTRICT OF COLUMBIA, ET AL.,
*Appellees.*

## On Appeal from the
## United States District Court for
## the District of Columbia

## Brief *Amicus Curiae* of
## Gun Owners of America, Inc., Gun Owners Foundation,
## Virginia Citizens Defense League, Maryland Shall Issue, Inc.,
## Gun Owners of California, Inc., Lincoln Institute for Research and
## Education, and Conservative Legal Defense and Education Fund
## In Support of Appellants and Reversal

WILLIAM J. OLSON*
HERBERT W. TITUS
JOHN S. MILES
JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, Virginia  22180-5615
  (703) 356-5070

*Attorney of Record
July 30, 2010

Counsel for *Amici Curiae*

# CERTIFICATE AS TO
# PARTIES, RULINGS, AND RELATED CASES

## Parties and Amici

All parties, intervenors, and amici curiae appearing before the district court below and this Court are listed in the Brief for Appellants.

## Ruling under Review

References to the ruling at issue appear in the Brief for Appellants.

## Related Cases

To the best of counsel's knowledge, this case has not previously been before this Court or any court other than the district court below. Counsel are unaware of any related cases currently pending in this Court or any other court.

## Statutes and Regulations

All applicable constitutional provisions and statutes and regulations are set forth in the Addendum to the Brief for Appellants.

# DISCLOSURE STATEMENT

The *amici curiae* herein, Gun Owners of America, Inc., Gun Owners Foundation, Virginia Citizens Defense League, Maryland Shall Issue, Inc., Gun Owners of California, Inc., Lincoln Institute for Research and Education, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Disclosure Statement pursuant to Rule 26.1(b), Federal Rules of Appellate Procedure ("Fed. R. App. P."), Rule 26.1(c), Rules of the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit Local Rules"), and Fed. R. App. P. 29(c).

These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them. The *amici curiae* are represented herein by William J. Olson, Esquire, who is counsel of record, Herbert W. Titus, Esquire, John S. Miles, Esquire, and Jeremiah L. Morgan, Esquire, of William J. Olson, P.C., 370 Maple Avenue West, Suite 4, Vienna, Virginia  22180-5615.

_____
William J. Olson

# TABLE OF CONTENTS

Page

Certificate as to Parties, Rulings, and Related Cases

Disclosure Statement

Table of Authorities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Glossary of Abbreviations. . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

Interest of *Amici Curiae*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Summary of Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT

I.    THIS COURT SHOULD EVALUATE THE DISTRICT'S GUN REGULATIONS ACCORDING TO THE TEXT OF THE SECOND AMENDMENT, NOT ACCORDING TO A JUDICIALLY-DEVISED BALANCING TEST. . . . . . . . . . 3

     A.    The District Court Misread <u>Heller</u> in Determining the Appropriate Standard of Review. . . . . . . . . . . . . . . . . . . . . . 4

     B.    In <u>Heller</u> and <u>McDonald,</u> the Supreme Court Rejected the Application of Any Judicially-Devised "Interest Balancing" Test. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          1.    The Supreme Court Has Rejected "Public Safety" as a Permissible Reason to Infringe Second Amendment Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          2.    The Supreme Court Has Rejected the District's "Access to Other Weapons" Argument. . . . . . . . . . . . . . . . . . . 10

          3.    The Second Amendment Right Is Not Subject to Legislative Balancing. . . . . . . . . . . . . . . . . . . . . . . . . 11

C.    The Second Amendment Right Is Subject to a Constitutional Test More Strict than Strict Scrutiny. . . . . . . . . . . . . . . . . . . 12

II.  THE D.C. REGISTRATION REQUIREMENT UNCONSTITUTIONALLY INFRINGES ON APPELLANTS' SECOND AMENDMENT RIGHT TO KEEP AND BEAR ARMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

A.    The Right to Keep and Bear Arms Is a Pre-Existent One Endowed by God in the Laws of Nature. . . . . . . . . . . . . . . . 15

B.    The District's Registration Requirement Is an Unconstitutional Prior Restraint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

III.  APPELLANTS' SECOND AMENDMENT RIGHTS INCLUDE THE RIGHT TO POSSESS "ASSAULT WEAPONS" AND "HIGH CAPACITY" MAGAZINES. . . 22

A.    United States v. Miller Provides the Framework for Determining Which Weapons Are Protected by the Second Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B.    So-called "Assault Weapons" Are Protected Arms. . . . . . . . . 26

C.    So-called "High Capacity" Magazines Are Protected Arms. . . . . 29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

# TABLE OF AUTHORITIES

Page

## CONSTITUTION
Article VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Amendment I. . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 19-21
*Amendment II. . . . . . . . . . . . . . . . . . . . 2, 5-7, 11-15, 17, 19-26, 32

## STATUTES
18 U.S.C. section 925(d)(3). . . . . . . . . . . . . . . . . . . . . . . . . . 29
1994 Assault Weapons Ban. . . . . . . . . . . . . . . . . . . . . . . . . . 29
D.C. Code Sec. 7-2502.02. . . . . . . . . . . . . . . . . . . . . . . . . . . 3
D.C. Code Sec. 7-2502.03. . . . . . . . . . . . . . . . . . . . . . . . . . . 3
D.C. Code Sec. 7-2502.04. . . . . . . . . . . . . . . . . . . . . . . . . . . 3
D.C. Code Sec. 7-2502.05. . . . . . . . . . . . . . . . . . . . . . . . . . . 3
D.C. Code Sec. 7-2506.01. . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## CASES
Arkansas Writers Project v. Ragland, 481 U.S. 221 (1987). . . . . . . . . . . . 5
Cornelius v. NAACP, 473 U.S. 788 (1985). . . . . . . . . . . . . . . . . . . 5
*District of Columbia v. Heller, 554 U.S. ___, 128 S.Ct. 2783 (2008)
. . . . . . . . . . . . . . . . . . . . 2-4, 6-8, 10-15, 17, 19-21, 23-26, 29, 31-32
Greer v. Spock, 424 U.S. 828 (1976). . . . . . . . . . . . . . . . . . . . . . 5
Lovell v. Griffin, 303 U.S. 444 (1938). . . . . . . . . . . . . . . . . . . . 21
*McDonald v. City of Chicago, 561 U.S. ___, 130 S.Ct. ___, 2010 U.S.
         LEXIS 5523 (2010). . . . . . . . . . . . . . . . . . 2, 7-9, 13, 20, 29
Near v. Minnesota, 283 U.S. 697 (1931). . . . . . . . . . . . . . . . . . 20-21
Ogden v. Saunders, 25 U.S. 213 (1827). . . . . . . . . . . . . . . . . . . . 6
Parker v. District of Columbia, 478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . 26
United States v. Miller, 307 U.S. 174 (1939). . . . . . . . . . . . . . . . . 23-26

