IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

10-7036

**DICK ANTHONY HELLER, ABSALOM JORDAN,
WILLIAM CARTER, and MARK SNYDER**

Appellants

v.

**THE DISTRICT OF COLUMBIA and
ADRIAN M. FENTY, Mayor, District of Columbia**,

Appellees

**BRIEF FOR APPELLANTS**

Appeal from the U.S. District Court
for the District of Columbia
District Ct. Civil No. 1:08-cv-01289 (RMU)

Stephen P. Halbrook
Richard E. Gardiner
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276

## CERTIFICATE OF COUNSEL AS TO PARTIES, RULINGS, AND RELATED CASES

### Parties and Amici

The plaintiffs in the district court were Dick Anthony Heller, Absalom F. Jordan, Jr., William Carter, and Mark Snyder. The defendants in the district court were the District of Columbia and Mayor Adrian M. Fenty. In this court, Appellants are Dick Anthony Heller, Absalom F. Jordan, Jr., William Carter, and Mark Snyder. Appellees are the District of Columbia and Mayor Adrian M. Fenty.

There were no amici in the district court. Amici in this court include:

1. Gun Owners of America, Inc., Gun Owners Foundation, Virginia Citizens Defense League, Maryland Shall Issue, Inc., Gun Owners of California, Inc., Lincoln Institute for Research and Education, and Conservative Legal Defense and Education Fund.

2. Brady Center to Prevent Gun Violence and Legal Community Against Violence.

3. Professional Historians and Law Professors.

No other parties, and no intervenors or amici, have appeared in this court.

**Ruling Under Review**

The ruling under review by this court is the March 26, 2010, Order and Memorandum Opinion of District Court Judge Ricardo M. Urbina denying plaintiffs' motion for summary judgment and granting defendants' cross-motion for summary judgment. The ruling may be found at Joint Appendix ("JA") 149, 150, and has not been reported.

**Related Cases**

This case has not previously been before this court or any other court other than the court below. Counsel are unaware of any related cases currently pending in this court or any other court.

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

GLOSSARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xvii

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

CONSTITUTION, STATUTES, AND REGULATIONS. . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      Proceedings in the Court Below. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      A.  Registration, Expiration, and Re-Registration Provisions. . . . . . . . . . . 3

      B.  Prohibition of "Assault Weapons". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      C.  Prohibition of Magazines for Firearms. . . . . . . . . . . . . . . . . . . . . . . . . . 12

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

      I. STRICT SCRUTINY IS THE APPROPRIATE
        STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

          A. The Right is Fundamental and
            Requires Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     B. *Heller* Took a Categorical Approach and
        Rejected Reliance on Committee Reports
        and Empirical Studies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

     C. Plaintiffs Were Entitled to Summary Judgment. . . . . . . . . . . . . 27

II. THE REGISTRATION, EXPIRATION, AND
    RE-REGISTRATION REQUIREMENTS
    VIOLATE THE SECOND AMENDMENT. . . . . . . . . . . . . . . . . . . . . 29

     A. *Heller* Reaffirms *Miller*'s Premise that
        Second Amendment Protection Precludes Registration. . . . . . . 34

     B. A Person May Not Be Required to Register
        to Exercise a Core Constitutional Right. . . . . . . . . . . . . . . . . . . 36

     C.  Registration Is Not a Traditional Regulation. . . . . . . . . . . . . . . 39

     D.  Registration Has No Militia Purpose. . . . . . . . . . . . . . . . . . . . . 41

     E.  Fees May Not Be Charged to Exercise
        Constitutional Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

     F.  Rationing Pistol Acquisition to One Per Month. . . . . . . . . . . . 43

     G.  Fingerprints and Photographs. . . . . . . . . . . . . . . . . . . . . . . . . . 44

     H.  Ballistics Testing. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

III. THE PROHIBITIONS ON COMMONLY-POSSESSED
     FIREARMS MISNAMED "ASSAULT WEAPONS"
     AND MAGAZINES VIOLATE THE SECOND AMENDMENT. . . . 45

IV. THE RESTRICTIONS ARE NOT AUTHORIZED
     BY D.C. CODE § 1-303.43. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

A D D E N D U M

UNITED STATES CONSTITUTION

Second Amendment

DISTRICT OF COLUMBIA CODE

§ 1-303.

§ 7-2501.01

§ 7-2502.01

§ 7-2502.03

§ 7-2502.04

§ 7-2502.05

§ 7-2502.07

§ 7-2502.08

§ 22-4501

§ 22-4504

# TABLE OF AUTHORITIES[*]

**CASES**                                                                **Page**

*Berger v. Iron Workers Reinforced Rodmen*,
170 F.3d 1111 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Bramlett v. Litscher*,
No. 01-C-193-C, 2001 WL 34377271 (W.D. Wis. 2001). . . . . . . . . . . . . . . . . . 47

*Burdick v. Takushi*,
504 U.S. 428 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Christian Knights of the Ku Klux Klan Invisible Empire, Inc.*
*v. District of Columbia*, 919 F.2d 148 (D.C. Cir. 1990). . . . . . . . . . . . . . . . . . 54

*Christianson v. Colt Industries Operating Corp.*,
486 U.S. 800 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*City of Mobile, Ala. v. Bolden*,
446 U.S. 55 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Clark v. Jeter*,
486 U.S. 456 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Cox v. New Hampshire*,
312 U.S. 569 (1941). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Crawford v. Marion County Election Bd.*,
553 U.S. 181 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*District Intown Properties Ltd. Partnership*
*v. District of Columbia*, 198 F.3d 874 (D.C. Cir. 1999). . . . . . . . . . . . . . . . . . 18

---

[*]Authorities chiefly relied upon are marked with asterisks.

*District of Columbia* v. *Heller*,
128 S.Ct. 2783 (2008). . . . . . . . . . . . . . . . 3, 14, 15, 16, 17, 20, 21, 22, 23, 24, 26,
27, 28, 34, 35, 36, 39, 40, 41, 49, 51

*District of Columbia v. John R. Thompson Co., Inc.*,
346 U.S. 100 (1953). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Forsyth County v. Nationalist Movement*,
505 U.S. 123 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Foucha v. Louisiana*,
504 U.S. 71 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Green v. District of Columbia*,
710 F.2d 876 (D.C. Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Harmelin v. Michigan*,
501 U.S. 957 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Harper v. Virginia State Board of Elections*,
383 U.S. 663 (1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Hendricks v. Geithner*,
568 F.3d 1008 (D.C. Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Kennedy v. Louisiana*,
128 S.Ct. 2641 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*La Forest v. Board of Commissioners of the District of Columbia*,
92 F.2d 547 (D.C. Cir. 1937). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Lawrence v. Texas*,
539 U.S. 558 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Los Angeles v. Alameda Books, Inc.*,
535 U.S. 425 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*McConnell v. Federal Election Comm'n,*
540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*\*McDonald v. Chicago,*
No. 08-1521, 2010 WL 2555188 (U.S. June 28, 2010). . . . . . . . . . . 15, 20, 21, 22,
27, 51, 55

*McIntosh v. Washington,*
395 A.2d 744 (D.C. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Miller* v. *Johnson,*
515 U.S. 900 (1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Moore v. District of Columbia,*
12 App. D.C. 537(1898). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Murdock v. Com. of Pennsylvania,*
319 U.S. 105 (1943). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Near v. Minnesota,*
283 U.S. 697 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Parker v. District of Columbia,*
478 F.3d 370 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 41, 49, 50

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n,*
460 U.S. 37 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Republican Party of Minnesota v. White,*
536 U.S. 765 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Reynolds v. District of Columbia,*
614 A.2d 1285 (D.C. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Rinzler v. Carson,*
262 So. 2d 661  (Fla. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

*San Antonio Independent School District
v. Rodriguez*, 411 U.S. 1 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Silveira v. Lockyer,*
312 F.3d 1052 (9th Cir.),
*cert. denied*, 540 U.S. 1046 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Staples v. United States,*
511 U.S. 600 (1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 47, 54

*Stenberg v. Carhart,*
530 U.S. 914 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Thomas v. Collins,*
323 U.S. 516 (1945). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Thompson v. Western States Medical Center*,
535 U.S. 357 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Turner Broadcasting System, Inc. v. FCC*,
520 U.S. 180 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Ullman v. District of Columbia,*
21 App.D.C. 241 (1903). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*United States* v. *Emerson,*
270 F.3d 203 (5th Cir. 2001),
*cert. denied*, 536 U.S. 907 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 49

*United States v. Miller,*
307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 34, 35, 36, 49

*Valley Forge Christian College v.
Americans United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Washington v. Glucksberg*,
521 U.S. 702 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Watchtower Bible & Tract Society of New York, Inc.*
 *v. Village of Stratton*, 536 U.S. 150 (2002). . . . . . . . . . . . . . . . . . . . . . . . . 37

*Welsh v. United States*,
398 U.S. 333 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Zauderer v. Office of Disciplinary Counsel*
*of Supreme Court*,
471 U.S. 626 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## UNITED STATES CONSTITUTION

Second Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 3, 15, 18, 19, 20,
24, 29, 35, 36, 45, 51

Eighth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## UNITED STATES STATUTES

18 U.S.C. § 922(t). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

18 U.S.C. § 922(t)(1)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

18 U.S.C. § 922(t)(2)(C). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

18 U.S.C. § 926(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

26 U.S.C. § 5841(a)............................................... 36

26 U.S.C. § 5845(a)............................................... 36

36 U.S.C. § 40722................................................ 9

Brady Handgun Violence Prevention Act,
P.L. 103-159, 107 Stat. 1536 (1993).................................... 56

Firearms Owners' Protection Act,
P.L. 99-308, 100 Stat. 449 (1986)..................................... 56

First Militia Act, 1 Stat. 271 (1792)................................... 41

Freedmen's Bureau Act, 14 Stat. 173 (1866)............................ 55

Gun Control Act,
P.L. 90-618, 82 Stat. 1214 (1968)..................................... 56

NICS Improvement Amendments Act, Pub. L. No. 110-180,
121 Stat. 2559 (2008) (codified at 18 U.S.C. 922 note)..................... 32

Property Requisition Act, P.L. 274,
55 Stat., pt. 1 (1941)............................................... 55

Protection of Lawful Commerce in Arms Act,
P.L. 109-92, 119 Stat. 2095 (2005).................................... 56

## DISTRICT OF COLUMBIA CODE

D.C. Code § 1-303.43.................................. 2, 17, 53, 54, 57

D.C. Code § 7-2501.01............................................. 2

D.C. Code § 7-2501.01(3A)(A)....................................... 7

D.C. Code § 7-2501.01(3A)(A)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

D.C. Code § 7-2501.01(3A)(A)(i)(IV). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

D.C. Code § 7-2502.01. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.01(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

D.C. Code § 7-2502.02(a)(6).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

D.C. Code § 7-2502.03. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.03(a)(10).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.C. Code § 7-2502.03(a)(11).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.C. Code § 7-2502.03(a)(13)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.C. Code § 7-2502.03(b)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.C. Code § 7-2502.03(b)(8). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.C. Code § 7-2502.03(b)(11). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

D.C. Code § 7-2502.03(b)(13). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 37

D.C. Code § 7-2502.03(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2502.03(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2502.04. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.04(a)-(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2502.05. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.05(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

D.C. Code § 7-2502.07. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.07a(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2502.07a(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2502.07a(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2502.07a(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2502.07a(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2502.08. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 7-2502.08(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 33

D.C. Code § 7-2502.08(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D.C. Code § 7-2502.08(1)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

D.C. Code § 7-2502.08(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 37

D.C. Code § 7-2502.09(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

D.C. Code § 7-2506.01(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

D.C. Code § 7-2507.06. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 12

D.C. Code § 22-4501. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

D.C. Code § 22-4504. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Code of Laws for the District of Columbia* (1819). . . . . . . . . . . . . . . . . . . . . 42

Firearms Registration Amendment Act of 2008,
Act 17-708. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 53

**DISTRICT OF COLUMBIA  REGULATIONS**

D.C. Municipal Regulations § 24-2311.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**DISTRICT OF COLUMBIA LEGISLATIVE MATERIALS**

Council of the District of Columbia, Committee
on Public Safety & the Judiciary,
Report on Bill 17-843, the
"Firearms Control Amendment Act of 2008,"
Nov. 25, 2008,
www.dccouncil.washington.dc.us/
images/00001/20090513152155.pdf . . . . . . . . . . . . . . . 8, 9, 10, 11, 14, 30, 32, 40,
43, 44, 45, 47, 50, 51, 53

**STATE STATUTES**

Ca. Penal Code § 12020(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Ca. Penal Code § 12280. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Ca. Penal Code § 12285. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Ca. Penal Code § 11186. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Conn. Gen. Stat. § 53-202a(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Conn. Gen. Stat. § 53-202d . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Conn. Gen. Stat. § 53-202m. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Conn. Gen. Stat. § 53-202n . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Conn. Gen. Stat. § 53-202o . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Haw. Rev. Stat. §§ 134-2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Haw. Rev. Stat. § 134-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Haw. Rev. Stat. § 134-4(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Md. Code § 4-303. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Md. Code § 5-101(p). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Md. Code § 5-129 *et seq.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Md. Code Public Safety § 5-128(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

M.G.L., Ch. 140 § 121. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

M.G.L., Ch. 140 § 131. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

N.J. Rev. Stat. § 2C:39-1w. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

N.J.Rev. Stat. § 2C:58-12a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

N.J.Rev. Stat. § 2C:58-12b. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

N.Y. Consl. Laws § 265(22). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

N.Y. Consl. Laws § 265(22)(e)(v). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Va. Code § 18.2-308.2:2(P)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Bureau of Alcohol, Tobacco, Firearms & Explosives,
*State Laws & Published Ordinances - Firearms*,
ATF Pub. 5300.5 (revised 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 51

## FEDERAL RULES

Fed.R.Civ.P. 56(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 46

Fed.R.Civ.P. 56(e)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Fed.R.Civ.P. 56(e)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

LcvR 7(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

## ENGLISH STATUTES

13 & 14 Car. II c.3 (1662). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Printing Act, 14 Car. II, ch. 33 (1662). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## OTHER AUTHORITIES

Brief for the United States,
*United States v. Miller*, O.T. 1938, No. 696. . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Letitia W. Brown,
*Free Negroes in the District of Columbia, 1790-1846* (1972). . . . . . . . . . . . . . 42

http://www.fas.org/irp/agency/doj/fbi/is/ncic.htm . . . . . . . . . . . . . . . . . . . . . . 31

Harold E. Johnson, *Small Arms Identification & Operation
Guide – Eurasian Communist Countries*
(Defense Intelligence Agency 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

C. Koper, *An Updated Assessment of the
Federal Assault Weapons Ban*
(Report to National Institute of Justice, U.S. Dep't. of Justice 2004),
http://www.sas.upenn.edu/jerrylee/research/aw_final2004.pdf . . . . . . . . . . . . . 50

Joyce Malcolm, *Guns and Violence: The English Experience* (2002). . . . . . . . . . 39

Michael P. O'Shea, "The Right to Defensive Arms after
*District Of Columbia v. Heller*,"
111 W. Va. L. Rev. 349 (Winter 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Webster's New World Dictionary* (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 54

# GLOSSARY

| Term | Abbreviation |
|------|--------------|
| Civilian Marksmanship Program | CMP |
| Committee Report | Com. Rep. |
| Joint Appendix | JA |
| Local Rule | LcvR |
| Metropolitan Police Department | MPD |
| National Instant Criminal Background Check System | NICS |
| Statement of Genuine Issues | SGI |
| Statement of Undisputed Material Fact | UMF |

## JURISDICTIONAL STATEMENT

Jurisdiction in the district court was founded on 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, and under 28 U.S.C. § 1343(3) in that this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs and usages of the District of Columbia, of rights, privileges or immunities secured by the United States Constitution.  This action seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 1983.

