**NOT YET SCHEDULED FOR ORAL ARGUMENT**

———————————————————————————

No. 10-7036

———————————————————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————————————————

DICK ANTHONY HELLER, et al., Plaintiffs-Appellants,

v.

DISTRICT OF COLUMBIA, et al., Defendants-Appellees.

———————————————————————————

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————————————————————

**APPELLEES' BRIEF**

———————————————————————————

PETER J. NICKLES
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

DONNA M. MURASKY
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 724-6609

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

*A. Parties and amici.* The parties before the district court in this civil action (No. 08-CV-1289) were Dick Anthony Heller, Absalom F. Jordan, Jr., Amy McVey, William Carter, Mark Snyder, the District of Columbia, and Mayor Adrian M. Fenty. The parties before the district court in a civil action that was consolidated with this one before it was dismissed (No. 09-CV-454) were Tracey Ambeau Hanson, Gillian St. Lawrence, Paul St. Lawrence, Second Amendment Foundation, Inc., the District of Columbia, and Chief of the Metropolitan Police Department Cathy Lanier. No amici appeared in the district court.

The parties before this Court are Dick Anthony Heller, Absalom F. Jordan, Jr., William Carter, Mark Snyder, the District of Columbia, and Mayor Adrian M. Fenty. Three groups of amici are participating in this appeal: (1) the Brady Center to Prevent Gun Violence and the Legal Community Against Violence; (2) a group of professional historians and law professors; and (3) Gun Owners of America, Inc., Gun Owners Foundation, Virginia Citizens Defense League, Maryland Shall Issue, Inc., Gun Owners of California, Inc., Lincoln Institute for Research and Education, and Conservative Legal Defense and Education Fund.

*B. Ruling under review.* The ruling under review is the order of the district court (Urbina, J.) issued on March 26, 2010, that denied plaintiffs' motion for summary judgment and granted defendants' cross-motion for summary judgment.

It appears at page 149 of the joint appendix. The accompanying memorandum opinion is at pages 150–79 of the joint appendix and 698 F.Supp.2d 179.

*C. Related cases.* This case has not previously been before this Court, and there are no related cases within the meaning of D.C. Cir. Rule 28(a)(1)(C).

# TABLE OF CONTENTS

STATEMENT OF ISSUES ...................................................................1

STATEMENT OF THE CASE..............................................................1

STATEMENT OF FACTS ...................................................................1

I. *HELLER* ...............................................................................1

II. GUN LAWS IN THE DISTRICT...............................................3

    A. The District complies immediately with *Heller* .........................3

    B. The District liberalizes its gun laws more than *Heller* required by legalizing semiautomatic firearms while banning assault weapons and LCAFDs. ...................................................3

    C. The District adjusts a pre-existing registration system to protect public interests while minimizing burdens on gun-owners ...................................................................................6

III. LITIGATION ....................................................................10

IV. DISTRICT COURT DECISION.........................................11

SUMMARY OF ARGUMENT .........................................................12

ARGUMENT ....................................................................................18

I. PLAINTIFFS' SECOND AMENDMENT CLAIM LACKS MERIT..................................................................................18

    A. The challenged provisions involve guns but nevertheless do not implicate the Second Amendment .................................18

        1. The registration scheme does not implicate the Amendment.....................................................................19

            a. Basic registration requirement ..............................19

            b. The District's registration scheme ........................23

        2. The assault weapons and LCAFD bans do not implicate the Amendment.................................................27

    B. This Court can also affirm simply by rejecting plaintiffs' call for strict scrutiny, and if it goes further should adopt a reasonable-regulation test .........................................................37

        1. Recognition that the right is fundamental marks the beginning of the inquiry, not the end..............................37

2. Strict scrutiny is inappropriate because the pre-existing right the Amendment codified has always been subject to broad regulation, consistent with the Framers' ideal of ordered liberty ....................................39

3. Strict scrutiny is inappropriate here because the District's regulation of guns has nothing to do with the Amendment's purpose for codification, which was to prevent national legislation that would eliminate the militia ............................................................................44

4. Strict scrutiny is inappropriate here because the restrictions at issue do not meaningfully burden either militia-related conduct or self-defense ...........................48

5. If this Court chooses a level of scrutiny, it should choose the deferential reasonable-regulation test...........50

C. The challenged laws would survive intermediate scrutiny or reasonableness review, and plaintiffs' arguments based on strict scrutiny are flawed in any event ......................................53

II. PLAINTIFFS' LOCAL-LAW CLAIM LACKS MERIT ...................58

A. The challenged statutes are within the Council's broad Home Rule Act authority ..........................................................58

B. The challenged statutes are authorized independently by D.C. Code § 1-303.43 ..............................................................60

CONCLUSION .......................................................................................61

# TABLE OF AUTHORITIES[*]

*Cases*

*Alaska v. American Can*, 358 U.S. 224 (1959)................................33

*Arnold v. City of Cleveland*, 616 N.E.2d 163 (Ohio 1993) ...................27

*Bartkus v. Illinois*, 359 U.S. 121 (1959) ........................................50

*Benjamin v. Bailey*, 662 A.2d 1226 (Conn. 1995)..........................27, 40

*Bliley v. Kelly*, 23 F.3d 507 (D.C. Cir. 1994) ..................................59

*Brandenburg v. Ohio*, 395 U.S. 444 (1969) (per curiam)......................41

*Buckley v. Valeo*, 424 U.S. 1 (1976) (per curiam)..............................49

*Burdick v. Takushi*, 504 U.S. 428 (1992).....................................39, 52

*Bush v. D.C.*, 595 F.3d 384 (D.C. Cir. 2010).......................................33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................34

*Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557 (1980).........39

*City of Cincinnati v. Langan*, 640 N.E.2d 200 (Ohio Ct. App. 1994)....................27

*Clark v. Jeter*, 486 U.S. 456 (1988)..................................................45

*Cox v. New Hampshire*, 312 U.S. 569 (1941)..............................22, 24, 41

*Craig v. Boren*, 429 U.S. 190 (1976)..................................................45

*Crawford v. Marion County Election Bd.*, 553 U.S. 181 (2008)............................55

*Cruz v. American Airlines*, 356 F.3d 320 (D.C. Cir. 2004) ........................25, 53–54

*D.C. v. Heller*, 128 S.Ct. 2783 (2008) ..................  1–3, 8–9, 11–16, 18–28, 32–33, 36, 38, 40–44, 46–47, 50–53

*Eldred v. Ashcroft*, 537 U.S. 186 (2003) ..............................................48

*Firemen's Ins. v. Washington*, 483 F.2d 1323 (D.C. Cir. 1973)..........................59–60

*Florida Bar v. Went For It*, 515 U.S. 618 (1995)...................................29

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ...........................25

*Gibbons v. D.C.*, 116 U.S. 404 (1886)..................................................46

---

[*]    Authorities upon which we chiefly rely are marked with asterisks.

*Greene v. Dalton*, 164 F.3d 671 (D.C. Cir. 1999) ....................................33

*Gunderson v. Hvass*, 339 F.3d 639 (8th Cir. 2003) .................................24

*Heller v. Doe*, 509 U.S. 312 (1993) ........................................................45

*Hutchins v. D.C.*, 188 F.3d 531 (D.C. Cir. 1999) ......................32, 35, 39

*Justice v. Town of Cicero*, 577 F.3d 768 (7th Cir. 2009) ........................19

*Kovacs v. Cooper*, 336 U.S. 77 (1949) .............................................36, 45

*Loughboro v. Blake*, 18 U.S. (5 Wheat.) 317 (1820)...............................46

*Lovell v. City of Griffin*, 303 U.S. 444 (1938) ......................................46

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................34

*Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803) ..............................44

*Maryland & D.C. Rifle & Pistol Ass'n v. Washington*, 442 F.2d 123 (D.C. Cir. 1971). .......................................................................................7, 60

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ...........................................52

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) (per curiam)....................26

*McDonald v. City of Chicago*, 130 S.Ct. 3020 (2010) ..... 37–38, 40–42, 47–48, 50

*McIntosh v. Washington*, 395 A.2d 744 (D.C. 1978) ......................6–7, 54, 58–60

*McLaughlin v. Florida*, 379 U.S. 184 (1964) .........................................45

*Medtronic v. Lohr*, 518 U.S. 470 (2006) ................................................40

*M.L.B. v. S.L.J.*, 519 U.S. 102 (1996) .....................................................25

*Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004) .........................................50

*National Ass'n of Mfrs. v. Taylor*, 582 F.3d 1 (D.C. Cir. 2009)............29

*National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156 (D.C. Cir. 1982).....43

*Newspapers, Inc. v. MPD*, 546 A.2d 990 (D.C. 1988) ...........................58

*Newsweek Magazine v. D.C. Comm'n on Human Rights*, 376 A.2d 777 (D.C. 1977) ..............................................................................................60

*Nordyke v. King*, 563 F.3d 439 (9th Cir. 2009) .....................................18

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) .........................39

*Parker v. D.C.*, 476 F.3d 370 (D.C. Cir. 2007) .................... 19, 25, 40, 42, 53–54

*Planned Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833 (1992)............23

*Renton v. Playtime Theatres*, 475 U.S. 41 (1986) .......................29, 35–36

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ......................................18, 40

*Robertson v. City & County of Denver*, 874 P.2d 325 (Colo. 1994) (*en banc*).........................................................................................................27, 50

*Roth v. U.S.*, 354 U.S. 476 (1957).......................................................................23

*Rutan v. Republican Party*, 497 U.S. 62 (1990) ...............................................40

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973) .......................38, 39

*Schneider v. State*, 308 U.S. 147 (1939) ...........................................................45

*Slaughterhouse Cases*, 83 U.S. 36 (1873) ..........................................................45

*Staples v. U.S.*, 511 U.S. 600 (1994) .................................................................30

*Stasiukevich v. Nicolls*, 168 F.2d 474 (1st Cir. 1948)......................................32, 33

*State v. Hamdan*, 665 N.W.2d 785 (Wis. 2003) ...............................................51

*State v. Reid*, 1 Ala. 612 (1840) .......................................................................50

*Strickland v. Washington*, 466 U.S. 668 (1984) ...............................................50

*Thomas v. Chi. Park Dist.*, 534 U.S. 316 (2002) ..............................................22

*Trinen v. City of Denver*, 53 P.3d 754 (Colo. Ct. App. 2002) .................................51

*Turner Broad. Sys. v. FCC*, 512 U.S. 622 (1994)............................................49

*Turner Broad. Sys. v. FCC*, 520 U.S. 180 (1997)...........................................29, 42

*U.S. v. Darrington*, 351 F.3d 632 (5th Cir. 2003) ..................................................38

*U.S. v. Emerson*, 270 F.3d 203 (5th Cir. 2001) ...............................................38

*U.S. v. Fincher*, 538 F.3d 868 (8th Cir. 2008) ................................................18, 19

*U.S. v. Harris*, 106 U.S. 629 (1883) ................................................................58

*\*U.S. v. Marzzarella*, 2010 WL 2947233 (3d Cir. July 29, 2010) .......18, 24, 36, 38, 49, 53, 55, 57

*\*U.S. v. Miller*, 307 U.S. 174 (1939) ..................................... 2, 20, 21, 33, 42, 44, 46

*U.S. v. Rene E.*, 583 F.3d 8 (1st Cir. 2009)..........................................................18

*U.S. v. Sechrist*, 640 F.2d 81 (7th Cir. 1981).........................................................24

*U.S. v. Skoien*, 2010 WL 2735747 (7th Cir. July 13, 2010) (*en banc*).............18, 36

*U.S. v. Williams*, 2010 WL 3035483 (7th Cir. Aug. 5, 2010) ................................37

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989).........................................49, 54

## Constitutional Provisions

U.S. Const. art. I, § 8, cl.17 ....................................................46–47

U.S. Const. art. III, § 3 ..................................................................50

U.S. Const. amend. I ............................................ 21–23, 36, 38, 41–43

U.S. Const. amend. II ..........................................................1–2, 10–57

U.S. Const. amend. VI ..............................................................49–50

U.S. Const. amend. XIV ................................................................45

## Federal Statutes and Regulations

Act of May 8, 1792, ch. XXXIII, § 10, 1 Stat. 271, 273–74 ...................21

Act of July 13, 1892, ch. 159, 27 Stat. 116 .......................................6

Act of July 8, 1932, ch. 465, 47 Stat. 650 ......................................3, 6

Act of Nov. 4, 1943, ch. 296, 57 Stat. 586. ......................................6

