**NOT YET SCHEDULED FOR ORAL ARGUMENT**
_____

No. 10-7036
_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT
_____

DICK ANTHONY HELLER, et al., Plaintiffs-Appellants,

v.

DISTRICT OF COLUMBIA, et al., Defendants-Appellees.
_____

ON APPEAL FROM A JUDGMENT OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
_____

**APPELLEES' STATUTORY ADDENDUM**
_____

PETER J. NICKLES
Attorney General for the District of Columbia

TODD S. KIM
Solicitor General

DONNA M. MURASKY
Deputy Solicitor General

HOLLY M. JOHNSON
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
441 4th Street, NW, Suite 600S
Washington, D.C. 20001
(202) 724-6609

# TABLE OF CONTENTS

*Current statutes and regulations*

Relevant Provisions of the District of Columbia Code ................................... 1

Relevant Provisions of Title 24 of the District of Columbia Municipal Regulations .................................................................................. 26

*Earlier statutes, regulations, and ordinances*

Town of Georgetown Ordinance of Oct. 24, 1801 ...................................... 40

Act of the City of Washington of Dec. 9, 1809 ........................................... 41

Act of the City of Washington of Nov. 18, 1858 ........................................ 43

Firearms Control Regulations Act of 1975, D.C. Law 1-85 ....................... 45

*Legislative history*

Council of the District of Columbia, Committee on the Judiciary and Criminal Law, Report on Bill 1-164, Apr. 21, 1976.............................. 88

Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 17-593, Nov. 25, 2008.......................... 120

Council of the District of Columbia, Committee on Public Safety and the Judiciary, Report on Bill 17-843, Nov. 25, 2008.......................... 161

# RELEVANT PROVISIONS OF
# THE DISTRICT OF COLUMBIA CODE

## § 1-201.02. Purposes.

(a) Subject to the retention by Congress of the ultimate legislative authority over the nation's capital granted by article I, § 8, of the Constitution, the intent of Congress is to delegate certain legislative powers to the government of the District of Columbia; authorize the election of certain local officials by the registered qualified electors in the District of Columbia; grant to the inhabitants of the District of Columbia powers of local self-government; modernize, reorganize, and otherwise improve the governmental structure of the District of Columbia; and, to the greatest extent possible, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters.

*   *   *

## § 1-203.02. Legislative power.

Except as provided in §§ 1-206.01 to 1-206.03, the legislative power of the District shall extend to all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this chapter subject to all the restrictions and limitations imposed upon the states by the 10th section of the 1st article of the Constitution of the United States.

*   *   *

## § 1-204.04. Powers of the Council.

(a) Subject to the limitations specified in §§ 1-206.01 to 1-206.04, the legislative power granted to the District by this chapter is vested in and shall be exercised by the Council in accordance with this chapter. In addition, except as otherwise provided in this chapter, all functions granted to or imposed upon, or vested in or transferred to the District of Columbia Council, as established by Reorganization Plan No. 3 of 1967, shall be carried out by the Council in accordance with the provisions of this chapter.

*   *   *

## § 1-303.43.  Regulations relative to firearms, explosives, and weapons.

The Council of the District of Columbia is hereby authorized and empowered to make, and the Mayor of the District of Columbia is hereby authorized and empowered to enforce, all such usual and reasonable police regulations, in addition to those already made under §§ 1-303.01 to 1-303.03 as the Council may deem necessary for the regulation of firearms, projectiles, explosives, or weapons of any kind in the District of Columbia.

\*   \*   \*

## § 7-2501.01.  Definitions.

As used in this unit the term:

(1) "Acts of Congress" means:

    (A) Chapter 45 of Title 22;

    (B) Omnibus Crime Control and Safe Streets Act of 1968, as amended (title VII, Unlawful Possession or Receipt of Firearms (82 Stat. 1236; 18 U.S.C. Appendix)); and

    (C) An Act to Amend Title 18, United States Code, To Provide for Better Control of the Interstate Traffic in Firearms Act of 1968 (82 Stat. 1213; 18 U.S.C. § 921 et seq.).

(2) "Ammunition" means cartridge cases, shells, projectiles (including shot), primers, bullets (including restricted pistol bullets), propellant powder, or other devices or materials designed, redesigned, or intended for use in a firearm or destructive device.

(3) "Antique firearm" means:

    (A) Any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and

    (B) Any replica of any firearm described in subparagraph (A) if such replica:

(i) Is not designed or redesigned for using rim-fire or conventional center-fire fixed ammunition; or

(ii) Uses rim-fire or conventional ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

(3A)(A) "Assault weapon" means:

(i) The following semiautomatic firearms:

(I) All of the following specified rifles:

(aa) All AK series including, but not limited to, the models identified as follows:

(1) Made in China AK, AKM, AKS, AK47, AK47S, 56, 56S, 84S, and 86S;

(2) Norinco (all models);

(3) Poly Technologies (all models);

(4) MAADI AK47 and ARM; and

(5) Mitchell (all models).

(bb) UZI and Galil;

(cc) Beretta AR-70;

(dd) CETME Sporter;

(ee) Colt AR-15 series;

(ff) Daewoo K-1, K-2, Max 1, Max 2, AR 100, and AR110 C;

(gg) Fabrique Nationale FAL, LAR, FNC, 308 Match, and Sporter;

(hh) MAS 223.

(ii) HK-91, HK-93, HK-94, and HK-PSG-1;

(jj) The following MAC types:

    (1) RPB Industries Inc. sM10 and sM11; and

    (2) SWD Incorporated M11;

(kk) SKS with detachable magazine;

(ll) SIG AMT, PE-57, SG 550, and SG 551;

(mm) Springfield Armory BM59 and SAR-48;

(nn) Sterling MK-6;

(oo) Steyer AUG, Steyr AUG;

(pp) Valmet M62S, M71S, and M78S;

(qq) Armalite AR-180;

(rr) Bushmaster Assault Rifle;

(ss) Calico --900;

(tt) J&R ENG --68; and

(uu) Weaver Arms Nighthawk.

(II) All of the following specified pistols:

    (aa) UZI;

    (bb) Encom MP-9 and MP-45;

    (cc) The following MAC types:

(1) RPB Industries Inc. sM10 and sM11;

(2) SWD Incorporated -11;

(3) Advance Armament Inc. --11; and

(4) Military Armament Corp. Ingram M-11;

(dd) Intratec TEC-9 and TEC-DC9;

(ee) Sites Spectre;

(ff) Sterling MK-7;

(gg) Calico M-950; and

(hh) Bushmaster Pistol.

(III) All of the following specified shotguns:

(aa) Franchi SPAS 12 and LAW 12; and

(bb) Striker 12. The Streetsweeper type S/S Inc. SS/12;

(IV) A semiautomatic, rifle that has the capacity to accept a detachable magazine and any one of the following:

(aa) A pistol grip that protrudes conspicuously beneath the action of the weapon;

(bb) A thumbhole stock;

(cc) A folding or telescoping stock;

(dd) A grenade launcher or flare launcher;

(ee) A flash suppressor; or

(ff) A forward pistol grip;

(V) A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the following:

    (aa) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer;

    (bb) A second handgrip;

    (cc) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning his or her hand, except a slide that encloses the barrel; or

    (dd) The capacity to accept a detachable magazine at some location outside of the pistol grip;

(VI) A semiautomatic shotgun that has one or more of the following:

    (aa) A folding or telescoping stock;

    (bb) A pistol grip that protrudes conspicuously beneath the action of the weapon;

    (cc) A thumbhole stock; or

    (dd) A vertical handgrip; and

(VII) A semiautomatic shotgun that has the ability to accept a detachable magazine; and

(VIII) All other models within a series that are variations, with minor differences, of those models listed in subparagraph (A) of this paragraph, regardless of the manufacturer;

(ii) Any shotgun with a revolving cylinder; provided, that this sub-subparagraph shall not apply to a weapon with an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition; and

(iii) Any firearm that the Chief may designate as an assault weapon by rule, based on a determination that the firearm would reasonably pose the same or similar danger to the health, safety, and security of the residents of the District as those weapons enumerated in this paragraph.

(B) The term "assault weapon" shall not include:

(i) Any antique firearm; or

(ii) Any of the following pistols, which are designed expressly for use in Olympic target shooting events, sanctioned by the International Olympic Committee and by USA Shooting, the national governing body for international shooting competition in the United States, and used for Olympic target shooting purposes:

| MANUFACTURER | MODEL | CALIBER |
| --- | --- | --- |
| BENELLI | MP90 | .22LR |
| BENELLI | MP90 | .32 S&W LONG |
| BENELLI | MP95 | .22LR |
| BENELLI | MP95 | .32 S&W LONG |
| HAMMERLI | 280 | .22LR |
| HAMMERLI | 280 | .32 S&W LONG |
| HAMMERLI | SP20 | .22LR |
| HAMMERLI | SP20 | .32 S&W LONG |
| PARDINI | GPO | .22 SHORT |
| PARDINI | GP-SCHUMANN | .22 SHORT |
| PARDINI | HP | .32 S&W LONG |
| PARDINI | MP | .32 S&W LONG |
| PARDINI | SP | .22LR |
| PARDINI | SPE | .22LR |
| WALTHER | GSP | .22LR |
| WALTHER | GSP | .32 S&W LONG |
| WALTHER | OSP | .22 SHORT |
| WALTHER | OSP-2000 | .22 SHORT |

(C) The Chief may exempt, by rule, new models of competitive pistols that would otherwise fall within the definition of "assault weapon" pursuant to this section from being classified as an assault weapon. The exemption of competitive pistols shall be based either on

recommendations by USA Shooting consistent with the regulations contained in the USA Shooting Official Rules or on the recommendation or rules of any other organization that the Chief considers relevant.

(4) "Chief" means the Chief of Police of the Metropolitan Police Department of the District of Columbia or his designated agent.

(5) "Crime of violence" means a crime of violence as defined in § 22-4501, committed in any jurisdiction, but does not include larceny or attempted larceny.

(6) "Dealer's license" means a license to buy or sell, repair, trade, or otherwise deal in firearms, destructive devices, or ammunition as provided for in subchapter IV of this unit.

(7) "Destructive device" means:

(A) An explosive, incendiary, or poison gas bomb, grenade, rocket, missile, mine, or similar device;

(B) Any device by whatever name known which will, or is designed or redesigned, or may be readily converted or restored to expel a projectile by the action of an explosive or other propellant through a smooth bore barrel, except a shotgun;

(C) Any device containing tear gas or a chemically similar lacrimator or sternutator by whatever name known;

(D) Any device designed or redesigned, made or remade, or readily converted or restored, and intended to stun or disable a person by means of electric shock;

(E) Any combination of parts designed or intended for use in converting any device into any destructive device; or from which a destructive device may be readily assembled; provided, that the term shall not include:

(i) Any pneumatic, spring, or B-B gun which expels a single projectile not exceeding .18 inch in diameter;

(ii) Any device which is neither designed nor redesigned for use as a weapon;

(iii) Any device originally a weapon which has been redesigned for use as a signaling, line throwing, or safety device; or

(iv) Any device which the Chief finds is not likely to be used as a weapon.

(8) "District" means District of Columbia.

(8A) ".50 BMG rifle" means:

(A) A rifle capable of firing a center-fire cartridge in .50 BMG caliber, including a 12.7 mm equivalent of .50 BMG and any other metric equivalent; or

(B) A copy or duplicate of any rifle described in subparagraph (A) of this paragraph, or any other rifle developed and manufactured after January 6, 2009, regardless of caliber, if such rifle is capable of firing a projectile that attains a muzzle energy of 12,000 foot-pounds or greater in any combination of bullet, propellant, case, or primer.

(9) "Firearm" means any weapon, regardless of operability, which will, or is designed or redesigned, made or remade, readily converted, restored, or repaired, or is intended to, expel a projectile or projectiles by the action of an explosive; the frame or receiver of any such device; or any firearm muffler or silencer; provided, that such term shall not include:

(A) Antique firearms; or

(B) Destructive devices;

(C) Any device used exclusively for line throwing, signaling, or safety, and required or recommended by the Coast Guard or Interstate Commerce Commission; or

(D) Any device used exclusively for firing explosive rivets, stud cartridges, or similar industrial ammunition and incapable for use as a weapon.

(9A) "Intrafamily offense" shall have the same meaning as provided in § 16-1001(8).

(10) "Machine gun" means any firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term "machine gun" shall also include the frame or receiver of any such firearm, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a firearm into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

(11) "Organization" means any partnership, company, corporation, or other business entity, or any group or association of 2 or more persons united for a common purpose.

(12) "Pistol" means any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length.

(12A) "Place of business" means a business that is located in an immovable structure at a fixed location and that is operated and owned entirely, or in substantial part, by the firearm registrant.

(13) "Registration certificate" means a certificate validly issued pursuant to this unit evincing the registration of a firearm pursuant to this unit.

(13A) "Restricted pistol bullet" means any bullet designed for use in a pistol which, when fired from a pistol with a barrel of 5 inches or less in length, is capable of penetrating commercially available body armor with a penetration resistance equal to or greater than that of 18 layers of kevlar.

(14) "Rifle" means a grooved bore firearm using a fixed metallic cartridge with a single projectile and designed or redesigned, made or remade, and intended to be fired from the shoulder.

(15) "Sawed-off shotgun" means a shotgun having a barrel of less than 18 inches in length; or a firearm made from a shotgun if such firearm as

modified has an overall length of less than 26 inches or any barrel of less than 18 inches in length.

(16) "Shotgun" means a smooth bore firearm using a fixed shotgun shell with either a number of ball shot or a single projectile, and designed or redesigned, made or remade, and intended to be fired from the shoulder.

(17) "Short barreled rifle" means a rifle having any barrel less than 16 inches in length, or a firearm made from a rifle if such firearm as modified has an overall length of less than 26 inches or any barrel of less than 16 inches.

(18) "Weapons offense" means any violation in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device.

## § 7-2502.01. Registration requirements.

(a) Except as otherwise provided in this unit, no person or organization in the District of Columbia ("District") shall receive, possess, control, transfer, offer for sale, sell, give, or deliver any destructive device, and no person or organization in the District shall possess or control any firearm, unless the person or organization holds a valid registration certificate for the firearm. A registration certificate may be issued:

(1) To an organization if:

(A) The organization employs at least 1 commissioned special police officer or employee licensed to carry a firearm whom the organization arms during the employee's duty hours; and

(B) The registration is issued in the name of the organization and in the name of the president or chief executive officer of the organization;

(2) In the discretion of the Chief of Police, to a police officer who has retired from the Metropolitan Police Department; or

(3) In the discretion of the Chief of Police, to the Fire Marshal and any member of the Fire and Arson Investigation Unit of the Fire Prevention

Bureau of the Fire Department of the District of Columbia, who is designated in writing by the Fire Chief, for the purpose of enforcing the arson and fire safety laws of the District of Columbia.

(b) Subsection (a) of this section shall not apply to:

(1) Any law enforcement officer or agent of the District or the United States, or any law enforcement officer or agent of the government of any state or subdivision thereof, or any member of the armed forces of the United States, the National Guard or organized reserves, when such officer, agent, or member is authorized to possess such a firearm or device while on duty in the performance of official authorized functions;

(2) Any person holding a dealer's license; provided, that the firearm or destructive device is:

    (A) Acquired by such person in the normal conduct of business;

    (B) Kept at the place described in the dealer's license; and

    (C) Not kept for such person's private use or protection, or for the protection of his business;

(3) With respect to firearms, any nonresident of the District participating in any lawful recreational firearm-related activity in the District, or on his way to or from such activity in another jurisdiction; provided, that such person, whenever in possession of a firearm, shall upon demand of any member of the Metropolitan Police Department, or other bona fide law enforcement officer, exhibit proof that he is on his way to or from such activity, and that his possession or control of such firearm is lawful in the jurisdiction in which he resides; provided further, that such weapon shall be transported in accordance with § 22-4504.02; or

(4) Any person who temporarily possesses a firearm registered to another person while in the home of the registrant; provided, that the person is not otherwise prohibited from possessing firearms and the person reasonably believes that possession of the firearm is necessary to prevent imminent death or great bodily harm to himself or herself.

**§ 7-2502.02. Registration of certain firearms prohibited.**

(a) A registration certificate shall not be issued for a:

(1) Sawed-off shotgun;

(2) Machine gun;

(3) Short-barreled rifle;

(4) Pistol not validly registered to the current registrant in the District prior to September 24, 1976, except that the prohibition on registering a pistol shall not apply to:

(A) Any organization that employs at least one commissioned special police officer or other employee licensed to carry a firearm and that arms the employee with a firearm during the employee's duty hours;

(B) A police officer who has retired from the Metropolitan Police Department; or

(C) Any person who seeks to register a pistol for use in self-defense within that person's home;

(5) An unsafe firearm prohibited under § 7-2505.04;

(6) An assault weapon; or

(7) A .50 BMG rifle.

(b) Repealed.

**§ 7-2502.03. Qualifications for registration; information required for registration.**

(a) No registration certificate shall be issued to any person (and in the case of a person between the ages of 18 and 21, to the person and his signatory parent or guardian) or organization unless the Chief determines that such person (or the president or chief executive in the case of an organization):

(1) Is 21 years of age or older; provided, that the Chief may issue to an applicant between the ages of 18 and 21 years old, and who is otherwise qualified, a registration certificate if the application is accompanied by a notarized statement of the applicant's parent or guardian:

> (A) That the applicant has the permission of his parent or guardian to own and use the firearm to be registered; and

> (B) The parent or guardian assumes civil liability for all damages resulting from the actions of such applicant in the use of the firearm to be registered; provided further, that such registration certificate shall expire on such person's 21st birthday;

(2) Has not been convicted of a crime of violence, weapons offense, or of a violation of this unit;

(3) Is not under indictment for a crime of violence or a weapons offense;

(4) Has not been convicted within 5 years prior to the application of any:

> (A) Violation in any jurisdiction of any law restricting the use, possession, or sale of any narcotic or dangerous drug;

> (B) A violation of § 22-407, regarding threats to do bodily harm, or § 22-404, regarding assaults and threats, or any similar provision of the law of any other jurisdiction so as to indicate a likelihood to make unlawful use of a firearm;

> (C) Two or more violations of § 50-2201.05(b) or, in any other jurisdiction, any law restricting driving under the influence of alcohol or drugs; or

> (D) Intrafamily offense;

(5) Within the 5-year period immediately preceding the application, has not been acquitted of any criminal charge by reason of insanity or has not been adjudicated a chronic alcoholic by any court; provided, that this paragraph shall not apply if such person shall present to the Chief, with the application, a medical certification indicating that the applicant has

recovered from such insanity or alcoholic condition and is capable of safe and responsible possession of a firearm;

(6) Within the 5 years immediately preceding the application, has not been voluntarily or involuntarily committed to any mental hospital or institution; provided, that this paragraph shall not apply, if such person shall present to the Chief, with the application, a medical certification that the applicant has recovered from whatever malady prompted such commitment;

(6A) Within the 5 years immediately preceding the application, has not had a history of violent behavior.

(7) Does not appear to suffer from a physical defect which would tend to indicate that the applicant would not be able to possess and use a firearm safely and responsibly;

(8) Has not been adjudicated negligent in a firearm mishap causing death or serious injury to another human being;

(9) Is not otherwise ineligible to possess a pistol under § 22-4503;

(10) Has not failed to demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to firearms and, in particular, the safe and responsible use, handling, and storage of the same in accordance with training, tests, and standards prescribed by the Chief; provided, that once this determination is made with respect to a given applicant for a particular type of firearm, it need not be made again for the same applicant with respect to a subsequent application for the same type of firearms; provided, further, that this paragraph shall not apply with respect to any firearm reregistered pursuant to § 7-2502.06;

(11) Has vision better than or equal to that required to obtain a valid driver's license under the laws of the District of Columbia; provided, that current licensure by the District of Columbia, of the applicant to drive, shall be prima facie evidence that such applicant's vision is sufficient and; provided further, that this determination shall not be made with respect to persons applying to reregister any firearm pursuant to § 7-2502.06;

(12)(A) Has not been the respondent in an intrafamily proceeding in which a civil protection order was issued against the applicant pursuant to § 16-1005; provided, that an applicant who has been the subject of such an order shall be eligible for registration if the applicant has submitted to the Chief a certified court record establishing that the order has expired or has been rescinded for a period of 5 years or more; or

(B) Has not been the respondent in a proceeding in which a foreign protection order, as that term is defined in § 16-1041, was issued against the applicant; provided, that an applicant who has been the subject of such an order shall be eligible for registration if the applicant has submitted to the Chief a certified court record establishing that the order has expired or has been rescinded for a period of 5 years;

(13)(A) Has completed a firearms training or safety course or class conducted by a state-certified firearms instructor or a certified military firearms instructor that provides, at a minimum, a total of at least one hour of firing training at a firing range and a total of at least 4 hours of classroom instruction.

(B) An affidavit signed by the certified firearms instructor who conducted or taught the course, providing the name, address, and phone number of the instructor and attesting to the successful completion of the course by the applicant shall constitute evidence of certified successful completion under this paragraph.

(14) Has not been prohibited from possessing or registering a firearm pursuant to § 7-2502.09(b).

(b) Every person applying for a registration certificate shall provide on a form prescribed by the Chief:

(1) The full name or any other name by which the applicant is known;

(2) The present address and each home address where the applicant has resided during the 5-year period immediately preceding the application;

(3) The present business or occupation and any business or occupation in which the applicant has engaged during the 5-year period immediately preceding the application and the addresses of such businesses or places of employment;

(4) The date and place of birth of the applicant;

(5) The sex of the applicant;

(6) Whether (and if so, the reasons) the District, the United States or the government of any state or subdivision of any state has denied or revoked the applicant's license, registration certificate, or permit pertaining to any firearm;

(7) A description of the applicant's role in any mishap involving a firearm, including the date, place, time, circumstances, and the names of the persons injured or killed;

(8) The intended use of the firearm;

(9) The caliber, make, model, manufacturer's identification number, serial number, and any other identifying marks on the firearm;

(10) The name and address of the person or organization from whom the firearm was obtained, and in the case of a dealer, his dealer's license number;

(11) Where the firearm will generally be kept;

(12) Whether the applicant has applied for other registration certificates issued and outstanding;

(13) Such other information as the Chief determines is necessary to carry out the provisions of this unit.

(c) Every organization applying for a registration certificate shall:

(1) With respect to the president or chief executive of such organization, comply with the requirements of subsection (b) of this section; and

(2) Provide such other information as the Chief determines is necessary to carry out the provisions of this unit.

(d) The Chief shall require any registered pistol to be submitted for a ballistics identification procedure and shall establish a reasonable fee for the procedure.

(e) The Chief shall register no more than one pistol per registrant during any 30-day period; provided, that the Chief may permit a person first becoming a District resident to register more than one pistol if those pistols were lawfully owned in another jurisdiction for a period of 6 months prior to the date of the application.

## § 7-2502.04. Fingerprints and photographs of applicants; application in person required.

(a) The Chief may require any person applying for a registration certificate to be fingerprinted if, in his judgment, this is necessary to conduct an efficient and adequate investigation into the matters described in § 7-2502.03 and to effectuate the purpose of this unit; provided, that any person who has been fingerprinted by the Chief within 6 years prior to submitting the application need not, in the Chief's discretion, be fingerprinted again if he offers other satisfactory proof of identity.

(b) Each applicant, other than an organization, shall submit with the application 2 full-face photographs of himself, 1 3/4 by 1 7/8 inches in size which shall have been taken within the 30-day period immediately preceding the filing of the application.

(c) Every applicant (or in the case of an organization, the president or chief executive, or a person authorized in writing by him), shall appear in person at a time and place prescribed by the Chief, and may be required to bring with him the firearm for which a registration certificate is sought, which shall be transported in accordance with § 22-4504.02.

## § 7-2502.05. Application signed under oath; fees.

(a) Each applicant (the president or chief executive in the case of an organization) shall sign an oath or affirmation attesting to the truth of all the information required by §§ 7-2502.03 or § 7-2502.07a.

(b) Each application required by this subchapter shall be accompanied by a nonrefundable fee to be established by the Mayor; provided, that such fee shall, in the judgment of the Mayor, reimburse the District for the cost of services provided under this subchapter.

## § 7-2502.06.  Time for filing registration applications.

(a) An application for a registration certificate shall be filed (and a registration certificate issued) prior to taking possession of a firearm from a licensed dealer or from any person or organization holding a registration certificate therefor.  In all other cases, an application for registration shall be filed immediately after a firearm is brought into the District.  It shall be deemed compliance with the preceding sentence if such person personally communicates with the Metropolitan Police Department (as determined by the Chief to be sufficient) and provides such information as may be demanded; provided, that such person files an application for a registration certificate within 48 hours after such communication.

(b) Any firearm validly registered under prior regulations must be registered pursuant to this unit in accordance with procedures to be promulgated by the Chief.  An application to register such firearm shall be filed pursuant to this unit within 60 days of September 24, 1976.

## § 7-2502.07.  Issuance of registration certificate; time period; corrections.

(a) Upon receipt of a properly executed application for registration certificate, the Chief, upon determining through inquiry, investigation, or otherwise, that the applicant is entitled and qualified under the provisions of this unit, thereto, shall issue a registration certificate.  Each registration certificate shall be in duplicate and bear a unique registration certificate number and such other information as the Chief determines is necessary to identify the applicant and the firearm registered.  The duplicate of the registration certificate shall be delivered to the applicant and the Chief shall retain the original.

(b) The Chief shall approve or deny an application for a registration certificate within a 60-day period beginning on the date the Chief receives the application, unless good cause is shown, including nonreceipt of information from sources outside the District government; provided, that in

the case of an application to register a firearm validly registered under prior regulations, the Chief shall have 365 days after the receipt of such application to approve or deny such application. The Chief may hold in abeyance an application where there is a revocation proceeding pending against such person or organization.

(c) Upon receipt of a registration certificate, each applicant shall examine same to ensure that the information thereon is correct. If the registration certificate is incorrect in any respect, the person or organization named thereon shall return it to the Chief with a signed statement showing the nature of the error. The Chief shall correct the error, if it occurred through administrative error. In the event the error resulted from information contained in the application, the applicant shall be required to file an amended application setting forth the correct information, and a statement explaining the error in the original application. Each amended application shall be accompanied by a fee equal to that required for the original application.

(d) In the event the Chief learns of an error in a registration certificate other than as provided in subsection (c) of this section, he may require the holder to return the registration certificate for correction. If the error resulted from information contained in the application, the person or organization named therein shall be required to file an amended application as provided in subsection (c) of this section.

(e) Each registration certificate issued by the Chief shall be accompanied by a statement setting forth the registrant's duties under this unit.

(f) In the discretion of the Chief of Police, a registration certificate may be issued to a retired police officer who is a resident of the District of Columbia for a pistol and ammunition which conforms to the Metropolitan Police Department General Orders and policies.

(g) When the retired police officer ceases to be a resident of the District of Columbia the registration certificate expires.

(h) Nothing in this unit shall create an entitlement to a registration certificate for a retired police officer. If the Chief of Police denies a retired police officer's registration certificate application, the Chief of Police shall state the reasons for the denial in writing.

(i) The District of Columbia shall not incur any liability by reason of the issuance or denial of a certificate, nor for any use made of the registered firearm.

## § 7-2502.07a.  Expiration and renewal of registration certificate.

(a) Registration certificates shall expire 3 years after the date of issuance unless renewed in accordance with this section for subsequent 3-year periods.

(b) A registrant shall be eligible for renewal of registration of a firearm if the registrant continues to meet all of the initial registration requirements set forth in § 7-2502.03 and follows any procedures the Chief may establish by rule.

(c) For each renewal, a registrant shall submit a statement to the Metropolitan Police Department attesting to:

    (1) Possession of the registered firearm;

    (2) The registrant's address; and

    (3) The registrant's continued compliance with all registration requirements set forth in § 7-2502.03.

(d) A registrant shall submit to a background check once every 6 years to confirm that the registrant continues to qualify for registration under § 7-2502.03.

(e)(1) The Metropolitan Police Department shall mail a renewal notice to each registrant at least 90 days prior to the expiration of the registration certificate.

    (2) A renewal application shall be received by the Metropolitan Police Department at least 60 days prior to the expiration of the current registration certificate to ensure timely renewal.

    (3) It is the duty of the registrant to timely renew a registration before its expiration date and a failure of the Metropolitan Police Department to mail or the registrant to receive the notice required under paragraph (1) of

this subsection shall not prevent a registration from expiring as of that date.

(f) An applicant for the renewal of a registration certificate may be charged a reasonable fee to cover the administrative costs incurred by the Metropolitan Police Department in connection with the renewal.

(g) The Chief shall establish, by rule, a method for conducting the renewal of registrations for all firearms registered prior to March 31, 2009. The renewals of all firearms registered prior to March 31, 2009, shall be completed within 3 years of March 31, 2009.

## § 7-2502.08. Duties of registrants.

Each person and organization holding a registration certificate, in addition to any other requirements imposed by this unit, or the acts of Congress, shall:

(1) Notify the Chief in writing of:

(A) The loss, theft, or destruction of the registration certificate or of a registered firearm (including the circumstances, if known) immediately upon discovery of such loss, theft, or destruction;

(B) A change in any of the information appearing on the registration certificate or required by § 7-2502.03;

(C) The sale, transfer or other disposition of the firearm not less than 48 hours prior to delivery, pursuant to such sale, transfer or other disposition, including:

(i) Identification of the registrant, the firearm and the serial number of the registration certificate;

(ii) The name, residence, and business address and date of birth of the person to whom the firearm has been sold or transferred; and

(iii) Whether the firearm was sold or how it was otherwise transferred or disposed of.

(2) Return to the Chief, the registration certificate for any firearm which is lost, stolen, destroyed, or otherwise transferred or disposed of, at the time he notifies the Chief of such loss, theft, destruction, sale, transfer, or other disposition.

(3) Have in his possession, whenever in possession of a firearm, the registration certificate for such firearm, and exhibit the same upon the demand of a member of the Metropolitan Police Department, or other law enforcement officer.

### § 7-2502.09. Revocation of registration certificate.

(a) A registration certificate shall be revoked if:

(1) Any of the criteria in § 7-2502.03 are not currently met;

(2) The registered firearm has become an unregisterable firearm under the terms of § 7-2502.02, or a destructive device; or

(3) The information furnished to the Chief on the application for a registration certificate proves to be intentionally false.

(4) Repealed.

(b) In addition to any other criminal or civil sanctions that may be imposed, including § 7-2507.06:

(1) A registrant shall be subject to a civil fine of $100 for the 1st violation or omission of the duties, obligations, or requirements imposed by § 7-2502.08.

(2) A registrant shall be subject to a civil fine of $500 for the 2nd violation or omission of the duties, obligations, or requirements imposed by § 7-2502.08, a registrant's registration shall be revoked, and the registrant shall be prohibited from possessing or registering any firearm for a period of 5 years.

(3) A registrant shall be subject to a civil fine of $500 for the 3rd violation or omission of the duties, obligations, or requirements imposed

by § 7-2502.08, a registrant's registration shall be revoked, and the registrant shall be prohibited from possessing or registering any firearm.

\*     \*     \*

## § 7-2506.01. Persons permitted to possess ammunition.

(a) No person shall possess ammunition in the District of Columbia unless:

(1) He is a licensed dealer pursuant to subchapter IV of this unit;

(2) He is an officer, agent, or employee of the District of Columbia or the United States of America, on duty and acting within the scope of his duties when possessing such ammunition;

(3) He is the holder of the valid registration certificate for a firearm of the same gauge or caliber as the ammunition he possesses; except, that no such person shall possess restricted pistol bullets; or
(4) He holds an ammunition collector's certificate on September 24, 1976.

(b) No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

\*     \*     \*

## § 7-2507.06. Penalties.

Any person convicted of a violation of any provision of this unit shall be fined not more than $1,000 or imprisoned for not more than 1 year, or both; except that:

(1) A person who knowingly or intentionally sells, transfers, or distributes a firearm, destructive device, or ammunition to a person under 18 years of age shall be fined not more than $10,000 or imprisoned for not more than 10 years, or both.

(2)(A) Except as provided in subparagraph (B) of this paragraph, any person who is convicted a second time for possessing an unregistered firearm shall be fined not more than $5,000 or imprisoned not more than 5 years, or both.

(B) A person who in the person's dwelling place, place of business, or on other land possessed by the person, possesses a pistol, or firearm that could otherwise be registered, shall be fined not more than $1,000 or imprisoned not more than 1 year, or both.

(3) A person convicted of knowingly possessing restricted pistol bullets in violation of § 7-2506.01(3) may be sentenced to imprisonment for a term not to exceed 10 years and shall be sentenced to imprisonment for a mandatory-minimum term of not less than 1 year and shall not be released from prison or granted probation or suspension of sentence prior to serving the mandatory-minimum sentence, and, in addition, may be fined an amount not to exceed $10,000.

\*　　\*　　\*

## § 7-2507.10.  Severability.

If any provision of this unit or the application thereof to any person or circumstance is held invalid, the remainder of this unit and the application of such provision to other persons not similarly situated or to other circumstances shall not be affected thereby.

## § 7-2507.11.  Rules.

The Chief, pursuant to subchapter I of Chapter 5 of Title 2, may issue rules to implement the provisions of this unit.

# RELEVANT PROVISIONS OF TITLE 24 OF
# THE DISTRICT OF COLUMBIA MUNICIPAL REGULATIONS

## 2305.  REGISTRATION OF FIREARMS: GENERAL PROVISIONS

2305.1  The provisions of §§ 2305 through 2319 are issued by the Chief of Police pursuant to § 206(b) of the Firearms Control Regulations Act of 1975, D.C. Law 1-85, D.C. Code § 6-2316(b) (1981); referred to as the "Act"] to prescribe procedures for registration of firearms.

2305.2  The Director is authorized by the Act to prescribe all forms required to implement the Act.  All the information called for in each form shall be furnished, as indicated by the headings on the form and the instructions that are on each form or that are issued with respect to each form.

2305.3  The Chief shall register no more than one pistol per registrant during any 30-day period.

2305.4  The Chief may permit a person first becoming a District resident to register more than one pistol if those pistols were lawfully owned in another jurisdiction for a period of 6 months prior to the date of application.

*     *     *

## 2307.  CRIMINAL DISQUALIFICATIONS FOR REGISTRATION

2307.1  For the purposes of §§ 203(a)(2), 203(a)(3), and 203(a)(4) of the Act, the following records shall be used to determine whether there is prima facie evidence of a disqualification:

(a) A criminal history record (as defined in 28 CFR 20.3) with a disposition showing a conviction or a sentence (including a suspended sentence, probation, incarceration, or a fine); or

(b) A court record showing a conviction or a sentence.

2307.2  Only convictions rendered by the courts of the several states, territories, possessions, and federal tribunals, including those of the military, shall be considered.

2307.3  The pendency of an appeal, or of any other judicial or non-judicial review, shall not be considered until the entry of a final order setting aside the conviction.  Non-judicial review includes the pardon authority of the jurisdiction where the conviction was obtained.

2307.4  The time period preceding an application for registration shall be computed by using the date of the applicant's signature on form P.D. 219 as the end of the period of time to be computed.

## 2308.  MEDICAL DISQUALIFICATIONS FOR REGISTRATION

2308.1  The records described in § 2307.1 shall also be used to establish whether a person was acquitted of a criminal charge by reason of insanity or adjudged a chronic alcoholic.

2308.2  Any official court or medical record revealing a civil judgment of chronic alcoholism or involuntary commitment to a private or public facility for chronic alcoholism shall establish the existence of that condition or disease for the purpose of disqualification imposed by § 203(a)(5) of the Act.

2308.3  Any medical certification submitted to lift the disqualification imposed by § 203(a)(5) of the Act shall meet the following criteria:

(a) Be written on the official letterhead of the institution or physician treating the person;

(b) Be signed by the treating physician, head of the treating physician's department, or medical director of the treating institution (signatures of non-medical administrative personnel shall not be acceptable);

(c) Describe the condition from which the applicant has recovered, including physical manifestations of the disease, such as tremors or blackouts; and

(d) State whether the person, in the certifying physician's opinion, is capable of the safe and responsible possession of the type of firearm for which an application has been filed.

2308.4  With respect to medical certifications to lift the disqualifier imposed by § 203(a)(6) of the Act upon persons voluntarily or involuntarily

committed to a mental hospital or institution, the requirements imposed by §
2308.3 shall be applicable.

2308.5  Physical defects indicating that an applicant would not be able to
safely and responsibly possess and use a firearm as required by § 203(a)(7)
of the Act include those conditions that, to the examining officer, visibly
prevent or substantially interfere with the ability to hold, load, aim, fire,
clean, or protect the weapon.

## 2309.  OTHER DISQUALIFICATIONS FOR REGISTRATION

2309.1  The entry of a judgment or consent order or decree of negligence in
any civil suit concerning the discharge of a firearm resulting in death or
serious injury to a human being without regard to the filing of criminal
charges, or the finding by a coroner of negligent homicide, shall be
considered an adjudication of negligence to establish the disqualifier in §
203 (a)(8) of the Act.

2309.2  Serious injury shall be deemed to have occurred where the victim
remains in a hospital in excess of forty-eight (48) hours.

2309.3  The existence of a record described in § 2307.1 showing a
conviction which makes a person ineligible to possess a pistol under D.C.
Code § 22-3203 (1981), shall establish that the person is disqualified from
possessing a rifle or shotgun under § 203(a)(9) of the Act.

2309.4  A court record showing the applicant is a respondent in an
intrafamily proceeding in which a civil protection order was issued against
the applicant, unless the applicant can demonstrate by a certified court
record establishing that the order has expired or has been rescinded for a
period of 5 years.

2309.5  A court record showing the applicant is a respondent in which a
foreign protection order (as defined in D.C. Official Code § 16-1041) was
issued against the applicant, unless the applicant can demonstrate by a
certified court record establishing that the order has expired or has been
rescinded for a period of 5 years.

2309.6  Arrest records within the 5 years immediately preceding the
application, showing that the applicant has had a history of violent behavior.

For purposes of this subsection, "history of violent behavior" includes but is not limited to arrests for violation of D.C. Official Code § 22-407, regarding threats to do bodily harm, or D.C. Official Code § 22-404, regarding assaults and threats, any crime of violence as defined in D.C. Official Code § 23-1331, or any similar provision of the law of any other jurisdiction so as to indicate a likelihood to make unlawful use of a firearm.

## 2310. AGE AND VISION REQUIREMENTS

2310.1  To establish age as required by § 203(a)(1), a valid driver's license, birth certificate, or other government document requiring a date of birth under penalty of perjury shall be acceptable.

2310.2  A valid driver's license from any state, territory, or possession, or an international driver's license or one issued by the military shall, in the case of a new resident, be treated the same as if it had been issued by the District.

2310.3  When a District permit is obtained, the applicant shall communicate the permit number to the Firearms Registration Section.

2310.4  If a District permit is denied, the applicant shall immediately contact the Firearms Registration Section to schedule a vision test.

## 2311. KNOWLEDGE OF FIREARMS AND TRAINING REQUIREMENTS

2311.1  Knowledge of the laws of the District pertaining to firearms, and knowledge of the safe and responsible use of firearms, shall be tested through a written examination.

2311.2  Under compelling circumstances, an oral test may be administered in place of the written test.

2311.3  The type of test and its content shall be at the sole discretion of the Director.

2311.4  The written exam shall consist of no less than twenty (20) questions.

2311.5  A score of seventy-five percent (75%) or better shall be a passing grade.

2311.6  Rifles and shotguns shall be considered the same type of firearm for the purposes of testing.

2311.7  If an applicant fails an examination, he or she shall be allowed one (1) retest without charge.

2311.8  A fee equal to that submitted with the original application shall be assessed for the second retest and for each subsequent retest.

2311.9  Complete a firearms training or safety course or class conducted by a state-certified firearms instructor or a certified military firearms instructor that provides, at a minimum a total of at least one hour of firing training at a firing range and a total of at least 4 hours of classroom instruction.

2311.10  Submit an affidavit from the certified firearms instructor who conducted or taught the course, providing the name, address, and phone number of the instructor and attesting to the successful completion of the course by the applicant shall constitute evidence of certified successful completion of the requirement imposed by section 2311.9.

## 2312.  FINGERPRINTS AND PHOTOGRAPHS

2312.1  Each person registering a firearm shall be fingerprinted, unless all of the following apply:

(a) The applicant has been fingerprinted by the Metropolitan Police Department within the five (5) year period immediately preceding the date the application was submitted;

(b) The applicant's fingerprints on file are, in the opinion of the Director, of the required quality; and

(c) The applicant offers sufficient identification to establish the applicant's identity as the same person whose fingerprints are already on file.

2312.2  An applicant shall not be required to submit new photographs with a second or subsequent application in order to meet the provisions of § 204 of the Act (D.C. Code § 6-2314(b) (1981)), unless the Director determines there is a need for new photographs.

## 2313.  PERSONAL APPEARANCE AND FILING TIME

2313.1  In accordance with D.C. Code § 6-2314(c) (1981), each applicant for a registration certificate shall personally present the required form at the Firearms Registration Section, during operating hours.

2313.2  Multiple applications submitted at one (1) time shall be accepted on the basis of a single personal appearance.

2313.3  The Director may waive the requirement for a personal appearance in emergency situations, including cases where the applicant is out of the country, in the hospital, or not ambulatory; Provided, that the application shall be accepted for processing, but shall not be approved until the applicant appears in person.

2313.4  If the condition preventing the personal appearance is permanent or continuing in nature, the Director may in his or her discretion satisfy this requirement by interviewing the applicant at a place convenient to the applicant.

2313.5  When a personal appearance is not made, an appropriate notation shall be made on the application showing that fact, together with the name, address, phone number, and relationship to the applicant of the person presenting the application on the person's behalf.

2313.6  A person other than the president or chief executive of an organization may submit an application if that person presents with the application a letter on the organization's official letterhead signed by the president or chief executive of the organization, stating the name of the person appearing, that person's position within the organization, and the identity of the weapon he or she is authorized to present for registration.

2313.7  When submitting an application, an applicant shall not have the firearm to be registered in his or her possession.

2313.8  The Director may require an applicant to return with the firearm if it appears to the Director that any of the following conditions may apply:

(a) That the person is unqualified or incapable of safe and responsible possession or use of the firearm;

(b) That the firearm may be unregisterable, defective, or in a dangerous condition or state of disrepair; or

(c) That the information relating to the weapon on the application is incorrect, misleading, or incomplete.

2313.9  A person shall be deemed to be in compliance with the personal notification requirements of § 206(a) of the Act (§ 6-2316(a), D.C. Code, 1981 ed.) if he or she, immediately after bringing a firearm into the District, telephonically notifies the Watch Commander of the Identification and Records Division.

## 2314.  ISSUANCE OF REGISTRATION CERTIFICATES

2314.1  Upon receipt of a properly completed application including photographs, fingerprints, and the required fee, the applicant shall be given a copy of the application form which indicates the fee has been paid.

2314.2  The Director shall make any inquiry and investigation as he or she shall deem necessary to determine whether the applicant is entitled and qualified to receive a registration certificate, including the following:

(a) Inquiry and investigation of the applicant's criminal history;

(b) Record checks;

(c) Submission of fingerprints to the F.B.I.; and

(d) Verification of the information supplied on the form through interviews or other investigative techniques.

2314.3  An applicant may be asked to supplement information originally submitted.

2314.4  If the Director finds the applicant eligible, the applicant shall be sent another copy of the application form which shall bear a unique registration number.  This copy of the application form shall be retained by the applicant as his or her registration certificate.

*    *    *

## 2317.  LOST, STOLEN, OR DESTROYED CERTIFICATES

2317.1  Upon discovering the loss, theft, or destruction of a registration certificate or firearm, the holder of the certificate shall immediately communicate this fact in writing or in person to the Firearms Registration Section in accordance with D.C. Code § 6-2318 (1981).

2317.2  Each written communication concerning a certificate shall contain sufficient information to identify the holder.

2317.3  The filing of an offense report or complaint of a crime with respect to the loss, theft, or destruction of the certificate or weapon shall be deemed to be compliance with this section.

2317.4  The holder of a destroyed, lost, or stolen certificate shall be issued duplicate certificate without charge.

2317.5  The reissued certificate shall be prominently marked as a duplicate, and the issuance of the duplicate certificate shall automatically invalidate the lost, destroyed, or stolen certificate.

\*   \*   \*

## 2320.  PROCEDURES AND REQUIREMENTS FOR REGISTRATION OF A PISTOL FOR THE PURPOSE OF SELF-DEFENSE WITHIN APPLICANT'S HOME

2320.1  In addition to satisfying all other firearms registration requirements in Chapter 23 of this Title, an applicant for a registration certificate for a pistol to be used for the purpose of self-defense within that person's home shall comply with all the procedures and requirements of this section.  In the event of any irreconcilable conflict between this section and any other regulations regarding the registration of a pistol, this section controls.

2320.2  The Director may register a pistol so long as the pistol is not an assault weapon, or a machine gun as those terms are defined in section 101(3A) & (10) of the Firearms Control Act of 1975 (D.C. Law 1-85; D.C. Official Code § 7-2501.01(3A), (10)), or an unsafe firearm prohibited under § 504 of the Firearms Registration Emergency Amendment Act of 2008.

2320.3  An applicant seeking to register a pistol he or she will purchase from a firearms dealer pursuant to this section shall:

(a) Acquire the Firearm Registration application (PD 219) either from any licensed firearms dealer in the District of Columbia, or in person at the Firearms Registration Section at Metropolitan Police Department (MPD) headquarters or by mailing a request with a self-addressed, stamped envelope to Firearms Registration Section, Metropolitan Police Department, 300 Indiana Avenue, NW, Washington, DC 20001;

(b) Present the Firearm Registration application to a licensed firearm dealer, whose assistance is necessary to complete the application;

(c) Appear in person at MPD headquarters to take these steps:

(1) Report to the Firearms Registration Section with the completed Firearm Registration application, acquire two fingerprint cards, and provide the following:

(A) Two passport-sized facial photos;

(B) A valid driver's license or a letter from a physician attesting that the applicant has vision as least as good as that required for a driver's license; and

(C) Residency verification, such as a District of Columbia driver's license or identification card, a current rental agreement, or a deed to property that includes a home;

(2) Complete a Firearm Registration test with at least a 75% proficiency;

(3) If successful on the test, pay all applicable and reasonable fees required by the Chief at the MPD cashier, including thirty five dollars ($35) for fingerprinting and thirteen dollars ($13) for a firearm registration;

(4) Present a fee receipt and the two fingerprint cards to the MPD fingerprint examiner, and submit to fingerprinting; and

(5) Return to the Firearms Registration Section with one fingerprint card for the office file and the other for submission to the Federal Bureau of Investigation (FBI) for fingerprint analysis for the purpose of a criminal record check;

(d) Await notification by mail to the address on the Firearm Registration application of whether all statutory and regulatory requirements for registration have been satisfied;

(e) Upon notification that all statutory and regulatory requirements for registration have been satisfied, return to the Firearms Registration Section to complete the registration process and obtain an MPD seal on the completed Firearms Registration certificate;

(f) Present the sealed Firearm Registration application to the licensed firearms dealer and take delivery of the applicant's pistol pending completion of a ballistic identification procedure, or, in the case of a purchase from a firearms dealer located in another jurisdiction, have that firearms dealer transport the applicant's pistol to a licensed firearms dealer in the District, where the applicant will take delivery of the pistol pending completion of a ballistic identification procedure;

(g) Transport the pistol to the Firearms Registration Section for completion of a ballistic identification procedure between the hours of 9:00 AM through 5:00 PM, Monday through Friday, pay a ballistic identification fee of twelve dollars ($12); and

(h) Retrieve the registered pistol from the Firearms Registration Section and transport it to the applicant's home.

2320.4  Up until March 22, 2009, an applicant seeking to register an unregistered pistol already in his or her possession pursuant to this section shall follow the procedure laid out in paragraphs (g), (a), (c), (d), (e), and (h) of section 2320.3, in that order.

2320.5  An applicant seeking to register a pistol legally possessed in another jurisdiction pursuant to this section shall follow the procedure laid out in paragraphs (g), (a), (c), (d), (e), and (h) of section 2320.3, in that order.  If the applicant does not transport the pistol immediately to the Firearms Registration Section upon bringing it into the District, the applicant shall

contact the Firearms Registration Section by calling 202-727-4275, providing notification that a pistol from another jurisdiction has been brought into the District, and then begin the application process within 48 hours of such notification.

2320.6  Failure to comply with the requirement to bring the pistol for a ballistics identification procedure will result in the denial of the registration application or revocation of the registration for that pistol and may subject the owner of the pistol to possible criminal charges.

2320.7  In the event of the loss, theft, or destruction of the registration certificate or of a registered pistol, a registrant shall immediately file a police report and shall also:

(a) Immediately notify the Firearms Registration Section in writing of the loss, theft, or destruction of the registration certificate or of the registered pistol (including the circumstances, if known) upon discovery of such loss, theft, or destruction; and

(b) Immediately return to the Firearms Registration Section the registration certificate for any firearm which is lost, stolen, or destroyed.

2320.8  When permitted under this section to transport a pistol between two places, a registrant must go directly between those places without deviation.

2320.9  When permitted under this section to transport a pistol, the firearm shall be unloaded, and neither the firearm nor any ammunition being transported shall be readily accessible or directly accessible from the passenger compartment of the transporting vehicle.

2320.10  If the transporting vehicle does not have a compartment separate from the driver's compartment, the firearm or ammunition shall be contained in a locked container other than the glove compartment or console, and the firearm shall be unloaded.

2320.11 If the transportation is in a manner other than in a vehicle, the firearm shall be:

(a) Unloaded;

(b) Inside a locked container; and

(c) Separate from any ammunition.

*   *   *

## 2324.  INTERPRETATION OF ASSAULT WEAPONS DEFINITION

2324.1 Section 101 paragraph 3A of the Firearms Regulations Control Act of 1975 (Act), effective March 31, 2009 (D.C. Law 17-0372; 56 DCR 1365.), defined the term "assault weapon", and section 202(a)(6) of the Act declared that "assault weapons" may not be registered in the District.

2324.2 In those instances where the definition of "assault weapon" refers to a firearms manufacturer or description without including a specific model reference, the term "assault weapon" shall be interpreted to include only those firearms produced by such manufacturer, or possessing such description, that share characteristics similar to other enumerated firearms in section 101 paragraph 3A(A)(i)(I)) through (III) of the Act, or possess any of the enumerated characteristics listed in section 101 paragraph 3A(A)(i)(IV) through (VIII) and 3A(A)(ii) through (iii) of the Act.

2324.3 A firearm that is produced by a manufacturer or possesses a description that is included in the definition of "assault weapon" referred to in § 2324.1, but which does not share characteristics similar to the enumerated firearms, or the enumerated characteristics described in § 2324.2, may be registered, provided that the firearm is not otherwise prohibited from registration under District or Federal law or regulation.

*   *   *

## 2399.  DEFINITIONS

2399.1  When used in this chapter, and in forms prescribed under this chapter, where not otherwise distinctly expressed or manifestly incompatible with the intent of the Act or this chapter, the following terms shall have the meanings ascribed:

Ballistics identification procedure—a process, approved by the Chief, undertaken to identify markings unique to a particular firearm or the ammunition used by the firearm.

Business premises—the property on which a licensed, deadly weapons dealer's business is or will be conducted.

Certified firearms instructor—any person certified as a firearms instructor by the military or a state authority.

Chief—the Chief of the Metropolitan Police Department.

Dealer—any person engaged in the business of buying, selling, or otherwise dealing in firearms, ammunition, or destructive devices at wholesale or retail; any person engaged in the business of repairing, testing, or analyzing firearms; any person engaged in the business of making or fitting special barrels, stocks, or trigger mechanisms for firearms or destructive devices; or any person repairing, testing, analyzing, or making any destructive device or ammunition.

Director—the commanding officer or acting commanding officer of the Police Business Services Division of the Metropolitan Police Department or their delegates.

Explosive or explosives—any chemical compound or mechanical mixture that contains any oxidizing and combustible units, or other ingredients, in such proportion, quantities, or packing that an ignition by fire, friction, concussion, percussion, or detonator, or any part of the compound or mixture, may cause a sudden generation of highly heated gasses that results in gaseous pressures capable of producing destructive effects on contiguous objects or of destroying life or limb. (Art. 9, § 3 of the Police Regulations)

Firearms Registration Section—a part of the Police Business Services Division of the Metropolitan Police Department, located in 300 Indiana Avenue, N.W., Washington, D.C. 20001

Home—the principal place of residence of an individual in the District and limited to the interior of a house, condominium unit, cooperative unit, apartment, houseboat, or a mobile home, so long as that structure is not

capable of unassisted movement.  The term home does not include any common areas of any condominium unit, cooperative unit, or apartment.

Intrafamily offense—shall have the same meaning as provided in D.C. Official Code § 16-1001(8).

Law enforcement officer—any person authorized by a unit of government to carry a firearm on public space and who is responsible for, and under a duty to, detect crimes and apprehend offenders.  A law enforcement officer is not a commissioned special police officer or the equivalent.

Licensed dealer—a deadly weapons dealer licensed under the Act and this chapter.

Machine gun—means any firearm which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term "machine gun" shall also include the frame or receiver of any such firearm, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a firearm into a machine gun, and any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

Pistol—any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length.

Place of business—means a business that is located in an immovable structure at a fixed location and that is operated and owned entirely, or in substantial part, by the firearm registrant.

Supervisor—the person in charge of the Firearms Registration Section

## *An Ordinance*

To prevent shooting with guns, or other fire-arms.

[Passed 24 October, 1801.]

BE it ordained by the Mayor, Recorder, Aldermen and Common Council of the Corporation of Georgetown. That from and after the first day of November next, it shall not be lawful for any person to shoot with any gun, or other fire-arm, within any of the inhabited parts of Georgetown or its additions; and if any person shall, contrary to this ordinance, shoot any gun or other fire-arm, such person shall forfeit and pay five dollars for every offence, to be recovered as other fines are now by law recoverable, the one half to the use of the Corporation, and the other half to the use of the informer.

II. And be it further ordained, That, should any slave or indented servant be guilty of any offence as above mentioned, such slave or indented servant shall be punished by lashes, not exceeding ten, unless the owner or owners of such slave or indented shrvant, shall pay the fine of two dollars, with costs, which is hereby imposed for every such offence.

>>>>>>>>>>>>>>>>>>><<<<<<<<<<<<<<<<<<

## An ordinance to appoint a Treasurer.

Passed 4 January, 1802.                    Expired.

An Ordinance for repealing certain resolutions passed 1 March, 1802.                    [Passed 5 March, 1802.]

These resolutions authorised the graduation and levelling of a part of High Street Continued, and of High Street and Water Street; and appear only on the Journal.

An Ordinance for raising the necessary supplies for 1802.                    Passed 15 March, 1802.

ered to appoint a gauger for the first and second wards, who shall reside within the same.

Sec. 2. *And be it enacted,* That the Mayor be empowered to appoint a gauger for the third and fourth wards, who shall reside within the same, whose duty it shall be to gauge all liquors that come to the city of Washington by land or water, for sale, which gaugers shall receive for their compensation six and one-fourth cents for each barrel, hogshead, pipe, or tierce, which shall be paid them by the seller. Before they enter upon the duties of their office they shall take an oath before some justice of the peace for the faithful performance of their duty.

*Approved, November 23d, 1809.*

---

AN ACT making an appropriation for C street north, from 8th street to Pennsylvania avenue.

*Be it enacted by the first and second chambers of the city council of Washington,* That the sum of eighty dollars be, and the same is hereby appropriated for opening C street north, from 8th street to Pennsylvania avenue, out of any moneys in the treasurer's hands not otherwise appropriated, and that the same be expended under the direction of the Mayor.

*Approved, November 23d, 1809.*

---

AN ACT to suppress horse running and shooting, in certain cases, in the city of Washington.

Sec. 1. *Be it enacted by the first and second chambers of the city council of Washington,* That from and after the first of January next, it shall not be lawful for any person or persons to run an animal of the horse kind in any of the streets or avenues in the city of Washington, within three hundred yards of any house or building in said city, under a penalty of ten dollars for each offence.

Sec. 2. *And be it enacted,* That if the owner of any horse shall permit any minor, slave, or other person, to run his horse in any street or avenue of the city, within three hundred yards of any house or building in said city, he shall incur the penalty of ten dollars for each offence, one half to go to the informer and the other half to the Corporation, and any person shall be authorized to stop or seize any horse so running until the owner shall pay the above penalty.

**11**

Sec. 3. *And be it enacted*, That if any slave shall be seen running any horse in any street or avenue of the city, within three hundred yards of any house or building, it shall be the duty of any constable to take such slave before a magistrate, and on his being convicted of such offence he shall be publicly whipped any number of lashes not exceeding thirty-nine.

Sec. 4. *And be it enacted*, That if any person or persons, from and after the first day of January next, shall shoot with a gun or other fire-arms, within four hundred yards of any house in said city, or on the Sabbath in any part of the city, shall forfeit and pay a fine of ten dollars, one half of said penalty to go to the informer, and the other half to the use of the city.

*Approved, December 9th,* 1809.

———

AN ACT for the opening of north New-Jersey avenue and Seventh street west.

Sec. 1. *Be it enacted by the first and second chambers of the city council of Washington,* That the sum of two thousand dollars be appropriated for opening New-Jersey avenue from the capitol to the northern boundary of the city; and that the sum of twelve hundred dollars be appropriated for opening Seventh street west from Pennsylvania avenue to the northern boundary of said city, which said appropriations shall be expended under the direction of three commissioners to be appointed by the Mayor.

Sec. 2. *And be it enacted,* That the Mayor be, and he is hereby authorized, to borrow at legal interest the sum of three thousand two hundred dollars for the above purposes.

*Approved, November 9th,* 1809.

———

AN ACT making an appropriation for improving the tobacco warehouse.

*Be it enacted by the first and second chambers of the city council of Washington,* That the sum of thirty-five dollars be, and the same is hereby appropriated, out of any money in the treasury not otherwise appropriated, for the erection of a covered prise or press in the tobacco warehouse, to be drawn for and expended by the inspector of tobacco under the direction of the Mayor.

*Approved, December 18th,* 1809.

# THE
# LAWS OF THE CORPORATION

OF

# THE CITY OF WASHINGTON,

DIGESTED AND ARRANGED UNDER APPROPRIATE HEADS

IN ACCORDANCE WITH

## A JOINT RESOLUTION OF THE CITY COUNCILS,

TOGETHER WITH

# AN APPENDIX,

CONTAINING A DIGEST OF THE CHARTER AND OTHER ACTS OF
CONGRESS CONCERNING THE CITY.

BY

# WILLIAM B. WEBB.

———————

WASHINGTON:
PRINTED BY R. A. WATERS.
1868.

43

Same, ¿3.    necessary, a clerk, whose pay shall be at the rate of
ninety dollars per month while so employed, payable
out of the Water Fund.

NOTE.—By an ordinance approved August 19, 1859, or about that
time, the Mayor was "authorized to purchase for the use of the
Corporation, as a place of deposit and safe keeping for the materials
used for the distribution of Potomac water throughout the city, the
eastern half of lot 5, in square 382." This is the lot upon which the
Central Guard House is erected; and in the same ordinance there is a
provision for the erection of this building, with a room on its first
floor for the Water Purveyor, in which to receive, inspect, and test
materials, &c. There is no longer such an officer as the Water Pur-
veyor, nor does the compiler of this Digest know to what extent
either the Guard House or the pipe-yard are now used for the pur-
poses of this ordinance; but it is thought proper to insert this infor-
mation here in connection with the subject of the Potomac water.

# WEAPONS, (DANGEROUS.)

Unlawful to carry concealed weapons.

Act of Nov. 18, 1858.

1.  It shall not be lawful for any person or persons to
carry or have concealed about their persons any deadly
or dangerous weapons, such as dagger, pistol, bowie
knife, dirk knife, or dirk, colt, slungshot, or brass or
other metal knuckles within the City of Washington;
and any person or persons who shall be duly convicted
of so carrying or having concealed about their persons
any such weapon shall forfeit and pay upon such con-
viction not less than twenty dollars nor more than fifty
dollars; which fines shall be prosecuted and recovered
in the same manner as other penalties and forfeitures
accruing to the city are sued for and recovered: *Pro-
vided,* That the Police officers when on duty shall be
exempt from such penalties and forfeitures.

Penalty.

1 0 AUG 1976

AN ACT    *Bill 1-164*

<u>1-142</u>

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

<u>July 23, 1976</u>

To protect the citizens of the District from loss of
    property, death, and injury, by controlling the
    availability of firearms in the community.

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA,
That this act may be cited as the "Firearms Control
Regulations Act of 1975".

Sec. 2. Findings and purpose.

The Council of the District of Columbia finds that in
order to promote the health, safety and welfare of the
people of the District of Columbia it is necessary to:

(1) Require the registration of all firearms that are
owned by private citizens;

(2) Limit the types of weapons persons may lawfully
possess;

(3) Assure that only qualified persons are allowed to
possess firearms;

(4) Regulate deadly weapons dealers; and

(5) Make it more difficult for firearms, destructive
devices, and ammunition to move in illicit commerce within
the District of Columbia.

TITLE I - DEFINITIONS

Sec. 101. As used in this act the term -

(1) "Acts of Congress" means (A) an Act to control the
possession, sale, transfer, and use of pistols and other
dangerous weapons, in the District of Columbia (Dangerous
Weapons Act), as amended, approved July 8, 1932 (D.C. Code,
sec. 22-3201, et seq.); (B) Omnibus Crime Control and Safe
Streets Act of 1968, as amended (Title VII, Unlawful
Possession or Receipt of Firearms (82 Stat. 236; 18 U.S.C.
Appendix)); and (C) an Act to Amend Title 18, United States
Code, to Provide for Better Control of the Interstate
Traffic in firearms Act of 1968 (82 Stat. 1213; 18 U.S.C.
921, et seq.).

(2) "Ammunition" means cartridge cases, shells,
projectiles (including shot), primers, bullets, propellant
powder, or other devices or materials designed, redesigned,
or intended for use in a firearm or destructive device.

(3) "Antique firearm" means -

(A) any firearm (including any firearm with a
matchlock, flintlock, percussion cap, or similar type of
ignition system) manufactured in or before 1898; and

(B) any replica of any firearm described in
subparagraph (1) if such replica-

1092

(i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or

(ii) uses rimfire or conventional ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade.

(4)    "Chief" means the Chief of Police of the Metropolitan Police Department of the District of Columbia or his designated agent.

(5)    "Crime of Violence" means a crime of violence as defined in section 1 of the Act of July 8, 1932, as amended (D.C. Code, sec. 22-3201), committed in any jurisdiction, but does not include larceny or attempted larceny.

(6)    "Dealer's license" means a license to buy or sell, repair, trade, or otherwise deal in firearms, destructive devices, or ammunition as provided for in Title IV of this Act.

(7)    "Destructive device" means -

(A)    an explosive, incendiary, or poison gas bomb, grenade, rocket, missile, mine, or similar device;

(B)    any device by whatever name known which will, or is designed or redesigned, or may be readily converted or restored to expel a projectile by the action of

1093

an explosive or other propellant through a smooth bore
barrel, except a shotgun.

    (C)   any device containing tear gas or a
chemically similar lacrimator or sternutator by whatever
name known;

    (D)   any device designed or redesigned, made or
remade, or readily converted or restored, and intended to
stun or disable a person by means of electric shock;

    (E)   any combination of parts designed or
intended for use in converting any device into any
destructive device; or from which a destructive device may
be readily assembled:
Provided, That the term shall not include -

    (i)   any pneumatic, spring, or B-B gun
which expels a single projectile not exceeding .18 inch
in diameter;

    (ii) any device which is neither designed
nor redesigned for use as a weapon;

    (iii) any device originally a weapon which
has been redesigned for use as a signaling, line
throwing, or safety device; or,

    (iv)   any device which the Chief finds is
not likely to be used as a weapon.

(8)   "District" means District of Columbia.

1094

(9) "Firearm" means any weapon which will, or is designed or redesigned, made or remade, readily converted or restored, and intended to, expel a projectile or projectiles by the action of an explosive; the frame or receiver of any such device; or any firearm muffler or silence:   Provided, That such term shall not include -

      (A)   antique firearms; and/or

      (B)   destructive devices;

      (C)   any device used exclusively for line throwing, signaling, or safety, and required or recommended by the Coast Guard or Interstate Commerce Commission; or

      (D)   any device used exclusively for firing explosive rivets, stud cartridges, or similar industrial ammunition and incapable for use as a weapon.

(10)  "Machine gun" means any firearm which shoots, is designed to shoot, or can be readily converted or restored to shoot:

      (A)   automatically, more than one shot by a single function of the trigger;

      (B)   semiautomatically, more than twelve shots without manual reloading.

(11)  "Organization" means any partnership, company, corporation, or other business entity, or any group or

1095

association of two or more persons united for a common
purpose.

(12)   "Pistol" means any firearm originally designed to
be fired by use of a single hand.

(13)   "Registration certificate" means a certificate
validly issued pursuant to this act evincing the
registration of a firearm pursuant to this act.

(14)   "Rifle" means a grooved bore firearm using a
fixed metallic cartridge with a single projectile and
designed or redesigned, made or remade, and intended to be
fired from the shoulder.

(15)   "Sawed-off shotgun" means a shotgun having a
barrel of less than 18 inches in length; or a firearm made
from a shotgun if such firearm as modified has an overall
length of less than 26 inches or any barrel of less than 18
inches in length.

(16)   "Shotgun" means a smooth bore firearm using a
fixed shotgun shell with either a number of ball shot or a
single projectile, and designed or redesigned, made or
remade, and intended to be fired from the shoulder.

(17)   "Short barreled rifle" means a rifle having any
barrel less than 16 inches in length, or a firearm made from
a rifle if such firearm as modified has an overall length of
less than 26 inches or any barrel of less than 16 inches.

1096

(18)   "Weapons offense" means any violation in any jurisdiction of any law which involves the sale, purchase, transfer in any manner, receipt, acquisition, possession, having under control, use, repair, manufacture, carrying, or transportation of any firearm, ammunition, or destructive device.

## TITLE II - FIREARMS AND DESTRUCTIVE DEVICES

Sec. 201.  Registration Required.   (a)   Except as otherwise provided in this act, no person or organization shall within the District receive, possess, have under his control, transfer, offer for sale, sell, give, or deliver any destructive device, and no person or organization shall, within the District possess or have under his or its control any firearm, unless such person or organization is the holder of a valid registration certificate for such firearm. In the case of an organization, a registration certificate shall be issued (1) only to an organization which has in its employ one or more commissioned special police officers or other employees licensed to carry firearms, and which arms such employees with firearms during such employees duty hours and (2) only to such organization in its own name and in the name of its president or the chief executive.

(b)   Subsection (a) shall not apply to -

(1)  Any law enforcement officer or agent of the
District or the United States, or any law enforcement
officer or agent of the government of any State or
subdivision thereof, or any member of the Armed Forces of
the United States, the National Guard or Organized Reserves,
when such officer, agent, or member is authorized to possess
such a firearm or device while on duty in the performance of
official authorized functions.

(2) . Any person holding a dealer's license:
Provided, That the firearm or destructive device is -

(A) acquired by such person in the normal
conduct of business;

(B) is kept at the place described in the
dealer's license; and

(C) is not kept for such person's private.
use or protection, or for the protection of his
. business.

(3)  With respect to firearms, any non-resident
of the District participating in any lawful recreational
firearm-related activity in the District, or on his way to
or from such activity in another jurisdiction;  Provided,
That such person, whenever in possession of a firearm, shall
upon demand of any member of the Metropolitan Police
Department, or other bona fide law enforcement officer,

1098

exhibit proof that he is on his way to or from such activity, and that his possession or control of such firearm is lawful in the jurisdiction in which he resides: Provided further, that such weapon shall be unloaded, securely wrapped, and carried in open view.

Sec. 202. Unregisterable Firearms. No registration certificate shall be issued for any of the following types of firearms:

(a) Sawed-off shotgun;

(b) Machine gun;

(c) Short-barreled rifle;

(d) Pistol not validly registered to the current registrant in the District prior to the effective date of this act; and

(e) Pistol not possessed by the current registrant in conformity with the regulations in effect immediately prior to the effective date of this act.

Sec. 203. Prerequisites to registration; application for registration.

(a) No registration certificate shall be issued to any person (and in the case of a person between the ages of 18 and 21, to the person and his signatory parent or guardian) or organization unless the Chief determines that such person

1 0 AUG 1976

(or the president or chief executive in the case of an organization):

    (1)  is twenty-one years of age or older: Provided, That the Chief may issue to an applicant between the ages of eighteen and twenty-one years old, and who is otherwise qualified, a registration certificate if the application is accompanied by a notarized statement of the applicant's parent or guardian -

        (A)  that the applicant has the permission of his parent or guardian to own and use the firearm to be registered; and

        (B)  the parent or guardian assumes civil liability for all damages resulting from the actions of such applicant in the use of the firearm to be registered: Provided further, that such registration certificate shall expire on such person's twenty-first birthday;

    (2)  Has not been convicted of a crime of violence, weapons offense, or of a violation of this act;

    (3)  Is not under indictment for a crime of violence or a weapons offense;

    (4)  Has not been convicted within five years prior to the application of any

(A)   violation in any jurisdiction of any law restricting the use, possession, or sale of any narcotic or dangerous drug; or

(B)   a violation of section 2 of the Act of July 16, 1912 (D.C. Code, sec. 22-507 (1973)), regarding threats to do bodily harm, or section 806 of the Act of March 3, 1901 (D.C. Code, sec. 22-504 (1973)), regarding assaults and threats, or any similar provision of the law of any other jurisdiction so as to indicate a likelihood to make unlawful use of a firearm:

(5)   Within the five year period immediately preceding the application, has not been acquitted of any criminal charge by reason of insanity or has not been adjudicated a chronic alcholic by any court, Provided, That this paragraph shall not apply if such person shall present to the Chief with the application, a medical certification indicating that the applicant has recovered from such insanity or alcholic condition and is capable of safe and responsible possession of a firearm:

(6)   Within the five years immediately preceding the application, has not been voluntary or involuntarily committed to any mental hospital or institution: Provided, That this paragraph shall not apply, if such person shall

1101

present to the Chief with the applicant a medical certification that the applicant has recovered from whatever malady prompted such commitment;

(7) Does not appear to suffer from a physical defect which would tend to indicate that the applicant would not be able to possess and use a firearm safely and responsibly;

(8) Has not been adjudicated negligent in a firearm mishap causing death or serious injury to another human being;

(9) Is not otherwise ineligible to possess a pistol under section 3 of the Act of July 8, 1932 (D.C. Code, sec. 22-3203);

(10) Has not failed to demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to firearms and the safe and responsible use of the same in accordance with tests and standards prescribed by the Chief; Provided, That once this determination is made with respect to a given applicant for a particular type of firearm, it need not be made again for the same applicant with respect to a subsequent application for the same type of firearm; and

(11) Has vision better than or equal to that required to obtain a valid driver's license under the laws

1102

of the District of Columbia: Provided, That current licensure by the District of Columbia, of the applicant to drive, shall be prima facie evidence that such applicant's vision is sufficient and, Provided further, that this determination need not be made more than once per year per applicant.

(b) Every person applying for a registration certificate shall provide on a form prescribed by the Chief:

(1) The full name or any other name by which the applicant is known.

(2) The present address and each home address where the applicant has resided during the five year period immediately preceding the application.

(3) The present business or occupation and any business or occupation in which the applicant has engaged during the five-year period immediately preceding the application and the addresses of such businesses or places of employment.

(4) The date and place of birth of the applicant.

(5) The sex of the applicant.

(6) Whether (and if so, the reasons) the District, the United States or the government of any State or subdivision of any State has denied or revoked the

1103

applicant's license, registration certificate, or permit pertaining to any firearm.

(7)   A description of the applicant's role in any mishap involving a firearm, including the date, place, time, circumstances, and the names of the person injured or killed.

(8)   The intended use of the firearm.

(9)   The caliber, make, model, manufacturer's identification number, serial number, and any other identifying marks on the firearm.

(10)  The name and address of the person or organization from whom the firearm was obtained, and in the case of a dealer, his dealer's license number.

(11)  Where the firearm will generally be kept.

(12)  Whether the applicant has applied for any other registration certificates issued and outstanding.

(13)  Such other information as the Chief determines is necessary to carry out the provisions of this act.

(c)   Every organization applying for a registration certificate shall -

(1)   with respect to the president or chief executive of such organization, comply with the requirements of subsection (b); and

1104

(2)  provide such other information as the Chief determines is necessary to carry out the provisions of this act.

Sec. 204.  Fingerprinting, pictures, personal appearances.

(a)  The Chief may require any person applying for a registration certificate to be fingerprinted if, in his judgment, this is necessary to conduct an efficient and adequate investigation into the matters described in section 203(a) and to effectuate the purpose of this act:  Provided, That any person who has been fingerprinted by the Chief within five years prior to submitting the application need not, in the Chief's discretion, be fingerprinted again if he offers other satisfactory proof of identity.

(b)  Each applicant, other than an organization, shall submit with the application two full-face photographs of himself, 1-3/4 by 1-7/8 inches in size which shall have been taken within the thirty-day period immediately preceding the filing of the application.

(c)  Every applicant (or in the case of an organization, the president or chief executive, or a person authorized in writing by him), shall appear in person at a time and place prescribed by the Chief, and may be required to bring with him the firearm for which a registration

1105

certificate is sought, which shall be unloaded and securely
wrapped, and carried in open view.

Sec. 205.  Application under oath: fees.

(a)  Each applicant (the president or chief executive
in the case of an organization) shall sign an oath or
affirmation attesting to the truth of all the information
required by section 203.

(b)  Each application required by this title shall be
accompanied by a non-refundable fee to be established by the
Mayor; Provided, That such fee shall, in the judgment of the
Mayor, reimburse the District for the cost of services
provided under this title.

Sec. 206.  Filing times for new purchase and firearms
entering the District; previously registered
firearms.

(a)  An application for a registration certificate
shall be filed (and a registration certificate issued) prior
to taking possession of a firearm from a licensed dealer or
from any person or organization holding a registration
certificates therefor.  In all other cases, an application
for registration shall be filed immediately after a firearm
is brought into the District.  It shall be deemed compliance
with the preceding sentence if such person personally
communicates with the Metropolitan Police Department (as

1106

determined by the Chief to be sufficient) and provides such information as may be demanded: Provided, That such person files an application for a registration certificate within 48 hours after such communication.

(b) Any firearm validly registered under prior regulations must be registered pursuant to this act in accordance with procedures to be promulgated by the Chief. An application to register such firearm shall be filed pursuant to this act within 60 days of the effective date of this act.

Sec. 207. Issuance of registration certificate.

(a) upon receipt of a properly executed application for a registration certificate, the Chief, upon determining through inquiry, investigation, or otherwise, that the applicant is entitled and qualified under the provisions of this act, thereto, shall issue a registration certificate. Each registration certificate shall be in duplicate and bear a unique registration certificate number and such other information as the Chief determines is necessary to identify the applicant and the firearm registered. The duplicate of the registration certificate shall be delivered to the applicant and the Chief shall retain the original.

(b) The Chief shall approve or deny an application for a registration certificate within a 60 day period beginning

1107

on the date the Chief receives the application, unless good cause is shown, including non-receipt of information from sources outside the District government; Provided, That in the case of an application to register a firearm validly registered under prior regulations, the Chief shall have 365 days after the receipt of such application to approve or deny such application. The Chief may hold in abeyance an application where there is a revocation preceeding pending against such person or organization.

(c) Upon receipt of a registration certificate, each applicant shall examine same to ensure that the information thereon is correct. If the registration certificate is incorrect in any respect, the person or organization names thereon shall return it to the Chief with a signed statement showing the nature of the error. The Chief shall correct the error, if it occurred through administrative error. In the event the error resulted from information contained in the application, the applicant shall be required to file an amended application setting forth the correct information, and a statement explaining the error in the original application. Each amended application shall be accompanied by a fee equal to that required for the original application.

1108

(d)   In the event the Chief learns of an error in a registration certificate other than as provided in subsection (c), he may require the holder to return the registration certificate for correction.  If the error resulted from information contained in the application, the person or organization named therein shall be required to file an amended application as provided in subsection (c).

(e)   Each registration certificate issued by the Chief shall be accompanied by a statement setting forth the registrant's duties under this act.

Sec. 208.   Additional Duties of Registrants.

Each person and organization holding a registration certificate, in addition to any other requirements imposed by this act, or the Acts of Congress, shall:

(a)   notify the Chief in writing of:

(1)   the loss, theft, or destruction of the registration certificate or of a registered firearm (including the circumstances, if known) immediately upon discovery of such loss, theft, or destruction;

(2)   a change in any of the information appearing on the registration certificate or required by section 203 of this act;

(3)   the sale, transfer or other disposition of the firearm not less than forty-eight hours prior to

1109

delivery, pursuant to such sale, transfer or other
disposition, including -

> (A) identification of the registrant, the
> firearm and the serial number of the registration
> certificate;

> (B) the name, residence, and business
> address and date of birth of the person to whom
> the firearm has been sold or transferred; and

> (C) whether the firearm was sold or how it
> was otherwise transferred or disposed of.

(b)   Return to the Chief, the registration certificate
for any firearm which is lost, stolen, destroyed, or
otherwise transferred or disposed of, at the time he
notified the Chief of such loss, theft, destruction, sale,
transfer, or other disposition.

(c)   Have in his possession, whenever in possession of
a firearm, the registration certificate for such firearm,
and exhibit the same upon the demand of a member of the
Metropolitan Police Department, or other law enforcement
officer.

Sec. 209.  Revocation.

A registration certificate shall be revoked if -

(1)   any of the criteria in section 203 of this act are
not currently met;

1110

(2)   the registered firearm has become an
unregisterable firearm under the terms of section 202 of
this act, or a destructive device;

(3)   the information furnished to the Chief on the
application for a registration certificate proves to be
intentionally false; or

(4)   there is a violation or omission of the duties,
obligations or requirements imposed by section 208 of this
act.

Sec. 210.   Procedures for denial or revocation.

(a)   If it appears to the Chief that an application for
a registration certificate should be denied or that a
registration certificate should be revoked, the Chief shall
notify the applicant or registrant of the proposed denial or
revocation, briefly stating the reason or reasons therefor.
Service may be made by delivering a copy of the notice to
the applicant or registrant personally, or by leaving a copy
thereof at the place of residence identified on the
application or registration with some person of suitable age
and discretion then residing therein, or by mailing a copy
of the notice by certified mail to the residence address
identified on the application or certificate, in which case
service shall be complete as of the date the return receipt
was signed.   In the case of an organization, service may be

1111

made upon the president, chief executive, or other officer, managing agent or person authorized by appointment or law to receive such notice as described in the preceding sentence at the business address of the organization identified in the application or registration certificate. The person serving the notice shall make proof thereof with the Chief in a manner prescribed by him. In the case of service by certified mail, the signed return receipt shall be filed with the Chief together with a signed statement showing the date such notice was mailed; and if the return receipt does not purport to be signed by the person named in the notice, then specific facts from which the Chief can determine that the person who signed the receipt meets the appropriate qualifications for receipt of such notice set out in this subsection. The applicant or registrant shall have 15 days from the date the notice is served in which to submit further evidence in support of the application or qualifications to continue to hold a registration certificate, as the case may be: Provided, that if the applicant does not make such a submission within fifteen days from the date of service, the applicant or registrant shall be deemed to have conceded the validity of the reason or reasons stated in the notice, and the denial or revocation shall become final.

1112

(b)  Within ten days of the date upon which the Chief receives such a submission, he shall serve upon the applicant or registrant in the manner specified in subsection (a) notice of his final decision.  The Chief's decision shall become effective at the expiration of the time within which to file a notice of appeal pursuant to the District of Columbia Administrative Procedure Act (D.C. Code, sec. 1-1501, et seq.) or, if such a notice of appeal is filed, at the time the final order or judgment of the District of Columbia Court of Appeals becomes effective.

(c)  Within seven days of a decision unfavorable to the applicant or registrant becoming final, the applicants or registrant shall (1) peaceably surrender to the Chief the firearm for which the registration certificate was revoked in the manner provided in section 704, or (2) lawfully remove such firearm from the District for so long as he has an interest in such firearm, or, (3) otherwise lawfully dispose of his interest in such firearm.

Sec. 211.  Certain information not to be used as
            evidence.

No information obtained from a person under this title or retained by a person in order to comply with any section of this title, shall be used as evidence against such person in any criminal proceeding with respect to a violation of

1113

this act, occurring prior to or concurrently with the filing
of the information required by this title:  Provided, That
this section shall not apply to any violation of section 858
of the Act of March 3, 1901 (D.C. Code, sec. 22.2501), or
section 703 of this act.

### TITLE III - ESTATES CONTAINING FIREARMS

Sec. 301.  Rights and responsibilities of executors and
administrators.

(a)  The executor or administrator of an estate
containing a firearm shall notify the Chief of the death of
the decedent within thirty days of his appointment or
qualification, whichever is earlier.

(b)  Until the lawful distribution of such firearm to
an heir or legatee or the lawful sale, transfer, or
disposition of the firearm by the estate; the executor or
administrator of such estate shall be charged with the
duties and obligations which would have been imposed by this
act upon the decedent, if the decedent were still alive;
Provided, That such executor or administrator shall not be
liable to the criminal penalties of section 705.

### TITLE IV - LICENSING OF FIREARMS BUSINESSES

Sec. 401.  Prohibitions, exceptions.

1114

(a)  No person or organization shall manufacture any
firearm, destructive device or parts thereof, or ammunition,
within the District: Provided, That persons holding
registration certificates may engage in hand loading,
reloading, or custom loading ammunition for his registered
firearms:  Provided further, that such persons may not hand
load, reload, or custom load ammunition for others.

(b)  No person or organization shall engage in the
business of selling, purchasing, or repairing any firearm,
destructive device, parts therefor, or ammunition, without
first obtaining a dealer's license, and no licensee shall
engage in the business of selling, purchasing, or repairing
firearms which are unregisterable under section 202 of this
act, destructive devices, or parts therefor, except pursuant
to a valid work or purchase order, for those persons
specified in section 201(b)(1) of this act.

Sec. 402.  Eligibility for dealer's license;
application for same; fee.

(a)  Any person eligible to register a firearm under
this act, and who, if a registrant, has not previously
failed to perform any of the duties imposed by this act;
and, any person eligible under the Acts of Congress to
engage in such business, may obtain a dealer's license, or a
renewal thereof, which shall be valid for a period of not

1115

69

more than one year from the date of issuance. The license required by this act, shall be in addition to any other license or licensing procedure required by law.

(b) Each application for a dealer's license and each application for renewal thereof shall be made on a form prescribed by the Chief, shall be sworn to or affirmed by the applicant, and shall contain –

(1) the information required by section 203(a);

(2) the address where the applicant conducts or intends to conduct his business;

(3) whether the applicant, prior to the effective date of this act, held a license to deal in deadly weapons in the District; and

(4) such other information as the chief may require, including fingerprints and photographs of the applicant, to carry out the purposes of this act.

(c) Each application for a dealer's license, or renewal shall be accompanied by a fee established by the Mayor; Provided, That such fee shall in the judgment of the Mayor, reimburse the District for the cost of services provided under this title.

Sec. 403. Issuance of a dealer's license, procedure.

(a) Upon receipt of a properly executed application for a dealer's license, or renewal thereof, the Chief, upon

1116

determining through further inquiry, investigation, or otherwise, that the applicant is entitled and qualified under the provisions of this act thereto, shall issue a dealer's license. Each dealer's license shall be in duplicate and bear a unique dealer's license number, and such other information as the Chief determines is necessary to identify the applicant and premises. The duplicate of the dealer's license shall be delivered to the applicant and the Chief shall retain the original.

(b) The Chief shall approve or deny an application for a registration certificate within a 60-day period beginning on the date the Chief receives the application, unless good cause is shown, including non-receipt of information from sources outside the District Government. The Chief may hold in abeyance an application where there is any firearms revocation proceeding pending against such person.

(c) Upon receipt of a dealer's license, each applicant shall examine the same to ensure that the information thereon is correct. If the dealer's license is incorrect in any respect, the person named thereon shall return the same to the Chief with a signed statement showing the nature of the error. The Chief shall correct the error, if it occurred through administrative error. In the event the error resulted from information contained in the

1117

application, the applicant shall be required to file an amended application explaining the error in the original application.  Each amended application shall be accompanied by a fee equal to that required for the original application.

(d)  In the event the Chief learns of an error in a dealer's license, other than as provided in subsection (c), he may require the holder to return the dealer's license for correction.  If the error resulted from information contained in the application, the person named therein shall be required to file an amended application as provided in subsection (c).

(e)  Each dealer's license issued by the Chief shall be accompanied by a statement setting forth a dealer's duties under this act.

Sec. 404.  Duties of licensed dealers; records, reports.

(a)  Each person holding a dealer's license, in addition to any other requirements imposed by this act, the Acts of Congress, and other law, shall -

(1)  display the dealer's license in a conspicuous place on the premises;

(2)  notify the Chief in writing -

1118

(A) of the loss, theft, or destruction of the dealer's license (including the circumstances, if known) immediately upon the discovery of such loss, theft, or destruction;

(B) of a change in any of the information appearing on the dealer's license or required by section 402 of this act immediately upon the occurrence of any such change;

(3)   keep at the premises identified in the dealer's license a true and current record in book form of

(A) the name, address, home phone, and date of birth of each employee handling firearms, ammunition, or destructive devices;

(B) each firearm or destructive device received into inventory or for repair including the –

(i)   serial number, caliber, make, model, manufacturer's number (if any), dealer's identification number (if any), registration certificate number (if any) of the firearm, and similar descriptive information for destructive devices;

(ii) name, address, and dealer's license number (if any) of the person or organization

1119

from whom the firearm or destructive device was
purchased or otherwise received;

(iii) consideration given for the firearm
or destructive device, if any;

(iv) date and time received by the licensee
and in the case of repair, returned to the person
holding the registration certificate; and

(v) nature of the repairs made.

(C) each firearm or destructive device
sold or transferred including the -

(i) serial number, caliber, make, model,
manufacturer's number or dealer's identification
number, and registration certificate number (if
any) of the firearm or similar information for
destructive devices;

(ii) name, address, registration
certificate number or license number (if any) of
the person or organization to whom transferred;

(iii) the consideration for transfer; and,

(iv) time and date of delivery of the
firearm or destructive device to the transferee;

(D) ammunition received into inventory
including the -

1120

(i)   brand and number of rounds of each each caliber or gauge;

(ii) name, address, and dealer's license or registration number (if any) of the person or organization from whom received;

(iii) consideration given for the ammunition; and

(iv) date and time of the receipt of the ammunition;.

(E)   ammunition sold or transferred including -

(i)   brand and number of rounds of each caliber or gauge;

(ii) name, address and dealer's license number (if any) of the person or organization to whom sold or transferred;

(iii) if the purchaser or transferee is not a licensee, the registration certificate number of the firearm for which the ammunition was sold of transferred;

(iv) the consideration for the sale and transfer; and

(v)   the date and time of sale or transfer;

1121

(b)   The records required by subsection (a) shall upon demand be exhibited during normal business hours to any member of the Metropolitan Police Department.

(c)   Each person holding a dealer's license shall, when required by the Chief in writing, submit on a form and for the periods of time specified, any record information required to be maintained by subsection (a), and any other information reasonably obtainable therefrom.

Sec. 405.   Revocation.

A dealer's license shall be revoked if -

(a)   any of the criteria in section 404 of this act is not currently met, or

(b)   the information furnished to the Chief on the application for a dealer's license proves to be intentionally false; or

(c)   there is a violation or omission of the duties, obligations, or requirements imposed by section 404 of this act.

Sec. 406.   Procedures for denial and revocation.

(a)   If it appears to the Chief that an application for a dealer's license should be denied or that a dealer's license should be revoked, the Chief shall notify the applicant or registrant of the proposed denial or revocation briefly stating the reason or reasons therefor.   Service may

1122

be made as provided for in section 210 (a) of this act.  The applicant or dealer shall have fifteen days from the date of service in which to submit further evidence in support of the application or qualifications to continue to hold a dealer's license, as the case may be:

provided, That if the applicant or dealer does not make such a submission within 15 days from the date of service, the applicant or dealer shall be deemed to have conceded the validity of the reason or reasons stated in the notice, and the denial or revocation shall become final.

(b) Within 10 days of the date upon which the Chief receives such a submission, the Chief shall serve upon the applicant or registrant in the manner provided in section 210 (a) of this act notice of his final decision.  The Chief's decision shall become effective at the expiration of the time within which to file a notice of appeal pursuant to the District of Columbia Administrative Procedure Act (D.C. Code, sec. 1-1501, et seq.) or, if such a notice of appeal is filed, at the time the final order or judgment of the District of Columbia Court of Appeals becomes effective.

(c) Within 45 days of a decision becoming effective, which is unfavorable to a licensee or to an applicant for a dealer's license, the licensee or applicant shall -

1123

(1)   if he is eligible to register firearms pursuant to this act, register such firearms in his inventory as are capable of registration pursuant to this act;

(2)   peaceably surrender to the Chief any firearms in his inventory which he does not register, and all destructive devices in his inventory in the manner provided for in section 604;

(3)   lawfully remove from the District any firearm in his inventory which he does not register and all destructive devices and ammunition in his inventory for so long as he has an interest in them; or

(4)   otherwise lawfully dispose of any firearms in his inventory which he does not register and all destructive devices and ammunition in his inventory.

Sec. 407.  Displays, employees.

(a)   No licensed dealer shall display any firearm or ammunition in windows visible from a street or sidewalk. All firearms, destructive devices, and ammunition shall be kept at all times in a securely locked place affixed to the premises except when being shown to a customer, being repaired, or otherwise being worked on.

1124

(b)  No licensee shall knowingly employ any person in his establishment if such person would not be eligible to register a firearm under this act.

Sec. 408.  Firearm markings.

No licensee shall sell or offer for sale any firearm which does not have imbedded into the metal portion of such firearm a unique manufacturer's identification number or serial number, unless the licensee shall have imbedded into the metal portion of such firearm a unique dealer's identification number.

Sec. 409.  Certain information not to be used as evidence.

No information obtained from or retained by a licensed dealer to comply with this title shall be used as evidence against such licensed dealer in any criminal proceeding with respect to a violation of this act occurring prior to or concurrently with the filing of such information; Provided, That this section shall not apply to any violation of section 858 of the Act of March 3, 1901 (D.C. Code, sec. 22-2501), or of section 703 of this act.

TITLE V - SALE AND TRANSFER OF FIREARMS, DESTRUCTIVE DEVICES, AND AMMUNITION

Sec. 501.  Prohibition.

No person or organization shall sell, transfer or otherwise dispose of any firearm, destructive device or

1125

ammunition in the District except as provided in sections
502 or 604 of this act.

Sec. 502. Permissible sales and transfers.

(a) Any person or organization eligible to register a
firearm may sell or otherwise transfer ammunition or any
firearm, except those which are unregisterable under section
202 of this act, to a licensed dealer.

(b) Any licensed dealer may sell or otherwise transfer
ammunition and any firearm or destructive device which is
lawfully a part of such licensee's inventory to -

(1) any nonresident person or business licensed
under the Acts of Congress and the jurisdiction where such
person resides or conducts such business;

(2) any other licensed dealer;

(3) any law enforcement officer or agent of the
District or the United States when such officer or agent is
on duty, and acting within the scope of his duties when
acquiring such firearm, ammunition, or destructive device,
if the officer or agent has in his possession a statement
from the head of his agency stating that the item is to be
used in such officer's or agent's official duties.

(c) Any licensed dealer may sell or otherwise transfer
a firearm except those which are unregisterable under
section 202 of this act, to any person or organization

**1126**

possessing a registration certificate for such firearm; Provided, That if the Chief denies a registration certificate, he shall so advise the licensee who shall thereupon (1) withhold delivery until such time as a registration certificate is issued, or, at the option of the pruchaser, (2) declare the contract null and void, in which case consideration paid to the licensee shall be returned to the purchaser; Provided further that this subsection shall not apply to persons covered by subsection (b).

(d)  Except as provided in subsections (b) and (f), no licensed dealer shall sell or otherwise transfer ammunition unless -

(1)  the sale or transfer is made in person; and

(2)  the purchaser exhibits, at the time of sale or other transfer, a valid registration certificate, or, in the case of a nonresident, proof that the weapon is lawfully possessed in the jurisdiction where such person resides;

(3)  the ammunition to be sold or transferred is of the same caliber or gauge as the firearm described in the registration certificate, or other proof in the case of nonresident; and

(4)  the purchaser signs a receipt for the ammunition which (in addition to the other records required

1127

under this act) shall be maintained by the licensed dealer for a period of one year from the date of sale.

(e)   Any licensed dealer may sell ammunition to any person holding an ammunition collector's certificate on the effective date of this act; Provided, That the collector's certificate shall be exhibited to the licensed dealer whenever the collector pruchases ammunition for his collection Provided further that the collector shall sign a receipt for the ammunition, which shall be treated in the same manner as that required under subsection (d)(4) of this section.

## TITLE VI - POSSESSION OF AMMUNITION

Sec. 601.   No person shall possess ammunition in the District of Columbia unless:

(a)   He is a licensed dealer pursuant to Title IV of this act.

(b)   He is an officer, agent, or employee of the District of Columbia or the United States of America, on duty and acting within the scope of his duties when possessing such ammunition.

(c)   He is the holder of a valid registration certificate for a firearm of the same gauge or caliber as the ammunition he possesses.

1128

(d) He holds an ammunition collector's certificate on the effective date of this act.

## TITLE VII - GENERAL PROVISIONS

Sec. 701. Pledges and loans.

(a) No firearm, destructive device, or ammunition shall be security for, or be taken or received by way of any mortgage, deposit, pledge, or pawn.

(b) No person may loan, borrow, give, or rent to or from another person, any firearm, destructive device, or ammunition.

Sec. 702. Except for law enforcement personnel described in section 201(b)(1), each registrant shall keep any firearm in his possession unloaded and disassembled or bound by a trigger lock or similar device unless such firearm is kept at his place of business, or while being used for lawful recreational purposes within the District of Columbia.

Sec. 703. Firing ranges.

Any person operating a firing range in the District, shall in addition to any other requirement imposed by law, register with the Chief, on a form prescribed by him, which shall include the business name of the range, the location, the names and home addresses of the owners and principal officers, the types of weapons fired there, the number and

1129

types of weapons normally stored there, the days and hours
of operation, and such other information as the Chief shall
require.

Sec. 704. · False information, forgery, alteration.

(a)   It shall be unlawful for any person purchasing any
firearm or ammunition, or applying for any registration
certificate or dealer's license under this act, or in giving
any information pursuant to the requirements of this act, to
knowingly give false information or offer false evidence of·
identity.

(b)   It shall be unlawful for anyone to forge or alter
any application, registration certificate, or dealer's
license submitted, retained or issued under this act.

Sec. 705.   Voluntary surrender; immunity.

(a)   If a person or organization within the District
voluntarily and peaceably delivers and abandons to the Chief
any firearm, destructive device or ammunition at any time,
such delivery shall preclude the arrest and prosecution of
such person on a charge of violating any provision of this
act with respect to the firearm, destructive device, or
ammunition voluntarily delivered.   Delivery under this
section may be made at any police district, station, or
central headquarters, or by summoning a police officer to
the person's residence or place of business.   Every firearm

**1130** ·

and destructive device to be delivered and abandoned to the Chief under this section shall be unloaded and securely wrapped in a package, and, in the case of delivery to a police facility, the package shall be carried in open view. No person who delivers and abandons a firearm, destructive device, or ammunition under this section, shall be required to furnish identification, photographs, or fingerprints. No amount of money shall be paid for any firearm, destructive devices, or ammunition delivered and abandoned under this section.

(b) Whenever any firearm, destructive device, or any ammunition is surrendered under this section or pursuant to section 210 (c) (1), the Chief shall inquire of the United States Attorney and the Corporation Counsel for the District whether such firearm is needed as evidence; Provided, That if the same is not needed as evidence, it shall be destroyed.

Sec. 706. Penalties.

Any person who violates any provision of this act shall, upon conviction for the first time be fined not more than $300 or be imprisoned for not more than ten (10) days, or both. Any subsequent conviction for a violation of this act shall be punishable by a fine of $300 and by imprisonment of not less than 10 days nor more than 90 days.

1131

Sec. 707.  Public education program.

The Chief shall carry on a suitable publicity program designed to inform the citizens of the District of the provisions of this act and the rights and obligations created by it.

Sec. 708.  Repealers.

(a)  District of Columbia Regulations Nos. 68-15 and 69-7 (Articles 50 to 55 inclusive of the Police Regulations of the District of Columbia) are hereby repealed.

(b)  Regulation 74-33 approved December 1, 1974, (relating to bounty payments for the turning in of firearms) is repealed.

(c)  Article 9 of the Police Regulations of the District of Columbia is repealed to the extent such article is in conflict with the provisions of this act.

Sec. 709.  Conflict with Federal law.

Nothing in this act shall be construed, or applied to necessarily require, or excuse noncompliance with any provision of any Federal Law.  This act and the penalties prescribed in section 605 of this act, for violations of this act, shall not supersede but shall supplement all statutes of the District and the United States in which similar conduct is prohibited or regulated.

1132

Sec. 710.  Applicability of District of Columbia
           Administrative Procedure Act.

The provisions of the District of Columbia
Administrative Procedure Act (D.C. Code, sec. 1-1501 et
seq.) shall apply to each proceeding, decision, or other
administrative action specified in this act, unless
otherwise specifically provided.

Sec. 711.  Savings clause.

If any provision of this act or the application thereof
to any person or circumstance is held invalid, the remainder
of this act and the application of such provision to other
persons not similarly situated or to other circumstances
shall not be affected thereby.

Sec. 712.  Effective date.

This act shall take effect pursuant to the provisions
of section 602(c)(1) of the District of Columbia Self-
Government and Governmental Reorganization Act.

1133

# Council of the District of Columbia
# Report

City Hall, 14th and E Streets, N.W.     Fifth Floor     638-2223 or Govern~~~~~~~~3806

RECEIVED
76 ~~ 21 P 4 49
OFFICE ~~~~~~~~

| | |
|---|---|
| To | Members of the Council |
| From | Committee on the Judiciary and Criminal Law<br>David A. Clarke, Chairperson |
| Date | April 21, 1976 |
| Subject | Bill No. 1-164, the "Firearms Control Act of 1975" |

The Committee on the Judiciary and Criminal Law, to which Bill No. 1-164 was referred, having considered the same, reports favorably on the bill as amended.

## BACKGROUND OF THIS LEGISLATION

Bill No. 1-164, as amended, evolved from a series of "gun control" bills which have been introduced in this Council. On February 11, 1975, Councilmember John Wilson introduced the first bill (Bill No. 1-24) to amend the D.C. Police Regulations, Articles 50 through 55, dealing with comprehensive firearm bans, registration and licensing. On March 11, 1975, Councilmember Polly Shackleton introduced Bill No. 1-42, the "District of Columbia Handgun Control Act of 1975", which would have defined new crimes in the D.C. Code involving a comprehensive ban, except in certain circumstances, on handguns or handgun ammunition in the District of Columbia. On June 6 and 7, 1975, your committee conducted extensive public hearings concerning the above-described bills and concerning the more general issue of firearm controls. A copy of the notice and the witness list for such public hearings is attached hereto as "Exhibit A". Councilmember Wilson, who participated in the conduct of the aforementioned hearings, on July 22, 1975, introduced Bill No. 1-164 in lieu of his previous bill, in order to amend the D.C. Police Regulations, Articles 50 through 55. Your committee concentrated its attention to Bill No. 1-164 which basically was aimed at reforming the current, firearm registration and licensing regulations. In its major parts, original Bill No. 1-164 would have (1) expanded the registration and reporting requirements currently placed on firearm owners and/or dealers, (2) substantially increased the fees for registering firearms and for obtaining a license to deal in firearms, (3) placed specific duties on personnel of the Office of Corporation Counsel to prosecute

and to monitor the firearm regulations, (4) increased the
penalties for violating the police firearm regulations,
(5) abolished judicial discretion in the process of meting
out punishment for violation of the firearm regulations, and
(6) mandated that the Chief of Police conduct an active
campaign to seize all prohibited firearms. After lengthy
research with regard to original Bill No. 1-164 and
refinements of gun controls in the District of Columbia,
your committee conducted a roundtable discussion and
preliminary mark-up on Tuesday, April 6, 1976 to consider an
amendment in the nature of a substitute to Bill No. 1-164.
On Thursday, April 15, 1975, your committee conducted a
mark-up of such amendment. The reported Bill No. 1-164, as
amended, is the product of the foregoing deliberations by
your committee.

## THE PURPOSE OF THIS LEGISLATION

The goals of this legislation are twofold: (1) to
reduce the potentiality for gun-related crimes and gun-
related deaths from occurring within the District of
Columbia; and (2) to strengthen the capacity of the District
of Columbia government to monitor the traffic in firearms
and ammunition within this jurisdiction. Bill No. 1-164, as
amended, would circumscribe the persons eligible to register
firearms in the District of Columbia and would delineate the
types of firearms which could not be registered within the
District of Columbia. The bill sets forth new and stringent
criteria in order to relegate guns with legitimate uses in
an urban area to demonstrably responsible types of persons.
This legislation would also place more expansive reporting
duties upon all firearm owners and dealers. This increased
accountability would fortify the government's ability to
keep track of the guns which are within the District of
Columbia. The increased penalties for violation of these

new regulations are designed to deter avoidance of the new requirements.

## THE NEED FOR THIS LEGISLATION

Your committee finds that, with reference to the possession, sale, purchase and control of any firearm or destructive device in the District of Columbia, the design and scope tation of the current D.C. Police Regulations, Articles 50 through 55, have not been sufficiently effective in reducing the potentiality of gun-related deaths and gun-related crimes from occurring within the District of Columbia, and there is a need to significantly improve the capacity of the District government to monitor the traffic of firearms within this jurisdiction.

The easy availability of firearms in the United States has been a major factor contributing to the drastic increase in gun-related violence and crime over the past 40 years. The number of deaths attributed to firearms grows each year. Since 1900, more people have been killed by private citizens using firearms than were killed in all our wars. One out of every 100 deaths in the United States is the result of a firearm. Guns are responsible for 69 deaths in this country each day. Approximately 25,000 gun-deaths occur each year and 200,000 individuals are wounded by firearms during this same period. Close to 3,000 accidental deaths are caused by firearms (1/4 of the victims are under 14 years of age). For every intruder stopped by a homeowner with a firearm, there are 4 gun-related accidents within the home.

The nationwide statistics dealing with handguns are even more staggering. The number of handguns alone in the U.S. is estimated to be as high as 40 million. (Congressional findings in Proposed Federal Firearms Act of 1976 - H.R. 11193). That's approximately 1 handgun for every 5 citizens in this country. And the supply of handguns may be increasing by as much as 2 1/2 million each year.

A crime committed with a pistol is 7 times more likely to be lethal than a crime committed with any other weapon. Over the last several years, statistics have shown that handguns are used in roughly 54% of all murders, 60% of robberies, 26% of assaults and 87% of all murders of law enforcement officials. In 1973, the FBI reported 19,510 murders in the United States, 53% of these homicides were committed with handguns. From 1964-1973 firearms were used to commit 95% of the slayings of police officers - 613 by handguns, 104 by rifles and 101 with shotguns. (STATEMENT OF DC. Delegate Walter E. Fauntroy).

In 1973, Detroit police reported 751 deaths from all criminal homicides, 24 more than the total number of civilians killed in Northern Ireland during the entire 5 1/2 years of their civil strife. The picture in the District of Columbia is not bright either. The Metropolitan Police Department reported a record 285 murders in the District of Columbia during 1974. Handguns were responsible for 155 of these homicides. In other violent crimes in which firearms were used in 1974-1975, handguns accounted for 88% of the robberies and 91% of the assaults.

Contrary to popular opinion on this subject, firearms are more frequently involved in deaths and violence among relatives and friends than in premeditated criminal activities. Most murders are committed by previously law-abiding citizens, in situations where spontaneous violence is generated by anger, passion or intoxication, and where the killer and victim are acquainted. (Murder and Gun Control, American Journal of Psychiatry, 128 Jan. 1972:456 No. 7). Twenty-five percent of these murders occur within families.

In addition to the inability of the present D.C. firearms law to reduce the potentiality for gun-related violence, the present regulations have not been sufficiently effective in efficiently monitoring the traffic of firearms and ammunition in the District. The Metropolitan Police

Department reports that during the period of 1968-1975,
57,755 firearms were registered in the District of
Columbia.1/  Of this total, 41,015 were handguns.  However,
in spite of the present regulations, less than 1/2 of 1% of
the total number of firearms (1974) used in crimes and
recovered by the police were registered in D.C. (Statement
of Maurice J. Cullinane, Chief of Police, Metropolitan
Police Department before Committee on Judiciary and Criminal
Law - 1975).  Approximately 12% of the firearms recovered
from all crimes in D.C. are then registered and only 1.7% of
the above-mentioned firearms are registered by the person
from whom they were recovered.  In addition, pistols have
become easy for juveniles to obtain, although the existing
regulations prohibit possession of pistols by juveniles.

The startling statistics presented here emphasize the
inability of the present law to cope with the problems of
gun control in the District of Columbia.  This bill, as
amended, will strengthen the District Government's role in
firearm control by:

(1)  making pistols and shotguns not registered
     according to the regulations in effect prior to the
     effective date of this bill unregisterable in a
     reasonable endeavor toward eventually freezing the
     pistol and shotgun population within the District
     of Columbia.

(2)  providing more appropriate penalties for violation
     of these Regulations.

(3)  providing a more stringent pre-clearance procedure
     to prevent the acquisition, possession and use of
     firearms by disqualified persons.

(4)  providing for annual registration, which will
     enable the District Government to better monitor
     the traffic in firearms and provide additional
     revenue (from annual license and permit fees) to

1/The total number of firearms registered in the District
  of Columbia as of 11:00 a.m., March 26, 1976, was 61,089.
  This includes firearms owned and used by the Metropolitan
  Police Department.

/

      implement this comprehensive program of gun control.

(5)    providing for a program of education in the District of Columbia designed to inform the community of the provisions of this act.

Your committee realizes the most effective gun control must eventually be applied at the national level. In the absence of such national action however, it becomes necessary for local governments to act to protect their citizens, and certainly the District of Columbia as the only totally urban statelike jurisdiction should be strong in its approach.

## IMPACT ON EXISTING LEGISLATION

A.    <u>Effect Upon Title 22, D.C. Code and Related Authority Questions</u>

Bill No. 1-164 as amended, the "Firearms Control Regulations act of 1975", is enacted for the purpose of amending the existing District of Columbia Police Regulations. Specifically affected are Articles 50 through 55 of those Regulations. This bill does not amend or conflict with the provisions of Chapter 32 of Title 22 of the D.C. Code. It specifically provides as much in section 902.

The authority for the Council of the District of Columbia to amend the aforementioned D.C. Police Regulations stems from not only the plenary delegation of section 302 of the D.C. Self-Government and Governmental Reorganization Act (hereinafter "Home Rule Act) (87 Stat. 787, D.C. Code, sec. 1-124) but also from the second sentence of section 404(a) of that Act (D.C. Code, sec. 1-444(a)), which vests the Council of the District of Columbia with all functions granted to its predecessor District of Columbia Council, including but not limited to the police regulatory powers

provided for in the Act of January 26, 1887 (D.C. Code §1-224), the health and welfare regulatory powers provided for in the Act of February 26, 1892 (D.C. Code §1-226), the firearm regulation powers provided for in the Act of June 30, 1906 (D.C. Code §1-227), and the penalty-creating powers provided for in the Act of December 17, 1942 (D.C. Code §1-224a).

The United States Court of Appeals for the District of Columbia Circuit has rendered a lengthy opinion delineating the relationship between the plenary power of Congress over District affairs and delegated the local government's powers (based on the pre-Home-Rule Act delegations) in the area of firearm control. In Maryland and District of Columbia Rifle and Pistol Association, Inc. v. Washington, 142 U.S. App. D.C. 375, 442 F.2d 123 (1971), the U.S. Court of Appeals upheld the authority of the former D.C. Council to promulgate the current gun control regulations.

Those seeking a declaration of invalidity in that case claimed that the Congress had pre-empted the area of gun control by the passage of An Act to Control the Possession, Sale, Transfer and Use of Pistols and Other Dangerous Weapons in the District of Columbia (47 Stat. 650) (codified in Chapter 32 of Title 22 of the District of Columbia Code), and that, in the passage of those Regulations the old Council was treading on ground the Congress had reserved for itself. The Court closely examined the legislative history of the various statutes noting that the 1932 statute was a substantial re-enactment of an 1892 statute (Act of July 13, 1892, 27 Stat. 116) predating the delegation of firearms regulatory powers.2/ The Court went on to note that Congress failed to repeal the regulatory powers when it passed the 1932 Act (now codified in Title 22 of the D.C. Code) finding therefrom and from the rest of its examination "a satisfying assurance that Congress, having dealt with some aspects of weapons control, left others for regulation by the District. Indeed...[the Court could] not fathom any other purpose to be achieved by leaving Section 1-227 in

2/Act of June 30, 1906 (D.C. Code, sec. 1-227 (1973)).

force." (442 F.2d at 131).  The Court set forth the text as follows:

> The important consideration, we
> think, is not whether the
> legislature and municipality
> have both entered the same
> field, but whether in doing so
> they have clashed.  Statutory
> and local regulation may
> coexist in identical areas
> although the latter, not
> inconsistently with the former,
> exacts additional requirements,
> or imposes additional
> penalties.  The test of
> concurrent authority, this
> court indicated many years ago,
> is the absence of conflict with
> the legislative will.  As the
> court declared in French v.
> District of Columbia, where
> [t]he subject [is] peculiarly
> within the scope of the
> [expressly delegated] police
> powers of the municipality, the
> exercise of authority ought not
> to be questioned unless clearly
> inconsistent with the expressed
> will of Congress.

Bill 1-164, as amended, would not clash at all with any
provision of Chapter 32 (or any other part) of Title 22 of
the Code.  Chapter 32 was not enacted to afford the right to
possess or carry weapons.  Absent some legislation to the
contrary, one could possess and carry a gun.  Rather Chapter
32 was enacted to restrict the ability to possess and carry
a gun.

Far from being in conflict with it, Bill 1-164 applies to present day conditions, the same approach the 72nd Congress took with respect to 1932 conditions. Bill 1-164, as amended, does not permit anything which Chapter 32 was designed to prohibit.

The Corporation Counsel of the District of Columbia argued in his brief in Maryland and D.C. Rifle and Pistol Association, Inc. v. Washington. That "since neither the Act of July 8, 1932 [codified in Chapter 32 of Title 22 of the Code], nor any other Act, deals with the registration of pistols by private owners, Article 51, section 1 [of the Police Regulations, prohibiting possession without registration], is not in conflict with any congressional enactment... Merely because the District of Columbia Council has added to the very limited congressional enactments relating to possession and transfer of weapons in the District of Columbia, does not mean that the additions are in conflict with the original limited provisions of the 1932 Act." (Brief of Appellees, p. 14)

Thus it is clear that Bill 1-164, as amended, was within the authority of the former D.C. Council to enact had it seen fit to do so.

There is no "expressed will of Congress" in the Home Rule Act to repeal the earlier delegations of gun control authority to the city. Any repeal would have to be by implication, and it "is a well-settled rule of statutory construction that there is a presumption against repeals by implication. See, Sutherland, Statutory Construction, sec. 2014 (3rd Ed., 1943).3/

The legislative history of the Home Rule Act clearly indicates that it was the intent of Congress to transfer to the new Council the full and immediate power of the old Council in this area. Both section 321(b) of S.1435, as reported by the Senate Committee on the District of Columbia, and the second sentence of section 404(a) of H.R.

3/Brief for Appellees, Maryland and D.C. Rifle and Pistol Association, Inc. v. Washington, U.S. App. D.C. No. 22,927 (1969), p. 17, citing United States v. Greathouse, 166 U.S. 601 (1897).

9682, as reported by the House Committee on the District of
Columbia, contain transfers of the authority of the old
Council to the new. Both of the Reports indicate an intent
to carry forth the old authority. Senate Report No. 93-219
says at p. 3: "The powers of the present Council and Mayor-
Commissioner are transferred to the new Council and Mayor."
House Report No. 93-482 says on p.21: "Section [sic] (a)
[of section 404] provides that the powers and functions of
the present Council and Commissioner are transferred to the
new Council and Mayor." Neither of these bills included at
the time of their report to their respective houses the
contents of section 602(a)(9) of the Home Rule Act. That
was added in conference, and thus the "except as otherwise
provided in this Act" language of the second sentence of
section 404(a) was not directed to section 602(a)(9). It
was more probably directed to delegations by the Home Rule
Act of authority held by the old Council to other agencies
[S.1435, as reported, provided in the very next section
(sec. 322) for functions subdelegated by the old Council and
Mayor-Commissioner were not to be considered as transferred
pursuant to section 321 of the bill but to be recoupable by
specific Council or Mayoral action]. The gun control powers
delegated to the city by D.C. Code, sections 1-224, 1-224a,
1-226, and 1-227 conferred on the old Council by sections
401(1), 401(2), and 401(4) of the Reorganization Plan
Numbered 3 of 1967 were not subdelegated by the old Council
nor were they reassigned by the Home Rule Act.

It would be absurd therefore to now conclude that the
Home Rule Act, designed and understood by all to have
expanded the authority of the local legislature, to have
repealed the powers delegated earlier. "It is axiomatic
that a statute must not be construed to produce an absurd
result." See Lange v. United States, 143 U.S. App. D.C.
305, 307-308, 443 F.2d 720, 722-723 (1971) 4/

Furthermore, Congressional Delegate Walter E. Fauntroy,
former Chairman of the Subcommittee on the Judiciary of the
Committee on the District of Columbia of the United States

---

4/Memorandum of the District of Columbia, District of
    Columbia v. Smith, et. al., D.C.C.A. No. 8780 (1974),
    p. 5

House of Representatives, submitted for the record a legal
memorandum (Exhibit B) supporting this Council's authority
to pass Bill No. 1-42, which, as mentioned earlier, would
have amended the current firearms law in the District of
Columbia by creating a statutory ban on handguns within the
District of Columbia. And Attorney Harley Daniels, former
Counsel to the Subcommittee on the Judiciary of the
Committee on the District of Columbia of the United States
House of Representatives, also testified in support of this
Council's authority to enact Bill 1-42. By contrast, Bill
No. 1-164 as reported herein, amends the current police
regulations passed by the former D.C. Council. The scope of
Bill No. 1-164, as amended, is significantly more clearly
within the ambit of authority of this Council than Bill 1-
42.

The following analysis of the major impact of this bill
upon the current firearms regulations illustrates the point
further.

B.    More Stringent Provisions Regarding Firearm
Registration.

Bill No. 1-164, as amended, abolishes the dual system
under the current regulations whereby persons who own rifles
or shotguns must both register and get a license for such
firearms. Under the bill, a uniform system of registration
is required whereby the Chief obtains not only the same data
about the firearms and their owners as he does under the
current regulations; but, in addition, the Chief is
authorized to obtain information which supplements the
current data which he lawfully obtains. For example, under
the bill, an applicant would have to inform the Chief as to
purpose for which he or she intends to use the firearm.

The bill would require annual registration of firearms
as opposed to the current, one-time registration
requirement.

The bill would give the Chief 60 days within which to
rule upon a registration application in contrast to 30 days
under the current regulations.

The new regulations formulated in this bill would expand
the existing pre-requisites to be met by any person in order
to register his firearm.  For example, the class of
convicted persons ineligible to register a firearm has been
enlarged in this bill.  The bill disqualifies anyone from
registering who within the 5 years preceding the application
for registration was convicted of any weapons offenses (as
defined in the bill), violation of any narcotics or
dangerous drug laws, or violation of any laws regarding
assaults or threats so as to indicate a likelihood to make
unlawful use of a firearm.  The current regulations have
only a three-year disqualification period for persons
convicted of offenses similar to those listed above.  Unlike
any provisions in the existing regulations, the bill
disqualifies any person from registering who was
involuntarily committed to a mental hospital within the _five_
years prior to the application or who was adjudicated by any
court to be insane or to be a chronic alcoholic within the
five years prior to the application.  The bill requires a
medical certification of cure of the foregoing maladies
prior to a registration certificate ever being issued by the
Chief to such persons.

The bill changes the current fee schedule for regis-
tration certificates.  The public record indicates that the
$2.00 fee for a registration certificate under the current
regulations does not even approximate the cost to the
District of Columbia to administer the existing gun control
registration system.  This bill directs that the Mayor set
the fee for registration at whatever amount will meet the
cost to the government for administering the registration
system.

Just as in the current gun regulations, the bill
generally will not allow destructive devices, sawed-off

shotguns, machine guns, or short-barreled rifles to be
registered. Of course, the bill recognizes that on-duty
federal and local law enforcement officers are permitted to
possess the above noted weapons. Cf. D.C. Code §22-3214.

The bill adds a new category of generally unregisterable
firearms in the District of Columbia, namely pistols not
registered and shotguns not registered and licensed pursuant
to the regulations in effect immediately prior to the
effective date of this bill. Such provision denotes a
policy decision that of handguns and shotguns have no
legitimate use in the purely urban environment of the
District of Columbia while at the same time avoiding any
conflict with constitutional doctrines which might require
compensation for materials declared to be illegal but which
were legally possessed prior to the declaration. Moreover,
the bill reflects a legislative decision that, at this point
in time and due to the gun-control tragedies and horrors
enumerated previously in this report, pistols and shotguns
are no longer justified in this jurisdiction. During the
Congressional review period of thirty legislative days,
there will be adequate time for any current possessor of a
pistol or shotgun, who is otherwise eligible, to register
the same and thus be eligible for registration under the new
regulations. Under section 203(c) of the bill, and Article
52, section 414 of the current regulations, his or her
application cannot be used to prosecute him or her for
illegal possession. If there is any fear that possibly
there will be a flurry of firearm purchases or registrations
of currently unregistered pistols and shotguns in the
District of Columbia prior to this bill completing the full
legislative process, it should be noted that the Police
Department can provide the Council with daily statistics
concerning recent registrations of firearms and with less
frequent reports on the inventories of local firearm
dealers. If the basis for the above-noted fears becomes a
reality based on law enforcement reports, then this Council
or the Congress can take further appropriate action prior to
the bill being enacted.

Another innovation of the registration provisions of this bill would be the requirement in section 203(a)(10) whereby applicants would have to demonstrate to the Chief that they are knowledgeable of the District of Columbia firearms laws and that they can safely use the firearm which they seek to register.

C.   Expanded Licensure Provisions.

Bill No. 1-164, as amended, creates two classes of business licensees whereas only one class now exists. The impact of such classification is to freeze at the current level of fourteen the number of dealers who can sell regis-terable firearms to the public.

The bill would extend from the current 30 days to 60 days the time allotted to the Chief to rule upon appli-cations for licenses.

The bill requires that applicants for licenses meet the same expanded eligibility requirements as are placed on persons applying for a registration certificate.

A major revision contemplated in this bill is the establishment of a process whereby a licensed dealer can dispose of his inventory in the event that he receives an unfavorable response to his application for renewal of his license. This is to avoid any constitutional problems of confiscation. The current regulations do not address the situation of what a dealer should do if his license is revoked. Under the provisions of this bill, if a denial or revocation becomes final, then the dealer would have to do any one of the following:  register any registerable firearms in his possession, surrender to the Chief those firearms not registered plus all destructive devices, or lawfully dispose of or remove from the District of Columbia any firearms in which he has an interest.

Bill No. 1-164 as amended contemplates more accounta-
bility in the reporting requirements than are presently
required of licensees under Article 54, sec. 5(c) of the
D.C. Police Regulations. Whereas a licensed dealer is
currently required to submit "periodic" reports, Bill No. 1-
164, as amended sec. 410), would require the maintenance of
very detailed monthly records by the licensee. The licensee
would be required to keep the records current and to open
them to inspection upon demand by the Chief.

 D.  Delineation of Sales or Transfers of Firearms.

   In both this bill and the current regulations, the
range of firearms which may be generally sold or transferred
coincides with the range of firearms which may be lawfully
registered in the District of Columbia. However, Article 5
of Bill No. 1-164 provides that all sales and transfers of
registerable firearms be accomplished only through a
licensed dealer to a qualified purchaser.

 E.  Ammunition Transfers.

   Article 6 of Bill No. 1-164 substantially follows
Article 53 of the current D.C. Police Regulations. Beyond
this, section 602 of the bill sets out in detail the precise
universe of lawful possessors of firearm ammunition; namely,
licensees, authorized government personnel, certified
collectors, and registrants of firearms of the same caliber
as the ammunition possessed.

 F.  Registration of Firing Range Operators.

   Section 703 provides that for the first time in
this jurisdiction that firing ranges shall be registered
with the Chief.

G.    Expanded Enforcement Provisions.

        Under the present Regulations (Article 55, sec. 2)
no penalty will befall a person who voluntarily surrenders
to the Police a firearm which is not registered, so long as
a proclaimed amnesty period is in effect.  This bill would
abolish the current amnesty and redemption regulations and
allow for surrender of firearms to the Chief at any police
station and at any time.  The same provision is made
regarding the voluntary surrender of ammunition.

        This bill also provides in section 803 that the Chief of
Police publicize certain aspects of the Police regulations
concerning firearms.  These matters include: · the elements
of lawful possession, the limitations placed on holders of
permits, the provisions for enforcement of the regulations,
the provisions for voluntary surrender, and the means by
which persons may aid the Police in enforcing the firearms
regulations.

        The bill sets a new mandatory minimum penalty of 10 days
imprisonment and a $300 fine for violation of certain key
sections of the bill (section 201 (re:  prohibition of
possession of a destructive device or unregistered firearm),
section 401 (re:  prohibition of engaging in firearms
business without firearms business license), section 501
(re:  limitations on sale or transfer of firearms), section
601 (re:  limitations on the sale of ammunition), and
section 602 (re:  limitations on the possession of
ammunition)).  Under the current regulations there are no
such mandatory sentencing provisions.  The Committee
reluctantly rejected higher penalties in an effort to remain
within the delegated powers of D.C. Code, secs. 1-224, 1-
224a, 1-226, and 1-227 so as to be certain of the Council's
authority.

        The foregoing considered, it should be apparent that
this bill would not cause a confiscation law, would not
amend any existing gun laws beyond the current D.C. Police

Regulations governing firearms, and would take nothing away
from sportsmen and collectors.

## EXECUTIVE POSITION

The Executive Branch position on Bill 1-164 is far from
clear. From the time of its introduction on July 22, 1975
until March, 1976, there was no communication from the
Branch on this particular bill.

On March 17, 1976, the Chairperson of your Committee
sent a copy of a working draft containing most of the
provisions of this bill, as amended, to the then Acting
Corporation Counsel and to the Chief of Police inviting
general comments, criticisms, and recommendations specifi-
cally requesting in each case certain information (Exhibit
C). Copies of the letters were sent to the Mayor's Special
Assistant for Legislation. It was requested that any
information be provided by March 23, 1976 at a roundtable
discussion to be conducted by your committee.

On March 23, 1976, a memorandum was received from the
Acting Corporation Counsel the only critical comment of
which was directed to a provision of the draft which would
have limited prosecutorial plea bargaining (Exhibit D).
That provision is not part of the bill as amended.

On March 23, 1976, a memorandum was also received from
the Chief of Police claiming inability to complete the
statistical data and analysis by that time (Exhibit E). The
March 23, 1976 meeting was cancelled.

On March 30, 1976, a six page memorandum was received
from the Chief of Police responding to so many of the
specific requests contained in the letter of March 17, 1976
as addressed themselves to standards and procedures used in
the enforcement of current regulations and to statistics
(Exhibit F).

On April 6, 1976, when a mark-up session of your
committee had been called, a memorandum was received from
the Mayor's Special Assistant for Legislation indicating "a
number of legally objectionable and administratively
defective provisions" in the working draft--a nearly
identical version of which was moved at that meeting as an
amendment in the nature of a substitute (Exhibit G).  The
memorandum indicated that the Executive Branch was preparing
a draft bill for the Committee's consideration "in the very
near future".  At the meeting, Mr. Chauncey Williams of the
Office of Legislation declined to cite what the Executive
Branch found to be legally objectionable and/or adminis-
tratively deficient.  The only "much needed change" in the
existing law which Mr. Williams would identify was the
requirement that persons register their firearms within
forty-eight hours of arrival in the city.  That meeting was
recessed to give Mr. Williams a chance to ascertain by what
time the Executive Branch could produce its draft bill.
When the meeting resumed, Mr. Williams was unable to state a
time but responded to an inquiry as to the ability of being
ready in a week by saying that it could be done if one
person worked upon the matter full time.  The Committee
thereupon set the matter over to April 15, 1976 requesting
that it be provided with the Executive Branch's draft bill
and other materials by the close of business on April 14,
1976.

No draft bill or other response from the Executive
Branch was received by or on April 15, 1976 other than
further response from the Chief of Police addressing the two
sections of the Bill (203 and what is now 410) which had
been specifically mentioned in the letter of March 17, 1976
(Exhibit H).  Mr. Robert Greenberg of the Office of General
Counsel of the Metropolitan Police Department appeared at
the mark-up session on April 15, 1976 and was of great
assistance.  Of the 27 points in the Chief's memorandum, the
Committee made amendments consistent with the Chief's
comments to the amendment-in-the-nature-of-a-substitute
before it in all respects except the following five (in none

of which are the Committee's positions any less stringent
than the current regulations):

1)    The Committee rejected the suggestion that persons
convicted of violation of provisions of the bill be later
permitted to register firearms after a period of disquali-
fication sirilar to that required of those convicted of
narcotics offenses.  Your committee felt that one violation
of the provisions of the bill was so serious as to indicate
a permanent disability to safely and lawfully handle
firearms.

2)    Your committee rejected the suggestion that persons
voluntarily entering mental hospitals should be as ineli-
gible as those committed involuntarily.  Your committee
feels that mere admission to a mental hospital does not
indicate incapacity and that the fact of the voluntariness
may indicate more of a presence of mind than an involuntary
commitment.

3)    Your committee and the Executive Branch represen-
tatives present at the meeting were unable to formulate at
the meeting any more specific standards for a disabling
physical defect than are in the current regulations and
which would be continued by the bill.

4)    The committee declined to make production of the
firearm at a station at the time of application mandatory
but chose to vest the Chief with discretion as in the
current regulations.  The Committee did not want to
encourage guns on the streets in any fashion and felt that,
if law enforcement needs dictated such production, the
discretion afforded the Chief enables it.

5)    Your committee rejected the suggestion that one
charged with a misdemeanor of assault or threats should, by
virtue of being so charged, be ineligible to register a
firearm.  Your committee accepted the idea of disquali-
fications upon indictment because there is a judicial

finding of probable cause. Your committee was here
concerned with the interdependent eligibility-to-register
and revocation sections which, if the Chief's suggestion
were adopted, could unfairly result in a citizen's regis-
tration being revoked merely upon a charge of assault by
another citizen.

In the last footnote of the document, the Chief says:
"These comments, as previously noted, were specifically
requested. While we believe adoption of the suggestions
made would greatly improve §§203 and 408, we continue to
believe the bill to be similarly deficient elsewhere to
preclude supporting its passage. (Memorandum of Judy Rogers
to Councilman Clarke dated April 6, 1976)."

Nevertheless, after repeated invitation, no repre-
sentative of the Executive Branch would specify any
objection or deficiency other than as hereinbefore
mentioned.5/

## FISCAL IMPACT

The bill would permit the Mayor to set application fees
for firearm registration and firearms business licenses at
whatever is needed to pay costs of administering the
provisions of the bill. Therefore its administration would
entail no cost except approximately $2500 for publication of
information pursuant to the publicity program mandated by
the bill.

There would be a net savings, as the current
registration fee is set at $2.00 by the current regulations.
The Chief of Police estimated that cost at $20.00 to
register a gun. At the current rate of about 4,000
registrations per year, we are now sustaining a loss of
about $72,000 per year. Thus the fiscal effect of passage
of this bill over the next five years would be approximately
a plus $357,500.
($72,000 x 5 = $360,000 - $2,500 = $357,500).

5/The hearings on Bills 1-24 and 1-42, the then Corporation
Counsel questioned as to the Council's authority to pass
either of those measures (both of which had penalty sections
beyond the scope of the old Council's authority to provide).
The Office of Corporation Counsel has not addressed the
authority to enact Bill 1-164. The question of the Council's
authority to enact Bill 1-164, as amended, is treated in the
section of this Report on "Impact on Existing Legislation",
supra.

## SECTION-BY-SECTION ANALYSIS

Section 101 of the bill sets forth the definitions of essential terms used in the bill.

Subsection (a) of section 201 provides for a general ban on destructive devices and directs that no person shall own, possess, or have under his control a firearm in the District of Columbia without a valid registration certificate being issued therefor to such person. In the case of an organization which owns any firearm, section 201 directs that dual registration be obtained both in the name of the organization and in the name of the president or chief executive of such organization. This provision is intended to establish personal responsibility at a high level within the organization for compliance with this Article. Subsection (b) of section 201 of the bill would provide an exception for licensees in that they would not be bound by the general registration requirements in subsection (a) with respect to firearms kept by them purely as inventory in their businesses.

Section 202 describes certain firearms which are unregisterable, namely any sawed-off shotgun, machine gun, short-barreled rifle and pistol not registered, or shotgun not registered and licensed, to the applicant pursuant to the regulations in effect immediately prior to the effective date of this bill.

Section 203 identifies the criteria and processes by which persons and chief executives in any organization owning firearms shall conform in order to obtain a registration certificate. Subsection (a) of section 203 lists the criteria which must be met by applicants registration certificate. cates. The personal criteria set forth in subsection (a) of section 203 are designed to promote a situation in the District of Columbia wherein registerable firearms, being lethal by nature, can only be registered to persons whose personal and social histories do not indicate

a susceptibility on their parts to use any firearm in a
manner which would be dangerous to themselves or to other
persons. Subsection (b) of section 203 specifies the data
which each applicant must provide for the Chief prior to his
issuing any registration certificate. The burden is upon
the applicant to provide the factual data required by
subsection (b) to the Chief in order that the Chief be able
to perform his duties under this bill. Subsection (c) of
section 203 prohibits any information contained in an
application from being used as evidence in a crivinal
proceeding against the applicant, except for prosecutions
for perjury in violation of D.C. Code §22-2501 or for
violation of section 705 of this bill as amended.
Subsection (c) of section 203 also provides that if a final
determination has been made to deny the issuance of an
application for a firearm, then the applicant shall have
seven days within which to surrender the firearm, lawfully
remove it from the District of Columbia, or otherwise
lawfully dispose of such firearm. Subsection (d) of section
203 affords the Chief the option of fingerprinting and
taking a photograph of an applicant for a firearm
registration certificate. Subsection (e) authorizes the
Chief, whenever he deems it advisable, to require an
applicant to appear in person and to bring the firearm in
question to the police department prior to the Chief's
ruling on the application. Subsection (f) of section 203
mandates that each application be executed in duplicate and
that each application be attested to by the applicant.

Section 204 provides that the registration certificate
shall have an effective life-span of one year, thus
establishing a system of annual registration.

Section 205 authorizes and directs the Mayor to set the
fee scale for any services rendered pursuant to sections 201
through 210 of this bill in order to cover the cost to the
District of Columbia government for providing such services
such as the processing of registration applications.

Section 205 specifically makes fees for registration applications non-refundable.

Section 206 establishes strict time frames within which applications must be filed. In particular, firearms registered or licensed under the Police Regulations in effect prior to the effective date of this bill must be registered within 60 days of the date upon which this bill becomes law. Otherwise a firearm must be registered within 48 hours after it is legally received or acquired or brought into the District of Columbia. Of course a firearm registered pursuant to this bill must be re-registered prior to the expiration of the registration certificate.

Section 207 sets a sixty-day time frame within which the Chief shall make a ruling upon an application for a registration certificate. The Chief shall have 120 days to rule upon applications for a registration certificate which have been filed within the first sixty days after the effective date of this bill.

Section 208 prescribes the grounds upon which a registration certificate shall be revoked. Generally, revocation shall be caused by a firearm becoming unregisterable under section 202, by the registrant becoming ineligible for registration under section 203(a), by failure to perform the duties set forth in section 210, or by the intentional falsification of information given to the Chief by the registrant.

Subsection (a) of section 209 sets forth the procedures to be followed for the denial of a registration application or the revocation of a registration certificate. Subsection (a) provides due process protections to all registrants or applicants affected by this Article. The provision does not alter the doctrine that ownership of a firearm is a privilege and not a right. Subsection (b) of section 209 delineates the legally permissible options available to an applicant or registrant after an order of denial or revo-

cation has become final. Subsection (c) of section 209
requires the Chief to destroy all firearms which are not
needed as evidence by any prosecutorial authorities of any
jurisdiction or which cannot be lawfully returned to the
rightful owner thereof.

Subsection (a) of section 210 of the bill sets forth
additional duties placed upon each person who has registered
a firearm pursuant to these Regulations. Specifically,
registrants shall report in writing to the Chief concerning
the loss, theft, or destruction of the registration
certificate or of the registered firearm within 48 hours of
such event. Registrants shall also report within 48 hours
any change of name or address from that recorded on the
registration certificate. This latter duty is especially
noteworthy for the president or chief executive of any
organization which has registered its firearms. It is the
intent of this subsection to insure that the Chief is kept
well-informed of any change in the identity of the officer
or an organization who is personally responsible for the
oversight of the use of such organization's firearm(s).
Registrants must also inform the Chief in writing of the
sale or transfer or other disposition of the firearm by the
firearm by the registrant. Simultaneous with the notice to
the Chief of the loss, theft, or other disposition of a
firearm, registrants must return to the Chief the regis-
tration certificate for any firearm which has been stolen,
lost, destroyed, sold, or otherwise disposed of. Finally, a
registrant must have in his possession a valid registration
certificate and an applicant, whose application has not yet
been acted upon pursuant to section 207, must have in his
possession his application for a registration certificate
for each firearm possessed. Such registrants and applicants
must exhibit the certificate or application, as the case may
be, upon the lawful demand of any law enforcement officer.
Subsection (b) of section 210 directs the Chief to inform
each applicant for a registration certificate of the duties
which flow from the provisions of this bill and which govern
such applicant.

Section 301 of the bill establishes the duties of executors and administrators of estates containing firearms. If the estate contains a validly registered firearm, the fiduciary has an obligation to report the death of the registrant to the Chief.  If such report is timely, then the registration certificate remains valid until the lawful distribution or transfer of the firearm in question.  In the case of an estate containing a validly registered firearm, the fiduciary is charged with all of the duties which this bill would have imposed upon the decedent if he or she were still alive, for example, the duties listed in section 210 of the bill.  In the case of an estate containing a firearm which is not validly registered, the fiduciary shall have the duty to surrender the firearm or lawfully dispose of such firearm as provided in subsection (b) of section 209 or in section 801 of the bill.  However the executor or administrator shall not be liable for the criminal penalties set forth in section 802 of the bill.

Section 401 prohibits any person or organization from engaging in the business of selling, purchasing, or repairing firearms, ammunition, or destructive devices without first obtaining a license and limits the lawful scope of such business according to the class of the license issued to the licensee.

Section 402 defines the two classes of firearms business licenses:  (1) a Class A license authorizes a business to engage in the sale, transfer, repair, and purchase of firearms and ammunition to any persons or organizations in accordance with the provisions of this bill, and (2) a Class B license authorizes a business to engage in the sale, transfer, repair, and purchase of firearms, ammunition and destructive devices only where the other party to the transaction is another licensee, as defined in the bill, or specified agents of the District of Columbia or the federal governments.

Section 403 specifies who is eligible to obtain each class of license described in section 402, above. Class B licenses may be issued to persons who or to organizations whose officers meet the registration eligibility requirements and do not fail to perform any of the duties set forth in this bill. Class A licenses are "grandfather" licenses which can only be issued to firearms businesses which have been licensed pursuant to the D.C. regulations in effect prior to the effective date of this bill and which qualify for a Class A license in accordance with the provisions of this bill.

Subsection (a) of section 404 regulates the contents of applications for firearms business licenses. Subsection (b) of section 404 provides a qualified evidentiary immunity for information elicited in applications for licenses.

Section 405 sets a sixty-day time frame within which the Chief shall make a ruling upon an application for a license. The Chief shall have one-hundred and twenty days to rule upon applications for a license which have been filed within the first sixty days after the effective date of this bill.

Section 406 authorizes and directs the Mayor to set the fee scale for any services rendered pursuant to sections 401 through 413 of the bill in order to cover the cost to the District of Columbia government for providing such services such as the processing of applications for licenses. Section 406 specifically makes fees for license applications non-refundable.

Section 407 provides that the license shall have an effective life span of one year.

Section 408 prescribes the grounds upon which a registration certificate shall be revoked.

Subsection (a) of section 409 sets forth the procedures to be followed with respect to denial of a license appli-

cation or the revocation of a license.  Subsection (a)
provides due process protections to all licensees and
applicants affected by this Article.  Such provision does
not alter the patent reality that carrying on a firearms
business is a privilege and not a right.  Subsection (b) of
section 408 delineates the legally permissible options
available to an applicant or licensee after an order of
denial or revocation has become final.  Subsection (c) of
section 409 directs the Chief to inform each applicant for a
license of the duties which flow from the provisions of this
bill and which govern the applicant.

Section 410 specifies the types of monthly records which
must be maintained by each licensee concerning the nature of
the inventories kept and the sales, transfers, and repairs
conducted in the course of his, her or its business.  The
Chief is directed to monitor such records at reasonable
regular intervals.  Each record is to be kept for one year
after the event recorded.

Section 411 indicates the permissible manner for a
licensee to keep or display his inventory.

Section 412 provides that all firearms with which a
licensee deals shall have identifying markings imbedded
therein.

Section 413 directs that licensees shall display their
licenses in a prominent place where customers may easily see
them.

Section 501 of this bill specifically limits sales and
transfers of firearms and destructive devices within the
District of Columbia to the provisions contained in sections
209(b) (re:  legal disposition of firearm after denial or
revocation of registration), 502 (re:  permissible sales and
transfers), and 801 (re:  voluntary surrender) of this bill.

Section 502 defines the permissible sales or transfers within the District of Columbia under the bill. Permissible sales under section 502 generally conform to the scope of the registration and licensing provisions of this bill. Subsection (a) of section 502 permits the sale or transfer of any registerable firearm to a Class B licensee. Subsection (b) of section 502 respects licit sales of any registered rifle to any Class A licensee. Subsection (c) of section 502 allows any Class A licensee to sell or transfer any pistol or shotgun, which is lawfully part of his inventory on the effective date of this bill, to any firearms business licensed by a non-D.C. jurisdiction so long as the delivery of the pistol or shotgun to the purchaser or transferee is made outside the District of Columbia. Subsection (d) of section 502 allows any Class A licensee to sell or transfer any pistol or shotgun which is lawfully part of such licensee's inventory on the effective date of this bill to any Class B licensee. Subsection (e) of section 502 warrants the sale or transfer of a rifle by any licensee to any person or organization provided that at least three days pass between the time the transaction is initiated by the prospective transferee's exhibition of an application(s) to register the subject rifle(s) to the transferor and the time the transaction is finally consummated by delivery of the rifle(s). The three-day hold on the transaction affords the Chief the opportunity to review the registration application of the transferee and to stop or suspend the transaction in cases where the Chief finds cause to deny the registration application. Subsection (f) of section 502 generally permits any licensee to sell or transfer a firearm or destructive device to any on-duty agent or employee of the federal or District of Columbia governments when such agent is acting within the scope of his duties in acquiring such firearm or destructive device. THUS THE ONLY FIREARM PURCHASABLE BY THE GENERAL PUBLIC WOULD BE A RIFLE.

Section 601 regulates the sale and transfer of firearm ammunition with the District of Columbia and provides

generally that only licensees can sell ammunition to non-
licensees. The necessary conditions for any sale or
transfer of ammunition by licensees are: (1) the trans-
action must be made in a face-to-face transaction; (2) the
purchaser or transferee must sign a receipt for the ammun-
ition and return such receipt for safe-keeping by the
licensee; (3) the purchaser or transferee must show a
legally authorized registration certificate to the licensee
for the firearm for which ammunition is being sought; and
(4) the ammunition being sold or transferred must be of the
same caliber or gauge as the firearm described in the regis-
tration certificate. The latter two conditions would not
apply in two cases: (a) where the purchaser or transferee
is an on-duty agent of the federal or District of Columbia
governments who is acting within the scope of his duties
when acquiring such ammunition, or (b) when the purchaser or
transferee is a certified ammunition collector who is
purchasing ammunition for his collection.

Section 602 of this bill specifies the persons who may
possess ammunition within the District of Columbia; namely,
licensees, on-duty agents of the federal and District of
Columbia governments, holders of valid registration certifi-
cates for firearms of the same gauge or caliber as the
ammunition being possessed, and locally certified ammunition
collectors.

Section 701 provides that no firearm or ammunition may
be used as security in a transaction and that no person may
loan, borrow, give, or rent any firearm except to the person
who is the registrant for such firearm.

Section 702 specifies that all firearms shall be kept
unloaded and disassembled in the District of Columbia except
when such firearms are being used at registered firing
ranges in D.C. and used at such ranges for recreational
purposes.

Section 703 requires that any person who operates a firing range in the District of Columbia shall register the same with the Chief.

Section 704 discloses that the provisions of this bill shall not apply to on-duty officers, agents, or employees of the federal or District of Columbia governments when such persons are acting within the scope of their erployment.

Section 705 prohibits the intentional giving of false information in course of applying for a registration certificate or license or in the course of supplying any information pursuant to these regulations. Section 706 also makes it unlawful to forge or alter any application, registration certificate, license, or temporary evidence of registration generated pursuant to this bill.

Section 801 provides a mechanism for the lawful surrender or abandoning of any firearm or ammunition to the Chief or to a Metropolitan police officer. Section 801 provides immunity from arrest or prosecution for any person who delivers any firearm or ammunition pursuant to the provisions contained in such section, but section 801 does not countenance the payment of any money to anyone in return for making such a delivery.

Section 802 sets out two levels of penalties for violation of the provisions of this bill. Each violation of section 201 (re: prohibition of possession of a destructive device or unregistered firearm), section 401 (re: prohibition of engaging in firearms business without firearms business license), section 501 (re: limitations on sale or transfer of firearms), section 601 (re: limitations on the sale of ammunition), or section 602 (re: limitations on the possession of ammunition) is subject to the strict mandatory penalty of ten days imprisonment and a $300 fine. Any other violation of the bill is subject to a penalty of imprisonment of up to ten days or a fine of up to $300 or both.

Bill No. 1-164, the "Firearms Control act of 1975"
Page 31
April 21, 1976


Section 804 mandates a publicity program to be contin-
uously conducted by the Chief in order to inform the
citizens of the District of Columbia of the provisions of
this bill and related matters.

Section 901 repeals the current firearms regulations
which are to be replaced by the provisions of this bill.
This section also repeals the regulation authorizing a
bounty to be paid as a redemption for firearms turned in to
the Chief by members of the public.

Section 902 fixes the supplementary nature of the
requirements and penalties of this bill in relation to the
requirements and penalties contained in statutes of the
District of Columbia and of the United States dealing with
similar subject matter.

Section 903 makes the individual sections or provisions
of this bill severable from each other in terms of survival
from any attack upon their validity.

Section 904 provides the effective date for the enact-
ment of this bill.

### COMMITTEE ACTION

On April 15, 1975, your committee convened in order to
mark-up Chairperson Clarke's amendment in the nature of a
substitute to Bill No. 1-164. On that date, your committee
voted to report to the Council a bill which was basically
comprised of the Clarke amendment-in-the-nature-of-a-
substitute with the incorporation of many of the changes
suggested by the Chief of Police (as discussed in the
"Executive Position" section of this report). The committee
vote was as follows: two (2) in favor (Clarke and Dixon),
none opposed. The committee also unanimously voted to
direct the staff to prepare a draft report on the reported
bill for later consideration by the committee. On
Wednesday, April 21, 1976, your committee met to approve

this report and to affirm certain amendments to the reported
bill of April 15. The following amendments were approved:
(1) provision in sec. 201(b) that licensees would not be
required to register their inventories; (2) provision in
sections 401 and 402(b) that destructive devices could be
sold by Class B licensees; (3) allowance in section 404(b)
for evidentiary immunity for information contained on
applications for licenses; (4) provision in section 410(c)
to require licenses to preserve their section 410 records
for 1 year; and (5) expansion of the limitations on
ammunition sales or transfers in section 601 to all persons
instead of merely to licensees. The foregoing amendments
and this report were approved unanimously; the vote being:
two (2) in favor (Clarke and Dixon), none opposed.

# COUNCIL OF THE DISTRICT OF COLUMBIA
# COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY

COMMITTEE REPORT

1350 Pennsylvania Ave, NW 20004

2008 DEC -1 PM 12: 24

OFFICE OF THE SECRETARY

| | |
|---|---|
| **TO:** | All Councilmembers |
| **FROM:** | Councilmember Phil Mendelson, Chairman, Committee on Public Safety and the Judiciary |
| **DATE:** | November 25, 2008 |
| **SUBJECT:** | Report on Bill 17-593, "Inoperable Pistol Amendment Act of 2008" |

The Committee on Public Safety and the Judiciary, to which Bill 17-593, the "Inoperable Pistol Amendment Act of 2008" was referred, reports favorably thereon, with amendments, and recommends approval by the Council.

## CONTENTS

| | | |
|---|---|---|
| I. | Background and Need | 1 |
| II. | Legislative Chronology | 5 |
| III. | Position of the Executive | 5 |
| IV. | Summary of Testimony | 6 |
| V. | Impact on Existing Law | 7 |
| VI. | Fiscal Impact | 7 |
| VII. | Section-by-Section Analysis | 7 |
| VIII. | Committee Action | 8 |
| IX. | Attachments | 8 |

## I.    BACKGROUND AND NEED

Bill 17-593, the Inoperable Pistol Amendment Act of 2008, was originally introduced in response to a problem in the prosecution of the common gun offense known as "Carrying a Pistol Without a License" (CPWL). For years the courts have required proof that a firearm is operable as a matter of law, even though the statute is silent as to operability and for many decades operability had not been required as an element of the offense. Not only does the bill address operability, but now it has been amended considerably to address other issues related to the carrying of firearms. These include criminalizing the discharge of a firearm in the District unless otherwise permitted by law, making explicit that no person shall carry a rifle or shotgun unless otherwise permitted by law, clarifying that one may carry their own registered firearm in their home and for lawful recreational purposes in light of the recent Supreme Court case, *Heller*; conforming the transport requirements to federal law, and changing the minimum waiting period to obtain a firearm from 48 hours to 10 days.

120

*Operability of Pistols*

Both the Office of the Attorney General for the District of Columbia ("OAG") and the United States Attorney for the District of Columbia ("USAO") have detailed a problem arising in presentment court, preliminary hearings, and juvenile detention or shelter care hearings, where the judge or magistrate judge requires proof that a firearm is operable in order to find probable cause that a person has carried a pistol without a license. The necessity of providing the court with a test-fire certificate, generally within 24 hours of the initial arrest, means that the Metropolitan Police Department ("MPD") has insufficient opportunity to conduct a thorough forensic analysis of the weapon, including using the latest technology for detailed forensic fingerprinting. This dilemma forces the government to make an undesirable choice of either releasing a defendant who should be held in order to process the firearm thoroughly, or going forward with a less compelling case at trial so that the gun can be test fired before presentment.

The D.C. Public Defender Service ("PDS") has a different take on the extent of the problem described by OAG and USAO. During the September 18th public hearing, PDS testified that Bill 17-593, as introduced, was too broad and should be tailored narrowly to address the problem. Bill 17-593, as introduced, amended Title 22, Chapter 45 of the D.C. Official Code to permit a charge of CPWL without determining the operability of the pistol. The bill also redefined "pistol" to ensure that CPWL would not apply to imitation firearms.

PDS testified the problem is not so great as the prosecutors claim, and further, that redefining "pistol" would require citizens to obtain a license to carry an inoperable pistol. During weekdays, MPD's ballistics section is open and operational, and it is "practically unheard of for the police to be unable to test fire the gun to determine whether it is operable." According to PDS, the problem occurs only when a defendant is first presented in court on a Saturday or a holiday, the person is only charged with CPWL, and the USAO requests that the defendant is preventively detained at the jail pending trial. PDS further stated that even under these circumstances, it is still rare for the court to release the defendant because the gun's operability was not established. Rather than amend the CPWL statute, PDS suggested amending D.C. Official Code § 23-1322 to allow the court to find that probable cause on operability is established if the police affirm that the pistol was fully assembled, appeared new or in otherwise good condition, and was loaded. The Committee does not support this amendment.

The USAO and OAG both support changing the code so that the government would no longer have to prove operability for any purpose – not just for a probable cause determination. USAO testified that amending Title 22 by adding the same definition of "firearm" as found in Title 7, (which is the District's gun registration law), clarified to eliminate the operability requirement, would have three significant benefits to law enforcement. First, the change would provide additional time for forensic technicians to fully process the weapon. Second, eliminating the operability requirement would eliminate the need for a testfire certificate before presentment. This would, in turn, reduce police overtime expenses and get police officers back on the streets more quickly. Third, it would eliminate the loophole that forces the government to dismiss cases against defendants who carry real guns that, for some reason, fail to testfire.

The Committee agrees. In general, persons should not be carrying real weapons on the street regardless of operability. What is the good in allowing someone to carry a Smith and Wesson revolver for instance – especially if it is not working? To everyone else who might see it, the gun still appears completely dangerous. Further, to allow a technical distinction based on operability would complicate law enforcement. And what about a thief who tosses his gun while fleeing, coincidentally rendering the weapon inoperable: suddenly he is no longer guilty of CPWL?

The USAO further testified on the history of the operability requirement. They stated that operability was never an original element of the offense CPWL as written by Congress in 1932. But the Court of Appeals in *Anderson v. United States*, 326 A.2d 807, 811 (D.C. 1974) found that "when a defendant is charged with carrying a pistol without a license, the government must prove that the weapon was operable." The USAO stated that the court initially made this determination without citation or analysis, but in a subsequent case explained that "[i]n the absence of a definition of the term 'firearm' applicable to [§ 22-4504], we looked to the common usage of that term and observed that it was a 'device *capable* of propelling a projectile by explosive force.'" *Townsend v. United States*, 559 A.2d 1319, 1320 (D.C. 1989) (emphasis in original). The Committee Print now defines "firearm," and operability is not a criterion.

Bill 17-593 would amend the D.C. Official Code to reflect that operability is not an element to be proved either at presentment or at trial. With the changes proposed in Bill 17-593, the government would still be required to prove the following elements: 1) the defendant carried a pistol, 2) they did so voluntarily, on purpose, and not by mistake or accident, 3) they did so without a license, and 4) that the pistol was a real firearm.

*Other Provisions*

Bill 17-593 is being recommended by the Committee at the same time as Bill 17-843, the "Firearms Registration Amendment Act of 2008." This other bill was introduced in response to *District of Columbia v. Heller*, in which the U.S. Supreme Court ruled in June of this year that District citizens have the right to register handguns for the purpose of self defense in their home.[1]

In considering the two bills, the Committee has made some distinction between the two organic statutes: The 1932 Congressional Act dealing with the carrying of weapons and criminal behavior; and the 1975 Council act establishing registration requirements.

The Committee Print for Bill 17-593 includes several provisions, not in the introduced version, resulting from our post-*Heller* work: (1) revising the definitions of "machine gun," "pistol," and "shotgun," in the 1932 act to conform to the definitions being revised in the 1975 act; (2) adding a definition "place of business" so as to limit who may carry a firearm at their place of business (to exclude ordinary employees, to exclude taxicab drivers, etc.); (3) criminalizing the discharge of firearms except as otherwise permitted by law (e.g. at a firing range, or in self-defense in the home; (4) clarifying that no person shall carry a long arm in the

---

[1] *District of Columbia v. Heller*, 128 S. Ct 2783 (2008).

District except as otherwise permitted by law (e.g. lawful transportation related to commerce or recreation); (5) clarifying that the restrictions on carrying do not apply within a registrant's home or in certain other limited situations; (6) revising the requirements pertaining to the transportation of firearms to more closely parallel federal law; (7) repealing the provision for issuance of licenses to carry a pistol; and (8) revising the regulation of transfers to apply to all firearms (not just pistols) and to change the waiting period from 48 hours to 10 days.

The Committee has found that the District is unusual in not having a law against the discharge of firearms. And yet the complaint of hearing gunshots is common in some neighborhoods, unfortunately. A cursory review of the law in other jurisdictions reveals that Arlington County and the City of Alexandria both criminalize this activity. So, too, Baltimore, Maryland and New York City. In each of these jurisdictions the unlawful discharge of a firearm is a misdemeanor offense. Criminalization makes sense in a dense, urban jurisdiction. It is not a provision we would expect for rural areas where guns are used for hunting and target practice. However, such sport would be especially dangerous within the close confines of the District.

The committee print revises the requirements pertaining to the transportation of firearms for two reasons. First, the District's current law is not best practice – to require that a gun be in plain view within the passenger compartment of a car, for instance. Second, the District's current law is practically opposite federal law, so that a District resident driving to Virginia for target practice would find they are breaking one law by complying with the other. The committee print is nearly identical to federal law with some exception: First, if transport is by motor vehicle and there is not a separate compartment (e.g. trunk) the print requires that both the firearm and ammunition be in a locked container. Second, the print includes a provision for transportation if other than in a vehicle (e.g. walking or bicycling to MPD for registration, or to/from a gun dealer).

The committee print repeals Section 6 of the 1932 act (§ 22-4506) at the request of the Chief of Police and the Executive. Without repeal, the provision gives the impression that ordinary people (as opposed to law enforcement personnel, the military, certain investigators, etc.) may obtain a license to carry a concealed weapon. Given the unique character of the District, such activity would be unwise.

The District shares the problem of gun violence with other dense, urban jurisdictions – a problem which is quite different than the experience in the rest of suburban and rural America. The District, however, has a unique distinction: as the nation's capital it hosts a large presence of government and diplomatic officials. Sadly, the District is no stranger to attacks on such officials – the assassinations for Presidents Lincoln and Garfield, attempted assassination of President Reagan, the assassination of former Chilean official Letelier, etc. Government officials and diplomats are constantly moving about the District. The threat of gun violence against them is an especial concern, and one of which we are reminded almost daily in the international news.

The committee print also revises the waiting period from 48 hours to 10 days to purchase a firearm. The 48-hour provision was enacted by Congress 76 years ago. We presume that

Committee on Public Safety and the Judiciary
Report on Bill 17-593

Page 5 of 8
November 25, 2008

Congress recognized that a waiting period is tantamount to a cooling off period for some purchases, and such a requirement results in less violence from guns. However, the Committee has surveyed the law in other jurisdictions and found that 10 days is a common waiting period. Some of the states requiring a waiting period of at least 10 days include California and Hawaii. A person feeling suicidal or angry is not as likely to have put that feeling behind them within 48 hours as within 10 days. Indeed, a few states require even longer waiting periods – Hawaii requires 14 days, and Connecticut requires two weeks for long guns.

The revised print with regard to the waiting period out to be read in conjunction with the revised registration law (D.C. Official Code Title 7). While the Committee is concerned that the registration of firearms should not be unduly burdensome and time consuming, the registration law permits the government to take up to 60 days to process a registration application. A 10-day waiting period included within that time frame is reasonable.

The Committee recommends approval of Bill 17-593, the "Inoperable Pistol Amendment Act of 2008" as amended.

## II.    LEGISLATIVE CHRONOLOGY

January 15, 2008    Bill 17-593, the "Inoperable Pistol Amendment Act of 2008" is introduced by Councilmember Mendelson, and is co-sponsored by Councilmembers Bowser, Brown, Catania, Cheh, and Schwartz.

January 25, 2008    Notice of Intent to Act on Bill 17-593 is published in the *D.C. Register*.

February 1, 2008    Public Hearing on Bill 17-593 scheduled, but cancelled at the request of the Executive and the U.S. Attorney in light of pending litigation.

July 11, 2008    Notice of a Public Hearing is published in the *D.C. Register*.

September 18, 2008    The Committee on Public Safety and the Judiciary holds a public hearing on Bill 17-593.

November 25, 2008    The Committee on Public Safety and the Judiciary marks-up Bill 17-593.

## III.    POSITION OF THE EXECUTIVE

Robert Hildum, Deputy Attorney General for Public Safety in the Office of the Attorney General for the District of Columbia, testified on behalf of the Executive regarding operability. His testimony is summarized below. The other provisions of this bill, as amended, were developed in consultation with the D.C. Attorney General and the Chief of Police.

## IV.    SUMMARY OF TESTIMONY

The Committee on Public Safety and the Judiciary held a public hearing on Bill 17-593 on Thursday, September 18, 2008. A copy of the testimony is attached to this report. In addition, the Committee received written comments on Bill 17-593. All of the testimony and comments pertain to the operability issue.

The Committee is recommending Bill 17-593 at the same time as Bill 17-843, the "Firearms Registration Amendment Act of 2008." The Committee held hearings on that bill, and regarding firearms control, on July 2, 2008, September 18, 2008, and October 1, 2008. Although the testimony from those hearings is not summarized in this report, those hearings influenced the expansion of Bill 17-593 in the Committee Print.

*Laura Hankins, Special Counsel to the Director, Public Defender Service,* testified in opposition to Bill 17-593. Ms. Hankins stated that the Committee should not change the definition of 'pistol' in Title 22 so that it more closely tracks the definition of 'firearm' found in Title 7 because the prosecution usually has no problem attempting to prove operability and such a change would change the licensing scheme in the District. Ms. Hankins suggested that the Committee instead amend D.C. Official Code § 23-1322 to allow the court to find that probable cause exists to believe a pistol is operable based on the appearance of the pistol and all the surrounding circumstances of the defendant's alleged possession of the pistol.

*Patricia Riley, Special Counsel to the U.S. Attorney, U.S. Attorney's Office for the District of Columbia,* testified in support of Bill 17-593, with amendments. Ms. Riley testified that the U.S. Attorney's Office has encountered problems in presentment court, preliminary hearings, etc. when the judge requires proof that a firearm is operable in order to find probable cause that a person has carried a pistol without a license. Ms. Riley suggested that the Committee amend D.C. Official Code § 22-2501 by adding a definition of 'firearm' that parallels the definition in D.C. Official Code § 7-2501.01(9) and in which operability is not a factor.

*Robert J. Hildum, Deputy Attorney General, Public Safety Division, Office of the Attorney for the District of Columbia,* testified in support of Bill 17-593, with amendments. Mr. Hildum supported the changes suggested by the USAO, namely amending Title 22, Chapter 45 of the D.C. Official Code to include the definition of 'firearm' found in Title 7. He stated that the Committee should eliminate the operability requirement for all purposes.

*Janae Grant, ANC Commissioner, ANC 5A 11,* submitted written comments in support of Bill 17-593. Ms. Grant stated that the bill is important because it is a good way of closing a loophole that allows attorneys and judges to make agreements, at their discretion, on the threat of an offender's status of being detained.

## V.    IMPACT ON EXISTING LAW

Bill 17-593 amends a 1932 Congressional law, "An Act To control the possession, sale, transfer and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes" (D.C. Official Code § 22-4501.01 *et seq.*) to: (1) add a definition for "firearm" which removes operability as an element to various offenses including carrying a pistol without a license; (2) revises the definitions of "machine gun," "pistol," and "shotgun"; (3) adds a definition for "place of business"; (4) criminalizes the discharge of firearms except as otherwise permitted by law; (5) clarifies that no person shall carry a long arm except as otherwise permitted by law; (6) clarifies that restrictions on carrying do not apply within a registrant's home or in certain other limited situations; (7) revises the requirements pertaining to the transportation of firearms; (8) repeals the provision for the issuance of a license to carry a pistol; (9) applies transfer restrictions to all firearms, not just pistols; and (10) changes the waiting period to 10 days to purchase a firearm.

## VI.    FISCAL IMPACT

The Committee has requested a Fiscal Impact Statement from the Chief Financial Officer. The Committee believes that funds are sufficient in the FY 2009 budget and the proposed FY 2010 through FY 2013 budget and financial plan to implement Bill 17-593. The Committee print refines existing criminal law and procedure and, thus, does not add a new government program, or require the hiring of new personnel.

## VII.    SECTION-BY-SECTION ANALYSIS

Section 1        States the short title of Bill 17-593.

Section 2        (a) Adds/revises definitions.

(b) Criminalizes discharge.

(c) Clarifies that no person shall carry a long arm except as otherwise permitted by law.

(d) States that the carrying restrictions do not apply within a registrant's home.

(e) Applies transfer restrictions to all firearms.

(f) Repeals § 22-4506 which provides for the issuance of licenses to carry a pistol. Under D.C. law generally, no executive officer can issue a license without express authority, authority which this subsection repeals.

(g) Changes the waiting period to 10 days to purchase a firearm.

Section 3    Savings Clause.

Section 4    Fiscal impact statement.

Section 5    Effective date, which follows a 60-day period for Congressional review.

## VIII.    COMMITTEE ACTION

On November 25, 2008, the Committee on Public Safety and the Judiciary met to consider Bill 17-593, the "Inoperable Pistol Amendment Act of 2008." The meeting was called to order at 10:50 a.m., and Bill 17-593 was number six on the agenda. After ascertaining a quorum (Chairman Mendelson and Councilmembers Alexander, Bowser, Cheh, and Evans present), he moved the print with leave for technical changes. During the opportunity for discussion, Councilmember Cheh stated that she wanted to be assured that Bill 17-593 did not implicitly allow firearms outside of the home, absent the limited circumstances as provided by law. Chairman Mendelson reassured the Committee of this fact. After the opportunity for discussion, the vote on the print was unanimous (Chairman Mendelson and Councilmembers Alexander, Bowser, Cheh, and Evans voting aye). He then moved the report with leave for staff to make technical and editorial changes. After opportunity for discussion, the vote was unanimous (Chairman Mendelson and Councilmembers Alexander, Bowser, Cheh, and Evans voting aye). The meeting adjourned at 11:53 a.m.

## IX.    ATTACHMENTS

1.    Bill 17-593 as introduced.
2.    Written testimony and comments.
3.    Committee Print for Bill 17-593.

**COUNCIL OF THE DISTRICT OF COLUMBIA**
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

**Memorandum**

---

To:         Members of the Council

From:       Cynthia Brock-Smith, Secretary to the Council

Date:       January 16, 2008

Subject:    Referral of Proposed Legislation


Notice is given that the attached proposed legislation was introduced in the Committee of the Whole on Tuesday, January 15, 2008. Copies are available in Room 10, the Legislative Services Division.


TITLE:  "Inoperable Pistol Amendment Act of 2008", B17-0593


INTRODUCED BY:  Councilmember Mendelson

CO-SPONSORED BY:   Councilmembers Schwartz, Catania, Brown, Cheh and Bowser


The Chairman is referring this legislation to the Committee on Public Safety and the Judiciary.


Attachment

cc: General Counsel
    Budget Director
    Legislative Services

Councilmember Phil Mendelson                                    1
                                                                2

A BILL                                          3

—————                                           4

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA              5

—————                                           6

Councilmember Phil Mendelson introduced the following bill, which was referred to the       7
    Committee on _____.                                 8

To amend An Act To control the possession, sale, transfer and use of pistols and other       9
    dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of   10
    evidence, and for other purposes, to permit a charge of carrying a pistol without a license   11
    without determining the operability of the pistol.                                           12

    BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this       13

act may be cited as the "Inoperable Pistol Amendment Act of 2008".       14

    Sec. 2.  Section 4 of an Act To control the possession, sale, transfer and use of pistols and   15

other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of   16

evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-   17

4501 *et seq.*), is amended as follows:       18

    (a) Section 1(a) (D.C. Official Code §23-4501(a)) is amend to read as follows:       19

      "(a)"Pistol," as used in this chapter, means any firearm with a barrel less than 12   20

inches in length and which is designed or redesigned, made or remade, readily converted or   21

restored, and intended to, expel a projectile or projectiles by the action of an explosive; provided,   22

that such term shall not include:       23

      "(A) Antique firearms;       24

1

"(B) Destructive devices; 1

(C) Any device used exclusively for line throwing, signaling, or safety, 2

and required or recommended by the Coast Guard or Interstate Commerce Commission; or 3

(D) Any device used exclusively for firing explosive rivets, stud 4

cartridges, or similar industrial ammunition and incapable for use as a weapon." 5

(b) Section 4 (D.C. Official Code §23-4504(a)), is amended by inserting the following 6

new paragraph (3) to read as follows: 7

"(3) For the purposes of establishing probable cause or a substantial probability 8

that a person has violated this subsection, it is not necessary for the government to prove that a 9

pistol is operable.". 10

Sec. 3.  Fiscal impact statement. 11

The Council adopts the attached fiscal impact statement as the fiscal impact statement 12

required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 13

24, 1973 (87 Stat. 813; D.C. Official Code §1-206.02(c)(3)). 14

Sec. 4.  Effective date. 15

This act shall take effect following approval by the Mayor (or in the event of veto by the 16

Mayor, action by the Council to override the veto), a 60-day period of Congressional review as 17

provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December 18

24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of 19

Columbia Register. 20

2

COMMENTS OF THE PUBLIC DEFENDER SERVICE
FOR THE DISTRICT OF COLUMBIA


concerning


Bill 17-593 – INOPERABLE PISTOL AMENDMENT ACT OF 2008


presented by


Laura E. Hankins
Special Counsel to the Director


before


THE COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY
COUNCIL OF THE DISTRICT OF COLUMBIA


The Honorable Phil Mendelson, Chair


September 18th, 2008

Avis E. Buchanan, Director
Public Defender Service
633 Indiana Avenue, N.W.
Washington, D.C. 20004
(202) 628-1200

Thank you for this opportunity to testify about Bill 17-593, the Inoperable Pistol Amendment Act of 2008. I am Laura Hankins, Special Counsel to the Director of the Public Defender Service. Section (a) of Bill 17-593 would change the definition of "pistol" in Title 22 of the D. C. Code so that it more closely tracks the definition of "firearm" found in Title 7 of the Code.[1] This definitional change would make it a crime for persons to carry a pistol that they know to be inoperable without obtaining a license for it. Section (b) of the bill, in contrast,[2] would merely eliminate the requirement that the government prove a pistol's operability when establishing probable cause or substantial probability. For example, when the Office of the U.S. Attorney must prove probable cause exists that the defendant committed the offense of carrying a pistol without a license[3] before the judge can detain the defendant at the jail pending trial, it would have to prove every element of the offense of carrying a pistol without a license except that the pistol in question was operable. The Public Defender Service opposes both provisions of Bill 17-593.

The Public Defender Service understands that the Office of the U.S. Attorney requests that the Council change the definition of "pistol" in Title 22 because it does not want to have to prove operability at the initial presentment of defendants charged with carrying a pistol without a license ("CPWL"). PDS urges this Committee not to alter its gun control laws in this manner for this purpose. First, the prosecution usually has no problem attempting to prove operability. The issue has to do with test firing the pistol. On weekdays, the ballistics section of the Metropolitan Police Department is open and it is practically unheard of for the police to be unable to test fire the gun to determine whether it is operable. If a defendant is first presented in court on a Saturday or a holiday,[4] meaning he or she was arrested late the night before or early that morning, and if the person is only charged with CPWL and if the U.S. Attorney's Office requests that the defendant be preventively detained at the jail pending trial,[5] then proving operability is a challenge because the ballistics section is reportedly closed and the police cannot test fire the pistol. According to the trial lawyers in my office, it is extremely rare in these

---

[1] See D.C. Code § 7-2501.01(9).

[2] If section (a) passes, section (b) would be superfluous, as there would be no operability requirement that would need to be established by probable cause.

[3] D.C. Code § 22-4504(a).

[4] D.C. Superior Court is closed on Sundays.

[5] If the prosecution charged another offense that constituted a "crime of violence" or a "dangerous crime" as those terms are defined in D.C. Code § 23-1331, then they could seek to preventively detain the defendant based on establishing probable cause for that offense and not have to establish probable cause for each element of CPWL, including operability, at that first court hearing. For example, if a defendant is initially charged with armed robbery and with CPWL, the prosecution could seek detention by establishing probable cause on the armed robbery charge, which does not require proof of operability. It is entirely within the discretion of the U.S. Attorney's Office to seek to preventive detention; it is not required to do so in any case. In fact, before the Council amended D.C. Code 23-1322(c) to extend the rebuttable presumption that no condition or combination of conditions of release would reasonably assure the safety of any other person or of the community to persons charged with CPWL, the office only sporadically sought preventive detention based on a CPWL charge alone. Now the office seeks detention in most cases.

circumstances for the court to release the defendant because the gun's operability was not established. Usually, the court holds the defendant until the next court day to give the prosecution time to "perfect the Gerstein," meaning to give the prosecution time to establish probable cause on each element, including operability. In practice this means, that the defendant is held at the jail; the police to test fire the gun as soon as the ballistics section is open, and the prosecution then "perfects the Gerstein" in court by proffering evidence of operability. So it would be a gross exaggeration to say that defendants are being released to the streets regularly because the prosecution cannot prove operability.

Even if it were the case that defendants were released routinely due to failure to prove operability, or there were some other compelling reason that requiring the police test fire the pistol so soon after it was seized was burdensome, the Council should consider a more tailored fix to the problem, rather than eliminating the operability requirement altogether. Specifically, the Council could amend D.C. Code § 23-1322 to allow the court to find that probable cause exists to believe a pistol is operable based on the appearance of the pistol and all the surrounding circumstances of the defendant's alleged possession of the pistol. For example, the court could find that probable cause on operability is established if the police affirm that the pistol was fully assembled, appeared new or in otherwise good condition and was loaded.[6]

This Committee should reject the more drastic proposal to change the definition of "pistol" because it would change the gun licensing scheme in the District - a scheme already under close scrutiny – to require residents to obtain licenses to carry inoperable pistols. As they currently exist, there is an internal logic to the District's licensing scheme and structure of offenses and penalties. All pistols, regardless of operability, must be registered; possession of an unregistered pistol is a 1-year misdemeanor.[7] It makes sense that the District would want to keep track of gun ownership and ensure an owner has knowledge of the safe and responsible use of firearms.[8] While carrying a pistol without a license is also considered a "crime of possession,"[9] when committed outside a person's home or place of business or off property owned by the person, it is a more serious crime than possession of an unregistered firearm and carries a five-fold more serious punishment. In contrast to the offense of possession of an unregistered firearm, CPWL requires that the defendant "carry" the pistol "on or about his person," meaning that the pistol must be conveniently accessible and within the person's reach. It is

---

[6] Section (b) of the bill appears to be an attempt at a more tailored solution to the alleged problem. The problem with section (b) is that, at a minimum, it would be challenged on the grounds that proof of probable cause on every element is a constitutional requirement and the legislature cannot simply give the prosecution and the court a pass on observing the Constitution, even in small part.

[7] D. C. Code §§ 7-2502.01, 7-2507.06

[8] This is so even in the case of an inoperable pistol given the definition of inoperability applies to guns that, with some time and perhaps expertise, could be reassembled and made functional. See infra p. 3.

[9] Strong v. United States, 581 A.2d 383, 387 (D.C. 1990).

logical that this offense would have a greater penalty. Its purpose is to deter and punish people who carry inherently dangerous weapons. If a person intends to carry an inherently dangerous weapon, it stands to reason that the Council would have a licensing scheme that, among other standards, requires that the person demonstrate that he is properly trained and experienced in the use, functioning, and safe operation of the pistol, that he has completed satisfactorily a course of supervised training at a certified firing range using the weapon to be licensed and that he can shoot the gun accurately and safely.[10] Broken or inoperable guns are not inherently dangerous. To be clear about the case law in this area, the D.C. Court of Appeals has found that a disassembled gun, all parts of which are easily accessible to the defendant and which can quickly and easily be reassembled, is an operable pistol within the meaning of the statute.[11] If a person is carrying, without a license to do so, all the pieces of a pistol and those pieces can be quickly assembled to become a functioning gun, then the person has committed the offense of CPWL. On the other hand, carrying a gun that is defective or broken and that can only be test fired if it is disassembled by an expert who diagnoses the reason for the malfunction and fixes it, does not constitute CPWL.[12] Carrying such a gun is not inherently dangerous. Carrying such a broken gun is no more inherently dangerous than carrying a toy gun or a water pistol.

This is not to say that an inoperable pistol cannot cause harm. There are a number of offenses with which a defendant could be charged if he uses or even intends to use a gun, even a broken or inoperable one, to harm someone. It would be a crime to possess a broken gun with the "intent to use [it] unlawfully against another."[13] It would be a crime, carrying a maximum penalty of 10 years imprisonment, to threaten someone with a broken gun.[14] It would increase the possible term of imprisonment to 30 years to commit a crime of violence, such as robbery, or a dangerous crime while armed with a broken gun.[15] Thus, use of inoperable pistols is already extensively criminalized; even possession with intent to use is criminalized. The issue then is whether it makes sense to require persons

[10] 24 DCMR 2303.9(d), (e); 24 DCMR 2303.10. Note that it would be impossible for a person to obtain a license for an inoperable pistol as the District's licensing regulations require that the training course be completed with the gun sought to be licensed and requires that the applicant test fire that weapon at the standard police course to demonstrate his ability to shoot accurately and safely.

[11] See Rouse v. United States, 391 A.2d 790, 791 (D.C. 1978).

[12] See Curtice v. United States, 488 A.2d 917, 918 (D.C. 1985).

[13] D.C. Code §22-4514(b), possession of a prohibited weapon. This offense carries a penalty of 1 year in prison except that if the person has been previously convicted of committing this offense or of committing any felony in the District or elsewhere, it is a 10-year offense.

[14] D.C. Code § 22-402, assault with a dangerous weapon. Note that a weapon is considered "dangerous" under this statute if it is used or threatened to be used in a manner likely to produce death or serious bodily injury. The alleged victim's perception of whether a weapon was dangerous is relevant to whether the weapon is "dangerous" under the law. So, for example, if a defendant thrusts his finger into the back of the complainant and by words and actions causes the complainant to conclude mistakenly that the defendant's finger is a gun, this conduct could constitute assault with a dangerous weapon. See Paris v. United States, 515 A.2d 199, 204 (D.C. 1986). If a finger can be a dangerous weapon for purposes of this statute, a broken gun would also be.

[15] D.C. Code § 22-4502, additional penalty for committing crime when armed.

to obtain licenses to carry pistols that do not work and cannot quickly be made to work. The answer is no. It is worth remembering that the Supreme Court did not address the District's licensing requirements beyond the carrying in the home issue because Mr. Heller conceded at his oral argument before the Court that he did not have a problem with the current licensing scheme as long as it was not enforced arbitrarily or capriciously. Thus, it is not the case that even the current scheme has withstood the test of Supreme Court scrutiny.

This Committee should not make such a drastic change to its licensing scheme to solve the small problem of the timing of test firing a pistol. A more tailored fix would suffice.

BEFORE THE
COUNCIL OF THE DISTRICT OF COLUMBIA
COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY
COUNCILMEMBER PHIL MENDELSON, CHAIRMAN



Bill 17-593
THE "INOPERABLE PISTOL AMENDMENT ACT OF 2008"

TESTIMONY OF

ROBERT HILDUM
DEPUTY ATTORNEY GENERAL FOR PUBLIC SAFETY
OFFICE OF THE ATTORNEY GENERAL FOR THE DISTRICT OF
COLUMBIA

September 18, 2008
10:00 a.m.

Room 500, Council Chamber
John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

Good morning, Chairman Mendelson and members of the Committee. My name is Robert Hildum and I am the Deputy Attorney General for Public Safety in the Office of the Attorney General for the District of Columbia (OAG).

I am pleased to have this opportunity to testify on Bill 17-593, the "Inoperable Pistol Amendment Act of 2008." First, I would like to adopt and support the testimony presented by the United States Attorney's Office (USAO). Although OAG recognizes the need for Bill 17-593 to eliminate the necessity of proving operability to establish probable cause, we do not feel that the bill goes far enough. We concur with the USAO's recommendation that the Council should amend Title 22, Chapter 45 of the D.C. Official Code to include the definition of "firearm" found in Title 7. For the reasons stated in the USAO's testimony, the Council should eliminate the operability requirement for all purposes.

Second, I would like to discuss some of the problems encountered by OAG's juvenile section and the Metropolitan Police Department (MPD) because of the requirement by some judges and magistrate judges that the operability of a firearm be established in order to find probable cause that a juvenile carried a pistol without a license. In a typical case where a gun is recovered and a juvenile is arrested for Carrying a Pistol Without a License ("CPWL"), the arresting officers will call for assistance from Crime Scene Search Officers ("CSSOs") to process the weapon. The CSSO will take photographs, unload the gun, and secure the bullets in an evidence bag. If there is a bullet in the chamber, they will separate it from the other bullets. More photos will be taken and then the CSSO will dust for prints. Unless there is an unusual circumstance, which I will discuss in a moment, the CSSO will give the weapon back to the

2

arresting officer. Because it is necessary to test-fire the gun, a thorough forensic examination of the weapon is not conducted. For example, while the CSSOs dust the gun for fingerprints, a more effective but more time-consuming method exists to lift usable fingerprints, the Cyanoacrylate or "super glue" method, but test-firing will make it impossible to recover any prints with this technique. The super glue method requires a laboratory setting with a sealed temperature control tank and can take over two hours before results are confirmed and carefully preserved. In addition, any trace evidence that could be recovered from the weapon and processed to yield evidence in this, and other cases, will be destroyed in the test-firing. It should be noted that as a result of television shows such as "CSI," more and more juries are expecting that these forensic tests at least be attempted.

The respondent is then transported to MPD's Juvenile Processing and the officers complete their paperwork. After completing the paperwork, the officer must report to OAG's juvenile section to paper the case. Officers who arrest a juvenile in the late afternoon or at night are required to be at OAG at 8:00 in the morning. Guns can only be test-fired at Police Headquarters between the hours of 6:30 a.m. and 3:00 p.m., so an officer could test-fire the gun prior to showing up for papering at 8:00 a.m. or wait until after the case is papered. Obviously, there are overtime implications to this decision just as there are court processing time issues should the officer obtain the test-fire certificate after the case is papered. Each course of action requires the officer to spend additional time waiting for the gun to be test-fired and obtaining the certificate of operability prior to the respondent's initial hearing just in case the court wants to hold a detention hearing. It is only after all of these tasks have been completed that the officer is available to testify at a detention hearing. We submit that Bill 17-593, just like the USAO's

3

amendment in the nature of a substitute, would improve and expedite the papering and court process.

The time it takes to test-fire the gun will vary considerably and depends on several factors. Initially, the police officer will fill out a form and identify the gun in question. On occasion, extra time may be required if the gun is an older model or if the serial number has been obliterated. There may be several officers in line to test-fire weapons and because of the demands of the firearms examiners, staff may be short. After the gun is test-fired, the firearms examiner and the officer will etch their initials onto the gun. The process may take 20-30 minutes; otherwise, it can take more than an hour to complete depending on the number of firearms to be tested.

The unusual circumstance I mentioned earlier, which will occasionally impact our cases, is when the weapon in question is suspected of being used in a shooting or homicide. In this situation, MPD's Mobile Crime Unit will take the weapon to safeguard the investigation. They will hold on to it and bring it to the Firearms Examination Section to be left with a firearms technician. This is a big problem for OAG in that if Mobile Crime takes the gun, it cannot be test-fired prior to the detention hearing, which results in a finding of no probable cause for the CPWL charge. It is important to note that CPWL is one of the few charges that creates a rebuttable presumption that the juvenile should be detained under D.C. Official Code § 16-2310 (a-1).

The Government on a daily basis must choose between test-firing the pistol, in order to establish probable cause to detain the respondent, or taking the time to properly process the pistol

4

and obtain additional evidence, in which case the suspect could be released. This problem is exacerbated when the respondent is arrested late in the morning and added to the court's list as a late lockup. If the arrest occurs at 11:00 a.m., for example, the time that it takes to process the juvenile and paper the case means that the juvenile will barely make the 3:00 p.m. cutoff for court (3:00 p.m. Monday through Friday and 2:30 p.m. on Saturday). The officer will not have time to have the gun test-fired before the hearing. The result, again, will be a finding of no probable cause even though the respondent was found possessing a gun.

A juvenile in possession of a gun, whether operable or inoperable, is a danger to himself and others. It can be argued that in one sense an inoperable pistol presents a greater danger in the hands of a juvenile because he could provoke a violent confrontation with no means of defense. However, an armed robbery or assault can still be committed with an inoperable pistol. The victim is equally scared for their life. Operability should not be a requirement at the juvenile's detention hearing and it should not be an element of the offense to be proven at trial. OAG concurs with the logic behind Bill 17-593's elimination of the necessity of proving operability to establish probable cause, but supports the USAO's proposal that the definition of firearm be changed to eliminate the operability requirement altogether.

Thank you for this opportunity to testify today. I would be happy to answer any questions that you might have.

5




**STATEMENT**
**on**
**BILL 17-593, THE "INOPERABLE PISTOL AMENDMENT ACT OF 2008"**
**by**
**PATRICIA A. RILEY**
**SPECIAL COUNSEL TO THE UNITED STATES ATTORNEY**
**before**
**THE COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY**
**COUNCIL OF THE DISTRICT OF COLUMBIA**

**Thursday, September 18, 2008, 10:00 a.m.**

Good morning, Chairman Mendelson and other members of the Committee. Thank you for the opportunity to testify on Bill 17-593, the "Inoperable Pistol Amendment Act of 2008."

Both the United States Attorney's Office and the Office of the Attorney General for the District of Columbia have encountered problems in presentment court, preliminary hearings, and detention or shelter care hearings when the judge or magistrate judge requires proof that a firearm is operable in order to find probable cause that a person has carried a pistol without a license [CPWL]. The necessity of providing the court with a test-fire certificate generally within 24 hours of the initial arrest means the police department has little time to conduct a thorough forensic analysis of the weapon, including detailed forensic fingerprinting. This forces the government to make an untenable choice – releasing a defendant who should be held in order to process the gun properly or going forward with a less compelling case at trial in order to testfire the gun before

presentment. There also is no reason why operability should be proven at trial. Such a requirement is not in the statute. However, the absence of a definition of firearm in this chapter of the Code led the Court of Appeals, erroneously in our view, to engraft such a requirement into the elements of the offense.

One example of the impact the court-made operability requirement has on public safety occurred earlier this year when an 18-year-old man was arrested for carrying a pistol without a license. He was presented in court on a Saturday, when testfire certificates are not available. Our request to have him held was denied because there was no evidence of operability. Three months later, he was arrested and charged with a murder that was committed in the same neighborhood where he was originally arrested for CPWL.

Adding to Title 22 essentially the same definition of "firearm" as that found in Title 7 of the Code would eliminate the operability requirement and thus have three significant impacts on law enforcement:

• First, eliminating the operability requirement will provide additional time for forensic technicians to fully process the weapon, including detailed fingerprinting. Because the weapon currently must be testfired before presentment, fingerprinting may be foregone all together or less sophisticated fingerprinting techniques may be used that reduce the chance of obtaining useable prints.

• Second, eliminating the operability requirement will eliminate the need for a testfire certificate before presentment and this, in turn, will reduce police overtime expenses and get officers back on the streets faster. Currently, officers who seize guns must report to MPD's

-2-

Firearms Examination Section prior to papering the case to have the gun testfired and the paperwork prepared. The process takes up to 30 minutes per weapon, longer if there is a line. In this connection, we note that only sworn officers may legally transport firearms that they seize.

- Third, eliminating the operability requirement will eliminate a loophole that forces the government to dismiss cases against defendants who carry real guns that, for some, often minor, reason fail to testfire. In this context, we note that it is not unusual for people to throw away their guns when they are pursued by the police. In some cases, this renders the guns inoperable even though they worked moments before, would clearly fit the definition of firearm in § 7-2501.01(9), and could easily be restored to a condition where they could be used to harm someone.

It would be useful for the Committee to understand the history of the operability requirement. Operability is not a statutorily imposed criterion for CPWL (or any other offense). *See Morrison v. United States*, 417 A.2d 409, 412 (D.C. 1980) ("[t]he statute does not declare operability to be an element of the offense"). Indeed, early cases described only two elements of the offense -- "(1) the carrying of a pistol and (2) without a license to do so" -- and did not mention operability. *(Andrew) Brown v. United States*, 66 A.2d 491, 493 (D.C. 1949) (reviewing the legislative history of section 22-3204).[1] Nevertheless, without citation or analysis, the Court of Appeals in *Anderson v. United*

---

[1] "While cases after the 1949 *Brown* case, *supra*, have spoken of the requirement of operability, there is no necessity for a pistol to be loaded for it to fall within the proscription of § 22-3204. Hence, it is somewhat anomalous for the court to have translated the government's custom of proving operability into an element of the offense." *Morrison v. United States, supra*, 417 A.2d at 412. D.C. Code § 22-3204 was renumbered § 22-4504 in the 2001 edition of the Code.

-3-

*States*, 326 A.2d 807, 811 (D.C. 1974), proclaimed that "[w]hen a defendant is charged with carrying a pistol without a license, the government must prove that the weapon was operable." The Court later explained that "[i]n the absence of a definition of the term 'firearm' applicable to [§ 22-4504], we looked to the common usage of that term and observed that it was a 'device *capable* of propelling a projectile by explosive force.'" *Townsend v. United States*, 559 A.2d 1319, 1320 (D.C. 1989) (emphasis in original) (quoting *(Don) Lee*, 402 A.2d 840, 841 (D.C.1979) ("A firearm is by common usage a device capable of propelling a projectile by explosive force. Therefore, operability is necessarily an element of the definition of a 'pistol' under § 22-3204.") (citation omitted)).

More recently, the Court has turned to definitions in other parts of the Code rather than resorting to a common usage when a term is not defined in a specific statute. *E.g., Nixon v. United States*, 730 A.2d 145, 150 (D.C. 1999) ("Since the definition of "serious bodily injury" which appears in § 22-4101(7) of the District's sexual abuse statute . . . is consistent with that followed in the majority of jurisdictions, we adopt it for the purpose of determining whether the government met its burden to prove "serious bodily injury" under the aggravated assault statute"). Had the Court done so in this case, operability would not have been incorporated into the elements of carrying a pistol without a license or other offenses involving firearms.

D.C. Code § 22-4501(a) defines pistol as a "firearm with a barrel less than 12 inches in length" but it does not define firearm. D.C. Code § 7-2501.01(9) defines firearm, with some exceptions, as "any weapon which will, or is designed or redesigned, made or remade, or may be readily converted or restored, and intended to, expel a projectile or projectiles by the action of an

-4-

explosive."[2] Thus, for purposes of prosecution for possession of an unregistered firearm, if the weapon is a real gun, even if it does not work at the moment it is seized, it is a firearm. *See Townsend,* 559 A.2d at 1320 ("the statute clearly includes in its definition of a 'firearm' inoperable weapons that may be redesigned, remade, or readily converted or restored to operability"). The definition of firearm should be consistent throughout the Code. For this reason, D.C. Code § 22-4501 should be amended to include essentially the same definition as D.C. Code § 7-2501.01(9).

In situations where a gun is used, as opposed to being carried or possessed, operability may be proved by circumstantial evidence: *Morrison v. United States,* 417 A.2d at 412-413 (armed offenses and CPWL; "factfinder could fairly infer that the guns were both loaded and operable" where "three robbers burst into the private residence of Evelyn Lewis, each displaying a gun to back up his demands, the assailants must have intended that their victims believe the weapons were capable of being discharged; [and] in fact, the gun carried by one of appellant's companions was discharged."); *Bartley v. United States,* 530 A.2d 692, 697-698 (D.C. 1987) (armed robbery with operable pistol; when robbers entered store, "each displaying a weapon to back up his demands, they

---

[2] We have not done a thorough search but a majority of jurisdictions appear to have the same or a substantially similar definition of firearm as that in D.C. Official Code § 7-2501.01(9). *See, e.g.,* 18 U.S.C. § 921(a)(3) ("The term 'firearm' means . . . any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive . . . . Such term does not include an antique firearm."); Ariz. Rev. Stat. § 13-105, as amended by Ariz. Legis. Serve. Ch. 150 (2008) (HB 2623) ("'Firearm' means any loaded or unloaded handgun, pistol, revolver, rifle, shotgun or other weapon that will or is designed to or may readily be converted to expel a projectile by the action of expanding gases, except that it does not include a firearm in permanently inoperable condition"). In addition to these jurisdictions and our neighboring states of Maryland and Virginia, Arkansas, California, Colorado, Delaware, Florida, Georgia, Idaho, Illinois, Indiana, Kansas, Louisiana, Maine, Maryland, Minnesota, Mississippi, New Hampshire, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, and West Virginia, 30 jurisdictions in all, define firearm as a weapon that is either designed to, or can be readily converted to expel a projectile by the action of an explosive, or both.

-5-

both must have intended that their victims believed that the weapons were capable of being discharged. Just as it would have been reasonable for the . . . employees to believe that appellants' weapons were operable, so too would it be reasonable for the jury to conclude likewise."); *Peterson v. United States*, 657 A.2d 756, 763 (D.C. 1995) (ADW and PPW(b); no rational juror, if fully instructed, could have failed to find operability when the shotgun was wielded in menacing manner and a Remington, semi-automatic, sawed-off shotgun was recovered with a live shell in the chamber and four additional shells in the magazine). The Court has stated that "[w]hen an object is used to coerce others into submitting to illegal requests, what is significant is whether the victims believe the item is a weapon. When, however, the item is merely being carried, the question is whether it may actually be used to harm someone." *Strong v. United States*, 581 A.2d 383, 388 (D.C. 1990) (reversing conviction for carrying a dangerous weapon based on carrying, but not brandishing, an air pistol).

The Court of Appeals has not held that proof of operability is required at a probable cause hearing. Nevertheless, judges of the Superior Court have done so, notwithstanding opinions upholding probable cause to arrest where operability could not have been known by the police officer at the time of arrest. *See, e.g., Bshara v. United States*, 646 A.2d 993, 995 (D.C. 1994) (officer saw a gun protruding out of the defendant's pocket on a subway train); *Poteat v. United States*, 330 A.2d 229, 232 (D.C. 1974) ( passenger in an automobile told a police officer that the driver had a gun); *Murphy v. United States*, 293 A.2d 849, 850-851 (D.C. 1972) (citing cases) (police officer immediately confirmed details provided in a radio report about a man named Murphy seated at a certain table in a restaurant who had a gun); *Contee v. United States*, 212 A.2d 342, 343 (D.C. 1965) (the only basis for the arrest was the fact that the officer saw the defendant "with a gun in his hand

-6-

in plain view"). Indeed, the Court has explicitly held that "a police officer who sees a non-uniformed person carrying a pistol in a public place could reasonably conclude that that person is violating the law and would therefore have probable cause to arrest the person for carrying a pistol without a license." *Bshara*, 646 A.2d at 996-997 (footnote omitted). Because the role of a judge at arraignment or presentment is to ascertain whether the police had probable cause to arrest, *see* Superior Court Rules of Criminal Procedure, Rule 5(c), setting a higher standard at this stage of the proceedings does not make sense.

It also does not make sense to require that a pistol be operable at the moment it is seized in order to prove carrying a pistol without a license or other weapons offenses beyond a reasonable doubt. If, as in a recent Virginia case, a weapon is not a real gun, a person should not be prosecuted or convicted of carrying a pistol without a license.[3] If, however, the person has a real gun that does not fire, s/he should be subject to both prosecution and conviction for carrying a pistol without a license just as s/he would be for unlawful possession of a pistol outside the home.

<u>D.C. Code § 22-4501 should define "firearm"</u>

Bill 17-593 amends the definition of pistol in D.C. Official Code § 22-4501(a). We recommend, instead, that D.C. Official Code § 22-4501 be amended by adding a definition of firearm that parallels the definition in D.C. Official Code § 7-2501.01(9).

Chapter 45 contains a number of statutes that involve firearms or imitation firearms. By

_____

[3] *See* Maria Glod, *Va. Court Grants First Ever Innocence Writ*, WASHINGTON POST (August 13, 2008) (conviction reversed because weapon was a gas gun, not an actual firearm). Although it did not get any publicity, a recent case in the District was dismissed after a finding of guilt when we determined that the gun was not a real gun.

-7-

amending the definition of pistol only, as Bill 17-593 does, it would create a disparity between the definition of pistol and all other firearms that is not warranted and not in the interest of public safety. For example, if a convicted felon had a firearm with a barrel length of less than 12 inches (*e.g.*, a pistol), but it did not work because the firing pin was missing or damaged, s/he could be charged under the felon in possession statute, D.C. Official Code § 22-4503. If, however, the barrel length was 12 inches, an argument could be made that since the Council did not apply the new definition of firearm to all firearms offenses, it means that a felon could not be charged with possessing an inoperable firearm. To date, the D.C. Court of Appeals has not decided whether the operability requirement applies to this offense.[4] If it does, it is unclear how any given case would be decided if only pistol and not firearm were defined.

In *Rouse v. United States*, 391 A.2d 790, 791 (D.C. 1978), for example, a disassembled pistol consisting of a frame, cylinder, firing pin, and two rounds of ammunition that could be assembled and loaded in 15 seconds and successfully testfired was deemed to be fully operable. By contrast, in *Curtice v. United States*, 488 A.2d 917, 917-918 (D.C. 1985), a fully assembled pistol with a malfunctioning firing pin that required a drop of oil, the removal and replacement of a spring, and less than one minute to repair before it was successfully testfired was deemed to be inoperable. We should not even have the argument. For purposes of felon in possession, operability of a firearm

---

[4] The D.C. Circuit has found that 18 U.S.C. § 921(a)(3) – that is substantially the same as D.C. Code § 7-2501.01(9) – "includes 'inoperable weapons' within the definition of 'firearm.'" *United States v. Gwyn*, 481 F.3d 849, 855, 375 U.S. App. D.C. 353, 359 (2007). The issue was raised recently in Superior Court where a defendant moved to dismiss his case on the ground that operability is a required element of felon in possession. Following essentially the same reasoning as *Gwyn*, the court denied the motion. The court found further that, even if operability was required, there was sufficient circumstantial evidence to meet this burden..

should not be required.

CPWL is not the only firearms offense for which the Court has imposed an operability requirement. In connection with the offense of possessing a prohibited weapon, the Court held that "to prove that an item is a [sawed-off] shotgun within the meaning of § 22-3214(a), the government must prove it operable."[5] *Washington v. United States*, 498 A.2d 247, 249 (D.C. 1985). In so doing, the Court relied on dictionary meanings of shotgun, portions of the definition of "firearm" in what is now Title 7, and earlier decisions imposing an operability requirement for CPWL. Agreeing with the result, one judge observed that "[i]t would be a simple matter to amend D.C. Code § 22-3214(a) so as to deal with the question of operability; alternatively, the definitions of "sawed-off shotgun" and "machine gun" which already appear in D.C. Code § 22-3201 could be amended so as to include inoperable as well as operable weapons. I have no particular language in mind, but I am sure that those whose task it is to draft legislation can come up with something appropriate." *Id.* at 250 (Terry, J., concurring). Adding a definition of "firearm" to Section 4501 would be appropriate and would ensure that people who possess real sawed-off shot guns and machine guns that did not work at the moment could be successfully prosecuted under Section 22-4514.

Finally, there is no logical reason for the definitions of "pistol" and "firearm" to be inconsistent within Chapter 45 of Title 22 and between Title 22 and Title 7. The danger to the

---

[5] D.C. Official Code § 22-3214 was renumbered in the 2001 edition of the Code to § 22-4514. It reads: "No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slungshot, sand club, sandbag, switchblade knife, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms." An amendment to this section is currently pending before the Council to change "metal knuckles" to "wood, metal or plastic knuckles." Bill 17-673, Ban on Weaponized Knuckles Amendment Act of 2008.

-9-

public is no less if a person possesses a sawed-off shotgun with a malfunctioning firing pin than if s/he carries a pistol in the same condition. The danger to the public is no less if a convicted felon possesses a sawed-off shotgun than if s/he possesses a pistol. Inconsistencies would breed litigation with no benefit to public safety.

For absolute clarity, we recommend that the definition of firearm contain the phrase "whether operable or not," and that the same change be made in Section 7-2501.01(9). We also recommend that the word "repair" be added to both statutes. *See* proposed text below.

<u>"Antique firearms" should not be excluded from the definition of "firearm"</u>

Bill 17-593, like Section 7-2501.01(9), excludes "antique firearms" from the definition of firearm.[6] Antique firearms, however, should not be excluded from the definition of "firearm" in section 22-4501. Under D.C. Official Code § 22-4513, toy and antique pistols that are not suitable for use as firearms are excluded from Chapter 45 generally, except when they are used to commit armed crimes of violence and dangerous crimes (D.C. Official Code § 22-4502), or when they are possessed with the intent to use unlawfully (D.C. Official Code § 22-4514(b)). Both of these statutes prohibit the use of imitation firearms as well.

---

[6] "Antique firearm" is defined as:

"(A) Any firearm (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) manufactured in or before 1898; and

(B) Any replica of any firearm described in subparagraph (A) if such replica:

(i) Is not designed or redesigned for using rim-fire or conventional center-fire fixed ammunition; or

(ii) Uses rim-fire or conventional ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade."

D.C. Official Code § 7-2501.01.

-10-

The prevention of coercion is at the heart of enhancement provisions which include imitation weapons within their scope.... As noted in a House Report accompanying the 1970 amendment to the "while armed" statute, which added imitation weapons to the list of prohibited items:

> To the unknowing victim of rape or robbery, it is of little or no consequence that subsequent to the crime it is determined that the weapon used was an antique firearm, blank pistol, or toy rifle, or other imitation. At the time of the rape or robbery, the victim is justifiably put in fear of being shot or beaten with whatever weapon or imitation thereof is employed by his assailant.

H.R. Rep. No. 91-907, 91st Cong., 2nd Sess. § 205 (1970), *reprinted in Legislative History of the District of Columbia Court Reform and Criminal Procedure Act of 1970,* at 67-68 (1970).

*Strong v. United States*, 581 A.2d 383, 387 (D.C. 1990).

Excluding antique firearms from the definition of firearm (or pistol), would create a conflict between the definition of firearm in D.C. Official Code § 22-4501 and the language of D.C. Official Code § 22-4513 that could lead to confusion, if not unintended results. For example, could a person lawfully carry outside the home an antique pistol that was suitable for use as a firearm? If Section 22-4513 applied, s/he could not. But if an antique firearm is not a firearm, then arguably s/he could. Which provision would control?

If antique firearms are excluded from the definition of firearm, could a convicted felon lawfully possess an operable antique pistol under D.C. Official Code § 22-4503? If an antique firearm is not a firearm, then could an imitation antique firearm be an imitation firearm? If not, contrary to the reasoning above, could a person commit a crime of violence with an antique pistol or imitation thereof and escape the enhanced penalties that would otherwise apply? There should be no room for argument on these points. We do not believe that the Committee intended such results.

-11-

<u>Proposed amendment in the nature of a substitute</u>

For the reasons stated above, we recommend that Section 2(a) of Bill 17-593 be amended as follows:

(a) Section 1 (D.C. Official Code §22-4501) is amended to add a new paragraph (k) to read as follows:

**"(k) "Firearm, as used in this chapter, means any weapon, whether operable or inoperable, which will, or is designed or redesigned, made or remade, or may be readily converted, restored, or repaired, or is intended to, expel a projectile or projectiles by the action of an explosive, provided that the term does not include:**

**"(1) a destructive device as defined in D.C. Code § 7-2501.01(7);**

**"(2) a device used exclusively for line throwing, signaling or safety and required or recommended by the Coast Guard or Interstate Commerce Commission; or**

**"(3) a device used exclusively for firing explosive rivets, stud cartridges or similar industrial ammunition and incapable for use as a weapon."**

We also recommend that the Committee delete the current Section 2 (b) of Bill 17-593.[7] This language is not necessary if Section 2(a) is adopted since the government would no longer have to prove operability for any purpose and not just for a probable cause determination.

For the sake of clarity, and to avoid the argument that a person cannot be convicted under D.C. Code § 22-4504(b), which also includes imitation firearms within its scope, a new Section 2(b)

---

[7] "(3) For purposes of establishing probable cause or a substantial probability that a person has violated this subsection, it is not necessary for the government to prove that a pistol or firearm is operable."

should be inserted:

(b) Section 13 (D.C. Official Code §22-4513) is amended to read as follows:

"Except as provided in § 22-4502, **§ 22-4504(b),** and § 22-4514(b), this chapter shall

not apply to toy or antique pistols unsuitable for use as firearms."

Finally, a new Section 3 should be added for consistency between the definition in Title 22

and the definition in Title 7:

(3) The lead-in language in Section 101(9) of the Firearms Control Regulation Act

of 1975, approved September 24, 1975 (D.C. Law 1-85; D.C. Official Code § 7-

2501.01(9)) is amended to read as follows.

"Firearm, as used in this chapter, means any weapon, **whether operable or**

**inoperable**, which will, or is designed or redesigned, made or remade, or may be

readily converted, restored, or repaired, or is intended to, expel a projectile or

projectiles by the action of an explosive, provided that the term does not include:"

With the amendment in the nature of a substitute, the government would be required to prove that

the defendant carried a pistol, that he did so voluntarily and on purpose and not by mistake or

accident, and that pistol had a barrel length less than 12 inches, and that the pistol was a real firearm.

Operability would not be an element to be proven either at presentment or at trial. However, as has

been the practice of the Metropolitan Police Department, firearms would continue to be testfired and

the results entered into the ballistics data base. It would be done, however, after fingerprinting and

-13-

any other forensic tests were completed.[8]

We appreciate the opportunity to testify on this issue and would be pleased to answer any questions you may have.

---

[8] If operability is retained as an element of CPWL, and other offenses, that has to be proven at trial, whoever testfires the gun will be required to testify.

A BILL                                             5

<u>17-593</u>                                      6


IN THE COUNCIL OF THE DISTRICT OF COLUMBIA         7

———                                               8


To amend An Act To control the possession, sale, transfer and use of pistols and other dangerous   9
    weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence,   10
    and for other purposes to change the definitions for the terms firearm, machine gun,   11
    pistol, and sawed-off shotgun, to provide definitions for the terms shotgun and place of   12
    business, to make discharging a weapon without a permit from the Chief of Police a   13
    misdemeanor offense, to prohibit carrying rifles and shotguns in the District except in   14
    limited circumstances and to provide penalties for violations of the prohibition that are   15
    equivalent to those for unlawfully carrying a pistol, to allow for the transportation of   16
    firearms in limited circumstances, to repeal the authority of the Chief of Police to issue   17
    licenses for the carrying of pistols, and to change the waiting period for delivery of a   18
    purchased pistol from 2 to 10 days; and to provide a savings clause with regard to the   19
    revised definitions.   20

    BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this   21

act may be cited as the "Inoperable Pistol Amendment Act of 2008".   22

    Sec. 2. An Act To control the possession, sale, transfer and use of pistols and other   23

dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of   24

evidence, and for other purposes, approved July 8, 1932 (47 Stat. 650; D.C. Official Code § 22-   25

4501.01 *et seq.*), is amended as follows:   26

    (a) Section 1 (D.C. Official Code § 22-4501) is amended as follows:   27


1

(1) A new paragraph (2A) is added to read as follows: 1

"(2A) "Firearm" means any weapon, regardless of operability, which will, or is 2

designed or redesigned, made or remade, readily converted, restored, or repaired, or is intended 3

to, expel a projectile or projectiles by the action of an explosive. The term "firearm" shall not 4

include: 5

"(1) A destructive device as that term is defined in section 101(7) of the Firearms 6

Control Regulations Act of 1975, effective September 24, 1976 (D.C. Law 1-85; D.C. Official 7

Code § 7-2501.01(7)); 8

"(2) A device used exclusively for line throwing, signaling, or safety, and required 9

or recommended by the Coast Guard or Interstate Commerce Commission; or 10

"(3) A device used exclusively for firing explosive rivets, stud cartridges, or 11

similar industrial ammunition and incapable for use as a weapon.". 12

(2) Paragraph (4) is amended to read as follows: 13

"(4) "Machine gun" shall have the same meaning as provided in section 101(10) 14

of the Firearms Control Regulations Act of 1975, effective September 24, 1976 (D.C. Law 1-85; 15

D.C. Official Code § 7-2501.01(10)).". 16

(3) Paragraph (6) is amended to read as follows: 17

"(6) "Pistol" shall have the same meaning as provided in section 101(12) of the 18

Firearms Control Regulations Act of 1975, effective September 24, 1976 (D.C. Law 1-85; D.C. 19

Official Code § 7-2501.01(12)).". 20

(4) A new paragraph (6A) is added to read as follows: 21

"(6A) "Place of business" shall have the same meaning as provided in section 22

2

101(12A) of the Firearms Control Regulations Act of 1975, effective September 24, 1976 (D.C. 1

Law 1-85; D.C. Official Code § 7-2501.01(12A)).". 2

(5) Paragraph (6B) is added to read as follows: 3

"(6B) "Registrant" means a person who has registered the firearm pursuant to The 4

Firearms Control Regulations Act of 1975 (D.C. Official Code § 7-2501.01 *et seq.*). 5

(6) Paragraph (8) is amended to read as follows: 6

"(8) "Sawed-off shotgun" shall have the same meaning as provided in section 7

101(15) of the Firearms Control Regulations Act of 1975, effective September 24, 1976 (D.C. 8

Law 1-85; D.C. Official Code § 7-2501.01(15)).". 9

(7) A new paragraph (9A) is added to read as follows: 10

"(9A) "Shotgun" shall have the same meaning as provided in section 101(16) of 11

the Firearms Control Regulations Act of 1975, effective September 24, 1976 (D.C. Law 1-85; 12

D.C. Official Code § 7-2501.01(16)).". 13

(b) A new section 3a is added to read as follows: 14

" Sec. 3a. Unlawful discharge of a firearm. 15

"(a) Except as otherwise permitted by law, including legitimate self-defense, no firearm 16

shall be discharged or set off in the District of Columbia without a special written permit from 17

the Chief of Police issued pursuant to Section 1 of Article 9 of the Police Regulations of the 18

District of Columbia, effective September 29, 1964 (C.O. 64-1397F; 24 DCMR § 2300.1).". 19

(c) Section 4 (D.C. Official Code § 22-4504) is amended by adding a new subsection (a- 20

1) to read as follows: 21

"(a-1) Except as otherwise permitted by law, no person shall carry within the District of 22

3

Columbia a rifle or shotgun. A person who violates this subsection shall be subject to the 1

criminal penalties set forth in subsection (a)(1) and (2) of this section.". 2

(d) New sections 4a and 4b are added to read as follows: 3

"Sec. 4a. Authority to carry firearm in certain places and for certain purposes. 4

"Notwithstanding any other law, a person holding a valid registration for a firearm 5

may carry the firearm: 6

"(1) Within the registrant's home; 7

"(2) While it is being used for lawful recreational purposes; 8

"(3) While it is kept at the registrant's place of business; or 9

"(4) While it is being transported for a lawful purpose as expressly authorized by 10

District or federal statute and in accordance with the requirements of that statute. 11

"Sec. 4b. Lawful transportation of firearms. 12

"(a) Any person who is not otherwise prohibited by the law from transporting, shipping, 13

or receiving a firearm shall be permitted to transport a firearm for any lawful purpose from any 14

place where he may lawfully possess and carry the firearm to any other place where he may 15

lawfully possess and carry the firearm if, during transportation, the firearm is unloaded, and 16

neither the firearm nor any ammunition being transported is readily accessible or is directly 17

accessible from the passenger compartment of the transporting vehicle. 18

"(b) If the transporting vehicle does not have a compartment separate from the driver's 19

compartment, the firearm or ammunition shall be contained in a locked container other than the 20

glove compartment or console, and the firearm shall be unloaded. 21

"(c) If the transportation is in a manner other than in a vehicle, the firearm shall be: 22

4

"(1)  Unloaded;

"(2)  Inside a locked container; and

"(3)  Separate from any ammunition.

(e) Section 5(a) (D.C. Official Code § 22-4505(a)) is amended by striking the phrase "pistol unloaded and in a secure wrapper from" and inserting the phrase "pistol, transported in accordance with section 4b, from" in its place

(f) Section 6 (D.C. Official Code § 22-4506) is repealed.

(g) Section 8 (D.C. Official Code § 22-4508) is amended as follows;

(1) Strike the word "pistol" wherever it appears and insert the word "firearm" in its place.

(2) Strike the phrase "48 hours" and insert the phrase "10 days" in its place.

(3) Strike the phrase "shall be securely wrapped and shall be unloaded" and insert the phrase "shall be transported in accordance with section 4b" in its place.

(h) Section 13 (D.C. Official Code § 22-4513) is amended to read as follows:

"Except as provided in § 22-4502, § 22-4504(b), and § 22-4514(b), this chapter shall not apply to toy or antique pistols unsuitable for use as firearms."

Sec. 3. Savings clause.

Nothing in section 2 shall affect any action, proceeding, or prosecution commenced before September 16, 2008. Any such action, proceeding, or prosecution shall continue, or may be enforced, in the same manner and to the same extent as if the amendment made by that section had not been made.

Sec. 4. Fiscal impact statement.

5

The Council adopts the fiscal impact statement in the committee report as the fiscal    1

impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act,    2

approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)).    3

    Sec. 5. Effective date.    4

This act shall take effect following approval by the Mayor (or in the event of veto by the    5

Mayor, action by the Council to override the veto), a 60-day period of Congressional review as    6

provided in section 602(c)(2) of the District of Columbia Home Rule Act, approved December    7

24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(2)), and publication in the District of    8

Columbia Register.    9

6

# COUNCIL OF THE DISTRICT OF COLUMBIA
# COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY
## COMMITTEE REPORT
### 1350 Pennsylvania Ave, NW 20004

**TO:**   All Councilmembers

**FROM:**  Councilmember Phil Mendelson,
     Chairman, Committee on Public Safety and the Judiciary

**DATE:**  November 25, 2008

**SUBJECT:** Report on Bill 17-843, "Firearms Registration Amendment Act of 2008"

  The Committee on Public Safety and the Judiciary, to which Bill 17-843, the "Firearms Registration Amendment Act of 2008" (introduced as the Firearms Control Amendment Act of 2008) was referred, reports favorably thereon with amendments, and recommends approval by the Council.

## CONTENTS

| | | |
|---|---|---|
| I. | Background and Need | 1 |
| II. | Legislative Chronology | 10 |
| III. | Position of the Executive | 11 |
| IV. | Summary of Testimony | 11 |
| V. | Impact on Existing Law | 14 |
| VI. | Fiscal Impact | 14 |
| VII. | Section-by-Section Analysis | 14 |
| VIII. | Committee Action | 16 |
| IX. | Attachments | 16 |

## I.  BACKGROUND AND NEED

  Bill 17-843, the Firearms Registration Amendment Act of 2008, amends the District of Columbia Firearms Control Regulations Act of 1975, in light of the United States Supreme Court decision in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008).

### Heller case; Council emergency bills

  On June 26, 2008, the United States Supreme Court issued a 5-4 decision in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), which held that the Second Amendment guarantees an individual's right to possess a firearm for the lawful purpose of self-defense within the home. In *Heller*, the Court struck down two provisions of the District's Firearms Control Regulations Act of 1975 (1975 Act) as unconstitutional.[1] First, the Court overturned the District's total ban on handguns. Second, the Court found that the District's safe storage provision, requiring that all firearms including rifles and shotguns, be kept "unloaded and disassembled or bound by a trigger

---

[1] D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*

locks", is unconstitutional because it does not contain an explicit exception for self-defense. The Court stated: "[i]n sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."[2]

The Council acted swiftly in response to the *Heller* case by adopting the Firearms Control Emergency Amendment Act of 2008 (D.C. Act 17-422) on July 15th, which was signed into law by the Mayor on July 16th. D.C. Act 17-422 permitted the registration of pistols and explicitly allowed an immediate self-defense exception to the safe storage provision of the law.

However, another provision of the 1975 Act, which had not been challenged in *Heller* and which was not addressed by the Supreme court, effectively prohibited the registration of most semi-automatic pistols because the typical semi-automatic can be fitted with a large ammunition magazine (containing over 12 rounds) and thus is considered a machine gun as that term is defined in the 1975 Act. Pursuant to law, machine guns are prohibited weapons in the District of Columbia.

In order to address this concern, the Council passed a subsequent piece of emergency legislation, the Second Firearms Control Emergency Amendment Act of 2008 (D.C. Act 17-502) on September 16th, which was signed into law by the Mayor on the same day. D.C. Act 17-502 changed the definition of machine gun. This allowed for the registration of most semi-automatic handguns and rifles. D.C. Act 17-502 also clarified the law's safe storage provisions.

Although the District noted during litigation of the *Heller* case that there had never been any prosecutions under this provision, the Council believes that a safe storage requirement is an important statement of policy and direction consistent with accepted firearms training. The District was, and continues to be, concerned about a potential increase in accidental shootings in the home and wants laws that reflect standard gun safety practices. Best practices in other states are to impose penalties for the reckless storage of firearms when a minor accesses, or could access, the firearm. Given the lack of prosecution under the District's 1975 safe storage law, and the primary goal of reducing the likelihood of accidental shootings, the Council believes that the child access prevention ("CAP") law is the better approach.

D.C. Act 17-502 also prohibits large capacity ammunition feeding devices (such as a magazine or ammunition feed strip) similar to a provision in the now-lapsed federal assault weapons ban, so as to prevent the ability of an individual to fire a large quantity of ammunition without having to pause to reload. This change became necessary because the Council changed the definition of machine gun within the D.C. Official Code. D.C. Act 17-502 also limited the number of handguns any one individual may register at one time. Both Maryland and Virginia generally limit handgun purchases to one-per-30-days, per individual. The Council adopted similar language in D.C. Act 17-502.

---

[2] *District of Columbia v. Heller*, 128 S. Ct 2783, 2821-2822 (2008).

### Bill 17-843

The Committee held one hearing on gun control generally, and two public hearings on Bill 17-843 specifically, in order to receive as much public comment as possible in crafting this bill. The District shares the problem of gun violence with other dense, urban jurisdictions – a problem which is quite different than the experience in suburban and rural America. The District, however, has a unique distinction: as the nation's capital it hosts a large presence of government and diplomatic officials. The Committee is cognizant of its duty to give law enforcement every tool to protect all citizens from violence, but also to protect these officials from assassination. Cathy Lanier, Chief of the Metropolitan Police Department, testified to this fact before Congress on September 9, 2008.[3]

On the last page of its *Heller* opinion, the Supreme Court acknowledged "the problem of handgun violence in this country," and the Court noted that, "The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns."[4] Keeping this in mind, the Committee has kept most of the provisions from D.C. Act 17-502 intact, and has added several additional provisions. The primary provisions of Bill 17-843 are discussed below.

### *Registration*

There is no comprehensive federal system of firearm registration. Federal law prohibits the use of the National Instant Criminal Background Check System (NICS) to create any system for the registration of firearms or firearms owners.[5] Nationally, however, seven states and the District of Columbia require registration of some or all firearms. Nine states have statutes prohibiting them from maintaining a registry of firearms.[6] Hawaii and the District are the only states that require all firearms to be registered. However, many major cities, including Chicago, Cleveland, and New York, have a system of firearm registration.

The Committee believes that the District must maintain a strong firearms' registration law because it is part of a sound gun policy. Registration is critical because it: gives law enforcement essential information about firearm ownership, allows officers to determine in advance whether individuals involved in a call may have firearms, facilitates the return of lost or stolen firearms to their rightful owners,   assists law enforcement in determining whether

---

[3] Chief Lanier stated, "The terrorist attacks of September 11th, 2001, demonstrated something that we have known for some time: government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city in the United States. But in Washington, DC, the likelihood of attack is higher, and the challenges to protecting the city are greater. The District's high concentration of iconic structures—such as the national monuments, the White House, and, of course, the Capitol—make it a highly attractive target." Testimony of Cathy L. Lanier, *Hearing on the Impact of Proposed Legislation on the District of Columbia's Gun Laws*, United States House of Representatives , Committee on Oversight & Government Reform, Honorable Henry A. Waxman, Chair, September 9, 2008, Page 2.
[4] Id. at 2822.
[5] 28 C.F.R. § 25.9(b)(3).
[6] Legal Community Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State and Selected Local Gun Laws* (hereafter "LCAV") (2d ed. 2008) at 190.

registered owners are eligible to possess firearms or have fallen into a prohibited class, permits officers to charge individuals with a crime if an individual is in possession of an unregistered firearm, and permits officers to seize unregistered weapons.

Some critics of gun registration complain that only law abiding citizens comply. Let's assume arguendo that they are correct. Registration is enormously beneficial to law enforcement because it readily identifies criminals, and provides a means to readily arrest them. Registration also provides a means to enhance criminal penalties. For instance, police suspect gang activity, obtain a warrant, search a house, but find only unregistered weapons. Because of registration, the police can make an arrest. Or, police apprehend an armed-robbery suspect. Not only will he do time for the robbery, but he will do additional time because of the registration law. By separating the law abiding from the criminal, registration gives police additional law enforcement power.

Juliet Leftwich with the Legal Community Against Violence ("LCAV"), testified during the October 1, 2008 hearing that while the District has a good registration law in place, it needs to be strengthened. In LCAV's opinion, the most important way to strengthen the law would be to require that registration be renewed annually. The Committee believes that annual registration may be too burdensome for gun owners, and instead believes that registrants should attest to their address and possession of the firearms every three years. In addition, registrants should undergo a background check every six years. By having renewable registration of firearms, the District will be able to better track where firearms are located and allow MPD to have a better sense of whether a registered gun owner has become ineligible to own a firearm (e.g. due to a felony conviction or CPO in another state).

In developing this provision with the Executive, the Committee envisions that re-registration may be relatively easy. The attestation of address and firearms in possession could be done by mail or on-line. MPD should notify the applicant but, much like DMV, the burden is on the registrant to re-register regardless of notice. The sexennial background check would entail a fee (the FBI processing charge) but might be handled again by mail or on-line. The background check is critical, in our view, because it is more genuine than NICs check (the former being based on fingerprints, the latter based on identification card, which may be false).

*Safe Storage Law -- CAP*

As stated earlier, in D.C. Act 17-502, in order to ensure compliance with the ruling in *Heller*, the Council amended the District's safe storage provision. Bill 17-843 adopts the language of D.C. Act 17-502. The language is based on the CAP law in Connecticut. The provision states that a person may not keep or store a firearm on any premises they control if a minor can gain access to the firearm, unless the person keeps the firearm in a securely locked box, secured container, or in a location which a reasonable person would believe to be secure, or if the person carries the firearm on his person or within such close proximity that he can readily retrieve and use it as if he carried it on his person. The person faces civil and criminal penalties

if they fail to take these precautions and either a minor gains access to the firearm or injures themselves or others.[7]

Bill 17-843 makes two changes from the second emergency regarding the CAP provision. First, the provision applies to all firearms, not just loaded firearms. Second, it increases the age of the minor from under 16 to under 18 years of age. The Committee believes that the child access prevention provision is necessary and useful because the research shows that CAP laws are effective at reducing unintentional firearm deaths among children. LCAV testified before the Committee that the presence of unlocked guns in the home increases the risk of both accidental gun injuries and intentional shootings. They cited a study showing that more than 75% of the guns used in youth suicide attempts and unintentional injuries were stored in the residence of the victim, a relative, or a friend.[8] LCAV also found that in states where CAP laws had been in effect for at least one year, unintentional firearm deaths fell by 23% from 1990-94 among children under 15 years of age.[9] They also cite a 2005 study finding that the practice of keeping firearms locked and unloaded serves as a protective measure to reduce youth suicide and unintentional injury in homes with children and teenagers where guns are stored.[10]

While there are no CAP laws at the federal level, there are more than two dozen states that have enacted laws to keep guns out of the hands of children. The CAP laws throughout the country range from imposing criminal liability when a minor gains access to an improperly stored firearm, to merely prohibiting persons from directly providing a firearm to a minor. Fourteen states, including Maryland, California, Connecticut, and Texas, have CAP laws that impose criminal liability when a minor gains access to an improperly stored firearm. Additionally, fifteen states define the term 'minor' as someone under the age of 18. The Committee believes that the CAP law in Bill 17-843 is a sensible alternative to the problematic 1975 safe storage provision, and that it is vital in order to safeguard the lives of children.

*Ballistics and Microstamping*

All firearms leave unique markings on the bullets and shell casings they fire. Ballistic identification laws enable law enforcement to link bullets and shell casings recovered at crime scenes to the firearm that fired them by test firing the firearm. During the October 1st hearing, Josh Horwitz, Executive Director of the Educational Fund to Stop Gun Violence ("Ed Fund"), testified on ballistics identification – specifically on a technology called "microstamping." Microstamping can identify the serial number of a firearm directly from an expended cartridge case found at a crime scene. It utilizes laser technology to engrave microscopic markings (in the form of alpha and geometric codes) on the internal parts of a firearm, e.g. the breech face and the tip of the firing pin. When the firearm is fired, the markings are stamped onto the cartridge.

---

[7] The Committee Print retains language originally from the 1975 Act as a statement of policy – that it is the policy of the District that all firearms, regardless of child access, should be stored unloaded and either disassembled or secured – but no criminal penalty attaches to this and it uses the word "should."

[8] Juliet Leftwich, Legal Community Against Violence, *Testimony on Bill 17-843, Firearms Control Amendment Act of 2008*, October 1, 2008, at 6.

[9] *LCAV*, (2d ed. 2008), at 233.

[10] *Id.*

According to the Ed Fund, microstamping is superior to traditional methods of ballistic identification because the markings are intentionally stamped onto the cartridge, versus relying on unintentional markings. The markings identifying important information about the firearm, such as make, model, and serial number of the weapon.[11] The goal of microstamping is to identify a firearm the first time it is used to commit a crime.[12] On October 13, 2007, California became the first state mandating the microstamping of all new models of semiautomatic handgun models sold in the state beginning in 2010. The legislation was supported by 65 police chiefs throughout California.

Traditional methods of ballistic identification involve focusing on the tool marks on the interior surface of a firearm that are transferred from the firearm to an expended cartridge when the firearm is fired. These unintentional marks are a product of the manufacturing process. For decades, ballistic identification has relied on highly trained firearm examiners to analyze the marks by hand to make matches between a cartridge and a recovered firearm. Around 10 years ago the federal government created the national Integrated Ballistic Information Network (NIBIN) program to allow for computer-assisted searches of digital images of cartridges found at crime scenes. According to the Ed Fund, the problem with NIBIN is that it "relies on the same unintentional markings used by firearm examiners and cannot lead investigators directly to a specific firearm and its serial number, unless that weapon is eventually recovered."[13] Unless a weapon has been used before in a crime, and recovered, and therefore entered into NIBIN, law enforcement will learn relatively little from a newly-recovered shell casing. With microstamping, however, law enforcement will almost immediately know the precise gun and its purchaser from the newly recovered shell casing, if from a semiautomatic pistol, even if never before used in a crime, and even if never having been entered into NIBIN.

This problem is highlighted by what has occurred in the State of Maryland over the past eight years. Maryland created the Maryland Integrated Ballistics Identification System ("MD-IBIS") program in 2000, at a cumulative cost of $2.5 million. A September 2004 report by the Maryland State Police Forensic Science Division found that "[c]ontinuing problems include the failure of the MD-IBIS to provide any meaningful hits. There have been no crime investigations that have been enhanced or expedited through the use of MD-IBIS...It is recommended that this Program be suspended..."[14]

Despite the results in Maryland, MPD insists that a DC-IBIS will work better. At the October 1st hearing, Chief Lanier testified that she believes that the District will have better success than Maryland because MPD would use trained firearms examiners (unlike what occurred in Maryland) and since MPD is test-firing all weapons to retrieve ballistics, the District would not have the problem of dealers not submitting authentic casings (as was the case in Maryland). In addition, Chief Lanier testified that the District would have better representation of crime scene evidence than either Maryland or New York because local jurisdictions process

---

[11] Testimony of Joshua Horwitz, Executive Director, Educational Fund to Stop Gun Violence, *Public Hearing on Bill 17-843, Firearms Control Amendment Act of 2008*, October 1, 2008, at 2.
[12] *Id.*
[13] *Id* at 1.
[14] Maryland State Police, Forensic Science Division, *MD-IBIS Progress Report*, September 2004.

most crime scenes. Chief Lanier stated that because MPD would be tracking both registered guns and crime scene evidence, there will be increased probability of a hit. Additionally, microstamping is not as useful for revolvers (since rarely are revolver shell casings left at a crime scene), and microstamping will apply only to newly manufactured pistols. For the reasons articulated by Chief Lanier during the hearing, the Committee has decided to retain the emergency acts' requirement that MPD conduct ballistic identification as part of the registration process for all handguns.

## *Assault Weapons*

The proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of the District. Assault weapons are military-style weapons of war, made for offensive military use. The Committee concurs with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives' (ATF) description of assault weapons as "mass produced mayhem,"[15] and ATF's finding that assault weapons are disproportionately likely to be used by criminals. The Committee also agrees with ATF that assault weapons "are not generally recognized as particularly suitable or readily adaptable to sporting purposes" under the test established by the federal Gun Control Act of 1968.[16] Assault weapons have no legitimate use as self-defense weapons, and would in fact increase the danger to law-abiding users and innocent bystanders if kept in the home or used in self-defense situations.

As stated in the above paragraph, assault weapons are military-style weapons made for offensive military use. They are designed with military features to allow rapid and accurate spray firing. They are not designed for sport, but to kill people quickly and efficiently. Assault weapons also have features such as pistol grips and the ability to accept a detachable magazine. Pistol grips help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position. Assault weapons are generally equipped with large-capacity ammunition magazines that allow the shooter to fire many more rounds than conventional firearms. In addition, features such as barrel shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession.

During the Committee's October 1, 2008 hearing, Brian Siebel, Senior Attorney with the Brady Center to Prevent Gun Violence testified on behalf of the Brady Center on the need for an assault weapons ban. The Brady Center testified that law enforcement officers are at particular risk from assault weapons due to their high firepower – which often times leaves officers outgunned by criminals. They cited several high-profile shootings involving law enforcement against criminals with assault weapons – including a 1994 incident at MPD headquarters that left one MPD officer and two FBI agents dead and another FBI agent seriously wounded.[17] The Brady Center further testified that assault weapons pose a risk to civilians and homeland security – the latter being a problem that is unique to the District, since it is the nation's capital. Assault weapons are preferred by terrorists, and would pose extraordinary risks to citizens, government

---

[15] ATF, *Assault Weapons Profile* 19 (1994).
[16] *Id.* at 20.
[17] Testimony of Brian J. Siebel, Senior Attorney, Brady Center to Prevent Gun Violence, *Bill 17-843*, October 1, 2008 at 3.

officials, visiting dignitaries, and law enforcement if they were allowed in the District of Columbia.

Further, the proliferation and use of .50 BMG rifles, as defined in Bill 17-843, poses a clear and present terrorist threat to the health, safety, and security of all residents of, and visitors to, the District, based upon findings that those firearms have such a high capacity for long distance and highly destructive firepower that they pose an unacceptable risk of death and serious injury of human beings, destruction or serious damage of vital public and private buildings, civilian, police, government and military vehicles, power generation and transmission facilities and transportation infrastructure. The Committee also finds that these weapons are particularly dangerous and have no legitimate use for self-defense.

Seven states currently ban assault weapons – California, New Jersey, Hawaii, Connecticut, Maryland, Massachusetts, and New York. California expanded its ban in 2000 to include all semiautomatic rifles or pistols that have the ability to accept a detachable magazine and contain one of a series of military-style features. The Committee has adopted the California language in Bill 17-843.

In adding an assault weapons ban to Bill 17-843, the Committee believes that it has not impinged on the Constitutional rights of law-abiding citizens of the District of Columbia to own and use legitimate self-defense firearms within the home. The Committee finds that assault weapons and .50 BMG rifles are a minute fraction of the firearms available in the United States, they have never been in common use, they are dangerous and unusual, and they pose an especial problem for public safety in the nation's capital.

### Unsafe Pistols

During the October 1, 2008 hearing on Bill 17-843, Daniel Webster, Co-Director of the Johns Hopkins Center for Gun Policy and Research, testified on numerous aspects of firearms laws. Mr. Webster suggested the Committee prohibit "unsafe handguns." These are a category of handguns characterized by their very small size, concealability, and poor construction, e.g. "saturday night specials." Unsafe handguns are more prone to accidental discharge, lack safety devices to prevent unintended discharge, misfire, and are prone to firing when dropped. In addition, these types of guns are disproportionately favored by criminals (because of their cheapness and concealability), and are less accurate and less reliable for self defense. Mr. Webster also testified that five states, including Maryland, have banned these unsafe guns. He stated that his research on Maryland's ban on these guns shows that the law was associated with 40 fewer homicides per year during the first 9 years the law was in place.

California has enacted a comprehensive scheme to identify and test handguns to ensure that they meet minimum standards for safety. Testing includes: identification of safety devices, a firing requirement to assess the propensity for misfiring, and a drop test to assess the propensity to fire when dropped. Pursuant to California Penal Code section 12131, the California Department of Justice developed and updates a roster of approved firearms that may lawfully be sold in California because they have met all standards to determine that they are not unsafe

handguns. The Committee has added a provision in Bill 17-843 that states that no handgun that is not on the California Roster of Approved Firearms as of January 1, 2009, may be manufactured, sold, given, loaned, exposed for sale, transferred, or imported into the District of Columbia. In addition to incorporating the current California roster, the Committee Print authorizes the Chief of Police to continually update the roster through rulemaking.

*Other Provisions*

In addition to the above mentioned provisions, Bill 17-843 also includes provisions dealing with a number of other public safety issues. Some of the more significant of these are discussed below. See the section-by-section analysis for others.

Bill 17-843 would make permanent revisions made in the Second Emergency (D.C. Act 17-502) permitting the registration of semiautomatic pistols. The 1975 law defined "machine gun" by capacity (over 12 rounds) rather than action (automatic v. semiautomatic). Thus, "machine gun" included almost all semiautomatic weapons because they are capable of taking (although not originally sold with) extended magazines. To fix this problem, since semiautomatic pistols are a common and popular weapon, Bill 17-843 redefines "machine gun." To deal with the capacity issue, the bill prohibits large capacity magazines ("large capacity ammunition feeding devices"), borrowing language from the now-lapsed federal assault weapons ban and current California law. Although the Committee heard testimony that magazine capacity of up to 20 rounds is not uncommon and "reasonable," and that an expert could reload 10 round clips within "seconds," the Committee agrees with the Chief of Police that the 2 or 3 second pause to reload can be of critical benefit to law enforcement, and that magazines holdings over 10 rounds are more about firepower than self-defense. Limiting fire power and desiring to advantage the police, especially given homeland security issues in the District, the Committee recommends the ban on extended clips.

The committee print also updates the law regarding disqualifications to registration. In the 1975 act, the Council prohibited felons and mentally ill, for instance, from being allowed to register a firearm. Bill 17-843 adds to the disqualifications being convicted of an intrafamily offense. Research shows there is a higher incidence of gun violence by perpetrators of domestic violence. Similarly, being the respondent to a civil protection order correlates to domestic violence (and higher risk for gun violence). In this regard the bill tracks federal law with some modifications. The bill also specifies that "mental disorder" (not just commitment) is a disqualification. The Committee makes these changes because it believes a more effective approach to controlling gun violence in lieu of complete prohibition, post-Heller, is to disqualify individuals at higher risk of misusing a firearm (e.g. in suicide, or rage).

The committee print retains authorization, first enacted in D.C. Act 17-422, for the Chief of Police to set a fee for conducting ballistic identification procedures. The Committee is concerned that the total cost to register a firearm not be unduly burdensome, and it is expected that the aggregate cost will be close to $100. But there is a cost for fingerprinting, the ballistic test, processing, and to maintain a database. The print uses the phrase "reasonable fees" to emphasize that the government must hold down the cost to the private citizen.

The committee print also retains, from the second emergency, the one-gun-per-month registration provision. Studies show that laws restricting multiple purchases or sales of firearms are designed to reduce the number of guns entering the illegal market and to stem the flow of firearms between states. Jurisdictions with weaker firearms laws may attract gun traffickers who make multiple purchases and resell the guns in jurisdictions with stronger firearms laws. Studies also show that handguns sold in multiple sales to the same individual purchaser are frequently used in crime. Three states, California, Maryland, and Virginia, have laws limiting firearm purchases or sales to one per month.

*Conclusion*

The Committee believes that the above stated provisions in Bill 17-843 comply with the United States Supreme Court's decision in *District of Columbia v. Heller,* while at the same time allow the District to protect its citizens and maximize public safety with reasonable and sensible gun policy. The Committee recommends approval of Bill 17-843, the "Firearms Control Amendment Act of 2008" as amended.

## II.    LEGISLATIVE CHRONOLOGY

| | |
|---|---|
| June 26, 2008 | United States Supreme Court decides *District of Columbia v. Heller.* |
| July 1, 2008 | Bill 17-843, the "Firearms Control Amendment Act of 2008 is introduced by Councilmember Mendelson, and is co-introduced by Chairman Gray and Councilmembers Alexander, Barry, Bowser, Brown, Catania, Cheh, Evans, Graham, Schwartz, Thomas, and Wells. |
| July 2, 2008 | Committee holds public oversight hearing on "The United States Supreme Court's decision in *District of Columbia v. Heller.*" |
| July 11, 2008 | Notice of Intent to Act on Bill 17-843 is published in the *D.C. Register.* |
| July 15, 2008 | Council unanimously adopts D.C. Act 17-422, the "Firearms Control Emergency Amendment Act of 2008." |
| August 1, 2008 | Notice of Public Hearing is published in the *D.C. Register.* |
| August 22, 2008 | Notice of a Second Public Hearing is published in the *D.C. Register.* |
| September 16, 2008 | Council unanimously adopts D.C. Act 17-502, the "Second Firearms Control Emergency Amendment Act of 2008." |
| September 18, 2008 | The Committee on Public Safety and the Judiciary holds a public hearing on Bill 17-843. |

| October 1, 2008 | The Committee on Public Safety and the Judiciary holds a second public hearing on Bill 17-843. |
| October 7, 2008 | Council unanimously adopts (on final reading) D.C. Act 17-536, the "Firearms Control Temporary Amendment Act of 2008." |
| November 25, 2008 | The Committee on Public Safety and the Judiciary marks-up Bill 17-843. |

### III.     POSITION OF THE EXECUTIVE

Peter Nickles, Attorney General for the District of Columbia, and Cathy Lanier, Chief of Police of the Metropolitan Police Department, testified on behalf of the Executive. The Executive supports Bill 17-843, as amended.

### IV.     SUMMARY OF TESTIMONY

The Committee on Public Safety and the Judiciary held two public hearings on Bill 17-843. The first hearing was on Thursday, September 18, 2008 and the second hearing was on Wednesday, October 1, 2008. The testimony summarized below is from both hearings. In addition, the Committee received several written statements from individuals and organizations unable to testify during the September 18th hearing. These statements are summarized below and as well.

*September 18, 2008*

***David White, Public Witness***, testified that he supports less restrictive gun laws so that he can better protect himself and his family. He stated that he was pleased with the steps the Council had taken so far.

***Dick Anthony Heller, Public Witness***, testified that he supports less restrictive gun laws because criminals don't follow laws, and since terrorists have weapons, citizens should have them as well in order to defend themselves.

***Ron Moten, Co-Founder, Peaceoholics***, testified in support of stricter gun laws. Mr. Moten stated that he is in favor of stricter penalties for persons who sell guns to children.

***Dane vonBreichenruchardt, President, U.S. Bill of Rights Foundation***, testified in support of less restrictive gun laws. Mr. vonBreichenruchardt stated that his views are similar to Mr. Heller and that he wants the Council to obey the U.S. Supreme Court's decision in the *Heller* case.

***Robert Moore, Public Witness***, testified that he wanted to see the process to register long-arms made more convenient or abolished.

*Tim Little, Public Witness*, testified as to the problems he encountered with the registration process and urged MPD to consider a streamlined process. He also stated that he supports the actions the Council has taken to comply with *Heller*, especially the child access prevention provision.

*Deborah Jane Anderson, Public Witness*, testified that she supports less restrictive gun laws. Ms. Anderson stated that she has been a crime victim more than once, and for that reason wants the Council to pass gun laws that would allow all persons the right to carry their guns outside of the home.

*Mark Anderson, Public Witness*, testified that he supports less restrictive gun laws. Mr. Anderson stated that the Council should not make gun ownership overly inconvenient and expensive, and that safe storage provisions can not be adequately addressed through legislation.

*Amy McVey, Co-Founder and President, CapitalGunOwners.org*, testified that gun ownership does not make one a criminal, and that she supports less restrictive gun laws. Specifically, Ms McVey stated that she wants the law changed to allow open carry, and that she would like the firearm registration process streamlined.

*George Lyon, Co-Founder, CapitalGunOwners.org*, testified that he had a number of suggestions for the permanent legislation, including repealing the prohibition on defensive use of firearms by citizens, adopting gun safety programs for the public schools, adopting a nondiscretionary provision for licensing persons to carry handguns, streamlining the gun registration process, and repealing the limitation on non-lethal weapons.

*Paula Miller, CapitalGunOwners.org*, testified in support of less restrictive gun laws.

*Gillian St. Lawrence, CapitalGunOwners.org*, testified that she supports the Council's efforts to allow the registration of semiautomatic handguns, but that she would like to see other changes made to the law, namely streamlining the gun registration process.

*Ricardo Royal, National President, Community Association for Firearms Education*, testified the Committee should amend the law so that the District's transportation laws are in line with federal standards, and that the law should be strengthened regarding training requirements.

*J. Bradley Jansen, Director, Center for Financial Privacy and Human Rights*, testified that the Council must approach the gun control question as it would the rest of the enumerated rights, such as the right to freedom of speech, assembly, association, etc. He stated that failure to act appropriately may jeopardize home rule for the District.

*Richard Gardner, Attorney for Mr. Heller*, testified that he supports less restrictive gun laws and that the Council should fully comply with the *Heller* decision.

*Janae Grant, ANC Commissioner, 5A11*, submitted a written statement in general support of Bill 17-843. Ms. Grant suggested lengthen the number of days before a registrant can

register additional firearms, from 30 days to 90 days. She also supports ballistic testing, the safe storage provision, and training requirements.

*Alex Sutono*, submitted a written statement in support of allowing semiautomatic handguns to be registered in the District.

*Lee Foulton*, submitted a written statement in support of revising Bill 17-843 to permit the sale or transfer of Curio and Relic firearms.

*Jake McGuigan, Director of Government Relations, National Shooting Sports Foundation, Inc.*, submitted several statements and information papers. The National Shooting Sports Foundation does not support ballistic testing, microstamping, or one-gun-per-month laws.

*October 1, 2008*

*Joshua Horwitz, Executive Director, Educational Fund to Stop Gun Violence*, testified in support of Bill 17-843, with amendments. Specifically, Mr. Horwitz testified to the benefits of microstamping and why it augments traditional methods of ballistic identification. Mr. Horwitz stated that microstamping enhances traditional methods of ballistic identification because the intentional markings are designed to be stable and easily extractable.

*Juliet Leftwich, Legal Director, Legal Community Against Violence*, testified in support of Bill 17-843, with amendments. Ms. Leftwich testified on the benefits of registering firearms, licensing of gun owners, firearms safety training, better regulation of firearms dealers, safe storage – specifically child access prevention laws, and waiting periods. Ms. Leftwich suggested that the Committee amend Bill 17-843 so that the CAP provision applies to children under the age of 18, versus under the age of 16, as is in the emergency and temporary legislation.

*Brian Siebel, Senior Attorney, Brady Campaign to Prevent Gun Violence*, testified in support of Bill 17-843, with amendments. Mr. Siebel testified on the dangerousness of assault weapons, specifically how these weapons pose a threat to citizens, law enforcement, and homeland security. He also testified on the need to ban the .50 caliber BMG sniper rifle because of the huge risk this weapon poses to public safety.

*Daniel Webster, Co-Director, Johns Hopkins Center for Gun Policy and Research*, testified in support of Bill 17-843, with amendments. Mr. Webster testified that the Committee should amend Bill 17-843 to prohibit domestic violence offenders from being able to possess firearms, and that the bill should prohibit "junk guns" – such as Saturday night specials – because of the unique danger such weapons pose to the public.

*Peter Nickles, Acting Attorney General, District of Columbia*, testified in support of Bill 17-843, with amendments. Mr. Nickles testified that Bill 17-843 be amended to: (1) align the District's transportation laws with federal standards; (2) provide for the revocation of firearms registrations for all person subject to a CPO; (3) clarify that public and private property owners in the District have the authority to prohibit the possession of firearms on their property; (4)

extend the provisions of the CAP law to other classes of individuals; and (5) strengthen penalties for possessing unlawful ammunition and illegally possessing firearms outside of a person's home.

**Cathy Lanier, Chief of Police, Metropolitan Police Department,** testified in support of Bill 17-843, with amendments. Chief Lanier testified that she believes that MPD should continue to perform ballistic testing on registered firearms, and that the CAP laws should be reinforced with an educational component. Further, Chief Lanier testified that the registration process for firearms is vital and enhances public safety, and that there would be real public safety benefits to requiring firearms to be re-registered.

## V.    IMPACT ON EXISTING LAW

Bill 17-843 would amend the Firearms Control Regulations Act of 1975 effective September 24, 1976 (D.C. Law 1-85; D.C. Official Code § 7-2501.01, *et seq.*) In understanding legislative intent, it is important to read as well this Committee's report on Bill 17-593, the "Inoperable Pistol Amendment Act of 2008." Bill 17-593 is being recommended together with Bill 17-843, both dealing with the regulation of firearms in the District.

## VI.    FISCAL IMPACT

The Committee has requested a Fiscal Impact Statement from the Chief Financial Officer. Attached, however, is the CFO's fiscal impact statement on the Second Firearms Control Emergency Amendment Act -- an emergency version of Bill 17-843. The Committee believes that funds are sufficient in the FY 2009 budget and the proposed FY 2010 through FY 2013 budget and financial plan to implement Bill 17-843.

## VII.    SECTION-BY-SECTION ANALYSIS

Section 1    states the short title of Bill 17-843.

Section 2    (a) amends definitions.
(1) Revises "firearm"; see Bill 17-593.
(2) Adds "intrafamily offense."
(3) Revises "machine gun."
(4) Revises "pistol" consistent with the Committee's work on Bill 17-593.
(5) Revises "shotgun" to allow the same barrel length (18 inches) as permitted under federal law. By requiring a 20 inch barrel, the District has been out of step with common practice.
(6) Adds "assault weapon," "magazine," "capacity," ".50 BMG rifle," and ".50 BMG Cartridge."

(b)(1) Revises transport requirements to be consistent with the provisions in D.C. Code Title 22, Chapter 45.

(2) Adds provision allowing temporary possession within a home by another person, for immediate self-defense, if the other person within the home is not otherwise prohibited from possessing firearms. The reason for this provision is to allow a person within the home, who is not the registrant of the firearm, to use the firearm for self-defense.

(c) Revises 7-2502.02 to permit the registration of handguns, pursuant to Heller, and to prohibit the registration of unsafe firearms, assault weapons, and .50 BMG rifles.

(d)(1) Changes from 5 years to 10 years the prohibition on registration of firearms various prohibited classes of persons, and adds persons convicted of "intrafamily offense" being prohibited from registering firearms. Adds mental disorder within immediately preceding 5 years as a disqualification to registration. Revises test applicants must take to emphasize familiarity with use, handling, and storage. Adds as a disqualifier to registration/possession the registrant having been the subject of a CPO.

(2) Requires Chief of Police to conduct a ballistics test for each pistol being registered, limits registration to one pistol per registrant per 30 day period, and authorizes the Chief to establish a reasonable fee.

(e)(1) The Chief may require any person applying for a registration certificate to be fingerprinted if, in his judgment, this is necessary to conduct an efficient and adequate investigation into the matters described in § 7-2502.03. Any person who has been fingerprinted by the Chief within 6 years (changing from 5 years) prior to submitting the application need not, in the Chief's discretion, be fingerprinted again if he offers other satisfactory proof of identity.

(2) Revises transport requirements to be consistent with the provisions in § 22-4501 et seq.

(f) Authorizes the Chief to offer a discount on registration fees of up to 50% for any registrant who has completed a course in firearms safety and proficiency. The Committee wants the public policy to encourage gun owners to be knowledgeable in firearms safety and proficient in their use. Thus, an earlier subsection ((d)(1)) revises the emphasis of the registration test, and this subsection allows a small financial incentive for greater training.

(g) Provides for re-registration, by requiring that registration certificates expire three years from the date of issuance. Although MPD shall mail renewal notices to registrants, the requirement is analogous to motor vehicle registration: the duty to renew is solely on the registrant regardless of what MPD or the U.S. Mail does. This subsection also requires that all existing registrations (pre-Heller) be re-registered within three years. In this way, the MPD shall have on up-to-date registration database.

(h) This subsection amends the existing law to establish a two-tier system of penalties for failure to report a change of address or a lost, missing, or stolen firearm. The first offense is a civil fine of $500. The second offense shall result in revocation of the registration.

(i) Requires microstamping on all semiautomatic pistols sold after December 31, 2010.

(j) Prohibits unsafe firearms (a defined term) from being brought into the District or registered after December 31, 2008. A felony penalty attaches to this provision.

(k) Prohibits possession of large capacity ammunition feeding devices.

(l) Revises the safe storage requirement to be a child access prevention law, consistent with many other states. A felony penalty attaches is violation leads to injury or death.

(m) Codifies right of the District government and private property owners to prohibit or restrict the possession of firearms on their property. Although there are few instances where this issue could arise, given the restrictions on carrying firearms in Title 22 as amended, on situation could be a residential landlord who does not want his tenants carrying firearms within their apartments.

(n) Amends D.C. Code § 7-2551.01 to conform the definition of "assault weapon" to the new definition in § 7-2501.01.

Section 3    Savings clause.

Section 4    Fiscal impact statement.

Section 5    Effective date.

## VIII.  COMMITTEE ACTION

On November 25, 2008, the Committee on Public Safety and the Judiciary met to consider Bill 17-843, the "Firearms Registration Amendment Act of 2008." The meeting was called to order at 10:50 a.m., and Bill 17-843 was number seven on the agenda. After ascertaining a quorum (Chairman Mendelson and Councilmembers Alexander, Bowser, Cheh, and Evans present), he moved the print with leave for technical changes. During the opportunity for discussion, Councilmember Cheh raised concerns with provisions dealing with public and private property owners, training, reporting lost or stolen firearms, and persons with mental illness being prohibited from registering. Chairman Mendelson agreed to work with Councilmember Cheh on amendments to the print for first reading. After the opportunity for discussion, the vote on the print was unanimous (Chairman Mendelson and Councilmembers Alexander, Bowser, Cheh, and Evans voting aye). He then moved the report with leave for staff to make technical and editorial changes. After opportunity for discussion, the vote was unanimous (Chairman Mendelson and Councilmembers Alexander, Bowser, Cheh, and Evans voting aye). The meeting adjourned at 11:53 a.m.

## IX.    ATTACHMENTS

1.    Bill 17-843 as introduced.
2.    Selected testimony and comments.

3.  Fiscal Impact Statement for Second Emergency.
4.  Committee Print for Bill 17-843.

**Memorandum**

To:        Members of the Council

From:    Cynthia Brock-Smith, Secretary to the Council

Date:     July 7, 2008

Subject:  Referral of Proposed Legislation

Notice is given that the attached proposed legislation was introduced in the Legislative Meeting on Tuesday, July 01, 2008. Copies are available in Room 10, the Legislative Services Division.

TITLE: "Firearms Control Amendment Act of 2008", B17-0843

INTRODUCED BY:  Councilmembers Mendelson, Evans, Schwartz, Catania, Brown, Graham, Cheh, Thomas, Wells, Barry, Bowser, Alexander and Chairman Gray

The Chairman is referring this legislation to the Committee on Public Safety and the Judiciary.

Attachment

cc: General Counsel
      Budget Director
      Legislative Services

Councilmember Phil Mendelson

Councilmember Carol Schwartz

Councilmember Yvette Alexander

Chairman Muriel Bowser

Councilmember Jack Evans

Councilmember Mary Cheh

Councilmember Tommy Wells

Chairman Vincent C. Gray                          1
                                                  2
Chairman Jim Graham                               3
                                                  4
Councilmember Marion Barry                        5
                                                  6
                                                  7
Councilmember Kwame Brown                         8
                                                  9
Councilmember Harry Thomas, Jr.                  10
                                                 11
Councilmember David Catania                      12
                                                 13
                                                 14
                                                 15
                         A BILL                  16

                                                 17

         IN THE COUNCIL OF THE DISTRICT OF COLUMBIA      18
                                                 19
                                                 20

        Chairman Vincent Gray, Councilmembers Phil Mendelson, Carol Schwartz,  Jim Graham    21
Yvette Alexander Marion Barry, Muriel Bowser, Jack Evans, Harry Thomas, Jr., Mary Cheh, and  22
David Catania introduced the following bill, which was referred to the Committee on          23
_____.                                    24

To amend the Firearms Control Regulations Act of 1975 to repeal the prohibition on the       25
        registration of pistols, to require a ballistics record for each registered pistol, to require a   26
        waiting period when registering a firearm, and  to establish a self-defense exception to the   27
        requirement for safe storage of firearms in the home.      28

        BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, that this    29

Act may be cited as the "Firearms Control Amendment Act of 2008".      30

                             1

Section 2.  The Firearms Control Regulations Act of 1975, effective September 24, 1976

(D.C. Law 1-85; D.C. Official Code § 7-2501.01, *et seq.*) is amended as follows:

(a) Section 202 (D.C. Official Code § 7-2502.02) is amended as follows:

(1) Subsection (a)(4) is repealed; and

(2) Subsection (b) is repealed.

(b) A new section 203a is added to read as follows:

"203a.  Ballistics Record.

"For each pistol subject to an application for a registration certificate the

Chief shall obtain an accurate ballistics print.".

(c) Section 206(a) (D.C. Official Code § 7-2502.06(a)) is amended to read as

follows:

"(a) An application for a registration certificate shall be filed, and a

registration certificate issued, prior to a person or organization having possession of the firearm

in the District.  The Chief may authorize possession of a firearm without a registration certificate

having been issued only if an application for a registration certificate has been filed and such

other requirements have been met as the Chief prescribes by regulation.".

(d) Section 702 (D.C. Official Code § 7-2507.02) is amended to read as follows:

"Sec. 702.  Except for law enforcement personnel described in section

201(b)(1), each registrant shall keep any firearm in his or her possession unloaded and either

disassembled or bound by a trigger lock or similar device unless such firearm is kept at his or her

place of business, or while being used for lawful recreational purposes within the District of

Columbia, or for the purpose of immediate self-defense in his or her home.".

2

Sec. 3. Fiscal Impact Statement. 1

The Council adopts the fiscal impact statement in the committee report as the fiscal 2

impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, 3

approved December 24, 1974 (87 Stat. 813, D.C. Official Code § 1-206(02(c)(3))). 4

Section 4. Effective Date. 5

This Act shall take effect following approval by the Mayor (or in the event of veto by the 6

Mayor, action by the Council to override the veto), a 30-day period of Congressional review as 7

provided in section 602(c)(2) of the District of Columbia Home Rule Act, approved December 8

24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(2)), and publication in the District of 9

Columbia Register. 10

3



educational fund to

# STOPGUNVIOLENCE

*imagine a future free from gun violence*

Testimony of
## Joshua Horwitz
Executive Director

## *Public Hearing on the*
## *"Firearms Control Amendment Act of 2008"*

Committee on Public Safety and the Judiciary
Council of the District of Columbia

October 1, 2008

John A. Wilson Building
1350 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Good morning, Chairman Mendelson and members of the Committee on Public Safety and the Judiciary. I appreciate this opportunity to speak to you today on the critical issue of firearm laws in the District of Columbia.

My name is Joshua Horwitz and I am the Executive Director of the Educational Fund to Stop Gun Violence (Ed Fund). The Ed Fund is a national non-profit organization in Washington, D.C., that seeks to secure freedom from gun violence through research, strategic engagement and effective policy advocacy.

I would like to focus my remarks today on the topic of comprehensive ballistics identification—specifically on a technology called "microstamping." We recommend that the District of Columbia require all new semiautomatic pistols sold in the city to be microstamped starting in 2011. This would assist law enforcement in identifying gun traffickers, discourage straw purchasers, and help solve gun crimes. Equally important, microstamping is an inexpensive technology that requires no new databases and produces no burden for law-abiding gun owners. The technology is utilized only when a gun is used in a crime.

Currently deployed ballistics technology focuses on the tool marks on the interior surface of a firearm that are transferred from the firearm to an expended cartridge during the firing process. These unintentional tool marks are a by-product of the manufacturing process. For over 100 years, highly trained firearm examiners examined these marks by hand to make matches between a cartridge(s) found at a crime scene and a recovered firearm. Starting about ten years ago, the federal government created the National Integrated Ballistic Information Network (NIBIN) program to allow for computer-assisted searches of digital images of cartridges found at crime scenes.

NIBIN, however, relies on the same unintentional markings used by firearm examiners and cannot lead investigators directly to a specific firearm and its serial number, unless that weapon is eventually recovered. A firearm serial number is a key investigative tool because law enforcement uses it to trace a weapon back to its original seller and purchaser.

1

Microstamping represents an evolution in ballistic identification because it can identify the serial number of a firearm directly from an expended cartridge case found at a crime scene. Originally created in the 1990s by Todd Lizotte and Orest Ohar, microstamping uses precise laser technology to engrave intentional microscopic markings on the internal mechanisms of a semiautomatic pistol (e.g., the breech face and the tip of the firing pin). When the handgun is fired, these engravings are stamped onto the cartridge—identifying essential information including the make, model and serial number of the weapon in the form of alphanumeric and geometric codes. Information extracted from these codes can be used to trace a firearm used in a violent crime, even if the crime gun itself is never recovered.

The elegance of the technology is that it uses the same natural forces that create the unintentional markings traditionally analyzed by firearm examiners. By *intentionally* stamping a code on cartridges, however, microstamp-equipped firearms provide investigators with more deliberate information than unintentional marks ever could. The goal of microstamping is to identify a firearm the *first* time it is used to commit a crime.

That's an important goal in a country where approximately 40% of homicide cases go unsolved.[1] At many shooting scenes, a crime gun is never recovered, and far too often NIBIN fails to exploit ballistic evidence that *is* recovered (i.e., expended cartridge casings). For example, the city of Boston reported a total of 1,301 crimes involving shootings in 2006. Investigators at 636 of these crime scenes recovered only shell casings, and not the crime gun itself.[2] In cases such as these, microstamping can provide essential leads to investigators.

With any new, innovative technology, there are going to be questions concerning the effectiveness and durability of the process and microstamping has not been immune to naysayers. One line of criticism has focused on whether the technology can withstand wear and tear under the violent conditions that exist within the chamber of a firearm. In order to

---

[1] *New York Times* Editorial, "A Crime-Fighting Opportunity," February 15, 2008, http://www.nytimes.com/2008/02/15/opinion/15fri3.html
[2] Boston Police Department

2

answer such claims, the technology has undergone numerous, rigorous tests with firearms including the Colt .45 (1911), S&W 4006, Ruger Mark III, SIG P229, AR-15, and AK-47.[3]

A series of studies conducted by microstamping's inventors have shown that firearms utilizing the latest generation of the technology consistently produce identifiable codes even after thousands of rounds of firing. For example, in 2007 Lizotte and Ohar fired over 2,500 rounds from a microstamped Smith and Wesson .40 caliber semiautomatic handgun using five different brands of ammunition. The results were impressive, with all eight digits of the alphanumeric code legible 97% of the time using both optical microscopy and scanning electron microscopy and with breech face markings successfully transferred to cartridge casings 96% of the time.[4] Taking firing pin and breech face markings together, all eight digits were identifiable in every single case.

Lizotte and Ohar were subsequently able to fire the same Smith & Wesson handgun in excess of 5,000 rounds and still produce identifiable marks. They also recently tested a used .45 Colt semi-automatic pistol with over 1,500 rounds and achieved identifiable marks over 95% of the time using optical microscopy.[5]

Independent forensic scientist Lucien Haag has also tested the durability of microstamping and found that even with the firearms involved operating under extremely high pressure, the microstamped impressions made on cartridges were still visible even after thousands of rounds were fired.[6]

---

[3] Todd E. Lizotte and Orest Ohar, "Forensic Firearm Identification of Semiautomatic Handguns Using Laser Formed Microstamping Elements," Peer-reviewed paper presented at the 2008 SPIE (The International Society for Optical Engineering) Annual Optics and Technology Conference, San Diego, California, September 3, 2008, http://www.csgv.org/atf/cf/%7B79FD0842-518D-42AC-8228-AE59B7990689%7D/Forensic%20Firearm%20Identification%20of%20Semiautomatic%20Handguns%20-%20Lizotte.pdf
[4] Press Release from NanoMark Technologies, "New Test Affirms Validity of Microstamping Technology," May 24, 2007, http://www.csgv.org/atf/cf/%7B79FD0842-518D-42AC-8228-AE59B7990689%7D/LIZOTTE%20TEST%20RELEASE%205-25-07.PDF
[5] Lizotte and Ohar, "Forensic Firearm Identification of Semiautomatic Handguns Using Laser Formed Microstamping Elements"
[6] Lucien Haag, "Ballistic ID Tagging and Microstamping—Performance in Practice," Presentation before Third Meeting of the Committee on Assessing the Feasibility, Accuracy, and Technical Capability of a National Ballistics Database," December 9, 2004

3

These endurance challenges achieved impressive results even though they test-fired far more rounds than would be expended by the typical crime gun. In reality, semiautomatic handguns have the shortest median "time-to-crime" of any firearm type[7] and crime guns are frequently recovered with fewer than 20 total rounds fired.[8]

Additionally, microstamped engravings on the firing pin and breech face of a handgun contain several "counter-measures" in order to prevent against tampering. These include redundant gear and/or radial marks on the firing pin, as well as marks on the breech face. Simply eradicating any one set of these marks (which is no easy feat for the common criminal) is insufficient to defeat the technology.

Microstamped semiautomatic pistols would also serve as a deterrent to illegal gun trafficking. First, the technology would help to curb "straw purchases." In a straw purchase, a prohibited purchaser recruits an individual(s) with a clean criminal record to pass a background check and purchase firearms for him/her. Microstamping would allow police to automatically link a shell casing found at a crime scene to this original purchaser. Straw purchasers would be far less likely to purchase firearms for convicted felons and other prohibited buyers if they believed those guns could be easily traced back to them after being used in crimes. Second, microstamping would help identify traffickers by providing more crime gun trace data for law enforcement to analyze.

I would also stress the ease with which microstamping technology can be integrated into the District's current ballistics systems. Microstamping does not require the creation of *any* new database of gun owners or ballistics information. It simply improves the usefulness of an existing tracing system by adding more information to that system. Microstamping does not collect any new personal information from gun owners or limit gun ownership in any way, and therefore has no Second Amendment implications whatsoever.

---

[7] Department of Justice, Bureau of Alcohol, Tobacco and Firearms, "Crime Gun Trace Reports (2000): National Report," July 2002, p. 32, http://www.atf.gov/firearms/ycgii/2000/
[8] Fox Butterfield, "Sniper Case Fuels a Debate Over Firearm Fingerprinting," *New York Times*, October 18, 2002, http://query.nytimes.com/gst/fullpage.html?res=9C02E0DE133DF93BA25753C1A9649C8B63&n=Top/Reference/Times%20Topics/Subjects/I/Identification%20Devices

4

The cost of implementing the technology is minimal as well. Laser Light Technologies, Inc., a laser micromachining and engraving company based in Missouri, has priced the microstamp engraving process at a maximum of $6.00 per handgun. As an additional benefit to manufacturers, the patent holders of the technology have announced they will provide a royalty-free license for the microstamping of semiautomatic handguns sold for civilian use in the United States and its territories.

Enthusiasm for the technology is spreading rapidly across the country. On October 13, 2007, California Governor Arnold Schwarzenegger signed first-of-its-kind microstamping legislation into law, mandating the microstamping of all new models of semiautomatic handgun models sold in the state beginning in 2010. The legislation was publicly supported by 65 police chiefs and sheriffs across California, including L.A. County Sheriff Lee Baca who stated, "The Los Angeles County Sheriff's Department Homicide Bureau has hundreds of unsolved cases where the only evidence left at the scene of the crime were expended bullet casings. If these casings had imprinted information on them from the firearm, our investigators would have an exceptional chance of solving these heinous crimes."[9] The California Police Chiefs Association (CPCA) and the Peace Officers Research Association of California (PORAC) also supported the bill.

Following the example set by California, several other states are now considering microstamping legislation, including Wisconsin, New Jersey, Illinois, and Connecticut and New York (where a bill passed the state assembly earlier this year). Microstamping bills have also been introduced in the U.S. Senate and House of Representatives by Senator Edward M. Kennedy and Respective Xavier Becerra, respectively.

As this committee works to change the District's firearms laws in the wake of the Supreme Court's decision in *District of Columbia v. Heller*, I would strongly advise you to consider the multiple benefits of microstamping. It is a forward-thinking technology that holds

---

[9] Press Release from Assemblyman Mike Feuer, "Gun Microstamping Demonstration Conducted Today," August 14, 2007, http://democrats.assembly.ca.gov/members/a42/newsroom/20070814AD42PR01.htm

tremendous promise to augment the city's crime-solving capabilities and bring peace and justice to victims and survivors of gun violence.

I thank you for conducting this hearing for the benefit of your constituents and look forward to you questions.

6

**Legal Community Against Violence**

expertise, information & advocacy to end gun violence

Testimony of
Juliet A. Leftwich
Legal Director
Legal Community Against Violence


Bill 17-843
"Firearms Control Amendment Act of 2008"


Committee on Public Safety and the Judiciary
Council of the District of Columbia
Phil Mendelson, Chairperson


October 1, 2008


John A. Wilson Building
1350 Pennsylvania Ave., N.W.
Washington, D.C.  20004

Good morning. My name is Juliet Leftwich and I am the Legal Director of Legal Community Against Violence (LCAV), a national law center formed in the wake of an assault weapon massacre at a San Francisco law firm in 1993. We provide free legal assistance to state and local governments seeking to adopt or defend laws to reduce gun violence. We also track all federal, all state and many local gun laws. In addition, we engage in educational outreach and advocacy, producing reports, analyses and model laws.[1] LCAV's website, www.lcav.org, is the most comprehensive resource on U.S. firearms laws in either print or electronic form.

LCAV has helped many state and local policymakers develop and draft strong, legally defensible laws to reduce firearm-related deaths and injuries. I'm pleased to be here today to provide our recommendations regarding the ways Washington, D.C. can strengthen its gun laws in the aftermath of the U.S. Supreme Court's decision in *District of Columbia v. Heller*.

Although I support each of the ideas discussed by the other expert witnesses on this panel today, my testimony will focus on laws relating to registration of firearms, licensing of gun owners/firearms safety training, firearms dealers, safe storage and waiting periods.

Registration of Firearms

Strong registration laws are the cornerstone of responsible gun policy. These laws are critical because they

- Furnish law enforcement with essential information about firearm ownership, facilitating fast and reliable tracing of crime guns;
- Protect law enforcement officers responding to calls for assistance (e.g., in domestic violence incidents) by allowing the officers to determine, in advance, whether the individuals involved possess firearms;
- Facilitate the return of lost or stolen firearms to their lawful owners;
- Reduce illegal guns sales and possession by ensuring, through periodic background checks, that all registered owners are eligible to possess firearms under applicable federal, state and local law; and
- Permit law enforcement to charge an individual with a crime if he or she is in possession of an unregistered gun, and to seize the unregistered weapon.

Opinion polls show overwhelming public support for registration laws. A 2001 national poll showed 83% of respondents, including 72% of gun owners, favor registration for newly-purchased handguns.[2]

Although the District of Columbia currently has a firearm registration system in place, registration is only required on a one-time basis. As a result, persons who initially pass a

---

[1] See, e.g., Legal Community Against Violence, *Regulating Guns in America: An Evaluation and Comparative Analysis of Federal, State and Selected Local Gun Laws* (2d ed. 2008).
[2] Lake, Snell, Perry & Associates, Inc. Poll, *Educational Fund to Stop Gun Violence* (May 15-21, 2001).

background check may subsequently become ineligible to possess firearms (e.g., because of a criminal conviction), yet remain in possession of those firearms.

The most important way to strengthen the District's registration laws would be to require that registration be renewed annually after the owner undergoes a background check. This would help ensure that persons who have fallen into a prohibited class do not continue to possess firearms. It would also increase gun owner accountability and responsibility by requiring gun owners to account for their firearms on a yearly basis. Annual renewal of registration would not impose an undue burden on gun owners – it could be completed through the mail at a reasonable cost.

This recommendation is consistent with the Supreme Court's ruling in the *Heller* decision. In that decision, the Court narrowly held that the Second Amendment guarantees the right of individuals to possess handguns in the home for self-defense. Registration laws do not interfere with that right.

A variety of registration laws have been adopted by state and local governments throughout the nation, including Hawaii, California, Michigan,[3] Chicago, Cleveland, New York City and Omaha.[4]


Licensing Gun Owners/Firearms Owner Safety Training

Laws requiring gun owners to obtain a license (or permit) and to undergo safety training have two primary goals: 1) to reduce the number of unintentional shootings by ensuring that gun owners know how to safely use and store firearms; and 2) to increase compliance with existing firearms laws by requiring gun owners to demonstrate knowledge of those laws.

Americans strongly support licensing laws. A nationwide poll conducted in 2001 found that 85% of respondents – including 73% of gun owners – favored laws requiring purchasers to obtain a permit before buying a handgun.[5]

Although the District does not currently require gun owners to obtain a separate license, the District's registration laws contain some license-like provisions. Specifically, those laws require an applicant for a registration certificate to "demonstrate satisfactorily a knowledge of the laws of the District of Columbia pertaining to firearms and the safe and

---

[3] Mich. Comp. Laws § 28.429. While Michigan does not require registration *per se*, it does require persons acquiring handguns to present the handgun to local law enforcement for a safety inspection. If the person presenting the handgun is eligible to possess it, a certificate of inspection will be issued reflecting his or her name, age, address, description and signature, as well as a full description of the handgun. Copies of the certificate are kept by state and local law enforcement, thereby creating a record of all legally acquired handguns possessed in the state and their owners.
[4] See Legal Community Against Violence, *supra* note 1, at 190-195.
[5] Lake, Snell, Perry & Associates, Inc., *supra* note 2.

responsible use of the same in accordance with tests and standards prescribed by the Chief."[6]

The District's laws could be strengthened through the enactment of either a separate licensing law or an amendment to the existing registration provisions requiring applicants to successfully complete a firearms safety training course. We recommend that the course include classroom instruction on the safe handling, use and storage of firearms, and on federal and District laws pertaining to gun sales, possession, transportation and self-defense use. The course should also include live firing instruction to ensure that the applicant knows how to safely fire the weapon. Applicants should be required to pass written and hands-on tests prior to completing the course.

Reasonable licensing/firearms safety training laws have been adopted widely by state and local governments throughout the United States,[7] and do not violate the *Heller* decision.

Licensing laws are most effective when combined with registration laws (discussed above). A 2001 study analyzing the firearm tracing data of crime guns recovered in 25 U.S. cities revealed that states with some form of both registration and licensing systems have greater success keeping firearms initially sold by dealers in the state from being recovered in crimes than states without such systems in place.[8] This suggests that licensing and registration laws may make it more difficult for criminals, juveniles and other prohibited purchasers to obtain guns.

An Opinion Research Corporation International poll in 2001, found that 82% of the respondents supported laws requiring the licensing and registration of handguns.[9] A nationwide poll conducted in May of 2001 found that 70% of the respondents mistakenly believed that a system of licensing and registration already exists.[10]


Firearms Dealers

Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) records from November 2007 indicate that 5 firearms dealers operated in the District at that time.[11] We would anticipate that that number would grow in response to the *Heller* decision.

---

[6] D.C. Code Ann. § 7-2502.03(a)(10).
[7] See Legal Community Against Violence, *supra* note 1, at 178-186.
[8] Daniel W. Webster et al., *Relationship Between Licensing, Registration, and Other Gun Sales Laws and the Source State of Crime Guns*, 7 Inj. Prevention 184, 188-89 (2001). The study included jurisdictions with concealed carry permits and dealer sales reporting, which have elements of licensing or registration but are not comprehensive licensing or registration systems.
[9] Lois Hess, Editorial, *Bush Undermining Gun Control Laws*, Balt. Sun, July 31, 2001, at 11A, *available at* http://www.commondreams.org/views01/0731-03.htm.
[10] Lake, Snell, Perry & Associates, Inc., *supra* note 2.
[11] Bureau of Alcohol, Tobacco, Firearms & Explosives, U.S. Department of Justice, *Federal Firearms Licensee List (Class 01 Dealers)* (report issued Nov. 16, 2007).

It is very important that the District regulate dealers because so little regulation exists at the federal level, and because dealers are a significant source of crime guns nationwide. Current federal dealer regulations – and the enforcement of those regulations – are insufficient to ensure that the public is safe from unscrupulous dealers. In June of 2000, ATF issued a comprehensive report of firearms trafficking in this country. That report analyzed 1,530 trafficking investigations during the period July 1996 through December 1998, involving more than 84,000 diverted firearms.[12] ATF found that firearms dealers were associated with the largest number of trafficked guns – over 40,000 – and concluded that the fact that dealers have "access to large numbers of firearms makes them a particular threat to public safety when they fail to comply with the law."[13]

Moreover, a 2004 report of the U.S. Department of Justice Office of the Inspector General found that ATF's compliance inspections of firearms dealers are "infrequent and of inconsistent quality, and follow-up inspections and adverse actions have been sporadic," even where numerous or serious violations were found.[14] Another study found that in 2000-2002, ATF prosecuted only 88 corrupt gun dealers nationwide.[15]

The District already regulates firearms dealers to some extent. Existing District laws could be significantly strengthened, however, by requiring dealers to:

- Conduct employee background checks (currently, there is no way for a dealer to know whether his/her employees are prohibited from possessing firearms);
- Immediately report the loss/theft of all firearms or ammunition;
- Conduct an annual inventory of all firearms and ammunition and provide a sworn affidavit with the inventory list to the Police Department;
- Videotape all firearm sales transactions;
- Install burglar alarms on their premises;
- Post a conspicuous notice advising customers of the District's safe storage laws, and that background checks are required for all gun transfers; and
- Sell a trigger lock or other locking device with each firearm (ideally the law would require that the locking device be on the roster of devices approved by California, Maryland or Massachusetts, since the quality of locking devices varies greatly).

Laws regulating firearms dealers are consistent with the Second Amendment. In fact, the *Heller* decision explicitly sanctioned laws imposing conditions on the commercial sale of firearms.[16]

---

[12] Bureau of Alcohol, Tobacco and Firearms, U.S. Department of the Treasury, *Following the Gun: Enforcing Federal Laws Against Firearms Traffickers* ix (June 2000).
[13] *Id.* at x.
[14] Office of the Inspector General, Evaluation and Inspections Division, U.S. Department of Justice, *Inspection of Firearms Dealers by the Bureau of Alcohol, Tobacco, Firearms and Explosives* i (July 2004).
[15] Americans for Gun Safety Foundation, *The Enforcement Gap: Federal Gun Laws Ignored 4* (May 2003).
[16] *District of Columbia v. Heller*, 128 S. Ct. 2783, 2817 (2008).

Many state and local laws throughout the United States regulate firearms dealers.[17]

Safe Storage Laws

Researchers have found that millions of children live in homes with easily accessible guns. A 2000 study of firearm storage patterns in U.S. homes found that "[o]f the homes with children and firearms, 55% were reported to have 1 or more firearms in an unlocked place," and 43% reported keeping guns without a trigger lock in an unlocked place.[18] A 2005 study on adult firearm storage practices in U.S. homes found that over 1.69 million children and youth under age 18 are living in homes with loaded and unlocked firearms.[19]

The presence of unlocked guns in the home increases the risk of both accidental gun injuries and intentional shootings. One study found that more than 75% of the guns used in youth suicide attempts and unintentional injuries were stored in the residence of the victim, a relative, or a friend.[20] At least two studies have found that the risk of suicide increases in homes where guns are kept loaded and/or unlocked.[21]

In October of 2000, the U.S. Secret Service published a study of 37 school shootings in 26 states. That study found that in more than 65% of the cases, the attacker got the gun from his or her own home or that of a relative.[22]

Daniel Webster, another expert on this panel, has also provided the Committee with citations to several studies demonstrating that safe storage laws, also known as Child Access Prevention (CAP) laws, help prevent unintentional injuries to children.[23]

The Second Emergency Legislation enacted by the District requires individuals to store loaded guns safely if they know or should know that a child 15 years of age or younger might gain access to those weapons.

---

[17] See Legal Community Against Violence, *supra* note 1, at 149-159.

[18] Mark A. Schuster et al., *Firearm Storage Patterns in U.S. Homes with Children*, 90 Am. J. Pub. Health 588, 590 (Apr. 2000).

[19] Catherine A. Okoro et al., *Prevalence of Household Firearms and Firearm-Storage Practices in the 50 States and the District of Columbia: Findings from the Behavioral Risk Factor Surveillance System, 2002*, 116 Pediatrics e370, e371-e372 (Sept. 2005), *at* http://pediatrics.aappublications.org/cgi/content/full/116/3/e370.

[20] David C. Grossman, Donald T. Reay & Stephanie A. Baker, *Self-Inflicted and Unintentional Firearm Injuries Among Children and Adolescents: The Source of the Firearm*, 153 Arch. Pediatr. Adolesc. Med. 875, 875 (Aug. 1999).

[21] Matthew Miller & David Hemenway, *The Relationship Between Firearms and Suicide: A Review of the Literature*, 4 Aggression & Violent Behavior 59, 62-65 (1999) (summarizing the findings of multiple studies).

[22] United States Secret Service, U.S. Department of the Treasury, *An Interim Report on the Prevention of Targeted Violence in Schools* 6 (Oct. 2000).

[23] See, e.g., Peter Cummings et al., *State Gun Safe Storage Laws and Child Mortality Due to Firearms*, 278 JAMA 1084, 1084 (Oct. 1997) (finding that in twelve states where CAP laws had been in effect for at least one year, unintentional firearm deaths fell by 23% from 1990-94 among children under 15 years of age).

The District could significantly strengthen its CAP law by making two changes. First, we recommend that the law apply to all firearms – loaded or unloaded – because even an unloaded gun in the hands of a child is extremely dangerous. Second, the law should apply to children who are under the age of 18 (rather than those 15 years of age and under), because older teenagers are in a particularly high risk age group for gun violence.[24]

Laws requiring that firearms be stored safely do not violate the Second Amendment. In fact, in *Heller*, the Supreme Court stated that its decision should not be read to suggest "the invalidity of laws regulating the storage of firearms to prevent accidents."[25] The District's safe storage law is consistent with *Heller* because it allows gun owners, as one of the storage options, to carry their guns on their person or within such close proximity that they can readily retrieve and use them as if the guns were carried on their person. Thus, the law allows for guns to be used in self-defense.

More than two dozen states have enacted laws to help keep guns out of the hands of children.[26]

<u>Waiting Periods</u>

Laws imposing waiting periods require that a certain number of days elapse between the time a firearm is purchased and is physically transferred to the purchaser. The purpose of a waiting period is to: 1) give law enforcement officials sufficient time to perform a background check; and 2) provide a "cooling off" period to help guard against impulsive acts of violence.

Washington, D.C. currently has a 48-hour waiting period.[27] We recommend that this waiting period be extended (e.g., for a period of at least 5 days). Reasonable waiting periods do not violate the Second Amendment.

Twelve states have enacted waiting periods that apply to the purchase of some or all firearms. Those waiting periods range in length from 24 hours (for the sale of long guns in Illinois) to 14 days (for the sale of all firearms in Hawaii).[28]

---

[24] In 2005, 2,623 teens ages 15 through 19 were killed with firearms. U.S. Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, Web-Based Injury Statistics Query & Reporting System (WISQARS), *WISQARS Injury Mortality Reports, 1999-2005* (2008), at http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html.

[25] *District of Columbia v. Heller, supra* note 16, at 2820.

[26] See Legal Community Against Violence, *supra* note 1, at 234-240.

[27] D.C. Code Ann. § 22-4508.

[28] See Legal Community Against Violence, *supra* note 1, at 134-138.

<u>Conclusion</u>

LCAV applauds Washington, D.C. for its long history of leadership in the important and challenging area of gun violence prevention. We believe the District has a great opportunity here – to look at its laws with a fresh eye, and to enact strong, legally defensible laws to protect those who live and work in and visit our nation's Capitol.

LCAV knows that policymakers across the country will be looking to the laws the District enacts as models for their own legislation. We pledge to assist the District in any way we can as it moves forward during this process.

Thank you very much for allowing me to address you today.



# Brady Center

## To Prevent Gun Violence

**Testimony of Brian J. Siebel**
**Senior Attorney**
**Brady Center to Prevent Gun Violence**
**Before the Council of the District of Columbia**
**October 1, 2008**

Thank you, Chairman Mendelson and other members of the Council, for inviting the Brady Center to Prevent Gun Violence to speak at this important committee hearing.

The Brady Center to Prevent Gun Violence and the Brady Campaign to Prevent Gun Violence are the nation's largest organizations working for sensible gun policies. The Legal Action Project of the Brady Center represents victims of gun violence and defends gun laws in the courts.

In addition to the other measures being suggested here today, which we support, the Brady Center and Brady Campaign strongly urge the Council to pass an assault weapons ban, a ban on .50 caliber sniper rifles, and retain its recently-passed ban on high-capacity ammunition magazines, as part of its process of strengthening the District's gun laws in light of the *Heller* decision.

## The Need for An Assault Weapons Ban

Assault weapons had been banned for more than 30 years under the broader D.C. ban on all semiautomatic weapons. However, now that that ban has been repealed, an assault weapon ban is needed to protect the people of the District, visitors, and law enforcement from these particularly dangerous weapons. An assault weapons ban would continue to allow law-abiding citizens to have common pistols in their homes for self-defense, and would remain in compliance with the *Heller* decision. We believe it is imperative for the Council, now that it has legalized common semiautomatic pistols, to restore a ban on military-style assault weapons.

## Assault Weapons Are "Mass Produced Mayhem"

Assault weapons are semiautomatic versions of fully automatic guns designed for military use. Even semiautomatic assault weapons unleash extraordinary firepower. When San Jose, California, police test-fired an UZI, a 30-round magazine was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semiautomatic.

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has described assault weapons in stark terms.

Assault weapons were designed for rapid fire, close quarter shooting at human beings. That is why they were put together the way they were. You will not find these guns in a duck blind or at the Olympics. **They are mass produced mayhem.**[1]

Assault weapons have distinct features that separate them from sporting firearms.[2] While hunting rifles are designed to be fired from the shoulder and depend upon the accuracy of a precisely aimed projectile, the military features of semiautomatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly. Assault weapons are generally equipped with large-capacity ammunition magazines that allow the shooter to fire 20, 50, or even more than 100 rounds without having to reload. Pistol grips on assault rifles and shotguns help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position. Barrel shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession. Far from being simply "cosmetic," these features all contribute to the unique function of any assault weapon to deliver extraordinary firepower. They are uniquely military features, with no sporting purpose whatsoever.

Accordingly, ATF has concluded that assault weapons "are not generally recognized as particularly suitable for or readily adaptable to sporting purposes" and instead "are attractive to certain criminals."[3] ATF's analysis of guns traced to crime showed that assault weapons "are preferred by criminals over law abiding citizens eight to one.... Access to them shifts the balance of power to the lawless."[4]

It is no accident that when a madman, Gian Luigi Ferri, decided to assault the law offices at 101 California Street in San Francisco, he armed himself with two TEC-9 assault weapons with 50 round magazines, which enabled him to kill eight people and wound six others.[5] Or that the Columbine high school shooters who killed 12 students and a teacher included a TEC-9 assault weapon in their arsenal. Or that James Huberty used an UZI assault pistol and a shotgun to kill 21 people and wound 19 others at a McDonald's in San Ysidro, California.[6] Or that Patrick Purdy used an AK-47 assault rifle to kill five children and wound 29 others and a teacher at an elementary School in Stockton, California. Equipped with a 75-round "drum" magazine, Purdy was able to shoot 106 rounds in less than two minutes.[7] The list goes on.

---

[1] ATF, *Assault Weapons Profile* 19 (1994) (emphasis added).

[2] *Id.* at 20.

[3] DEP'T OF TREASURY, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 38 (1998).

[4] ATF, *Assault Weapons Profile, supra* note 1, at 19-20.

[5] *Ferri Used Guns That California Ban Does Not Forbid,* SAN FRANCISCO EXAMINER, July 4, 1993.

[6] *Satellite College Campus Helps to Heal the Scars at San Ysidro Massacre,* LOS ANGELES TIMES, Mar. 30, 1989; *A 77-Minute Moment in History That Will Never Be Forgotten,* LOS ANGELES TIMES, July 16, 1989.

[7] *The Kinds of Guns School Killer Used,* SAN FRANCISCO CHRONICLE, Jan. 19, 1989; Michael Taylor & Leslie Guevarra, *Mysterious Scrawlings and Slogans, School Killer's Last Days, Toy Army in his Room,* SAN FRANCISCO CHRONICLE, Jan. 19, 1989.

2

## Assault Weapons Threaten Law Enforcement

Law enforcement officers are at particular risk from these weapons because of their high firepower, which often leaves them outgunned by criminals. A researcher for the Department of Justice found that

> assault weapons account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.[8]

Assault weapons have even been used in a brazen attack at D.C. Police Headquarters. On November 22, 1994, a man armed with a MAC-11 assault pistol walked into Metropolitan Police headquarters and shot and killed Sergeant Henry Daly and FBI Agents Mike Miller and Martha Martinez. The shooter seriously wounded FBI Agent John Kuchta and shot at couches, walls, computers, and desks before shooting and killing himself with Agent Martinez's gun.[9]

In addition, numerous law enforcement officers have been killed with high-firepower assault weapons. Here are a few recent examples:

- **Philadelphia, PA. May 3, 2008.** Officer Stephen Liczbinski was shot and killed by an assault rifle as he was responding to a robbery at a Bank of America branch. Three men robbed the bank and were fleeing when Officer Liczbinski stopped their car and exited his patrol car. At that time, one of the bank robbers opened fire with an SKS assault rifle, striking Liczbinski numerous times. One suspect was eventually shot and killed by police and the other two suspects were arrested and charged with murder.[10]

- **Miami, Florida. September 13, 2007.** Police spotted a vehicle driving erratically and followed it until it stopped in a residential complex. The suspect got out and hopped a fence to the rear of the home; the officers exited their patrol car and went to the front of the home and were granted permission to search by a female resident. The suspect grabbed a high-powered, military-grade rifle and fired at the police officers through a window, killing Officer Jose Somohano. The suspect then exited the house and shot three other officers as he escaped. The shooter was caught later that day but would not relinquish his assault rifle so he was shot and killed by police officers.[11]

---

[8] Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, U. Penn. Jerry Lee Center of Criminology 87 (June 2004).

[9] Brian Reilly, *Cop killers' guns similar; handgun converted to fiercer weapon*, THE WASHINGTON TIMES, May 1, 1995.

[10] Joseph A. Gambardello, *Liczbinski suspect's girlfriend to stand trial*, PHILADELPHIA INQUIRER, July 17, 2008; *Officer shot, killed after bank robbery*, NBC 10.COM, May 3, 2008; Sergeant Stephen Liczbinski, www.odmp.org, *available at*: http://www.odmp.org/officer/19359-sergeant-stephen-liczbinski (last visited Sept. 30, 2008).

[11] David Ovalle et. al., *The murder and the manhunt started in a South Miami-Dade townhouse, zigzagged...*, MIAMI HERALD, Sept. 15, 2007.

3

- **Chantilly, Virginia. May 8, 2006.** A teenager with an AK-47 and 5 handguns engaged in a firefight at a police station in suburban Virginia, killing Detective Vicky Armel immediately and wounding two other officers, one of whom, Officer Michael Garbarino, died nine days later from his injuries.[12]

The threat posed to law enforcement is one reason why major law enforcement organizations are united in supporting bans on assault weapons.

### Assault Weapons Threaten Civilians

Assault weapons have also been used to massacre and terrorize civilians. Who can forget the nightmare we lived through in the District of Columbia and surrounding communities during the attacks committed by the D.C. snipers. Their weapon of choice? A Bushmaster XM-15 assault rifle.

There have been hundreds of other shootings committed with semiautomatic assault weapons. Here, we list just a few recent examples:

- **Arvada & Colorado Springs, Colorado. December 9, 2007.** One man with an assault rifle attacked a missionary training center in Arvada and a church in Colorado Springs. He killed two people and injured two others in Arvada, and killed two and injured three others, including two teenage sisters, in Colorado Springs. He died after being shot by a security guard and then shooting himself.[13]

- **Omaha, Nebraska. December 5, 2007.** Nine people were shot to death and five others were injured after a 20-year-old shooter, armed with a military-style assault rifle, attacked shoppers in a department store in a Nebraska mall.[14]

- **Indianapolis, Indiana. June 2, 2006.** Seven family members, four adults and three children, were shot and killed in their home by a robber armed with an assault rifle. Nearly 30 shell casings were found.[15]

- **Tyler, Texas. February 25, 2005.** A gunman with a history of domestic violence and a felony conviction, who was reportedly fighting with his ex-wife over child support for their two youngest children, shot over 50 rounds from an SKS assault rifle on the steps of his local courthouse when his ex-wife exited the building. His ex-wife was killed along with a bystander who tried to shoot the gunman. The shooter's 23-year-old son and three law enforcement officers were wounded during the shooting, including a 28-year-old deputy who

---

[12] Ian Urbina, *Fatal police station attack shocks tranquil community*, NEW YORK TIMES, May 10, 2006; *Officer Killed*, BOSTON GLOBE, May 18, 2006.

[13] Erin Emery, *Report details church shooting, the document chronicles the days leading up to the Dec. 9 deaths of four young people*, DENVER POST, Mar. 13, 2008.

[14] *The American Way*, REGISTER-GUARD, Dec. 17, 2007.

[15] Ashley M. Heher, *Suspect in slaying of 7 family members surrenders / Indianapolis police say he had nowhere else to go*, HOUSTON CHRONICLE, June 4, 2006.

was in grave condition. The gunman fled the scene but was pursued and shot by police when he exited his car and shot toward officers.[16]

- **Akron, Ohio. February 24, 2005.** A man shot and killed his girlfriend and her seven-year old son using an AR-15 assault weapon, then fired more than one hundred rounds at a dozen law enforcement officers as he fled the murder scene. The gunman was arrested the next morning inside the apartment of a Kent State University student, who he also murdered with the AR-15 assault weapon. Police subsequently seized 21 weapons kept by the suspect, including an Uzi and an AK-47.[17]

### Assault Weapons Threaten Homeland Security

These weapons pose particular and severe risks for homeland security here in the Nation's Capital. The extraordinary firepower of these weapons could wreak havoc at any number of high-profile sites or events that occur in Washington, or victimize any number of high-profile targets, from government officials to foreign dignitaries.

And make no mistake: these weapons have great appeal for terrorists. The oft-seen file footage of Osama Bin Laden, aiming his AK-47 at an unknown target, is now a familiar reminder of the incontrovertible connection between terrorism and assault weapons.

The *Chicago Tribune* has reported that, found among the mounds of rubble at a training facility in Kabul for a radical Pakistan-based Islamic terrorist organization, was a manual entitled "How Can I Train Myself for Jihad" containing an entire section on "Firearms Training."[18] Tellingly, the manual singles out the United States for its easy availability of firearms and stipulates that al-Qaeda members living in the United States "obtain an assault weapon legally, preferably AK-47 or variations."

Terrorists have used assault weapons in numerous attacks. I am going to mention just one that is close to home.

- **Langley, Virginia, January 25, 1993.** Pakistani national Mir Aimal Kasi killed two CIA employees and wounded three others outside the entrance to CIA headquarters in Langley, Virginia. Kasi used a Chinese-made semiautomatic AK-47 assault rifle equipped with a 30-round magazine purchased from a Northern Virginia gun store.[19] After fleeing the country, he was arrested in Pakistan in 1997.[20]

---

[16] Bill Hanna & Jack Douglas Jr., *Rampage in Tyler leaves three dead, four wounded*, FORT WORTH STAR-TELEGRAM, Feb. 25, 2005; Jack Douglas Jr. & Bill Hanna, *Police order emergency trace on weapon used in shootings*, FORT WORTH STAR-TELEGRAM, FEB. 26, 2005.

[17] Ed Meyer, *Police eye semiautomatic rifles, Brimfield officials want to be prepared after recent shooting rampage that killed 3 people*, AKRON BEACON JOURNAL, Feb. 24, 2005.

[18] Paul Salopek, *A Chilling Look into Terror's Lair*, CHICAGO TRIBUNE, Nov. 18, 2001.

[19] *CIA Killings Prompt Scrutiny on 2 Fronts; Fairfax Loophole Expedited Gun Purchase*, WASHINGTON POST, Feb. 11, 1993.

[20] Robert O'Harrow, Jr., *Kansi's Shadowy Stay in U.S. Leaves a Hazy Portrait*, WASHINGTON POST, Mar. 3, 1993.

5

### .50 Caliber Sniper Rifles Pose Serious Dangers

Fifty caliber sniper rifles also pose an extraordinary risk in the District. In 1987, Barrett Firearms Manufacturing Inc., patented its self-described "armor-penetrating" .50 caliber BMG sniper rifle.[21] Capable of destroying armored personnel carriers, aircraft and bulk fuel and ammunition sites, the .50 caliber sniper rifle is now proliferating in the civilian market.[22] Accurate at up to 2,000 yards, it can inflict effective damage to targets over four miles away.[23] With more power on impact then any other semi-automatic rifle legally available on the civilian market,[24] the .50 caliber represents a serious threat to local law enforcement and national security. A 2004 report on airport security at Los Angeles International Airport warned that terrorists could use .50-caliber sniper rifles to target parked and taxiing airplanes "firing over 50 shots in five minutes."[25] The Council should take action to prohibit the possession of these weapons in civilian hands.

### High-Capacity Magazines Increase Firepower

The threat posed by military-style assault weapons is increased significantly if they can be equipped with high-capacity ammunition magazines, defined as those accepting more than ten rounds. The 1994-2004 federal ban on assault weapons also banned these magazines. By permitting a shooter to fire more than ten rounds without reloading, they greatly increase the firepower of mass shooters. For example, the shooter at Virginia Tech equipped himself with numerous high-capacity magazines of up to 30 rounds, which enabled him to get off nearly 200 rounds in his attack. In self-defense situations, too much firepower is a hazard, because the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders.

### Assault Weapons Bans Already In Place

Six states currently ban assault weapons. Those include California, which passed the nation's first statewide ban in May 1989, as well as New Jersey (1990), Hawaii (1991), Connecticut (1993), Maryland (1994), Massachusetts (1998), and New York (2000). California expanded its ban in 2000 to include all semiautomatic rifles or pistols that have the ability to accept a detachable magazine and contain any one of a series of military-style features. We strongly support that legislation as a model for the District of Columbia.

---

[21] Carolyn Marshall, *California Bans Large Caliber Guns, and the Battle is on,* NEW YORK TIMES, Jan. 4, 2005.

[22] *See,* Government Accounting Office for U.S. House of Representatives, Committee on Government Reform, *Long Range 50 Caliber Sniper Weapons* 4 (May 3, 1999).

[23] *Id.*

[24] *Id.* at 3.

[25] Donald Stevens, *Near Term Options for Improving Security at Los Angeles International Airport,* RAND (2004).

In addition, from 1994-2004, there was a federal ban on assault weapons. Plus, as mentioned above, ATF currently bans assault weapons from being imported into this country because they are not weapons suitable for sporting purposes.

## Banning Assault Weapons and Sniper Rifles Is Consistent with *Heller*

A ban on assault weapons and .50 caliber sniper rifles would be constitutional and consistent with the Supreme Court's decision in *District of Columbia v. Heller*. In *D.C. v. Heller*, the Supreme Court narrowly defined the Second Amendment as protecting the right of law-abiding citizens to keep and use guns in the home for self-defense. At the same time, the Court indicated that the right to keep and bear arms is limited in a number of ways. The Court made clear that the Second Amendment does not entitle citizens to any and all guns. Certainly, military-style assault weapons and .50 caliber sniper rifles are not a part of this right. The Court held that not all "arms" are protected.

> We also recognize another important limitation on the right to keep and carry arms. [*U.S. v.*] *Miller* said, as we have explained, that the sorts of weapons protected were those **"in common use at the time."** We think that limitation is fairly supported by the historical tradition of prohibiting carrying of **"dangerous and unusual weapons."**[26]

Assault weapons and .50 caliber sniper rifles are certainly "dangerous and unusual weapons" according to any reasonable analysis of that phrase. They are military-style offensive weapons designed to slaughter human beings. This differentiates them from all hunting rifles and shotguns, as well as common handguns, which are often used in crime but have also been used in self-defense.

Moreover, assault weapons and .50 caliber sniper rifles are not "in common use." As semiautomatic versions of machine guns developed for use during the World Wars of the 20th Century, assault weapons are a relatively recent invention. Plus, ATF has twice concluded, after thorough analyses in 1989 and 1998, that assault weapons have no sporting purpose. And the Barrett .50 caliber sniper rifles was patented a mere twenty-one years ago, and was made for military, not civilian use.

Finally, assault weapon bans have been challenged in court, but have never been struck down as unconstitutional under the Second Amendment or under right to bear arms provisions in state constitutions.[27]

## Conclusion

Outside of the military or law enforcement, assault weapons and .50 caliber sniper rifles have no place in civilized society. We would urge the D.C. Council to adopt a ban on these weapons. Thank you.

---

[26] *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008).

[27] *See, e.g., Benjamin v. Bailey*, 662 A.2d 1226 (Conn. 1995); *Robertson v. Denver*, 874 P.2d 325 (Colo. 1994); *Arnold v. City of Cleveland*, 616 N.E.2d (Ohio 1993).

**Daniel W. Webster, Co-Director, Johns Hopkins Center for Gun Policy and Research**
**Testimony on firearm sales regulations before the District of Columbia's Council Committee on**
**Public Safety and the Judiciary, October 1, 2008**

Chairman Mendelson and council members, thank you for inviting me to testify today. I am here to urge the Council to develop a comprehensive set of policies and procedures for regulating guns that are grounded in the best available science relevant to protecting public safety. I am an associate professor and co-director of the Center for Gun Policy and Research at the Johns Hopkins Bloomberg School of Public Health. I have studied gun violence and its prevention for 20 years and have worked with several cities on their efforts to curb gun violence.

The primary goal of the District's gun laws should be to maximize public safety without preventing truly law-abiding, mentally-stable adults to possess firearms. The most effective gun policies will 1) proscribe the most dangerous people from possessing firearms; and 2) establish accountability measures to discourage illegal transfer to and acquisition by those proscribed individuals. Unfortunately, federal law and most state laws allow criminals convicted of misdemeanor crimes involving violence, weapons, drugs, and alcohol abuse to legally acquire as many firearms as they please. Current law in the District of Columbia wisely prohibits criminals convicted of crimes involving violence and/or guns or anyone convicted of an offense involving illegal drugs within the past five years to possess firearms regardless of whether the convictions were for felonies or misdemeanors. Prior research has shown that young men with misdemeanor convictions who were legally able to purchase handguns went on to commit crimes involving violence at a rate that was 2- to 10-times higher (depending on the prior offense) than that of men who were truly law-abiding when they purchased a handgun.[1] Prohibitions of firearm ownership by violent misdemeanants is associated with lower rates of violence by this high-risk group[2] and has broad public support, even among gun owners.[3]

While the standards for firearm registrants in the District of Columbia are appropriate, they could be improved by denying registration to individuals who have 2 or more violations for driving while intoxicated. In addition to having demonstrated a history of reckless behavior that threatens public safety, repeat DUI/DWI offenders have very high rates of substance abuse and other psychiatric disorders.[4,5,6] Such offenders have less self-control[7] and have higher rates of repeated arrests[8] - not a group that should be trusted with firearms.

Another group of individuals who should be prohibited from possessing firearms (but aren't currently prohibited) because they are a clear threat to others, including innocent children, are domestic violence offenders. I co-authored a large study to determine what factors most contributed to lethal outcomes from domestic violence. Abuser's ownership of a firearm increased the risk of homicide five-fold, more than any other risk factor we identified.[9] Federal law and many state laws prohibit firearm possession by persons restrained by protective orders issued by courts to protect victims of domestic violence. Research has demonstrated that these policies save lives.[10] Because these orders rarely last more than 12 months despite a more enduring threat, I recommend that the offender should be proscribed from possessing firearms in the District for a five-year period as is the case now for drug offenders.

In addition to setting high standards for legal firearm ownership, the District should have a set of regulations and enforcement procedures to reduce the likelihood that dangerous people can obtain firearms. My own research demonstrates that the rate at which new guns are diverted to criminals can be significantly reduced by regulation, oversight, and scrutiny that retail gun shops receive.[11,12,13,14,15] The District should set the highest of standards for obtaining and retaining a license to sell firearms. In addition to standard record-keeping requirements to ensure accountability, I urge the Council to make most of the firearms sales policies that Wal-Mart (the world's largest retail seller of firearms) is implementing mandatory for all firearm dealers. These include point-of-sale security cameras, criminal

background checks of employees, requirements that dealers safely lock up their guns, employee training to identify fake IDs and illegal straw purchases, and regular audits of inventory. Twenty gun stores agreed to adopt these measures after they were caught making gun sales of questionable legality as part of their legal settlement with New York City. I analyzed sales and crime gun recovery data for the dealers who had been keeping individualized gun sales records and documented a dramatic decrease in the risk that a gun sold by the dealers would subsequently be recovered from criminals.[15]

In Maryland and Virginia and throughout the U.S., there have been cases in which gun dealers were allowed to retain their licenses for many years despite racking up hundreds of firearm sales violations, failing to account for hundreds of guns, and being a well-known conduit for guns into the criminal market. The District should avoid such travesties by requiring gun dealers to conduct and submit a list of guns in their inventory when they renew their licenses annually, and to report any loss or theft of firearms immediately upon discovering missing firearms. In addition, the District should allow the Metropolitan Police Department to suspend, revoke, or deny renewal of a license to sell firearms to gun dealers who do not comply with regulations.

Private gun owners must be held accountable for selling to individuals who do not have a valid license to own a firearm and who have not passed a background check. Gun owners should also be required to keep their guns locked up when they are not being used to prevent access to children, teens, or thieves. In addition to reducing accidental shootings,[16, 17, 18] my research has shown that safe gun storage laws significantly reduce adolescent suicides.[19] Some of this research has indicated that so-called Child Access Prevention laws are most effective when penalties are strong.[17, 18] Thus, I believe there is good justification to allow for felony prosecution when a gun owners' failure to comply with the CAP law results in injury to others, to penalize unsafe gun storage that enables a minor to access the firearm, and to require gun dealers to post signs reminding gun purchasers of their duty to keep guns safely stored to prevent child access.

The final recommendation, supported by research I have led, is that the District of Columbia should ban the sale and possession of "junk guns" – a category of handguns characterized by their very small size and concealability and poor construction. Five states, including Maryland, have banned junk guns (though through somewhat different approaches or criteria) because they are prone to misfire, fire when dropped, and are disproportionately involved in crime. My colleagues and I studied the effect of a large gun dealer near Milwaukee who, after receiving bad publicity for the large number of his guns that were being linked to violent crimes, voluntarily decided to stop selling junk guns. We found that this change in sales policy led to 77% reduction in the number of new guns sold by the dealer that were soon recovered from criminals.[12] My research on Maryland's ban of these guns demonstrated that the law was associated with 40 fewer homicides per year during the first 9 years the law was in place.[20]

# References

[1] Wintemute GJ, Drake CM, Beaumont JJ, Wright MA. Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. JAMA. 1998;280:2083-7.

[2] Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. *Journal of the American Medical Association* 2001;285:1019-1026.

[3] Teret SP, Webster DW, Vernick JS, et al. Support for new policies to regulate firearms. Results of two national surveys. N Engl J Med. 1998;339:813-8.

[4] Shaffer HJ, Nelson SE, LaPlante DA, LaBrie RA, Albanese M, Caro G. The epidemiology of psychiatric disorders among repeat DUI offenders accepting a treatment-sentencing option. *Journal of Consulting and Clinical Psychology* 2007;75:795-804.

[5] Lapham SC, Baca JC, McMillan GP, Lapidus J. Psychiatric disorders in a sample of repeat impaired-driving offenders. *Journal of Studies on Alcohol*. 2006;67: 707-713.

[6] Lapham SC, Smith E, Baca JC, Chang IY, Skipper BJ, Baum G, Hunt WC. Prevalence of psychiatric disorders among persons convicted of driving while impaired. Archives of General Psychiatry 2001;58:943-949.

[7] Keane C, Maxim PS, Teevan JJ. Drinking and driving, self-control, and gender – testing a general theory of crime. Journal of Research in Crime and Delinquency. 30(1):30-46; 1993.

[8] Lucker GW, Kruzich DJ, Holt MT, Gold JD. The prevalence of antisocial behavior among U.S. Army DWI offenders. Journal of Studies on Alcohol. 52(4):318-20; 1991.

[9] Campbell JC, Webster DW, Koziol-McLain J, et al. Risk factors for femicide within physically abusive intimate relationships: Results from a multi-site case control study. *American Journal of Public Health* 2003; 93:1089-1097.

[10] Vigdor ER, Mercy JA. Do laws restricting access to firearms by domestic violence offenders prevent intimate partner homicide? *Evaluation Review* 2006;30:313-346.

[11] Webster DW, Bulzacchelli MT, Zeoli AM, Vernick JS. Effects of undercover police stings of gun dealers on the supply of new guns to criminals. *Injury Prevention.*2006; 12:225-230.

[12] Webster DW, Vernick JS, Bulzacchelli MT. Effects of a gun dealer's change in sales practices on the supply of guns to criminals. *Journal of Urban Health* 2006; 83:778-787.

[13] Webster DW, Vernick JS, Bulzacchelli MT. The association between state regulation of gun dealers, law enforcement practices, and the supply of guns to criminals. Presented at the Annual Meeting of the American Society of Criminology, Atlanta, November 2007.

[14] Webster DW. Supplemental expert report submitted for City of New York V. A-1 Jewerly & Pawn, Inc. *et al.*, 06 CV 2233, City of New York V. Bob Moates' Sport Shop, INC., *et al.*, 06 CV 6504, May 27, 2008.

[15] Vernick JS, Webster DW, Bulzacchelli MT. Regulating firearms dealers in the United States: an analysis of state law and opportunities for improvement. *Journal of Law, Medicine, and Ethics* 2006;34:765.

[16] Hepburn L, Azrael D, Miller M, Hemenway D. The effect of child access prevention laws on unintentional child firearm fatalities, 1979-2000. *Journal of Trauma* 2006;61:423-428.

[17] Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional firearm deaths among children, *Pediatrics*, 2000;106:1466-1469.

[18] Cummings P, Grossman DC, Rivara FP, Koepsell TD. State gun safe storage laws and child mortality due to firearms. *Journal of the American Medical Association* 1997;278:1084-6.

[19] Webster DW, Vernick JS, Zeoli AM, Manganello JA. Effects of youth-focused firearm laws on youth suicides. *JAMA* 2004; 292:594-601.

[20] Webster DW, Vernick JS, Hepburn LM. Effects of Maryland's law banning Saturday night special handguns on homicides. *American Journal of Epidemiology* 2002;155:406-412.

Office of the Attorney General for the District of Columbia

Before the


COMMITTEE ON PUBLIC SAFETY AND THE JUDICIARY
Phil Mendelson, Chairperson


Bill 17-0843, the "Firearms Control Amendment Act of 2008"



Peter J. Nickles
Acting Attorney General for the District of Columbia

Wednesday, October 1, 2008
10:00 a.m.
Room 500
John A. Wilson Building
1350 Pennsylvania Avenue, N.W.

Good morning Chairman Mendelson, members of the Committee on Public Safety and the Judiciary, members of the Council of the District of Columbia, and guests. I am Peter J. Nickles, Acting Attorney General for the District of Columbia, and I am pleased to appear before you this morning to discuss Bill 17-843, the "Firearms Control Amendment Act of 2008."

On June 26, 2008, the U.S. Supreme Court issued its decision in *District of Columbia v. Heller*. As you know, the Court held that two particular aspects of District law violated the Second Amendment. The first was a broad ban on private possession of handguns. The second was a provision on safe storage of firearms that was found to have no self-defense exception, so that homeowners could never use a gun in self-defense. Immediately upon receipt of the decision, the Mayor and the Council began a process to address both issues and to consider what other legislative or regulatory actions should be taken to achieve the necessary balancing of competing interests between gun owners and the public's right to be protected from increased gun violence. As a first step, emergency legislation was passed and emergency regulations were promulgated which both became effective on July 16th — less than three weeks after the decision — to address the two issues specifically covered by the *Heller* decision. Pursuant to that emergency action, many residents, including Mr. Heller, began and completed a registration process that resulted in those residents obtaining registrations for pistols for use in self-defense within their homes.

In addition to the new pistol registration legislation, it was determined that the District needed to revise its zoning regulations as they applied to retail gun dealers. Emergency regulations to require retail gun dealers to complete a special exception

process and to satisfy reasonable siting and safety requirements were submitted to the Zoning Commission, which approved them and set the permanent regulation for a public hearing.

Those two actions were the first step in the District's response to the *Heller* decision. The second step occurred when the Mayor and the Council recognized that the initial emergency actions required additional provisions to address legitimate concerns raised by District residents on both sides of this issue. The concerns focused on whether the emergency measures were overly restrictive and whether the District's laws should be revised to address these concerns. In response, the Mayor and the Council agreed on revisions that were enacted in the Second Firearms Control Emergency Amendment Act of 2008 on September 16, 2008. Those revisions included: 1) providing authority for the registration of semi-automatic firearms which are not equipped with a high capacity ammunition feeding device; 2) outlawing ammunition feeding devices that can hold more than 10 shots of ammunition; and 3) revising the District's safe storage laws to move to a Child Access Prevention prohibition to provide criminal liability for gun owners who fail to keep their firearms secured when minors are present.

This hearing, and the one the Committee conducted on September 18, 2008, represents the third step in the District's ongoing process to revise its firearms laws. The Committee has heard a number of suggested changes or additions to our laws. I would like to suggest the following changes: 1) aligning the method of transporting registered firearms with federal standards and providing that only registered owners may legally transport firearms; 2) providing for the revocation of firearms registrations for all persons subject to a Civil Protection Order as that term is defined in District law; 3) clarifying

that public and private property owners in the District have the authority to prohibit the possession of firearms on their property; 4) extending the provisions of the Child Access Prevention (CAP) prohibition to other classes of individuals that a gun owner should reasonably know might have access to the owner's firearms, such as persons with mental health issues and convicted felons, and revising the age of minority regarding CAP provisions in the current emergency act to raise it from 16 to 18 years of age; and 5) strengthening penalties for possessing unlawful ammunition and illegally possessing firearms outside of a person's home.

## CONCLUSION

I appreciate the opportunity to present my views at this point in the process. I pledge the full support of my Office to assist the Mayor and Council with any legal assistance and advice that is required as the District continues the process of revising its firearms statutes and regulations. I am happy to answer any questions you may have.

4

Government of the District of Columbia



# Metropolitan Police Department

Testimony of
**Cathy L. Lanier**
Chief of Police

# Bill 17-843
*Firearms Control Amendment Act of 2008*

Committee on Public Safety & the Judiciary
Phil Mendelson, Chair
Council of the District of Columbia

October 1, 2008

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

Good morning, Chairman Mendelson, Council members, community members, and guests. My name is Cathy Lanier, and I am Chief of the Metropolitan Police Department. I am pleased to testify before you today about the important issue of firearms regulation in the District of Columbia.

The District has long wrestled with the epidemic of gun violence that plagues our neighborhoods. The Metropolitan Police Department and our partners in the criminal justice system are continually working to develop and implement better strategies to prevent gun violence, and arrest and prosecute violent criminal offenders. Among the initiatives are the Gun Recovery Unit and the GunStat program. In November 2007, I reinstituted the Gun Recovery Unit, staffed with officers with enhanced training on identifying and recovering illegal guns. In March of this year, Mayor Fenty launched the GunStat program, a collaborative information sharing process among local criminal justice agencies, including police, prosecutors, Superior Court, Court Services and Offender Supervision Agency (CSOSA) and DC Pretrial Services Agency. GunStat tracks gun cases from arrest to prosecution, allowing criminal justice partners to identify repeat offenders, follow trends, and create law enforcement strategies to prevent gun-related crimes. We are seeing positive results from these and other efforts; so far in 2008, violent gun crimes are down 12 percent.

However, we have found ourselves faced with a new challenge since the Supreme Court issued its decision in *District of Columbia vs. Heller*. Let there be no misunderstanding: there is no question of whether we will comply with the Court ruling. The Metropolitan Police Department has worked closely with Mayor Fenty, Acting Attorney General Nickles and others in the Administration to ensure that our laws and policies are in compliance with the Court decision. But we are still working to determine the appropriate level of regulation for legally owned firearms. For example, what steps might have the greatest benefits for public safety? Which ones will be the most cost-effective? We are still exploring these questions as we work to bring the firearms registration process into the 21st century.

As you know, there are no easy consensus answers on this hotly debated topic. The laws and regulations vary greatly from state to state, and in some cases, from city to city. The impact of firearms on communities also varies among jurisdictions, but some studies have found common outcomes that suggest a direct link between access to legal guns and increased violence. According to the Bureau of Alcohol, Tobacco, Firearms and Explosives – more commonly known as ATF – most guns used in crimes are obtained from legitimate channels – gun stores or gun shows. A 2007 study conducted by the Harvard Injury Control Research Center found a direct relationship between legal gun ownership and homicide rates. This first nationally representative study found that gun-related homicide rates among children, and among women and men of all ages, are higher in states where more households have guns. According to the researchers, the results suggest that "household firearms may be an important source of guns used to kill children, women and men, both on the street and in their homes."[1] These findings suggest that the issues we are grappling with today regarding regulating guns will have a direct impact on public safety.

The fact that very few legal guns have been involved in crimes in the District, because there are so few legally owned firearms, should not change this conclusion. The majority of handguns

---

[1] Harvard School of Public Health (2007, January 14). *States With Higher Levels of Gun Ownership Have Higher Homicide Rates*. *Science Daily*. http://www.sciencedaily.com/releases/2007/01/070111181527.htm

registered in DC over the past decade are in the possession of former law enforcement officers and licensed security agencies, a group with a higher level of training and understanding of the need to safeguard firearms than the general public. Therefore it would be a serious mistake to assume that we do not need to be concerned about legally registered firearms based on this limited experience. We have made real progress in driving down the homicide rate in the District over the past several years; we want to do everything possible to continue that trend.

In addition to the violent crime that we see in our city everyday, we must also guard against potential terrorist acts. I will not spend too much time on this today, but as I testified in September before the House Committee on Oversight & Government Reform, terrorists will take great steps to ensure they stay within the law up to and until they attempt a terrorist attack. For instance, the 9/11 Commission found that many of the 9/11 hijackers acquired some form of legal U.S. identification.

Therefore, it does seem appropriate for DC to consider gun registration as a viable means to reduce potential gun violence. The District's registration process serves four key purposes: verifying the eligibility of the owner to legally possess the firearm; ensuring that owners have a common body of knowledge; providing a certificate that enables law enforcement to readily identify legal firearms and the rightful owners; and establishing a means of tracking legal firearms that may be lost, stolen, or used in a crime.

It is critical that the city be able to verify the eligibility of a person to possess a firearm. The criminal background check performed by MPD, which is based on fingerprints, is more effective than that performed by a gun dealer, which is merely based on a social security number. Indeed, a study published this summer found that states that perform local-level background checks for firearms have lower homicide and suicide rates than states that rely only on a federal background check. Local-level checks were associated with a 22-percent lower homicide rate and a 27 percent lower suicide rate in adults aged 21 years or older.[2]

Two goals of the registration process are very similar to standard driver's license processes. First, it is a means of ensuring that all registrants share the same basic level of knowledge. I think we all agree that gun registrants should know the relevant laws and regulations. In addition, two issues that merit further consideration are whether the city also needs to ensure that owners share a common understanding of safety measures, as well as a certain level of proficiency at using guns. I am not ready to suggest that the city require firearm proficiency to own one. Unlike a driver's license, firearm registration does not give the owner permission to use the gun on public space in the city.

However, I believe the city has an important role in providing education on firearms safety to a registrant. In addition to criminal gun violence, the city should also be very concerned about a potential increase in accidental injuries and their impact on public health and economic outcomes. For instance, a 2007 survey of families with children and household firearms found that less than 30 percent store their firearms safely in their residence.[3] Moreover, parents need to be concerned not

[2] Medical College of Wisconsin (2008, June 3). Firearm Suicide and Homicide Rates Associated with Level of Background Check. *ScienceDaily*. http://www.sciencedaily.com/releases/2008/06/080603155227.htm
[3] Wake Forest University Baptist Medial Center (2007, June 5). Few Families Report Safe Firearm Storage, According to Survey. *ScienceDaily*. http://www.sciencedaily.com/releases/2007/06/070604090250.htm

just with their own firearms, but with firearms in homes where their children visit. Although I think the child access provisions that are currently law are sound, they should be reinforced with education. I would recommend that some safety information be communicated specifically to gun registrants, in addition to broader public information campaigns. One option is to mirror the Maryland requirement that applicants watch a video before receiving their registration. This could potentially be done at firearms dealers, online, or at the MPD Firearms Registration Section.

Also similar to the driver's license process, MPD issues a certificate with a photograph of the owner to all firearms registrants. Registrants are required to have this certificate in their possession whenever they have the firearm in their possession. A registrant must also exhibit the license upon request of a law enforcement officer. I firmly believe that this certificate with photo identification is critical to public safety in the District. Without this, in many instances it will be far more difficult for officers to readily distinguish between a registered owner legally transporting a firearm, and someone carrying an illegal firearm.

Lastly, the registration process allows us to identify and track legal firearms that may be lost, stolen, or used in a crime. Given that legal guns are indeed used in crimes and associated with higher homicide rates, I think there is a clear reason for the District to continue to register firearms. However, there is some debate about whether the technology is capable of helping us to link legal guns to gun crimes. The debate focuses on the potential of two technologies to help make this link: one uses ballistics images and the other, microstamping.

The ATF uses ballistics images to help solve crimes by supporting a National Integrated Ballistic Information Network – or NIBIN, a national database of essentially digital pictures of bullets and cartridge casings. When new ballistics images of crime scene evidence is entered into NIBIN, trained firearms examiners look for "hits," a linkage of two different crime scene investigations through NIBIN where previously there had been no known connection. According to the ATF, there have been tens of thousands of "hits" through NIBIN, linking criminals to multiple crimes, enabling us to hold offenders accountable and to bring closure to victims and their families. MPD has recorded more than 800 hits over the past seven years.

To be clear, the NIBIN method compares ballistics across crime scenes, not to ballistics records for legally purchased firearms. Maryland and New York, however, use an Integrated Ballistic Identification System – or IBIS, to track ballistics images of legally registered firearms. It has been reported that they have had very few hits against registered firearms from crime scene evidence. I will explain in a moment some of the reasons why this might be. But it is important to note that MPD was able to get solid evidence in a high-profile case based on crime scene evidence run through Maryland's database on registered firearms. I am sure many of you remember the triple homicide that occurred in the Colonel Brooks' Tavern in 2003. MPD was able to link the offenders to the crime when the crime scene evidence hit against a firearm legally registered in Maryland. The gun had been purchased by the cousin of one of the perpetrators. Despite the fact that we did not have the gun that was used, the ballistics and other evidence was so strong that one suspect committed suicide and two pled guilty. The only suspect who went to trial was convicted.

While Maryland and New York may not have had many hits using the IBIS method, I believe that the District may have better results with such a system for a couple of reasons. The science of

firearms examination is based on the unique "toolmarks" that a firearm leaves on a fired bullet and casing. Extensive experience in the criminal justice field indicates that the toolmarks left by a firearm are so distinct as to be essentially unique. On a practical level, this means that although there is no mathematical certainty of a "match" generated by NIBIN or IBIS, the program narrows the search, and then trained professionals compare images. Maryland and New York may have limited success with IBIS because of practices that increase the error rates in the "hits." For instance, in Maryland, laboratory technicians who were not qualified firearms examiners captured the ballistics images, which overall probably decreased the quality of the images. In contrast, MPD would use trained firearms examiners. Another issue may be the authenticity of the cartridge casings entered into the database of registered firearms. Both Maryland and New York enter casings submitted by gun dealers, and Maryland has found at least one dealer that was not submitting authentic casings. Since MPD is firing all weapons to retrieve the ballistics, we would not have that problem. We are also able to increase the likelihood of matches by firing two types of bullets: both copper and nickel. Because the metallic composition of the bullet can have an impact on the image, having images from multiple types of bullets would make the District database more robust.

The District would also have a more robust representation of crime scene evidence than either Maryland or New York. The Maryland and New York State Police maintain their databases for the legally registered firearms, but local jurisdictions process most crime scenes. Many of them, including New York City, do not enter all crime scene ballistics against IBIS. In the District, MPD would be tracking both the registered guns and the crime scene evidence, thereby increasing the probability of a hit.

Thus I think there are several ways that MPD could improve the use of IBIS and achieve better results. Nevertheless, before we purchase an IBIS system for use with our firearms registration, I want to be sure that we will be able to use it efficiently. One potential drawback to the IBIS system is that our ability to use old ballistics evidence already in NIBIN may be limited. The Department would need to request permission from ATF to bring NIBIN data into IBIS. I am submitting this request to ATF at the same time that my staff is talking with New York and Maryland about other procedures they may be using.

Although there are several concerns about the value of using ballistics to link crime scene evidence with registered firearms, it does not seem that microstamping is ready to replace ballistics testing yet. Microstamping technology uses a laser to etch a pattern or code onto the head of a firing pin or another internal surface of a firearm. Like the traditional firearms tool marks, microstamps leave a mark on a cartridge case. It appears that several studies on microstamping have reached different conclusions. Most recently, a study by the Forensic Science Graduate Group at University of California—Davis indicated that the technology is feasible, but its performance and durability varied.[4] There were some questions about the validity of the study when the findings were first released. The fact that the findings were released at a politically sensitive time – during the debate in the California legislature on microstamping – may have contributed to a sharp reaction to it. But the study has now been subject to peer review and has been officially released with the support of the university president.

[4] University of California – Davis (2008, May 16). Firearms Microstamping Feasible but Variable, Study Finds. *ScienceDaily*. http://www.sciencedaily.com/releases/2008/05/080514092333.htm

After reading materials on this technology, I can only come to the same conclusion as UC—Davis as well as the well-regarded National Research Council: more research should be conducted before we adopt the technology. The Department will certainly continue to explore it. As you know, I am strongly committed to ensuring that MPD has the technology that supports our mission. I look forward to meeting with some of the proponents of the technology here today. In the meantime, until more questions about the technology are answered, I strongly recommend that MPD continue to collect ballistics samples for registered firearms for the time being. Rest assured, I certainly want to resolve this question expeditiously, but I do not want to make a hasty decision. It would be foolish to act too precipitously and lose the opportunity to capture the casings from the firearms being registered now.

In conclusion, I think that the registration process for firearms is vital and enhances public safety. It enables MPD to verify eligibility through a local background check, a process that has been found to reduce homicide rates. It also provides an opportunity to educate registrants about vital laws, responsibilities, and safety. The registration certificate helps MPD to identify illegal firearms, while the ballistics testing can help MPD to investigate and solve crimes.

Beyond the value of the initial registration, I think there would be real public safety benefits to requiring firearms to be re-registered every five years. This would enable MPD to verify that the owner has maintained eligibility, and to update the registration certificate with the owners current address and picture. It would also help to ensure that people accurately report when firearms are lost or stolen. We would not, however, need to conduct another ballistics test during this process. But I believe it is sound public policy to establish the requirement now, with the commitment to develop an efficient and effective process in the future.

Thank you for the opportunity to present this statement for the record. I will be happy to answer any questions that you have.

Government of the District of Columbia



## Metropolitan Police Department

Testimony of
## Cathy L. Lanier
## Chief of Police

# *Hearing on the Impact of Proposed Legislation on the District of Columbia's Gun Laws*

United States House of Representatives
Committee on Oversight & Government Reform
Honorable Henry A. Waxman, Chair

September 9, 2008

U.S. House of Representatives
Washington, DC 20515

Chairman Waxman, members of the Committee, staff, and guests: my name is Cathy Lanier, and I am the Chief of Police of the Metropolitan Police Department of the District of Columbia. Thank you for the opportunity to present this statement on the likely impact of H.R. 6691 on public safety in the Nation's Capital.

To begin with, I would like to briefly share with you what has happened in Washington, DC, since the US Supreme Court issued its decision in *District of Columbia v. Heller*. The District government – both the Executive and the Legislative branches – fully respects the Supreme Court's decision. We have demonstrated that respect by taking quick action to pass legislation and emergency regulations to enable registration of handguns and to ensure that residents already possessing unregistered handguns could register them without fear of criminal liability under District law. The current legislation and regulations are only temporary—valid for 90 and 120 days, respectively—and remain works in progress. The Council of the District of Columbia will be holding a hearing next week to continue to elicit comment from the public and will amend the temporary legislation on September 16th and enact permanent legislation soon after. Today's hearing is another important opportunity to hear a variety of viewpoints on this issue.

After the Court ruling, I mobilized my staff to ensure that MPD's 4,000 sworn members and the public were immediately educated about the impact of the ruling. Within hours of the decision, I held a conference call with my Command Staff, and informed the entire force of the content of the decision via a teletype, our internal daily newsletter, and on "Temperature Boards," which are television screens at MPD facilities broadcasting vital information to the force 24-hours a day. This message was reinforced by a training video on the impact of the decision that officers began viewing within days of the ruling. At the same time, I issued a personal message to the public on community list-serves, posted information on our website, and created a 24-hour public hotline. Since the regulations were issued, the Department has registered 23 handguns. We expect this volume to increase now that there is a firearms dealer in the District of Columbia with a Federal Firearms License.

* * * *

1

Turning to H.R. 6691, I have grave concerns about the proposed bill, which would prevent the District of Columbia from registering firearms, or taking many other reasonable and commonly-used steps—taken by states and municipalities across the country—to regulate or limit possession and use of firearms. In layman's terms, this means that anyone not prohibited by Federal law from possessing a firearm could legally own a small, easily concealed, semi-automatic handgun, or could carry a semi-automatic rifle on the street, either of which could be capable of firing up to 30 rounds of ammunition without reloading.

In my professional opinion, if H.R. 6691 were passed, it would be far more difficult for MPD and Federal law enforcement agencies in the District of Columbia to ensure safety and security in the Nation's Capital. I say this not just as a police officer, but as someone with extensive experience in homeland security and counterterrorism. As Representative Norton mentioned, after September 11th, I served as the Commander of MPD's Special Operations Division for four years, and I was the first Commanding Officer of the Department's Office of Homeland Security and Counterterrorism. In that capacity, I worked extensively with a multi-agency taskforce of local and Federal law enforcement agencies to plan and implement security for critical events like the President Inaugural. In short, I have spent a great deal of time working with national experts to analyze terror threats and develop ways to combat them, especially here in the Nation's capital.

The terrorist attacks of September 11th, 2001, demonstrated something that we have known for some time: government facilities, dignitaries, and public servants are prime targets for terrorists, both foreign and domestic. Protecting government officials and infrastructure is a challenge for every city in the United States. But in Washington, DC, the likelihood of attack is higher, and the challenges to protecting the city are greater.

The District's high concentration of iconic structures—such as the national monuments, the White House, and, of course, the Capitol—make it a highly attractive target. The high-profile human targets—from the Nation's top elected leaders to the more than 400 foreign dignitaries that make official visits to DC each year—are also an obvious and attractive target. In addition, any Federal building or career public servant is a potential target. We have seen this in numerous

2

attacks—from the Oklahoma City bombing to the 1993 shootings outside of CIA headquarters at Langley. And oversees, even the families of high-profile leaders and public servants are a frequent target of terrorists. I hope that we never see that in the United States, but with the many important U.S. officials and foreign dignitaries here in the city, it is a possibility we need to recognize. Moreover, it is not just well-coordinated terrorist attacks we need to secure the city against. We must also consider the unsophisticated "lone wolf" terrorist, angry at the US Government for a seemingly small matter, such as the size of a tax refund.

The second key vulnerability is due to the sheer volume of secure motorcades traveling in Washington on any given day. Given the daily movements around the city of the President, Vice President, and their families, and the fact that almost 3,000 foreign dignitaries spend time in our city each year—the routes for their movements cannot be shut down, as they are in other cities. As you know from your own districts, when the President and Vice President travel outside of Washington, roads are cleared of all traffic, parked cars, and such, and spectators are often kept behind barricades. We don't do this in DC because shutting down the routes for every motorcade would make it virtually impossible to navigate much of the city on a continuous basis, and we don't want the Nation's capital to take on the character of an armed fortress. This freedom, however, comes with the cost of higher vulnerability—both for the officials and dignitaries, and the general population. In attempted and successful assassinations around the world, the first step in attacking a motorcade is frequently to take out the security detail with semi-automatic and automatic firearms. This forces the motorcade to stop, at which point the terrorist can use explosives to attack the armored vehicles carrying the targeted individual.

In addition to assisting the Secret Service with daily movements of the President and Vice President around the city, and protecting foreign dignitaries, MPD also provides security support for more than 4,000 special events annually. Some of the events are small—a low-profile protest or foot race—and the threat of a terrorist attack at one of these may be relatively low. However, the risks associated with other events are significant. I would ask you to consider, for example, two events familiar to almost every American, and, I believe, extremely important to the city and to the nation—the 4th of July celebration on the National Mall and the Presidential Inauguration. Hundreds of thousands of Americans will be here for these public events. Imagine how difficult

3

it will be for law enforcement to safeguard the public, not to mention the new President at the Inaugural Parade, if carrying semi-automatic rifles were to suddenly become legal in Washington.

As another example, I'd remind the Committee of the 8,000 delegates who come to Washington from around the world each fall for a meeting of the Boards of Governors of the International Monetary Fund and World Bank. The delegates stay at 16 hotels around the city. Even under current law, new challenges to protecting the delegates from terrorist threats arise each year. That risk would grow exponentially if we had to also protect them from a legally-armed "lone wolf" gunman staying in or working at one of their hotels.

If these scenarios scare you—they should. They scare me. We all have an immediate concern for any life threatened or lost in a terrorist event. But here in the Nation's Capital, we must also recognize that any terrorist incident, no matter how small, would garner world-wide attention and could have significant international implications. I am certain that the broader repercussions of an incident in the city is also of grave concern to everyone in this room.

Finally, on a personal level, the thought of a member of the Metropolitan Police Department or any law enforcement officer being injured or killed during such an incident worries me greatly. The safety of the men and women of MPD serving this city and country are my responsibility, and I take this responsibility very seriously. My Department devotes significant resources to trying to prevent such an event. Providing easy access to deadly semi-automatic firearms and high capacity ammunition clips and allowing them to be carried in a large number of places outside the home will make this job much more dangerous and difficult.

* * * *

It is clear to me and others engaged every day in securing DC against terrorism that our city is unique. The Federal government already acknowledges that authorizing the general public to carry firearms in certain places is not in the general interest. For instance, as a law enforcement officer, I can carry my gun almost everywhere in the country. I can carry it in schools, on

4

airplanes, and most public buildings. But ironically, upon entering the Supreme Court to hear the arguments in the *Heller* case, I learned that even the Chief of Police of the District of Columbia cannot carry a gun into the Court. The Federal Government considers the Court building to be so sensitive that, no matter who you are, you cannot wear your firearm in the building.

I would argue that similar caution should apply to the District of Columbia. Supreme Court Justice Scalia, writing the majority decision for the Court, acknowledged that "[L]aws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are constitutional.

The District of Columbia, as the seat of the Federal government, with its multitude of critical official and symbolic buildings, monuments, and events, and high-profile public officials traversing its streets every day, is a city filled with "sensitive" places. Our laws should reflect that reality.

Thank you again for the opportunity to appear before you today. I would be pleased to answer any questions that you have.

* * * *

5

# Government of the District of Columbia
## Office of the Chief Financial Officer



Natwar M. Gandhi
Chief Financial Officer

## MEMORANDUM

| | |
|---|---|
| **TO:** | **The Honorable Vincent C. Gray**<br>**Chairman, Council of the District of Columbia** |
| **FROM:** | Natwar M. Gandhi<br>Chief Financial Officer |
| **DATE:** | SEP 16 2008 |
| **SUBJECT:** | Fiscal Impact Statement: "Firearms Control Temporary Amendment Act of 2008" |
| **REFERENCE:** | Bill Number 17-887, Amendment in the Nature of a Substitute |

## Conclusion

Funds are sufficient in the FY 2008 budget and the proposed FY 2009 through FY 2012 budget and financial plan to implement the proposed legislation. Implementation of the proposed legislation would result in initial expenditures of $1.95 million and annual costs of $860,000. Resources will be made available to fund this legislation but the shift in resource use would have an operational impact on the Metropolitan Police Department (MPD). In addition, while a registration fee for registering firearms is not reflected in the proposed legislation, it is anticipated that a fee will be implemented in such a way to offset some of the future costs of firearms registration.

## Background

The proposed legislation would amend multiple sections of D.C. Official Code to allow District residents to register pistols for use in self-defense within the registrant's home. Specifically, the proposed legislation would:

- Allow a District resident to register a pistol for use in self-defense within the registrant's home (D.C. Official Code § 7-2502.02);

- Permit a District resident who holds a valid registration for a firearm to forgo obtaining a license to carry the firearm within the resident's abode, while the firearm is being used for recreational purposes, while the firearm is kept at the registrant's business, or while the firearm is in transport for a lawful purpose (D.C. Official Code § 7-2502.02);

- Require the Chief of the Metropolitan Police Department (Chief) to conduct a ballistics identification procedure on all registered pistols (D.C. Official Code § 7-2502.03);

- Limit registration to no more than one pistol per registrant during any 30-day period (D.C. Official Code § 7-2502.03);

- Prohibit a person from carrying a rifle or shotgun in the District (D.C. Official Code § 22-4504);

- Require each firearm registrant to keep that firearm in his or her possession unloaded and either disassembled or secured by a trigger lock, gun safe, locked box, or other secure device (D.C. Official Code § 7-2507.02);

- Clarify the District's firearms storage policy and provide for penalties for "reckless storage" of a firearm accessible by a minor (i.e. under 16 years of age) (D.C. Official Code § 7-2507.02);

- Revise the definition of "machine gun" to allow semi-automatic handguns to fall under "firearms" that are permitted to be registered (D.C. Official Code § 7-2501.01); and

- Prohibit any person in the District from possessing, selling, or transferring any large capacity ammunition feeding device (i.e. capable of accepting more than 10 rounds of ammunition) (D.C. Official Code § 7-2506.01).

**Financial Plan Impact**

Funds are sufficient in the FY 2008 budget and the proposed FY 2009 through FY 2012 budget and financial plan to implement the proposed legislation. Implementation of the proposed legislation would result in initial expenditures of $1.95 million and annual costs of $860,000. Resources will be made available to fund this legislation but the shift in resource use would have an operational impact on the Metropolitan Police Department (MPD).

Initial costs to implement the legislation would total $1.95 million and would include the following, which would be incurred in FY 2008:

- **Ballistics Identification: $1,081,467**
  - Bullet testing component
  - Cartridge testing component
  - Wiring/cabling component

- o Testing supplies
- o Mobile bullet capturing devices

- **Personnel:** $608,202
  - o 5 DS-9 Compensation for Firearms Examination Unit
  - o 2 DS-9 Compensation for Gun Registration Unit

- **Examination Secure Space:** $258,000

MPD will use existing resources to fund $660,000 of the ballistics identification equipment. The additional funding ($422,000) required to purchase and implement the ballistics testing equipment would come from available funds in the master equipment lease purchase program. This proposed temporary amendment, like the emergency legislation approved in July 2008, would be implemented immediately, and existing personnel would be used to staff the firearms examination and gun registration units. Although the use of existing staff does not result in a fiscal impact, it does result in shifting resources away from other duties within MPD. The cost of additional space would be covered by funds from the Office of Property Management.

In addition, while a registration fee for registering firearms is not reflected in the proposed legislation, it is anticipated that a fee will be implemented in such a way to offset some of the future costs of firearms registration.

A BILL

1

<u>17-843</u>

2

IN THE COUNCIL OF THE DISTRICT OF COLUMBIA

3

_____

4

To amend the Firearms Control Regulations Act of 1975 to revise the definition of machine gun, to add a definition of assault weapon and prohibit assault weapons, to provide a self-defense exemption for possession of a firearm registered to another person within the home, to provide for the registration of pistols for use in self-defense within the home, to provide that a person holding a valid registration for a firearm shall not be required to obtain a license to carry the firearm within the registrant's home or place of business, while being used for lawful recreational purposes, or while being transported for a lawful purpose in accordance with a District or federal statute, to extend the prohibition on registering firearms to persons with drug convictions of ten years prior to application to persons who have committed an intrafamily offense, and to persons with mental disorders and a history of violence, to establish a registration limit of one pistol per registrant per 30 days, to clarify the process of revocation of a registration certificate, to prohibit large capacity ammunition feeding devices, to provide a process for the renewal of registration certificates, to provide that semi-automatic pistols manufactured and sold in the District be microstamped, to clarify the firearms storage policy, and to establish penalties for the reckless storage of a firearm accessible by a minor; to provide a savings clause with regard to the revised definition of machine gun.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this

22

act may be cited as the "Firearms Registration Amendment Act of 2008".

23

Sec. 2. The Firearms Control Regulations Act of 1975, effective September 24, 1976

24

(D.C. Law 1-85; D.C. Official Code § 7-2501.01 *et seq.*), is amended as follows:

25

(a) Section 101 (D.C. Official Code § 7-2501.01) is amended as follows:

26

(1) Paragraph (9) is amended by striking the phrase "any weapon which will, or is

27

1

designed or redesigned, made or remade, readily converted or restored, and intended to," and     1

inserting the phrase "any weapon, regardless of operability, which will, or is designed or     2

redesigned, made or remade, readily converted, restored, or repaired, or is intended to," in its     3

place.     4

(2) A new paragraph (9A) is added to read as follows:     5

"(9A) "Intrafamily offense" shall have the same meaning as provided in D.C.     6

Official Code § 16-1001(8).".     7

(3) Paragraph (10) is amended to read as follows:     8

"(10) "Machine gun" means any firearm which shoots, is designed to shoot, or can     9

be readily restored to shoot, automatically more than one shot, without manual reloading, by a     10

single function of the trigger. The term "machine gun" shall also include the frame or receiver of     11

any such firearm, any part designed and intended solely and exclusively, or combination of parts     12

designed and intended, for use in converting a firearm into a machine gun, and any combination     13

of parts from which a machine gun can be assembled if such parts are in the possession or under     14

the control of a person.".     15

(4) Paragraph (12) is amended by striking the word "hand" and inserting the     16

phrase "hand or with a barrel less than 12 inches in length" in its place.     17

(5) Paragraph (15) is amended by striking the phrase "20 inches in length' both     18

times it appears and inserting the phrase "18 inches in length" in its place.     19

(6) Paragraphs (19) through (23) are added to read as follows:     20

2

(19) "Assault weapon" means the following semiautomatic firearms designated in 1
paragraphs (a) through (d): 2

(a) All of the following specified rifles: (1) All AK series including, but not limited to, 3
the models identified as follows: (A) Made in China AK, AKM, AKS, AK47, AK47S, 56, 56S, 4
84S, and 86S. (B) Norinco (all models). (C) Poly Technologies (all models). (D) MAADI AK47 5
and ARM. (E) Mitchell (all models). (2) UZI and Galil. (3) Beretta AR-70. (4) CETME Sporter. 6
(5) Colt AR-15 series. (6) Daewoo K-1, K-2, Max 1, Max 2, AR 100, and AR110 C. (7) Fabrique 7
Nationale FAL, LAR, FNC, 308 Match, and Sporter. (8) MAS 223. (9) HK-91, HK-93, HK-94, 8
and HK-PSG-1 (10) The following MAC types: (A) RPB Industries Inc. sM10 and sM11. (B) 9
SWD Incorporated M11. (11) SKS with detachable magazine. (12) SIG AMT, PE-57, SG 550, 10
and SG 551. (13) Springfield Armory BM59 and SAR-48. (14) Sterling MK-6. (15) Steyer AUG, 11
Steyr AUG. (16) Valmet M62S, M71S, and M78S. (17) Armalite AR-180. (18) Bushmaster 12
Assault Rifle. (19) Calico M-900. (20) J&R ENG M-68. (21) Weaver Arms Nighthawk. 13

(b) All of the following specified pistols: (1) UZI. (2) Encom MP-9 and MP-45. (3) The 14
following MAC types: (A) RPB Industries Inc. sM10 and sM11. (B) SWD Incorporated —11. 15
Advance Armament Inc. M-11. (D) Military Armament Corp. Ingram M-11. (4) Intratec TEC-9 16
and TEC-DC9. (5) Sites Spectre. (6) Sterling MK-7. (7) Calico M-950. (8) Bushmaster Pistol. 17

(c) All of the following specified shotguns: (1) Franchi SPAS 12 and LAW 12. (2) 18
Striker 12. The Streetsweeper type S/S Inc. SS/12. 19

3

(d) The term "series" includes all other models that are variations, with minor differences, 1

of those models listed in subdivision (a), regardless of the manufacturer. 2

(e) Notwithstanding paragraphs (a) through (d), "assault weapon" shall also mean any of 3

the following: (1) A semiautomatic, centerfire rifle that has the capacity to accept a detachable 4

magazine and any one of the following: (A) A pistol grip that protrudes conspicuously beneath 5

the action of the weapon. (B) A thumbhole stock. (C) A folding or telescoping stock. (D) A 6

grenade launcher or flare launcher. (E) A flash suppressor. (F) A forward pistol grip. (2) A 7

semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 8

rounds. (3) A semiautomatic, centerfire rifle that has an overall length of less than 30 inches. (4) 9

A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the 10

following: (A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or 11

silencer. (B) A second handgrip. (C) A shroud that is attached to, or partially or completely 12

encircles, the barrel that allows the bearer to fire the weapon without burning his or her hand, 13

except a slide that encloses the barrel. (D) The capacity to accept a detachable magazine at some 14

location outside of the pistol grip. (5) A semiautomatic pistol with a fixed magazine that has the 15

capacity to accept more than 10 rounds. (6) A semiautomatic shotgun that has both of the 16

following: (A) A folding or telescoping stock. (B) A pistol grip that protrudes conspicuously 17

beneath the action of the weapon, thumbhole stock, or vertical handgrip. (7) A semiautomatic 18

shotgun that has the ability to accept a detachable magazine. (8) Any shotgun with a revolving 19

cylinder. 20

4

(f) The Council finds a significant public purpose in exempting pistols that are designed 1

expressly for use in Olympic target shooting events. Therefore, those pistols that are sanctioned 2

by the International Olympic Committee and by USA Shooting, the national governing body for 3

international shooting competition in the United States, and that are used for Olympic target 4

shooting purposes at the time the act adding this subdivision is enacted, and that would 5

otherwise fall within the definition of "assault weapon" pursuant to this section are exempt, as 6

provided in paragraphs (g) and (h). 7

(g) "Assault weapon" does not include either of the following: (1) Any antique firearm. 8

(2) Any of the following pistols, because they are consistent with the significant public purpose 9

expressed in subdivision (f): 10

| MANUFACTURER | MODEL | CALIBER | |
|---|---|---|---|
| BENELLI | MP90 | .22LR | 11 |
| BENELLI | MP90 | .32 S&W LONG | 12 |
| BENELLI | MP95 | .22LR | 13 |
| BENELLI | MP95 | .32 S&W LONG | 14 |
| HAMMERLI | 280 | .22LR | 15 |
| HAMMERLI | 280 | .32 S&W LONG | 16 |
| HAMMERLI | SP20 | .22LR | 17 |
| HAMMERLI | SP20 | .32 S&W LONG | 18 |
| PARDINI | GPO | .22 SHORT | 19 |
| PARDINI | GP-SCHUMANN | .22 SHORT | 20 |
| PARDINI | HP | .32 S&W LONG | 21 |
| PARDINI | MP | .32 S&W LONG | 22 |
| PARDINI | SP | .22LR | 23 |

5

| PARDINI | SPE | .22LR | 1 |
| WALTHER | GSP | .22LR | 2 |
| WALTHER | GSP | .32 S&W LONG | 3 |
| WALTHER | OSP | .22 SHORT | 4 |
| WALTHER | OSP-2000 | .22 SHORT | 5 |

(h) The Mayor may exempt new models of competitive pistols that would otherwise 6

fall within the definition of "assault weapon" pursuant to this section from being classified as an 7

assault weapon. The exempt competitive pistols may be based on recommendations by USA 8

Shooting consistent with the regulations contained in the USA Shooting Official Rules or may 9

be based on the recommendation or rules of any other organization that the department deems 10

relevant. 11

(20) "Magazine" shall mean any ammunition feeding device. 12

(21) "Capacity to accept more than 10 rounds" shall mean capable of accommodating 13

more than 10 rounds, but shall not be construed to include a feeding device that has been 14

permanently altered so that it cannot accommodate more than 10 rounds. 15

(22) ".50 BMG rifle" means a center fire rifle that can fire a .50 BMG cartridge and is not 16

already an assault weapon or a machinegun, but does not include any antique firearm. 17

(23) ".50 BMG cartridge" means a cartridge that is designed and intended to be fired from 18

a center fire rifle and that meets all of the following criteria: (1) It has an overall length of 5.54 19

inches from the base to the tip of the bullet. (2) The bullet diameter for the cartridge is from .510 20

6

to, and including, .511 inch. (3) The case base diameter for the cartridge is from .800 inch to, and
including, .804 inch. (4) The cartridge case length is 3.91 inches.

    (b) Section 201(b) (D.C. Official Code § 7-2502.01(b)) is amended as follows:

        (1) Paragraph (3) is amended by striking the phrase "that such weapon shall be
unloaded, securely wrapped, and carried in open view" and inserting the phrase "that such
weapon shall be transported in accordance with section 4b of An Act To control the possession,
sale, transfer and use of pistols and other dangerous weapons in the District of Columbia, to
provide penalties, to prescribe rules of evidence, and for other purposes; or" in its place.

        (2) A new paragraph (4) to read as follows:

        "(4) Any person who temporarily possesses a firearm registered to another person
in the home of the registrant; provided, that the person is not otherwise prohibited from
possessing firearms and the person reasonably believes that possession of the firearm is necessary
to prevent imminent death or great bodily harm to himself or herself or to another person.".

    (c) Section 202 (D.C. Official Code § 7-2502.02) is amended as follows:

        (1) Subsection (a) is amended as follows:

            (A) Paragraph (3) is amended by striking the word "or" at the end.

            (B) Paragraph (4) is amended to read as follows:

        "(4) Pistol not validly registered to the current registrant in the District prior to
September 24, 1976, except that the prohibition on registering a pistol shall not apply to:

            "(A) Any organization that employs at least one commissioned special

7

police officer or other employee licensed to carry a firearm and that arms the employee with a

firearm during the employee's duty hours;

   "(B) A police officer who has retired from the Metropolitan Police

Department; or

   "(C) Any person who seeks to register a pistol for use in self-defense

within that person's home; or".

   (C) A new paragraph (5) is added to read as follows:

  "(5) An unsafe firearm prohibited under section 504.".

  "6.  Assault weapon; or

  "7.  .50 BMG rifle.

(2) Subsection (b) is repealed.

   (d) Section 203 (D.C. Official Code § 7-

2502.03) is amended as follows:

(1) Subsection (a) is amended as follows:

(A) Paragraph (4) is amended as follows:

(i) The lead-in language is amended by striking the phrase "5 years" and inserting the

phrase "10 years" in its place.

(ii) Subparagraph (A) is amended by striking the word "or" at the end.

(iii) Subparagraph (B) is amended by adding the word "or" at the end.

8

234

(iv) A new subparagraph (C) is added to read as follows: 1

"(C) Intrafamily offense;" 2

(B) A new subparagraph (6A) is added to read as follows: 3

"(6A) Within the 5 years immediately preceding the application, has not suffered from a 4

mental disorder, as defined by rule, and has a history of violent behavior against the 5

applicant or another person, unless the applicant has a physician's certificate that the 6

applicant is capable of possessing a regulated firearm without undue danger to the 7

applicant or to another person;". 8

(C) Paragraph (10) is amended as follows: 9

(i) Strike the phrase "use of the same in accordance with tests and standards" and 10

inserting the phrase "use, handling, and storage of the same in accordance with training, 11

tests, and standards" in its place. 12

(ii) Strike the word "and" at the end. 13

(D) Paragraph (11) is amended by striking the period at the end and inserting the phrase "; 14

and" in its place. 15

(E) A new paragraph (12) is added to read as follows: 16

"(12)(A) Has not been the respondent in an intrafamily proceeding in which a civil 17

protection order was issued against the applicant pursuant to D.C. Official Code § 16- 18

1005; provided, that an applicant who has been the subject of such an order shall be 19

9

eligible for registration if the applicant has submitted to the Chief a certified court record 1

establishing that the order has expired or has been rescinded; or 2

"(B) Has not been the respondent in a proceeding in which a foreign protection order, as 3

that term is defined in D.C. Official Code § 16-1041, was issued against the applicant; 4

provided, that an applicant who has been the subject of such an order shall be eligible for 5

registration if the applicant has submitted to the Chief a certified court record establishing 6

that the order has expired or has been rescinded.". 7

(2) New subsections (d) and (e) are added to read as follows: 8

"(d) The Chief shall require any registered pistol to be submitted for a ballistics 9

identification procedure and shall establish a reasonable fee for such procedure. 10

"(e) The Chief shall register no more than one pistol per registrant during any 30- 11

day period.". 12

(e) Section 204) (D.C. Official Code § 7-2502.04) is amended as follows: 13

(1) Subsection (a) is amended by striking the phrase "5 years" and inserting the phrase "6 14

years" in its place. 15

(2) Subsection (c) is amended by striking the phrase "shall be unloaded and securely 16

wrapped, and carried in open view" and inserting the phrase "shall be transported in 17

accordance with section 4b of An Act To control the possession, sale, transfer and use of 18

pistols and other dangerous weapons in the District of Columbia, to provide penalties, to 19

10

prescribe rules of evidence, and for other purposes" in its place.     1

(f) Section 205 (D.C. Official Code § 7-2502.05) is amended by adding a new subsection     2

(c) to read as follows:     3

"(c) The Chief may offer a discount on the registration fees of up to 50% for any     4

applicant who produces a certificate of completion of a firearms safety and proficiency     5

course from an approved instructor as determined by the Chief.".     6

(g) A new section 207a is added to read as follows:     7

"Sec. 207a. Expiration and renewal of registration certificate     8

"(a) Registration certificates shall expire 3 years after the date of issuance unless     9

renewed in accordance with this section for subsequent 3-year periods.     10

"(b) A registrant shall be eligible for renewal of registration of a firearm if the registrant     11

continues to meet all of the initial registration requirements set forth in section 203(a) and     12

follows any procedures the Chief may establish by rule.     13

"(c) For each renewal, a registrant shall submit a statement to the Metropolitan Police     14

Department attesting to:     15

"(1) Possession of the registered firearm; and     16

"(2) The registrant's address.     17

"(d) A registrant shall submit to a background check once every 6 years to confirm that     18

the registrant continues to qualify for registration under section 203.     19

11

"(e)(1)  The Metropolitan Police Department shall mail a renewal notice to each registrant at his or her address of record at least 90 days prior to the expiration of the registration certificate.

"(2) A renewal application shall be received by the Metropolitan Police Department at least 60 days prior to the expiration of the current registration certificate.

"(f) An applicant for the renewal of a registration certificate may be charged a reasonable fee to cover the administrative costs incurred by the Metropolitan Police Department in connection with the renewal.

"(g) The Chief shall establish, by rule, a method for conducting the renewal of registrations for all firearms registered prior to July 17, 2008. The renewals of all firearms registered prior to July 17, 2008, shall be completed within 3 years of the effective date of the Firearms Control Amendment Act of 2008.".

(h) Section 209 (D.C. Official Code § 7-2502.09) is amended as follows:

(1) Designate the existing text as subsection (a).

(2) The newly designated subsection (a) is amended as follows:

(A) Paragraph (2) is amended by adding the word "or" at the end.

(B) Paragraph (3) is amended by striking the phrase "false; or" and inserting the phrase "false." in its place.

(C) Paragraph (4) is repealed.

12

(3) A new subsection (b) is added to read as follows: 1

"(b)(1) A registrant shall be fined not more than $500 for the first violation or 2
omission of the duties, obligations, or requirements imposed by section 208. 3

"(2) A registrant's registration shall be revoked for a second violation or omission of the 4
duties, obligations ,or requirements imposed by section 208.". 5

(i) Section 408 (D.C. Official Code § 7-2504.08) is amended as follows: 6

(1) Designate the existing text as subsection (a). 7

(2) A new subsection (b) is added to read as follows: 8

"(b) Beginning on January 1, 2011, no licensee shall sell or offer for sale any 9
semiautomatic pistol manufactured on or after January 1, 2011 that is not microstamp 10
ready as required by and in accordance with section 503.". 11

(j) New sections 503 and 504 are added to read as follows: 12

"Sec. 503. Microstamping. 13

"(a) For the purposes of the section, the term: 14

"(1) "Firearms dealer" means a person or organization possessing a dealer's license under 15
authority of Title IV 16

"(2) "Manufacturer" means any person in business to manufacture or assemble a firearm, 17
for sale or distribution. 18

13

"(3) "Microstamp-ready" means a semiautomatic pistol that is manufactured to produce a    1

unique alpha-numeric or geometric code on at least 2 locations on each expended    2

cartridge case that identifies the make, model, and serial number of the pistol.    3

"(4) "Semiautomatic pistol" means a pistol capable of utilizing a portion of the energy of    4

a firing cartridge to extract the fired cartridge case and automatically chamber the next    5

round, and that requires a separate pull of the trigger to fire each successive round.    6

"(b) Except as provided in subsection (c) of this section, beginning on January 1, 2011, a    7

semiautomatic pistol falling into any of the following categories shall be micro-stamp    8

ready:    9

"(1) Manufactured in the District of Columbia;    10

"(2) Delivered or caused to be delivered by any manufacturer to a firearms dealer in the    11

District of Columbia; or    12

"(3) Sold, offered for sale, loaned, given, or transferred by a firearms dealer in the District    13

of Columbia.    14

"(c) This section shall apply only to semiautomatic pistols that:    15

"(1) Are manufactured  in the District of Columbia, or delivered or caused to be delivered    16

to a firearms dealer in the District of Columbia, on or after January 1, 2011; and    17

"(2) Have not been transferred to a person not licensed as a firearms dealer    18

pursuant to state or federal law.    19

14

"(d)(1) Intentionally defacing or altering a microstamp-ready semiautomatic pistol or a   1

portion of the pistol for the purpose of preventing law enforcement from identifying the   2

unique alpha-numeric or geometric code associated with that pistol is prohibited.   3

(2) Replacing a firing pin that has been damaged or otherwise in need of replacement for   4

the safe use of the semiautomatic pistol or for a legitimate sporting purpose shall not   5

alone be evidence that someone has violated this subsection.   6

"(e) (1) Beginning January 1, 2011, a manufacturer that delivers a semiautomatic pistol, or   7

causes a semiautomatic pistol to be delivered, to a firearms dealer for sale in the District of   8

Columbia shall certify that:   9

"(A) Each semiautomatic pistol offered for sale in the District will produce a unique alpha-   10

numeric code or a geometric code on each cartridge case that identifies the make, model, and   11

serial number of the semiautomatic pistol that expended the cartridge casing; and   12

"(B) The manufacturer will supply the Chief of Police with the make, model, and serial   13

number of the semiautomatic pistol that expended the cartridge case, when presented with   14

an alpha-numeric or geometric code from a cartridge case; provided, that the cartridge case   15

was recovered as part of a legitimate law enforcement investigation.   16

"(f) The Chief of Police, pursuant to Title I of the District of Columbia Administrative   17

Procedure Act, approved October 21, 1968 (82 Stat. 1204; D.C. Official Code § 2-501 *et*   18

*seq.*), shall issue rules to implement the provisions of this section.   19

15

"(g) Any person who violates this section shall be guilty of a misdemeanor and, upon 1

conviction, shall be imprisoned not more than one year, fined not more than $1,000, or 2

both. 3

"Sec. 504. Prohibition on sale, transfer, ownership, or possession of designated unsafe 4

firearms. 5

"(a) Except as provided in subsections (c), (d), or (e) of this section, beginning January 1, 6

2009, a pistol that is not on the California Roster of Approved Firearms as of January 1, 7

2009, may not be manufactured, sold, given, loaned, exposed for sale, transferred, or 8

imported into the District of Columbia. 9

"(b) Except as provided in subsection (e) of this section, beginning January 1, 2009, a 10

firearm that is not on the California Roster of Approved Firearms as of January 1, 2009, 11

may not be owned or possessed within the District of Columbia unless that handgun was 12

lawfully owned and registered prior to January 1, 2009. 13

"(c) Except as provided in subsection (e) of this section, a District of Columbia resident 14

who is the owner of a handgun lawfully registered prior to January 1, 2009, that is not on 15

the California Roster of Approved Firearms as of January 1, 2009, and who wishes to sell 16

or transfer that handgun after January 1, 2009, may do so only by selling or transferring 17

ownership of the handgun to a licensed firearm dealer. 18

16

"(d) Except as provided in subsection (e) of this section, beginning January 1, 2009, a   1

licensed firearm dealer who retains in the dealer's inventory, or who otherwise lawfully   2

acquires, any firearm  not on the California Roster of Approved Firearms as of January 1,   3

2009, may sell, loan, give, trade, or otherwise transfer the firearm only to another licensed   4

firearm dealer.   5

"(e) This section shall not apply to:   6

"(1) Firearms defined as curios or relics, as defined in 27 C.F.R. § 478.11;   7

"(2) The purchase of any firearm by a member of the Metropolitan Police Department and   8

other law enforcement personnel designated by the Mayor.   9

"(3) Pistols that are designed expressly for use in Olympic target shooting events as   10

defined by California Penal Code section 12132 (h);   11

"(4) Certain single action revolvers as defined by California Penal Code section 12133;   12

"(5) The sale, loan, or transfer of any firearm that is to be used solely as a prop during the   13

course of a motion picture, television, or video production by an authorized participant in   14

the course of making that production or event or by an authorized employee or agent of   15

the entity producing that production or event;   16

"(6) The temporary transfer of a lawfully owned and registered firearm for the purposes   17

of cleaning, repair, or servicing of the firearm by a licensed firearm dealer; or   18

17

"(7) The possession of a firearm by a non-resident of the District of Columbia while 1

temporarily traveling through the District for a duration of [less than one day]; provided, 2

that the firearm is at all times stored unloaded and within a locked box or other locked 3

container. 4

"(f) The District of Columbia shall provide to the licensed firearm dealers within the 5

District information about how to obtain a copy of the California Roster of Approved 6

Firearms. 7

"(g) Any person, firm, corporation, partnership, or other association that violates this 8

section shall be guilty of a felony and, upon conviction, shall be imprisoned for no more 9

than 5 years, fined not more than $5,000, or both.". 10

(k) Section 601 (D.C. Official Code § 7-2506.01) is amended as follows: 11

(1) Designate the existing text as subsection (a). 12

(2) A new subsection (b) is added to read as follows: 13

"(b) No person in the District shall possess, sell, or transfer any large capacity 14

ammunition feeding device. For the purposes of this subsection, the term "large capacity 15

ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device 16

that has a capacity of, or that can be readily restored or converted to accept, more than 10 17

rounds of ammunition. The term "large capacity ammunition feeding device" shall not 18

18

include an attached tubular device designed to accept, and capable of operating only with, 1

.22 caliber rimfire ammunition.". 2

(l) Section 702 (D.C. Official Code § 7-2507.02) is amended to read as follows: 3

"Sec. 702. Responsibilities regarding storage of firearms. 4

"(a) It shall be the policy of the District of Columbia that each registrant should 5

keep any firearm in his or her possession unloaded and either disassembled or secured by 6

a trigger lock, gun safe, locked box, or other secure device. 7

"(b) No person shall store or keep any firearm on any premises 8

under his control if he knows or reasonably should know that a minor is likely to gain 9

access to the firearm without the permission of the parent or guardian of the minor unless 10

such person: 11

"(1) Keeps the firearm in a securely locked box, secured container, or in a 12

location which a reasonable person would believe to be secure; or 13

"(2) Carries the firearm on his person or within such close proximity that 14

he can readily retrieve and use it as if he carried it on his person. 15

"(c)(1) A person who violates subsection (b) of this section is guilty of criminally 16

negligent storage of a firearm and, except as provided in paragraph (2) of this subsection, 17

shall be fined not more than $1,000, imprisoned not more than 180 days, or both. 18

19

"(2) A person who violates subsection (b) of this section and the minor causes injury or

death to themselves or another shall be fined not more than $5,000, imprisoned not more

than 5 years, or both.

"(3) The provisions of paragraphs (1) and (2) of this subsection shall not apply if the

minor obtains the firearm as a result of an unlawful entry to any premises by any person.

"(d) For the purposes of this section, the term "minor" shall mean a person under

the age of 18 years.".

(m) A new section 702a is added to read as follows:

"Sec. 702a. Prohibition of firearms from public or private property.

"(a) The District of Columbia may prohibit or restrict the possession of firearms on its

property and any property under its control.

"(b) Private persons or entities owning property in the District of Columbia may prohibit

or restrict the possession of firearms on their property.".

(n) Section 705(a) (D.C. Official Code § 7-2507.05(a)) is amended by striking the phrase

"shall be unloaded and securely wrapped in a package" and inserting the phrase "shall be

transported in accordance with section 4b of An Act To control the possession, sale,

transfer and use of pistols and other dangerous weapons in the District of Columbia, to

provide penalties, to prescribe rules of evidence, and for other purposes" in its place.

20

(n) D.C. Code § 7-2551.01 is amended by deleting ":(1) 'Assault weapon'" and all that follows and replacing it with "'assault weapon' shall have the same meaning as in paragraph (19) of § 7-2501.01." 1 2 3

Sec. 3. Savings clause. 4

Nothing in section 2(a)(3) shall affect any action, proceeding, or prosecution commenced before September 16, 2008. Any such action, proceeding, or prosecution shall continue, or may be enforced, in the same manner and to the same extent as if the amendment made by that section had not been made. 5 6 7 8

Sec. 4. Fiscal impact statement. 9

The Council adopts the fiscal impact statement of the Chief Financial Officer as the fiscal impact statement required by section 602(c)(3) of the District of Columbia Home Rule Act, approved December 24, 1974 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(3)). 10 11 12

Sec. 5. Effective date. 13

This act shall take effect following approval by the Mayor (or in the event veto by the Mayor, action by the Council to override the veto), a 30-day period of Congressional review as provided in section 602(c)(1) of the District of Columbia Home Rule Act, approved December 24, 1973 (87 Stat. 813; D.C. Official Code § 1-206.02(c)(1)), and publication in the District of Columbia Register. 14 15 16 17 18

21

**CERTIFICATE OF SERVICE**

I certify that on September 3, 2010, electronic copies of this statutory addendum were served through the Court's ECF system and paper copies were mailed by first-class mail, postage prepaid, to:

Stephen P. Halbrook        Matthew Shors
Richard E. Gardiner        O'Melveny & Myers LLP
3925 Chain Bridge Road    1625 Eye Street, NW
Suite 403                   Washington, DC 20006-4001
Fairfax, VA 22030

William J. Olson          Paul R.Q. Wolfson
370 Maple Avenue West    Wilmer Cutler Pickering Hale and Dorr LLP
Suite 4                     1875 Pennsylvania Avenue, NW
Vienna, VA 22180-5615    Washington, DC 20006

/s/ Todd S. Kim
TODD S. KIM