# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

DICK ANTHONY HELLER, ET AL.,

*Plaintiff-Appellants*,

*v.*

DISTRICT OF COLUMBIA, ET AL.,

*Defendants-Appellees.*

**On Appeal From the United States District Court
for the District of Columbia, Hon. Ricardo M. Urbina**

**BRIEF FOR AMICI CURIAE BRADY CENTER TO PREVENT GUN
VIOLENCE, HISPANIC AMERICAN POLICE COMMAND OFFICERS
ASSOCIATION, INTERNATIONAL BROTHERHOOD OF POLICE
OFFICERS, AND NATIONAL BLACK POLICE ASSOCIATION
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

JONATHAN E. LOWY
DANIEL R. VICE
BRADY CENTER TO PREVENT GUN
   VIOLENCE
LEGAL ACTION PROJECT
1225 Eye Street, N.W., Suite 1100
Washington, D.C. 20005
(202) 289-7319

PAUL R.Q. WOLFSON
   *Counsel of Record*
A. STEPHEN HUT, JR.
JOSHUA M. SALZMAN
LAURA MORANCHEK HUSSAIN
FRANCESCO VALENTINI
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
paul.wolfson@wilmerhale.com

September 20, 2010

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### Parties and Amici

Except for the Hispanic American Police Command Officers Association, the International Brotherhood of Police Officers, and the National Black Police Association, all parties, intervenors, and *amici* appearing before the district court and in this Court are listed in the brief for Appellees.

### Rulings Under Review

References to the rulings at issue appear in the briefs for Appellants and Appellees.

### Related Cases

To the best of counsel's knowledge, this case was not previously before this Court or any court other than the district court below. Counsel are unaware of any related cases currently pending in this Court or any other court.

### Statutes and Regulations

All applicable constitutional provisions, statutes, and regulations are set forth in the Addendum to the briefs for Appellants.

# DISCLOSURE STATEMENT

*Heller et al. v. District of Columbia et al.*, No. 10-7036

Pursuant to Fed. R. App. P. 26.1 and D.C. Cir. Rule 26.1, the Brady Center To Prevent Gun Violence states that it is a § 501(c)(3) non-profit corporation dedicated to reducing gun violence through education, research, and legal advocacy. The Brady Center To Prevent Gun Violence has no parent corporation, and no publicly held corporation holds ten percent or more of its stock.

The Hispanic American Police Command Officers Association states that it has no parent corporation, and no publicly held corporation holds ten percent or more of its stock.

The International Brotherhood of Police Officers states that it has no parent corporation, and no publicly held corporation holds ten percent or more of its stock.

The National Black Police Association states that it has no parent corporation, and no publicly held corporation holds ten percent or more of its stock.

*Amici Curiae* are represented herein by Paul R.Q. Wolfson, who is counsel of record, A. Stephen Hut, Jr., Joshua M. Salzman, Laura Moranchek Hussain, and Francesco Valentini of Wilmer Cutler Pickering Hale and Dorr LLP, 1875 Pennsylvania Avenue N.W., Washington, D.C. 20006; and Jonathan E. Lowy and

Daniel R. Vice of the Brady Center To Prevent Gun Violence, Legal Action

Project, 1225 Eye Street, N.W., Suite 1100, Washington, D.C. 20005.

/s/ Paul R.Q. Wolfson
_____

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
paul.wolfson@wilmerhale.com
*Counsel for Amici Curiae*

# D.C. CIR. R. 29(d) STATEMENT

Brady Center to Prevent Gun Violence, Hispanic American Police Command Officers Association, International Brotherhood of Police Officers, and National Black Police Association are filing a separate brief *amici curiae* in support of Appellees and affirmance from *amici* Professional Historians and Law Professors. Counsel for Brady Center and other *amici* understands that the brief of *amici* Professional Historians and Law Professors will principally address the history of the Second Amendment and historical limitations on the right to arms. This topic is not addressed in this brief, nor is it an area of expertise of the Brady Center and other *amici*. Accordingly, the Brady Center and other *amici* certify that a separate brief is necessary to permit the Brady Center and other *amici* to address, *inter alia*, the impact of firearms regulations on public safety and the interests of law enforcement and society at large in preventing gun violence.

/s/ Paul R.Q. Wolfson

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
paul.wolfson@wilmerhale.com
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED
    CASES ................................................................................. C-1

DISCLOSURE STATEMENT .......................................................... C-2

D.C. CIR. R. 29(d) STATEMENT ................................................... C-4

TABLE OF AUTHORITIES ................................................................ iii

INTEREST OF AMICI CURIAE ......................................................... 1

SUMMARY OF ARGUMENT .............................................................. 3

ARGUMENT ......................................................................................... 6

I.     STRICT SCRUTINY IS NOT APPLICABLE TO
     APPELLANTS' SECOND AMENDMENT CHALLENGES ...................... 6

     A.     Applying Strict Scrutiny Would Be Inconsistent With
          *Heller* And *McDonald* ........................................................... 6

     B.     The Reasonable-Regulation Test Gives Appropriate
          Respect To The Legislature's Empirical Judgments In
          Protecting The Public From Gun Violence ...................... 12

     C.     The Reasonable-Regulation Test Has Been Widely
          Adopted Under State Constitutional Provisions
          Recognizing An Individual Right To Keep And Bear
          Arms ................................................................................. 16

II.    THE DISTRICT'S GUN REGISTRATION AND LICENSING
     SYSTEM IS CONSTITUTIONAL ................................................ 18

     A.     Registration And Licensing Requirements Do Not Limit
          Exercise Of The Right To Armed Self-Defense ............... 19

     B.     The District's Registration And Licensing Provisions
          Serve Crucial Government Interests ................................ 22

III. THE DISTRICT'S BAN ON PARTICULARLY
DANGEROUS WEAPONS AND LARGE-CAPACITY
MAGAZINES IS CONSTITUTIONAL ...................................................... 25

    A.     The Bans Do Not Implicate The Second Amendment
Right Recognized In *Heller* ................................................................ 26

    B.     Even If The Ban On Assault Weapons And Large-
Capacity Magazines Implicates The Second Amendment,
It Is Constitutional ............................................................................... 29

CONCLUSION ................................................................................................. 32

RULE 32 CERTIFICATION

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES*

## CASES

Page(s)

*Action for Children's Television v. FCC*, 58 F.3d 654 (D.C. Cir. 1995)............... 10

*Arnold v. Cleveland*, 616 N.E.2d 163 (Ohio 1993) ............................... 29

*Benjamin v. Bailey*, 662 A.2d 1226 (Conn. 1995)............................. 17, 29

*Bleiler v. Chief, Dover Police Department*, 927 A.2d 1216 (N.H. 2007) .................................................................. 17

*Burdick v. Takushi*, 504 U.S. 428 (1992) ............................................ 10

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ........................ 14

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986)................... 9, 12, 14

*Clark v. Community for Creative Non-Violence*, 468 U.S. 288 (1984).................. 12

*Cox v. New Hampshire*, 312 U.S. 569 (1941) ....................................... 20

*Crawford v. Marion County Election Board*, 553 U.S. 181 (2008) ....................... 22

