---

CASE NO. 10-7036

---

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

DICK ANTHONY HELLER, ABSALOM JORDAN,
WILLIAM CARTER, AND MARK SNYDER

APPELLANTS,

V.

THE DISTRICT OF COLUMBIA AND
ADRIAN M. FENTY, MAYOR, DISTRICT OF COLUMBIA,

APPELLEES.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

**BRIEF FOR PROFESSIONAL HISTORIANS AND LAW PROFESSORS
SAUL CORNELL, PAUL FINKELMAN, STANLEY N. KATZ, AND
DAVID T. KONIG AS *AMICI CURIAE* IN SUPPORT OF APPELLEES**

MATTHEW M. SHORS
O'MELVENY & MYERS LLP
1625 Eye St. NW
Washington, DC 20006
(202) 383-5300

Dated: September 20, 2010    *Attorney for Amici Curiae*

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1)(A), the undersigned counsel of record certifies as follows:

(A) **Parties and *Amici*.** To *amici*'s knowledge, all parties, intervenors, and *amici* appearing in this court are listed in the Brief for Appellees, other than the professional historians and law professors filing this brief as *amici curiae* in support of Appellees.

(B) **Ruling Under Review**. References to the ruling at issue appear in the Brief for Appellants.

(C) **Related Cases**. References to related cases appear in the Brief for Appellants.

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE AND SUMMARY OF ARGUMENT ..............1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................1

ARGUMENT .........................................................................................................3

I. STATES AND MUNICIPALITIES HAVE LONG IMPOSED REQUIREMENTS AKIN TO THE DISTRICT'S REGISTRATION REGULATIONS, AND THESE REQUIREMENTS HAVE BEEN UNDERSTOOD TO BE CONSISTENT WITH THE RIGHT TO BEAR ARMS ...................................................................................3

    A.    States in the Early Republic Regularly Conditioned the Right to Bear Arms on Registration, Training, and Reporting with the Authorities .................................................................................3

    B.    States Have Continued to Use Registration for the Sale, Transfer, or Possession of Firearms to Protect the Public Safety .........8

II. STATES AND MUNICIPALITIES HAVE LONG BANNED DANGEROUS WEAPONS, AND COURTS HAVE UPHELD THESE REGULATIONS AS CONSISTENT WITH THE RIGHT TO BEAR ARMS ...............................................................................12

    A.    States and Cities Have Historically Outlawed Dangerous Weapons ...............................................................................13

    B.    Courts Have Historically Upheld Restrictions on Dangerous Weapons ...............................................................................18

    C.    Leading Treatises Recognized States' and Cities' Authority to Regulate Arms to Protect the Public Safety .......................................23

CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Andrews v. State*,
50 Tenn. 165 (1871) .................................................................. 20, 21

*Aymette v. State*,
21 Tenn. 154 (1840) ........................................................................18

*Barton v. State*,
66 Tenn. 105 (1874) ........................................................................17

*Bliss v. Commonwealth*,
12 Ky. 90 (1822)...............................................................................19

*Brown v. Maryland*,
25 U.S. (12 Wheat.) 419 (1827) .......................................................13

*Carson v. State*,
241 Ga. 622 (1978)...........................................................................20

*Day v. State*,
37 Tenn. 496 (1857) ........................................................................18

*Dycus v. State*,
74 Tenn. 584 (1880) ........................................................................17

*English v. State*,
35 Tex. 473 (1871) ...........................................................................22

*Ex parte Thomas*,
97 P. 260 (Okla. 1908) .....................................................................22

*Fife v. State*,
31 Ark. 455 (1876) ...........................................................................22

*Foote v. Fire Dep't of New York*,
5 Hill 99 (N.Y. Sup. Ct. 1843) .........................................................13

*\*Heller v. District of Columbia*,
128 S. Ct. 2783 ............................................... 1, 2, 3, 4, 6, 7, 8, 13, 22

*Hill v. State*,
53 Ga. 472, 474 (1874).....................................................................22

*Nunn v. State*,
1 Ga. 243 (1846)...............................................................................19

*Authorities upon which we chiefly rely are marked with asterisks.

ii

Page(s)

*State v. Buzzard*,
  4 Ark. 18 (1842) ...................................................................................18

*State v. Chandler*,
  5 La. Ann. 489 (1850) ...........................................................................18

*State v. Jumel*,
  13 La. Ann. 399 (1858) .........................................................................18

*State v. Reid*,
  1 Ala. 612 (1840) ..................................................................................18

*State v. Wilburn*,
  66 Tenn. 57 (1872) ................................................................................22

*State v. Workman*,
  35 W. Va. 367 (1891) ............................................................................22

*Strickland v. State*,
  137 Ga. 1 (1911) .............................................................................. 19, 20

*Thurlow v. Massachusetts (The License Cases)*,
  46 U.S. (5 How.) 504 (1847) ................................................................20

*Williams v. City Council*,
  4 Ga. 509 (1848) ...................................................................................13

## CONSTITUTIONS

*U.S. Const. amend. II ...............................................................................4

Ala. Const. of 1868, art. I, § 28..............................................................16

Ark. Const. of 1868, art. I, § 5 ...............................................................16

Del. Const. of 1897, art. I, § 20..............................................................16

Ky. Const. of 1850, art. XIII, § 25 .........................................................19

Or. Const. of 1857, art. I, § 27 ...............................................................16

*Pa. Decl. of Rights § XIII (1776)............................................................7

Pa. Const. of 1874, art. I, § 21 ...............................................................16

S.C. Const. of 1868, art. I § 28 ..............................................................16

S.D. Const. of 1889, art. VI, § 24 ..........................................................16

*Authorities upon which we chiefly rely are marked with asterisks.

