**ORAL ARGUMENT SCHEDULED FOR NOVEMBER 15, 2010**

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————

10-7036

———————

**DICK ANTHONY HELLER, ABSALOM JORDAN,
WILLIAM CARTER, and MARK SNYDER**

Appellants

v.

**THE DISTRICT OF COLUMBIA and
ADRIAN M. FENTY, Mayor, District of Columbia**,

Appellees

———————

**REPLY BRIEF FOR APPELLANTS**
(Corrected)

———————

Appeal from the U.S. District Court
for the District of Columbia
District Ct. Civil No. 1:08-cv-01289 (RMU)

Stephen P. Halbrook
Richard E. Gardiner
3925 Chain Bridge Road, Suite 403
Fairfax, VA  22030
(703) 352-7276

# TABLE OF CONTENTS

<u>Page</u>

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   I. STRICT SCRUTINY IS APPROPRIATE, BUT
     THE PROHIBITIONS CANNOT STAND EVEN
     UNDER A LESSER STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       A. The Need for Strict Scrutiny Flows from
          The Framers' Understanding of the Right
          To Keep and Bear Arms as a Fundamental
          Right Essential to Ordered Liberty . . . . . . . . . . . . . . . . . . . . . . . . 4

       B. The District's Textual Arguments
          Ignore *McDonald*, *Heller*, and History . . . . . . . . . . . . . . . . . . . . . 5

       C. The District's Remaining Arguments
          Attempt To Resurrect The Interest-Balancing
          Approach That The Supreme Court Rejected . . . . . . . . . . . . . . . . 9

   II. THE PROHIBITION ON POSSESSION OF
      ANY FIREARM THAT IS UNREGISTERED
      VIOLATES THE SECOND AMENDMENT . . . . . . . . . . . . . . . . . . . . 11

   III. THE BAN ON COMMONLY-POSSESSED
       RIFLES AND MAGAZINES VIOLATES
       THE SECOND AMENDMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

   IV. THE RESTRICTIONS ARE NOT "USUAL
       AND REASONABLE" AS REQUIRED BY CONGRESS . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

i

# TABLE OF AUTHORITIES[*]

| CASES | <u>Page</u> |
|---|---|

*Andrews v. State*,
50 Tenn. 165 (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Arnold v. City of Cleveland*,
616 N.E.2d 163 (Ohio 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Bulova Watch Co. v. United States*,
365 U.S. 753 (1961) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Christensen v. Harris County*,
529 U.S. 576 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cox v. New Hampshire*,
312 U.S. 569 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*District of Columbia v. Heller*,
128 S. Ct. 2783 (2008) . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4, 5, 6, 7, 8, 9, 10, 11,
12, 15, 19, 22, 24, 27, 28

*Graham v. Richardson*,
403 U.S. 365 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Gunderson v. Hvass*,
339 F.3d 639 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Harrold v. Collier*,
107 Ohio St.3d 44, 836 N.E.2d 1165 (2005) . . . . . . . . . . . . . . . . . . . . . . . . 22

---

[*]Authorities chiefly relied upon are marked with asterisks.

*Hutchins v. District of Columbia*,
188 F.3d 531 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Johnson v. California*,
543 U.S. 499 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Justice v. Town of Cicero*,
577 F.3d 768 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Kovacs v. Cooper*,
336 U.S. 77 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Landmark Commcns. v. Virginia*,
435 U.S. 829 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Los Angeles v. Alameda Books, Inc.*,
535 U.S. 425 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 22

*M.L.B. v. S.L.J.*,
519 U.S. 102 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Maryland & D.C. Rifle & Pistol Ass'n v. Washington*,
442 F.2d 123 (D.C. Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5, 6, 7, 8, 11, 12

*McIntosh v. Washington*,
395 A.2d 744 (D.C. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*New Albany DVD, LLC v. City of New Albany, Ind.*,
581 F.3d 556 (7th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Nunn v. State*,
1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Parker v. District of Columbia*,
478 F.3d 370 (D.C. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Reno v. Flores*,
507 U.S. 292 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Rinzler v. Carson*,
262 So. 2d 661 (Fla. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Robertson v. City & County of Denver*,
874 P.2d 325 (Colo. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Sable Commcns. of Cal., Inc. v. FCC,*
492 U.S. 115 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Staples v. United States*,
511 U.S. 600 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Stasiukevich v. Nicolls*,
168 F.2d 474 (1st Cir. 1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State v. Hamdan*,
665 N.W.2d 785 (Wis. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*State v. Kerner*,
181 N.C. 574, 107 S.E. 222 (1921) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 20

*State v. Reid*,
1 Ala. 612 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*State v. Rosenthal*,
75 Vt. 295, 55 A. 610 (1903) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*State ex rel. City of Princeton v. Buckner*,
180 W.Va. 457, 377 S.E.2d 139 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

iv

*Turner Broadcasting System, Inc. v. FCC,*
520 U.S. 180 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Brown,*
381 U.S. 437 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Fincher,*
538 F.3d 868 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Marzzarella,*
2010 WL 2947233 (3rd Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 27

*United States v. Menasche,*
348 U.S. 528 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Miller,*
307 U.S. 174 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14

*United States v. Sechrist,*
640 F.2d 81 (7th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Ward v. Rock Against Racism*,
491 U.S. 781 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Watson v. Stone,*
148 Fla. 516, 4 So.2d 700 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*White River Amusement Pub, Inc. v. Town of Hartford*,
481 F.3d 163 (2nd Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11


**CONSTITUTION**

U.S. Const., Amendment I . . . . . . . . . . . . . . . . . . . . . . . . 1, 4, 5, 6, 7, 9, 10, 11, 14

U.S. Const., Amendment II . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 5, 6, 10, 11, 12, 14,
15, 19, 20, 21, 26, 28

U.S. Const., Amendment IV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 16

U.S. Const., Amendment VI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

U.S. Const., Amendment XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## UNITED STATES STATUTES

P.L. 105-277, 112 Stat. 2681 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