## MISCELLANEOUS
B. Abbott, Judge & Jury: A Popular Explanation of the Leading Topics
         in the Law of the Land. . . . . . . . . . . . . . . . . . . . . . . . 23
Declaration of Independence. . . . . . . . . . . . . . . . . . . . . . . . . 11

\* Authorities upon which we chiefly rely are marked with asterisks.

W. Blackstone, <u>Commentaries on the Laws of England</u> (U. of Chi. Facsimile ed., 1765). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

T. Cooley, <u>Treatise on Constitutional Limitations</u>. . . . . . . . . . . . . . . . . . 21

J. Ordronaux, <u>Constitutional Legislation in the United States</u> (1891). . . . . . . 15

J. Pomeroy, <u>An Introduction to the Constitutional Law of the United States</u> (1868). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 23

<u>Sources of Our Liberties</u> 295 (R. Perry & J. Cooper, eds., American Bar Foundation: Rev. ed. 1978). . . . . . . . . . . . . . . . . . . . . . . 16, 18

P. Sweeney, <u>The Gun Digest Book of The AR-15</u> (2005). . . . . . . . . . . . 26-27

H. Titus, "The Law of Our Land," 6 J. OF CHRISTIAN JURIS. 57 (1986). . . . . 16

N. Webster, <u>American Dictionary of the English Language</u> (1828). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## GLOSSARY OF ABBREVIATIONS

D.C. Op. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . District Court Opinion

JA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Joint Appendix

**INTEREST OF *AMICI CURIAE***

The *amici* are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code, and each is dedicated, *inter alia*, to the correct construction, interpretation, and application of the law, with particular emphasis on constitutional guarantees related to firearm ownership and use.  Each of the following *amici* has filed *amicus curiae* briefs in other federal litigation involving such issues, including <u>District of Columbia</u> v. <u>Heller</u>, 554 U.S. __, 128 S.Ct. 2783 (2008) and <u>McDonald</u> v. <u>City of Chicago</u>, 561 U.S. __, 130 S.Ct. __, 2010 U.S. LEXIS 5523 (2010):[1]

- **Gun Owners of America, Inc. (**<u>www.gunowners.org</u>**)**

- **Gun Owners Foundation (**<u>www.gunowners.com</u>**)**

- **Virginia Citizens Defense League (**<u>www.vcdl.org</u>**)**

- **Maryland Shall Issue, Inc. (**<u>www.marylandshallissue.org</u>**)**

- **Gun Owners of California, Inc. (**<u>www.gunownersca.com</u>**)**

- **Lincoln Institute for Research and Education (**<u>www.lincolnreview.com</u>**)**

- **Conservative Legal Defense and Education Fund (**<u>www.cldef.org</u>**)**

---

[1]     A more complete description of each of the *amici* appears in their brief *amicus curiae* filed in <u>Heller</u>, pp. 1-2 (Feb. 11, 2008), <u>http://www.wjopc.com/site/constitutional/DCvHellerAmicus.pdf</u>, and in <u>McDonald</u>, pp. 1-4 (Nov. 23, 2009), <u>http://www.wjopc.com/site/firearms/McDonald_Amicus.pdf</u>.

## SUMMARY OF ARGUMENT

The Second Amendment commands that "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." In <u>District of Columbia</u> v. <u>Heller</u>, 554 U.S. ___, 128 S.Ct. 2783 (2008), the Supreme Court rejected the District of Columbia's effective ban on the private possession of firearms, recognizing that the right to keep and bear arms is held by all American citizens, as individuals. In <u>McDonald</u> v. <u>City of Chicago</u>, 561 U.S. ___, 130 S.Ct. ___, 2010 U.S. LEXIS 5523 (2010), the Court categorized that right to be a "fundamental right[] necessary to our system of ordered liberty." *Id.* at *64.

Having been rebuked in its earlier effort to ban the private possession of firearms, the District of Columbia now seeks to achieve the same goal through (i) back-door restrictions on firearm ownership so onerous that few individuals would pass muster, and (ii) an outright ban of certain weapons and magazines commonly owned and used throughout the country. Applying a judicially-devised interest-balancing test prohibited by <u>Heller</u>, the District Court erroneously deferred to the D.C. Council, in disregard of the Second Amendment principles articulated in <u>Heller</u> and <u>McDonald</u>.

## ARGUMENT

## I. THIS COURT SHOULD EVALUATE THE DISTRICT'S GUN REGULATIONS ACCORDING TO THE TEXT OF THE SECOND AMENDMENT, NOT ACCORDING TO A JUDICIALLY-DEVISED BALANCING TEST.

In defense of its post-<u>Heller</u> firearms regulations,[2] the District urged the court below to apply what it denotes a "reasonableness review." District's Motion for Summary Judgment ("D.C. Motion"), p. 12, R. __. The District argued that its regulations are "reasonable" because they purportedly respond to the "dangers posed by handguns" and are designed to "prevent[] crime" and "protect public health and safety." *Id*. at 12, 13, 18, JA ___. The plaintiffs urged use of a strict scrutiny standard. The district court chose to apply what it termed intermediate scrutiny in a manner that balanced away the interests D.C.'s

---

[2] The District responded to <u>Heller</u> by prohibiting possession of any firearm without a registration certificate, requiring, *inter alia,* a written test, good vision, and a training course. D.C. Code Sec. 7-2502.03(a)(10), (11), (13). Under penalty of perjury, the applicant must identify the purpose for which the firearm is intended, provide his work history, provide the firearm's serial number, and pay for the District to conduct a "ballistic identification procedure" for the firearm. D.C. Code Sec. 7-2502.03(b)(3), (8), (9), (d). The applicant must pay fees to the District (D.C. Code Sec. 7-2502.05(b)) and pay for a certified training course (D.C. Code Sec. 7-2502.03(a)(13)). An applicant must give fingerprints, a photograph, and appear in person to apply. D.C. Code Sec. 7-2502.04. Additionally, the District has banned the possession of so-called "assault weapons" (D.C. Code Sec. 7-2502.02(a)(6)) and "high capacity magazines" (D.C. Code Sec. 7-2506.01(b)).

sovereign of citizens in favor of the interests of the government. D.C. Op., 2010 U.S. Dist. LEXIS 29063, at *22.