This Court has jurisdiction under 28 U.S.C. § 1291.  The district court rendered final judgment in an Order granting summary judgment for the defendants and denying summary judgment for the plaintiffs on March 26, 2010.  JA 149.  Plaintiffs filed a timely notice of appeal on April 1, 2010.  JA 180.  The appeal is from a final order by the United States district court that disposes of all claims with respect to the parties.

## STATEMENT OF ISSUES

1) Whether strict scrutiny should be applied to determine the validity, under the Second Amendment to the United States Constitution, of the challenged provisions of the District's firearms laws.

2) Whether the challenged registration requirements violate the Second

Amendment.

3) Whether the prohibition on "assault weapons" violates the Second Amendment.

4) Whether the prohibition on "large capacity ammunition feeding devices" violates the Second Amendment.

5) Whether the challenged registration requirements and the prohibitions on "assault weapons" and "large capacity ammunition feeding devices" are authorized by D.C. Code § 1-303.43.

## CONSTITUTION, STATUTES, AND REGULATIONS

The following are in the Addendum: U.S. Const., Amend. II; D.C. Code §§ 1-303.43, 7-2501.01, 7-2502.01, 7-2502.03, 7-2502.04, 7-2502.05, 7-2502.07, 7-2502.08, 22-4501, and 22-4504.

## STATEMENT OF THE CASE

### Proceedings in the Court Below

This is an action for declaratory and injunctive relief to allow plaintiffs, who are law-abiding residents of the District of Columbia, to keep and bear arms under the Second Amendment without burdensome registration requirements and to possess ordinary firearms and magazines which the District prohibits. Second Amended Complaint, JA 9. Defendants include the District of Columbia and Adrian M. Fenty,

Mayor of the District of Columbia.

Count One of the Second Amended Complaint alleges that the District's firearm registration, expiration, and re-registration requirements, both singly and as a whole, infringe on the right of the people to keep and bear arms. JA 24. Count Two alleges that the District's prohibitions on firearms that it calls "assault weapons" and on magazines that hold over ten cartridges violate the Second Amendment. JA 26. Count Three alleges that these provisions are not "usual and reasonable police regulations" and are thus not authorized under D.C. Code § 1-303.43. JA 27.

Plaintiffs and defendants each filed motions for summary judgment. By Order dated March 26, 2010, the district court rendered summary judgment for defendants and denied summary judgment for plaintiffs. JA 149.

## STATEMENT OF FACTS

Following *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008), which invalidated the District's handgun prohibition, the District amended its ordinances on firearms. The Firearms Registration Amendment Act of 2008, Act 17-708, which became effective on April 1, 2009, made registration requirements for all firearms more onerous and banned numerous firearms and magazines.

### A. Registration, Expiration, and Re-Registration Provisions

D.C. Code § 7-2502.01(a) provides that "no person . . . shall possess or control

any firearm, unless the person . . . holds a valid registration certificate for the firearm." Violation is punishable by one year's imprisonment and a $1,000 fine, and by five years' imprisonment and a $5,000 fine for a second offense. § 7-2507.06.[1]

To register a firearm, the applicant must demonstrate knowledge of D.C. firearms laws, including the use and handling of firearms in accord with tests prescribed by the Metropolitan Police Department ("MPD"). § 7-2502.03(a)(10). The applicant must pass a written test with content "at the sole discretion" of the MPD. D.C. Municipal Regulations § 24-2311.3. The applicant must have "vision better than or equal to that required to obtain a valid driver's license . . . ." D.C. Code § 7-2502.03(a)(11). The applicant must complete a training course by a certified instructor with at least four hours of classroom instruction and one hour of firing at a range. § 7-2502.03(a)(13)(A). No public firing range exists in the District. JA 44 (Statement of Undisputed Material Fact ("UMF") 2). The applicant must disclose, *inter alia*, any business or occupation in which he/she has engaged during the previous five years, the intended use of the firearm, and "[s]uch other information as the Chief determines is necessary to carry out the provisions of this unit." § 7-2502.03(b)(13). The applicant must pay "a nonrefundable fee to be established by the Mayor . . . ." § 7-2502.05(b). The applicant must be fingerprinted, submit

---

[1] All citations are to the D.C. Code unless otherwise noted.

photographs, and appear in person with the firearm. § 7-2502.04(a)-(c). Pistols must be submitted "for a ballistics identification procedure," for which the Chief "shall establish a reasonable fee." § 7-2502.03(d). "The Chief shall register no more than one pistol per registrant during any 30-day period . . . ." § 7-2502.03(e).

Registration certificates expire every 3 years. § 7-2502.07a(a), (b). To renew, the applicant must submit a statement confirming possession of the firearm, address, and "continued compliance with all registration requirements . . . ." § 7-2502.07a(c). This duplicates information already in the original registration and in any notice of changed information filed pursuant to § 7-2502.08(1). The applicant "may be charged a reasonable fee" for the renewal. § 7-2502.07a(f). A new background check is required every 6 years. § 7-2502.07a(d).

Each registrant must have "in his possession, whenever in possession of a firearm, the registration certificate for such firearm, and exhibit the same upon the demand" of an MPD member. § 7-2502.08(3). A registrant must also must have the registration papers in his possession whenever in possession of the firearm and must notify the MPD in writing of the "[l]oss, theft, or destruction *of the registration certificate* … (including the circumstances, if known) *immediately* upon discovery of such loss theft or destruction." D.C. Code § 7-2502.08(1)(A) and (3) (emphasis added). In addition, a registrant must notify the MPD anytime he/she changes jobs,

5

changes his intended use of the firearm, changes where in the home the firearm will generally be kept, or has a change of such other information as the Chief of Police specifies. *D.C. Code § 7-2502.08(1)(B).*

"In addition to any other criminal or civil sanctions that may be imposed," a registrant is subject to the following for any "violation or omission of the duties . . . imposed by [§ 7-2502.08]": (1) for the first instance, a fine of $100; (2) for the second, a fine of $500, revocation of the registration, and prohibition of possessing a firearm for five years; and (3) for the third, a fine of $500, revocation of the registration, and a permanent prohibition on possessing any firearm. § 7-2502.09(b).

Thus, a registrant may be prohibited from firearm possession for failure to notify the Chief of a change, *e.g.*, in her occupation or the location the firearm is stored in the home. If a registration expires and is inadvertently not renewed, possession of an unregistered firearm is punishable by one year's imprisonment. § 7-2507.06.

Plaintiff Mark Snyder wished to purchase a .22 caliber bolt action target rifle. JA 44 (UMF 3). On January 20, 2009, he was advised of the registration requirements by the MPD. *Id.* (UMF 4). He ordered the rifle from a dealer. He received the registration paperwork from the MPD, filled it out and sent it to the dealer, who returned it. JA 44-45 (UMF 5). He located a certified instructor, paid

$125, and took the D.C.-approved course consisting of five hours of *handgun* training. JA 45. At the MPD, he took the required written test, submitted fingerprints, completed the mental health form, and paid the fees. *Id.* On February 25, he called the MPD to learn that his registration was approved and picked up the registration papers. *Id.* (UMF 6). Finally, he returned to the dealer, which conducted a check on him under the National Instant Background Check System (NICS), 18 U.S.C. § 922(t), and then transferred the .22 rifle to him. *Id.* (UMF 7).

The other plaintiffs underwent similar procedures. Plaintiff Jordan registered a pistol, but was unable at the same time to register two other pistols which he stores outside the District due to the prohibition on registering more than one handgun per 30 days. JA 45-46 (UMF 8-9).

## B. Prohibition of "Assault Weapons"

The Act prohibits possession of rifles, shotguns, and pistols defined as "assault weapons." "A registration certificate shall not be issued for a: . . . (6) An assault weapon . . . ." D.C. Code § 7-2502.02(a)(6).

"Assault weapon" is defined to include firearms of some 75 specified makes and models, or having certain generic features. § 7-2501.01(3A)(A). The list begins with: "(I) All of the following specified rifles," following which are named models such as "Colt AR-15 series" and "Armalite AR-180." The term also includes: "(VIII)

All other models within a series that are variations, with minor differences, of those models listed . . . regardless of the manufacturer . . . ."

The term "Colt AR-15 series" refers to variations made by Colt, and "AR-15" is commonly also used to describe similar rifles made by other manufacturers. JA 46 (UMF 10). AR-15 rifles are semiautomatic, meaning that they fire only once when the trigger is pulled. *Id.* They accept detachable magazines, standard capacities of which hold 20 or 30 rounds of ammunition, but magazines of other capacities are also available. *Id.* They also have a pistol grip typically 3¾ to 4 inches in length that protrudes at a rearward angle beneath the action of the rifle. *Id.* (UMF 11). Since being introduced in 1963, roughly two million AR-15 type rifles have been manufactured. *Id.* (UMF 12). AR-15s accounted for 14.4 percent of rifles made in the U.S. for the domestic market in 2007. *Id.* (UMF 13). A projected 2,145,162 AR-15 type rifles will have been produced (and not exported) from 1986 through 2009. JA 46 (UMF 14).

In the court below, the District presented no evidence but relied on the unsupported allegation in a committee report that such firearms "are a minute fraction of the firearms available" and "have never been in common use." Council of the District of Columbia, Committee on Public Safety & the Judiciary, Report on Bill 17-843, the "Firearms Control Amendment Act of 2008," Nov. 25, 2008, at 8 (hereafter

"Committee Report" or "Com. Rep.").[2]

Plaintiff Heller applied to register an AR-15 type rifle (a Bushmaster XM-15-E2S), "For use in the Civilian Marksmanship Program [CMP]."[3] JA 46. The MPD found it to be an "assault weapon" and denied the application. *Id.* (UMF 15). AR-15 rifles are widely used in the CMP, and were used exclusively in a clinic taken by Heller in which a number of Junior shooters also participated. JA 46, 129-130 (UMF 16; Statement of Genuine Issues ("SGI") ¶ 9-10).

Plaintiff Jordan applied to register an Armalite AR-180 .223 caliber rifle to be used for "personal protection." JA 47. The MPD found it to be an "assault weapon" and denied the application. *Id.* (UMF 17). Similar to the AR-15, rifles of this type are commonly possessed for protection, target shooting, competitions, and sporting purposes. *Id.* (UMF 18).

D.C. Code § 7-2501.01(3A)(A)(i)(IV) further defines "assault weapon" as: "A semiautomatic, [sic] rifle that has the capacity to accept a detachable magazine" with

---

[2]  The District did not put the report into evidence and simply cited to http://www.dccouncil.washington.dc.us/images/00001/20090513152155.pdf (as of July 22, 2009).

[3]  The CMP functions, as provided by 36 U.S.C. § 40722:

(1) to instruct citizens of the United States in marksmanship;
(2) to promote practice and safety in the use of firearms; [and]
(3) to conduct competitions in the use of firearms . . . .

any one of various features, including "(aa) A pistol grip that protrudes conspicuously beneath the action of the weapon; . . . (cc) A folding or telescoping stock . . . ."

Plaintiff Carter applied to register an AR-15 type rifle (LMT Defender 2000) which had a protruding pistol grip and telescoping stock, to be used for "recreational activity, NRA range." JA 47. The MPD found it to be an "assault weapon" and denied the application. *Id.* (UMF 19). A protruding pistol grip allows the rifle to be accurately shot from the shoulder without excessive muzzle rise.[4] JA 47. In his Marine Corps training, Carter was instructed to fire the M16 (which has a similar pistol grip) only from the shoulder and was never trained to fire it from the hip. *Id.* (UMF 20). Numerous persons possess such rifles in the U.S. for target shooting and other lawful purposes. *Id.* (UMF 21). Most AR-15 rifles have fixed stocks, but some have a telescoping stock which allows adjustment to the person's physique. JA 48 (UMF 24).

The District relied on the committee report's claim as follows: "Pistol grips help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position." Com. Rep. at 7. Plaintiffs' expert evidence was that such grips allow the rifle to be fired accurately from the shoulder and are *not* designed to allow

---

[4] Protruding pistol grips are also used on single-shot Olympic air rifles. JA 47 (UMF 22).

the shooter to spray-fire from the hip.  JA 129 (SGI 7).

The ArmaLite AR-180 rifle and AR-15 variants are commonly possessed for sport and security, including personal protection in the home.  JA 48 (UMF 26).  The accuracy and light recoil of these rifles make them useful for hunting small and medium-sized game.  JA 49 (UMF 28).  For personal protection by police and private owners, a rifle provides better accuracy than a handgun, and the small caliber round of these rifles tends to break up rather than penetrate walls.  *Id.*  (UMF 29).