District of Columbia Home Rule Act (HRA), Pub. L. No. 93-198, 87 Stat. 774 (1973) ..............................................................7, 54, 58–60

18 U.S.C. 921(a)(30) (2000) ........................................................4

18 U.S.C. 921(a)(31) (2000) ........................................................6

18 U.S.C. 922(d) .....................................................................55

18 U.S.C. 922(v) (2000) .............................................................4

18 U.S.C. 922(w) (2000)..............................................................6

18 U.S.C. 927 ........................................................................55

Reorg. Plan No. 3 of 1967, § 402(4)................................................7

27 C.F.R. 478.124 ...................................................................25

ATF Form 4473 ..................................................................25, 55

## District Statutes and Regulations

Firearms Control Regulations Act of 1975, D.C. Law 1-85................7, 56

Firearms Registration Amendment Act of 2008, D.C. Law 17-372.........3

D.C. Code § 1-201.02 ......................................................7, 58

D.C. Code § 1-203.02 ......................................................7, 58

D.C. Code § 1-204.04(a).............................................7, 58–60

D.C. Code § 1-206.02 ......................................................7, 58

D.C. Code § 1-303.43 .......................... 7–8, 12, 17–18, 58–61

D.C. Code § 7-2501.01(3A).....................................................4

D.C. Code § 7-2501.01(3A)(A)(i)(I)(ee), (qq), (rr), (IV)(aa), (cc) .........................4

D.C. Code § 7-2501.01(10)......................................................3

D.C. Code § 7-2502.01 .........................................................20

D.C. Code § 7-2502.02 ...........................................................3

D.C. Code § 7-2502.02(a) .......................................................4

D.C. Code § 7-2502.03(a) .....................................................55

D.C. Code § 7-2502.03(d) ..................................................9, 23

D.C. Code § 7-2502.03(e) ..................................................9, 23

D.C. Code § 7-2502.04 .....................................................9, 23

D.C. Code § 7-2502.05(b)..................................................9, 23

D.C. Code § 7-2502.07a ........................................................25

D.C. Code § 7-2502.07a(a), (d) ..........................................9, 23

D.C. Code § 7-2506.01(b).......................................................5

D.C. Code § 7-2507.02 ...........................................................3

D.C. Code § 7-2507.10 .........................................................34

D.C. Code § 11-723 .............................................................61

D.C. Police Regs. arts. 50–51 (1968) ......................................6

24 D.C.M.R. 2320..........................................................9, 26

Town of Georgetown Ordinance of Oct. 24, 1801 ................6, 48

Act of the City of Washington of Dec. 9, 1809 .....................6, 48

Act of City of Washington of Nov. 18, 1858........................6, 48

*Legislative History*

H.R. Rep. No. 103-489 (1994)........................................................................30–31

Council Committee on the Judiciary and Criminal Law, Report on Bill 1-164, Apr. 21, 1976 ..........................................................................................8, 57–58

Council Committee on Public Safety and the Judiciary, Report on Bill 17-593, Nov. 25, 2008........................................................................................................5

Council Committee on Public Safety and the Judiciary, Report on Bill 17-843, Nov. 25, 2008............................................................. 3–6, 8–10, 27–31, 34–34, 57

Video of Oct. 1, 2008 Hearing Before the Committee on Public Safety and the Judiciary ..............................................................................................29–32

http://www.dccouncil.washington.dc.us/lims/searchbylegislation.aspx .................32

*Other*

ATF, *State Laws & Published Ordinances—Firearms* (2008) ...................................6

Ashutosh Bhagwat, *The Test That Ate Everything: Intermediate Scrutiny in First Amendment Jurisprudence*, 2007 U. Ill. L. Rev. 783 (2007)....................38, 49

William Blackstone, *Commentaries on the Laws of England* (1769) .................2, 41

Robert Churchill, *Gun Regulation, the Police Power and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139 (2007) .................................20, 41

*The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* (Neil Cogan ed., 1997) ............................................................................................43

Saul Cornell et al., *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487 (2004) .....................................................20, 40–41

Lawrence Cress, *Whither Columbia? Congressional Residence and the Politics of the New Nation, 1776 to 1787*, 32 Wm. & Mary Q. 581 (1975) ............................47

Bernard Harcourt, *On Gun Registration, the NRA, Adolf Hitler, and Nazi Gun Laws*, 73 Fordham L. Rev. 653 (2004) ....................................................................22

David Hemenway, *Private Guns, Public Health* (2004) ....................................19, 42

Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1777).................43

Christopher Koper, *An Updated Assessment of the Federal Assault Weapons Ban* (2004)..........................................................................................................29–32

James Madison, *The Federalist* No. 43 ................................................................47

Lois Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 Chi.-Kent L. Rev. 27 (2000) ....................................................................22, 40

S.B. Sorenson *et al.*, *Buying a Handgun for Someone Else*, 9 Injury Prevention 147 (2003)..............................................................................56

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443 (2009) ......................... 18, 21, 23–24, 28, 36, 38, 42, 50–51

D.W. Webster *et al.*, *Relationship Between Licensing, Registration, and Other State Gun Sales Laws and the Source State of Crime Guns*, 7 Injury Prevention 184 (2001)...........................................................................56

Noah Webster, *An American Dictionary of the English Language* (1828).............43

Douglas Weil *et al.*, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759 (1996) .......................................................56

Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683 (2007) ...........................................................................36–37, 42, 50–51

# GLOSSARY

| | |
|---|---|
| Act | Firearms Registration Amendment Act of 2008 |
| AR-180 | Armalite AR-180 rifle |
| ATF | Bureau of Alcohol, Tobacco, Firearms and Explosives |
| Council | Council of the District of Columbia |
| D.C. or District | District of Columbia |
| H | Video of Oct. 1, 2008 Hearing Before the Committee on Public Safety and the Judiciary |
| HRA | District of Columbia Home Rule Act |
| JA | Joint Appendix |
| LCAFD | large capacity ammunition feeding device |
| LMT | LMT Defender 2000 rifle |
| MPD | Metropolitan Police Department |
| NICS | National Instant Criminal Background Check System |
| PBr | Plaintiffs-Appellants' Brief |
| RD | Record Document |
| Report | Council Committee on Public Safety and the Judiciary, Report on Bill 17-843, Nov. 25, 2008 |
| SA | Statutory Addendum |
| U.S. | United States |

## STATEMENT OF ISSUES

1. Whether the Second Amendment "right … to keep and bear Arms" is "infringed" by statutes that establish firearm registration requirements and ban certain "assault weapons" and "large capacity ammunition feeding devices."

2. Whether the Council of the District of Columbia had legislative authority to enact these statutes.

## STATEMENT OF THE CASE

After the District of Columbia (District or D.C.) rewrote its gun laws to comply with *D.C. v. Heller*, 128 S.Ct. 2783 (2008), plaintiffs challenged provisions in the revised statutes that (1) retained a longstanding requirement that guns be registered, and updated the registration system; and (2) banned certain "assault weapons" and "large capacity ammunition feeding devices" (LCAFDs). Plaintiffs claim these provisions violate the Second Amendment and exceed the legislative authority of the Council of the District of Columbia (Council). The district court rejected both claims on summary judgment.

## STATEMENT OF FACTS

### I.  *HELLER*

*Heller* invalidated the District's ban on handguns and a statute construed to prevent use of firearms for self-defense in the home. 128 S.Ct. at 2817–22. "The handgun ban amounts to a prohibition of an entire class of 'arms' that is

overwhelmingly chosen by American society for that lawful purpose." *Id.* at 2818. The Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home"—a "pre-existing" right. *Id.* at 2797, 2821. The Court directed "the District [to] permit [respondent] to register his handgun and … issue him a license to carry it in the home." *Id.* at 2822. It expressly declined to establish a level of scrutiny, though it rejected rational-basis review. *Id.* at 2817–18 & n.27, 2821.

*Heller* confirmed that "the right secured by the Second Amendment is not unlimited" and "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2816. Only weapons "'in common use'" and "typically possessed by law-abiding citizens for lawful purposes" are even within the Amendment's scope given "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 2815–17 (quoting *U.S. v. Miller*, 307 U.S. 174, 179 (1939), and 4 William Blackstone, *Commentaries on the Laws of England* 148–49 (1769)). *Heller* also listed "presumptively lawful" measures including "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places," while noting that its list was not exhaustive. *Id.* at 2816–17 & n.26. "The Constitution leaves the District … a variety of tools for combating [handgun violence] …." *Id.* at 2822.

## II.     GUN LAWS IN THE DISTRICT

### A.     The District complies immediately with *Heller*.

The Council passed emergency legislation less than three weeks after *Heller* issued and then held public hearings as it considered permanent legislation. Statutory Addendum (SA) 161–62, 171–74 (Council Committee on Public Safety and the Judiciary, Report on Bill 17-843, Nov. 25, 2008 (Report)).  Per *Heller*, the Firearms Registration Amendment Act of 2008, D.C. Law 17-372 (Act), allowed the possession and use of firearms including handguns for self-defense in the home.  D.C. Code §§ 7-2502.02, 7-2507.02.[1]

### B.     The District liberalizes its gun laws more than *Heller* required by legalizing semiautomatic firearms while banning assault weapons and LCAFDs.

The Act liberalized District gun laws more than *Heller* required.  Congress in 1932 banned guns that shoot automatically or "semiautomatically more than twelve shots without reloading" in the District.  Act of July 8, 1932, ch. 465, 47 Stat. 650.  The Council expanded this ban to cover virtually all semiautomatic firearms.  D.C. Code §§ 7-2501.01(10), 7-2502.02 (2008 repl.); SA169.  This ban was not at issue in *Heller*.  Nevertheless, the Act amended it to cover only automatic firearms.  D.C. Code § 7-2501.01(10).  It thus legalized a multitude of semiautomatic firearms.

---

[1]     Except where specified, statutory references are to current statutes.

The Act excepted only a small number of the newly allowed semiautomatic firearms through a ban on "assault weapons." D.C. Code §§ 7-2501.01(3A), 7-2502.02(a). Like an expired federal ban, the District's ban applies to certain named semiautomatic firearms and to unnamed semiautomatics with certain military-style features. *Id.*; *see* 18 U.S.C. 921(a)(30), 922(v) (2000). As relevant here, the ban applies to Colt AR-15 series, Armalite AR-180, and Bushmaster semiautomatic rifles, and to any semiautomatic rifle with a "pistol grip that protrudes conspicuously beneath the action of the weapon" or a "telescoping stock." D.C. Code § 7-2501.01(3A)(A)(i)(I)(ee), (qq), (rr), (IV)(aa), (cc).

The Report cited seven states that ban assault weapons, which "are a minute fraction of the firearms available," "have never been in common use, … are dangerous and unusual, and … pose an especial problem for public safety in the nation's capital." SA168. The Report explained:

> Assault weapons are military-style weapons of war, made for offensive military use. The Committee concurs with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) description of assault weapons as "mass produced mayhem," and ATF's finding that assault weapons are disproportionately likely to be used by criminals …. Assault weapons have no legitimate use as self-defense weapons, and would in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations.
>
> … They are designed with military features to allow rapid and accurate spray firing. They are not designed for sport, but to kill people quickly and efficiently. Assault weapons also have features such as pistol grips and the ability to accept a detachable magazine.

> Pistol grips help stabilize the weapon during rapid fire and allow the
> shooter to spray-fire from the hip position.

SA167 (footnote omitted).

The Report relied on testimony that "law enforcement officers are at particular risk from assault weapons due to their high firepower—which often times leaves officers outgunned by criminals." SA167. "Assault weapons are preferred by terrorists, and would pose extraordinary risks to citizens, government officials, visiting dignitaries, and law enforcement …." SA167–68. Metropolitan Police Department (MPD) Chief Cathy Lanier emphasized the District's uniquely high concentration of government officials and infrastructure. SA163 n.3. The report for a companion bill added: "The District shares the problem of gun violence with other dense, urban jurisdictions … which is quite different than … in … suburban and rural America." SA123 (Council Committee on Public Safety and the Judiciary, Report on Bill 17-593, Nov. 25, 2008).

Lifting the ban on semiautomatic guns capable of shooting more than twelve shots without reloading also required the Council to address the capacity of the semiautomatic weapons being legalized. SA162. The Act thus banned "large capacity ammunition feeding devices." D.C. Code § 7-2506.01(b). As relevant, such an LCAFD is "a magazine … that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition." *Id.* The Council again followed the lead of the expired federal assault weapons ban and

many states.  SA169; 18 U.S.C. 921(a)(31), 922(w) (2000); *see* ATF, *State Laws & Published Ordinances—Firearms* 22–24, 219–22, 286–88, 307–08 (2008).  The LCAFD ban serves to limit people from "fir[ing] a large quantity of ammunition without having to pause to reload."  SA162.  The Report agreed with Chief Lanier that this "2 or 3 second pause … can be of critical benefit to law enforcement, and that magazines holding[] over 10 rounds are more about firepower than self-defense."  SA169.