*Delaware v. Prouse*, 440 U.S. 648 (1979) ............................................ 9

\* *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008)..........................1, 3, 4, 5, 6, 7, 8, 10, 11, 15, 18, 22, 26, 31

*Edenfield v. Fane*, 507 U.S. 761 (1993)............................................. 10

*English v. State*, 35 Tex. 473 (1872).............................................. 16

*Ewing v. California*, 538 U.S. 11 (2003)............................................ 12

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992)........................... 20

*Gitlow v. New York*, 268 U.S. 652 (1925)............................................. 9

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*Heffron v. International Society for Krishna Consciousness, Inc.*,
452 U.S. 640 (1981) .................................................................. 12

*Heller v. District of Columbia*, 698 F. Supp. 2d 179 (D.D.C. 2010) .................... 26

*Jackson v. State*, 68 So. 2d 850 (Ala. Ct. App. 1953) ............................................ 17

*Justice v. Town of Cicero*, 577 F.3d 768 (7th Cir. 2009) ...................................... 21

*Kelley v. Johnson*, 425 U.S. 238 (1976) ............................................................... 13

*Kovacs v. Cooper*, 336 U.S. 77 (1949) ................................................................. 31

*McConnell v. FEC*, 540 U.S. 93 (2003) ..................................................................7

\* *McDonald v. City of Chicago*, 130 S. Ct. 3020
(2010) ........................................................... 1, 3, 6, 7, 9, 14, 15, 26, 29, 31

*Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004) ....................................................... 16

*Navegar, Inc. v. United States*, 192 F.3d 1050 (D.C. Cir. 1999) ......................... 29

*New York v. Quarles*, 467 U.S. 649 (1984) .......................................................... 15

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ...................... 1, 11

*People v. James*, 94 Cal. Rptr. 3d 576 (Ct. App. 2009) ........................................ 26

*Robertson v. City & County of Denver*, 874 P.2d 325 (Colo. 1994) .... 17, 28, 29, 31

*San Antonio Independent School District v. Rodriguez*, 411 U.S. 1
(1973) ..........................................................................................................8

*State v. Buzzard*, 4 Ark. 18 (1842) ....................................................................... 16

*State v. Cole*, 665 N.W.2d 328 (Wis. 2003) ................................................... 16, 17

*State v. Comeau*, 448 N.W.2d 595 (Neb. 1989) ................................................... 16

*State v. Dawson*, 159 S.E.2d 1 (N.C. 1968) ........................................................ 17

*State v. Hamdan*, 665 N.W.2d 785 (Wis. 2003) .................................................. 17

*State v. Reid*, 1 Ala. 612 (1840) ............................................................16

*State v. Shelby*, 2 S.W. 468 (Mo. 1886) ...............................................16

*State v. Wilburn*, 66 Tenn. 57 (1872) ...................................................16

*Tennessee v. Lane*, 541 U.S. 509 (2004) ...............................................20

*Trinen v. City & County of Denver*, 53 P.3d 754 (Colo. Ct. App. 2002) ..............17

*Turner v. Safley*, 482 U.S. 78 (1987) ....................................................19

*United States v. Marzzarella*, No. 09-3185, 2010 WL 2947233 (3d Cir. July 29, 2010) ....................................................................25

*United States v. O'Brien*, 391 U.S. 367 (1968) ......................................9

*United States v. Skoien*, No. 08-3770, 2010 WL 2735747 (7th Cir. May 10, 2010 ) ...............................................................1, 18

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) ...............................................7

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ................................9, 11, 12

*Watchtower Bible & Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150 (2002) .......................................................20

*White v. Colorado*, 157 F.3d 1226 (10th Cir. 1998) ...............................20

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) .............................................9

*Young v. American Mini Theatres, Inc.*, 427 U.S. 50 (1976) ....................12

## STATUTES AND RULES

18 U.S.C. § 922 ...................................................................................23

D.C. Code
  § 46-409 ......................................................................................20
  § 46-410 ......................................................................................20

Marriage Amendment Act of 2008, D.C. Law 17-222 ..........................20

# OTHER AUTHORITIES

Bureau of Justice Statistics, *Crimes committed with firearms, 1973-2007*, *available at* http://bjs.ojp.usdoj.gov/content/glance/tables/guncrimetab.cfm (last updated Sept. 20, 2010) ................................. 13

Bureau of Justice Statistics, *Homicide Trends in the U.S., Weapons Used*, *available at* http://bjs.ojp.usdoj.gov/content/homicide/weapons.cfm (last updated Sept. 20, 2010) .................................................. 14

Bureau of Justice Statistics, *Nonfatal Firearm-Related Violent Crimes, 1993-2008*, *available at* http://bjs.ojp.usdoj.gov/content/glance/tables/firearmnonfataltab.cfm (last updated Sept. 20, 2010) ................................................................................................. 14

Campbell, Jacqueline C., et al., *Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study*, 93 Am. J. of Pub. Health 1089 (2003) .............................................. 14

Centers for Disease Control and Prevention, *available at* http://www.cdc.gov/injury/wisqars/index.html (last visited Sept. 20, 2010) ............ 12, 15

CDC National Center for Injury Prevention and Control, WISQARS, *available at* http://webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html (last updated May 27, 2010) .......................................................... 23

Cook, Philip J. & Jens Ludwig, *Gun Violence: The Real Costs* (2000) ................. 13

Cook, Philip J. et al., *The Medical Costs of Gunshot Injuries in the United States*, 282 J. Am. Med. Ass'n 447 (1999) ...................................... 13

Henigan, Dennis A., *The Heller Paradox*, 56 UCLA L. Rev. 1171 (2009) ................................................................................................... 8

Hepburn, Lisa, et al., *The Effect of Child Access Prevention Laws on Unintentional Child Firearm Fatalities, 1979-2000*, 61 J. Trauma, Injury, Infection & Critical Care 423 (2006) ................................ 13

Holmes, Oliver Wendell, *The Common Law* (1881) ............................................. 17

Koper, C., *An Updated Assessment of the Federal Assault Weapons Ban* (Report to National Institute of Justice, U.S. Dep't. of Justice 2004)......................................................................................... 27, 30

Larson, Carlton F.W., *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit*, 60 Hastings L.J. 1371 (2009) ......................................................................................... 8

U.S. Department of Justice, *Murder Victims by Weapon, 2004-2008*, *available at* http://www.fbi.gov/ucr/cius2008/offenses/ expanded_information/data/shrtable_08.html (last updated Sept. 20, 2010) ....................................................................................... 14

U.S. Department of Treasury, *Assault Weapons Profile* (1994) ........................... 30

U.S. Department of Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* (1998) ..................................... 28, 30

Webster, Daniel W. et al., *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. Urban Health: Bulletin N.Y. Acad. Med. 525 (2009) ..................................... 13, 21

Webster, Daniel W. et al., Johns Hopkins Bloomberg School of Public Health, *Comprehensive Ballistic Fingerprinting of New Guns: A Tool for Solving and Preventing Crime* (updated Nov. 21, 2002) ................................................................................................... 25

Webster, Daniel W. et al., *Relationship Between Licensing, Registration, and Other State Gun Sales Laws and the Source State of Crime Guns*, 7 Injury Prevention 184 (2001) ..................... 13, 21, 24

Weil, Douglas S. & Rebecca C. Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. Am. Med. Ass'n 1759 (1996) ............................................................................ 14, 21

Winkler, Adam, *Scrutinizing The Second Amendment*, 105 Mich. L. Rev. 683 (2007)................................................................................... 16, 17

Zawitz, Marianne, *Guns Used in Crime*, U.S. Dep't of Justice, Bureau of Justice Statistics (1995) ........................................................................ 27

**INTEREST OF AMICI CURIAE**

The Brady Center To Prevent Gun Violence is a non-profit organization

dedicated to reducing gun violence through education, research, and legal

advocacy.  Through its Legal Action Project, the Brady Center has filed numerous

briefs *amicus curiae* in cases involving the constitutionality of firearms

regulations, including in *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010),

*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), *United States v. Skoien*, No.