Wash. Const. of 1889, art. I, § 24 ........................................................................16

Wyo. Const. of 1889, art. I, § 24.........................................................................16

**STATUTES**

Act of June 30, 1837,
 1837 Ala. Acts 11 ...........................................................................................15

Act of Apr. 1, 1881, No. 96
 1881 Ark. Acts 191 ............................................................................. 16, 17, 18

Act of May 4, 1917, ch.145,
 1917 Cal. Laws 221 ........................................................................................10

Act of May 8, 1792,
 1792 Conn. Pub. Acts 440 ...............................................................................4

Act of Apr. 10, 1917, ch. 129,
 1917 Conn. Laws 98.......................................................................................10

Colo. Rev. Stat. § 149 (1881) ...............................................................................17

Act of Feb. 5, 1782,
 1782 Del. Laws 3 .............................................................................................4

Dodge City, Kan., Ordinance No. 16 (Sept. 22, 1876)........................................18

Fla. Act of Aug. 8, 1868 .......................................................................................18

Fla. Act of Feb. 12, 1885, ch. 3620,......................................................................17

Act of Aug. 12, 1910, No. 432,
 1910 Ga. Laws 134 ................................................................................. 10, 11

Small Arms Act, Act 206,
 1927 Haw. Laws 209 ......................................................................................11

Ill. Act of Apr. 16, 1881 ............................................................................... 17, 18

Act of Feb. 13, 1813, ch. 89,
 1813 Ky. Acts 100 ...........................................................................................15

Ky. Gen. Stat., ch. 29, § 1 (1880) ........................................................................17

Act of Mar. 14, 1776, ch. 7,
 1776 Mass. Acts 31 ...........................................................................................8

*Authorities upon which we chiefly rely are marked with asterisks.

Act of July 19, 1776, ch. I,
   1776 Mass. Acts 15 ....................................................4, 5

1850 Mass. Laws, ch. 194, § 2.........................................18

Act of June 26, 1792, ch. 10,
   1792 Mass. Acts 208 ......................................................13

Act of June 2, 1927, No. 372,
   1927 Mich. Laws 887 ............................................... 11, 12

Neb. Cons. Stat. § 5604 (1893)........................................16

Act of Mar. 17, 1903, ch. 114,
   1903 Nev. Laws 208........................................................11

Act of Apr. 6, 1909, ch. 114,
   1909 N.H. Laws 451.......................................................11

Act of Apr. 3, 1778, ch. 33,
   1778 N.Y. Laws 62.......................................................4, 5

Act of Apr. 13, 1784, ch. 28,
   1784 N.Y. Laws 627.......................................................13

Act of May 25, 1911, ch. 195,
   1911 N.Y. Laws 442.................................................. 9, 10

1879 N.C. Sess. Laws, ch. 127 .........................................16

N.D. Pen. Code § 457 (1895)............................................16

Ohio Act of Feb. 17, 1831, ch. 834....................................14

Act of Mar. 18, 1859,
   1859 Ohio Laws 56 ........................................................15

Act of Feb. 18, 1885, ch. 8,
   1885 Or. Laws 33 ...........................................................16

Act of Feb. 21, 1917, ch. 377,
   1917 Or. Laws 804 .........................................................11

Act of June 13, 1777, ch. 21,
   1777 Pa. Laws 61 .............................................................8

Act of Mar. 20, 1780, ch. 167,
   1780 Pa. Laws 347 ...........................................................4

*Authorities upon which we chiefly rely are marked with asterisks.

**Page(s)**

Act of Dec. 6, 1783, ch. 1059,
11 Pa. Stat. 209 ...................................................................................13

Act of Mar. 26, 1784,
1784 S.C. Acts 68 ...............................................................................4, 5

1880 S.C. Acts 448 .............................................................................16,

S.D. Terr. Pen. Code § 455 (1877) .......................................................16

Act of Dec. 3, 1825, ch. 292,
1825 Tenn. Priv. Acts 306 ....................................................................14

Act of Jan. 27, 1838, ch. 137,
1837-1838 Tenn. Pub. Acts 200 ...........................................................15

1879 Tenn. Pub. Acts, ch. 96 ...............................................................18

1879 Tenn. Pub. Acts, ch. 186 .............................................................16

Tenn. Act of June 11, 1870 ..................................................................21

Tex. Act of Apr. 12, 1871 ............................................................. 16, 18

Act of May 5, 1777, ch. III,
1777 Va. Acts 8 ......................................................................................7

Act of Feb. 4, 1806, ch. 94,
1805-1806 Va. Acts 51 .........................................................................13

Act of Jan. 30, 1847, ch. 79,
1846-1847 Va. Acts 67 .........................................................................13

1869-1870 Va. Acts 510 .......................................................................16

Wash. Code § 929 (1881) .....................................................................16

W. Va. Code ch. 148, § 7 (1870) .........................................................16

Act of Apr. 23, 1925, ch. 95,
1925 W.V. Laws 389..............................................................................11

1876 Wyo. Laws ch. 52, § 1 ......................................................... 16, 18

## OTHER AUTHORITIES

2 Joel Prentiss Bishop, *Commentaries on the Criminal Law* (4th ed. 1868)...........20

*Authorities upon which we chiefly rely are marked with asterisks.

*Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (2006) .............................................................. 9, 14, 15

Saul Cornell, *The Original Meaning of Original Understanding: A Neo-Blackstonian Critique*, 67 Md. L. Rev. 150 (2007) ..............................................15

Saul Cornell & Nathan DeNino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 497 (2004) .....................................5

*Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (1999) ................................ 14, 15

Robert R. Dykstra, *The Cattle Towns* (1968) .........................................................18

Ernst Freund, *The Police Power: Public Policy and Constitutional Rights* 90-91 (1904)..................................................................................................................24

Roger Lane, *Policing the City: Boston, 1822-1885* (1967) ......................................9

William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth-Century America* (1996) ..................................................................................12

5 *The Federal and State Constitutions, Colonial Charters, and Other Organic Laws* 3081, 3083 (Francis N. Thorpe ed., 1909)....................................................7

3 *The Founders' Constitution* (Philip B. Kurland & Ralph Lerner eds., 1987)........6

*John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* (1868) .............................................................................................. 22, 23

*Revolver Killings Fast Increasing; Legislative Measure to be Urged for Curbing the Sale of Firearms*, New York Times, Jan. 30, 1911 .........................................9

Dennis Rousey, *Policing the Southern City: New Orleans*, 1805-1889 (1996)........9

*The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L.J. 259 (Hon. John F. Dillon & Seymour D. Thompson, eds., 1874)....23

Joel Tiffany, *A Treatise on Government, and Constitutional Law* (1867) ..............23

George Washington, Sentiments on a Peace Establishment (May 2, 1783) ............6

*Authorities upon which we chiefly rely are marked with asterisks.