18 U.S.C. § 922(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 922(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 926(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

26 U.S.C. § 5845(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## DISTRICT OF COLUMBIA ORDINANCES

Firearms Registration Amendment Act of 2008 . . . . . . . . . . . . . . . . . . . . . . . 28

D.C. Code § 1-124 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D.C. Code § 1-203.02 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D.C. Code § 1-204.04(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D.C. Code § 1-206.02(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D.C. Code § 1-227 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

D.C. Code § 1-303.43 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 28, 29

D.C. Code § 7-2501.01(17) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## STATE STATUTES

Act of Feb. 4, 1806, ch. 94, 1805-1806 Va. Acts 51 . . . . . . . . . . . . . . . . . . . . . . . 21

Act of Jan. 30, 1847, ch. 79, 1846-1847 Va. Acts 67 . . . . . . . . . . . . . . . . . . . . . 21

## LEGISLATIVE MATERIALS

144 Cong. Rec. H11652 (October 20, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

## FEDERAL REGULATIONS

27 C.F.R. § 478.124(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## OTHER AUTHORITIES

Churchill, R. H., *Gun Regulation, the Police Power
& the Right to Keep Arms in Early America*,
25 Law & Hist. Rev. 139 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Documentary History of the First Federal Congress* (1986) . . . . . . . . . . . . . . . . . 7

*Documentary History of the Ratification of the Constitution* (2000) . . . . . . . . . . . 7

FBI, *Crime in the U.S.*,
http://www.fbi.gov/ucr/cius2009/data/table_20.html . . . . . . . . . . . . . . . . . . . . . . 24

Harcourt, B., *On Gun Registration, the NRA, Adolf Hitler,
& Nazi Gun Laws*,
73 Fordham L. Rev. 653 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Koper, C., *An Updated Assessment of the Federal Assault
Weapons Ban* (2004),
http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf . . . . . . . . . . . . . . . . . . . . . 23

**GLOSSARY**

| | |
|---|---|
| Brady Br. | Brief for Amici Curiae Brady Center |
| CMP | Civilian Marksmanship Program |
| DC Br. | Appellees' Brief |
| Heller Br. | Appellants' Brief |
| Hist. Br. | Brief for Professional Historians |
| JA | Joint Appendix |
| MPD | Metropolitan Police Department |
| NFA | National Firearms Act |
| NICS | National Instant Criminal Background Check System |
| SA | Appellees' Statutory Addendum |

# SUMMARY OF ARGUMENT

The District's prohibitions are void under both strict scrutiny and the categorical approach of *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), but also under any standard of review applicable to a fundamental right. The District's argument below for "reasonableness" review was based on the inaccurate premise that the right is not fundamental. *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), held the right to be essential to ordered liberty.

The existence of unprotected conduct fails to negate the need for strict scrutiny of a fundamental right in the First or Second Amendment. The former's use of the term "abridge" and the latter's use of the term "infringe" fail to provide the textual difference claimed by the District. The District's militia-related arguments do not negate application of strict scrutiny. The District argues for a deferential test in which a committee report overrides the right, but that was rejected in *Heller* and *McDonald*.

The prohibition on possession of a firearm that is not registered implicates and violates the core right. State precedents drawing the line between regulation and prohibition do not support the District. The premise of *United States v. Miller*, 307 U.S. 174 (1939), is that only unprotected "arms," those that are not commonly possessed, may be subject to registration. The District's references to English and American historical precedent either do not support registration or show what the

1

Second Amendment was adopted to prohibit.

Given the National Instant Criminal Background Check System and the District's own ability to conduct background checks, registration of all firearms – not to mention expiration of registration every three years – is not narrowly tailored. The argument that it is useful for fighting crime to allow police to arrest persons for unregistered firearms disregards the constitutional right. The precedents cited for fingerprinting sex offenders and incarcerated persons do not apply to exercise of a fundamental right. The same may be said of the District's arguments for fees, vision testing, and reporting one's occupation. The District's registration system, as a whole and in its parts, violates the Second Amendment.

The District's bans on commonly-possessed firearms it calls "assault weapons," such as the AR-15 rifle, and magazines holding more than ten rounds, violate the Second Amendment. The unsupported allegations in its committee report that such firearms – which fire only once per trigger pull – are not commonly possessed for lawful purposes, and instead are designed for military use, defy the uncontradicted evidence in the record. That evidence demonstrates that millions of Americans possess such firearms and magazines for self defense, target shooting, hunting, and other lawful purposes such as the Civilian Marksmanship Program. No military force in the world issues such firearms, nor are they preferred by terrorists. No historical

2

or judicial precedent is cited which justifies prohibiting such firearms.

As in *Heller*, the District cannot override a constitutional right by making allegations in a committee report, and then failing to submit *any* evidence in court. The District's criticism of a nationwide "common use" standard is precluded by *Heller*.

Finally, the restrictions are not "usual and reasonable" firearms regulations as required by D.C. Code § 1-303.43. The District does not have an alternative general legislative authority such that it can ignore the specific powers defined by Congress.

## ARGUMENT

## I. STRICT SCRUTINY IS APPROPRIATE, BUT THE PROHIBITIONS CANNOT STAND EVEN UNDER A LESSER STANDARD

The District prohibits possession of any firearm which is unregistered, any firearm it calls an "assault weapon," and any magazine holding more than ten rounds. These prohibitions are void under both strict scrutiny and the categorical approach taken in *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), but also under any standard of review applicable to a fundamental right. *See* Heller Br. 19-29.

In the court below, the District based its argument for "reasonableness" review on the premise: "The Right Identified in *Heller* is Not Fundamental." Defendants' Reply to Opp. to Motion for Sum. Jud., 4. *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), held the right to be fundamental, but the District continues to argue for

the same low standard of review.  DC Br. 37.