## A. The District Court Misread Heller in Determining the Appropriate Standard of Review.

The district court opined that it was required to select a standard of review on its own, as the Heller Court had left that issue "for another day" (D.C. Op. at *19):

> [t]he Court expressly reserved the question of what standard of review to apply, concluding that the laws were invalid '[u]nder any of the standards of scrutiny that [the Court has] applied to enumerated constitutional rights.' *Id.* at 2817. [D.C. Op. at *11.]

Then, the district court inferred that the Heller Court rejected:

> a **strict scrutiny** standard of review [because it] would not square with the majority's references to '**presumptively lawful** regulatory measures' such as laws prohibiting firearms possession by felons and the mentally ill, forbidding the carrying of firearms in schools or government buildings and imposing conditions and qualifications on the commercial sale of arms. [D.C. Op. at *20-21 (emphasis added).]

Without analysis, the district court jumped to the conclusion these presumptively legal regulations could not co-exist with the strict scrutiny standard. Had it performed any analysis, it might have seen the issue differently. For example, the court failed to recognize that the right to keep and bear arms is

possessed only by the people — citizens — and, if it were determined that a citizen forfeited civil rights by virtue of felonious behavior or mental impairment, he would no longer be entitled to its protection — without regard to a strict scrutiny standard. As for carrying a firearm in a schoolhouse or other government building, the court failed to recognize that such facility-specific regulations are issued by government in its capacity as proprietor, having no less rights than a proprietor in the private sector. It is well-established that the First Amendment strict scrutiny standard does not apply to government property dedicated to government business. *See* <u>Greer</u> v. <u>Spock</u>, 424 U.S. 828, 836 (1976) (access to military base); <u>Cornelius</u> v. <u>NAACP</u>, 473 U.S. 788, 800 (1985) (access to federal workforce in government building). Just as newspaper and magazine publication and distribution are subject to commercial regulations generally applicable to all businesses without being subject to "strict scrutiny," so such scrutiny would not govern the application of such general regulations applicable to firearms manufacturers and dealers. Strict scrutiny would be reserved to "discriminatory" regulations designed to censor the rights of the people protected under both Amendments. *See* <u>Arkansas Writers Project</u> v. <u>Ragland</u>, 481 U.S. 221 (1987). Even under strict scrutiny, bans on "dangerous and unusual weapons," such as "pipe bombs," would not be protected unless

they first were determined to be "arms" under the Second Amendment.
*Compare* <u>Heller</u>, 128 S.Ct. at 2815-16 with D.C. Op. at *26.

Additionally, in rejecting strict scrutiny, the district court reads far too much into the "presumptively lawful" dicta in <u>Heller</u>, as if the term means "conclusively constitutional." In fact, "presumptively lawful" does not indicate that a reviewing court should accord any greater deference to the <u>Heller</u> Court's illustrations of "presumptively lawful" statutes than to any other firearms statute. Since the beginning of our republic, laws have been presumed constitutional, and the burden is on the party bringing the challenge to show why the law is unconstitutional. *See* <u>Ogden</u> v. <u>Saunders</u>, 25 U.S. 213, 270 (1827). There is no indication that the Court in <u>Heller</u> was urging use of a standard of review by which lower courts would defer readily to legislative restrictions on protected rights. Instead, the Court stated that it was willing to evaluate all such challenges to determine if such laws can be justified under the Second Amendment: "there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us." <u>Heller</u>, 128 S.Ct. at 2822. This is such a case.

**B. In <u>Heller</u> and <u>McDonald,</u> the Supreme Court Rejected the Application of Any Judicially-Devised "Interest Balancing" Test.**

The Second Amendment states that — compelling, reasonable, or other governmental interest notwithstanding — the right protected "shall not be infringed." According to its ordinary meaning, "infringe" means "to break, as contracts." N. Webster, <u>American Dictionary of the English Language</u> (1828). In short, the view that "the right of the people" is subject to regulation and restriction, even if seemingly reasonable, is contradicted by the words of the Second Amendment.

Dissenting in <u>Heller</u>, Justice Breyer argued for an "interest balancing inquiry" which "asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests." <u>Heller</u>, 128 S.Ct. at 2852. The <u>Heller</u> majority disagreed, responding:

> We know of no other enumerated constitutional right [which] has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right **takes out of the hands of government** — even the Third Branch of Government — **the power to decide** on a case-by-case basis whether the right is really worth insisting upon. [<u>Heller</u>, 128 S.Ct. at 2821 (emphasis added).]

In McDonald, the Court reinforced Heller, stating further that the Second

Amendment cannot be "balanced" away, no matter how compelling the

government's interest:

> In Heller, however, we expressly rejected the argument that the
> scope of the Second Amendment right should be determined by
> judicial interest balancing…. [McDonald, 2010 U.S. LEXIS at
> *77.]

**1.   The Supreme Court Has Rejected "Public Safety" as a
Permissible Reason to Infringe Second Amendment Rights.**

In Heller, the District argued public safety to justify its outright handgun ban.

The Court replied that "[w]e are aware of the problem of handgun violence in

this country, and we take seriously the concerns raised by the many *amici* who

believe that prohibition of handgun ownership is a solution." Heller, 128 S.Ct.

at 2822.  However, the Court decided:

> **the enshrinement of constitutional rights necessarily takes
> certain policy choices off the table.**  Undoubtedly some think
> that the Second Amendment is outmoded in a society where our
> standing army is the pride of our Nation, where well-trained
> police forces provide personal security, and where gun violence
> is a serious problem.  That is perhaps debatable, but what is not
> debatable is that it is not the role of this Court to pronounce the
> Second Amendment extinct.  [*Id*. (emphasis added).]