D.C. Code § 7-2501.01(3A)(A)(iii) also defines "assault weapon" as: *"Any firearm that the Chief may designate* as an assault weapon by rule, based on a determination that the firearm would reasonably pose the same or similar danger to the health, safety, and security of the residents of the District as those weapons enumerated in this paragraph." (emphasis added).  No objective feature is specified.

The Committee Report alleged, without any documentation, that "assault weapons" are "made for offensive military use," allow "rapid and accurate spray firing," "are not designed for sport, but to kill people quickly and efficiently," "are preferred by terrorists," and "have no legitimate use as self-defense weapons . . . ."  Comm. Rep. 7-8.  Plaintiffs presented expert evidence that military forces throughout the world use real "assault rifles," which are selective fire.  Selective fire means the capability to fire both fully automatic (continues to fire as long as the trigger is

pulled), as well as semiautomatic (fires only once per trigger pull). JA 128, 129 (SGI 1, 4).[5] Semiautomatic rifles, including all of those designated as "assault weapons," are not designed for offensive military use, are not used as service rifles by any military force in the world, do not allow rapid and spray firing, and are not preferred by irregular forces or terrorists. JA 129 (SGI 5). Semiautomatic rifles are widely used for target shooting, competitions, hunting, and self defense. *Id.* (SGI 6).

## C. Prohibition of Magazines for Firearms

D.C. Code § 7-2506.01(b) prohibits possession of any "large capacity ammunition feeding device," which includes any magazine or other device that "has a capacity of . . . more than 10 rounds of ammunition." Violation is punishable by a $1,000 fine and one year in prison. § 7-2507.06.

Plaintiff Heller applied to register a Sig Sauer P226 9mm pistol with a magazine capacity of 15 rounds of ammunition for "self-defense in the home."[6] JA 52. The MPD disapproved the application because the magazine exceeded the ten

---

[5] "Assault rifles are short, compact, selective-fire weapons . . . . Assault rifles . . . are capable of delivering effective full automatic fire . . . ." Harold E. Johnson, *Small Arms Identification & Operation Guide – Eurasian Communist Countries* (Defense Intelligence Agency 1980), p. 51. JA 128-129 (SGI 3).

[6] Heller is a Special Police Officer in the District, which licensed him to carry a pistol. He has provided security for judges at the Thurgood Marshall Federal Judicial Center and for federal officials at other buildings in the District. JA 50 (UMF 33).

round limit. *Id.* (UMF 42). Plaintiff Jordan's Model 59 S&W pistol was originally sold with a magazine holding 14 rounds. JA 49. As a result of the ban, he must store it outside the District. *Id.* (UMF 30).

Magazines holding more than 10 rounds are commonly sold with numerous makes and models of pistols and rifles, and are commonly possessed for self defense, target shooting, hunting, and sporting purposes. JA 49, 50 (UMF 30, 32). Millions of such magazines are available in the commercial market and are in common use for self protection, target shooting, competitions, and other sporting purposes. JA 50 (UMF 34).

Of the 1.5 million handguns made in the U.S. and not exported in 2007, 77 percent were semiautomatic pistols. JA 50 (UMF 35). Standard magazines for such pistols hold up to 17 rounds of ammunition. *Id.* In 2007, about 2/3 of the pistols made and not exported were in calibers typically using magazines that hold over 10 rounds. *Id.* (UMF 36).

More than six million M1 Carbine rifles have been made since the 1940s, standard magazines for which hold 15 or 30 rounds. *Id.* There are roughly two million AR-15 type rifles, which are typically sold with magazines holding 20 or 30 rounds. *Id.* More than 800,000 Ruger Mini-14 rifles have been produced, many of which have magazines holding 20 or 30 rounds. *Id.* Numerous other rifles are

commonly equipped with magazines holding more than 10 rounds. *Id.* (UMF 37).

As of 1994, an estimated 25 million firearms, amounting to 18 percent of civilian-

owned firearms, had magazines holding over ten rounds. *Id.* (UMF 39). That same

year, an estimated 40 percent of the semiautomatic handgun models and a majority

of the semiautomatic rifle models manufactured were sold with, or had a variation

that was sold with, a magazine holding over 10 rounds. *Id.* (UMF 40).

The usefulness of magazines holding more than 10 rounds for lawful defense

of self and others is demonstrated by the fact that they are issued to the police. JA 51-

52. In 1989, the MPD adopted the Glock 17 as its service pistol, magazines for which

hold 17 rounds, and later adopted the Glock 19, magazines for which hold 15 rounds.

JA 52 (UMF 41). The Committee conceded that "semiautomatic pistols are a

common and popular weapon," and "heard testimony that magazine capacity of up

to 20 rounds is not uncommon and 'reasonable.'" Com. Rep. at 9.

## SUMMARY OF ARGUMENT

*Heller*, *supra*, held that the Second Amendment guarantees the individual right

to keep and bear arms and invalidated the District's prohibition on possession of

handguns. The District responded by making it more difficult for citizens to possess

any firearm by enactment of a more burdensome registration scheme, and by

prohibiting possession of firearms it calls "assault weapons" and of magazines

holding more than ten rounds. The issues are whether these provisions violate the Second Amendment and whether they are "usual and reasonable" regulations authorized by D.C. Code § 1-303.43.

The Second Amendment recognizes a fundamental right to keep and bear arms,[7] restrictions on which are subject to strict scrutiny. *Heller* rejected review based on rational basis and interest-balancing. Without any reference to the District's committee report and crime data, *Heller* held as a categorical matter that handguns are constitutionally protected.

In support of their motion for summary judgment, plaintiffs submitted undisputed factual evidence demonstrating that the banned firearms are in common use and that the registration requirements are burdensome and highly unusual. The District offered no evidence and relied on assertions in the committee report. The court below uncritically and erroneously accepted that report as dispositive, warranting summary judgment.

The District's registration, expiration, and re-registration requirements infringe on Second Amendment rights. Neither the United States nor any State imposes such burdensome requirements merely to possess a firearm. The National Instant Criminal

---

[7] Any doubt that *Heller* so held was resolved in *McDonald v. Chicago*, No. 08-1521, 2010 WL 2555188 (U.S. June 28, 2010).

Background Check System (NICS) ensures that persons may exercise their right to keep and bear arms without a registration system, while screening out potentially dangerous persons.

*United States v. Miller*, 307 U.S. 174, 178 (1939), as discussed in *Heller*, posed the question of whether a firearm can be required to be registered by asking whether it is a commonly-possessed, and hence constitutionally-protected, arm. There would have been no point to the discussion if registration did not violate the Second Amendment.

Just as one may not be required to register to exercise the rights to freedom of religion and speech, a person may not be required to register merely to possess a firearm in his or her home. *Heller* did not question "longstanding prohibitions on the possession of firearms by felons and the mentally ill." 128 S.Ct. at 2816-17. But registration is not a traditional regulation for mere possession of ordinary firearms in the United States. No State requires registration of all firearms, except Hawaii, and even there registrations do not expire. Traditional militia laws provided for inspection of the arms carried by militiamen, but not for registration of all arms by all persons.

Nor may fees be charged to exercise fundamental constitutional rights. The further requirements of fingerprints and photographs, written tests, vision tests,

training courses, and ballistics tests are inconsistent with the ability freely to exercise a constitutional right.

The District prohibits commonly-possessed firearms which it maligns as "assault weapons" and magazines which hold more than 10 rounds. Millions of these firearms and magazines are possessed for lawful purposes.

*Staples v. United States*, 511 U.S. 600, 603, 610 (1994), distinguished the "civilian" semiautomatic AR-15 rifle from the "military" M-16 rifle which fires fully automatic. The former is part of "a long tradition of widespread lawful gun ownership" while the latter is subject to strict regulation. *Id*. *Heller* held that the Second Amendment protects arms "typically possessed by law-abiding citizens for lawful purposes," in contrast to arms such as the M-16 "that are highly unusual in society at large." 128 S.Ct. at 2815-16. AR-15 rifles and magazines holding more than ten cartridges meet *Heller*'s common-use test for Second Amendment protection.

An expired federal law banned a short list of "semiautomatic assault weapon[s]," but only if made after 1994. Four states regulate "assault weapons," but do not define them so broadly and do not ban them entirely as does the District.

Finally, Congress authorized the District to make only "usual and reasonable police regulations . . . for the regulation of firearms," D.C. Code § 1-303.43. The provisions at issue are not "usual" as they do not exist in the laws of the United States

and are non-existent or extremely unusual in the laws of the States.  Registration of ordinary firearms is prohibited at the federal level and is required in only one state.  Only a tiny handful of states regulate "assault weapons" and magazines at all.

Nor are the provisions "reasonable" by any standard Congress had in mind.  Historically, Congress has declared the right to keep and bear arms to be a civil right, declared against any intent to discourage private ownership of firearms, and protected the availability of firearms to consumers.  Federal statutes forbid records generated by federal firearms laws from being transferred to federal, State, or local facilities and prohibit any system of firearms and firearm owners.

Accordingly, in addition to being violative of the Second Amendment, the provisions at issue are not authorized by Congress.

## ARGUMENT

### Standard of Review

As the issues here are questions of law, this Court conducts a *de novo* review.  *Berger v. Iron Workers Reinforced Rodmen*, 170 F.3d 1111, 1125 (D.C. Cir. 1999).  Further, "this court reviews a grant of summary judgment *de novo*. . . . In deciding whether there is a genuine issue of material fact, the court must assume the truth of all statements proffered by the non-movant . . . ."  *District Intown Properties Ltd. Partnership v. District of Columbia*, 198 F.3d 874, 878 (D.C. Cir. 1999).

# I.  STRICT SCRUTINY IS THE APPROPRIATE STANDARD OF REVIEW

## A.  The Right is Fundamental and Requires Strict Scrutiny

The Second Amendment recognizes an explicitly-protected, fundamental right, restrictions on which are subject to strict scrutiny.  A right is "fundamental" if it is "explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 17, 33 (1973).  "[C]lassifications affecting fundamental rights . . . are given the most exacting scrutiny."  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("strict scrutiny [is] applied when government action impinges upon a fundamental right protected by the Constitution").[8]  "Under the strict-scrutiny test," the government has the burden to

---

[8]  *See also Zauderer v. Office of Disciplinary Counsel of Supreme Court*, 471 U.S. 626, 651 n.14 (1985) ("governments are entitled to attack problems piecemeal, save where their policies implicate rights so fundamental that strict scrutiny must be applied"); *Lawrence v. Texas*, 539 U.S. 558, 586 (2003) (Scalia, J., dissenting) (noting that "the standard of review that [is] appropriate" for "a fundamental right" is "strict scrutiny"); *Washington v. Glucksberg*, 521 U.S. 702, 766-67 (1997) (Souter, J., concurring in judgment) (citing *Poe v. Ullman*, 367 U.S. 497, 548 (1961) (Harlan, J., dissenting) for proposition that "an 'enactment involving . . . a most fundamental aspect of liberty . . . [is] subject to strict scrutiny'"); and *Foucha v. Louisiana*, 504 U.S. 71, 115 (1992) (Thomas, J., dissenting) ("Certain substantive rights we have recognized as 'fundamental'; legislation trenching upon these is subjected to 'strict scrutiny,' and generally will be invalidated unless the State demonstrates a compelling interest and narrow tailoring.").

prove that a restriction "is (1) narrowly tailored, to serve (2) a compelling state interest." *Republican Party of Minnesota v. White*, 536 U.S. 765, 774-75 (2002).

Blackstone "cited the arms provision of the [English] Bill of Rights as one of the fundamental rights of Englishmen." *Heller*, 128 S.Ct. at 2798. "By the time of the founding, the right to have arms had become fundamental for English subjects." *Id*. The district court dismissed these statements as "the *Heller* majority's oblique references to the gun ownership rights of eighteenth-century English subjects," adding that "[i]f the Supreme Court had wanted to declare the Second Amendment right a fundamental right, it would have done so explicitly." JA 161.

*McDonald*, *supra*, said so explicitly several times in holding that the Second Amendment right is incorporated through the Due Process Clause of the Fourteenth Amendment because "the right to keep and bear arms is fundamental to *our* scheme of ordered liberty," and is "deeply rooted in this Nation's history and tradition . . . ." 2010 WL 2555188, *16.

Blackstone's view that the arms right was fundamental was "shared by the American colonists." *Id*. at *16-17. "The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights." *Id*. at *17. Its inclusion in the Bill of Rights "is surely powerful evidence that the right was regarded as fundamental in the sense relevant here." *Id*.

The efforts of the Reconstruction Congress, *McDonald* continued, "to safeguard the right to keep and bear arms demonstrate that the right was still recognized to be fundamental." *Id*. at *19. "[T]he Framers and ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *Id*. at *20.[9]

Finding that there is"a 'popular consensus' that the right is fundamental," *id*. at *26, *McDonald* concluded that the Second Amendment is "a provision of the Bill of Rights that protects a right that is fundamental from an American perspective" and thus "applies equally to the Federal Government and the States." *Id*. at *28.

*McDonald* rejected the view "that the Second Amendment should be singled out for special – and specially unfavorable – treatment." *Id*. at *21. It refused "to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees . . . ."[10] *Id*. at *22.

As *Heller* stated, "the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." 128 S.Ct. at 2797. This precludes use

---

[9] *See also id.* at 20 ("The right to keep and bear arms was considered no less fundamental by those who drafted and ratified the Bill of Rights.").

[10] No constitutional right is "less 'fundamental' than" others, and "we know of no principled basis on which to create a hierarchy of constitutional values . . . ." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982).

of the rational-basis standard of review:

> Obviously, the same test could not be used to evaluate the extent to which a legislature may regulate a specific, enumerated right, be it the freedom of speech, the guarantee against double jeopardy, the right to counsel, or the right to keep and bear arms. See *United States v. Carolene Products Co.,* 304 U.S. 144, 152, n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) ("There may be narrower scope for operation of the presumption of constitutionality [*i.e.,* narrower than that provided by rational-basis review] when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten amendments . . .").

*Id*. at 2818 n.27.