### C.  The District adjusts a pre-existing registration system to protect public interests while minimizing burdens on gun-owners.

Firearm use in the District has long been regulated.  Over two centuries ago, firing guns was forbidden in "inhabited parts" of the then-Town of Georgetown and "within four hundred yards of any house" in the then-City of Washington.  SA40–42 (Town of Georgetown Ordinance of Oct. 24, 1801; Act of the City of Washington of Dec. 9, 1809).  In 1858, the city prohibited "carry[ing] or hav[ing] concealed about [one's] person[] any deadly or dangerous weapons."  SA44 (Act of City of Washington of Nov. 18, 1858).  Congress in 1892 began allowing such carrying in the District only with a permit.  Act of July 13, 1892, ch. 159, 27 Stat. 116; *see* Act of July 8, 1932, *supra*; Act of Nov. 4, 1943, ch. 296, 57 Stat. 586.

In 1968, police regulations complemented that permit requirement by requiring guns to be registered with the police.  D.C. Police Regs. arts. 50–51 (1968); *McIntosh v. Washington*, 395 A.2d 744, 752 (D.C. 1978).  The predecessor

to the current Council enacted those regulations consistent with authority dating back to 1906, now codified at D.C. Code § 1-303.43, to make "usual and reasonable police regulations … as [it] may deem necessary for the regulation of firearms." *Maryland & D.C. Rifle & Pistol Ass'n v. Washington*, 442 F.2d 123, 125 & n.11 (D.C. Cir. 1971).

In 1973, Congress passed the District of Columbia Home Rule Act (HRA), Pub. L. No. 93-198, 87 Stat. 774 (1973). Its "core and primary purpose" was "reliev[ing] Congress of the burden of legislating upon essentially local matters 'to the greatest extent possible, consistent with the constitutional mandate.'" *McIntosh*, 395 A.2d at 753 (quoting D.C. Code § 1-201.02). Congress gave the current Council, with limited exceptions, "legislative power" that "extend[s] to all rightful subjects of legislation." D.C. Code §§ 1-203.02, 1-204.04(a), 1-206.02. Congress also directed the Council, "in accordance with [the HRA]," to "carr[y] out" the "functions" of its predecessor. D.C. Code § 1-204.04(a). These "functions" included regulating firearms. Reorg. Plan No. 3 of 1967, § 402(4) (referencing earlier codification of D.C. Code § 1-303.43).

The Council soon adopted the Firearms Control Regulations Act of 1975, D.C. Law 1-85 (SA45–87). It relied on both "the plenary delegation [in D.C. Code § 1-203.02]" and "[D.C. Code § 1-204.04(a),] which vests the Council … with all functions granted to its predecessor … , including but not limited to … the firearm

7

regulation powers [in D.C. Code § 1-303.43]." SA93–94 (Council Committee on the Judiciary and Criminal Law, Report on Bill 1-164, Apr. 21, 1976). The Council retained the registration requirement. It found that "to promote the health, safety and welfare" it was "necessary to," *inter alia*, "[r]equire the registration of all firearms … owned by private citizens," ensure that "only qualified persons are allowed to possess firearms," and "[m]ake it more difficult for firearms, destructive devices, and ammunition to move in illicit commerce within the District." SA45 (uncodified "Findings and purpose" section); *see* SA89.

Decades later, post-*Heller*, the Council retained the registration requirement again and most aspects of its earlier registration system. As the Report noted, many states and major cities have longstanding firearm registration requirements. SA163; *see* JA99–104. It further explained:

> Registration is critical because it: gives law enforcement essential information about firearm ownership, allows officers to determine in advance whether individuals involved in a call may have firearms, facilitates the return of lost or stolen firearms to their rightful owners, assists law enforcement in determining whether registered owners are eligible to possess firearms or have fallen into a prohibited class, permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permits officers to seize unregistered weapons.

SA163–64. Chief Lanier testified similarly. SA214–17.

A few aspects of the Act's registration system beyond the base requirement to register are relevant. First, the District generally "shall register no more than

one pistol per registrant during any 30-day period."  D.C. Code § 7-2502.03(e).
The Report linked this requirement to studies showing that such laws "reduce the
number of guns entering the illegal market" and that "handguns sold in multiple
sales to the same individual are frequently used in crime."  SA170.  It noted three
states with a similar one-per-month limit.  SA170.

Second, the Act requires submission of registered pistols "for a ballistics
identification procedure."  D.C. Code § 7-2502.03(d).  Such measures "enable law
enforcement to link bullets and shell casings recovered at crime scenes to the
firearm that fired them."  SA165.  The Report relied on Chief Lanier's expert
testimony regarding why ballistics testing would work in the District.  SA166–67.

Third, as before *Heller*, registrants must submit photographs and possibly
fingerprints.  D.C. Code § 7-2502.04.

Fourth, as before *Heller*, the Mayor may require the registrant to pay a fee.
D.C. Code § 7-2502.05(b).  The Report noted the concern that the cost not be
"unduly burdensome" but recognized "a cost for fingerprinting, the ballistic test,
processing," and database maintenance.  SA169.  The current fees are $13 for
registration, $12 for the ballistics test (applicable only to handguns), and $35 for
fingerprinting and a federal background check.  24 D.C.M.R. 2320.

Fifth, registration certificates expire within three years unless renewed, with
a background check needed every six years.  D.C. Code § 7-2502.07a(a), (d).

Renewable registration allows the District "to better track where firearms are located" and gives MPD "a better sense of whether a registered gun owner has become ineligible to own a firearm." SA164. The Report rejected a suggestion of annual re-registration. SA164.

## III. LITIGATION

Four District residents challenged the registration statutes and the bans on assault weapons and LCAFDs under the Second Amendment and local law. JA9–29. Three of them had successfully registered guns. JA53–56, 69. One plaintiff wished to register multiple pistols, however, without waiting thirty days for each. JA56. Further, the assault weapons ban prevented registration of an Armalite AR-180 rifle (AR-180), an LMT Defender 2000 rifle (LMT), and a Bushmaster XM-15-E2S rifle. JA56, 64–65, 69–70. The LCAFD ban prevented plaintiffs from equipping registered firearms with high-capacity magazines. JA57, 70.

The assault weapons at issue are semiautomatic rifles with protruding pistol grips. JA56, 65, 70, 82–83, 90. According to plaintiffs, such a grip "allows the rifle to be accurately shot from the shoulder without excessive muzzle rise"; its purpose "is not to allow the rifle to be fired from the hip." JA65, 137. The LMT also has a "telescoping stock." JA65. A declarant for plaintiffs, Harold Johnson, believes these guns are not proper "assault weapons" because they do not fire automatically, and further that semiautomatic guns are "not made or designed for

offensive military use," are not "preferred by irregular forces or terrorists," and "do not allow rapid and spray firing." JA134–37.

Plaintiffs declared that these semiautomatic rifles are "commonly possessed" for purposes including "protection, target shooting, competitions, and sporting" but did not quantify how common such possession is. JA56, 65, 70, 91. They similarly declared that LCAFDs "are commonly sold" and "commonly possessed" for self-defense and other lawful purposes. JA57, 71, 85–86, 92. Another declarant, Mark Overstreet, discussed AR-15 rifles in particular. JA82–85. He estimated that "two million AR-15s have been manufactured" since 1963, and that they accounted "for at least 5.5 percent of firearms, and at least 14.4 percent of rifles, made in the U.S. for the domestic market" in 2007. JA83–84. He did not discuss what percentage of Americans or American firearm owners own AR-15 rifles, or what percentage of rifles or firearms in the United States are AR-15 rifles.

## IV. DISTRICT COURT DECISION

The district court granted summary judgment to the District. JA149. On the constitutional claim, the court first asked whether each provision "implicates the core Second Amendment right" *Heller* identified—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home." JA163. If so, the court "appl[ied] intermediate scrutiny." JA163.

Each challenged provision was constitutional as applied to plaintiffs. JA164–76. Applying intermediate scrutiny to the registration scheme, the court "ha[d] no trouble" finding "an important governmental interest." JA167. Deferring to the Council's legislative findings, it also found the scheme was "substantially related to the goal of public safety." JA167–71.

The bans on assault weapons and LCAFDs "do not implicate the core Second Amendment right." JA175. Again deferring to relevant legislative findings, the court concluded that assault weapons and LCAFDs "are not in common use, are not typically possessed by law-abiding citizens for lawful purposes and are 'dangerous and unusual'" under *Heller*. JA171–75. In any event, these bans too survive intermediate scrutiny. JA176.

On the local-law claim, the court held that all these provisions were within the Council's legislative authority because they were "usual and reasonable" under D.C. Code § 1-303.43. JA176–79. The court did not reach the District's argument that the Council had independent authority under the HRA. Record Document (RD) 25, at 35–36.

## SUMMARY OF ARGUMENT

I. Plaintiffs' constitutional claim lacks merit. They argue that the Second Amendment forbids the District from requiring that guns be registered, or from banning assault weapons and LCAFDs—they claim a constitutional entitlement to

a secret arsenal of military-style weapons and high-capacity magazines. That view is inconsistent with normal principles of constitutional law. This Court can affirm the rejection of plaintiffs' Second Amendment claim for three separate reasons.

A. *Heller* and normal principles of constitutional law establish that some provisions may involve guns yet nevertheless not implicate the Second Amendment. The provisions challenged here fall within "presumptively lawful" exclusions, burden protected conduct too trivially to "infringe[]" the right, or involve weapons that are not even protected "arms."

*First*, the registration scheme does not implicate the Amendment. Both government measures to survey gun ownership and government requirements of approval for gun possession have longstanding acceptance, like other "presumptively lawful" exclusions listed in *Heller*. 128 S.Ct. at 2816–17 & n.26. Laws dating to before the Framing authorized door-to-door gun censuses, allowed gun possession only by those swearing loyalty, and allowed intrusive government tracking of who had firearms for militia purposes. Registration is similar, but far less intrusive.

None of the other challenged registration provisions burdens protected conduct substantially enough to implicate the Amendment. For instance, the one-pistol-per-30-days limit does not affect how many pistols a person may register in total, or limit shotguns and rifles at all. The other provisions are even less

burdensome, and leave untouched the right *Heller* recognized "to use arms in defense of hearth and home." 128 S.Ct. at 2821. At minimum, these laws are constitutional as applied to plaintiffs, who successfully registered firearms and never assert that any challenged provision undermines their self-defense abilities.

*Second*, the assault weapons and LCAFD bans also do not implicate the Amendment. They too burden protected conduct minimally. The assault weapons ban applies to a minute fraction of available guns and leaves myriad choices for self-defense. The LCAFD ban merely requires "individuals seeking to fire more than ten rounds of ammunition … to pause for a few seconds to reload." JA174. Further, an assault weapons ban does not even involve protected "arms," only weapons not "in common use" and "dangerous and unusual" under *Heller*, 128 S.Ct. at 2815–17.

The legislative findings in the committee report supporting these conclusions justified summary judgment. Per usual practice, the Court should defer to legislative findings on empirical matters. These findings were supported by the legislative record, other jurisdictions' experiences under federal and state assault weapons and LCAFD bans, and common sense. The findings indicated that assault weapons are a tiny percentage of available firearms, are not useful for legitimate self-defense, are military-style weapons designed to kill people quickly and efficiently, and are disproportionately involved in crime, preferred by terrorists,

and a particular threat to law enforcement; and that LCAFDs are more about firepower than self-defense. Plaintiffs' reasons for rejecting the legislative findings (which are mostly procedural) fail. The evidence they submitted created no genuine issue of material fact. It did not even address many of the relevant legislative findings and, when it did, did so in a conclusory fashion that cannot overcome the deference due to the Council.

Plaintiffs also say the legislature's view should be rejected because, under *Heller*, no protected "arm" may ever be banned. *Heller* says no such thing. Under standard constitutional principles, the conclusion that a weapon is a protected "arm" means the Second Amendment is implicated, but not that a narrow ban is forbidden no matter how strong the government interest.