08-3770, 2010 WL 2735747 (7th Cir. July 13, 2010) (en banc), and *Parker v.

District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007).

The Hispanic American Police Command Officers Association represents

1,500 command law enforcement officers and affiliates from municipal police

departments, county sheriffs' offices, and state and federal agencies.

The International Brotherhood of Police Officers is one of the largest police

unions in the country, representing more than 50,000 members.

The National Black Police Association represents approximately 35,000

individual members and more than 140 chapters.

*Amici* focus on the problem of gun violence and its impact on the victims of

gun violence, law-enforcement personnel, and society at large.  They therefore

have a strong interest in ensuring that the Second Amendment does not stand as an

obstacle to effective governmental action to prevent gun violence.

All parties have consented in writing to the filing of this brief. Pursuant to Fed. R. App. P. 29 and D.C. Cir. Rule 29, on May 31, 2010 *amicus* Brady Center to Prevent Gun Violence filed a notice of intent to participate in this case as *amici curiae* and represented to this Court that all parties had consented to the filing of this brief. On September 17, 2010, Hispanic American Police Command Officers Association, International Brotherhood of Police Officers, and National Black Police Association filed an unopposed motion to join the Brady Center's *amicus* brief.

## SUMMARY OF ARGUMENT

The District of Columbia's measures requiring firearms registration and licensing, as well as training and demonstrated ability to use firearms safely, are fully consistent with the Second Amendment, as are the District's restrictions on possession of assault weapons and large-capacity magazines.

While the Supreme Court in *District of Columbia v. Heller* recognized an individual right to keep and bear arms in the home for the purpose of self-defense, it made clear that (a) the right extends to individuals who are "law-abiding [and] responsible," (b) the Second Amendment does not encompass "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," and (c) broad classes of firearms regulations are "presumptively lawful." 128 S. Ct. 2783, 2816, 2821 (2008). In *McDonald v. City of Chicago*, the Court "repeat[ed] those assurances" and agreed that "'state and local experimentation with reasonable firearms regulation will continue under the Second Amendment.'" 130 S. Ct. 3020, 3047 (2010). These admonitions by the Court are inconsistent with Appellants' submission that all firearms regulations require strict scrutiny, and are consistent with an approach that would uphold firearms regulations such as the District's if they are reasonable, but still leave qualified individuals able to possess firearms to defend themselves in the home.

This Court has applied a similar reasonable-regulation test for firearms regulations, as have many state courts. In applying that test, courts have consistently recognized that, because firearms pose a unique risk to the safety of the community, great deference to firearms regulations is warranted. The reasonable-regulation test should be adopted here.

Under any standard of review, the District's laws are constitutional. Individuals who are not legally disqualified from or physically incapable of using firearms are fully able to possess a handgun in the home. The District's registration, licensing, and training requirements are designed to identify those who are *not* eligible or able to possess weapons in a manner that is both "law-abiding [and] responsible," *Heller*, 128 S. Ct. at 2821, and thus serve a critical public safety interest. In arguing that the District may not even seek to identify persons whose possession of weapons would be dangerous or inimical to the public interest, Appellants seek to expand the right recognized by the Supreme Court into a right the Court never countenanced and implicitly rejected—a constitutional right of unqualified and untrained persons to amass an arsenal of firearms. This vast expansion of the Second Amendment would cripple law enforcement by precluding common-sense laws needed to stem the epidemic of gun violence that harms more than 100,000 Americans every year.

Similarly, the District has acted reasonably in banning particularly

dangerous assault weapons and large-capacity ammunition magazines. Such "'dangerous and unusual weapons,'" *Heller*, 128 S. Ct. at 2817, designed and used principally for offensive purposes, do not even fall within the Second Amendment right defined in *Heller*. Even if they did, any Second Amendment interest in their possession would be outweighed by the District's crucial need to reduce the particularly grave threat of violence in the nation's capital caused by these highly dangerous weapons.

# ARGUMENT

## I. STRICT SCRUTINY IS NOT APPLICABLE TO APPELLANTS' SECOND AMENDMENT CHALLENGES

### A. Applying Strict Scrutiny Would Be Inconsistent With *Heller* And *McDonald*

Appellants and their *amici* argue that *Heller* and *McDonald*—by recognizing a "fundamental" individual right to keep and bear arms in the home for self-defense—require the application of strict scrutiny to all firearms regulations, or at least to those regulations that might affect the right of individuals to possess any kind of firearm in their homes. But those decisions lend no support to the application of strict scrutiny, and in fact are incompatible with such an exacting test for firearms regulations.

*Heller* held—and *McDonald* confirmed—that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *District of Columbia v. Heller*, 128 S. Ct. 2783, 2821 (2008); *see McDonald v. City of Chicago*, 130 S. Ct. 3020, 3036 (2010). *Heller* and *McDonald* make clear that the right protected by the Second Amendment is "not unlimited" in scope and does not amount to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 128 S. Ct. 2816; *see McDonald*, 130 S. Ct. at 3047.

Although those decisions articulated no specific standard of review for firearms regulations, they made clear that the individual right to keep and bear arms in the home for self-defense is subject to reasonable regulation by the legislature. In *Heller*, the Court emphasized that the Constitution leaves legislatures "a variety of tools for combating" the "problem of handgun violence." 128 S. Ct. at 2822. And, just this year, *McDonald* reaffirmed *Heller*'s "assurances" about the limited nature of the Second Amendment right, and put to rest "doomsday proclamations" that incorporation would lead to the invalidation of a variety of state and local firearms laws, emphasizing that "incorporation does not imperil every law regulating firearms," and agreeing that "'reasonable firearms regulation will continue under the Second Amendment.'" 130 S. Ct. at 3046, 3047. Such "assurances" from the Supreme Court, stated twice in two years, are incompatible with Appellants' suggestion that firearms regulations are subject to the "strong presumption against constitutionality [that is] often thought to accompany" strict scrutiny. *McConnell v. FEC*, 540 U.S. 93, 137 (2003) (internal quotation marks omitted), *overruled in part on other grounds*, *Citizens United v. FEC*, 130 S. Ct. 876 (2010); *see also, e.g.*, *Vieth v. Jubelirer*, 541 U.S. 267, 294-295 (2004) (plurality op.) ("As is well known, strict scrutiny readily, and almost always, results in invalidation.").