**INTERESTS OF *AMICI CURIAE* AND SUMMARY OF ARGUMENT**

*Amici* are Saul Cornell, Professor of History at Fordham University; Paul Finkelman, Professor of Law and Public Policy at Albany Law School; Stanley N. Katz, Lecturer with Rank of Professor in Public and International Affairs at Princeton University; and David T. Konig, Professor of History and Professor of Law at Washington University. *Amici* have taught courses and published scholarship on the Second Amendment and legal and constitutional history, and file this brief in support of appellees. As set forth below, there is ample historical precedent for the type of reasonable gun regulations enacted by the District of Columbia at issue in this case.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In *District of Columbia v. Heller*, the Court observed that "the right secured by the Second Amendment is not unlimited," and that "nothing in our opinion should be taken to cast doubt on" the validity of various historical regulations of gun use. 128 S. Ct. 2783, 2816-17 (2008). It identified some of these historical regulations, such as laws prohibiting "the possession of firearms" by certain types of persons, laws "imposing conditions and qualifications" on gun sales, and noted "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.*

The regulations at issue here fall within the tradition of historical gun use regulations identified in *Heller*. The use of registration requirements to regulate firearms has been a consistent and common historical practice in the United States. For example, early laws regulating the militias, which at the time comprised "the body of all citizens capable of military service," required regular weapons inspections and registration with the States. Early registration laws often extended even more broadly, as several states conditioned the ownership of firearms on the swearing of an oath of loyalty and also required the recordation of related information. And states and cities continued to use registration requirements into the twentieth century by enacting laws designed to control the new dangers arising from the use of handguns in densely populated urban centers.

State and local governments have also exercised their police powers throughout our nation's history to limit and ban the use of particularly dangerous weapons and ammunition. At or near the time of the founding, governments regulated the storage of gunpowder in order to protect against fires and accidental shootings. By the early nineteenth century, governments placed many limitations on the use and carrying of certain classes of concealable weapons, which were perceived to pose unique dangers to the citizenry. And state legislatures continued to enact broad restrictions on the possession of dangerous weapons in the years

following adoption of the Fourteenth Amendment.  All of these restrictions (if challenged at all) have by and large been upheld by the courts.

## ARGUMENT

**I.     STATES AND MUNICIPALITIES HAVE LONG IMPOSED REQUIREMENTS AKIN TO THE DISTRICT'S REGISTRATION REGULATIONS, AND THESE REQUIREMENTS HAVE BEEN UNDERSTOOD TO BE CONSISTENT WITH THE RIGHT TO BEAR ARMS.**

From the nation's founding until today, states have used registration requirements to regulate the possession of firearms.  During the founding period, these state and local laws included registration and training requirements, as well as requirements that persons eligible for militia service subject their personal firearms to regular inspection.  Several states even conditioned the exercise of gun rights on individual registration with local governments and the swearing of an oath of loyalty to the State.  Governments also continued to use registration schemes throughout the nineteenth and twentieth centuries to protect the public safety, most recently as a tool to control new dangers arising from the use of handguns in densely populated urban centers.

**A.     States in the Early Republic Regularly Conditioned the Right to Bear Arms on Registration, Training, and Reporting with the Authorities.**

1.     Registration requirements and similar laws date back to the militia-related origins of the Second Amendment.  In the early Republic, militias were crucial to the nation's defense, and were responsible for "repelling invasions and

3

suppressing insurrections." *District of Columbia v. Heller*, 128 S. Ct. 2783, 2800

(2008). Thus, the Second Amendment states that a "well regulated Militia" is

"*necessary to the security of a free State*." U.S. Const. amend. II (emphasis

added). As with the individual right to bear arms, the State militias were "assumed

by Article I [and the Bill of Rights] already to be *in existence*" at the time of

ratification. *See Heller*, 128 S. Ct. at 2800. Early militias did not consist merely of

persons with specialized training or weaponry. Rather, "the conception of the

militia at the time of the Second Amendment's ratification was the body of all

citizens capable of military service, who would bring the sorts of lawful weapons

that they possessed at home to militia duty." *Id.* at 2817.[1] Accordingly, during the

founding era, most States enacted militia laws regulating large portions of the

population deemed eligible for service. *See, e.g.*, 1776 Mass. Acts at 15-22; 1778

N.Y. Laws at 62-71; Act of Mar. 20, 1780, ch. CLXVII, 1780 Pa. Laws 347; Act

of Feb. 5, 1782, 1782 Del. Laws 3; Act of Mar. 26, 1784, 1784 S.C. Acts 68; Act

of May 8, 1792, 1792 Conn. Pub. Acts 440.

    State militia laws generally required that all persons eligible for service

sumbit to training and registration with appropriate authorities, and also required

---

[1] In New York, for example, the militia consisted of "every able bodied male person Indians and slaves excepted residing within [the] State from sixteen years of age to fifty." Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 62, 62. In Massachusetts, the militia was divided into different groups, but generally included any "able-bodied Male Persons . . . from sixteen Years old to fifty." Act of July 19, 1776, ch. I, § 1, 1776 Mass. Acts 15, 15.

those same individuals to submit their arms for inspection. *See* Saul Cornell &

Nathan DeNino, *A Well Regulated Right: The Early American Origins of Gun*

*Control*, 73 Fordham L. Rev. 497, 508-10 (2004). For example, in South Carolina

the Governor could order regimental musters at least once a year, and individual

companies could be mustered every two months. *See* 1784 S.C. Acts at 68. In

New York, members were required to attend a regimental parade in April and

November of every year. *See* 1778 N.Y. Laws at 65. During these parades, the

"the arms, ammunition and accoutrements of each man [were] examined, and the

defaulters . . . noted." *Id.* Also noted were the names of those who failed to attend

altogether. Individuals who either failed to attend, or whose arms failed

inspection, were fined, and the names of those absent were sent to the governor or

brigadier general for appropriate disciplinary action. *Id.* Similarly, in

Massachusetts, the clerk of each company was required biannually to make "an

exact List of [each man in the] Company, and of each Man's Equipments." 1776

Mass. Acts at 18. These lists were sent on to the company's and the regiment's

commanding officers. *Id.* In addition, those who neglected their duties, either by

failing to muster or by neglecting their firearms, faced steep fines. *Id.* at 19.