### A.  The Need for Strict Scrutiny Flows from The Framers' Understanding of the Right To Keep and Bear Arms as a Fundamental Right Essential to Ordered Liberty

The District cites no case questioning that restrictions on fundamental rights are subject to strict scrutiny.  It falls back instead to Justice Breyer's *Heller* dissent, suggesting that the presumptive validity of a ban on felon firearm possession is inconsistent with strict scrutiny.  DC Br. 38.  But that is no more true of the Second Amendment than the First.  The existence of unprotected speech does not negate the need for strict scrutiny of restrictions on protected speech, as "'the freedom of speech' referred to by the First Amendment does not include a freedom to disregard these traditional limitations." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382-83 (1992).  The same principle applies to the Second Amendment.[1]  *See Heller*, 128 S. Ct. at 2821 (noting First Amendment exceptions and stating that "[t]he Second Amendment is no different.").

In response to Justice Stevens' dissenting view in *McDonald* that the right is not fundamental, Justice Scalia noted: "No fundamental right – not even the First

___

[1]The "presumptively lawful" *dictum* can also be understood as a prediction that certain restrictions are likely to survive strict scrutiny.  *See Johnson v. California*, 543 U.S. 499, 515 (2005) ("The fact that strict scrutiny applies 'says nothing about the ultimate validity of any particular law . . . .'") (citation omitted); *see also R.A.V.*, 505 U.S. at 390 n.6 ("presumptive invalidity does not mean invariable invalidity").

Amendment – is absolute. The traditional restrictions go to show the scope of the right, not its lack of fundamental character."  130 S. Ct. at 3056 (Scalia, J., concurring).  Yet the District relies on that same dissenting view in arguing against strict scrutiny.  DC Br. 39-40.[2]  In short, no fundamental right is absolute, but restrictions on fundamental rights require strict scrutiny.[3]

## B.  The District's Textual Arguments Ignore *McDonald*, *Heller*, and History

The District makes the novel claim that the text of the Second Amendment precludes strict scrutiny.  First, the District emphasizes the reference to a "well regulated" militia. DC Br. 42. But "well-regulated" is not a synonym for pervasively-regulated, let alone for regulated subject only to a permissive reasonableness test. *Heller* rejected this same argument in concluding that "the adjective 'well-regulated'

---

[2]The District cites *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (*per curiam*), DC Br. 41, but that decision invalidated a prohibition on speech which was not likely to incite "imminent lawless action."  *Id*.  Equivalent Second Amendment exceptions would be prohibitions on brandishing or assault with a weapon.

[3]That rule is not limited to the equal protection context (*see* DC Br. 38).  *See, e.g.*, *Reno v. Flores*, 507 U.S. 292, 302 (1993) (due process "forbids the government to infringe certain 'fundamental' liberty interests . . . unless the infringement is narrowly tailored to serve a compelling state interest"); Heller Br. 19 n.8.  Of course, the levels-of-scrutiny framework does not govern if an enumerated right directly suggests its own standard, such as the Fourth Amendment's prohibition on "unreasonable searches," or is by its terms absolute where it applies, such as the Sixth Amendment's guarantee that the accused "shall enjoy" the right to confront witnesses.

implies nothing more than the imposition of proper discipline and training." 128 S. Ct. at 2800. After *McDonald*, the District's argument is weaker still, for it can no longer dispute that the right to keep and bear arms is a fundamental individual right – notwithstanding the prefatory clause. *See* 130 S. Ct. at 2797, 2798 (plurality op.) ("By the time of the founding, the right to have arms had become fundamental for English subjects," and the Second Amendment "codified" this "pre-existing right"). Nor can the District cite any precedent for the notion that a fundamental right may be restricted subject only to reasonableness review. In reality, "what [the District] must mean is that the Second Amendment should be singled out for special – and specially unfavorable – treatment." *Id*. at 3043. But the Second Amendment right is not "a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Id*. at 3044.

Second, the District argues that the Second Amendment's protection is weak because it uses the term "infringe," whereas the First Amendment uses the supposedly stronger term "abridge." DC Br. 43. But these terms were used interchangeably during the debate over what became the Bill of Rights, and ever since. Samuel Adams proposed that the Constitution "be never construed to authorize Congress, to infringe the just liberty of the press . . .; or to prevent the people . . . from keeping their own

arms . . . ."[4] The "Federal Farmer" proposed a declaration of "fundamental" rights on which the government "can never infringe."[5] A version of the Bill of Rights in the House provided that the freedom of speech and press may not be "infringed."[6] Madison proposed that "no state shall infringe" free speech or press.[7]

*Heller* endorsed the following broad usage: "The right of the whole people . . . to keep and bear *arms* of every description, . . . shall not be *infringed,* curtailed, or broken in upon, in the smallest degree . . . ." 128 S. Ct. at 2809, quoting *Nunn v. State,* 1 Ga. 243, 251 (1846). And *McDonald* referred to "the rights protected by the Fourteenth Amendment against state infringement," which would include First Amendment rights. 130 S. Ct. at 3030-31. See also *id*. at 3098 (Stevens, J., dissenting) ("The right to free speech . . . has been safeguarded from state infringement").

---

[4] 6 *Documentary History of the Ratification of the Constitution* 1453 (2000).

[5] *Id*., vol. 14, at 45-46 (1983).

[6] 4 *Documentary History of the First Federal Congress* 28-29 (1986). The District speculates that the Senate's changing of "infringe" to "abridge" in the First Amendment was intended to strengthen the rights therein. But the House version also referred to "the right of the people peaceably to assemble, and consult for their common good," *id*., and it cannot be inferred that the Senate's deletion of the latter clause was anything but stylistic.

[7] *Id*., vol. 11, at 1291-02 (1992).

The District next argues against strict scrutiny because its restrictions are unrelated to "the Amendment's purpose for codification" of protecting the militia. DC Br. 44. *Heller* squarely rejected this argument: "The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." 128 S. Ct. at 2801. The argument that "the Framers were concerned with *national* legislation, not local gun laws," DC Br. 46, ignores that the District's power derives from Congress. In all events, this argument cannot survive *McDonald*.