Again, in McDonald, the City of Chicago made the same argument as the

District here, attempting to justify its ban on handguns by portraying the firearm

as "highly dangerous … designed to kill or inflict serious injury…" and the City's law as responsive to "increased firearm related deaths and injuries." McDonald, Brief for Municipal Respondents, pp. 1, 11. The McDonald Court did not deny that firearms can be used in violent crimes. *See* McDonald, 2010 U.S. LEXIS at *84. However, the Court chose to apply the Constitution as written, rather than invoking non-textual standards of review which require deference to "good reasons" advanced by government litigants.

Twice, then, the Supreme Court has **flatly rejected** a "public safety" argument of the type now made again by the District. In McDonald, the Court pointed out that "[t]he right to keep and bear arms … is not the only constitutional right that has controversial public safety implications," citing several constitutional guarantees, the enforcement of which may set dangerous criminals free. McDonald, 2010 U.S. LEXIS at *72.

Social science studies contrasting the number of murders **committed** with a firearm with the number of murders **prevented** by the use of a firearm may be an interesting topic for academics, but such studies do not inform a decision about the authorial intent of the framers of the U.S. Constitution. The Court in McDonald concluded as much, noting that "[m]unicipal respondents cite no case in which we have refrained from holding that a provision of the Bill of Rights is

binding on the States on the ground that the right at issue has disputed public

safety implications." McDonald, 2010 U.S. LEXIS at *73.

**2.    The Supreme Court Has Rejected the District's "Access to Other Weapons" Argument.**

In the court below, the District argued that the "Council properly acted to

reduce harms" by "regulating which weapons are available to District residents,"

while "still allowing residents to exercise their Second Amendment rights"

because "individuals [still] have access to … other weapons." D.C. Motion, pp.

13, 31.  When this same argument was made in Heller, Chief Justice Roberts

asked, "if you have a law that prohibits the possession of books, it's all right if

you allow the possession of newspapers?" Heller, S.Ct. Docket No. 07-290, Tr.

pp. 18-19 (Mar. 18, 2008).  The majority in Heller agreed with the Chief

Justice's point:  "It is no answer to say, as petitioners do, that it is permissible to

ban the possession of handguns so long as the possession of other firearms (*i.e.*,

long guns) is allowed." Heller, 128 S.Ct. at 2818.  Yet what was considered

"no answer" in Heller is the answer the District offers again here.

In Heller, the Court explained that "[t]here are many reasons that a citizen

may prefer a handgun for self defense.…" Heller, 128 S.Ct. at 2818.  Likewise

here, there are many reasons a District resident may prefer a weapon (such as

the banned AR-15 rifle) over a weapon that the District allows. *See* Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion"), p. 7; *see also*, Section III, *infra*. The choice is not the District's to make.

### 3. The Second Amendment Right Is Not Subject to Legislative Balancing.

Justice Breyer suggested in <u>Heller</u> that the Court should "defer[] to a legislature's empirical judgment in matters where a legislature is likely to have greater expertise and greater institutional factfinding capacity." <u>Heller</u>, 128 S.Ct. at 2852. The District has renewed this argument here, claiming that "'deference must be accorded to [the legislature's] findings as to the harm to be avoided....'" D.C. Motion, p. 32. The District puts forth a "variety of evidence" from "a number of sources," including "studies," "hearings," and "experiences of many other jurisdictions." *Id*. The District Court adopts this view. D.C. Op. at *19-21. But the <u>Heller</u> majority allows for no such legislative discretion:

> Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures … think that scope too broad. [<u>Heller</u>, 128 S.Ct. at 2821.]

The framers were not ignorant of the concept of "public safety," but the very purpose of the Second Amendment was to constrain future legislatures, and

remove from their purview the ability to decide whether the Second Amendment "is really worth insisting on." <u>Heller</u>, 128 S.Ct. at 2821. <u>Heller</u> recognized that the Second Amendment itself was the "very product of an interest-balancing by the people" (*id*.), and legislators by their oath of office prescribed by Article VI of the Constitution are required to respect the choices of the framers reflected in the Constitution text — no matter how well-considered by some social science writers, and by members of the District Council.

### C. The Second Amendment Right Is Subject to a Constitutional Test More Strict than Strict Scrutiny.

Although the <u>Heller</u> Court rejected judicial[3] and legislative interest balancing, courts are not without guidance as to the standard of review to employ in Second Amendment cases. At oral argument in <u>Heller</u>, Chief Justice Roberts led the way, noting that the:

> various phrases under the **different standards proposed** [by counsel], "compelling interest," "significant interest," "narrowly tailored," **none of them appear in the Constitution**; and I wonder why in this case we have to articulate an all-encompassing standard…. I mean these standards that apply in the First Amendment just kind of developed over the years as sort **of baggage that the First Amendment picked up**. [<u>Heller</u>,

---

[3]     "A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all." <u>Heller</u>, 128 S.Ct. at 2821.

S.Ct. Docket No. 07-290, Oral Argument Transcript, p. 44
(Mar. 18, 2008) (emphasis added).]

Following the Chief Justice's lead, the <u>Heller</u> majority refrained from

adopting and applying any extra-textual standard, concentrating its opinion on an

exposition of the precise text and historical context of the Second Amendment,

and applying that analysis to the District's handgun ban. The court below is

simply mistaken when it claims that <u>Heller</u> "expressly reserved the question of

what standard of review to apply...." D.C. Op. at *11. Even Justice Stevens'

dissent in <u>McDonald</u> recognized that the Court had not applied any of the three

traditional levels of scrutiny in its ruling that the District handgun ban violated

the Second Amendment. <u>McDonald</u>, 2010 U.S. LEXIS at *49 (Stevens, J.,

dissenting).