*McDonald* rejected the power "to allow state and local governments to enact any gun control law that they deem to be reasonable . . . " 2010 WL 2555188, at *23. The district court here also rightly rejected a "reasonableness" test as it "subjects firearms laws to only a marginally more heightened form of review than rational-basis review."[11] JA 160. Under the "reasonableness" test, a law would be upheld "so long as the legislature had 'articulated proper reasons for acting, with meaningful supporting evidence,' and the measure did 'not interfere with the 'core right' the Second Amendment protects . . . ." JA 159. However, the district court applied that very test under the rubric of "intermediate scrutiny."

*Heller* rejected Justice Breyer's "judge-empowering 'interest-balancing

---

[11] The term "reasonable" is a synonym of "rational." *Webster's New World Dictionary* (3rd College Ed. 1991), 1118.

inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Id*. at 2821. Such a test would allow "arguments for and against gun control" and the upholding of a handgun ban "because handgun violence is a problem . . . ." *Id*. Justice Breyer's dissent relied on cases such as *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180 (1997), and *Thompson v. Western States Medical Center*, 535 U.S. 357 (2002), which are undeniably intermediate scrutiny cases. *See Heller*, 128 S. Ct. at 2852 (Breyer, J., dissenting). Even more revealingly, Justice Breyer invoked *Burdick v. Takushi*, 504 U.S. 428 (1992). *See Heller*, 128 S. Ct. at 2852 (Breyer, J., dissenting). That is the case on which the United States principally relied in advocating that the Court adopt intermediate scrutiny. *See* Brief of United States at 8, 24, 28, *Heller*, 128 S. Ct. 2783. Thus, Justice Breyer's interest-balancing test is nothing other than intermediate scrutiny, and the Court's rejection of that approach in *Heller* forecloses this Court from adopting intermediate scrutiny in Second Amendment cases.

*Heller* explained:

> Like the First, it [the Second Amendment] is the very *product* of an interest-balancing by the people . . . . And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

*Id.*

The district court agreed with Justice Breyer's suggestion that the *Heller* majority "implicitly" rejected strict scrutiny based on *dictum* about "presumptively lawful" restrictions on possession by felons and the mentally ill, possession in sensitive locales, and commercial sales. JA 162 (citing *Heller*, 128 S.Ct. at 2851 (Breyer, J., dissenting)). Yet a compelling state interest for narrowly tailored restrictions of these types may be easily articulated.[12] Not so with the District's draconian prohibitions focused against law-abiding citizens, requiring them to register to exercise Second Amendment rights and banning them from mere possession of common firearms.

Recognition of the right still allows "limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms . . . ." *United States* v. *Emerson*, 270 F.3d 203, 261 (5th Cir. 2001) (upholding prohibition of firearm by person subject to domestic violence restraining order), *cert.*

---

[12] Strict scrutiny in the First Amendment context, after all, is not foreclosed by the recognition that there are reasonable limits on the scope of the right. *See Heller* at 2821 ("The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed views. The Second Amendment is no different.").

*denied*, 536 U.S. 907 (2002).

 *Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), which *Heller* affirmed, stated: "The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment." *Id*., citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). However, such restrictions must not "impair the core conduct upon which the right was premised." *Parker*, 478 F.3d at 399. Similarly, restrictions on core First Amendment rights must pass strict scrutiny and, even where exercised in a public forum with public impact (where reasonable time, place, or manner restrictions may apply), the restrictions must be "narrowly tailored to serve a significant governmental interest . . . ." *Ward*, 491 U.S. at 791.

## B. *Heller* Took a Categorical Approach and Rejected Reliance on Committee Reports and Empirical Studies

Plaintiffs produced uncontradicted evidence about the common use of the firearms banned by the District and the unusual character of the District's registration requirements. The District offered no evidence and rested its entire case on the allegations in a committee report. The district court asked "whether the provision at issue implicates the core Second Amendment right," and if so, applied "intermediate scrutiny" "to determine whether the measure is substantially related to an important

governmental interest." JA 163. The district court approved all of the restrictions based on the committee report and disregarded plaintiffs' evidence.

In *Heller*, the District sought to rely on a similar committee report as well as empirical studies to justify its restrictions. Without *any* consideration or even mention of the committee report or studies, the *Heller* Court took the following categorical approach:

> The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," . . . would fail constitutional muster.

*Heller*, 128 S.Ct. at 2817-18.

Justice Breyer, whose "interest-balancing inquiry" the majority rejected, *id*. at 2821, relied on the committee report proposing the handgun ban in 1976 which, like the report on which the District now relies, was filled with allegations denouncing the type of firearm it sought to ban. *Id*. at 2854-55 (Breyer, J., dissenting). The dissent also cited empirical studies about the alleged role of handguns in crime, injuries, and death, rejecting contrary studies questioning the effectiveness of the ban and focusing on lawful uses of handguns. *Id*. at 2855-61.

*Heller* rejected the dissent's conclusions based on the committee report and empirical studies, remarking:

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government – even the Third Branch of Government – the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.

*Id*. at 2821.

Similarly, *McDonald* barely mentioned Chicago's legislative finding and accorded it no discussion. 2010 WL 2555188, at *7 (quoting Journal of Proceedings of the City Council stating that handgun ban was enacted to protect residents from injury or death from firearms). Instead, *McDonald* upheld the right of residents to enhance their safety by having arms for their defense, noting that "the Second Amendment right protects the rights of minorities and other residents of high-crime areas whose needs are not being met by elected public officials." *Id.* at *27.

This case is in the same posture as *Heller*, and should be resolved in the same manner by ordering that summary judgment be rendered for plaintiffs. See *Heller*, 128 S.Ct. at 2819, 2821-22.

## C.  Plaintiffs Were Entitled to Summary Judgment

In support of their motion for summary judgment, plaintiffs submitted

uncontradicted evidence demonstrating that the firearms banned by the District are in common use and that the District's registration requirements are most unusual. The court below made no reference to this evidence. The District relied solely on the unsupported allegations in the committee report, which it did not even introduce into evidence. The court below uncritically accepted this as fact warranting summary judgment. Under any standard of review, this approach was incorrect.

Summary judgment is appropriate if the pleadings and evidence in the record "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." F.R.Civ.P. 56(c). "Material facts are those that might affect the outcome of the suit under governing law; genuine issues are those in which the evidence before the court is such that a reasonable trier of fact could find for the moving party." *Hendricks v. Geithner*, 568 F.3d 1008, 1012 (D.C. Cir. 2009).

LcvR 7(h) provides that an opposition to a motion for summary judgment must include a statement of genuine issues with "all material facts as to which it is contended there exists a genuine issue," including "references to the parts of the record relied on." Defendants' Statement of Material Facts contained *no* facts and made *no* references to the record. Instead, it consisted solely of references to *Heller*, the legislation leading to the Act, and the committee report.

LcvR 7(h) further provides: "In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." The District failed to controvert any of the facts in Plaintiffs' Statement of Undisputed Facts, and thus admitted them. Defendants' Opposition to Plaintiffs' Statement of Undisputed Material Facts included only two types of responses: "the District does not dispute" the fact, or "the District objects to" the fact, without denying it. JA 143-47.

The lower court accepted as true every unsworn, unsupported allegation made in the committee report and disregarded the specific, sworn testimony presented by plaintiffs, including six declarations under oath, that refuted the committee report's allegations. It was error to grant summary judgment to the District and to deny it to plaintiffs.

## II. THE REGISTRATION, EXPIRATION, AND RE-REGISTRATION REQUIREMENTS VIOLATE THE SECOND AMENDMENT

The District's registration, expiration, and re-registration requirements, individually and collectively, infringe on plaintiffs' Second Amendment rights.

The district court conceded: "Because no individual may possess an unregistered firearm in the District, the registration requirements plainly implicate the

core Second Amendment right . . . ." JA 167. The district court quoted the reasons given for the registration requirements in the Committee Report as follows:

> give[] law enforcement essential information about firearm ownership, allow [] officers to determine in advance whether individuals involved in a call may have firearms, facilitate[] the return of lost or stolen firearms to their rightful owners, assist[] law enforcement in determining whether registered owners are eligible to possess firearms or have fallen into a prohibited class, permit[] officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permit[] officers to seize unregistered weapons.[13]

JA 167 (citing Committee Report at 3-4).

The district court concluded that "these goals constitute an important governmental interest." JA 167. However, because the right to keep arms is fundamental, the government's interest must be compelling, not merely important, and the law must be narrowly tailored to achieve that compelling interest. Moreover, the government bears the burden of proof to show that the interests are compelling and that the law is narrowly tailored. *Miller* v. *Johnson*, 515 U.S. 900, 920 (1995). None of the above purported interests are compelling or narrowly tailored.

A) "[G]iv[ing] law enforcement essential information about firearm ownership." The Report fails to suggest why all the information required by the

---

[13] The above list of reasons for registration was first suggested in testimony by Juliet A. Leftwich, Legal Community Against Violence, at 2, appended to the Committee Report. The Committee copied them almost verbatim. The District submitted no evidence that it actually implements these purposes.

registration law (*e.g.*, occupation) is "essential."  Moreover, the government has no

legitimate interest in having information about a person's  exercise of a fundamental

right merely for the sake of having the information.

B) "[A]llow[] officers to determine in advance whether individuals involved

in a call may have firearms."  This is not compelling because police officers are

certainly trained to assume that a firearm may be present when responding to *any* call.

Further, the registration law is not narrowly tailored because this interest could be

achieved by simply requiring a person to report being a firearm owner without

registering every firearm, not to mention that a law-abiding person is unlikely to be

involved in a "call."

C) "[F]acilitate[] the return of lost or stolen firearms to their rightful owners."

This is not compelling as the FBI maintains a database of lost/stolen firearms in the

National Crime Information Center.[14]  Moreover, the registration law is not narrowly

tailored because the interest could be achieved by the mechanism established in Code

§ 7-2502.08, which requires reporting of the loss or theft of a firearm.

D) "[A]ssist[] law enforcement in determining whether registered owners are

eligible to possess firearms or have fallen into a prohibited class."  This interest is not

---

[14]  "Categories of records in the system: . . . D. Stolen Gun File: 1. Stolen guns. 2. Recovered guns, when ownership of which has not been established." http://www.fas.org/irp/agency/doj/fbi/is/ncic.htm (visited July 8, 2010).

compelling as all persons who purchase a firearm from a federally-licensed dealer are screened by the National Instant Criminal Background Check System (NICS), 18 U.S.C. § 922(t), which accesses records of criminal convictions, mental disabilities, and other prohibited categories. The FBI conducts NICS checks without charging a fee.[15] The NICS system ensures that persons may exercise their right to keep and bear arms without a registration system, while screening out potentially dangerous persons. Indefinite police monitoring of persons who have shown that they are lawfully exercising a constitutional right is not warranted based on speculation that they one day might "fall[] into a prohibited class." Moreover, the registration law is not narrowly tailored because the asserted interest could be achieved by simply requiring a person to report being a firearm owner without registering every firearm.

E) "[P]ermit[] officers to charge individuals with a crime if an individual is in possession of an unregistered firearm." This is not a compelling interest because, while it allows police to arrest persons suspected of other crimes for which insufficient evidence exists,[16] it broadly encompasses all persons, including those not

---

[15] NICS Improvement Amendments Act, Pub. L. No. 110-180, § 103(f), 121 Stat. 2559, 2568 (2008) (codified at 18 U.S.C. 922 note).

[16] See Committee Report 4 ("police suspect gang activity, obtain a warrant, search a house, but find only unregistered firearms. Because of registration, the police can make an arrest.").

suspected of anything.  Making exercise of a constitutional right a crime indeed permits officers to bring charges, but debases a fundamental right.

F) "[P]ermit[] officers to seize unregistered weapons." This is not a compelling interest because exercise of a fundamental constitutional right may not be made a crime merely so that property may be seized more easily.

In addition to the above interests not being either compelling or the law not being narrowly tailored, nothing further in the legislative history shows a nexus between those interests and the registration provisions.[17]  The District has thus not met its burden of showing that there is a compelling interest in its registration law, or that it is narrowly tailored.

The district court accepted the Committee's assertion that the expiration of registrations in three years and the re-registration requirement are necessary to "track where firearms are located and allow MPD to have a better sense of whether a registered gun owner has become ineligible to own a firearm . . . ."  JA 169; Com. Rept. 4.  This is not a compelling interest because D.C. Code § 7-2502.08(1) requires that the MPD be notified immediately of any address change and if a firearm is lost, stolen, or destroyed.  Moreover, the registration law is not narrowly tailored because

---

[17]  The testimony of the chief of police appended to the Committee Report gave some of the same reasons for registration as the above, but provided no further detail.

the District could conduct new background checks without causing the registrations to expire. The chance that a person who passed the NICS check has "become ineligible to own a firearm" is too remote to justify this burden on all lawful firearm owners.

Finally, the district court repeated the Committee's argument that registration is needed in the nation's capital "to protect these [government and diplomatic] officials from assassination." JA 171; Com. Rep. 3. How registering law-abiding citizens would prevent assassination is not explained. Again, no compelling interest has been shown to justify registration.

The above burdens infringe on the right to keep and bear arms and would never be upheld for exercise of any other fundamental constitutional right, precluding the restrictions at issue here.

### A. *Heller* Reaffirms *Miller*'s Premise that Second Amendment Protection Precludes Registration

The indictment in *United States v. Miller*, 307 U.S. 174, 175 (1939), charged defendants with transportation of a short-barreled shotgun in interstate commerce "not having registered said firearm" and "not having in their possession a stamp-affixed written order for said firearm," as required by the National Firearms

Act (NFA).[18] The issue was thus whether the *registration requirement* was consistent with the Second Amendment – the firearms at issue were not banned outright.[19]

*Miller* pointed to "the absence of any evidence" and its inability to take judicial notice of whether the weapon was "ordinary military equipment," and thus "we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id*. at 178. "Had the Court believed that the Second Amendment protects only those serving in the militia, it would have been odd to examine the character of the weapon rather than simply note that the two crooks were not militiamen." *Heller*, 128 S.Ct. at 2814. Similarly, had the *Miller* Court believed that the Second Amendment is consistent with registration, it would have been odd to examine the character of the weapon rather than simply note that registration does not violate the Second Amendment.

*Heller* read *Miller* to hold that "the Second Amendment right . . . extends only

---

[18] The NFA registration included the registrant's name, address, place of storage, and place of business. The written order required to transfer a firearm included identification of the transferee, fingerprints, photograph, and the identification mark of the firearm. *Miller*, 307 U.S. at 175 n.1.