B. This Court can also affirm by rejecting plaintiffs' call for strict scrutiny. Again looking to normal principles of constitutional law, this Court should do so. Only a minority of enumerated rights—even those deemed fundamental—triggers strict scrutiny. In deciding what scrutiny to apply, the Supreme Court has looked to the nature of the right at issue, its purposes, and the extent to which the challenged restrictions implicate those purposes. Considering such factors, the Court should reject strict scrutiny and, if it goes further, adopt the deferential reasonable-regulation test long accepted under state Second Amendment

analogues.  The political branches should be able to enact reasonable measures that leave the core right intact while protecting public safety.

*First*, strict scrutiny is inappropriate because the pre-existing right the Amendment codified has always been subject to broad regulation—from the English Declaration of Rights and Blackstone through today.  Further, the Framers sought ordered rather than absolute liberty, and guns have unique potential to destabilize ordered liberty.  Indeed, the Second Amendment speaks of a "well regulated" militia and uses the word "infringe[]" rather than a word early American dictionaries show connoted a stricter test—"abridge[]," used in the First Amendment.

*Second*, strict scrutiny is inappropriate here because the District's regulation of guns has nothing to do with the Amendment's purpose for codification, namely "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms." *Heller*, 128 S.Ct. at 2801.  When a law does not undermine the purpose for codification, lesser scrutiny should apply, consistent with precedent under the Equal Protection Clause and the First Amendment.  The laws at issue do not interfere with any militia.  Moreover, the Framers were concerned with national legislation, not local gun laws in the District.

*Third*, strict scrutiny is inappropriate here because the restrictions at issue do not meaningfully burden either militia-related conduct or self-defense.  That lesser

scrutiny should apply to laws that impose lesser burdens makes practical sense and comports with precedent under the First and Sixth Amendments.

C.  The challenged laws would survive intermediate scrutiny or reasonableness review, as they are at minimum substantially related to important government interests.  Plaintiffs apparently concede as much.  Their arguments based on strict scrutiny (which pertain only to registration) are flawed in any event.  They argue that the District's laws are not narrowly tailored because they duplicate federal practices but provide no support for the view that the constitutionality of one government's laws should depend on what a different government does.  They also suggest that the Council may not impose any burden on the "law-abiding" simply because "criminals" may misuse guns, but that impractical view is inconsistent with normal constitutional law.  At minimum, the basic requirement to register satisfies strict scrutiny.  Registration is narrowly tailored to compelling interests in that it serves to ensure that only qualified persons possess firearms and to discourage gun trafficking and crimes.

II.  Plaintiffs' local-law claim also lacks merit.  The Council properly enacted the challenged statutes under the Home Rule Act's broad grant of legislative authority.  Plaintiffs' argument that the Council relied on D.C. Code § 1-303.43 rather than the HRA fails both because the Council's failure to cite the correct authority would not void authorized legislation, and because the Council in

fact relied on its new HRA authority. Regardless, the challenged provisions would also be authorized under § 1-303.43 as "usual" and "reasonable" gun laws.

## ARGUMENT

## I. PLAINTIFFS' SECOND AMENDMENT CLAIM LACKS MERIT.

### A. The challenged provisions involve guns but nevertheless do not implicate the Second Amendment.

Some laws involving guns do not implicate the Second Amendment, and so require no independent scrutiny. They may fall within a "presumptively lawful" exclusion. *Heller*, 128 S.Ct. at 2816–17 & n.26; *Robertson v. Baldwin*, 165 U.S. 275, 281–82 (1897); *U.S. v. Marzzarella*, 2010 WL 2947233, at *4–7 (3d Cir. July 29, 2010); *U.S. v. Skoien*, 2010 WL 2735747, at *1–3 (7th Cir. July 13, 2010) (*en banc*); *U.S. v. Rene E.*, 583 F.3d 8, 11–16 (1st Cir. 2009). They may burden protected conduct too trivially to "infringe[]" the right. Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense*, 56 UCLA L. Rev. 1443, 1454–60 (2009); *see Marzzarella*, 2010 WL 2947233, at *6; *Nordyke v. King*, 563 F.3d 439, 458–60 (9th Cir. 2009), *vacated*, 2010 WL 2721856 (9th Cir. July 12, 2010). They may involve weapons that are not protected "arms." *Heller*, 128 S.Ct. at 2815–17; *U.S. v. Fincher*, 538 F.3d 868, 873–74 (8th Cir. 2008).

The district court found that some of the provisions challenged here do not implicate the Second Amendment. JA175–76. This Court can so conclude as to

all the challenged provisions, at least as applied to these plaintiffs, and thus affirm without deciding what scrutiny otherwise would apply.

      1.    The registration scheme does not implicate the Amendment.

    a. *Basic registration requirement*—The Second Amendment protects an individual's right "to keep and bear Arms," but not to do so without government regulation, let alone government knowledge.  In the decision *Heller* affirmed, this Court explained:

> The protections of the Second Amendment are subject to the same sort of reasonable restrictions that have been recognized as limiting, for instance, the First Amendment …. These regulations promote the government's interest in public safety consistent with our common law tradition.  Just as importantly, however, they do not impair the core conduct upon which the right was premised.
>
> Reasonable restrictions also might be thought consistent with a "well regulated Militia."  The registration of firearms gives the government information as to how many people would be armed for militia service if called up.

*Parker v. D.C.*, 476 F.3d 370, 399 (D.C. Cir. 2007).  Other courts after *Heller* have consistently upheld registration schemes and conceptually similar licensing schemes.  JA166 (citing, *e.g.*, *Justice v. Town of Cicero*, 577 F.3d 768, 774 (7th Cir. 2009); *Fincher*, 538 F.3d at 874).  Plaintiffs cite no decision striking registration or licensing requirements, which enjoy broad popular support.  David Hemenway, *Private Guns, Public Health* 161–65 (2004) (describing polls).

The basic requirement in D.C. Code § 7-2502.01 that guns must be registered does not implicate the Second Amendment. Registration is like some of the "presumptively lawful" measures listed in *Heller* in that similar requirements have long been accepted. 128 S.Ct. at 2816–17 & n.26. Both government measures to survey gun ownership and government requirements of approval for gun possession have historic roots. Colonial legislation before and after 1776 authorized door-to-door gun censuses. Robert Churchill, *Gun Regulation, the Police Power and the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 161 & n.54 (2007). During the Revolution, several states allowed gun possession only by those swearing loyalty. Saul Cornell *et al.*, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506–08 (2004).

Furthermore, Framing-era laws organizing state militias "could be quite intrusive, allowing government not only to keep track of who had firearms, but requiring them to report for a muster or face stiff penalties." *Id.* at 505, 509–10. For instance, Virginia militiaman at musters held every two months had to produce guns and ammunition "whenever called for by [their] commanding officers." *Miller*, 307 U.S. at 182. The first Congress enacted a federal militia law that required officers to "inspect" militia arms and report at least annually on "the actual situation of the arms, accoutrements, and ammunition of the several corps."

Act of May 8, 1792, ch. XXXIII, § 10, 1 Stat. 271, 273–74.  The Framers thus understood that the pre-existing right the Amendment codified was not offended by government measures to determine how the people were armed.  Registration achieves largely the same end as these measures, but is far less intrusive.

Plaintiffs fail to rebut the natural conclusion that a basic registration requirement does not implicate the Second Amendment.  *First*, they suggest that *Heller* and *Miller* both presuppose that the Amendment precludes registration.  Plaintiffs-Appellants' Brief (PBr) 34–36.  But the *Heller* Court affirmatively required the District to allow Heller "to register his handgun."  128 S.Ct. at 2822.  And *Miller* held that an unregistered gun at issue was not even a protected "arm."  307 U.S. at 178–79.  "Beyond that, the opinion provided no explanation of the content of the right."  *Heller*, 128 S.Ct. at 2814.

*Second*, plaintiffs contend based on First Amendment cases that exercise of a core constitutional right never requires registration.  PBr36–38.  But "this is not the normal rule for constitutional rights."  Volokh, *supra*, at 1546–49 (discussing various accepted registration requirements, and suggesting that registration comports with self-defense right in Second Amendment).  Moreover, the government's authority to regulate lethal firearms need not mirror precisely its authority to regulate speech, and plaintiffs' rule does not even apply to all First

Amendment activity.  PBr38; *Cox v. New Hampshire*, 312 U.S. 569, 576 (1941) (parades).

*Third*, plaintiffs rely on early English history, but inaccurately.  "Both prior to and after … the English Bill of Rights, there were a number of gun regulations in place in England, including registration requirements."  Bernard Harcourt, *On Gun Registration, the NRA, Adolf Hitler, and Nazi Gun Laws*, 73 Fordham L. Rev. 653, 661–62 (2004); *see* Lois Schwoerer, *To Hold and Bear Arms: The English Perspective*, 76 Chi.-Kent L. Rev. 27, 35 (2000).  Plaintiffs infer that the Second Amendment was intended to prohibit such requirements because registration facilitated gun confiscation in England.  PBr39–40.  Neither logic nor historical evidence supports their inference.  While early American gun laws sought to prevent forcible disarmament by a tyrannical government, *see Heller*, 128 S.Ct. at 2799, 2801, they also imposed many requirements that served the same ends as the registration provisions plaintiffs challenge, but were more intrusive.  That these requirements were accepted shows their consistency with the Second Amendment right.  By contrast, English speech licensing laws were the "core abuse against which [the First Amendment] was directed," such that prior restraints are particularly suspect under that Amendment.  *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 320–21 (2002).

*Fourth*, plaintiffs argue that registration has no militia purpose in the District. PBr41–42. They miss the point: the right the Second Amendment protects is not implicated by registration, whatever the government's purpose in requiring it. The First Amendment similarly is not implicated by a law regulating obscenity regardless of the law's purpose. *Roth v. U.S.*, 354 U.S. 476, 485 (1957).

b. *The District's registration scheme*—Although plaintiffs challenge more than the basic registration requirement, none of the challenged provisions implicates the Second Amendment. Plaintiffs challenge: (1) the one-pistol-per-30-days limit in § 7-2502.03(e); (2) the ballistics requirement for pistols in § 7-2502.03(d), and the requirement that registrants submit fingerprints and photographs in § 7-2502.04; (3) the Mayor's authority to require a fee in § 7-2502.05(b); and (4) the re-registration requirement in § 7-2502.07a(a), (d). PBr29–45. At least as applied, these provisions singly and collectively with the basic registration requirement affect protected conduct too trivially to implicate the Second Amendment.

A restriction may be upheld if the burden it imposes on the exercise of a right is so trivial that it does not "infring[e]" the right, such that a court need not consider or weigh governmental interests. Volokh, *supra*, at 1454. "We see this approach in many constitutional doctrines," including those relating to marriage, abortion, and free exercise of religion. *Id.*; *see Planned Parenthood of S.E. Pa. v.*

*Casey*, 505 U.S. 833, 873 (1992) (op. of O'Connor, Kennedy, & Souter, JJ.). Such an approach is consistent with *Heller*. 128 S.Ct. at 2819–20 (colonial gunpowder-storage laws did "not remotely burden the right of self-defense as much as an absolute ban on handguns"). It is also sensible. Any burden from a ban on guns with obliterated serial numbers, for instance, is at least "arguably *de minimis.*" *Marzzarella*, 2010 WL 2947233, at *6.

The provisions that plaintiffs challenge beyond the basic registration requirement burden protected conduct too trivially to implicate the Second Amendment. (1) Although only one pistol may be registered every 30 days, the Act does not cap how many pistols may be registered, or how many or how frequently shotguns and rifles may be registered. (2) Ballistics, fingerprint, and photograph requirements also burden conduct protected under the Second Amendment minimally if at all. *Cf. Gunderson v. Hvass*, 339 F.3d 639, 644–45 (8th Cir. 2003); *U.S. v. Sechrist*, 640 F.2d 81, 86 (7th Cir. 1981). (3) Nor is there any significant burden from the possibility that registrants may have to pay some fee given that plaintiffs do not challenge its amount. (Here too, plaintiffs incorrectly suggest a flat rule. PBr42–43. It is not true that fees may never be charged to exercise constitutional rights, at least where legitimate regulation leads to administrative costs. *Cox*, 312 U.S. at 576–77; Volokh, *supra*, at 1543–44; *see*

*M.L.B. v. S.L.J.*, 519 U.S. 102, 123–24 (1996).[2]) (4) Re-registration is required

every three years, but the act of re-registration is not burdensome. Under § 7-

2502.07a, it requires submission of a simple statement and potentially an

unspecified fee every three years, and a background check every six years.