Further indicating that exacting scrutiny is inapposite in the Second Amendment context, the *Heller* Court explicitly identified as "presumptively lawful" a host of firearms regulations. 128 S. Ct. at 2816-2817. These "presumptively lawful" regulations are not limited to categorical bans on firearm possessions by felons, but include laws that may affect the ability of even law-abiding citizens to obtain firearms for self-defense in the home—as in the case of "laws imposing conditions and qualifications on the commercial sale of arms." *Id.* at 2816-2817.[1] The Court also made clear that its analysis did not "suggest the invalidity of laws regulating the storage of firearms to prevent accidents," *id.* at 2820, despite the fact that such laws regulate firearms in the home. As the district court correctly recognized, *Heller*'s presumption of lawfulness "would not square" with applying strict scrutiny to such firearms regulations. App'x 162; *see also* Henigan, *The* Heller *Paradox*, 56 UCLA L. Rev. 1171, 1197-1198 (2009); Larson, *Four Exceptions in Search of a Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 Hastings L.J. 1371, 1379 (2009). Indeed, if they were subject to strict scrutiny, laws implicating the Second Amendment would, by definition, "*not* [be] entitled to the usual presumption of validity." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16-17 (1973) (emphasis added).

---

[1]  The *Heller* Court also emphasized that this list of "presumptively lawful" regulations was purely illustrative and non-exclusive. 128 S. Ct. at 2816 n.26.

Appellants contend (Br. 19-25) that strict scrutiny must apply to their claims because *McDonald* concluded that the right to keep and bear arms is "fundamental" for incorporation purposes. 130 S. Ct. at 3042. But in *McDonald*, the Court emphasized that its conclusion that the Second Amendment right is "fundamental" was limited to "the sense relevant [t]here"—*i.e.*, incorporation. *Id.* at 3037. And laws that affect "fundamental" rights are *not* necessarily subject to strict scrutiny. The First Amendment, for example, is surely "fundamental," *see Gitlow v. New York*, 268 U.S. 652, 666 (1925), yet, in numerous contexts, restrictions on the exercise of First Amendment rights are not subject to strict scrutiny—and may be sustained even on the basis of a mere government interest in preserving "the quality of urban life."[2] The Fourth Amendment also imposes less-searching review.[3] Similarly, although voting is a "fundamental political right," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886), the Supreme Court has expressly

---

[2]    *See, e.g.*, *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (applying deferential form of intermediate scrutiny to restrictions on time, place, and manner of speech to limit noise); *United States v. O'Brien*, 391 U.S. 367, 376-377 (1968) (applying similarly deferential test to content-neutral regulations of expressive conduct); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48-50 (1986) (applying similarly deferential standard to laws aimed at "secondary effects" of particular types of speech that affect "neighborhoods, commercial districts, and the quality of urban life").

[3]    *See Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (declining to adopt "least intrusive" standard under the Fourth Amendment).

rejected the argument that "any burden upon the right to vote must be subject to strict scrutiny." *Burdick v. Takushi*, 504 U.S. 428, 432 (1992).

Nor would heightened intermediate scrutiny sufficiently accommodate *Heller*'s presumption of constitutionality. Under the more demanding form of intermediate scrutiny governing commercial-speech restrictions, for example, it is incumbent upon the government to proffer evidence affirmatively "demonstrating that its restriction serves a substantial state interest and is designed in a reasonable way to accomplish that end." *Edenfield v. Fane*, 507 U.S. 761, 768-769 (1993); *see also, e.g.*, *Action for Children's Television v. FCC*, 58 F.3d 654, 681 (D.C. Cir. 1995) (en banc). Placing the burden on the government to demonstrate that its regulation is valid cannot be squared with the presumption of constitutionality recognized in *Heller*.

To be sure, *Heller* also rejected rational-basis review for regulations that effectively eviscerate the individual right to self-defense in the home. *See* 128 S. Ct. at 2817 n.27. Thus, the Court held that the District's complete ban on handgun possession in the home could not stand, because that ban would effectively disable law-abiding individuals from possessing arms to defend themselves in their own residences. *See id.* at 2817-2818.[4] But the Court nowhere suggested that

---

[4]     *Heller* also rejected an "interest-balancing" test that would have allowed a total handgun ban such as the one at issue in *Heller*. 128 S. Ct. at 2821.

reasonable regulations on firearms possession that did not prevent such home defense would be invalid.

The standard of review most faithful to the Supreme Court's decisions in *Heller* and *McDonald*, and used overwhelmingly by state court in analogous firearms cases, is the "reasonable regulation" framework this Court endorsed in *Parker v. District of Columbia*, 478 F.3d 370, 399 (D.C. Cir. 2007), *aff'd sub nom. District of Columbia v. Heller*, 128 S. Ct. 2783 (2008). This standard is comparable to—though perhaps more accommodating of government regulation than—the standard of review applicable to content-neutral restrictions on the time, place, and manner of speech. *Id.* (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). As explained below, such a standard appropriately protects the individual right to keep and bear arms in the home for self-defense, while providing elected officials with the necessary latitude to engage in the complex empirical judgments that are so critical to protecting the societal interest in public safety. That standard also would not upset settled expectations across the country, for it would be consonant with the broad consensus of the state courts that have examined firearms regulations under state constitutional provisions analogous to the Second Amendment as interpreted in *Heller*.

**B.** **The Reasonable-Regulation Test Gives Appropriate Respect To The Legislature's Empirical Judgments In Protecting The Public From Gun Violence**

The Supreme Court has repeatedly stressed that legislatures "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976); *see also Ewing v. California*, 538 U.S. 11, 28 (2003) (federal courts "do not sit as … 'superlegislature[s]' to second-guess … policy choices"). The Court has thus upheld regulations on speech to further the government's interests in "protecting its citizens from unwelcome noise,"[5] "avoiding congestion and maintaining [] orderly movement,"[6] maintaining public parks "in an attractive and intact condition,"[7] and preventing "secondary effects" of particular kinds of speech, and "preserv[ing] the quality of urban life."[8]

In contrast to these important, but not life-and-death matters, guns in America kill more than 30,000 people nationwide each year, and injure 70,000 more.[9] In 2007, firearms were used in more than 385,000 serious crimes, including

---

[5]    *Ward*, 491 U.S. at 796.

[6]    *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 652 (1981).

[7]    *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 296 (1984).

[8]    *City of Renton*, 475 U.S. at 48-50.

[9]    *See* CDC National Center for Injury Prevention and Control, Web-based Injury Statistics Query and Reporting System ("WISQARS"), *available at*

an estimated 12,000 murders, 191,000 robberies, and 181,000 aggravated assaults.[10] Social scientists have estimated that the lifetime medical costs for U.S. gunshot injuries in one year alone is $2.3 billion, of which $1.1 billion was paid by U.S. taxpayers.[11] When lost earnings, pain, disability, and the costs of lost life are included, the aggregate economic cost of gun violence to American society approaches $100 billion annually.[12] As firearms regulations clearly further the "promotion of safety of persons and property," they are "unquestionably at the core of the State's police powers." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

As significant as the societal costs of gun violence are today, they would be much higher if not for reasonable state and federal firearms regulations. Reasonable regulations are associated with reduced risk of gun deaths and criminal access to guns.[13] For instance, after the Brady Act mandated background checks

---

http://www.cdc.gov/injury/wisqars/index.html (last visited Sept. 20, 2010) (2008 data).