George Washington similarly expressed his understanding that the nation's

security demanded that its citizens submit to regular inspection of their firearms.

Thus, Washington stated that the federal militia ought to be "regularly Mustered

and trained, and to have their Arms and Accoutrements inspected at certain appointed times, not less than once or twice in the course of every [year]." George Washington, Sentiments on a Peace Establishment (May 2, 1783), *in* 3 The Founders' Constitution 129 (Philip B. Kurland & Ralph Lerner eds., 1987).

The Supreme Court explained in *Heller* that the Framers codified the right to bear arms in the Second Amendment with the aim of protecting and preserving militias as they existed at the time of the founding—including the laws and regulations described above, which were necessary to the militias' continued existence. *See* 128 S. Ct. at 2801. Accordingly, these laws and regulations, which included requirements that gun-owners regularly assemble for weapons training, submit their firearms for inspection, and identify themselves to the state, would have been understood to be consistent with (and indeed supportive of) the right to bear arms in the early Republic.

2. States in the early Republic also enacted loyalty statutes requiring all males over a certain age to identify themselves and swear allegiance to state and local authorities, or else to be disarmed. These loyalty statutes effectively conditioned the very possession of firearms in the general population on registration and other requirements more burdensome than those at issue in this case.

Virginia, for instance, enacted a law requiring citizens to take a recorded loyalty oath or face disarmament. The law stated that "allegiance and protection are reciprocal, and those who will not bear the former are not entitled to the benefits of the latter," and accordingly conditioned the possession of arms by "all free born male inhabitants . . . above the age of sixteen years" on the taking of an "oath or affirmation before some one of the justices of the peace of the county, city, or borough, where they shall respectively inhabit." Act of May 5, 1777, ch. III, 1777 Va. Acts 8. Additionally, the justices of the peace were directed to "make a tour of the county, and tender the oath . . . to every free born male person above the age of sixteen," to *record* the name and information of oath-takers, and to "cause . . . recusants to be disarmed." *Id.*

Similar requirements were enforced in states that, as the Supreme Court concluded, had adopted provisions "analog[ous] to the Federal Second Amendment" in their constitutions prior to the ratification of the Bill of Rights. *Heller*, 128 S.Ct. at 2802-03. Pennsylvania's 1776 Constitution, for example, guaranteed "[t]hat the people have a right to bear arms for the defence of themselves and the state." Pa. Decl. of Rights § XIII (1776), *in 5 The Federal and State Constitutions, Colonial Charters, and Other Organic Laws* 3081, 3083 (Francis N. Thorpe ed., 1909); *Heller*, 128 S. Ct. at 2802. One year after the ratification of its Constitution, the Pennsylvania government passed the Test Acts,

which required each male white inhabitant above the age of eighteen years to *register* his name with the local justice of the peace and take a loyalty oath before the State or else "be disarmed by the lieutenant or sublieutenants of the City or County [where he inhabits]." *See* Act of June 13, 1777, ch. 21, 1777 Pa. Laws 61, 62-63.

Similarly, Massachusetts required that "every Male Person above sixteen Years of Age . . . who shall neglect or refuse to subscribe a printed or written [loyalty oath] . . . shall be disarmed, and have taken from him . . . all such Arms, Ammunition and Warlike Implements, as by the strictest Search can be found in his Possession or belonging to him." Act of Mar. 14, 1776, ch. VII, 1776 Mass. Acts 31, 32; *c.f. Heller*, 128 S. Ct. at 2803. A related provision authorized state officials to search a non-compliant person's home for any weapons, and to seize those weapons upon evidence that he violated the registration and oath requirements. 1776 Mass. Acts at 32-33.

### B. States Have Continued to Use Registration for the Sale, Transfer, or Possession of Firearms to Protect the Public Safety

State and local governments continued to use registration to protect the public safety into the twentieth century, primarily as a tool to address new dangers arising from firearms becoming cheaper, deadlier, and more readily available in more densely populated urban centers.

The expanding economy in the nineteenth century increased the availability of pistols and other weapons used for personal self-defense. *See* Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 137 (2006). Major cities, including Boston, Philadelphia, New Orleans, and New York began to issue revolvers to their police forces for the first time. *See, e.g.,* Roger Lane, *Policing the City: Boston, 1822-1885* (1967); Dennis Rousey, *Policing the Southern City: New Orleans, 1805-1889* (1996). The growth of urban centers was also bringing more people of more varied backgrounds closer together than ever before. This combination of urbanization and the increased availability of firearms brought new dangers, and gun-related homicide rates steadily increased. *See Revolver Killings Fast Increasing; Legislative Measure to be Urged for Curbing the Sale of Firearms*, New York Times, Jan. 30, 1911.

States and localities once again turned to registration and licensing requirements to address these public safety concerns. An assassination attempt on New York's Mayor William J. Gaynor in 1910, for example, led the state to consider its first major gun reform, which included significant licensing and registration requirements. *See* Cornell, *A Well Regulated Militia*, *supra*, at 197. The legislation, which was signed into law on May 29, 1911, required the issuance of a license by the local government for the possession of a pistol, revolver, or other concealable firearm. *See* Act of May 25, 1911, ch. 195, § 1, 1911 N.Y. Laws

442, 443.  It also directed sellers to record the "date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calib[er], make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm."  *Id.* § 2, 1911 N.Y. Laws at 444.