The District cites early regulations such as a prohibition on firing guns in inhabited places. DC Br. 47-48. Conspicuously absent is any mention of the Slave Codes, the District's only true gun ban of the era. *See* Heller Br. 42 n.31. The District's "authority" for the proposition that "broad regulation of guns was commonplace in early England and has been throughout American history" is three dissenting opinions and two law review articles previously relied on by the District in *Heller*. DC Br. 40; Br. for Petitioners, *DC v. Heller*, 31, 42.

### C. The District's Remaining Arguments Attempt To Resurrect The Interest-Balancing Approach That The Supreme Court Rejected

Strict scrutiny is further said to be inappropriate because the prohibitions here do not burden militia-related conduct or self-defense. DC Br. 48. Yet these are the most burdensome restrictions in the United States. The registration requirements, onerous enough for plaintiffs, prevent many persons from possessing firearms at all. The ban on AR-15 rifles burdens self-defense and militia-related activity, such as in the Civilian Marksmanship Program (CMP). Heller Br. 8-10.

The District and its amici cite First Amendment cases upholding restrictions because the activities took place in public, disrupting the lives of others. DC Br. 49; Brady Br. 9, 12. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989), involved noise regulations in a public place, and even those regulations were required to be narrowly tailored. The bans on certain types of arms and magazines in the home are not remotely analogous.

The "deferential reasonable-regulation test" proposed by the District and its amici, DC Br. 50 & Brady Br. 16, is no different from the rational basis and interest balancing tests rejected in *Heller*. But the restrictions here would not pass muster under a meaningful "reasonableness" test under the precedents they cite. *State v. Reid*, 1 Ala. 612, 616-17 (1840), upheld a regulation on how arms are carried with the reasoning: "A statute which, under the pretence of regulating, amounts to a destruction

of the right, or which requires arms to be borne as to render them wholly useless for the purposes of defense, would be clearly unconstitutional." *State v. Hamdan*, 665 N.W.2d 785, 808 (Wis. 2003), held that the right includes the ability "to possess, carry, and sometimes conceal arms to maintain the security of [one's] private residence or privately operated business . . . ."

The District claims that its "reasonableness" test is consistent with *Heller*'s rejection of the "interest-balancing" test, DC Br. 52, but if anything, interest-balancing is more demanding. Justice Breyer cited intermediate scrutiny cases as embodying his proposed "interest balancing," 128 S. Ct. at 2852, which the majority rejected as insufficiently protective of the right, *id*. at 2821. The District's suggestion that "balancing tests" are appropriate for "matters outside the 'core'" disregards that its bans apply to mere possession of firearms in the home. In claiming that *Heller* supports a "reasonable-regulation" test by stating that "the fear of disarmament was a key motivation of the Second Amendment," DC Br. 53, it disregards that the provisions at issue make that fear a reality.

The District rests its case on the unsubstantiated assertions in a committee report. Yet not even true legislative fact-finding may undermine fundamental rights. "Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commcns. v. Virginia*, 435 U.S. 829, 843

(1978).  Even in the context of the relaxed scrutiny applicable to less protected speech where findings count, *e.g.*, regarding the location of an adult bookstore, a municipality cannot "get away with shoddy data or reasoning."  *Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438-39 (2002).  Plaintiffs cast doubt on the District's rationale, but the District failed to sustain its burden to produce evidence to justify its restrictions.  *See id.*[8]

In sum, application of the approach followed in *Heller* and *McDonald* renders the restrictions void without consideration of the committee report.  But even if the report is considered, it fails to support the restrictions.

## II.  THE PROHIBITION ON POSSESSION OF ANY FIREARM THAT IS UNREGISTERED VIOLATES THE SECOND AMENDMENT

The district court correctly observed: "Because no individual may possess an unregistered firearm in the District, the registration requirements plainly implicate the core Second Amendment right . . . ."  JA 167.

This Court's statement that the First and Second Amendments "are subject to the same sort of reasonable restrictions" does not sanction "reasonableness" as a standard of review.  *See* DC Br. 19, quoting *Parker v. District of Columbia*, 478 F.3d

---

[8] *See New Albany DVD, LLC v. City of New Albany, Ind.*, 581 F.3d 556, 560 (7th Cir. 2009) (failure to supply evidence); *White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163, 173 (2nd Cir. 2007) (same).

370, 399 (D.C. Cir. 2007), which *Heller* affirmed. No court would sanction a requirement that one must register with the government to pray or to utter an opinion in one's own home. *See* Heller Br. 36-38.

The District states that post-*Heller* courts have upheld firearm registration. DC Br. 19. But the holding in *Justice v. Town of Cicero*, 577 F.3d 768, 774 (7ᵗʰ Cir. 2009), that "the Second Amendment does not apply to the states" does not survive *McDonald*, and it has no substantive discussion of registration.

*United States v. Fincher*, 538 F.3d 868, 874 (8th Cir. 2008), upheld registration requirements of the National Firearms Act (NFA) because the Second Amendment "does not protect 'weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.'" 538 F.3d at 873-74, quoting *Heller*, 128 S. Ct. at 2815-16. Certain firearms that are not in common use may be required to be registered because they are not protected by the Second Amendment.

There is no caselaw striking general registration laws because, other than Hawaii, no State has ever enacted them. See DC Br. 19. But there are decisions which strike onerous licensing requirements. *State ex rel. City of Princeton v. Buckner*, 180 W.Va. 457, 462, 377 S.E.2d 139 (1988), invalidated a prohibition on carrying a handgun without a license which infringed on the right to bear arms, as it did so "by means which sweep unnecessarily broadly . . . ." *Id*. at 467.

Similarly, *State v. Kerner*, 181 N.C. 574, 107 S.E. 222, 225 (1921), invalidated, as violative of the right to bear arms, a statute requiring that to carry a pistol, even openly, one must obtain a license and pay $5. *Id*. at 225. "In the case of a riot or mob violence, . . . this would place law-abiding citizens entirely at the mercy of the lawless element."[9] *Id*.