What <u>Heller</u> teaches, then, is that questions of the constitutionality of

firearms laws must be resolved by a textual analysis addressed first to whether

the person affected by the law is within the class protected by the Second

Amendment (*i.e.*, "the people") and second whether the firearm at issue is

among the class protected by that Amendment (*i.e.,* "arms") in light of the

Amendment's overarching purpose to preserve the ultimate sovereignty of the

American people in a free state. If so, the right "shall not be infringed." Thus,

the Second Amendment establishes its own standard of review for courts to apply

— "shall not be infringed."

## II. THE D.C. REGISTRATION REQUIREMENT UNCONSTITUTIONALLY INFRINGES ON APPELLANTS' SECOND AMENDMENT RIGHT TO KEEP AND BEAR ARMS.

In their capacity as "resident[s] of the District … and … citizen[s] of the United States," appellants have challenged the District's requirement that before any "person … in the District [may] possess or control any firearm," that person must "hold[] a valid registration certificate for the firearm." *See* Complaint ¶¶ 2-5, 13, JA 10-11. For example, Appellant Mark Snyder has challenged the District's registration requirement as applied to "a Savage BTVS .22 rimfire caliber bolt action target rifle," a firearm that, without question, is within the protective cover of the Second Amendment. However, the law of the District requires Appellant Snyder to obtain permission from District officials before he can "keep and bear" a constitutionally-protected firearm. D.C. Code Sec. 7-2502.03(a)(10), (11), (13). Such a requirement is an unconstitutional infringement of that Second Amendment right.

**A. The Right to Keep and Bear Arms Is a Pre-Existent One Endowed by God in the Laws of Nature.**

As the Supreme Court observed in Heller, "[t]he first salient feature of the operative clause [of the Second Amendment] is that it **codifies** a 'right of the people.'" Heller, 128 S.Ct. at 2790 (emphasis added). As a codification, the Second Amendment does not create the right to keep and bear arms, but "reduces" a pre-existing individual right into a written enforceable form. *Id.* at 2797-98. As a pre-existing right of the people, the right to keep and bear arms not only existed **chronologically** before its codification in the Second Amendment, but has "always existed," being by nature "the distinctive privilege of freemen," needing no human act, constitutional or otherwise, to bring it into existence. *See* J. Ordronaux, Constitutional Legislation in the United States, 241-42 (1891), quoted in Heller, 128 S.Ct. at 2812.

As the Heller Court explained, the Second Amendment right secures a "right of the people," that is, a right that belongs to "all members of the [national] political community" — "all Americans." *Id.* at 2790-91. According to Heller, the people's right to keep and bear arms is for the constitutionally-expressed purpose of "'secur[ing] a free state.'" *Id.* at 2800. Designed to protect the people from political tyrants who, by disarming the people, would take away the

people's liberties, the Second Amendment "secure[s] the ideal of a citizen militia which might be necessary to oppose an oppressive military force if the constitutional order breaks down." *Id.* at 2801.

The Second Amendment was not the first time an American founding document recognized the inherent right of the people to resist political tyranny by force of arms. On July 6, 1775, the Second Continental Congress declared it necessary for the people of the North American colonies to resort to arms to defend themselves from the English Parliament's "attempt[] to effect their cruel and impolitic purpose of enslaving these colonies by violence." "Declaration of the Causes and Necessity of Taking up Arms," reprinted in <u>Sources of Our Liberties</u> 295 (R. Perry & J. Cooper, eds., American Bar Foundation: Rev. ed. 1978) (hereinafter "<u>Sources</u>"). One year later, on July 4, 1776, America's founders immortalized this pre-existing right by declaring the people's right (i) to "throw off" the "absolute despotism" of the English crown and (ii) to constitute a new government for a new nation, the better to secure their "unalienable rights … to life, liberty and the pursuant of happiness." "Declaration of Independence," reprinted in <u>Sources</u> at 319.

According to the nation's charter, this right of the people to resort to arms against the tyrant, and to reconstitute their government, came from "the laws of

nature and of nature's God," that is, God's will revealed in nature and in the

Holy Scriptures.[4]  And, as Sir William Blackstone wrote in 1765:

> "[t]his law of nature, being co-eval with mankind and dictated by God himself, is of course superior in obligation to any other. It is binding over all the globe, in all countries, and at all times: **no human laws are of any validity, if contrary to this....** [1 W. Blackstone, <u>Commentaries on the Laws of England</u> 41 (Univ. of Chi. Facsimile ed.: 1765) (hereinafter "Blackstone's <u>Commentaries</u>") (emphasis added).]

**B.  The District's Registration Requirement Is an Unconstitutional Prior Restraint.**

In <u>Heller</u>, the Supreme Court ruled that, according to the Second

Amendment's prefatory clause, the right to keep and bear arms was "**necessary**

**to the security of a free state**."  <u>Heller</u>, 128 S.Ct. at 2800 (emphasis added).

Thus, the Court announced that "the **purpose** for which the right was codified

[was] to prevent elimination of the [citizen-run] **militia** … as a **safeguard**

**against tyranny**."  *Id*. at 2801-02 (emphasis added).  And the **means** chosen by

the Second Amendment to accomplish this purpose was to prohibit Congress

from exercising "plenary authority" over the ordinary citizen's right to keep and

bear arms," including the authority to say who may exercise that right.  *Id*.

---

[4]  *See* H. Titus, "The Law of Our Land," 6 J. OF CHRISTIAN JURIS. 57, 59-68 (1986).

In analogous fashion — 243 years before <u>Heller</u> — Sir William Blackstone wrote of the First Amendment right of "[t]he liberty of the press [that it] is … **essential to the nature of a free state**." 4 Blackstone's <u>Commentaries</u> at 151 (emphasis added). Thus, Blackstone announced that the **purpose** of the freedom of the press was to provide a **safeguard against tyranny**, one that made the civil government "the arbitrary and infallible judge of all controverted points in learning, religion and **government**." *Id.* at 152 (emphasis added). And the **means** chosen to preserve a free press was to prohibit the government from exercising plenary authority over who could wield the power of the press, "[e]very free man ha[ving] an undoubted right to lay what sentiments he pleases before the public." *Id.*

By the late 1600's, it was well-established in England that the liberty of the press "consist[ed] in laying down no *previous* restraints upon publications," thereby eliminating "the restrictive power of a licenser," and limiting the power of the government to the punishment of after-the-fact misuse of the press, such as the publication of libel and slander. *Id.* at 151-52 (italics original). While this no-licensure principle governed the liberty of the press in England,[5] the British

---

[5]        *See* <u>Sources</u> at 242-43.

authorities kept a tight reign over the right of the people to keep and bear arms, subjecting it to the censorial power of the government. *See* Sources at 231 and "Bill of Rights," reprinted in Sources at 245. Hence, the 1689 English Bill of Rights provided "[t]hat the subjects which are protestants, may have arms for their defense **suitable to their conditions, and as allowed by law**." "Bill of Rights" reprinted in Sources at 246 (emphasis added).