[19] "But even as to this class of firearms there is not a word in the National Firearms Act which expressly prohibits the obtaining, ownership, possession or transportation thereof by anyone if compliance is had with the provisions relating to registration, the payment of taxes, and the possession of stamp-affixed orders . . . ." Brief for the United States, *United States v. Miller*, O.T. 1938, No. 696, at 6-7.

to certain types of weapons," those that are commonly possessed, and not to "only those weapons useful in warfare." *Id*. at 2815. The latter "would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns . . . might be unconstitutional . . . ." *Id*. What are these "restrictions"? The NFA requires machineguns to be registered.[20] *Heller* and *Miller* thus presuppose that requiring registration of *commonly-possessed* arms would violate the Second Amendment.

*Heller* continues: "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Id*. at 2815-16. Protect such weapons from what? Registration, as required by the NFA. The premise again is that registration of common firearms would violate the Second Amendment.

## B. A Person May Not Be Required to Register to Exercise a Core Constitutional Right

*Heller* treats the Second Amendment on a par with other constitutional rights. "[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *Heller*, 128 S.Ct. at 2797. Just as a person may not be required to register to exercise the fundamental rights to freedom of religion, speech and press,

---

[20]    26 U.S.C. § 5841(a).  *See* § 5845(a) ("firearm" defined to include machineguns, short-barreled shotguns, and other narrow classes).

and freedom from unreasonable search and seizure, a person may not be required to register merely to possess a firearm in his or her home.

"If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them . . . ." *Thomas v. Collins,* 323 U.S. 516, 539-40 (1945). *See Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 169 (2002) (finding it "unlikely that the absence of a permit would preclude criminals" from violating the law and invalidating a canvassing registration and licensing requirement).[21] Similarly, requiring law-abiding

---

[21] The licensing requirements invalidated in *Watchtower* are strikingly similar to the District's firearms registration regime. The ordinance in *Watchtower* required the registrant to report his "employer or affiliated organization," just as the District requires a registrant to report his "business or occupation." The ordinance in *Watchtower* required the registrant to report exactly where and when he would canvas, just as the District requires a registrant to report "where the firearm generally be kept." The ordinance in *Watchtower* required the registrant to report the nature and purpose of canvassing, just as the District requires a registrant to report the "intended use of the firearm." The ordinance in *Watchtower* required a registrant to report any "[s]uch other information … as may be reasonably necessary," just as the District requires a registrant to report "[s]uch other information as … determine[d] necessary." And the ordinance in *Watchtower* required each registrant "at all times[] while exercising the privilege" to "carry upon his person his permit and .. exhibit[] [it] … whenever he is requested to do so by any police officer," just as the District requires a registrant to "[h]ave in his possession, whenever in possession of a firearm, the registration certificate for such firearm, and exhibit the same upon the demand [of the police]." *Compare* 536 U.S. at 155 & n.2, *with* D.C. Code §§ 7-2502.03(b)(3), (8), (11), (13), *and* D.C. Code § 7-2502.08(3).

citizens to register firearms does not prevent criminals from committing crimes with firearms.[22]

A license may be required to hold a parade on a public street. *Cox v. New Hampshire*, 312 U.S. 569, 576 (1941). However, a law which prohibited the distribution of literature "at any time, at any place, and in any manner without a permit," would "strik[e] at the very foundation of the freedom of the press by subjecting it to license . . . ." *Id*. at 577 (citation omitted). The District prohibits possession of a firearm at any time, at any place, and in any manner without registration.

Even if a simple registration requirement passed constitutional muster, the District's complex procedures do not. These onerous requirements appear calculated to discourage persons from registering firearms at all and, for those who do so, to snare them with expiration and re-registration deadlines that, if missed, would turn them into criminals.

_____

Indeed, the registration law here is comparatively far more invasive than that in *Watchtower* insofar as the District imposes these requirements even when the individual does not set foot outside his own home.

[22] *See also Near v. Minnesota,* 283 U.S. 697, 722 (1931) (rejecting argument for prior restraint based on the possibility that unlicensed speech could "provoke assaults and the commission of crime.").

## C. Registration Is Not a Traditional Regulation

*Heller* did not "cast doubt on longstanding prohibitions" on firearm possession by felons and the mentally ill, regulations on carrying firearms in sensitive places, or conditions on commercial arms sales.[23]   128 S.Ct. at 2816-17.   By contrast, registration is not a traditional regulation for mere possession of ordinary firearms,[24] and the Second Amendment was codified in part to preclude registration.

To disarm political enemies, Charles II decreed in 1660 that gunsmiths report information on firearm buyers to the authorities. Joyce Malcolm, *Guns and Violence: The English Experience* 52 (2002).  The authorities were then authorized "to search for and seize all arms in the . . . possession of any person . . . judge[d] dangerous to the peace of the kingdom . . . ."  13 & 14 Car. II c.3 (1662).[25]  The Stuart Kings "suppress[ed] political dissidents, in part by disarming their opponents," and "what the Stuarts had tried to do to their political enemies, George III had tried to do to the

---

[23] These provisions, moreover, were merely "presumptively lawful regulatory measures."  128 S.Ct. at 2817 n.26.

[24] *Heller*'s directive that the District register plaintiffs's handgun did not purport to approve the constitutionality of the registration requirements *sub silentio* as the registration requirements were not at issue.  *See* 128 S.Ct. at 2822.

[25] Similarly, the Printing Act, 14 Car. II, ch. 33 (1662), required licenses for the press, which "subject[ed] all freedom of sentiment to the prejudices of one man . . . ."  4 Blackstone, *Commentaries* *152 & n.

colonists." *Heller*, 128 S.Ct. at 2798-99.

The Americans of the founding generation would not have deemed a requirement that their firearms be registered with the Crown as consistent with their right to keep and bear arms, any more than they would have viewed registration of the press consistent with the right to utter opinions. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Heller*, 128 S.Ct. at 2821.

No State imposes requirements as onerous as the District's.[26] No State requires registration of all firearms, with the exception of Hawaii,[27] and even Hawaii does not provide that registrations expire and must be renewed.[28] No State requires training, a written test, and a vision test for the possession of any firearm.[29]

---

[26] *See* Bureau of Alcohol, Tobacco, Firearms & Explosives, *State Laws & Published Ordinances - Firearms*, ATF Pub. 5300.5 (revised 2008).

[27] "Hawaii and the District are the only states [*sic*] that require all firearms to be registered." Com. Rep. at 3.

[28] Haw. Rev. Stat. § 134-3.

[29] Such requirements might be appropriate to license persons to carry concealed weapons in public. However, people exercise the right to "keep arms" for other reasons, *e.g.*, for home defense, hunting, to sell, or as an inheritance. *Heller*, 128 S.Ct. at 2792 & n.7. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 189 (2008) ("even rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications"); *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 83

## D. Registration Has No Militia Purpose

Traditional militia laws provided for inspection of the arms carried by militiamen in service, but not for registration of all arms by all persons. The First Militia Act provided that "every free able-bodied white male citizen" aged 18 to 44 years old shall "be enrolled in the militia." 1 Stat. 271 (1792), cited in *Heller*, 128 S.Ct. at 2800. Each was required to "provide himself with a good musket or firelock." 1 Stat. at 271. A brigade-inspector had a duty "to inspect their arms," "make returns," and report "the actual situation of the arms" to the state adjutant-general. *Id*. at 273.

The District's registration provisions have no militia purpose. "The question presented [in *Heller*] presumes that respondent is '*not* affiliated with any state-regulated militia,'" and District law "does not consider him, at 66 years of age, to be a member of its militia." *Heller*, 128 S.Ct. at 2861-62 (Breyer, J., dissenting).[30]

*Parker*, 478 F.3d at 399, suggested in *dictum* that registration "gives the government information as to how many people would be armed for militia service

---

(1980) (Stevens, J., concurring) ("practices such as poll taxes or literacy tests that deny individuals access to the ballot").

[30] The District eschews reliance on a militia power to justify its registration requirements. *See* Brief for Petitioners, *District of Columbia v. Heller*, No. 07-290, at 4, 7 (2008).

if called up." However, *Parker* also recognized that registration lacked any militia

nexus as applied to persons not in the militia:

> A physically disabled person, for instance, might not be able to participate in even the most rudimentary organized militia. But this person would still have the right to keep and bear arms, just as men over the age of forty-five and women would have that right, even though our nation has traditionally excluded them from membership in the militia.

*Id*. at 399.

### E.  Fees May Not Be Charged to Exercise Constitutional Rights

The District requires payment of various fees to register firearms, and also

requires training by instructors who charge fees.  "A state may not impose a charge

for the enjoyment of a right granted by the federal constitution."  *Murdock v. Com.*

*of Pennsylvania*, 319 U.S. 105, 113 (1943).  Moreover, fees have been invalidated

where the  amount has been "left to the whim of the administrator." *Forsyth County*

*v. Nationalist Movement,* 505 U.S. 123, 133 (1992) (parade permit fee).  "[W]ealth

or fee paying has . . . no relation to voting qualifications; the right to vote is too

precious, too fundamental to be so burdened or conditioned."  *Harper v. Virginia*

*State Board of Elections*, 383 U.S. 663, 670 (1966) (poll tax). The same applies to

exercise of the right to keep arms.[31]

---

[31]  While invidious voting restrictions were historically based on race, so too were firearms restrictions. *Code of Laws for the District of Columbia* 290-91 (1819) ("No slave shall . . . keep nor carry away any gun"), 300 ( same applied to any "negro

That these fees are "intended to compensate the District," JA 170, Com. Rept. 9, begs the question.  Persons who purchase firearms after checks by NICS, which charges no fee, are capable of quietly keeping their firearms in their homes without any expense to the public.  The District may not condition exercise of a fundamental constitutional right in one's home on a burdensome registration regime and then justify imposing "administrative costs" to pay for it.

## F.  Rationing Pistol Acquisition to One Per Month

The District prohibits acquisition of more than one pistol per month by residents without any exceptions.  Unnamed "studies" alleged that such laws "reduce the number of guns entering the illegal market" and "stem the flow of firearms between states."  JA 170; Com. Rep. 10.[32]  Since any District resident who lawfully acquires a pistol must pass the federal NICS background check, any such pistols are not entering the illegal market or unlawfully flowing between states.  No justification, let alone a compelling interest, has been articulated for such rationing of the exercise

---

or mulatto").  *See* Letitia W. Brown, *Free Negroes in the District of Columbia, 1790-1846*, at 140 (1972) (free blacks were "prohibited from voting . . . and from bearing arms.").

[32]  The Committee stated that three states have such laws, *id.*, but those states exempt persons whose firearm has been lost or stolen, collectors, permit holders, and other acquisitions.  Ca. Penal Code § 12020(a)(9); Md. Code Public Safety § 5-128(a); Va. Code § 18.2-308.2:2(P)(2).

of a fundamental constitutional right, nor has the District shown that its law is narrowly tailored.

## G.  Fingerprints and Photographs

The identity of a firearm transferee is established for NICS checks  in part by presentation of a government-issued photo identification card.   18 U.S.C. § 922(t)(1)(C).  The District needlessly requires fingerprints and photographs.  MPD Chief Cathy Lanier was quoted as asserting that "local background checks have been found to reduce homicide and suicide rates," JA 170, but no evidence was cited.  Thus, no compelling interest has been shown, nor has it been shown that the law is narrowly tailored.[33]

## H.  Ballistics Testing

The District requires that pistols be ballistically tested.   The Committee asserted that this would enable police to "link bullets and shell casings recovered at crime scenes," as if the guns of criminals would be registered and tested.  JA 169; Com. Rep. at 5.  The Maryland State Police reported that that state's ballistics database resulted in "failure . . . to provide any meaningful hits. There have been no criminal investigations that have been enhanced or expedited through the use of [this

---

[33]  Only one State requires fingerprints and a photograph to acquire any kind of firearm.  Haw. Rev. Stat. §§ 134-2.

technology]." Com. Rep. at 6.

Exercise of a fundamental constitutional right cannot be made dependent on government testing and recordation of an object which itself is constitutionally protected, whether it be a pistol or a printing press.

In sum, all of the above restrictions, whether taken singly or together, impose unconstitutional burdens.

### III. THE PROHIBITIONS ON COMMONLY-POSSESSED FIREARMS MISNAMED "ASSAULT WEAPONS" AND MAGAZINES VIOLATE THE SECOND AMENDMENT

The District prohibits firearms defined as "assault weapons" and magazines that hold more than 10 rounds of ammunition, both of which are commonly possessed by law-abiding persons for lawful purposes. Those provisions, as applied to the firearms and magazines in this case, violate the Second Amendment.

The district court held that it was "compelled to defer to the Council's findings" that these items not "in common use, are not typically possessed by law-abiding citizens for lawful purposes and are 'dangerous and unusual' within the meaning of *Heller*" (JA 174-75), citing Com. Rep. at 7-9. This conclusion suffers from several fatal defects.

First, the Council made no findings. The only "findings" were the above unsupported allegations made by the Committee in its Report.

45

Second, the Committee Report was not put into the record as evidence, but was simply cited with a website address in defendants' memoranda. Summary judgment may be rendered only if the affidavits or other items in the record show lack of any genuine issue of a material fact. Fed.R.Civ.P. 56(c). Affidavits must be made on personal knowledge, set out facts that would be admissible, and show that the affiant is competent to testify. Fed.R.Civ.P. 56(e)(1). The Committee Report was unsworn, contained hearsay upon hearsay, and should not have been considered.[34]

Third, plaintiffs placed into the record affidavits showing that the particular "assault weapons" at issue and specific magazines holding over ten rounds are in common use, are typically possessed by law-abiding citizens for lawful purposes, and are not "dangerous and unusual."[35] JA 82-85, 88-92, 132-137. The district court improperly disregarded this evidence.

In particular, the district court disregarded evidence that some two million AR-15 type rifles are in civilian hands and the widespread use thereof for target shooting, defense, and other lawful purposes, including the reasons given by plaintiffs in this

---

[34] *Cf. McConnell v. Federal Election Comm'n,* 540 U.S. 93, 146 (2003) ("evidence in the record shows that candidates and donors alike have in fact exploited the soft-money loophole," citing sworn declarations).