Moreover, as explained, Framing-era militia laws required far more frequent and

intrusive muster and inspection. The registration provisions do not implicate the

Second Amendment; they leave intact the right *Heller* recognized "to use arms in

defense of hearth and home." 128 S.Ct. at 2821.[3]

At minimum, these laws are constitutional as applied to these plaintiffs.

They successfully registered various firearms. JA53–56, 69. They never assert

that any challenged provision undermines their ability to defend themselves. For

all the record reveals, for instance, the plaintiff who complains about the one-

---

[2]    Plaintiffs suggest that the fee provision unconstitutionally leaves the amount "to the whim of the administrator." PBr42 (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 (1992)). The amount is, however, set by 24 D.C.M.R. 2320, not subject to case-by-case whim as in *Forsyth*.

[3]    Plaintiffs mention other statutes and regulations in their statement of facts, PBr3–6, but not in their argument. They thus forfeit any challenge to other laws. *Cruz v. American Airlines*, 356 F.3d 320, 333–34 (D.C. Cir. 2004). In any event, such other laws—in particular, the requirements for providing certain information when registering and the vision and testing requirements—similarly impose only burdens too insignificant to implicate the Amendment. Those purchasing firearms from licensed dealers under federal law must also provide substantial personal information. 27 C.F.R. 478.124; ATF Form 4473 (http://www.atf.gov/forms/ download/atf-f-4473.pdf). Further, this Court in *Parker* appeared to approve testing requirements. 478 F.3d at 399.

pistol-per-30-days limit already has more pistols at home than he could use in any self-defense situation.  JA56.  Although plaintiffs contend without support that the District's registration system "appear[s] calculated to discourage persons from registering firearms," PBr38, their philosophical disagreement with registration does not suggest that the Council's public-safety purposes were pretext.  *Cf. Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (refusing to "assume unconstitutional legislative intent" behind abortion regulation).  Plaintiffs' contention accounts for neither the District's legitimate need to ensure that newly legalized handguns are regulated consistent with the public interest, nor the Council's choice to legalize far more guns than *Heller* even required, *see supra* pp.3–4.

Moreover, though plaintiffs call the system burdensome, PBr2, they develop no argument that the time registration took, the administrative requirements they encountered, or the fees they paid were unconstitutional as applied to them. Indeed, one plaintiff declared that MPD registered a pistol for him the same day he applied.  JA56.  Further, though regulations establish how the registration system actually functions, their complaint challenges only statutory provisions.  JA24–28; 24 D.C.M.R. 2320.  They have no valid as-applied challenge, and *a fortiori* no facial one.  JA164 n.10.

2.    The assault weapons and LCAFD bans do not implicate the Amendment.

The assault weapons and LCAFD bans also do not implicate the Second Amendment.  They too burden protected conduct only minimally.  Further, assault weapons fall outside the definition of protected "arms" under *Heller*.  These conclusions are supported by legislative findings, and plaintiffs' arguments why this Court should disregard those findings are incorrect.

Plaintiffs never assert that the assault weapons ban meaningfully affects their right under *Heller* "to use arms in defense of hearth and home."  128 S.Ct. at 2821.  It applies to only a "minute fraction" of available guns and leaves plaintiffs with myriad choices of guns for self-defense.  SA168.  The Report finds that "[a]ssault weapons have no legitimate use as self-defense weapons, and would in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations."  SA167.  Various state courts have upheld assault weapons bans.  *E.g.*, *Benjamin v. Bailey*, 662 A.2d 1226, 1230–35 (Conn. 1995); *Robertson v. City & County of Denver*, 874 P.2d 325, 331–33 (Colo. 1994) (*en banc*); *Arnold v. City of Cleveland*, 616 N.E.2d 163, 166–73 (Ohio 1993).

Similarly, the LCAFD ban does not meaningfully affect plaintiffs' self-defense capabilities.  *See City of Cincinnati v. Langan*, 640 N.E.2d 200, 203 n.1, 205–06 (Ohio Ct. App. 1994) (upholding similar ban).  The Report concluded that "magazines holding[] over 10 rounds are more about firepower than self-defense,"

and the district court that the "burden on individuals seeking to fire more than ten rounds of ammunition by requiring them to pause for a few seconds to reload" is "slight." SA169; JA174; *see* Volokh, *supra*, at 1489. Plaintiffs counter that not having to pause after shooting ten rounds "can be of critical benefit," and that police use magazines with over ten rounds. PBr51. That such magazines may be useful in rare circumstances does not suggest that the burden on protected conduct is more than minimal. Plaintiffs give no reason to think they will ever face such circumstances, let alone with the frequency for which police must be prepared. There is no constitutional right to be as well-armed as professional peacekeepers.

Further, the Report finds that assault weapons have "never been in common use," are "dangerous and unusual," and thus are not even "arms" protected by the Second Amendment. SA168; *Heller*, 128 S.Ct. at 2815–17. They are "military-style weapons of war"; "mass produced mayhem"; "disproportionately likely to be used by criminals" and "preferred by terrorists"; and "not designed for sport, but to kill people quickly and efficiently." SA167. Their "high firepower … often times leaves officers outgunned by criminals." SA167.

Such findings deserve substantial deference and supported summary judgment. Even when government regulations are subject to heightened scrutiny, courts properly defer to legislative findings on empirical matters, for "legislative bodies are 'far better equipped than the judiciary to amass and evaluate the vast

amounts of data bearing upon legislative questions.'" JA167–68 (quoting *Turner Broad. Sys. v. FCC*, 520 U.S. 180, 195 (1997)). "[T]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments [varies] up or down with the novelty and plausibility of the justification raised." *National Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 15 (D.C. Cir. 2009). A detailed record may thus be unnecessary. *See Florida Bar v. Went For It*, 515 U.S. 618, 628 (1995) (even strict scrutiny sometimes satisfied "based solely on history, consensus, and 'simple common sense'").

The key legislative findings are not novel and are perfectly plausible. The legislative record supported each, and the Council could also rely on other jurisdictions' experiences under federal and state assault weapons and LCAFD bans. *See Renton v. Playtime Theatres*, 475 U.S. 41, 51–52 (1986).

*First*, assault weapons are a tiny percentage of firearms available in the country. SA168. Both written and oral testimony so indicated. SA203; Video of Oct. 1, 2008 Hearing Before the Committee on Public Safety and the Judiciary (H) 45:56–46:04, 58:33–58:38 (http://oct.dc.gov/services/on_demand_video/ channel13/October2008/10_01_08_JUDICI.asx). So does a study for the Department of Justice that a witness was asked to submit to the Council and that plaintiffs cite. Christopher Koper, *An Updated Assessment of the Federal Assault Weapons Ban*, at 10 (2004) (http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf)

("0.5% of the estimated civilian gun stock"); H58:45–59:37; PBr50. Plaintiffs'

suggestion that *Staples v. U.S.*, 511 U.S. 600 (1994), "find[s]" otherwise, PBr 47,

simply misreads that opinion.

*Second*, assault weapons are not useful for legitimate self-defense. SA167.

Again, testimony supports that finding. H38:00–38:36. Their features "appear

useful in military and criminal applications but unnecessary in shooting sports or

self-defense." Koper, *supra*, at 1.

*Third*, assault weapons are military-style weapons designed to kill people

quickly and efficiently. SA167. ATF described them as "mass produced

mayhem." SA167; *see also* H.R. Rep. No. 103-489, at 8–9 (1994) (noting "expert

evidence" that assault weapons features serve "combat-functional ends"). They are

"semiautomatic versions of fully automatic weapons that are designed for military

use." SA197; H38:28–38:37; *see* Koper, *supra*, at 1. Although not automatic, they

shoot very rapidly—in one example, thirty bullets in five seconds. H38:39–38:51;

*see* H.R. Rep. No. 103-489, at 8 (noting testimony that rate of fire makes

semiautomatic weapons "virtually indistinguishable in practical effect from

machineguns"). Pistol grips "help stabilize the weapon during rapid fire and allow

the shooter to spray-fire from the hip position." SA198; H51:46–52:15; Koper,

*supra*, at 8, 80 n.94. Telescoping stocks make assault weapons more concealable.

H51:31–51:47.

*Fourth*, assault weapons are disproportionately involved in crime, preferred by terrorists, and a particular threat to law enforcement.  SA167; *see* H.R. Rep. No. 103-489, at 5 ("weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder").  A witness estimated that they are one percent or less of the gun stock yet are associated with up to eight percent of crime.  H58:32–58:45.  In particular, they appear disproportionately responsible for mass murders and murders of police.  Koper, *supra*, at 14–19, 87; SA199–201.  (Plaintiffs rely on a finding that assault weapons were used in "no more than 8%" of gun crimes prior to the federal ban, PBr50 (citing Koper, *supra*, at 2), but that says nothing about whether their effect was disproportionate.)  A terrorist manual advises "al-Qaeda members living in the United States [to] 'obtain an assault weapon legally.'"  SA201.

*Fifth*, LCAFDs are more about firepower than self-defense.  SA169.  Testimony and common sense indicate that "permitting a shooter to fire more than ten rounds without reloading … greatly increase[s] the firepower of mass shooters," as in the Virginia Tech tragedy.  SA202; H54:58–55:26.  LCAFDs' self-defense value is doubtful given the lack of known instances when magazines with such capacity would have been necessary in self-defense.  H1:39:08–1:39:59.  Further, because people in self-defense situations tend to continue firing until the magazine is empty, even after the threat is gone, LCAFDs "pose[] grave risks to

others in the household, passersby, and bystanders." SA202. They too appear disproportionately involved in murders of police, and facilitate mass shootings. Koper, *supra*, at 18; H1:40:53–1:41:24.

Plaintiffs' reasons for rejecting the legislative findings fail. They say *Heller* rejected reliance on committee reports and empirical studies. PBr25–27. But *Heller* found that a handgun ban infringed the Second Amendment right so severely that nuanced analysis was unnecessary, not that committee reports and empirical studies are categorically irrelevant. 128 S.Ct. at 2817–18.

Plaintiffs also say, without citation, that findings in a committee report deserve no deference absent adoption by the full legislature. PBr45. But even in applying intermediate scrutiny, this Court has found previously that the Council had an "adequate[]" basis for certain factual conclusions based on an MPD chart summarized in a committee report. *Hutchins v. D.C.*, 188 F.3d 531, 542–44 & n.5 (D.C. Cir. 1999) (*en banc*). It did so even though the district court, like plaintiffs here, questioned the chart's reliability. *Id.* at 565 n.27 (Rogers, J., dissenting in part); *see Stasiukevich v. Nicolls*, 168 F.2d 474, 479 (1st Cir. 1948) (committee report findings are "evidence of the facts asserted"). Moreover, here, the full Council unanimously approved the committee's bill based on the committee's report. *See* http://www.dccouncil.washington.dc.us/lims/searchbylegislation.aspx (search for L17-372).

Relatedly, plaintiffs argue that the district court could not consider the committee report because the District did not formally introduce it as evidence. PBr28–29, 46. Federal courts may judicially notice the legislative history supporting challenged state statutes. *E.g.*, *Alaska v. American Can*, 358 U.S. 224, 226–27 (1959); *Stasiukevich*, 168 F.2d at 479. In any event, whether any sanction was warranted for any local rule violation was for the district court in its discretion, *see Bush v. D.C.*, 595 F.3d 384, 387 (D.C. Cir. 2010), and it properly chose to accept and rely on the legislative history the District cited. RD25; JA167–76.

Plaintiffs also say they submitted evidence controverting the committee report, PBr27–29, 46, but their evidence created no genuine issue of material fact. On the points above: *First*, plaintiffs' declarations indicated that certain assault weapons are commonly possessed for lawful purposes, but their assertions are reasonably read to mean only that the small percentage of Americans who possess assault weapons typically have lawful purposes. JA56, 65, 91. *Heller* adopted an entirely different test, based on *Miller*—whether a gun is "in common use," meaning widely owned. 128 S.Ct. at 2815–17 (quoting 307 U.S. at 179). Assuming these declarations were meant to address *Heller*'s test, a mere assertion that assault weapons possession is "common" is too vague and conclusory to create a genuine issue. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Another declaration suggests that two million AR-15s are "in civilian hands," PBr46;

JA82–85, but that is still a minute fraction of the total civilian gunstock. Plaintiffs

do not say what percentage of Americans or American gun-owners have AR-15s.[4]

*Second*, plaintiffs do not meaningfully dispute the finding that assault

weapons are not useful for legitimate self-defense. That some people own them

for purposes including "protection," JA56, does not suggest they are well-suited

for self-defense or that plaintiffs would be harmed if they had to choose other guns.

Plaintiffs present no empirical evidence or even anecdotes suggesting otherwise.