[10] Bureau of Justice Statistics, *Crimes committed with firearms, 1973-2007*, *available at* http://bjs.ojp.usdoj.gov/content/glance/tables/guncrimetab.cfm.

[11] Cook et al., *The Medical Costs of Gunshot Injuries in the United States*, 281 J. Am. Med. Ass'n 447, 447 (1999) (costs for injuries in 1994).

[12] *See* Cook & Ludwig, *Gun Violence: The Real Costs* 117 (2000).

[13] *See, e.g.*, Webster et al., *Relationship Between Licensing, Registration, and Other State Gun Sales Laws and the Source State of Crime Guns*, 7 Injury Prevention 184, 184 (2001) ("Firearm Registration Study"); Hepburn et al., *The Effect of Child Access Prevention Laws on Unintentional Child Firearm Fatalities, 1979-2000*, 61 J. Trauma, Injury, Infection & Critical Care 423, 423 (2006); Webster et al., *Effects of State-Level Firearm Seller Accountability Policies on*

on handgun purchasers in 1994, the number of violent crimes committed with firearms, which had risen in nine of the ten preceding years, decreased substantially, from more than one million gun crimes in 1993 to about 313,000 in 2008, a decline of more than seventy percent.[14]

While the Supreme Court has not "refrained from holding that a provision of the Bill of Rights is binding on the States on the ground that the right at issue has disputed public safety implications," *McDonald*, 130 S. Ct. at 3045, the Court has also never ignored public safety considerations in articulating the proper framework to review constitutional challenges, as Appellants would have this Court do. *See, e.g.*, *City of Renton*, 475 U.S. at 48-50 (ordinance aimed at the secondary effects of adult film theaters on the community—including "prevent[ing] crime"—constitutionally permissible); *see also City of Los Angeles*

---

*Firearm Trafficking*, 86 J. Urban Health: Bulletin N.Y. Acad. Med. 525, 525 (2009) ("Seller Accountability Study"); Weil & Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. Am. Med. Ass'n 1759, 1759 (1996) ("Interstate Firearms Transfer Study"); Campbell et al., *Risk Factors for Femicide in Abusive Relationships: Results from a Multisite Case Control Study*, 93 Am. J. Pub. Health 1089, 1094 (2003).

[14] *See* Bureau of Justice Statistics, *Nonfatal Firearm-Related Violent Crimes, 1993-2008*, *available at* http://bjs.ojp.usdoj.gov/content/glance/tables/ firearmnonfataltab.cfm (last updated Sept. 20, 2010) (data on nonfatal gun crimes); Bureau of Justice Statistics, *Homicide Trends in the U.S., Weapons Used*, *available at* http://bjs.ojp.usdoj.gov/content/homicide/weapons.cfm (homicide data from 1976-2005); DOJ, *Murder Victims by Weapon, 2004-2008*, *available at* http://www.fbi.gov/ucr/cius2008/offenses/expanded_information/ data/shrtable_08.html (last updated Sept. 20, 2010) (homicide data 2004-2008).

*v. Alameda Books*, *Inc.*, 535 U.S. 425, 440 (2002) (plurality op.) (same); *New York v. Quarles*, 467 U.S. 649, 656 (1984) ("[W]e do not believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety"—*i.e.*, where "a gun was concealed … with its actual whereabouts unknown, [and, as such,] it obviously posed more than one danger to the public safety[.]").  In the same vein, the *Heller* Court recognized "the problem of handgun violence in this country," 128 S. Ct. at 2822, and both *Heller* and *McDonald* indicated that "reasonable firearms regulation" is consistent with the Second Amendment.  130 S. Ct. at 3046; *see also Heller*, 128 S. Ct. at 2816-2817, 2822.

The fact that approximately one million Americans have been wounded or killed by gunfire in the last decade alone demonstrates the severity of the problem of gun violence and the overwhelming societal interest in preserving legislative discretion to craft an effective response.[15]  Given that even protected speech may be restricted on the basis of "common experience" generally linking adult establishments to crime, *see supra*, the possession of firearms certainly should be subjected to reasonable regulations supported by history, common sense, and empirical data linking guns to approximately 30,000 deaths every year.

---

[15]     *See* WISQARS, *supra* (extrapolation based on 2000-2007 data for fatal shootings and 2000-2008 data for nonfatal shootings).

**C.** **The Reasonable-Regulation Test Has Been Widely Adopted Under State Constitutional Provisions Recognizing An Individual Right To Keep And Bear Arms**

The constitutions of more than forty States include right-to-bear-arms provisions, yet not a single state reviews firearms regulations under heightened scrutiny. *See* Winkler, *Scrutinizing The Second Amendment*, 105 Mich. L. Rev. 683, 686-687 (2007); *see, e.g.*, *State v. Cole*, 665 N.W.2d 328, 337 (Wis. 2003) ("If this court were to utilize a strict scrutiny standard [for application of the Wisconsin right-to-keep-and-bear-arms provision] Wisconsin would be the only state to do so."). "Even in jurisdictions that have declared the right to keep and bear arms to be a fundamental constitutional right, a strict scrutiny analysis has been rejected in favor of a reasonableness test[.]" *Mosby v. Devine*, 851 A.2d 1031, 1044 (R.I. 2004). Instead, courts "have uniformly upheld the police power of the state through its legislature to impose reasonable regulatory control over the state constitutional right to bear arms in order to promote the safety and welfare of its citizens." *State v. Comeau*, 448 N.W.2d 595, 597 (Neb. 1989).[16] If "[t]he life

---

[16]    *See also State v. Reid*, 1 Ala. 612, 616-617 (1840) ("Legislature [has] the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals," so long as state statutes do not "amount[] to a destruction of the right."); *State v. Shelby*, 2 S.W. 468, 469 (Mo. 1886) (state prohibition on possession of firearms by intoxicated individuals is "but a reasonable regulation of the use of such arms, and to which the citizen must yield, and a valid exercise of the legislative power."); *English v. State*, 35 Tex. 473, 478 (1871); *State v. Wilburn*, 66 Tenn. 57 (1872); *State v. Buzzard*, 4 Ark. 18 (1842).

of the law has … been experience,"[17] then this uniform experience tells a compelling story. *See, e.g.*, *Benjamin v. Bailey*, 662 A.2d 1226, 1233 (Conn. 1995) ("[T]he uniformity in the analysis [state courts] have used to address the question before us lends particular authority to their decisions."); Winkler, 105 Mich. L. Rev. at 686-687 & n.12 (collecting cases).