Many other states enacted similar licensing and registration requirements during this period.  Although the details of these varied, as a general matter they required individuals to provide detailed information to, and obtain permission from, a government official in order to bear arms.  In addition, some states required inspection of weapons and obtaining particular licenses.  For example:

- In California, any person selling, leasing, or transferring a firearm of the type which could be concealed was required to "keep a register" containing information about the sale and the purchaser, and the seller and the purchaser were directed to sign a form with the information and submit it to government officials.  Act of May 4, 1917, ch.145, § 7, 1917 Cal. Laws 221, 222-23.

- Connecticut made it a crime for any person to "carry . . . any pistol [or] revolver . . . unless such person shall have been granted a written permit issued and signed by the mayor or chief of police of a city, warden of a borough, or the first selectman of a town, authorizing such person to carry such weapon or instrument within such city, borough or town."  Act of Apr. 10, 1917, ch. 129, 1917 Conn. Laws 98, 98.

- Georgia made it "unlawful for any person to have or carry about his person, in any county in the State of Georgia, any pistol or revolver without first taking out a license from the Ordinary of the respective counties in which the party resides." Act of Aug. 12, 1910, No. 432, § 1, 1910 Ga. Laws 134, 134.  A public official was directed to "keep a record of the name of the person taking out such license, the name of the maker of the fire-arm to be

carried, and the caliber and number of the same." *Id.* § 2, 1910 Ga. Laws at 135.

- A Nevada law made it "unlawful for any person . . . to wear, carry or have concealed upon his person, in any town any . . . pistol . . . or other dangerous weapon, without first obtaining permission from the Board of County Commissioners." Act of Mar. 17, 1903, ch. CXIV, § 1, 1903 Nev. Laws 208, 208-09.

- A New Hampshire law provided that "[t]he selectmen of towns or the mayor or the chief of police of cities may, upon the application of any person issue a license to such person to carry a loaded pistol or revolver in this State, if it appears that the applicant is a suitable person to be so licensed." Act of Apr. 6, 1909, ch. 114, § 3, 1909 N.H. Laws 451, 451-52.

- Oregon law stated that "[n]o person shall carry in any city, town or municipal corporation of this State any pistol, revolver or other firearm . . . of a size which may be concealed upon his or her person, without a license or permit therefor, issued to him or her [by the local government] . . . " Act of Feb. 21, 1917, ch. 377, § 1, 1917 Or. Laws 804.

- In West Virginia, it was a misdemeanor to "carry about [one's] person any revolver or other pistol," but a license could be obtained by publishing in a newspaper notice of intent to acquire a license, and making a showing to a circuit court judge that the applicant was of good moral character and had cause for carrying a weapon. Act of Apr. 23, 1925, ch. 95, 1925 W.V. Laws 389, 389-90.

- Hawaii also generally prohibited carrying a pistol or revolver outside the home without a license. Small Arms Act, Act 206, 1927 Haw. Laws 209. Licenses were issued by "[t]he judge of a court of record or the sheriff of a county, or city and county . . . if it appears that the applicant has good reason to fear an injury to his person or property, or has any other proper reason for carrying a pistol or revolver, and that he is a suitable person to be so licensed." *Id.* § 7, 1927 Haw. Laws at 210.

- Michigan enacted a law that required "any person within this State who owns weapons or has in his possession a pistol" to "present such weapon for safety inspection to the commissioner or chief of police . . . . A certificate of inspection shall thereupon be issued . . . [and] mailed to the commissioner of public safety and filed and indexed by him and kept as a permanent official

record for a period of six years."  Act of June 2, 1927, No. 372, § 9, 1927 Mich. Laws 887, 891.

For these reasons, it has been common practice for jurisdictions across the United States to condition the right to bear arms on an individual's willingness to provide information to government officials and register his or her firearms.

II. **STATES AND MUNICIPALITIES HAVE LONG BANNED DANGEROUS WEAPONS, AND COURTS HAVE UPHELD THESE REGULATIONS AS CONSISTENT WITH THE RIGHT TO BEAR ARMS.**

Since the Founding, states and municipalities have possessed broad "police power" to enact safety regulations protecting the public.  *See* William J. Novak, *The People's Welfare: Law and Regulation in Nineteenth-Century America* 53-54 (1996).  Jurisdictions have exercised their police powers to regulate arms in many ways, including, as explained above, with laws akin to the registration requirements challenged here.  But one constant has been that governments have repeatedly banned weapons that the community views to be particularly dangerous in that jurisdiction.  That was the case with gunpowder in cities in the eighteenth century, with certain types of knives and handguns in nineteenth-century states and towns, and with certain types of semi-automatic weapons and ammunition in more recent years.  And courts have repeatedly upheld these types of bans of dangerous weapons against constitutional challenges.

## A. States and Cities Have Historically Outlawed Dangerous Weapons.

1.  In one early form of regulation, several states regulated the storage of gunpowder in order to protect against the accidental discharge of a weapon during a fire, in some instances effectively banning the possession of loaded weapons in the home.[2]  As Chief Justice Marshall observed, "[t]he power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States."  *Brown v. Maryland*, 25 U.S. (12 Wheat.) 419, 443 (1827).  He explained that "[t]he removal or destruction of infectious or unsound articles is, undoubtedly, an exercise of that power."  *Id.* at 444.

Shortly thereafter, other states, including Ohio, Tennessee, and Virginia, enacted laws regulating the discharge of guns, particularly in potentially crowded public places like the town square.[3]  Since the Founding, then, states and local

_____

[2] *See, e.g.*, Act of June 26, 1792, ch. 10, 1792 Mass. Acts 208; Act of Apr. 13, 1784, ch. 28, 1784 N.Y. Laws 627; Act of Dec. 6, 1783, ch. 1059, 11 Pa. Stat. 209; *see also Heller*, 128 S. Ct. at 2819 (stating that the Massachusetts law would have been construed to permit self-defense and, "[i]n any case, we would not stake our interpretation of the Second Amendment upon a single law, in effect in a single city"); *id.* at 2849 (Breyer, J., dissenting) (describing various laws regulating gunpowder).  Antebellum courts repeatedly upheld such regulations.  *See, e.g.*, *Foote v. Fire Dep't of New York*, 5 Hill 99, 101 (N.Y. Sup. Ct. 1843) ("The statute is a mere police regulation—an act to prevent a nuisance to the city . . . ."); *Williams v. City Council*, 4 Ga. 509, 512 (1848).