The District claims historical precedent for registration, such as "door-to-door gun censuses." DC Br. 20, citing Robert H. Churchill, *Gun Regulation, the Police Power & the Right to Keep Arms in Early America*, 25 Law & Hist. Rev. 139, 161 &n.54 (2007). But Churchill referred to laws requiring militiamen – not other persons – to exhibit their militia arms, typically on the muster field. *Id*. A penalty was imposed only if the person did *not* possess a firearm.

The District sees historical precedent in the Revolutionary War requirement of allowing gun possession only to those swearing loyalty. DC Br. 20; *see* Historian Br. 6-8. But these "test acts" were far broader. Pennsylvania's act "prohibited those refusing the test from voting, holding office, serving on juries, suing, and transferring land." Churchill, *supra*, at 159. In addition to the First and Second Amendments, the Bill-of-Attainder Clause was adopted to prohibit these very deprivations. *See United*

---

[9]*See also State v. Rosenthal*, 75 Vt. 295, 55 A. 610, 611 (1903) (invalidating prohibition on carrying weapon without written permission of mayor or chief of police).

*States v. Brown*, 381 U.S. 437, 442, 458-59 (1965).

The District also cites Churchill for the proposition that "[h]undreds of individual statutes regulated the possession and use of guns in colonial and early national America." DC Br. 41. But Churchill was referring to restrictions on the *use* of firearms, such as gunfire "on the Sabbath" and on "the King's highways" (which did not include "carrying a gun on the public highway"). Churchill, *supra*, at 162-63. Indeed, Churchill concluded:

> [A]t no time between 1607 and 1815 did the colonial or state governments of what would become the first fourteen states exercise a police power to restrict the ownership of guns by members of the body politic.

*Id*. at 142.

It is claimed that historically States required "registration for the sale, transfer, or possession of firearms," Historian Br. 8-12, but no such law is cited. Some States required dealer recordkeeping of handgun sales or licenses to carry handguns, but no State required registration of firearms.

The District read *United States v. Miller*, 307 U.S. 174 (1939), as having "held that an unregistered gun at issue was not even a protected 'arm.'" DC Br. 21. Actually, *Miller* held that it could not take judicial notice of whether a short-barreled shotgun was "ordinary military equipment," and thus could not decide whether the NFA registration requirement offended the Second Amendment. *Id*. at 178.

Discussion of whether the shotgun was a protected "arm" would have been pointless if registration of protected arms did not violate the Second Amendment.

The District purports to find precedent for registration in English history. DC Br. 22, citing Bernard Harcourt, *On Gun Registration, the NRA, Adolf Hitler, & Nazi Gun Laws*, 73 Fordham L. Rev. 653, 661-62 (2004). Harcourt, however, refers only to the 1660 decree of Charles II that gunsmiths report information on firearm buyers to the authorities. *Id*. at 661 n.33-35. This decree was followed by a 1662 law allowing search and seizure of arms of persons "dangerous to the kingdom," Heller Br. 39-40, episodes in the suppression of political dissidents by the Stuart Kings which later "George III had tried to do to the colonists." *Heller*, 128 S. Ct. at 2798-99. The District mistakes precedent for what the Second Amendment was designed to *preclude*, such as policies that facilitate arms confiscation, for what it *allows*. DC Br. 22.

Those restrictions are hardly "*de minimis*" in a manner comparable to the prohibition on a firearm with an obliterated serial number. DC Br. 24, citing *United States v. Marzzarella,* 2010 WL 2947233 (3rd Cir. 2010). That court could not "conceive of a lawful purpose for which a person would prefer an unmarked firearm . . . ." *Id*. at *10. No burden would stem from possessing a firearm with a serial number, which is widely available, rather than seeking out one without such number. *Id*. at *10.

The National Instant Criminal Background Check System (NICS) screens firearm purchasers, rendering District screening redundant.[10] The District also screens for certain misdemeanants not covered by NICS. DC Br. 54-55. But screening for such records does not require registration of every firearm, which is thus not the least restrictive alternative.[11]

That no need exists to retain records following a successful background check refutes the District's claim that the registration requirement is "narrowly tailored" as its "only mechanism for screening" persons. DC Br. 57. It argues that it even "passes strict scrutiny" because it is "useful for fighting crime," as "officers can seize unregistered guns and charge those possessing such guns with a crime." *Id.* It could just as well assert that nullifying the Fourth Amendment would be "useful for fighting crime," as officers could search homes without limit. Criminalizing a constitutional right cannot be justified because it allows police to make more arrests.

The District cannot explain how registering law-abiding citizens would prevent

---

[10]While NICS applies only to transfers by federally-licensed dealers, Brady Br. 23, District residents may lawfully obtain firearms only from such dealers. *See* 18 U.S.C. § 922(a)(3) (prohibition on transfer from out-of-state), (b)(3) (receipt of long gun from another state must be from dealer).

[11]It is also claimed that straw purchases are possible under the NICS, DC Br. 56, but such violation of law is also possible under the District's registration system, because a registrant could unlawfully transfer a firearm to another.

assassination. It responds that a terrorist "may have no prior criminal record." DC Br.

55. If true, such person would have no problem registering a firearm.

Among the "trivial" requirements are the ballistics, photograph, and fingerprint

requirements. DC Br. 24. The District cites *Gunderson v. Hvass*, 339 F.3d 639, 644-

45 (8th Cir. 2003), which found the requirements of a photograph and fingerprints to

be a minimal burden *for a registered sex offender* under the *rational-relation test*. No

fundamental right was involved, but: "If the statute implicates a fundamental right, the

state must show a legitimate and compelling governmental interest for interfering with

that right." *Id*. at 643, citing *Graham v. Richardson*, 403 U.S. 365, 376 (1971). The

District has shown no such interest.[12]

The District maintains that it can prohibit exercise of a constitutional right in the

home unless the person pays fees, DC Br. 24, but it relies on a case where fees were

required for a parade permit for the "public expense of policing the spectacle." *Cox v.*

*New Hampshire*, 312 U.S. 569, 577 (1941). Nothing in *Cox* suggested that

constitutionally-protected activity in the home is to be treated on a par with public

gatherings on public streets. The District further cites *M.L.B. v. S.L.J.*, 519 U.S. 102,

123-24 (1996), yet that decision noted that privileges like driving may require license

---

[12]*See United States v. Sechrist*, 640 F.2d 81, 86 (7th Cir. 1981) (upholding the
fingerprinting of a suspect in custody; no fundamental right implicated).

fees, "[b]ut voting cannot hinge on ability to pay . . ., for it is a 'fundamental political right . . . preservative of all rights." *Id.* at 124 n.14 (citation omitted).