Although the right to keep and bear arms did not gain equal status with the freedom of the press in England, it did in America. As the First Amendment prohibited laws "abridging" the freedoms of speech, press, assembly, and petition, the Second Amendment prohibited any "infringe[ment" of the "right to keep and bear arms." No doubt, the right to keep and bear arms was elevated to equal status alongside speech, press, assembly, and petition because one of the major grievances that led to the American Revolution was the British seizure of "the arms and ammunition of the colonists at Concord." Sources at 231-32. *See* Brief *Amicus Curiae* of Gun Owners of America, Inc. *et al.*, in Heller (S.Ct. Docket No. 07-290) (Feb. 11, 2008), pp. 22-27, for a discussion of the degree to which the American Revolution was precipitated by British gun control.

It would be more than 230 years later, however, before the Supreme Court would rule that the Second Amendment, like the First, protected the individual

rights of the American people.  *See* <u>Heller</u>, 128 S.Ct. at 2790.  And it took another two years before the nation's highest Court recognized that the Second Amendment right deserved at least the same level of protection afforded to the First Amendment rights set forth in the federal Bill of Rights.  <u>McDonald</u> v. <u>Chicago</u>, 2010 U.S. LEXIS at *40, *78-79.

The right most closely analogous to the right to keep and bear arms is the freedom of the press[6] — each right deemed to be "necessary" or "essential" to a free state, each having the purpose of protecting the people from tyranny, and each denying the government's claim of plenary licensing authority.  Quoting from, and relying extensively on, Blackstone's view about liberty of the press, the Supreme Court established that the chief means of enforcement of that guaranty was "to prevent **previous restraints** upon publications."  <u>Near</u> v. <u>Minnesota</u>, 283 U.S. 697, 713 (1931) (emphasis added).  Rejecting the argument that press licensure could be justified as a measure to prevent abuse, the Court responded:

> The fact that the liberty of the press may be abused by miscreant purveyors of scandal does not make any the less necessary the **immunity** of the press **from previous restraint** in dealing with

---

[6]    *See* J. Pomeroy, <u>An Introduction to the Constitutional Law of the United States</u>, 152-53 (1868), quoted in <u>Heller</u>, 128 S.Ct. at 2812.

> official misconduct. Subsequent punishment for such abuses as
> may exist is the appropriate remedy, consistent with the
> constitutional privilege. [*Id.*, 283 U.S. at 720 (emphasis added).]

While the right to keep and bear arms, like the freedom of the press, may be abused by "miscreants," the Second Amendment, like the First, precludes the enforcement of a system of licensing, especially where the scope of the licensing power is "comprehensive" and discretionary, sweeping indiscriminately all of the "historic weapons in the defense of liberty." *See* <u>Lovell</u> v. <u>Griffin</u>, 303 U.S. 444, 452 (1938). The District's regulations require all D.C. residents to seek permission to possess or control any firearm for any purpose, including handguns for self-defense that <u>Heller</u> held to be absolutely protected by the Second Amendment (<u>Heller</u>, 128 S.Ct. at 2782), and subjects those weapons to the discretion of the city's chief of police and mayor, with respect to its "intended use" and "placement" and with respect to an applicant's "work history" and payment of "fees." *See* note 2, *supra*.

As the eminent constitutional authority, Thomas Cooley, wrote in his 1868 <u>Treatise on Constitutional Limitations</u>, approvingly quoted in <u>Heller</u>, "the people … shall have the right to keep and bear arms; and they **need no permission or regulation of law for the purpose**." *See* <u>Heller</u>, 128 S.Ct. at 2811 (emphasis added).

## III. APPELLANTS' SECOND AMENDMENT RIGHTS INCLUDE THE RIGHT TO POSSESS "ASSAULT WEAPONS" AND "HIGH CAPACITY" MAGAZINES.

The District bans registration of so-called "assault weapons,"[7] and prohibits possession of so-called "high capacity" magazines that hold more than 10 rounds of ammunition. Appellants have not been permitted to register variants of the AR-15 semi-automatic rifle, and full-size semi-automatic pistols with magazines holding over 10 rounds, even though both of these weapons systems are clearly protected "arms" under the Second Amendment.

The district court's embrace of intermediate scrutiny led it down a pre-set path: (i) defining fundamental versus non-fundamental and core versus noncore rights; (ii) weighing burdens versus benefits; and (iii) finally deferring to legislators who do not trust their constituents to be armed — a journey almost ensuring that any government limitation on the right to keep and bear arms will be sanctioned. Thus bogged down, the district court never got around to determining whether items banned by the District fall under the class of weapons

---

[7] The District reveals its bias when it adopts the "assault weapons" lexicon of the anti-gun community. True assault rifles are capable of fully-automatic fire, but long ago, gun opponents mislabeled certain semi-automatic rifles as "assault weapons" as part of a political strategy to make them sound particularly dangerous.

protected by the Second Amendment as required by <u>Heller</u>. *See* <u>Heller</u>, 128 S.Ct. at 2815-16.