[35] *See* F.R.Civ.P. 56(e)(2) (opposing party must set out, through affidavits or other competent evidence, specific facts showing a genuine issue for trial).

very case. It disregarded plaintiffs' expert evidence demonstrating that AR-15s are made for civilian use, and are not used by any military force in the world (JA 129 (SGI 5)), instead deferring to the Committee's baseless assertion that the banned firearms are "made for offensive military use." JA 172; Com. Rep. 7.

The district court ignored the Supreme Court's finding that "[t]he AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon. The M-16, in contrast, is a selective fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic or automatic fire." *Staples v. United States*, 511 U.S. 600, 603 (1994).[36] Ordinary firearms such as the AR-15 rifle have "traditionally have been widely accepted as lawful possessions . . . ." *Id*. at 612.

The district court further disregarded the fact that a true "assault rifle" is a rifle "capable of delivering effective full automatic fire." JA 135. The term "assault weapon" has become a classic case of "an Alice-in-Wonderland world where words have no meaning." *Welsh v. United States*, 398 U.S. 333, 354 (1970) (Harlan, J., concurring).[37]

---

[36] *See Christianson v. Colt Industries Operating Corp*., 486 U.S. 800, 804 (1988) (describing the M-16 selective fire rifle as the "standard assault rifle").

[37] "Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance." *Stenberg v. Carhart*, 530 U.S. 914,

Fourth, defendants were required to present evidence rebutting the evidence in plaintiffs' affidavits. A municipality cannot "get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance." *Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 438-39 (2002). If plaintiffs "cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings," then "the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Id.* The defendants here presented no admissible evidence rebutting plaintiffs' evidence, and the district court erred in accepting the Committee Report's allegations as undisputed fact.

Moreover, *Heller* took a categorical approach and disregarded the allegations in the committee report in that case. "[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 128 S.Ct. at 2791-92. The Court continued:

> The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. . . . We therefore read *Miller* to say only that the Second Amendment does not

---

1001 n.16 (2000) (Thomas, J., dissenting) (citation omitted). *See Bramlett v. Litscher*, No. 01-C-193-C, 2001 WL 34377271, *2 (W.D. Wis. 2001) ("the mop wringer . . . could be used as an assault weapon.").

protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.

*Id*. at 2815-16, citing *Miller*, 307 U.S. at 178.

Thus, "the sorts of weapons protected were those 'in common use at the time.' . . . We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id*. at 2817.  Under this test, full automatics like the M-16 machinegun may be restricted as may "sophisticated arms that are highly unusual in society at large." *Id*.

*Heller* found: "The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose [self-defense]." *Id*. at 2817.  "It is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed." *Id*. at 2818.  The same reasoning applies here.[38]

*Parker* applied *Miller*'s "common use" test and found that "most handguns (those in common use) fit that description then and now." *Parker*, 478 F.3d at 397 (citing *Emerson,* 270 F.3d at 227 n.22).  *Emerson* "assum[ed] that a Beretta pistol passed the *Miller* test." *See id.* at 216, 273 (describing a Beretta 9mm semiautomatic

---

[38]  Protected arms are those that "are commonly kept and used by law-abiding people for hunting purposes or for the protection of their persons and property, such as semi-automatic shotguns, semi-automatic pistols and rifles." *Rinzler v. Carson*, 262 So. 2d 661, 666 (Fla. 1972).

pistol). The Beretta M9, used by the U.S. military, has a 15-shot magazine. JA 50-51 (UMF 36). *Parker* rejected the suggestion "that only colonial-era firearms (e.g., single-shot pistols) are covered by the Second Amendment," which instead "protects the possession of the modern-day equivalents of the colonial pistol." 478 F.3d at 398.

"The modern handgun – and for that matter the rifle and long-barreled shotgun – is undoubtedly quite improved over its colonial-era predecessor, but it is, after all, a lineal descendant of that founding-era weapon, and it passes *Miller* 's standards." *Parker*, 478 F.3d at 398. Using a pejorative term to describe selected rifles does not remove them from Second Amendment protection.

The district court deferred to the Committee's assertion that "assault weapons are disproportionately likely to be used by criminals." JA 173; Com. Rep. 7. Not so. "AWs [assault weapons] were used in only a small fraction of gun crimes prior to the ban: about 2% according to most studies and no more than 8%." C. Koper, *An Updated Assessment of the Federal Assault Weapons Ban* (Report to National Institute of Justice, U.S. Dep't. of Justice 2004), at 2.[39] "Should it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement." *Id*. at 3.

---

[39] Available at http://www.sas.upenn.edu/jerrylee/research/aw_final2004.pdf (visited July 14, 2010).

The district court found that the ban on magazines holding over ten rounds "imposes a slight burden" by requiring persons "to pause for a few seconds to reload." JA 174; Com. Rep. 9. Yet not having to do so in a stressful situation can be of critical benefit to the law-abiding citizen. That is why pistols with such magazines are in common use, including by MPD officers. JA 51-51 (UMF 41).

No State prohibits possession of what the District labels "assault weapons," with the following four qualified exceptions.[40] These laws are not as extreme as the District's, and, in any event, constitutional rights are not defined by statutes.

California prohibits "assault weapons," but exempts guns registered by specified deadlines. Ca. Penal Code §§ 12280, 12285, 11186. The ban was upheld under the "collective rights" theory of the Second Amendment which *Heller* and *McDonald* have now rejected. *Silveira v. Lockyer,* 312 F.3d 1052, 1056 (9th Cir.), *cert. denied*, 540 U.S. 1046 (2003).

Connecticut defines "assault weapon" to require two generic features, rather than only one. Conn. Gen. Stat. § 53-202a(a)(3). It allows possession thereof under several circumstances, including all that were manufactured before 1994. *Id*. §§ 53-202d, -m, -n, & -o.

New Jersey defines "assault firearm" by name, not generically. N.J. Rev. Stat.

---

[40] *See State Laws & Published Ordinances - Firearms*, *supra*.

§ 2C:39-1w.  Those "used for legitimate target-shooting purposes," including "competitive shooting matches sanctioned by the Director of Civilian Marksmanship," § 2C:58-12a, could be registered by a certain deadline.  § 2C:58-12b.

New York defines "assault weapon" to require two generic features.  N.Y. Consl. Laws § 265(22).  It excludes any firearm lawfully possessed before 1994.  § 265(22)(e)(v).[41]

Of the above four States, all allow some form of registration of "assault weapons."  Two exempt any firearm made before 1994.  None defines the term as broadly as the District.

In sum, the AR-15 rifle and magazines holding more than ten cartridges are "widely owned by private citizens today for legitimate purposes," including "for self-defense, hunting, and target shooting . . . ."  Michael P. O'Shea,  "The Right to Defensive Arms after *District Of Columbia v. Heller*," 111 W. Va. L. Rev. 349, 388 (Winter 2009).  As if by waving a magic wand, the District may not justify banning them by calling them a derogatory name.

---

[41]  Massachusetts restricts a "large capacity weapon," but "any person" is eligible to apply for a license. M.G.L., Ch. 140 § 121 (definition), 131 (license). Maryland regulates "assault weapons" similar to handguns, Md. Code §§ 5-101(p), 5-129 *et seq*.; it bans "assault pistols" only if unregistered. § 4-303. Hawaii restricts transfer, not possession, only of "assault pistols."  Haw. Rev. Stat. § 134-4(e).

## IV.  THE RESTRICTIONS ARE NOT
## AUTHORIZED BY D.C. CODE § 1-303.43

Congress empowered the District as follows: "The Council of the District of Columbia is hereby authorized and empowered to make . . . all such usual and reasonable police regulations . . . as the Council may deem necessary for the regulation of firearms . . . ."  D.C. Code § 1-303.43.

The provisions at issue are not "usual and reasonable."  They do not exist in the laws of the United States and are non-existent or unusual in the laws of the States. Thus, such provisions are not authorized by § 1-303.43 and are beyond the District's power to enact.

The district court concluded that the restrictions are "reasonable" based on its finding that they survived intermediate scrutiny.  JA 177.  It found them to be "usual" based on the Committee's general assertion that "several other cities and states require the registration and licensing of firearms and prohibit certain categories of dangerous firearms . . . ."  JA 178; Com. Rep. 8.

The Firearms Registration Amendment Act of 2008, § 2, declares that "The Firearms Control Regulations Act of 1975 . . . is amended as follows," following which are the provisions at issue here.  D.C. Code § 1-303.43 was "the section on which the Council relied for its authority to enact the Firearms Act [of 1975]."

*McIntosh v. Washington*, 395 A.2d 744, 750 n.11 (D.C. 1978). Thus, the 2008 Act is valid only if consistent with § 1-303.43.[42]

The provisions at issue are not "usual," which means "such as is in common or ordinary use; such as is most often seen, heard, used, etc."[43] *Webster's New World Dictionary* (1991), at 1470. Under the laws of the United States and of virtually every State, a law-abiding citizen may possess a firearm without being subjected to onerous registration, expiration, and re-registration requirements like those imposed by the District. *See Staples*, 511 U.S. at 613-14 ("owning a gun is usually licit and blameless conduct. Roughly 50 percent of American homes contain at least one firearm"). The United States and the States generally allow possession of the firearms that the District bans, with the exception of a tiny handful of States that impose less onerous restrictions than the District.

By contrast, "unusual" means "such as does not occur in ordinary practice" or

---

[42] *See Green v. District of Columbia*, 710 F.2d 876, 877 (D.C. Cir. 1983) (determining "the background, authority for, and legal validity of" gambling regulation under D.C. Code § 1-303.03).

[43] *See Ullman v. District of Columbia*, 21 App.D.C. 241 (1903) ("To keep a record of transactions is now usual . . . in all classes of business"); *Christian Knights of the Ku Klux Klan Invisible Empire, Inc. v. District of Columbia*, 919 F.2d 148, 150 (D.C. Cir. 1990) ("usual and reasonable" factors found regarding permit to march "on grounds traditionally made available"); *District of Columbia v. John R. Thompson Co., Inc.*, 346 U.S. 100, 114 (1953) (anti-discrimination law valid as "reasonable and usual police regulation" of restaurants).

"is not common use." *Harmelin v. Michigan*, 501 U.S. 957, 976 (1991) (citing

dictionaries) (brackets eliminated).  The Eighth Amendment prohibits "cruel and

unusual punishment," but mandatory penalties "are not unusual in the constitutional

sense, having been employed in various forms throughout our Nation's history. . . .

They were also common in the several States . . . ." *Id.* at 994-95.  That cannot be

said about the District's firearm prohibitions.[44]

Nor are the District's prohibitions "reasonable" for the reasons set out above.

Further, Congress would not have understood them as being "reasonable" in that,

historically, it has passed laws against firearm bans as a civil rights violation,[45]

prohibited registration,[46] declared against any intent to discourage private ownership

---

[44]  By contrast, the death penalty was held cruel and unusual for child rape where 44 States did not authorize it, and as applied to the mentally retarded and juveniles where 30 States did not authorize it. *Kennedy v. Louisiana*, 128 S.Ct. 2641, 2652, 2653 (2008).

[45]  The Freedmen's Bureau Act recognized "the right . . . to have full and equal benefit of all laws and proceedings concerning personal liberty, personal security, and . . . estate, . . . including the constitutional right to bear arms . . . ." § 14, 14 Stat. 173, 176-77 (1866).  *See McDonald*, 2010 WL 2555188, *19.

[46]  When the Nazi threat arose, Congress prohibited preparedness legislation from being construed to "require the registration of firearms possessed by any individual for his personal protection or sport (and the possession of which is not prohibited or the registration of which is not required by existing law)," or "to impair or infringe in any manner the right of any individual to keep and bear arms." Property Requisition Act, P.L. 274, 55 Stat., pt. 1, 742 (1941).

of firearms,[47] and passed legislation to ensure the availability of firearms to consumers.[48]

The Firearms Owners' Protection Act recognized "the rights of citizens . . . to keep and bear arms under the second amendment to the United States Constitution." §1(b), P.L. 99-308, 100 Stat. 449 (1986). It thus enacted 18 U.S.C. § 926(a), which prohibits any regulation to require that records of firearm transactions "be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof," and prohibits "any system of registration of firearms, firearms owners, or firearms transactions or dispositions." Almost identical language appears in the law creating the NICS background check system. Brady Handgun Violence Prevention Act, § 103(i), P.L. 103-159, 107 Stat. 1536 (1993).[49]

"If it be shown and determined that the regulations, or any material parts

---

[47] "[T]his title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." Gun Control Act, § 101, P.L. 90-618, 82 Stat. 1214 (1968).

[48] The Protection of Lawful Commerce in Arms Act was passed in part "to preserve a citizen's access to a supply of firearms and ammunition for all lawful purposes, including hunting, self-defense, collecting, and competitive or recreational shooting." § 2(b)(2), P.L. 109-92, 119 Stat. 2095 (2005).

[49] That law also requires the destruction of background check records on law-abiding persons. 18 U.S.C. § 922(t)(2)(C).

thereof, are unusual or unreasonable, they would be inoperative and void, to the extent that they are so unusual or unreasonable, because, in such case they would not be within the power delegated by Congress." *Moore v. District of Columbia*, 12 App. D.C. 537, 540 (1898).[50]

Accordingly, the prohibitions at issue, being neither usual nor reasonable, are not authorized by D.C. Code § 1-303.43 and are thus void.

## CONCLUSION

This Court should decide that the provisions at issue violate the Second Amendment and are not authorized by D.C. Code § 1-303.43, reverse the judgment of the court below, and remand with instructions to grant summary judgment for the plaintiffs.

Date: July 23, 2010

Respectfully Submitted,

/s/ Stephen P. Halbrook
STEPHEN P. HALBROOK
D.C. Bar No. 379799

---

[50] *See Reynolds v. District of Columbia*, 614 A.2d 1285, 1288-89 (D.C. 1992) (regulation not "a reasonable regulation designed to control traffic"); *La Forest v. Board of Commissioners of the District of Columbia*, 92 F.2d 547, 549-50 (D.C. Cir. 1937) ("if such a case [of unreasonable regulations] should arise the right of review by this court insures protection against such abuse of power").