*Third*, plaintiffs claim that these are not really "assault weapons" or military

weapons because they are not automatic, and they quibble with the findings

regarding pistol grips. JA134–37. It is irrelevant whether plaintiffs agree with the

District's terminology and whether assault weapons as defined by the District are

used by military forces. The Report deemed them "military-style" and focused on

their dangerous features. SA137. Regarding features, plaintiffs say the "purpose"

of a pistol grip is "not to allow the rifle to be fired from the hip." JA65, 137. The

Report does not suggest, however, that pistol grips are manufactured for that

purpose. Whatever their purpose, they "help stabilize the weapon during rapid fire

---

[4]     Further, plaintiffs cannot challenge the entire assault weapons ban, but rather
only its application to the particular weapons they attempted to register and
regarding which they submitted summary judgment evidence. *Lujan v. Defenders
of Wildlife*, 504 U.S. 555, 560–61 (1992); *Celotex Corp. v. Catrett*, 477 U.S. 317,
322–23 (1986). Also, any unconstitutional provision is severable. D.C. Code § 7-
2507.10.

and *allow* the shooter to spray-fire from the hip position." SA167 (emphasis added). Although one declarant said semiautomatic weapons "do not allow rapid and spray firing," JA137, the Council could conclude otherwise given the evidence before it and common sense, as well as the experiences of the federal government and states under their own assault weapons bans. *Renton*, 475 U.S. at 51–52. Summary judgment was appropriate given that the district court had to defer to the Council and accept any "adequate" basis for its factual conclusions, JA174–75; *Hutchins*, 188 F.3d at 542–44, and that the overall finding that assault weapons are not protected "arms" had support beyond the particular finding regarding rapid and spray firing.

*Fourth*, one declarant stated without elaboration that assault weapons are not "preferred by irregular forces or terrorists." JA137. The Council again could conclude otherwise. Further, plaintiffs submitted no evidence disputing the separate findings that assault weapons are disproportionately involved in crime and a particular threat to law enforcement. SA167.

*Fifth*, plaintiffs put forth evidence that LCAFDs are commonly possessed. *E.g.*, JA85–87. The Council did not indicate otherwise, but instead concluded that LCAFDs are more about firepower than self-defense. SA169. Plaintiffs put forth no evidence suggesting otherwise, and that finding supports the conclusion that the LCAFD ban also does not implicate the Second Amendment.

Finally, plaintiffs misread *Heller* to argue that no protected "arm" may ever be banned, no matter how little the ban actually affects protected conduct—apparently, even if strict scrutiny is satisfied. PBr49. That unusual view of constitutional law is unsupported. Under *Heller*, a broad ban on the "class" of handguns could not stand. 128 S.Ct. at 2817–18. "*Heller* distinguished handguns from other classes of firearms … by looking to their functionality." *Marzzarella*, 2010 WL 2947233, at *5. The Court did not suggest that narrower classes of "arms" may never be banned, even for compelling public safety reasons. *See Skoien*, 2010 WL 2735747, at *1 ("Judicial opinions [like *Heller*] must not be confused with statutes, and general expressions must be read in light of the subject under consideration."). If the First Amendment does not forbid narrow bans on modes of communication that leave alternative channels for speech, *Kovacs v. Cooper*, 336 U.S. 77, 86–89 (1949); *see Renton*, 475 U.S. at 53–54, the Second Amendment does not forbid narrow bans on guns that leave alternative means of self-defense. *See* Volokh, *supra*, at 1483–91. Indeed, plaintiffs' rule is unworkable for anything but the most severe bans: how is a judge to measure whether a gun is "common" enough that it may not be banned? It also makes little sense: why should the Second Amendment require an urban jurisdiction like the District to allow assault weapons even assuming they are common in other,

dissimilar jurisdictions? The conclusion that a weapon is a protected "arm" is just the first step in assessing the constitutionality of a ban, not the last.

**B.**   **This Court can also affirm simply by rejecting plaintiffs' call for strict scrutiny, and if it goes further should adopt a reasonable-regulation test.**

Plaintiffs' constitutional claim relies entirely on the adoption of strict scrutiny or their even stricter rule that no "arm" may be banned. PB19–25, 49. This Court therefore need do no more than reject strict scrutiny here to reject their Second Amendment claim. As the Supreme Court has done in other constitutional contexts, this Court in identifying a level of scrutiny should look to the nature of the right, its purposes, and the extent to which the challenged restrictions implicate those purposes. Considering such factors, the Court should reject strict scrutiny and, if it goes further, adopt the deferential reasonable-regulation test.

1.   Recognition that the right is fundamental marks the beginning of the inquiry, not the end.

Only a minority of enumerated rights—even those deemed fundamental— triggers strict scrutiny. Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 693–700 (2007). Thus, although the enumerated right the Second Amendment protects is fundamental, *McDonald v. City of Chicago*, 130 S.Ct. 3020, 3036–42 (2010), all the Circuits and most of the district courts that have chosen a level of scrutiny for particular Second Amendment claims have rejected strict scrutiny. *U.S. v. Williams*, 2010 WL 3035483, at *6 (7th Cir. Aug.

5, 2010); *Marzzarella*, 2010 WL 2947233, at \*7–8; JA158–59; *cf. U.S. v. Darrington*, 351 F.3d 632, 635 (5th Cir. 2003) (clarifying that *U.S. v. Emerson*, 270 F.3d 203 (5th Cir. 2001), did not adopt strict scrutiny). The Third Circuit explained: "the right to free speech, an undeniably enumerated fundamental right, is susceptible to several standards of scrutiny, depending upon the type of law challenged and the type of speech at issue. We see no reason why the Second Amendment would be any different." *Marzzarella*, 2010 WL 2947233, at \*7 (citation omitted); *see* Volokh, *supra*, at 1445–47; Ashutosh Bhagwat, *The Test That Ate Everything: Intermediate Scrutiny in First Amendment Jurisprudence*, 2007 U. Ill. L. Rev. 783, 786–800 (2007).

Plaintiffs are simply wrong to argue that strict scrutiny inexorably applies whenever a fundamental right is involved. PBr19–20. They rely on inapposite precedent discussing how *equal protection* claims concerning classifications that affect fundamental rights trigger strict scrutiny. *E.g.*, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). Indeed, if plaintiffs were correct and if *Heller* itself made clear that the Second Amendment right is fundamental, as they and *McDonald* suggest, PBr20; *McDonald*, 130 S.Ct. at 3036, the *Heller* Court would have had no reason to refuse to adopt strict scrutiny. *Heller*'s list of presumptively lawful measures actually appears inconsistent with strict scrutiny. 128 S.Ct. at 2851 (Breyer, J., dissenting).

Courts should apply strict scrutiny only where it is warranted, because the test sharply limits the discretion of the political branches and because immoderate application could lead judges to dilute the test, thereby imperiling cherished civil liberties properly associated with strict scrutiny. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978). Nevertheless, plaintiffs do not even ask, let alone answer, the meaningful question: why do fundamental rights trigger strict scrutiny in some contexts, but not others?

> 2. Strict scrutiny is inappropriate because the pre-existing right the Amendment codified has always been subject to broad regulation, consistent with the Framers' ideal of ordered liberty.

Much as strict scrutiny does not apply to commercial speech because it occurs "in an area traditionally subject to government regulation," *Central Hudson Gas & Elec. v. Public Serv. Comm'n*, 447 U.S. 557, 562–63 (1980), to voting laws because the "government must play an active role in structuring elections," *Burdick v. Takushi*, 504 U.S. 428, 433–34 (1992), and to some conduct of juveniles because their characteristics "warrant increased state oversight," *Hutchins*, 188 F.3d at 541, strict scrutiny does not apply to gun laws. The Framers could not have intended anything like strict scrutiny given their acceptance of heavy regulation of guns and their ideal of ordered liberty.

Adopting strict scrutiny with its presumption of unconstitutionality, *San Antonio Indep. Sch. Dist.*, 411 U.S. at 16, would improperly make the right broader

than it was when the Second Amendment was adopted. The Bill of Rights "did not

create by implication novel individual rights overturning accepted political norms."

*Rutan v. Republican Party*, 497 U.S. 62, 95–96 (1990) (Scalia, J., dissenting); *see*

*Robertson*, 165 U.S. at 281–82. In codifying the "pre-existing" right in the Second

Amendment, *Heller*, 130 S.Ct. at 2797, the Framers presumably intended to accept

existing "restrictions at common law," *Parker*, 478 F.3d at 399, and "[t]he

common law principle permitting one to use deadly force in self-defense has long

been restricted by the general rule of reason. Thus, the constitutional text

embodies a rule of reason, rather than an absolute." *Benjamin*, 662 A.2d at 1232

(discussing analogous state provision).

"Throughout our history," governments exercising police power have had

"great latitude" to protect their citizens' lives and safety. *Medtronic v. Lohr*, 518

U.S. 470, 475 (2006). That latitude undisputedly has encompassed gun laws.

*McDonald*, 130 S.Ct. at 3125–26 (Breyer, J., dissenting).

Indeed, broad regulation of guns was commonplace in early England and has

been throughout American history. *See McDonald*, 130 S.Ct. at 3113 (Stevens, J.,

dissenting), 3131–32 (Breyer, J., dissenting); *Heller*, 128 S.Ct. at 2848–50 (Breyer,

J., dissenting); Cornell, *supra*, at 502–16; Schwoerer, *supra*, at 35–36. For

instance, the 1689 English Declaration of Rights—"the predecessor to our Second

Amendment"—allowed only Protestants to have "arms for their defense," and only

those "suitable to their conditions," "as allowed by law." *Heller*, 128 S.Ct. at 2798. This right was subject to "due restrictions" and "necessary restraints." 1 Blackstone, *supra*, at 139–40. Unsurprisingly, then, "[h]undreds of individual statutes regulated the possession and use of guns in colonial and early national America." Churchill, *supra*, at 143. These included the laws regarding loyalty oaths, gun censuses, and militias detailed above, bans on firing guns in Boston, Philadelphia, and New York City, and much more. *Id.* at 161–65. Gun regulation increased after the Founding, and today all fifty states regulate guns. Cornell, *supra*, at 512–16; ATF, *supra*. There has never been "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 128 S.Ct. at 2816.

Strict scrutiny would be inconsistent not only with this tradition, but also our Framers' ideal of *ordered* liberty rather than absolute liberty. *McDonald*, 130 S.Ct. at 3032. "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses." *Cox*, 312 U.S. at 574. Even the First Amendment allows prohibition of some speech directed to inciting crime, *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam), and guns have a "unique potential to facilitate death and destruction and thereby to

destabilize ordered liberty," *McDonald*, 130 S.Ct. at 3108 (Stevens, J., dissenting). As history shows, the Framers understood as much.

There remains today both general consensus and strong empirical support for the notion that guns must be regulated. Hemenway, *supra*, at 161–65; *Heller*, 128 S.Ct. at 2855–60 (Breyer, J., dissenting). Given that legislatures are better equipped than courts to make empirical judgments, *Turner Broad. Sys.*, 520 U.S. at 195–96, that the question of which gun regulations work well is hotly debated but essentially incapable of proof based on empirical studies available today, Volokh, *supra*, at 1465–67; Winkler, *supra*, at 731, and that jurisdictions with different conditions need different gun laws, *McDonald*, 130 S.Ct. at 3046 (plurality op.), strict scrutiny would be unwarranted and impractical.

That strict scrutiny would be inconsistent with the Framers' intent also follows from the Second Amendment's text. *First,* it begins by referring to a "well regulated" militia. Although that may "impl[y] nothing more than the imposition of proper discipline and training," *Heller*, 128 S.Ct. at 2800, the militia laws described above make clear the Framers' understanding that the *government* would be providing discipline and training through regulation: the militia was "[a] body of citizens *enrolled* for military discipline." *Miller*, 307 U.S. at 179 (emphasis added); *see Parker*, 478 F.3d at 388–89 (discussing enrollment). By contrast, the First Amendment begins: "Congress shall make no law ...."