The reasonable-regulation test is deferential, but not toothless. Under this test, laws are struck down if they "eviscerate," *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2003), render "nugatory," *Trinen v. City & County of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002), or result in the effective "destruction" of the right, *e.g.*, *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968). *See also Cole*, 665 N.W.2d at 541 (distinguishing reasonableness test from rational basis). Under this standard, complete bans on gun possession of the sort at issue in *Heller* and *McDonald* cannot stand, but laws that are reasonably designed to further public safety and that do not prevent the exercise of the core of the right are upheld. *See, e.g.*, *Robertson v. City & County of Denver*, 874 P.2d 325, 328, 330 n.10 (Colo. 1994); *Jackson v. State*, 68 So. 2d 850, 852 (Ala. Ct. App. 1953); *Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216, 1223 (N.H. 2007).

---

[17] Holmes, *The Common Law* 1 (1881).

## II.	THE DISTRICT'S GUN REGISTRATION AND LICENSING SYSTEM IS CONSTITUTIONAL

The Supreme Court in *Heller* stated that individuals who are "responsible" and "law-abiding" have the right under the Second Amendment to keep a weapon in the home for the purpose of self-defense.  128 S. Ct. at 2821.  But the Court cast no doubt on the government's authority to ensure that persons who seek to possess such weapons are, in fact, "responsible, law-abiding" citizens.  *Id*. at 2821.  Indeed, it ruled that Mr. Heller could possess a handgun "assuming that [he] is not disqualified from the exercise of Second Amendment Rights."  *Id.* at 2822 (emphasis omitted).  The Second Amendment does not disable the government from using registration, licensing, and training requirements to ensure that firearms do not fall into the hands of those who are not law-abiding or who would not or could not use firearms responsibly.  The District's licensing and registration requirements reasonably advance that purpose without infringing on the right of law-abiding, responsible individuals to defend themselves in the home.  *See United States v. Skoien*, No. 08-3770, 2010 WL 2735747, at *3 (7th Cir. Jul. 13, 2010) (en banc) ("Congress is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy of weapons.").

### A. Registration And Licensing Requirements Do Not Limit Exercise Of The Right To Armed Self-Defense

Appellants fail to show that the District's laws impose any meaningful burden on their right to possess firearms in the home for self-defense. Individuals who are not otherwise disqualified by operation of law and who can demonstrate that they can possess and use firearms responsibly are allowed, under District law, to maintain a handgun, rifle, or a shotgun to protect themselves in the home. The Second Amendment does not forbid the District from implementing reasonable measures to ensure that individuals who bring firearms into their homes are legally entitled to possess such weapons and can fire them safely, without posing an unreasonable risk of injury to themselves, their families, or innocent bystanders.

The First Amendment and voting rights cases on which Appellants heavily rely afford them no help, both because Appellants misstate the holdings of those cases, and because the concerns that animate them are inapplicable to the Second Amendment. First, courts have *not* invalidated all registration and fee requirements imposed as a condition to the exercise of fundamental rights. "[T]he decision to marry is a fundamental right," *Turner v. Safley*, 482 U.S. 78, 95 (1987), and yet the District conditions the right to marriage on obtaining a license, presenting identification, paying a $35 fee, and waiting for a period of three days

prior to marrying.[18]  D.C. Code §§ 46-409 & 46-410.  Similarly, there is a

"fundamental right of access to the courts," *see Tennessee v. Lane*, 541 U.S. 509,

533-534 (2004), and yet access to the courts can be conditioned on the payment of

filing fees.  *See, e.g.*, *White v. Colorado*, 157 F.3d 1226, 1234 (10th Cir. 1998).

And "[t]here is nothing contrary to the Constitution in the charge of a fee" or a

registration requirement as a precursor to holding public events or parades, which

are at the core of activity protected by the First Amendment.  *Cox v. New

Hampshire*, 312 U.S. 569, 577 (1941).

 Moreover, where the Supreme Court has invalidated registration schemes or

fees for protected speech, it has done so because those particular schemes

implicated concerns unique to the First Amendment that are not applicable to the

Second Amendment.  Thus, the Court invalidated a registration scheme for door-

to-door solicitation because it could discourage protected anonymous speech,

burden those whose "religious scruples prevent them from applying for such a

license," and limit spontaneous speech.  *Watchtower Bible & Tract Soc'y of N.Y.,

Inc. v. Village of Stratton*, 536 U.S. 150, 167 (2002); *see Forsyth County v.

Nationalist Movement*, 505 U.S. 123, 133-134 (1992) (invalidating ordinance

imposing fee on parades because fee calculation under the ordinance "often

require[d] that the fee be based on the content of the speech" at issue).  These

---

[18]  Before 2008, individuals applying for a marriage license were required to
submit to blood tests.  *See* Marriage Amendment Act of 2008, D.C. Law 17-222.

concerns are irrelevant here, for the courts have never recognized a constitutional value in anonymous gun ownership, no religious principle stands in the way of registering a gun, and ensuring the "spontaneous" exercise of a right is not a significant concern, especially given that gun possession requires purchasing or otherwise obtaining a weapon, and the use of a gun without some experience and forethought can cause grave (often lethal) harm. Similarly, there is no Second Amendment analogue to the First Amendment's requirement that regulations burdening speech be content-neutral.

The District's licensing and registration requirements can help reduce criminals' access to firearms[19] while not materially affecting Appellants' ability to possess firearms in the home for self-defense. Indeed, Appellants never seriously argue that they have been or could be deterred from obtaining a gun by the District's laws. *See Justice v. Town of Cicero*, 577 F.3d 768, 773-774 (7th Cir. 2009), *cert. denied*, 130 S. Ct. 3410 (2010) (upholding ordinance "requiring registration of all firearms" because the law "leaves law-abiding citizens free to possess guns"). Registration, fingerprinting, and photographing are common aspects of many licensing regimes; in the context of voter registration, similar requirements were described by the Supreme Court as imposing a mere

---

[19]     *See, e.g.*, Webster et al., Firearm Registration Study, *supra*, at 184-189; Webster et al., Seller Accountability Study, *supra*, at 525-537; Weil & Knox, Interstate Firearms Transfer Study, *supra*, at 1759-1761.

"inconvenience" on potential voters. *See Crawford v. Marion County Election Bd.*, 553 U.S. 181, 198 (2008) (plurality op.). In suggesting that they have a constitutional right to amass an unlimited arsenal, Appellants also fail to demonstrate how limiting registration of firearms to one per month imposes any burden on their ability to effectively engage in self-defense in the home. No court has concluded that the right to bear arms encompasses a right to stockpile an arsenal rapidly, which would pose serious risks to law enforcement and the public.

Similarly, Appellants never explain how submitting weapons for ballistics testing burdens their ability to possess firearms for self-defense. Ballistics testing is a fairly new innovation, just as firearms serial numbers once were, but it does not follow that it is unconstitutional. Appellants incorrectly contend (Br. 16) that the *Heller* Court's *approval* of certain "'longstanding'" gun laws implies that the Court *disapproved* of laws that are not longstanding. The Court nowhere suggested that, in responding to serious gun violence, governments are limited to those regulatory choices made by legislatures some decades past. Individuals can readily comply with all of the District's regulations and still maintain a gun in their residences to ensure self-protection.