[3] *See, e.g.*, Act of Feb. 17, 1831, ch. 834, § 6, *in* 3 *The Statutes of Ohio and of the Northwestern Territory* 1740 (Salmon P. Chase ed., 1835); Act of Dec. 3, 1825, ch. 292, § 3, 1825 Tenn. Priv. Acts 306; Act of Jan. 30, 1847, ch. 79, 1846-1847 Va. Acts 67; Act of Feb. 4, 1806, ch. 94, 1805-1806 Va. Acts 51.

governments have regulated arms when necessary to protect citizens from such threats to public safety as fires and accidental shootings.

2. In the early part of the nineteenth century, the states were confronted with an additional problem concerning firearms. In the years since the colonial era, weapons had grown smaller and cheaper, and the practice of traveling with concealed weapons, such as handguns and knives, had become both common and dangerous. *See* Cornell, *A Well-Regulated Militia*, *supra*, at 137-40. Perceiving a threat to their citizens' safety, many state legislatures responded to this new danger by enacting laws prohibiting the carrying of concealed weapons. *See id.* at 140. Kentucky passed the first of these in 1813, prohibiting the wearing of a "pocket pistol, dirk, large knife, or sword in a cane, concealed as a weapon," with a narrow exception for "when traveling on a journey." Act of Feb. 13, 1813, ch. 89, 1813 Ky. Acts 100, *in* Cramer, *supra*, at 143-44. Louisiana passed a similar ban the same year. Other states soon followed suit.[4]

Several states went further in response to this new threat, deciding not only to outlaw the carrying of concealed weapons, but to proscribe entire classes of concealable weapons, which by their nature posed threats to public safety. In 1837, for example, Alabama imposed a tax on the sale or giving of Bowie Knives

---

[4] See statutes from Alabama, Virginia, Arkansas, and Indiana, *in* Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 145-46, 150-52 (1999), and from Ohio, Act of Mar. 18, 1859, 1859 Ohio Laws 56.

or Arkansas Tooth-picks. *See* Act of June 30, 1837, 1837 Ala. Acts 11, *in* Cramer, *supra*, at 146. The following year, Tennessee altogether banned the wearing, sale, or giving of the same weapons. *See* Act of Jan. 27, 1838, ch. CXXXVII, 1837-1838 Tenn. Pub. Acts 200, *in* Cramer, *supra*, at 148-49; *see also* Cornell, *A Well-Regulated Militia*, *supra*, at 142 (describing the Alabama and Tennessee statutes as "more robust" than earlier statutes by "effectively moving from regulation to prohibition of certain classes of weapons"). The Founders understood the protections of the Second Amendment to apply to these edged weapons, as they were typically associated with the militia. *See* Saul Cornell, *The Original Meaning of Original Understanding: A Neo-Blackstonian Critique*, 67 Md. L. Rev. 150, 157 n.42 (2007). It was therefore generally recognized in the period before the Civil War that American governments could react to threats to the public safety through reasonable regulation of the right to bear arms, including outlawing certain classes of particularly dangerous weapons.

3. States continued to enact broad restrictions on the possession of weapons in the years following the Civil War. These regulations were more pervasive than those enacted during the antebellum period. Even when new state constitutions contained a right to bear arms not expressly subject to legislative regulation,[5]

---

[5] *See* Ala. Const. of 1868, art. I, § 28; Ark. Const. of 1868, art. I, § 5; Del. Const. of 1897, art. I, § 20; Or. Const. of 1857, art. I, § 27; Pa. Const. of 1874, art. I, § 21;

legislatures still regulated firearms.[6] Several even imposed outright bans on handguns.

The most common regulations of the period were concealed-weapons laws. At least fifteen states prohibited the carrying of concealed pistols and deadly weapons, some explicitly covering all firearms or all weapons.[7] Although three of these statutes created exceptions for travelers, persons on their own premises, or those with a legitimate fear of attack,[8] the majority contained no such exceptions.

But concealed-weapons laws were not the only legislative prerogative exercised at the time. At least four states banned the possession of all non-military handguns. Tennessee criminalized carrying, "publicly or privately, any . . . belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in the hand." 1879 Tenn.

S.C. Const. of 1868, art. I § 28; S.D. Const. of 1889, art. VI, § 24; Wash. Const. of 1889, art. I, § 24; Wyo. Const. of 1889, art. I, § 24.

[6] *See* Act of Apr. 1, 1881, 1881 Ark. Acts 191; Act of Feb. 18, 1885, ch. 8, § 1–4, 1885 Or. Laws 33; 1880 S.C. Acts 448, § 1; S.D. Terr. Pen. Code § 455 (1877); Wash. Code § 929 (1881); 1876 Wyo. Laws ch. 52, § 1.

[7] *See* Act of Apr. 1, 1881, 1881 Ark. Acts 191; Colo. Rev. Stat. § 149, at 229 (1881); Fla. Act of Feb. 12, 1885, ch. 3620, § 1; Ill. Act of Apr. 16, 1881; Ky. Gen. Stat., ch. 29, § 1 (1880); Neb. Cons. Stat. § 5604 (1893); 1879 N.C. Sess. Laws, ch. 127; N.D. Pen. Code § 457 (1895); Act of Feb. 18, 1885, ch. 8, §§ 1-4, 1885 Or. Laws 33; 1880 S.C. Acts 448, § 1; S.D. Terr. Pen. Code § 457 (1877); Tex. Act of Apr. 12, 1871; 1869–1870 Va. Acts 510; Wash. Code § 929 (1881); W. Va. Code ch. 148, § 7 (1870).