The District claims that the expiration of registration every three years and the requirement of re-registration "is not burdensome," DC Br. 25, but, if the person does not re-register, he or she is in criminal violation.[13] It is unclear why this provision suddenly became compelling in 2008, given that the District has required registration since 1976 without these impediments.

The District further claims that the burdens of disclosing one's occupation for the last five years and the vision, training, and testing requirements are "insignificant." DC Br. 25 n.3. What of the elderly lady who inherits her husband's old shotgun and saves it for a grandchild, but cannot pass the vision test or take a training course?[14] Or the unemployed person who has no money for the fees or the course?

The District notes that federal law requires persons purchasing firearms from licensed dealers to provide personal information. DC Br. 25. But federal law requires only the information necessary to identify the firearm transferee, including name, sex,

---

[13]A person may have several registered firearms, such as for a collection or different types of hunting, and the cancellation of just one registration suffices to put that person in violation.

[14]The District is no more entitled, based on poor eyesight, to confiscate a firearm from a home closet than it is to seize a car stored in a garage.

18

address, date and place of birth, height, weight and race.  27 C.F.R. § 478.124(c).  Any

system of registration of firearm owners is prohibited.  18 U.S.C. § 926(a).

In sum, the District's registration system, as a whole and in its individual

components, violates the Second Amendment.

### III.  THE BAN ON COMMONLY-POSSESSED RIFLES AND MAGAZINES VIOLATES THE SECOND AMENDMENT

The District claims that its ban on commonly-possessed semiautomatic firearms,

which fire only once per trigger pull, and magazines holding more than ten rounds

"burdens protected conduct only minimally."  DC Br. 27.[15]  However, semiautomatic

rifles, pistols, and shotguns "are commonly kept and used by law-abiding people for

hunting purposes or for the protection of their persons and property . . . ."  *Rinzler v.*

*Carson*, 262 So. 2d 661, 666 (Fla. 1972).[16]

The District fails to acknowledge that *Staples v. United States*, 511 U.S. 600,

610 (1994), analyzed the AR-15 rifle in the context of "a long tradition of widespread

---

[15]The District claims that "the Act liberalized District gun laws more than *Heller* required,"  and that its ban on "virtually all semiautomatic firearms . . . was not at issue in *Heller*."  DC Br. 3.  But most handguns are semiautomatic, and *Heller* held handguns to be constitutionally protected.  The Act repealed the handgun ban but banned many semiautomatic rifles.

[16]*See also Kerner*, 107 S.E. at 224 (protected arms include "the rifle, the musket, the shotgun, and the pistol," i.e., "all 'arms' as were in common use, and borne by the people as such when this provision was adopted.").

lawful gun ownership." DC Br. 30.  In contrast with machineguns, rifles such as the

AR-15 "have been widely accepted as lawful possessions . . . ."  *Id*. at 612.

The District complains that plaintiffs "did not quantify how common" are

semiautomatic rifles.  DC Br. 3.  Yet it summarizes the following evidence:

> [Overstreet] estimated that "two million AR-15s have been manufactured" since 1963, and that they accounted "for at least 5.5 percent of firearms, and at least 14.4 percent of rifles, made in the U.S. for the domestic market" in 2007. JA83–84. He did not discuss what percentage of Americans or American firearm owners own AR-15 rifles, or what percentage of rifles or firearms in the United States are AR-15 rifles.

DC Br. 3.

The latter information is not available due to Congress' long-standing

prohibitions on registration of firearms, which would violate the Second Amendment.[17]

But the above data prove common possession.

It is claimed that historically "States and municipalities have long banned

dangerous weapons . . . ."  Historian Br. 12.  But the laws cited only regulated

gunpowder storage and carrying concealed weapons.  *Id*. at 13-17.  In any event the

mere existence of a law does not speak to its constitutionality.  *See Watson v. Stone,*

---

[17]For instance, records generated by NICS background checks on lawful firearm transferees must be destroyed.  § 621, Title VI, P.L. 105-277, 112 Stat. 2681 (1998). "This language is carefully crafted to . . . prevent this system from turning into a gun registration scheme to restrict the second amendment rights of law-abiding Americans."  144 Cong. Rec. H11652 (Oct. 20, 1998) (statement of Rep. Bob Barr).

148 Fla. 516, 524, 4 So.2d 700 (1941) (Buford, J., concurring) ("the Act [requiring a carry license] was passed for the purpose of disarming the negro laborers . . . . The statute was never intended to be applied to the white population . . . .").

Amici refer to "laws regulating the discharge of guns," Historian Br. 13, but instead cite a law making it a crime to "shoot at another in any public square" with intent to maim or kill,[18] and also a law providing that *"no free negro or mulatto shall be suffered to keep or carry any fire-lock . . . without first obtaining a license . . . ."*[19]

License requirements for carrying concealed weapons have been upheld, Historians Br. 18-22, but none sanction a ban on firearms at home. *Andrews v. State*, 50 Tenn. 165, 179 (1871), held that "the rifle of all descriptions, the shotgun, the musket, and repeater, are such [protected] arms; and that under the Constitution the right to *keep* such arms, can not be *infringed* or *forbidden* by the Legislature."