Clearly, the Second Amendment "extends only to certain types of weapons." <u>Heller</u>, 128 S.Ct. at 2814. Guidance as to the nature of the weapons protected is provided by both <u>United States</u> v. <u>Miller</u>, 307 U.S. 174 (1939), and <u>Heller</u>. However, <u>Heller</u> provides an overarching theme as to the reason that the framers chose to deny to government the power to regulate certain types of arms. <u>Heller</u> instructs that citizens have a right to those arms necessary to fulfill the purpose of the Amendment — to "secure a free state." *Id.* That "free state," the Court explained, exists when the people possess arms sufficient to protect themselves from criminals (<u>Heller</u>, 128 S.Ct. at 2793), to repel a foreign invasion (*id.*, 128 S.Ct. at 2800) and, if need be, to resist their own tyrannical government, particularly if the government were to act to seize the people's arms (*id.*, 128 S.Ct. at 2801).[8] Thus, the "arms" protected by the Second Amendment are

---

[8]     While the District seems to fear entrusting its citizens with arms, it was not always so. In 1868, J. Pomeroy in his <u>Introduction to the Constitutional Law of the United States</u> wrote that "'[A] militia would be useless unless the citizens were enabled to exercise themselves in the use of **warlike** weapons.'" *See* <u>Heller</u>, 128 S.Ct. at 2812 (emphasis added). Later that century, B. Abbott wrote that: "'Some general knowledge of firearms is important to the public welfare, because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people have some familiarity with

weapons that are useful in self-defense situations, in resisting foreign invaders,

and in effectively resisting a domestic standing army "if the constitutional order

broke down." *Id.*, 128 S.Ct. at 2801.

**A. <u>United States</u> v. <u>Miller</u> Provides the Framework for Determining Which Weapons Are Protected by the Second Amendment.**

In <u>United States</u> v. <u>Miller</u>, 307 U.S. 174 (1939), the Supreme Court refused

to assume that a short-barreled shotgun (made illegal under the National Firearms

Act of 1934) was protected by the Second Amendment, because there was no

evidence that it was "part of the **ordinary military equipment or** that its use

**could** contribute to the common defense." *Id.*, 307 U.S. at 178 (emphasis

added). The <u>Miller</u> Court did not require that a weapon be "necessary" for the

common defense or even "useful," but only that it have "**some reasonable**

**relationship** to the preservation or efficiency of a well regulated militia."

<u>Miller</u>, 307 U.S. at 178.

---

**weapons of war**.'" *See* <u>Heller</u>, 128 S.Ct. at 2812 (citing <u>Judge & Jury: A Popular Explanation of the Leading Topics in the Law of the Land</u>) (emphasis added). The <u>Heller</u> Court recognized that "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny," and that "'[o]ne of the ordinary modes, by which tyrants accomplish their purposes without resistance, is, by disarming the people, and making it an offence to keep arms....'" <u>Heller</u>, 128 S.Ct. at 2801, 2807.

The Miller Court also held that courts should determine which weapons are covered by the Second Amendment by looking at weapons that are "in common use at the time." Miller, 307 U.S. at 178. In Heller, Justice Scalia explained that Miller should not be read as limiting weapons to "only those weapons useful in warfare...." Heller, 128 S.Ct. at 2815. Instead, "in common use" also applies to "lawful purposes like self-defense." Id.

Heller "read Miller to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." Heller, 128 S.Ct. at 2815-16.

Thus, according to both Miller and Heller,[9] so long as appellants have demonstrated that their weapons are in common use as part of the ordinary military equipment, or alternatively are reasonably related to any of the three purposes for which the Second Amendment was ratified, they are protected by

---

[9]    In the Court of Appeals case leading to the Heller decision, Judge Silberman found the "modern handgun ... quite improved over its colonial-era predecessor" but as "a lineal descendant of that founding-era weapon ... it passes Miller standards. Parker v. District of Columbia, 478 F.3d 370, 398 (D.C. Cir. 2007) (emphasis added). According to the "lineal descendant" test, there would be no question that the weapons regulated by the District are protected "arms."

the Second Amendment.[10]  By this test, it is unquestionable that "assault rifles"

and "high-capacity" magazines are protected arms because they are owned all

over America by law-abiding citizens for legitimate purposes.

**B.  So-called "Assault Weapons" Are Protected Arms.**

One of the most prominent banned "assault weapons" is the AR-15 rifle —

the popular semi-automatic version of the fully-automatic, M16 U.S. military

assault rifle.  Many versions of the AR-15 rifle is in widespread use in America

and has been called "America's Most Versatile Rifle."  *See* P. Sweeney, The

Gun Digest Book of the AR-15 (2005), p. 4.  "Assault rifles" are a compromise

weapon, useful in a variety of environments, and against a variety of targets.

They strike a balance of accuracy, length, weight, speed, power, ergonomics,

capacity, and a host of other factors.

---

[10]     A court could look to the small arms currently employed by the U.S.
Armed Forces as an indication of what should be available to the American
people in order that they be able to effectively resist tyranny.  A court could look
to weapons in use by foreign militaries in order to determine what would be
needed for the American people to effectively resist an invading force.  Finally,
a court could look to those weapons currently employed by law enforcement
agencies and the American people generally to determine what weapons are
effective in self-defense and in maintaining civil order.  All of these types of
weapons are protected by the Second Amendment.

Historically, rifles used heavy, long range ammunition, such as the M1 Garand's .30-06 cartridge and the M14's .308 cartridge. Assault rifles generally employ an "intermediate caliber," lightweight cartridge, such as the .223 Remington (5.56x45 NATO), which translates to **more manageable recoil** than rifles in larger calibers as well as lighter weight of both ammunition and rifle. *Id.* "Assault rifles" traditionally are also **shorter** than their predecessors which means that the rifle can be used more effectively indoors, such as in short-range self-defense encounters, and can be more effectively employed in urban environments. Additionally, the shorter length means that the rifle can be easily manipulated to the firing position with the stock against the shoulder.

"Assault rifles" tend to have **better-designed ergonomics** than other rifles. The collapsible stock common to many AR-15 rifles, for example, allows the user to adjust the length to fit his frame. A pistol grip mounted under the trigger, and a foregrip mounted to the handguard under the barrel allow the rifle to be used more comfortably, permitting the arms and hands to adopt a more natural position when firing the rifle.

"Assault rifles" tend to have **user-friendly fire controls** (*e.g.*, triggers, magazine releases, bolt release devices, and safeties), which allow the rifle to be easily manipulated and controlled with little extraneous movement. In situations

where a balance of speed and accuracy can mean the difference between life and death, well-designed controls mean a more effective weapon. Additionally, such "common sense" weapons require less skill to operate, and such skills can be readily acquired, and therefore, actually safer in the hands of the average user.