/s/ Richard E. Gardiner
RICHARD E. GARDINER
D.C. Bar No. 386915

3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
(703) 352-7276

Counsel for Appellants

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,331 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word Perfect 12 in 14-point Times New Roman.

 /s/ Richard E. Gardiner
RICHARD E. GARDINER
Counsel for Appellants

Date: July 23, 2010

# A D D E N D U M

# UNITED STATES CONSTITUTION

## *Second Amendment*

A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

# DISTRICT OF COLUMBIA CODE

## § 1-303.43.  Regulations relative to firearms, explosives, and weapons

The Council of the District of Columbia is hereby authorized and empowered to make, and the Mayor of the District of Columbia is hereby authorized and empowered to enforce, all such usual and reasonable police regulations, in addition to those already made under §§ 1-303.01 to 1-303.03 as the Council may deem necessary for the regulation of firearms, projectiles, explosives, or weapons of any kind in the District of Columbia.

## § 7-2501.01. Definitions.

As used in this unit the term:

(1) "Acts of Congress" means:

(A) Chapter 45 of Title 22;

(B) Omnibus Crime Control and Safe Streets Act of 1968, as amended (title VII, Unlawful Possession or Receipt of Firearms (82 Stat. 1236; 18 U.S.C. Appendix)); and

(C) An Act to Amend Title 18, United States Code, To Provide for Better Control of the Interstate Traffic in Firearms Act of 1968 (82 Stat. 1213; 18 U.S.C. § 921 et seq.).

(2) "Ammunition" means cartridge cases, shells, projectiles (including shot), primers, bullets (including restricted pistol bullets), propellant powder, or other devices or materials designed, redesigned, or intended for use in a firearm or destructive device.

(3) "Antique firearm" means:

(A) Any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and

(B) Any replica of any firearm described in subparagraph (A) if such replica:

(i) Is not designed or redesigned for using rim-fire or conventional center-fire fixed ammunition; or

(ii) Uses rim-fire or conventional ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

(3A)(A) "Assault weapon" means:

(i) The following semiautomatic firearms:

(I) All of the following specified rifles:

(aa) All AK series including, but not limited to, the models identified as follows:

(1) Made in China AK, AKM, AKS, AK47, AK47S, 56, 56S, 84S, and 86S;

(2) Norinco (all models);

(3) Poly Technologies (all models);

(4) MAADI AK47 and ARM; and

(5) Mitchell (all models).

(bb) UZI and Galil;

(cc) Beretta AR-70;

(dd) CETME Sporter;

(ee) Colt AR-15 series;

(ff) Daewoo K-1, K-2, Max 1, Max 2, AR 100, and AR110 C;

(gg) Fabrique Nationale FAL, LAR, FNC, 308 Match, and Sporter;

(hh) MAS 223.

(ii) HK-91, HK-93, HK-94, and HK-PSG-1;

(jj) The following MAC types:

(1) RPB Industries Inc. sM10 and sM11; and

(2) SWD Incorporated M11;

(kk) SKS with detachable magazine;

(ll) SIG AMT, PE-57, SG 550, and SG 551;

(mm) Springfield Armory BM59 and SAR-48;

(nn) Sterling MK-6;

(oo) Steyer AUG, Steyr AUG;

(pp) Valmet M62S, M71S, and M78S;

(qq) Armalite AR-180;

(rr) Bushmaster Assault Rifle;

(ss) Calico --900;

(tt) J&R ENG --68; and

(uu) Weaver Arms Nighthawk.

(II) All of the following specified pistols:

(aa) UZI;

(bb) Encom MP-9 and MP-45;

(cc) The following MAC types:

(1) RPB Industries Inc. sM10 and sM11;

(2) SWD Incorporated -11;

(3) Advance Armament Inc. --11; and

(4) Military Armament Corp. Ingram M-11;

(dd) Intratec TEC-9 and TEC-DC9;

(ee) Sites Spectre;

(ff) Sterling MK-7;

(gg) Calico M-950; and

(hh) Bushmaster Pistol.

(III) All of the following specified shotguns:

(aa) Franchi SPAS 12 and LAW 12; and

(bb) Striker 12. The Streetsweeper type S/S Inc. SS/12;

(IV) A semiautomatic, rifle that has the capacity to accept a detachable magazine and any one of the following:

(aa) A pistol grip that protrudes conspicuously beneath the action of the weapon;

(bb) A thumbhole stock;

(cc) A folding or telescoping stock;

(dd) A grenade launcher or flare launcher;

(ee) A flash suppressor; or

(ff) A forward pistol grip;

(V) A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the following:

(aa) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer;

(bb) A second handgrip;

(cc) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning his or her hand, except a slide that encloses the barrel; or

(dd) The capacity to accept a detachable magazine at some location outside of the pistol grip;

(VI) A semiautomatic shotgun that has one or more of the following:

(aa) A folding or telescoping stock;

(bb) A pistol grip that protrudes conspicuously beneath the action of the weapon;

(cc) A thumbhole stock; or

(dd) A vertical handgrip; and

(VII) A semiautomatic shotgun that has the ability to accept a detachable magazine; and

(VIII) All other models within a series that are variations, with minor differences, of those models listed in subparagraph (A) of this paragraph, regardless of the manufacturer;

(ii) Any shotgun with a revolving cylinder; provided, that this sub-subparagraph shall not apply to a weapon with an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition; and

(iii) Any firearm that the Chief may designate as an assault weapon by rule, based on a determination that the firearm would reasonably pose the same or similar danger to the health, safety, and security of the residents of the District as those weapons enumerated in this paragraph.

(B) The term "assault weapon" shall not include:

(i) Any antique firearm; or

(ii) Any of the following pistols, which are designed expressly for use in Olympic target shooting events, sanctioned by the International Olympic Committee and by USA Shooting, the national governing body for international shooting competition in the United States, and used for Olympic target shooting purposes:

MANUFACTURER MODEL CALIBER

BENELLI MP90 .22LR
BENELLI MP90 .32 S&W LONG
BENELLI MP95 .22LR
BENELLI MP95 .32 S&W LONG
HAMMERLI 280 .22LR
HAMMERLI 280 .32 S&W LONG
HAMMERLI SP20 .22LR
HAMMERLI SP20 .32 S&W LONG
PARDINI GPO .22 SHORT
PARDINI GP-SCHUMANN .22 SHORT
PARDINI HP .32 S&W LONG
PARDINI MP .32 S&W LONG
PARDINI SP .22LR

PARDINI SPE .22LR
WALTHER GSP .22LR
WALTHER GSP .32 S&W LONG
WALTHER OSP .22 SHORT
WALTHER OSP-2000 .22 SHORT

(C) The Chief may exempt, by rule, new models of competitive pistols that would otherwise fall within the definition of "assault weapon" pursuant to this section from being classified as an assault weapon. The exemption of competitive pistols shall be based either on recommendations by USA Shooting consistent with the regulations contained in the USA Shooting Official Rules or on the recommendation or rules of any other organization that the Chief considers relevant.

(4) "Chief" means the Chief of Police of the Metropolitan Police Department of the District of Columbia or his designated agent.

(5) "Crime of violence" means a crime of violence as defined in § 22-4501, committed in any jurisdiction, but does not include larceny or attempted larceny.

(6) "Dealer's license" means a license to buy or sell, repair, trade, or otherwise deal in firearms, destructive devices, or ammunition as provided for in subchapter IV of this unit.

(7) "Destructive device" means:

(A) An explosive, incendiary, or poison gas bomb, grenade, rocket, missile, mine, or similar device;

(B) Any device by whatever name known which will, or is designed or redesigned, or may be readily converted or restored to expel a projectile by the action of an explosive or other propellant through a smooth bore barrel, except a shotgun;

(C) Any device containing tear gas or a chemically similar lacrimator or sternutator by whatever name known;

(D) Any device designed or redesigned, made or remade, or readily converted or restored, and intended to stun or disable a person by means of electric shock;

(E) Any combination of parts designed or intended for use in converting any device into any destructive device; or from which a destructive device may be readily assembled; provided, that the term shall not include:

(i) Any pneumatic, spring, or B-B gun which expels a single projectile not exceeding .18 inch in diameter;

(ii) Any device which is neither designed nor redesigned for use as a weapon;

(iii) Any device originally a weapon which has been redesigned for use as a signaling, line throwing, or safety device; or

(iv) Any device which the Chief finds is not likely to be used as a weapon.

(8) "District" means District of Columbia.

(8A) ".50 BMG rifle" means:

(A) A rifle capable of firing a center-fire cartridge in .50 BMG caliber, including a 12.7 mm equivalent of .50 BMG and any other metric equivalent; or

(B) A copy or duplicate of any rifle described in subparagraph (A) of this paragraph, or any other rifle developed and manufactured after January 6, 2009, regardless of caliber, if such rifle is capable of firing a projectile that attains a muzzle energy of 12,000 foot-pounds or greater in any combination of bullet, propellant, case, or primer.

(9) "Firearm" means any weapon, regardless of operability, which will, or is designed or redesigned, made or remade, readily converted, restored, or repaired, or is intended to, expel a projectile or projectiles by the action of an explosive; the frame or receiver of any such device; or any firearm muffler or silencer; provided, that such term shall not include:

(A) Antique firearms; or

(B) Destructive devices;

(C) Any device used exclusively for line throwing, signaling, or safety, and required or recommended by the Coast Guard or Interstate Commerce Commission; or

(D) Any device used exclusively for firing explosive rivets, stud cartridges, or similar industrial ammunition and incapable for use as a weapon.

(9A) "Intrafamily offense" shall have the same meaning as provided in § 16- 1001(8).

(10) "Machine gun" means any firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term "machine gun" shall also include the frame or receiver of any such firearm, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a firearm into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

(11) "Organization" means any partnership, company, corporation, or other business entity, or any group or association of 2 or more persons united for a common purpose.

(12) "Pistol" means any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length.

(12A) "Place of business" means a business that is located in an immovable structure at a fixed location and that is operated and owned entirely, or in substantial part, by the firearm registrant.

(13) "Registration certificate" means a certificate validly issued pursuant to this unit evincing the registration of a firearm pursuant to this unit.

(13A) "Restricted pistol bullet" means any bullet designed for use in a pistol which, when fired from a pistol with a barrel of 5 inches or less in length, is capable of penetrating commercially available body armor with a penetration resistance equal to or greater than that of 18 layers of kevlar.

(14) "Rifle" means a grooved bore firearm using a fixed metallic cartridge with a single projectile and designed or redesigned, made or remade, and intended to be fired

from the shoulder.

(15) "Sawed-off shotgun" means a shotgun having a barrel of less than 18 inches in length; or a firearm made from a shotgun if such firearm as modified has an overall length of less than 26 inches or any barrel of less than 18 inches in length.

(16) "Shotgun" means a smooth bore firearm using a fixed shotgun shell with either a number of ball shot or a single projectile, and designed or redesigned, made or remade, and intended to be fired from the shoulder.

(17) "Short barreled rifle" means a rifle having any barrel less than 16 inches in length, or a firearm made from a rifle if such firearm as modified has an overall length of less than 26 inches or any barrel of less than 16 inches.

(18) "Weapons offense" means any violation in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device.


## § 7-2502.01. Registration requirements.

(a) Except as otherwise provided in this unit, no person or organization in the District of Columbia ("District") shall receive, possess, control, transfer, offer for sale, sell, give, or deliver any destructive device, and no person or organization in the District shall possess or control any firearm, unless the person or organization holds a valid registration certificate for the firearm. A registration certificate may be issued:

(1) To an organization if:

(A) The organization employs at least 1 commissioned special police officer or employee licensed to carry a firearm whom the organization arms during the employee's duty hours; and

(B) The registration is issued in the name of the organization and in the name of the president or chief executive officer of the organization;

(2) In the discretion of the Chief of Police, to a police officer who has retired from the Metropolitan Police Department; or

(3) In the discretion of the Chief of Police, to the Fire Marshal and any member of the Fire and Arson Investigation Unit of the Fire Prevention Bureau of the Fire Department of the District of Columbia, who is designated in writing by the Fire Chief, for the purpose of enforcing the arson and fire safety laws of the District of Columbia.

(b) Subsection (a) of this section shall not apply to:

(1) Any law enforcement officer or agent of the District or the United States, or any law enforcement officer or agent of the government of any state or subdivision thereof, or any member of the armed forces of the United States, the National Guard or organized reserves, when such officer, agent, or member is authorized to possess such a firearm or device while on duty in the performance of official authorized functions;

(2) Any person holding a dealer's license; provided, that the firearm or destructive device is:

(A) Acquired by such person in the normal conduct of business;

(B) Kept at the place described in the dealer's license; and

(C) Not kept for such person's private use or protection, or for the protection of his business;

(3) With respect to firearms, any nonresident of the District participating in any lawful recreational firearm-related activity in the District, or on his way to or from such activity in another jurisdiction; provided, that such person, whenever in possession of a firearm, shall upon demand of any member of the Metropolitan Police Department, or other bona fide law enforcement officer, exhibit proof that he is on his way to or from such activity, and that his possession or control of such firearm is lawful in the jurisdiction in which he resides; provided further, that such weapon shall be transported in accordance with § 22-4504.02; or.

(4) Any person who temporarily possesses a firearm registered to another person while in the home of the registrant; provided, that the person is not otherwise prohibited from possessing firearms and the person reasonably believes that possession of the firearm is necessary to prevent imminent death or great bodily harm to himself or herself.