*Second*, the Amendment declares that the right shall not be "infringed." That word does not appear elsewhere in the Constitution. The First Amendment by contrast prevents Congress from "abridging" certain freedoms. Early American dictionaries cited favorably in *Heller*, 128 S.Ct. at 2791, indicate that the two are different, with the word "abridge" suggesting a more stringent test than "infringe." "Abridge" meant to "contract," "lessen," or "diminish"—it would mean to "deprive of" *only* if followed by "from" or "of"—while "infringe" meant to "break," "violate," "destroy," or "hinder." Samuel Johnson, *A Dictionary of the English Language* (4th ed. 1777); Noah Webster, *An American Dictionary of the English Language* (1828). Such "use of two different terms is presumed to be intentional." *National Wildlife Fed'n v. Gorsuch*, 693 F.2d 156, 172 (D.C. Cir. 1982). Indeed, the drafting history supports that conclusion: the Senate deliberately changed the word "infringed" in a House precursor of the First Amendment to "abridged" on the same day it substantially rewrote a House precursor of the Second Amendment but left the word "infringed." *The Complete Bill of Rights: The Drafts, Debates, Sources, and Origins* 85–86, 173–74 (Neil Cogan ed., 1997). The Court should conclude the Framers intended to leave more room for regulation under the Second Amendment than under the First. Strict scrutiny is never the appropriate test under the Second Amendment.

3.    Strict scrutiny is inappropriate here because the District's regulation of guns has nothing to do with the Amendment's purpose for codification, which was to prevent national legislation that would eliminate the militia.

The challenged laws do not warrant strict scrutiny for the additional reason that they have nothing to do with why the Framers adopted the Second Amendment. "[T]he threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason th[e] right … was codified in a written Constitution." *Heller*, 128 S.Ct. at 2801. Although self-defense is the "central component" of the right, "prevent[ing] elimination of the militia" was "the purpose for which the right was codified." *Id.* (emphasis omitted). When a law does not affect that purpose, lesser scrutiny should apply.

Accounting for the purpose of codification honors the Framers' choice to include the Amendment's prefatory clause, which is "unique in our Constitution." *Id.* at 2789. That clause does "not limit or expand the scope of the operative clause," *id.*, but knowledge of the Framers' purpose is relevant to what level of scrutiny applies to particular laws that affect conduct that falls within the operative clause's scope. The *entire* Amendment was adopted "[w]ith obvious purpose to assure the continuation and render possible the effectiveness of [militia] forces" and "must be interpreted and applied with that end in view." *Miller*, 307 U.S. at 178; *see Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803) ("It cannot be presumed that any clause in the constitution is intended to be without effect ….").

Applying lesser scrutiny to laws that do not implicate the Amendment's militia-related purpose comports not only with the history of heavy gun regulation, but also with Supreme Court precedent in other contexts. When the Court devised the strict scrutiny test for race-based classifications, it did so based on "the historical fact that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *McLaughlin v. Florida*, 379 U.S. 184, 191–92 (1964); *see Slaughterhouse Cases*, 83 U.S. 36, 81 (1873). Certain other classifications that implicate the Equal Protection Clause but not the purpose of codification do not trigger such exacting review. *E.g.*, *Heller v. Doe*, 509 U.S. 312, 319–20 (1993) (rational-basis review for certain non-suspect classifications); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (intermediate scrutiny for legitimacy-based classifications); *Craig v. Boren*, 429 U.S. 190, 197–98 (1976) (same for gender-based classifications).

The Supreme Court also has looked to the purpose of a right's codification when determining a level of scrutiny under the First Amendment. In considering laws restricting distribution of pamphlets or leaflets—which function like other content-neutral restrictions warranting only intermediate review, *see Kovacs*, 336 U.S. at 86–89—the Court has applied heavy scrutiny in part because the Framers codified speech and press rights with this very activity in mind. *Schneider v. State*,

308 U.S. 147, 161–64 (1939); *Lovell v. City of Griffin*, 303 U.S. 444, 451–52 (1938).

Any interpretation of the Second Amendment similarly should consider the reason for its codification. Lesser scrutiny thus should apply to the laws at issue for two separate reasons. *First,* they do not interfere with any militia. Plaintiffs have never so suggested.

*Second*, and more fundamentally, the Framers were concerned with *national* legislation, not local gun laws. *Heller*, 128 S.Ct. at 2801; *Miller*, 307 U.S. at 178. Some constitutional provisions restrict the national powers of Congress but not its local powers under the Seat of Government Clause, U.S. Const. art. I, § 8, cl.17. *See Gibbons v. D.C.*, 116 U.S. 404, 407–08 (1886); *Loughboro v. Blake*, 18 U.S. (5 Wheat.) 317, 318 (1820). Similarly, what level of scrutiny is appropriate may turn on what power Congress or its delegate is exercising. Although *Heller* presupposes that the Second Amendment applies to the District's local government because it derives authority from Congress, local legislation in a federal enclave was plainly not the Framers' concern.

Indeed, applying strict scrutiny here would be inconsistent with the reason why the District even exists. The Framers established a federal enclave largely because of an incident in 1783 in which disgruntled, armed soldiers surrounded the State House in Philadelphia, where the Continental Congress was residing.

Lawrence Cress, *Whither Columbia? Congressional Residence and the Politics of the New Nation, 1776 to 1787*, 32 Wm. & Mary Q. 581, 587–88 (1975). Pennsylvania refused to "call out the militia" to restore control, so Congress had to flee. *Id.* In response, James Madison declared that the federal government needed "complete authority at the seat of government" because, without it, "the public authority might be insulted and its proceedings interrupted." *The Federalist* No. 43. The Seat of Government Clause thus provides Congress with plenary authority over this jurisdiction and explicitly allows the "Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings," to ensure that the new government could defend itself.

The Framers thus could not have intended to disable Congress from enacting firearms regulations in the District as greatly as plaintiffs suggest in calling for strict scrutiny. Indeed, because the Second Amendment did not limit the states' regulatory authority over firearms when enacted, *McDonald*, 130 S.Ct. at 3028, plaintiffs must be taken to suggest that the Framers intended Congress to be more constrained in the seat of federal power than a state would be in its own territory. That suggestion is completely implausible.

History again proves the point. Although there was little national gun regulation immediately after the Founding, *see Heller*, 128 S.Ct. at 2816, local gun regulation in the District was heavy, yet apparently accepted. In 1801, the then-

Town of Georgetown forbade firing guns in its "inhabited parts." SA40. Far from causing any Second Amendment-related outcry, the ordinance was followed eight years later by the then-City of Washington, which forbade firing guns "within four hundred yards of any house." SA42. In 1858, the city forbade "carry[ing] or hav[ing] concealed about [one's] person[] any deadly or dangerous weapons." SA44. The Court should presume that laws enacted soon after the Second Amendment were consistent with it. *See Eldred v. Ashcroft*, 537 U.S. 186, 200–02, 213–14 (2003). They show that deference rather than strict scrutiny is appropriate for local gun laws in the District.

> 4. Strict scrutiny is inappropriate here because the restrictions at issue do not meaningfully burden either militia-related conduct or self-defense.

The right to keep and bear arms is not an "intrinsic" right, valued for its own sake, but "instrumental"—a means to the ends of protecting the militia and enabling self-defense. *McDonald*, 130 S.Ct. at 3047–48 (plurality op.). That does not render the right an anomaly, or non-fundamental. "[Q]uite a few of the rights previously held to be incorporated—for example the right to counsel and the right to confront and subpoena witnesses—are clearly instrumental by any measure." *Id.* Strict scrutiny should apply, however, to only those restrictions on instrumental rights that substantially burden the "end" the constitutional provision was designed to protect. Much as the Third Circuit has applied lesser scrutiny to a law that

minimally burdened protected conduct, *Marzzarella*, 2010 WL 2947233, at \*8, this Court should apply lesser scrutiny here (assuming the Second Amendment is even implicated) because, as discussed, the laws at issue do not meaningfully burden either militia-related conduct or self-defense.

While regulation of arms should be accorded more deference than regulation of speech, support for that approach exists in First Amendment jurisprudence. Speech restrictions that implicate individual freedom of thought and expression by "suppress[ing], disadvantag[ing], or impos[ing] differential burdens upon speech because of its content" receive "the most exacting scrutiny." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 641–42 (1994). Speech restrictions that do not implicate this "end"—in particular, content-neutral restrictions—receive lesser scrutiny "because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." *Id.*; *e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see* Bhagwat, *supra*, at 786–800. Similarly, more exacting scrutiny applies to limitations on election-related expenditures than to limitations on contributions because the former "impose far greater restrains on the freedom of speech and association." *Buckley v. Valeo*, 424 U.S. 1, 14–23, 44–45 (1976) (per curiam).

Sixth Amendment jurisprudence is also instructive. The right to counsel is also instrumental rather than intrinsic, with the "end" being a fair trial. *McDonald*,

130 S.Ct. at 3048 (plurality op.); *Strickland v. Washington*, 466 U.S. 668, 685 (1984). The right does not entail strict scrutiny. Rather, "taking its purpose—to ensure a fair trial—as the guide," the Court has held that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 686, 689. Similarly, given the Framers' purposes in adopting the Second Amendment, deferential review rather than strict scrutiny is appropriate here.[5]

> 5. If this Court chooses a level of scrutiny, it should choose the deferential reasonable-regulation test.

If this Court chooses a level of scrutiny, it should choose the deferential reasonable-regulation test. That test is applied uniformly by state courts construing state constitutional arms provisions, none of which has adopted strict scrutiny. *Mosby v. Devine*, 851 A.2d 1031, 1044 (R.I. 2004); Volokh, *supra*, at 1458; Winkler, *supra*, at 686–87. The "experience of state courts" is generally informative in interpreting the federal Constitution. *Bartkus v. Illinois*, 359 U.S. 121, 134 (1959). That experience is especially informative in this context. Most gun regulation has occurred at the state level, and states have long experience in construing their own arms provisions to allow reasonable regulation, *e.g.*, *State v. Reid*, 1 Ala. 612, 616–17 (1840), whereas *Heller* was the Court's "first in-depth

---

[5] Unlike some academics, plaintiffs have never suggested that the Framers' had a purpose of facilitating insurrection. *Heller* speaks of "law-abiding, responsible citizens," not insurrectionists. 128 S.Ct. at 2821. The Constitution does not encourage treason, but criminalizes it. U.S. Const. art. III, § 3.

examination of the Second Amendment," 128 S.Ct. at 2821. Further, given that the right now applies against the states, *McDonald*, 130 S.Ct. at 3026, adoption of the reasonable-regulation test would minimize disruption of longstanding state practices.

Under the reasonable-regulation test, the government may not prohibit firearm ownership, but "may regulate the exercise of th[e] right … so long as the exercise of that power is reasonable." *Robertson*, 874 P.2d at 328. The test is deferential, but is violated by laws that "eviscerate[]" the right or render it "nugatory." *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2003); *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002). It is more rigorous than rational-basis review in four ways: first, the standard is stricter—"reasonable" as opposed to "rational"; second, the reasonable-regulation test looks to the extent of the burden on protected conduct; third, a court should consider the legislature's actual purpose rather than any legitimate purpose that may be conceived; and fourth, no matter the legislature's purpose and how reasonable it may seem, the right leaves a core of protected conduct inviolate. *See* Winkler, *supra*, at 716–18; Volokh, *supra*, at 1458.

The district court was incorrect to reject the reasonable-regulation test based on the unsupported notion that it was "more lenient" than what *Heller* "envisioned." JA160. The Court left the level of scrutiny open so that lower

courts could decide what level makes sense in particular contexts.  The reasonable-regulation test makes sense under the Second Amendment because the nation has long accepted heavy gun regulation, and in this context in particular because local District laws rather than national legislation are at issue, and those laws do not meaningfully burden militia-related conduct or self-defense.

Application of the reasonable-regulation test is also consistent with *Heller*'s rejection of an "interest-balancing" approach suggested by Justice Breyer.  Again, the Court was considering an entirely different type of law—a handgun ban—that violated the core "right of law-abiding, responsible citizens to use arms in defense of hearth and home," and it thought Justice Breyer would have eviscerated that right.  128 S.Ct. at 2821.  The Court rejected application of an interest-balancing test in those circumstances:  "We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding 'interest-balancing' approach."  *Id.*  It did not suggest, however, that balancing tests would be inappropriate when matters outside the "core" were at issue, or where the test could not be applied to eviscerate the right.  Nor would that be sensible given that balancing tests are commonplace in constitutional law.  *E.g.*, *Burdick*, 504 U.S. at 433–34; *Mathews v. Eldridge*, 424 U.S. 319, 339–49 (1976).  (More plainly, plaintiffs are wrong to say intermediate scrutiny is a forbidden "interest-balancing

test." PBr23. It involves no balancing but rather, like strict scrutiny, is a "means-end" test. *Marzzarella*, 2010 WL 2947233, at *2.)