### B. The District's Registration And Licensing Provisions Serve Crucial Government Interests

As the Supreme Court recognized in *Heller*, this country faces a serious "problem of handgun violence." 128 S. Ct. at 2822. The problem is serious

nationwide, see *supra* Part I.B, but the District has a higher per-capita death rate from firearms than that of any State, with a firearm death rate in 2007 of 24.5 per 100,000 persons.[20]  The District's registration and licensing laws serve crucial government interests by preventing irresponsible and ineligible individuals from obtaining firearms, ensuring that the police have adequate tools to investigate gun-related crimes, and helping to decrease gun violence.

Appellants do not dispute that the government may put in place systems to determine prospectively whether individuals are qualified to own firearms.  They argue, however (Br. 31-33), that the federal National Instant Background Check System (NICS), 18 U.S.C. § 922(t), is a sufficient means of protecting that governmental interest.  The District has reasonably concluded, however, that reliance on NICS would not sufficiently ensure that firearms are possessed only by qualified individuals.  The NICS system does not determine whether a prospective gun owner is able to use a firearm safely.  Further, as NCIS captures only sales by federally licensed dealers, it does not enable the government to identify individuals who acquire weapons from other sources.  The District's system is essential to filling these gaps.

---

[20]     *See* WISQARS, *supra*, *available at* http://webappa.cdc.gov/sasweb/ ncipc/mortrate10_sy.html (query for "Firearms" by "State" on 2007, most recent data available).

Empirical evidence supports the District's use of licensing and registration to protect the public from unlawful gun violence. In states with licensing and registration systems, fewer guns used in crime originated from inside the state, suggesting that "comprehensive gun sales regulations that include permit-to-purchase licensing and registration can affect the availability of guns to criminals."[21] Evidence also shows that street prices of guns are higher in states with more restrictive gun-control laws.[22]

Appellants' assertions to the contrary—that licensing and registration systems serve no public safety benefit—are inaccurate, and partly based on misstatements of law. They state, for example (Br. 31), that "the FBI maintains a database of lost/stolen firearms in the National Crime Information Center." Yet federal law requires only that licensed federal firearms *dealers* inform law enforcement when they discover that a firearm is lost or stolen. The FBI is not informed of guns lost and stolen from *individuals*, and that information is certainly not recorded in a federal database. And in attacking the requirement of re-registration, Appellants fail to acknowledge that a person who could safely possess a gun when she registered it may not be able to do so three years later. Her vision may worsen, her mental state may deteriorate, or she may become a criminal. The

---

[21]     Webster et al., Firearm Registration Study, *supra*, at 189.

[22]     *Id*. at 188.

District has an important continuing interest in ensuring that persons who possess guns are law-abiding, responsible and capable of operating firearms safely—not just that they were when they initially registered their guns.

The District's ballistics registration requirement also serves important governmental interests. The system will enable law-enforcement officers to link bullets and shell casings recovered at crime scenes to the firearm that fired them. One study conducted in Maryland, which has enacted a comprehensive ballistics registration program, suggested that it deterred criminally involved youth from purchasing used guns.[23] Given that ballistics registration poses no burden to the Appellants' ability to defend themselves in the home, the District's important interest in solving gun-related crime is sufficient to sustain the registration requirement. *See United States v. Marzzarella*, No. 09-3785, 2010 WL 2947233, at *5 (3d Cir. July 29, 2010).

## III. THE DISTRICT'S BAN ON PARTICULARLY DANGEROUS WEAPONS AND LARGE-CAPACITY MAGAZINES IS CONSTITUTIONAL

The District, like many states and municipalities, has prohibited a narrow class of firearms with features that dangerously enhance the weapons' assaultive capabilities, have particular appeal to criminals, and cause heightened damage

---

[23] *See* Webster et al., Johns Hopkins Bloomberg School of Public Health, *Comprehensive Ballistic Fingerprinting of New Guns: A Tool for Solving and Preventing Crime* 2 (Nov. 21, 2002).

(particularly in densely populated urban areas).  Similar concerns have led the

District to restrict possession of large-capacity magazines (*i.e.*, those holding more

than ten rounds).  These regulations do not infringe the right of self-defense found

in the Second Amendment, for, as *Heller* made clear, the Second Amendment does

not protect a right to own "any weapon whatsoever," and "'dangerous and unusual

weapons'" may be prohibited.  128 S. Ct. at 2816.

### A. The Bans Do Not Implicate The Second Amendment Right Recognized In *Heller*

As the district court correctly concluded, the bans on "assault weapons and

large capacity ammunition feeding devices fall outside the scope of the core

Second Amendment right."  *Heller v. District of Columbia*, 698 F. Supp. 2d 179,

195 (D.D.C. 2010).  As the *Heller* Court took pains to note, the right is in no way

incompatible with the "historical tradition of prohibiti[ons on] the carrying of

'dangerous and unusual weapons'" unnecessary for self-defense.  128 S. Ct. at

2817; *see also McDonald*, 130 S. Ct. at 3047 (stressing that the "right to keep and

bear arms is not 'a right to keep and carry any weapon whatsoever in any manner

whatsoever and for whatever purpose'" (quoting *Heller*, 128 S. Ct. at 2816)).  The

bans on assault weapons and large-capacity magazines are entirely consistent with

the scope of the Second Amendment right recognized in *Heller*.  *See People v.

James*, 94 Cal. Rptr. 3d 576, 585-586 (Ct. App. 2009), *cert. denied*, 130 S. Ct.

1517 (2009) ("*Heller* does not extend Second Amendment protection to assault weapons[.]").

Assault weapons are both unusual and dangerous. They comprise a tiny fraction of firearms in circulation. *See* Zawitz, U.S. Dep't of Justice, Bureau of Justice Statistics, *Guns Used in Crime* 6 (1995) (assault weapons constituted about 1% of guns in circulation prior to federal assault weapons ban); Koper, *An Updated Assessment of the Federal Assault Weapons Ban* 10 (Report to National Institute of Justice, U.S. Dep't. of Justice 2004) ("Around 1990, there were an estimated 1 million privately owned AWs in the U.S. (about 0.5% of the estimated civilian gun stock)[.]"). They are also dangerous to an extraordinary degree. The assault-weapon ban covers rifles with features such as protruding pistol grips— which help the shooter to stabilize a weapon during rapid fire and allow the shooter to spray-fire from the hip position—and barrel shrouds—which protect the shooter's hands from the heat generated by firing many rounds in rapid succession. Firearms incorporating these characteristics enable the shooter to maximize firepower, ensuring that she can inflict a high degree of lethal damage rapidly and, often, indiscriminately. These features are inherently more suited to offensive and mass assaults than to responsible self-defense in the home, especially in urban areas where an errant bullet can fire into a neighbor's apartment. Other characteristics used to identify assault weapons, such as telescoping stocks, serve

mostly to facilitate concealment, which is of little value to those intending to use their firearm for lawful purposes, but is obviously appealing to criminals. *See, e.g.*, *Robertson*, 874 P.2d at 333 (noting "weapons which are easily concealed, such as shotguns equipped with folding stocks, pose a greater threat to law enforcement officials and the public at large because their concealability makes them better suited to criminal purposes").[24]

Assault weapons are disproportionately used in crimes generally, but they are particularly overrepresented in the most devastating attacks. For example, as District residents doubtless recall, John Allen Muhammad and Lee Boyd Malvo, better known as the Beltway snipers, killed ten people using a Bushmaster XM-15—the same weapon sought by Appellant Heller. Other mass killings perpetrated with assault weapons include those at Columbine High School, the office shooting at 101 California Street in San Francisco, and the December 2007 mall shooting in Omaha. As these incidents show, assault weapons are particularly well suited for those who desire to impose maximum destruction, and the severity of such incidents is exacerbated when the killers can keep shooting without stopping to reload.