[8] *See* Neb. Cons. Stat. § 5604 (1893); 1879 N.C. Sess. Laws, ch. 127; 1880 S.C. Acts 448, § 1.

Pub. Acts, ch. 186. The only persons exempted from the statute were military personnel and those performing specified law enforcement functions. *Id.* Perhaps most pertinent here, the Tennessee Supreme Court construed the act to apply even "upon one's own farm or premises, or in fact in *any place*." *Dycus v. State*, 74 Tenn. 584, 585 (1880) (emphasis added); *see also Barton v. State*, 66 Tenn. 105, 105-06 (1874).

Tennessee was not alone in such regulation. Wyoming likewise forbade anyone from "bear[ing] upon his person, concealed or openly, any fire-arm or other deadly weapon, within the limits of any city, town or village." 1876 Wyo. Laws ch. 52, § 1. Arkansas and Texas enacted similar bans. *See* Act of Apr. 1, 1881, No. 96, 1881 Ark. Acts 191; Tex. Act of Apr. 12, 1871. States also outlawed the sale of non-military pistols,[9] or prohibited specific weapons elected officials determined were public dangers.[10]

Municipalities likewise enacted their own regulations. Dodge City, Kansas, for example, banned the carrying of pistols and other dangerous weapons in response to violence accompanying western cattle drives. *See* Dodge City, Kan., Ordinance No. 16, § XI (Sept. 22, 1876); Robert R. Dykstra, *The Cattle Towns* 121-22 (1968).

---

[9] *See* Ark. Act of Apr. 1, 1881; 1879 Tenn. Pub. Acts, ch. 96.

[10] *See* Fla. Act of Aug. 8, 1868; Ill. Act of Apr. 16, 1881; 1850 Mass. Laws, ch. 194, § 2; N.D. Pen. Code § 457 (1895); S.D. Terr. Pen. Code § 455 (1877).

**B.     Courts Have Historically Upheld Restrictions On Dangerous Weapons**

1.   In the early Republic, state courts repeatedly upheld arms-regulating statutes against constitutional attack, even when the pertinent state constitution explicitly protected the right to bear arms.  *See, e.g.*, *Day v. State*, 37 Tenn. 496, 499 (1857); *Aymette v. State*, 21 Tenn. 154, 159-61 (1840) (right to keep weapons is unqualified, but right to bear arms for purposes other than the common defense can be regulated); *State v. Buzzard*, 4 Ark. 18, 21 (1842); *State v. Chandler*, 5 La. Ann. 489, 489-90 (1850) (upholding a ban on concealed weapons that was "absolutely necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons"); *State v. Jumel*, 13 La. Ann. 399, 400 (1858) (upholding a concealed-weapons law because it only banned a "*particular mode* of bearing arms which is found dangerous to the peace of society"); *State v. Reid*, 1 Ala. 612, 616-17 (1840) (holding that it was permissible for the state to regulate weapons "merely to promote personal security" by prohibiting the wearing of weapons "in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others").  Courts thus recognized that states and localities had authority to exercise their police powers to regulate weapons deemed particularly dangerous.

Against this backdrop, there are two major outliers. The first is *Bliss v. Commonwealth*, 12 Ky. 90, 91, 93 (1822), in which the Kentucky Supreme Court declared Kentucky's concealed-weapons ban in conflict with its Constitution. As commentators in the era of the Fourteenth Amendment recognized, *Bliss* is properly understood as the exception, not the rule, in judicial decisions involving challenges to gun-safety regulations. *See* 2 Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125, at 75-76 (4th ed. 1868). And, indeed, it was so anomalous that the legislature responded by amending the state constitution to allow a concealed-weapons ban. *See* Ky. Const. of 1850, art. XIII, § 25.

The second outlier is *Nunn v. State*, in which the Georgia Supreme Court used broad language in upholding a constitutional challenge against part of a Georgia law banning the open carry of a horseman's pistol. *Nunn v. State*, 1 Ga. 243, 251 (1846). The same court, however, upheld the portion of the law which prohibited the carry of "certain weapons secretly." And the Georgia Supreme Court has since taken a narrow reading of *Nunn*, stating on two separate occasions that "evidently [*Nunn*] was never intended to hold that men, women, and children had some inherent right to keep and carry arms or weapons of every description, which could not be infringed by the legislature, unless as a result of the constitutional provision under consideration." *Strickland v. State*, 137 Ga. 1, 8 (1911); *Carson v. State*, 241 Ga. 622, 627-28 (1978). Indeed, the Georgia

Supreme Court later cited *Nunn* in *upholding* a 1910 law that prohibited any person from carrying a revolver without a license. *Strickland*, 137 Ga. at 8.

Similarly, the vast majority of state and local laws regulating or outlawing dangerous arms were upheld as paradigmatic examples of the exercise of police power. "The acknowledged police power of a State extends often to the destruction of property. A nuisance may be abated. Every thing prejudicial to the health or morals of a city may be removed." *Thurlow v. Massachusetts (The License Cases)*, 46 U.S. (5 How.) 504, 589-91 (1847) (McLean, J., dissenting). This power, Justice McLean explained, is "essential to self-preservation, and exists, necessarily, in every organized community. It is, indeed, the law of nature, and is possessed by man in his individual capacity. He may resist that which does him harm, whether he be assailed by an assassin, or approached by poison." *Id.* at 589. Thus, for example, in light of the "explosive nature of gunpowder, a city may exclude it" as an "act[] of self-preservation." *Id.* For "[i]ndividuals in the enjoyment of their own rights must be careful not to injure the rights of others." *Id.*