The District avers that "state courts have upheld assault weapons bans," DC Br. 27, but the District defines "assault weapon" far more broadly than the provisions in those cases, which fail to apply a credible standard of review. *See Robertson v. City & County of Denver*, 874 P.2d 325, 328 (Colo. 1994) ("this case does not require us

---

[18]Act of Jan. 30, 1847, ch. 79, 1846-1847 Va. Acts 67.

[19]Act of Feb. 4, 1806, ch. 94, 1805-1806 Va. Acts 51.

to determine whether that right is fundamental").[20]

The District concedes that magazines holding more than ten rounds "may be useful in rare circumstances," adding that plaintiffs may never "face such circumstances."  DC Br. 28.  Yet *Heller* invalidated the trigger-lock requirement without any showing of the likelihood that a handgun would be used in self defense. 128 S. Ct. at 2818-19.

The District demands deference to the committee report's unsupported assertions that "assault weapons" are not "in common use" other than by military forces, terrorists and criminals.  DC Br. 28.  But "it is [the Court's] task in the end to decide whether Congress has violated the Constitution," and thus "whatever deference is due legislative findings would not foreclose our independent judgment of the facts bearing on an issue of constitutional law . . . ."  *Sable Commcns. of Cal., Inc. v. FCC,* 492 U.S. 115, 129 (1989).[21]  *See also Alameda Books,* 535 U.S. at 438-439 (where evidence

---

[20]*Compare Arnold v. City of Cleveland*, 616 N.E.2d 163, 172 (Ohio 1993) ("reasonableness test" applies to the "fundamental right" to have arms) *with Harrold v. Collier*, 107 Ohio St.3d 44, 836 N.E.2d 1165 (2005) (strict scrutiny applies to fundamental rights).

[21]The District argues that "courts properly defer to legislative findings on empirical matters," DC Br. 28-29, citing *Turner Broadcasting System, Inc. v. FCC,* 520 U.S. 180 (1997), but that case applied intermediate scrutiny to a content-neutral regulation, and held that the regulation must not burden more speech than necessary. *Id*. at 189.

casts doubt on ordinance's rationale, municipality must supplement the record with strong evidence).

The District claims that "assault weapons are a tiny percentage of firearms," DC Br. 29, but cites no data.[22] A reference to an outdated 1989 newspaper estimate, based on who knows what sources or what definition of "assault weapon," is not admissible.[23]

Plaintiffs offered uncontradicted evidence that AR-15 rifles are commonly possessed for self protection, target shooting, hunting, and use in the CMP. Heller Br. 9-11. The District gave no reason why such semiautomatic rifles "are not useful for legitimate self-defense," or why, despite no military force in the world using them (Heller Br. 11-12), they are "military-style weapons" that are "useful in military and criminal applications."[24] DC Br. 30. It fails to suggest *why* guns that fire only once per

---

[22]References to statements in the "Video of Oct. 1, 2008 Hearing Before the Committee on Public Safety and the Judiciary (H)" (quoted at least ten times on pages 29-32), should be stricken from the District's brief, as the video is not in the record and is hearsay of which the court may not take judicial notice. *See* Appellants' Motion to Strike.

[23]"Cox Newspapers, 1989," cited in Christopher Koper, *An Updated Assessment of the Federal Assault Weapons Ban*, at 10 (2004) (http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf).

[24]AR-15 rifles are lawful in Virginia, Maryland, and almost all other states. Yet in the District for 2009, of 144 murders, only one was committed with a rifle (of unknown kind), and very few murders were committed with rifles in any State. FBI, *Crime in the U.S.*, http://www.fbi.gov/ucr/cius2009/data/table_20.html.

trigger pull, instead of fully automatic machineguns, are supposedly "preferred by terrorists."[25] (DC Br. 31)

*Heller* invalidated the District's handgun ban without mentioning the committee report that consisted of the same kind of baseless rhetoric as the one on which the District now relies. *See* DC Br. 32. The District cites *Hutchins v. District of Columbia*, 188 F.3d 531, 542–44 & n.5 (D.C. Cir. 1999) (*en banc*), but this court upheld the Council's reliance on factual conclusions based on objective statistics on juvenile arrests. Unlike here, the curfew there "implicates no fundamental rights," *id*. at 534.

The report here has no objective data. Where are its statistics listing the military forces or the terrorists of the world who use semiautomatic rifles instead of fully automatic machineguns? They do not exist. Or the criminals who prefer *rifles of any kind* over other types of firearms? The District offers nothing but fantasy speculations.[26]

---

[25]The Brady Center makes exaggerated claims about "assault weapons," without defining the term or referring to the record. Brady Br. 26-32. It recalls that a certain rifle was used by the "Beltway snipers" in several murders, *id.* at 28, but neglects to mention that each murder was committed with a single shot.

[26]The District cites *Stasiukevich v. Nicolls*, 168 F.2d 474, 479 (1st Cir. 1948), but it held that a court need not "accept the findings in the report as indisputable truth," and that "the other party may introduce evidence tending to prove the contrary of the facts asserted in the official report."

Plaintiffs presented ample evidence from the plaintiffs, experts, an industry executive, and government sources that AR-15 rifles are widely possessed for defensive and sporting purposes. The District's denial of this evidence is based solely on assertion. DC Br. 33. Undisputed evidence that civilians own two million AR-15s shows common use without knowing the exact percentage of Americans who own them. *See* DC Br. 33-34.[27]

The District asserts that it is "irrelevant . . . whether assault weapons as defined by the District are used by military forces" because the Report only "deemed them 'military-style' and focused on their dangerous features." DC Br. 34. But the Report explicitly claimed: "Assault weapons are military-style weapons of war, made for offensive military use." SA 167. Thus, if the banned firearms are not, as Appellants' evidence shows, "made for offensive military use," the District's justification for the ban evaporates.