The District asserts that "assault rifles" are more "dangerous" than are other rifles.[11] *See* D.C. Motion, pp. 6, 13. However, an "assault rifle" is arguably less "dangerous" than other rifles. For example, a long-range, bolt-action hunting rifle with a scope would not have any of the supposedly problematic attributes of an "assault rifle," yet it is more accurate at longer distances, and hits with a more potent (heavier and faster) bullet with greater penetration.

In sum, most of the features that make a rifle an "assault rifle" are no more than ergonomic and design features intended to make the rifle more user-friendly, and more effective as self-defense weapons, which is why they are preferred by a wide variety of Americans. With lighter ammunition, less recoil, and better ergonomics and controls, these rifles are used effectively by a wider swath of the general public, including those with smaller frames or limited upper

---

[11] The District claims that these weapons are "preferred by terrorists." Terrorists also prefer communicating via cell phone instead of using carrier pigeons. So does everyone else. That does not mean that cell phones should be banned because they are "preferred by terrorists."

body strength.  This ease of use is also important in today's America, where

people devote less time to hunting and target practice, because it allows them to

be prepared to contribute to the common defense while putting in less time

learning the skills needed to do so with larger caliber weapons.[12]

### C.  So-called "High Capacity" Magazines Are Protected Arms.

Numerous types of rifles and handguns often employ what the District calls

"high capacity"[13] box magazines.  The District, of course, claims that such

magazines are "dangerous," and that they have the "potential to cause havoc."[14]

---

[12]     The District draws from the 1968 Gun Control Act (18 U.S.C. section 925(d)(3)) and the 1994 Assault Weapons Ban (Pub. L. 103-322), claiming that its ban on "assault weapons" is appropriate because such weapons have no "sporting purpose."  D.C. Motion, p. 33.  Reliance on a lapsed, pre-Heller and McDonald statute is unpersuasive, particularly since the Supreme Court has since held that the Second Amendment protects both self-defense and resistance against military forces — uses completely unrelated to "sporting purposes."

[13]     The term "high capacity" is used here only because the District does so.  Actually, these magazines are so universally accepted and common across the country that they should be termed "standard capacity" magazines.  The magazines that the District allows are "low capacity" magazines which must be specially designed for a firearm designed to use standard magazines.

[14]     The District invents the legislative purpose that "guns capable of shooting more than 12 bullets at a time without reloading are particularly dangerous" and claims that "'[a] gun … capable of firing 13 or more rounds without reloading, may reasonably be considered a greater public threat than firearms of more limited capacity.'"  D.C. Motion, p. 31.

D.C. Motion, p. 31.  Together, the District asserts, an "assault weapon" and "high capacity" magazine are capable of "rapid and accurate spray firing."[15] D.C. Motion, p. 30.  The District ignores the fact that "assault weapons" do not have a faster rate of fire than other semi-automatic firearms.  All semi-automatic firearms fire only one round every time the trigger is pulled.

"High capacity" magazines serve critical, legitimate functions related to resisting invaders from abroad as well as potential tyrants at home.  Self-defense is often required in situations where the person defending himself is unable to use one of his arms (*e.g.*, being injured, or protecting a child) or is under attack by more than one person.  High capacity magazines allow the person to continue to defend himself despite being unable to perform a reload.  Additionally, changing magazines takes both time and coordination — usually the one operation requiring the most dexterity in the use of a firearm.  Under the stress of a self-defense encounter when it is most difficult to load fresh ammunition, a high capacity magazine may keep a gun available for self-defense, while a failed reload could result in accidentally dropping a spare magazine into a storm drain.

---

[15]    If the word "spray" is akin to "scattered, diffuse and non-localized," then it is unclear how one could have an "accurate spray" — but technical accuracy is not required if the goal is to evoke fear.

The District claims "high capacity" magazines have "no legitimate use." That is not true. Such magazines allow law-abiding citizens to defend themselves against multiple attackers. D.C. Motion, p. 31. While all firearms can be misused, criminals will always have access to weapons, and they will always disobey laws that prohibit their possession. In one situation, a criminal may end up being able to fire more shots without reloading, but in another situation, those few extra rounds will mean that a law-abiding citizen will be able to successfully defend his family. This concern clearly would have been important to the <u>Heller</u> Court, which stressed the need that newly-freed black citizens had for firearms after the Civil War to protect against mob violence. <u>Heller</u>, 128 S.Ct. at 2812, 2842.

## CONCLUSION

For the reasons stated herein, the decision of the district court should be reversed, and the challenged portions of the D.C. Code should be struck down as violating the Second Amendment of the U.S. Constitution.

Respectfully submitted,

_____

WILLIAM J. OLSON*
HERBERT W. TITUS
JOHN S. MILES

JEREMIAH L. MORGAN
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue West, Suite 4
  Vienna, Virginia  22180-5615
  (703) 356-5070

*Attorney of record

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

IT IS HEREBY CERTIFIED:

1.   That the foregoing Brief of Appellant complies with the type-volume limitation of Rule 32(a)(7)(B), Federal Rules of Appellate Procedure, because this brief contains 6,942 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 10.0.0.990 in 14-point CG Times.


_____
William J. Olson
Attorney for *Amici Curiae*

Dated: July 30, 2010

# CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Appellants and Reversal, was made, this 30th day of July 2010, by the Court's Case Management/Electronic Case Files system upon the following attorneys for the parties:

Stephen Porter Halbrook
Law Office of Stephen P. Halbrook
3925 Chain Bridge Road
Suite 403
Fairfax, VA 22030

and

Richard E. Gardiner
Law Office of Richard E. Gardiner
3925 Chain Bridge Road
Fairfax, VA 22030

**Attorneys for Appellants**

Todd Sunhwae Kim
Office of the Attorney General,
District of Columbia
Office of the Solicitor General
441 4th Street, NW
One Judiciary Square, Sixth Floor
Washington, DC 20001-2714

and

Donna M. Murasky
Office of the Attorney General,
District of Columbia
Office of the Solicitor General
441 4th Street, NW
One Judiciary Square, Sixth Floor
Washington, DC 20001-2714

**Attorneys for Appellees**

_____
William J. Olson
Attorney for *Amici Curiae*