## § 7-2502.03. Qualifications for registration; information required for registration.

(a) No registration certificate shall be issued to any person (and in the case of a person between the ages of 18 and 21, to the person and his signatory parent or guardian) or organization unless the Chief determines that such person (or the president or chief executive in the case of an organization):

(1) Is 21 years of age or older; provided, that the Chief may issue to an applicant between the ages of 18 and 21 years old, and who is otherwise qualified, a registration certificate if the application is accompanied by a notarized statement of the applicant's parent or guardian:

(A) That the applicant has the permission of his parent or guardian to own and use the firearm to be registered; and

(B) The parent or guardian assumes civil liability for all damages resulting from the actions of such applicant in the use of the firearm to be registered; provided further, that such registration certificate shall expire on such person's 21st birthday;

(2) Has not been convicted of a crime of violence, weapons offense, or of a violation of this unit;

(3) Is not under indictment for a crime of violence or a weapons offense;

(4) Has not been convicted within 5 years prior to the application of any:

(A) Violation in any jurisdiction of any law restricting the use, possession, or sale of any narcotic or dangerous drug;

(B) A violation of § 22-407, regarding threats to do bodily harm, or § 22-404, regarding assaults and threats, or any similar provision of the law of any other jurisdiction so as to indicate a likelihood to make unlawful use of a firearm;

(C) Two or more violations of § 50-2201.05(b) or, in any other jurisdiction, any law restricting driving under the influence of alcohol or drugs; or

(D) Intrafamily offense;

(5) Within the 5-year period immediately preceding the application, has not been acquitted of any criminal charge by reason of insanity or has not been adjudicated a chronic alcoholic by any court; provided, that this paragraph shall not apply if such person shall present to the Chief, with the application, a medical certification indicating that the applicant has recovered from such insanity or alcoholic condition and is capable of safe and responsible possession of a firearm;

(6) Within the 5 years immediately preceding the application, has not been voluntarily or involuntarily committed to any mental hospital or institution; provided, that this paragraph shall not apply, if such person shall present to the Chief, with the application, a medical certification that the applicant has recovered from whatever malady prompted such commitment;

(6A) Within the 5 years immediately preceding the application, has not had a history of violent behavior.

(7) Does not appear to suffer from a physical defect which would tend to indicate that the applicant would not be able to possess and use a firearm safely and responsibly;

(8) Has not been adjudicated negligent in a firearm mishap causing death or serious injury to another human being;

(9) Is not otherwise ineligible to possess a pistol under § 22-4503;

(10) Has not failed to demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to firearms and, in particular, the safe and responsible use, handling, and storage of the same in accordance with training, tests, and standards prescribed by the Chief; provided, that once this determination is made with

respect to a given applicant for a particular type of firearm, it need not be made again for the same applicant with respect to a subsequent application for the same type of firearms; provided, further, that this paragraph shall not apply with respect to any firearm reregistered pursuant to § 7-2502.06;

(11) Has vision better than or equal to that required to obtain a valid driver's license under the laws of the District of Columbia; provided, that current licensure by the District of Columbia, of the applicant to drive, shall be prima facie evidence that such applicant's vision is sufficient and; provided further, that this determination shall not be made with respect to persons applying to reregister any firearm pursuant to § 7-2502.06;

(12)(A) Has not been the respondent in an intrafamily proceeding in which a civil protection order was issued against the applicant pursuant to § 16- 1005; provided, that an applicant who has been the subject of such an order shall be eligible for registration if the applicant has submitted to the Chief a certified court record establishing that the order has expired or has been rescinded for a period of 5 years or more; or

(B) Has not been the respondent in a proceeding in which a foreign protection order, as that term is defined in § 16-1041, was issued against the applicant; provided, that an applicant who has been the subject of such an order shall be eligible for registration if the applicant has submitted to the Chief a certified court record establishing that the order has expired or has been rescinded for a period of 5 years;

(13)(A) Has completed a firearms training or safety course or class conducted by a state-certified firearms instructor or a certified military firearms instructor that provides, at a minimum, a total of at least one hour of firing training at a firing range and a total of at least 4 hours of classroom instruction.

(B) An affidavit signed by the certified firearms instructor who conducted or taught the course, providing the name, address, and phone number of the instructor and attesting to the successful completion of the course by the applicant shall constitute evidence of certified successful completion under this paragraph.

(14) Has not been prohibited from possessing or registering a firearm pursuant to § 7-2502.09(b).

(b) Every person applying for a registration certificate shall provide on a form prescribed by the Chief:

(1) The full name or any other name by which the applicant is known;

(2) The present address and each home address where the applicant has resided during the 5-year period immediately preceding the application;

(3) The present business or occupation and any business or occupation in which the applicant has engaged during the 5-year period immediately preceding the application and the addresses of such businesses or places of employment;

(4) The date and place of birth of the applicant;

(5) The sex of the applicant;

(6) Whether (and if so, the reasons) the District, the United States or the government of any state or subdivision of any state has denied or revoked the applicant's license, registration certificate, or permit pertaining to any firearm;

7) A description of the applicant's role in any mishap involving a firearm, including the date, place, time, circumstances, and the names of the persons injured or killed;

(8) The intended use of the firearm;

(9) The caliber, make, model, manufacturer's identification number, serial number, and any other identifying marks on the firearm;

(10) The name and address of the person or organization from whom the firearm was obtained, and in the case of a dealer, his dealer's license number;

(11) Where the firearm will generally be kept;

(12) Whether the applicant has applied for other registration certificates issued and outstanding;

(13) Such other information as the Chief determines is necessary to carry out the

provisions of this unit.

(c) Every organization applying for a registration certificate shall:

(1) With respect to the president or chief executive of such organization, comply with the requirements of subsection (b) of this section; and

(2) Provide such other information as the Chief determines is necessary to carry out the provisions of this unit.

(d) The Chief shall require any registered pistol to be submitted for a ballistics identification procedure and shall establish a reasonable fee for the procedure.

(e) The Chief shall register no more than one pistol per registrant during any 30-day period; provided, that the Chief may permit a person first becoming a District resident to register more than one pistol if those pistols were lawfully owned in another jurisdiction for a period of 6 months prior to the date of the application.


## § 7-2502.04. Fingerprints and photographs of applicants; application in person required.

(a) The Chief may require any person applying for a registration certificate to be fingerprinted if, in his judgment, this is necessary to conduct an efficient and adequate investigation into the matters described in § 7-2502.03 and to effectuate the purpose of this unit; provided, that any person who has been fingerprinted by the Chief within 6 years prior to submitting the application need not, in the Chief's discretion, be fingerprinted again if he offers other satisfactory proof of identity.

(b) Each applicant, other than an organization, shall submit with the application 2 full-face photographs of himself, 1 3/4 by 1 7/8 inches in size which shall have been taken within the 30-day period immediately preceding the filing of the application.

(c) Every applicant (or in the case of an organization, the president or chief executive, or a person authorized in writing by him), shall appear in person at a time and place prescribed by the Chief, and may be required to bring with him the firearm for which a registration certificate is sought, which shall be transported in accordance with §

22-4504.02.

**§ 7-2502.05. Application signed under oath; fees.**

(a) Each applicant (the president or chief executive in the case of an organization) shall sign an oath or affirmation attesting to the truth of all the information required by §§ 7-2502.03 or § 7-2502.07a.

(b) Each application required by this subchapter shall be accompanied by a nonrefundable fee to be established by the Mayor; provided, that such fee shall, in the judgment of the Mayor, reimburse the District for the cost of services provided under this subchapter.

**§ 7-2502.07. Issuance of registration certificate; time period; corrections.**

(a) Upon receipt of a properly executed application for registration certificate, the Chief, upon determining through inquiry, investigation, or otherwise, that the applicant is entitled and qualified under the provisions of this unit, thereto, shall issue a registration certificate. Each registration certificate shall be in duplicate and bear a unique registration certificate number and such other information as the Chief determines is necessary to identify the applicant and the firearm registered. The duplicate of the registration certificate shall be delivered to the applicant and the Chief shall retain the original.

(b) The Chief shall approve or deny an application for a registration certificate within a 60-day period beginning on the date the Chief receives the application, unless good cause is shown, including nonreceipt of information from sources outside the District government; provided, that in the case of an application to register a firearm validly registered under prior regulations, the Chief shall have 365 days after the receipt of such application to approve or deny such application. The Chief may hold in abeyance an application where there is a revocation proceeding pending against such person or organization.

(c) Upon receipt of a registration certificate, each applicant shall examine same to ensure that the information thereon is correct. If the registration certificate is incorrect

in any respect, the person or organization named thereon shall return it to the Chief with a signed statement showing the nature of the error. The Chief shall correct the error, if it occurred through administrative error. In the event the error resulted from information contained in the application, the applicant shall be required to file an amended application setting forth the correct information, and a statement explaining the error in the original application. Each amended application shall be accompanied by a fee equal to that required for the original application.

(d) In the event the Chief learns of an error in a registration certificate other than as provided in subsection (c) of this section, he may require the holder to return the registration certificate for correction. If the error resulted from information contained in the application, the person or organization named therein shall be required to file an amended application as provided in subsection (c) of this section.

(e) Each registration certificate issued by the Chief shall be accompanied by a statement setting forth the registrant's duties under this unit.

(f) In the discretion of the Chief of Police, a registration certificate may be issued to a retired police officer who is a resident of the District of Columbia for a pistol and ammunition which conforms to the Metropolitan Police Department General Orders and policies.

(g) When the retired police officer ceases to be a resident of the District of Columbia the registration certificate expires.

(h) Nothing in this unit shall create an entitlement to a registration certificate for a retired police officer. If the Chief of Police denies a retired police officer's registration certificate application, the Chief of Police shall state the reasons for the denial in writing.

(i) The District of Columbia shall not incur any liability by reason of the issuance or denial of a certificate, nor for any use made of the registered firearm.

## § 7-2502.08. Duties of registrants.

Each person and organization holding a registration certificate, in addition to any other requirements imposed by this unit, or the acts of Congress, shall:

(1) Notify the Chief in writing of:

(A) The loss, theft, or destruction of the registration certificate or of a registered firearm (including the circumstances, if known) immediately upon discovery of such loss, theft, or destruction;

(B) A change in any of the information appearing on the registration certificate or required by § 7-2502.03;

(C) The sale, transfer or other disposition of the firearm not less than 48 hours prior to delivery, pursuant to such sale, transfer or other disposition, including:

(i) Identification of the registrant, the firearm and the serial number of the registration certificate;

(ii) The name, residence, and business address and date of birth of the person to whom the firearm has been sold or transferred; and

(iii) Whether the firearm was sold or how it was otherwise transferred or disposed of.

(2) Return to the Chief, the registration certificate for any firearm which is lost, stolen, destroyed, or otherwise transferred or disposed of, at the time he notifies the Chief of such loss, theft, destruction, sale, transfer, or other disposition.

(3) Have in his possession, whenever in possession of a firearm, the registration certificate for such firearm, and exhibit the same upon the demand of a member of the Metropolitan Police Department, or other law enforcement officer.

## § 22-4501. Definitions.

For the purposes of this chapter, the term:

(1) "Crime of violence" shall have the same meaning as provided in § 23- 1331(4).

(2) "Dangerous crime" means distribution of or possession with intent to distribute a controlled substance. For the purposes of this definition, the term "controlled

substance" means any substance defined as such in the District of Columbia Official Code or any Act of Congress.

(2A) "Firearm" means any weapon, regardless of operability, which will, or is designed or redesigned, made or remade, readily converted, restored, or repaired, or is intended to, expel a projectile or projectiles by the action of an explosive. The term "firearm" shall not include:

(1) A destructive device as that term is defined in § 7-2501.01(7);

(2) A device used exclusively for line throwing, signaling, or safety, and required or recommended by the Coast Guard or Interstate Commerce Commission; or

(3) A device used exclusively for firing explosive rivets, stud cartridges, or similar industrial ammunition and incapable for use as a weapon.

(3) "Knuckles" means an object, whether made of metal, wood, plastic, or other similarly durable material that is constructed of one piece, the outside part of which is designed to fit over and cover the fingers on a hand and the inside part of which is designed to be gripped by the fist.

(4) "Machine gun" shall have the same meaning as provided in § 7- 2501.01(10).

(5) "Person" includes individual, firm, association, or corporation.

(6) "Pistol" shall have the same meaning as provided in § 7-2501.01(12)).

(6A) "Place of business" shall have the same meaning as provided in § 7-2501.01(12A).

(7) "Playground" means any facility intended for recreation, open to the public, and with any portion of the facility that contains one or more separate apparatus intended for the recreation of children, including, but not limited to, sliding boards, swingsets, and teeterboards.

(7A) "Registrant" means a person who has registered a firearm pursuant to Unit A of Chapter 25 of Title 7.

(8) "Sawed-off shotgun" shall have the same meaning as provided in § 7-2501.01(15).

(9) "Sell" and "purchase" and the various derivatives of such words shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

(9A) "Shotgun" shall have the same meaning as provided in § 7-2501.01(16).

(10) "Video arcade" means any facility legally accessible to persons under 18 years of age, intended primarily for the use of pinball and video machines for amusement, and which contains a minimum of 10 pinball or video machines.

(11) "Youth center" means any recreational facility or gymnasium (including any parking lot appurtenant thereto), intended primarily for use by persons under 18 years of age, which regularly provides athletic, civic, or cultural activities.

## § 22-4504. Carrying concealed weapons; possession of weapons during commission of crime of violence; penalty.

(a) No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed. Whoever violates this section shall be punished as provided in § 22-4515, except that:

(1) A person who violates this section by carrying a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon, in a place other than the person's dwelling place, place of business, or on other land possessed by the person, shall be fined not more than $5,000 or imprisoned for not more than 5 years, or both; or

(2) If the violation of this section occurs after a person has been convicted in the District of Columbia of a violation of this section or of a felony, either in the District of Columbia or another jurisdiction, the person shall be fined not more than $10,000

or imprisoned for not more than 10 years, or both.

(a-1) Except as otherwise permitted by law, no person shall carry within the District of Columbia a rifle or shotgun. A person who violates this subsection shall be subject to the criminal penalties set forth in subsection (a)(1) and (2) of this section.

(b) No person shall within the District of Columbia possess a pistol, machine gun, shotgun, rifle, or any other firearm or imitation firearm while committing a crime of violence or dangerous crime as defined in § 22-4501. Upon conviction of a violation of this subsection, the person may be sentenced to imprisonment for a term not to exceed 15 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 5 years and shall not be released on parole, or granted probation or suspension of sentence, prior to serving the mandatory-minimum sentence.

# CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of July, 2010, two copies of the foregoing

were mailed, first class postage prepaid, to:

Todd S. Kim
Office of the Attorney General for the District of Columbia
441 4th St., N.W., Suite 600-S
Washington, D.C. 20001

William J. Olson
WILLIAM J. OLSON, P.C.
370 Maple Avenue West, Suite 4
Vienna, VA 22180-5615

Paul R. Q. Wolfson
Wilmer Cutler Pickering Hale & Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

Matthew Shors
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC 20006

/s/ Richard E. Gardiner