If anything, *Heller* provides support for a reasonable-regulation test. It makes clear that the fear of disarmament was a key motivation of the Second Amendment. 128 S.Ct. at 2799, 2801; *see id.* at 2806 (quoting 1825 commentator's view that Amendment prevented Congress from "disarm[ing] the people"). So too this Court made clear that "reasonable regulations" were acceptable if they "promote the government's interest in public safety" but "do not impair the core conduct upon which the right was premised." *Parker*, 478 F.3d at 399. Laws like those at issue do not approach disarmament. They deserve the great deference applied under the reasonable-regulation test.

### C. The challenged laws would survive intermediate scrutiny or reasonableness review, and plaintiffs' arguments based on strict scrutiny are flawed in any event.

Plaintiffs choose not to challenge the ruling that all the challenged laws survive intermediate scrutiny, and so forfeit their entitlement to do so. *Cruz*, 356 F.3d at 333–34. In any event, as the district court's explanation and the legislative record make clear, all these laws are at minimum substantially related to important

government interests.[6]  JA167–71, 176.  More clearly, the laws pass the reasonable-regulation test.

Furthermore, though plaintiffs argue that the registration provisions fail strict scrutiny, PBr29–34, their arguments are flawed.  (They forfeit the argument that the assault weapons and LCAFD bans fail strict scrutiny, as they rely solely on the mistaken premise, discussed above, that no "arm" may be banned.  PBr45–52; *Cruz*, 356 F.3d at 333–34.)

*First*, plaintiffs repeatedly argue that the District's laws are not narrowly tailored because they duplicate federal practices in some respects, and in particular the National Instant Criminal Background Check System (NICS).  PBr30–34.  Their view that the constitutionality of one government's laws should depend on what a different government has done is unsupported.  Plaintiffs' argument would do violence to federalism as applied against state laws, and to Congress's purposes in adopting the HRA as applied against District laws.  *See McIntosh*, 395 A.2d at 753.  What the United States does may be relevant for purposes of pre-emption, but plaintiffs present no pre-emption argument and Congress has explicitly

---

[6]      Assuming some form of intermediate scrutiny should apply, another potential test for the assault weapons and LCAFD bans would be one like the First Amendment test for "time, place, or manner" restrictions.  That test considers whether restrictions are "narrowly tailored" in the sense that they "promote[] a substantial government interest that would be achieved less effectively absent the regulation," and leave "ample alternative channels" for protected conduct.  *Ward*, 491 U.S. at 791, 798–99; *see Parker*, 478 F.3d at 399.  The bans pass that test too.

disavowed pre-emptive intent.  18 U.S.C. 927.  In any event, federal and District

practices differ significantly.  For instance, the District departs from NICS in

prohibiting registration (and thus possession) by those convicted of any weapons

offense, including non-violent misdemeanors.  D.C. Code § 7-2502.03(a); 18

U.S.C. 922(d); ATF Form 4473, *supra*.

*Second*, plaintiffs repeatedly suggest that the Council may not impose any

burden on the "law-abiding" simply because "criminals" may misuse guns.  *E.g.*,

PBr34 ("How registering law-abiding citizens would prevent assassination is not

explained.").  Their view is hopelessly impractical and unsupported.  Although the

right to vote is fundamental, a government may require even the law-abiding to

comply with measures against vote fraud.  *See Crawford v. Marion County*

*Election Bd.*, 553 U.S. 181 (2008).  As the Third Circuit recently held, even if there

is nothing to fear when the truly law-abiding possess guns with obliterated serial

numbers, the government may prohibit such possession to "serve[] a law

enforcement interest in enabling the tracing of weapons."  *Marzzarella*, 2010 WL

2947233, at *7–11.  The Council had ample reason to find some regulation of

everyone, including the law-abiding, necessary given that guns can be lost or

stolen, and that some who appear law-abiding may not be—an assassin, terrorist,

or mass murderer may have no prior criminal record.

For instance, despite plaintiffs' blithe assertion that the NICS background check ensures that pistols purchased by District residents "are not entering the illegal market or unlawfully flowing between states," PBr43, a study in the legislative record describes how "straw purchasers"—those who purchase guns and pass the background check but then sell the guns illegally to others—contribute significantly to the stock of guns used in crime. S.B. Sorenson *et al.*, *Buying a Handgun for Someone Else*, 9 Injury Prevention 147 (2003). Further, generally applicable registration and licensing schemes have been associated with reducing that stock. D.W. Webster *et al.*, *Relationship Between Licensing, Registration, and Other State Gun Sales Laws and the Source State of Crime Guns*, 7 Injury Prevention 184 (2001).[7] So too, for obvious reasons, have laws limiting how frequently handguns can be purchased. Douglas Weil *et al.*, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 JAMA 1759 (1996).

At minimum, the base requirement to register satisfies strict scrutiny. The Council found registration of all firearms necessary in 1975 not only to ensure that "only qualified persons are allowed to possess firearms," but also to "[m]ake it more difficult for firearms, destructive devices, and ammunition to move in illicit commerce within the District." SA45. Then and again in 2008, legislative history

---

[7]   The Sorenson and Webster studies were not cited in the Report or introduced below but were among the studies submitted to the Council's Committee on Public Safety and the Judiciary. They are on file with the committee.

explained that the registration requirement would "strengthen the capacity of the District … to monitor the traffic in firearms and ammunition."  SA89, 163.  The need to ensure that only responsible persons have firearms is obviously and undisputedly compelling, and the registration requirement is narrowly tailored as the District's only mechanism for screening those who wish to possess guns in their homes for self-defense.

Further, though plaintiffs say the District "has no legitimate interest" in having information about guns "merely for the sake of having the information," PBr31, the information plainly can be *used* to promote public safety.  Registration provides a powerful tool for law enforcement in protecting the public and investigating gun crimes, just as registration of automobiles assists the investigation of crimes involving cars.  Registration "allows officers to determine in advance whether individuals involved in a call may have firearms," and if so how many and of what types, and to "return … lost or stolen firearms."  SA163.  Moreover, because criminals obviously have greater incentive than the law-abiding to avoid registering their guns, the registration requirement is itself useful for fighting crime, as officers can seize unregistered guns and charge those possessing such guns with a crime.  SA163–64.  Much like a ban on guns with obliterated serial numbers, *Marzzarella*, 2010 WL 2947233, at *10–11, the registration requirement passes strict scrutiny.

## II. PLAINTIFFS' LOCAL-LAW CLAIM LACKS MERIT.

### A. The challenged statutes are within the Council's broad Home Rule Act authority.

The HRA delegated the Council authority to enact laws on "all rightful subjects of legislation," with certain inapplicable exceptions. D.C. Code §§ 1-203.02, 1-204.04(a), 1-206.02. Its overarching purpose was to "relieve Congress of the burden of legislating upon essentially local District matters." *McIntosh*, 395 A.2d at 753; D.C. Code § 1-201.02(a).

Plaintiffs do not dispute that the challenged statutes were within the Council's HRA authority. Instead, they argue that the Council actually relied only on D.C. Code § 1-303.43, such that the Council's HRA authority is irrelevant. PBr53–54. Their apparent view that *authorized* legislation is void if the legislature cites the wrong source of authority makes no sense. *See U.S. v. Harris*, 106 U.S. 629, 635–44 (1883). Moreover, their factual premise is incorrect. The 1975 legislation that the 2008 Act amended was founded on *both* the general delegation of authority in the HRA *and* the specific HRA provision that gave the Council its predecessor's "functions," including that codified at § 1-303.43. SA93–94. In both 1975 and 2008, the Council passed "Acts," whereas § 1-303.43 authorizes only "regulations." The two are different. *Newspapers, Inc. v. MPD*, 546 A.2d 990, 996–97 (D.C. 1988).

Although plaintiffs quote footnote 11 in *McIntosh* to assert that § 1-303.43 "was 'the section on which the Council relied,'" PBr53–54, they misread the decision. *McIntosh* held that the 1975 act "can be sustained under the Council's newly conferred power set forth in [D.C. Code § 1-204.04(a)]" in the HRA. 395 A.2d at 751 & n.13. That holding deserves deference. *See Firemen's Ins. v. Washington*, 483 F.2d 1323, 1327 (D.C. Cir. 1973). *But cf. Bliley v. Kelly*, 23 F.3d 507, 511 (D.C. Cir. 1994) (not deferring regarding direct interplay between Congress and Council, which involved federal-law rather than local-law aspect of HRA). In the meanwhile, footnote 11 clarifies that the Council could rely on both its HRA authority over "all rightful subjects of legislation" and the HRA provision giving the Council its predecessor's "functions." *Id.* at 750 n.11.

Plaintiffs wisely abandon the argument that the HRA left in place pre-existing limits on regulatory authority in statutes like § 1-303.43. RD26, at 32. Congress's very purpose was to expand local authority under § 1-303.43 and similar statutes. *McIntosh*, 395 A.2d at 753. The relevant statute reads:

> Subject to [specified limitations], the legislative power granted to the District by [the HRA] is vested in … the Council …. In addition, except as otherwise provided in [the HRA], all functions granted to … [the Council's predecessor] shall be carried out by the Council in accordance with … [the HRA].

D.C. Code § 1-204.04(a). Congress thus ensured that the Council could perform its predecessor's "functions" without suggesting that earlier limitations would apply. The limitations on the Council's authority are, instead, those in the HRA.

**B. The challenged statutes are authorized independently by D.C. Code § 1-303.43.**

In any event, the challenged statutes are "usual and reasonable" gun measures under § 1-303.43. This Court has held that § 1-303.43 provides "ample warrant" for enactment of "a comprehensive scheme of control over firearms" like that in the police regulations replaced by the 1975 legislation. *Maryland & D.C. Rifle Ass'n*, 442 F.2d at 125–26 & n.9. The D.C. Court of Appeals then upheld the Council's authority under § 1-303.43 to enact the 1975 legislation, without explicitly addressing whether the legislation was "usual" and "reasonable." *McIntosh*, 395 A.2d at 752–54. Precedent suggests no need to examine independently whether a particular measure is "usual" and "reasonable" as long as the legislature had good reason to act. *Firemen's Ins.*, 483 F.2d at 1327–28; *Newsweek Magazine v. D.C. Comm'n on Human Rights*, 376 A.2d 777, 782 (D.C. 1977).

In any event, these laws are "usual" and "reasonable." As the district court concluded, whether a regulation is "usual" turns on "whether other jurisdictions have laws that address [similar] subject matter," not whether those laws are "more or less restrictive." JA177–78. Plaintiffs do not cite the cases on which the court relied, dispute that laws in other jurisdictions address similar subject matter (though the

particulars may differ), or respond to the court's reasoning. *See* JA99–122 (listing similar gun laws). Further, the challenged laws must be "reasonable" if they pass the higher threshold of intermediate scrutiny. JA177. Whether Congress has legislated differently for the nation as a whole, PBr55–56, is irrelevant, as reasonable minds can disagree on what local laws are appropriate.[8]

## CONCLUSION

The Court should affirm the judgment of the district court.

Respectfully submitted,

PETER J. NICKLES
Attorney General for the District of Columbia

/s/ Todd S. Kim
TODD S. KIM
Solicitor General

DONNA M. MURASKY
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, N.W., 6th Floor South
Washington, D.C. 20001
(202) 724-6609

---

[8] If this Court has any doubt that plaintiffs' local-law claim is meritless, it should certify the question to the D.C. Court of Appeals. D.C. Code § 11-723.

# CERTIFICATE OF SERVICE

I certify that on September 3, 2010, electronic copies of this brief were

served through the Court's ECF system and paper copies were mailed by first-class

mail, postage prepaid, to:

Stephen P. Halbrook                      Matthew Shors
Richard E. Gardiner                      O'Melveny & Myers LLP
3925 Chain Bridge Road                   1625 Eye Street, NW
Suite 403                                Washington, DC 20006-4001
Fairfax, VA 22030

William J. Olson                         Paul R.Q. Wolfson
370 Maple Avenue West                    Wilmer Cutler Pickering Hale and Dorr LLP
Suite 4                                  1875 Pennsylvania Avenue, NW
Vienna, VA 22180-5615                    Washington, DC 20006

                          /s/ Todd S. Kim
                          TODD S. KIM

# CERTIFICATE OF COMPLIANCE

I further certify that the brief complies with the type-volume limitation in

Federal Rule of Appellate Procedure 32(a)(7)(B) because the brief contains 14,000

words, excluding exempted parts. This brief complies with the typeface and type

style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because

it has been prepared in a proportionally spaced typeface using Microsoft Word

2007 in Times New Roman 14 point.

                          /s/ Todd S. Kim
                          TODD S. KIM