---

[24] The Department of the Treasury has also concluded that such assault weapons serve no legitimate sporting purpose. Dep't of Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* ("Treasury Study") 38 (1998).

Assault weapons and large-capacity ammunition-feeding devices are not the usual weapons of self-defense, and they present a heightened danger of the mass killing of individuals. The District's regulations do not infringe on the right that the Second Amendment protects.

**B. Even If The Ban On Assault Weapons And Large-Capacity Magazines Implicates The Second Amendment, It Is Constitutional**

Even if the bans on assault weapons and large-capacity magazines somehow implicated Second Amendment interests, they would still survive review because of the slight burden they impose on the right and the importance of the governmental interest at stake. Similar bans have been upheld under a variety of state right to bear arms provisions. *See, e.g.*, *Arnold v. Cleveland*, 616 N.E.2d 163, 173 (Ohio 1993); *Robertson*, 874 P.2d at 333; *Benjamin*, 662 A.2d at 1235; *compare McDonald*, 130 S. Ct. at 3047 (noting "the paucity of precedent sustaining bans comparable to" the Chicago handgun ban invalidated in that case); *cf. Navegar, Inc. v. United States*, 192 F.3d 1050, 1053 (D.C. Cir. 1999) (upholding federal assault weapons ban against challenges under various constitutional provisions other than the Second Amendment).

Appellants argue that such bans are poorly tailored because assault weapons are employed in only a relatively small fraction of gun crimes overall. (Br. 50.) But this follows from assault weapons being relatively uncommon, and does not

change the fact that assault weapons are effective for offensive assaults and mass killings, but not home defense, and that they are used in gun crimes at a disproportionately high rate. *See* U.S. Dep't of Treasury, *Assault Weapons Profile* 19 (1994) (finding that assault weapons "are preferred by criminals over law abiding citizens 8 to 1"); Treasury Study, *supra*, at 38 (describing assault weapons as "attractive to certain criminals"). Even Appellants' own source notes that "[assault weapons] still seem to account for a somewhat disproportionate share of guns used in murders and other serious crimes," that "[assault weapons] and other guns equipped with [large-capacity magazines] tend to account for a higher share of guns used in murders of police and mass public shootings," and that "reducing criminal use of [assault weapons] and especially [large-capacity magazines] could have non-trivial effects on gunshot victimizations …. [because attacks with such weapons] result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms." Koper, *supra*, at 2, 3, 17. The District has a compelling interest in preventing the crimes committed with such weapons.

In assessing the governmental interest in the bans, it bears emphasis that the District—unlike the states that Appellants use in comparison (Br. 50-51)—is entirely urban. Many other large cities—including New York City, Chicago, Denver, Cleveland, Columbus and Cincinnati—have banned assault weapons. *See*

*McDonald*, 130 S. Ct. at 3135 (Breyer, J., dissenting). Assault weapons and the prolonged assaults enabled by large-capacity magazines can pose particular dangers in such urban areas, which may be more likely to experience gang violence or innocent bystanders being struck. *McDonald* emphasized that "conditions and problems differ from locality to locality," and the Second Amendment "thus *limits* (but by no means eliminates) the[] ability to devise solutions to social problems that suit local needs and values." *Id*. at 3046.

Whereas the governmental interest in limiting access to assault weapons is overwhelming, the corresponding burden on the right to self-defense in the home is minimal, if any. Since the ban covers only a tiny fraction of available firearms, and those covered were chosen based only on their offensive capabilities, the ban does not interfere with public access to a wide array of arms effective for self-defense in the home. *See Robertson*, 874 P.2d at 333; *cf. Kovacs v. Cooper*, 336 U.S. 77, 87-88 (1949) (upholding ban on sound trucks when alternative "easy means of publicity" were available). Appellants argue that this wide availability of alternative firearms is immaterial, analogizing the ban on assault weapons to the handgun ban invalidated in *Heller*. (Br. 49.) But the handgun ban prohibited possession of "the quintessential self-defense weapon." *Heller*, 128 S. Ct. at 2818. And the Court noted that long guns are inferior for self-defense purposes. *Id*. The salient feature of assault weapons, by contrast, is their offensive rather than their

defensive capabilities.  Banning assault weapons and large-capacity magazines does not impair the ability of people to arm themselves for self-defense in their homes.  It is thus an appropriately tailored means of serving the vital governmental interest in protecting the public from these dangerous instruments of mayhem.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: September 20, 2010

Respectfully submitted,

/s/ Paul R.Q. Wolfson

JONATHAN E. LOWY
DANIEL R. VICE
BRADY CENTER TO PREVENT GUN
    VIOLENCE
LEGAL ACTION PROJECT
1225 Eye Street, N.W., Suite 1100
Washington, D.C.  20005
(202) 289-7319

PAUL R.Q. WOLFSON
    *Counsel of Record*
A. STEPHEN HUT, JR.
JOSHUA M. SALZMAN
LAURA MORANCHEK HUSSAIN
FRANCESCO VALENTINI
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
paul.wolfson@wilmerhale.com

# RULE 32 CERTIFICATION

I hereby certify that:

1.     This brief complies with the type volume limitation of Federal Rules of Appellate Procedure 32(a)(7)(B) and 29(d) because it contains 6,972 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 32(a)(5), 32(a)(6), and Circuit Rule 32(b), because it has been prepared using the Microsoft Word 2003, version 11.8227.822 SP3, proportionally spaced typeface of Times New Roman with 14-point font.


Dated: September 20, 2010                    Respectfully submitted,

/s/ Paul R.Q. Wolfson
_____

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
paul.wolfson@wilmerhale.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 20th day of September 2010, I electronically

filed the foregoing Brief For *Amici Curiae* Brady Center Against Gun Violence,

Hispanic American Police Command Officers Association, International

Brotherhood of Police Officers, and National Black Police Association in Support

of Appellees and Affirmance using the Court's CM/ECF system.  I certify that the

following counsel for the parties or *amici* are registered as ECF Filers and that they

will be served electronically by the CM/ECF system:

Stephen P. Halbrook
Richard E. Gardiner
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030

Todd Sunhwae Kim
Donna M. Murasky
D.C. Office of the Solicitor General
441 4th Street, N.W.
One Judiciary Square, Sixth Floor
Washington, DC 20001

William J. Olson
Herbert W. Titus
John S. Miles
William J. Olson, P.C.
370 Maple Avenue W., Suite 4
Vienna, VA 22180

Matthew MacKinnon Shors
O'Melveny & Myers LLP
1625 Eye Street, NW, 10th Floor
Washington, DC 20006

/s/ Paul R.Q. Wolfson

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
    HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C.  20006
(202) 663-6000
paul.wolfson@wilmerhale.com
   *Counsel for Amici Curiae*