2. In the wake of the Civil War and adoption of the Fourteenth Amendment, courts continued to recognize state legislative authority to regulate dangerous weapons, including handguns. The Tennessee Supreme Court's *Andrews v. State* decision is illustrative. 50 Tenn. 165, 171 (1871). The plaintiffs there challenged

a statute forbidding any person to "publicly or privately carry any . . . pocket pistol . . . or revolver," Tenn. Act of June 11, 1870, asserting "that it is in violation of, and repugnant to" the Second Amendment of the U.S. Constitution and Tennessee's constitution. 50 Tenn. at 171. The court interpreted the statute to "amount[] to a prohibition to keep and use such weapon for *any and all purposes*." *Id.* at 187 (emphasis added). Although the court held that the federal Constitution did not limit the state legislature, *id.* at 175, it interpreted the state right-to-bear-arms provision *in pari materia* with the Second Amendment, *id.* at 177. Nevertheless, this right did not extend to "every thing that may be useful for offense or defense." *Id.* at 179. Weapons such as the pocket pistol and revolver could be prohibited *altogether. Id.* Even the use of weapons such as "the rifle . . . , the shot gun, the musket, and repeater," could "be subordinated to such regulations and limitations as are or may be authorized by the law of the land, passed to subserve the general good." *Id.* at 179-80; *see also State v. Wilburn*, 66 Tenn. 57, 59-60 (1872).

Similarly, the Arkansas Supreme Court upheld that state's prohibition on carrying pistols. *See Fife v. State*, 31 Ark. 455 (1876). Tracking the reasoning of *Andrews*, the Arkansas Supreme Court upheld that State's prohibition as a lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms. *Id.* at 461. So, too, the Texas Supreme Court

upheld a conviction for carrying an unloaded pistol for the purpose of getting it repaired, and concluded that such carrying is not "in any way protected either under the State or Federal Constitution." *English v. State*, 35 Tex. 473, 473, 478 (1871).

Courts in Georgia, West Virginia, and Oklahoma followed suit. *See Hill v. State*, 53 Ga. 472, 474 (1874); *State v. Workman*, 35 W. Va. 367, 373 (1891); *Ex parte Thomas*, 97 P. 260, 262 (Okla. 1908). In the Georgia case, the author of the Court's opinion noted that he was "at a loss to follow the line of thought that extends the guarantee"—in the state Constitution of the "right of the people to keep and bear arms"—"to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day." *Hill*, 53 Ga. at 474.

### C. Leading Treatises Recognized States' and Cities' Authority to Regulate Arms to Protect the Public Safety.

Major legal treatises, including those from the earliest periods of American history cement the conclusion that governments were widely understood to have broad authority to regulate and ban dangerous weapons. In *Heller*, the Supreme Court cited John Norton Pomeroy's treatise as representative of "post-Civil War 19th-century sources" commenting on the right to bear arms. 128 S. Ct. at 2812. As the Court noted, Pomeroy observed that while "[t]he object of" the Second Amendment "is to secure a well-armed militia," "a militia would be useless unless

the citizens were enabled to exercise themselves in the use of warlike weapons," and so the government "is forbidden by any law or proceeding to invade or destroy the right to keep and bear arms." John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152 (1868). The very next sentence in Pomeroy's treatise is: "But all such provisions, all such guarantees, must be construed with reference to their intent and design. This constitutional inhibition is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons, or laws forbidding the accumulation of quantities of arms with the design to use them in a riotous or seditious manner." *Id.* at 152-53.

One early commentator on the right to bear arms similarly observed that the "right in the people to keep and bear arms, although secured by . . . the constitution, is held in subjection to the public safety and welfare." Joel Tiffany, *A Treatise on Government, and Constitutional Law* 394 (1867). Even where there is a right to bear arms, "the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons." *The Right to Keep and Bear Arms for Public and Private Defence,* 1 Cent. L.J. 259, 287 (Hon. John F. Dillon & Seymour D. Thompson, eds., 1874). And so the law must "strike some sort of balance between these apparently conflicting rights." *Id.*

In his authoritative survey of police power, published in 1904, Ernst Freund reviewed nineteenth-century weapons regulations to conclude that the constitutional guarantees of the Second Amendment and similar state constitutional provisions had "not prevented the very general enactment of statutes forbidding the carrying of concealed weapons, and the *possession or use of certain deadly weapons*." Ernst Freund, *The Police Power: Public Policy and Constitutional Rights* 90-91 (1904) (emphasis added). He deemed this a classic illustration of the more general principle whereby "constitutional rights must if possible be so interpreted as not to conflict with the requirements of peace, order and security." *Id.* at 91.

## CONCLUSION

For the foregoing reasons this Court should affirm the decision below.

/s/ Matthew M. Shors

MATTHEW M. SHORS
O'MELVENY & MYERS LLP
1625 Eye St. NW
Washington, DC 20006
(202) 383-5300

Dated: September 20, 2010          *Attorney for Amici Curiae*

## CERTIFICATE OF COMPLIANCE WITH RULE 29(d)

In accordance with D.C. Circuit Rule 29(d), the undersigned certifies that the accompanying brief is necessary. *Amici* are Professional Historians and Law Professors who have taught courses and published scholarship on the Second Amendment and legal and constitutional history. The Supreme Court in *Heller v. District of Columbia*, 128 S. Ct. 2783 (2008), looked to historical gun regulations in determining the Second Amendment's application to current gun laws. *Amici* are not aware of any other brief in this case that describes in detail the history of registration requirements and regulations of dangerous weapons dating back to the early Republic.

Dated: September 20, 2010

/s/ Matthew M. Shors

Matthew M. Shors
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 383-5300

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2010, I caused a true and accurate copy of the Brief for Professional Historians and Law Professors Saul Cornell, Paul Finkelman, Stanley N. Katz, and David T. Konig as *Amici Curiae* in Support of Appellees to be served upon the following counsel for the parties via the Court's ECF system:

Stephen P. Halbrook
Richard E. Gardiner
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276

Todd S. Kim
Office of the Attorney General for the District of Columbia
441 4th St., N.W., Suite 600-S
Washington, D.C. 20001

<u>/s/ Matthew M. Shors</u>

Matthew M. Shors
O'Melveny & Myers LLP
1625 Eye Street, NW
Washington, D.C. 20006
(202) 383-5300