Despite its failure to dispute plaintiffs' evidence on any point, the District replies simply that "the Council could conclude otherwise." DC Br. 33-35. For instance, a protruding pistol grip does nothing to make a rifle more dangerous, or to remove it

---

[27]The District argues that only the ban as applied to the AR-15 type rifles is being challenged, and the other "assault weapons" are not at issue. DC Br. 34 n.4. Yet if that ban is unconstitutional, it includes all other rifles banned solely by reason of having the same characteristics, i.e., a protruding pistol grip or adjustable stock.

from Second Amendment protection. The District says it makes it possible to "spray fire,"[28] DC Br. 30, but it does not, and indeed such pistol grips are found on single-shot Olympic rifles. JA 47, 129. Similarly, the retractable shoulder stock allows the rifle to be adjusted to an individual's physique, particularly his or her arm length. JA 48. Like a shoe, a firearm must "fit" the person using it.[29]

But the Council did not "conclude otherwise" on the banned magazines: "plaintiffs put forth evidence that LCAFDs are commonly possessed. . . . The Council did not indicate otherwise . . . ." DC Br. 35.

The District repeats its losing argument in *Heller* that a ban may be enacted if "[a]lternative means of exercising a right" are available. Def. Mem. 36. It cites *Kovacs v. Cooper*, 336 U.S. 77, 89 (1949), but the ordinance at issue there only "bar[red] sound trucks from broadcasting in a loud and raucous manner on the streets." The Second Amendment analogue to that ordinance would be a ban on discharge of firearms on the streets, not a ban on possession of firearms in the home.

The District also cites *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 53–54

---

[28]One can "spray fire" with a shotgun – it shoots multiple pellets with each shot – but it is not banned.

[29]Even when retracted, such a rifle remains the legal "non-concealable" overall length of more than 26 inches. *See* 26 U.S.C. § 5845(a)(4); D.C. Code § 7-2501.01(17).

(1986), but it involved a zoning regulation for adult theaters, not a ban on a type of expression. *Heller* rejected the argument that the District may "ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed." 128 S. Ct. at 2818. The District now argues the reverse.

"*Heller* distinguished handguns from other classes of firearms, such as long guns, by looking to their functionality." *Marzzarella*, 2010 WL 2947233, at *5; *see* DC Br. 36. *Marzzarella* upheld the ban on firearms with obliterated serial numbers because it did *not* ban a class of firearms: "Because unmarked weapons are functionally no different from marked weapons, [the prohibition] does not limit the possession of any class of firearms." *Id*. at *10.

The District concludes by attacking *Heller*'s "common use" test, asking "how is a judge to measure whether a gun is 'common' enough that it may not be banned," and saying that it "makes little sense" that the District must allow certain firearms because they are common elsewhere. DC Br. 36-37. These criticisms are precluded by *Heller*'s explicit adoption of a nationwide common use test. 128 S. Ct. at 2815-17.

## IV.  THE RESTRICTIONS ARE NOT "USUAL AND REASONABLE" AS REQUIRED BY CONGRESS

The restrictions here are not "usual and reasonable" firearms regulations as required by D.C. Code § 1-303.43.  *See* Heller Br. 53-57.  The District argues that it can legislate without limit based on § 1-203.02, which provides that its "legislative power . . . shall extend to all rightful subjects of legislation . . . ."  DC Br. 58.

One of the "rightful subjects of legislation" under § 1-203.02 (then codified as § 1-124) was "provided for" in § 1-303.43 (then codified as § 1-227).  *McIntosh v. Washington*, 395 A.2d 744, 750 n.11 (D.C. 1978).  *McIntosh* concerned first whether the Firearms Act was "a legitimate exercise of the authority" under § 1-303.43, and secondly whether § 1-206.02(a)(9), which prohibited any enactment relating to the criminal code for two years, constrained § 1-204.04(a), which vested the Council with all legislative functions granted to its predecessor Council.  395 A.2d at 750-51 & n.11, 13.  That no inconsistency existed on the latter issue did not imply, as the District argues, that it need not comply with § 1-303.43.  DC Br. 58-59.[30]

"It is our duty 'to give effect, if possible, to every clause and word of a statute,'

---

[30]*McIntosh* concerned the District's authority to legislate on the subject and not the validity of the specific regulations.  *See also Maryland & D.C. Rifle & Pistol Ass'n v. Washington*, 442 F.2d 123, 125 n.9 (D.C. Cir. 1971) (same).  Both cases concerned enactments, precluding the District's argument that § 1-303.43 pertains only to "regulations," not to "acts."  DC Br. 58.

. . . rather than to emasculate an entire section, as the Government's interpretation requires." *United States v. Menasche*, 348 U.S. 528, 539 (1955). "[A] specific statute controls over a general one . . . ." *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961). "When a statute limits a thing to be done in a particular mode, it includes a negative of any other mode." *Christensen v. Harris County*, 529 U.S. 576, 583 (2000).

## CONCLUSION

The judgment below should be reversed.


Respectfully Submitted,

/s/ Stephen P. Halbrook
STEPHEN P. HALBROOK
D.C. Bar No. 379799

/s/ Richard E. Gardiner
RICHARD E. GARDINER
D.C. Bar No. 386915

3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030
(703) 352-7276

Counsel for Appellants

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,846 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word Perfect 12 in 14-point Times New Roman.

/s/ Richard E. Gardiner
RICHARD E. GARDINER

**CERTIFICATE OF SERVICE**

I certify that on October 18, 2010, electronic copies of this brief were served

through the Court's CM/ECF system and two (2) paper copies were mailed by first-

class mail, postage prepaid, to:

Todd S. Kim                               Matthew Shors
Solicitor General                         O'Melveny & Meyers LLP
Office of the Attorney General            1625 Eye Street, NW
441 4th Street, NW, Suite 600S            Washington, D.C. 20006-4001
Washington, D.C. 20001


William J. Olson                          Paul R.Q. Wolfson
370 Maple Avenue West                     Wilmer Culter Pickering HALe and Dorr LLP
Suite 4                                   1875 Pennsylvania Ave., NW
Vienna, VA 22180-5615                     Washington, DC 20006



/s/ Richard E. Gardiner
RICHARD E. GARDINER