
--- F.3d ----, 2010 WL 5396069 (C.A.4 (W.Va.))
**(Cite as: 2010 WL 5396069 (C.A.4 (W.Va.)))**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
William Samuel CHESTER, Jr., Defendant-Appellant.
**No. 09-4084.**

Argued Dec. 4, 2009.
Decided Dec. 30, 2010.

**Background:** Defendant was convicted in the United States District Court for the Southern District of West Virginia, John T. Copenhaver, Jr., J., of possessing a firearm after being convicted of a misdemeanor crime of domestic violence, and he appealed.

**Holding:** The Court of Appeals, Traxler, Chief Judge, held that intermediate scrutiny applied in determining whether defendant's conviction abridged his Second Amendment rights.

Vacated and remanded.

Davis, Circuit Judge, filed concurring opinion.

West Headnotes

**[1] Weapons 406 ☞0**

406 Weapons
Intermediate scrutiny, rather than strict scrutiny, applied in determining whether a defendant's conviction for possessing a firearm after being convicted of a misdemeanor crime of domestic violence abridged his Second Amendment right to keep and bear arms; defendant's asserted right to possess a firearm did not fall within the Second Amendment's core right of law-abiding, responsible citizens to possess and carry weapons for self-defense in light of his criminal history. U.S.C.A. Const.Amend. 2; 18 U.S.C.A. § 922(g)(9).

**[2] Constitutional Law 92 ☞0**

92 Constitutional Law
A content-based restriction on non-commercial speech is permissible only if it satisfies strict scrutiny. U.S.C.A. Const.Amend. 1.

**[3] Constitutional Law 92 ☞0**

92 Constitutional Law
Courts review content-neutral time, place, and manner speech regulations using an intermedi-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ate level of scrutiny. U.S.C.A. Const.Amend. 1.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. John T. Copenhaver, Jr., District Judge. (2:08-cr-00105-1).**ARGUED:**Edward Henry Weis, Office of the Federal Public Defender, Charleston, West Virginia, for Appellant. Elizabeth Dorsey Collery, United States Department of Justice, Washington, D.C ., for Appellee. **ON BRIEF:**Mary Lou Newberger, Federal Public Defender, Jonathan D. Byrne, Appellate Counsel, Office of the Federal Public Defender, Charleston, West Virginia, for Appellant. Charles T. Miller, United States Attorney, Gerald M. Titus, III, Assistant United States Attorney, Office of the United States Attorney, Charleston, West Virginia, for Appellee.

Before TRAXLER, Chief Judge, and AGEE and DAVIS, Circuit Judges.

Vacated and remanded by published opinion. Chief Judge TRAXLER wrote the majority opinion, in which Judge AGEE joined. Judge DAVIS wrote a separate opinion concurring in the judgment.

# ON REHEARING

TRAXLER, Chief Judge:

**\*1** The sole issue presented in this appeal is whether William Samuel Chester's conviction for illegal possession of a firearm under 18 U.S.C. § 922(g)(9) abridges his right to keep and bear arms under the Second Amendment in light of *District of Columbia v. Heller,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). We vacate the decision below and remand for further proceedings.

## I.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. *Heller* resolved a decades-long debate between those who interpreted the text to guarantee a private, individual right to bear arms and those who generally read it to secure a collective right to bear arms in connection with service in the state militia.[FN1] *See Heller,* 128 S.Ct. at 2789. *See generally Parker v. District of Columbia,* 478 F.3d 370, 379 (D.C.Cir.2007) (explaining the collective right and individual right positions in the Second Amendment debate); *United States v. Emerson,* 270 F.3d 203, 218-20 (5th Cir.2001) (same). Interpreting the text in light of how it would have been understood by "ordinary citizens in the founding generation," *Heller,* 128 S.Ct. at 2788, the Supreme Court sided with proponents of the individual right view and held that the Second Amendment guaranteed protection of an individual right to possess and carry arms without regard to militia service. *See id.* at 2799.

The Court began its textual analysis by explaining that the function of the Second Amend-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment's prefatory clause ("A well regulated Militia, being necessary to the security of a free State") is merely to announce a purpose for the command given by the operative clause ("the right of the people to keep and bear Arms, shall not be infringed")-"apart from that clarifying function, [the] prefatory clause does not limit or expand the scope of the operative clause." *Id.* at 2789.FN2 The operative clause, *Heller* concluded, "guarantee[s] the individual right to possess and carry weapons in case of confrontation," a meaning that "is strongly confirmed by the historical background of the Second Amendment." *Id.* at 2797. Consideration of the historical sources was important because, as *Heller* explained, "the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right." *Id.* Finally, the Court explained why the prefatory clause was consistent with an individual right interpretation of the operative clause:

The debate with respect to the right to keep and bear arms, as with other guarantees in the Bill of Rights, was not over whether it was desirable (all agreed that it was) but over whether it needed to be codified in the Constitution.... It was understood across the political spectrum that the right helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down.

*2 It is therefore entirely sensible that the Second Amendment's prefatory clause announces the purpose for which the right was codified: to prevent elimination of the militia. The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting. But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right-unlike some other English rights-was codified in a written Constitution.

*Id.* at 2801.

Significantly, *Heller* recognized that the right to keep and bear arms, like other Constitutional rights, is limited in scope and subject to some regulation: "[W]e do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose.* " *Id.* at 2799; *see id.* at 2816 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). One specific limitation recognized in *Heller* concerned the *types* of weapons protected by the Second Amendment. In accordance "with the historical understanding of the scope of the right," the Second Amendment protected only weapons "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 2816; *see id.* at 2817 (explaining that the Second Amendment protected "the right to keep and carry arms ... in common use at the time") (internal quotation marks omitted).

The other type of limitation identified in *Heller* involved what the Supreme Court termed "presumptively lawful regulatory measures," *id.* at 2817, n. 26, although *Heller* did not explain *why* the listed regulations are presumptively lawful:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 2816-17.[FN3] Although the Court expressly declined to "undertake an exhaustive historical analysis ... of the full scope of the Second Amendment," *id.* at 2816, it clearly staked out the core of the Second Amendment. Indeed, *Heller* explained that "whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 2821.

In light of these principles, the Supreme Court invalidated two District of Columbia statutes at issue in *Heller*. First, *Heller* invalidated the District's total ban on the possession of handguns, concluding that such a complete ban-which extended "to the home, where the need for defense of self, family, and property is most acute[,]"-was incompatible with the Second Amendment "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 2817-18. Although the Court acknowledged that rational-basis scrutiny would be inappropriate, *see id.* at 2817, n. 27, it declined to choose the proper level of scrutiny for Second Amendment challenges. Second, *Heller* concluded that the District's requirement that citizens keep their firearms in an inoperable condition "[made] it impossible for citizens to use [firearms] for the core lawful purpose of self-defense." *Id.* at 2818.

## II.

*3 In October 2007, officers from the Kanawha County, West Virginia, Sheriff's Department responded to a 911 call reporting a domestic disturbance at Chester's residence. Chester's wife reported to the officers that Chester grabbed her throat and threatened to kill her after she caught him receiving the services of a prostitute on their property. In a subsequent search of the home, officers recovered a 12-gauge shotgun in the kitchen pantry and a 9mm handgun in the bedroom. Chester admitted both firearms belonged to him.

In May 2008, as a result of this incident, Chester was indicted for possessing firearms after having been convicted "of a misdemeanor crime of domestic violence" in violation of 18 U.S.C. § 922(g)(9). The indictment charged that in February 2005, Chester had been convicted in Kanawha County Magistrate Court of domestic assault and battery, a misdemeanor offense under West Virginia law. *See* W. Va.Code § 61-2-28(a) and (b). Chester conceded that the 2005 domestic assault and battery offense qualified as a predicate "misdemeanor crime of domestic violence" under § 922(g)(9).[FN4]

Chester moved to dismiss the indictment, arguing that § 922(g)(9), both on its face and as applied to him in this instance, violated his Second Amendment right to keep and bear arms under *Heller*. Seizing upon *Heller's* list of "presumptively lawful regulatory measures" including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," 128 S.Ct. at 2817 & n. 26, the district court reasoned by analogy that "the prohibition by Congress as embodied in § 922(g)(9) of the possession of a firearm by a misdemeanant who has committed a crime of domestic violence is a lawful exercise by the government of its regulatory

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

authority notwithstanding the Second Amendment." *United States v. Chester,* No. 2:08-00105, 2008 WL 4534210, at *2 (S.D.W.Va. Oct.7, 2008). The district court concluded that, like the felon dispossession provision set forth in § 922(g)(1), the prohibition of firearm possession by domestic violence misdemeanants is a danger-reducing regulation designed "to protect family members and society in general from potential [violence]." *Id.* In fact, the district court believed that, if anything, "the need to bar possession of firearms by domestic violence misdemeanants" is "often far greater than that of the similar prohibition of § 922(g)(1) on those who commit nonviolent felonies." *Id.* Thus, the district court denied the motion to dismiss the indictment, and Chester entered a conditional guilty plea, reserving his right to raise on appeal the application of the Second Amendment.

Chester then filed this appeal. In February 2010, we vacated the judgment and remanded in an unpublished opinion. *See United States v. Chester,* No. 09-4084, 367 Fed.Appx. 392, 2010 WL 675261 (4th Cir. Feb.23, 2010) (per curiam). We declined to find § 922(g)(9) valid by analogy based on *Heller's* "presumptively lawful" language, and we remanded for the district court to conduct an analysis of whether § 922(g)(9) could be " 'independently justified' " in light of *Heller. Id.* at 398. Our approach followed that taken in *United States v. Skoien,* 587 F.3d 803 (7th Cir.2009), *vacated,* 614 F.3d 638 (7th Cir.2010) (en banc), a panel decision that was vacated by the Seventh Circuit for *en banc* review at about the same time that we released our opinion in *Chester.* In *Skoien,* the defendant was convicted under 18 U.S.C. § 922(g)(9) for illegally possessing a shotgun that he claimed to have kept for hunting purposes. The *Skoien* panel reasoned that because "the core right of self-defense identified in *Heller* [was] not implicated," intermediate scrutiny was the appropriate standard to apply to the defendant's Second Amendment challenge to § 922(g)(9). *Id.* at 805. The panel voted to remand the case to give the government an opportunity to carry its burden imposed by the intermediate constitutional framework:

> **\*4** Under intermediate scrutiny, the government need not establish a close fit between the statute's means and its end, but it must at least establish a *reasonable* fit. The government has done almost nothing to discharge this burden. Instead, it has premised its argument almost entirely on *Heller's* reference to the presumptive validity of felon-dispossession laws and reasoned by analogy that § 922(g)(9) therefore passes constitutional muster. That's not enough.

*Id.* at 805-06. Similarly, we remanded Chester's appeal for clarification of the precise contours of his Second Amendment claim-a necessary step in determining the appropriate standard of constitutional scrutiny to apply-and for development of the record under the appropriate means-end framework. *See Chester,* 2010 WL 675261, at *6. We stopped short, however, of identifying the proper level of scrutiny, leaving that task to the district court on remand.

After we issued the unpublished *Chester* opinion, the government filed a petition for panel rehearing in light of the fact that the *Skoien* panel decision had been vacated by the Seventh Circuit *en banc.* While Chester's petition for rehearing was pending, the Seventh Circuit issued its en banc decision in *Skoien,* rejecting the Second Amendment challenge to § 922(g)(9) on the basis that "logic and data" demonstrate "a substantial relation between § 922(g)(9) and [an important governmental] objective." 614 F.3d at 642. We now grant panel rehearing, vacate

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

our initial opinion and reissue our decision to provide district courts in this Circuit guidance on the framework for deciding Second Amendment challenges.

### III.

We turn first to the question of how to evaluate Chester's Second Amendment challenge to § 922(g)(9). To the extent *Heller* provides an answer to this question, it would be found in the Court's truncated discussion of the limitations on the right to bear arms preserved by the Second Amendment. As noted previously, *Heller* recognized that the pre-existing right guaranteed by the Second Amendment "was not unlimited, just as the First Amendment's right of free speech was not." *Heller,* 128 S.Ct. at 2799; *see id.* at 2816. And because "it has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *preexisting* right," *id.* at 2797, determining the limits on the scope of the right is necessarily a matter of historical inquiry. *Heller* declined to "undertake an exhaustive historical analysis ... of the full scope of the Second Amendment," *id.* at 2816, but did identify one specific historical limitation as to *which* arms a citizen had the right to bear. In accordance "with the historical understanding of the scope of the right," the Second Amendment protected only weapons "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 2816; *see id.* at 2817 (explaining that the Second Amendment protected "the right to keep and carry arms.. in common use at the time") (internal quotation marks omitted). The Court found support for this limitation in " 'the historical tradition of prohibiting the carrying of dangerous and unusual weapons.' " *Id .* at 2817. Thus, a citizen's right to carry or keep sawed-off shotguns, for instance, would not come within the ambit of the Second Amendment. *See id.* at 2816.

**\*5** Having acknowledged that the scope of the Second Amendment is subject to historical limitations, the Court cautioned that *Heller* should not be read "to cast doubt on longstanding prohibitions" such as "the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Id.* at 2816-17. *Heller* described its exemplary list of "longstanding prohibitions" as "presumptively lawful regulatory measures," *id.* at 2817, n. 26, without alluding to any historical evidence that the right to keep and bear arms did not extend to felons, the mentally ill or the conduct prohibited by any of the listed gun regulations. It is unclear to us whether *Heller* was suggesting that "longstanding prohibitions" such as these were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason. *See United States v. Rene E.,* 583 F.3d 8, 12 (1st Cir.2009) (concluding that *Heller* "identified limits deriving from various historical restrictions on possessing and carrying weapons," including the felon dispossession provision, that "were left intact by the Second Amendment"). Federal felon dispossession laws, for example, were not on the books until the twentieth century, and the historical evidence and scholarly writing on whether felons were protected by the Second Amendment at the time of its ratification is inconclusive. But even if the listed regulations were not historical limitations on the scope of the Second Amendment, the Court could still have viewed the regulatory measures as "presumptively lawful" if it believed they were valid on their face under any level of means-end scrutiny applied.[FN5]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Some courts have treated *Heller's* listing of "presumptively lawful regulatory measures," for all practical purposes, as a kind of "safe harbor" for unlisted regulatory measures, such as 18 U.S.C. § 922(g)(9), which they deem to be analogous to those measures specifically listed in *Heller. See, e.g., United States v. White,* 593 F.3d 1199, 1206 (11th Cir.2010) ("We see no reason to exclude § 922(g)(9) from the list of longstanding prohibitions on which *Heller* does not cast doubt."). This approach, however, approximates rational-basis review, which has been rejected by *Heller. See Heller,* 128 S.Ct. at 2817, n. 27. In fact, the phrase "*presumptively* lawful regulatory measures" suggests the possibility that one or more of these "longstanding" regulations "could be unconstitutional in the face of an as-applied challenge." *United States v. Williams,* 616 F.3d 685, 692 (7th Cir.2010).

In view of the fact that *Heller* ultimately found the District's gun regulations invalid "under any standard of scrutiny," it appears to us that the Court would apply some form of heightened constitutional scrutiny if a historical evaluation did not end the matter. The government bears the burden of justifying its regulation in the context of heightened scrutiny review; using *Heller's* list of "presumptively lawful regulatory measures" to find § 922(g)(9) constitutional by analogy would relieve the government of its burden.

**\*6** Thus, a two-part approach to Second Amendment claims seems appropriate under *Heller,* as explained by the Third Circuit Court of Appeals, *see Marzzarella,* 614 F.3d at 89, and Judge Sykes in the now-vacated *Skoien* panel opinion, *see* 587 F.3d at 808-09. The first question is "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* This historical inquiry seeks to determine whether the conduct at issue was understood to be within the scope of the right at the time of ratification. *See Heller,* 128 S.Ct. at 2816. If it was not, then the challenged law is valid. *See Marzzarella,* 614 F.3d at 89. If the challenged regulation burdens conduct that was within the scope of the Second Amendment as historically understood, then we move to the second step of applying an appropriate form of means-end scrutiny. *See id. Heller* left open the issue of the standard of review, rejecting only rational-basis review. Accordingly, unless the conduct at issue is not protected by the Second Amendment at all, the Government bears the burden of justifying the constitutional validity of the law.

## A.

Under this approach, the first question is whether § 922(g)(9) burdens or regulates conduct that comes within the scope of the Second Amendment-*i.e.,* whether the possession of a firearm in the home by a domestic violence misdemeanant is protected by the Second Amendment. *Cf. Marzzarella,* 615 F.3d at 89 ("Our threshold inquiry, then, is whether [the challenged law] regulates conduct that falls within the scope of the Second Amendment. In other words, we must determine whether the possession of an unmarked firearm in the home is protected by the right to bear arms."). Section 922(g)(9), like the felon-dispossession provision set forth in § 922(g)(1), permanently disarms an entire category of persons. Thus, we are seeking to determine whether a person, rather than the person's conduct, is unprotected by the Second Amendment. *See Skoien,* 614 F.3d at 649 (Sykes, J., dissenting) (framing the threshold question as "whether persons convicted of a domestic-violence misdemeanor are completely

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

'outside the reach' of the Second Amendment as a matter of founding-era history and background legal tradition").

In this case, the government has not taken the position that persons convicted of misdemeanors involving domestic violence were altogether excluded from the Second Amendment as it was understood by the founding generation. Moreover, it appears to us that the historical data is not conclusive on the question of whether the founding era understanding was that the Second Amendment did not apply to felons. *See Williams,* 616 F.3d at 692 (noting that "[t]he academic writing on the subject of whether felons were excluded from firearm possession at the time of the founding is inconclusive at best" (internal quotation marks omitted)); *Skoien,* 614 F.3d at 650-51 (Sykes, J., dissenting) ("[S]cholars disagree about the extent to which *felons*-let alone misdemeanants-were considered excluded from the right to bear arms during the founding era.... We simply cannot say with any certainty that persons convicted of a domestic-violence misdemeanor are wholly excluded from the Second Amendment right as originally understood."); *United States v. McCane,* 573 F.3d 1037, 1048 (10th Cir.2009) (Tymkovich, J., concurring) ("[T]he felon dispossession dictum may lack the 'longstanding' historical basis that *Heller* ascribes to it. Indeed, the scope of what *Heller* describes as 'longstanding prohibitions on the possession of firearms by felons' ... is far from clear.").

**\*7** Of course, we are dealing in this appeal not with felons but people who have been convicted of domestic-violence misdemeanors. If the historical evidence on whether felons enjoyed the right to possess and carry arms is inconclusive, it would likely be even more so with respect to domestic-violence misdemeanants. The federal provision disarming domestic-violence misdemeanants is of recent vintage, having been enacted in 1996 as part of the Lautenberg Amendment to the Gun Control Act of 1968. *See* Pub.L. No. 104-208, § 658, 110 Stat. 3009, 3009-371 to -372 (1996). By contrast, the federal felon dispossession provision has existed in some form or another since the 1930s, and thus there is a much larger body of scholarly work considering the question of whether felons were originally excluded from the protection afforded by the Second Amendment. Commentators are nonetheless divided on the question of the categorical exclusion of felons from Second Amendment protection. *Compare* C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?,* 32 Harv. J.L. & Pub. Pol'y 695, 714 (2009) (reviewing founding-era precedents and explaining that, "much like the American authorities for a century and a half after the Second Amendment's adoption, the actual English antecedents point against lifetime total disarmament of all 'felons,' but do support lesser limitations"), *and* Carlton F.W. Larson, *Four Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial Ipse Dixit,* 60 Hastings L.J. 1371, 1376 (2009) (explaining that because state and federal "felon disarmament laws significantly postdate both the Second Amendment and the Fourteenth Amendment [,][a]n originalist argument that sought to identify 1791 or 1868 analogues to felon disarmament laws would be quite difficult to make"), *with* Don B. Kates & Clayton E. Cramer, *Second Amendment Limitations & Criminological Considerations,* 60 Hastings L.J. 1339, 1360 (2009) ("[T]here is every reason to believe that the Founding Fathers would have deemed persons convicted of any of the common law felonies not to be among 'the [virtuous] people' to whom they were guaranteeing the right to arms."), *and* Glenn Harlan Reynolds, *A Critical Guide to the Second Amendment,* 62 Tenn. L.Rev. 461, 480 (1995) (opining that "felons, children, and the insane were excluded from the right to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

arms precisely as (and for the same reasons) they were excluded from the franchise").

The government has not contended that § 922(g)(9) is valid because Chester, having been convicted of a domestic violence misdemeanor, is wholly unprotected by the Second Amendment. Based on this and the lack of historical evidence in the record before us, we are certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors. We must assume, therefore, that Chester's Second Amendment rights are intact and that he is entitled to some measure of Second Amendment protection to keep and possess firearms in his home for self-defense.[FN6] The question then becomes whether the government can justify, under the appropriate level of scrutiny, the burden imposed on Chester's Second Amendment rights by § 922(g)(9). *Cf. Marzzarella,* 614 F.3d at 95 (applying intermediate scrutiny after finding insufficient evidence to establish with certainty "that the possession of unmarked firearms in the home is excluded from the right to bear arms").

### B.

**\*8** [1] *Heller* left open the level of scrutiny applicable to review a law that burdens conduct protected under the Second Amendment, other than to indicate that rational-basis review would not apply in this context. *See Heller,* 128 S.Ct. at 2817, n. 27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."). Our task, therefore, is to select between strict scrutiny and intermediate scrutiny. Given *Heller's* focus on "core" Second Amendment conduct and the Court's frequent references to First Amendment doctrine, we agree with those who advocate looking to the First Amendment as a guide in developing a standard of review for the Second Amendment. *See Marzzarella,* 614 F.3d at 89 n. 4; *Skoien,* 587 F.3d at 813-14.

[2][3] Chester urges us to adopt a strict scrutiny standard because § 922(g)(9) severely burdens an enumerated, fundamental right. This argument is too broad. We do not apply strict scrutiny whenever a law impinges upon a right specifically enumerated in the Bill of Rights. In the analogous First Amendment context, the level of scrutiny we apply depends on the nature of the conduct being regulated and the degree to which the challenged law burdens the right. For example, a "content-based speech restriction" on noncommercial speech is permissible "only if it satisfies strict scrutiny." *United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). But, courts review content-neutral time, place, and manner regulations using an intermediate level of scrutiny. *See Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). Likewise, a law regulating commercial speech is subject to a more lenient intermediate standard of scrutiny in light of "its subordinate position in the scale of First Amendment values." *Bd. of Trs. of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 477, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (internal quotation marks omitted). As Judge Sykes observed in the now-vacated *Skoien* panel opinion:

> The Second Amendment is no more susceptible to a one-size-fits-all standard of review than
> any other constitutional right. Gun-control regulations impose varying degrees of burden on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Second Amendment rights, and individual assertions of the right will come in many forms. A severe burden on the core Second Amendment right of armed self-defense should require strong justification. But less severe burdens on the right, laws that merely regulate rather than restrict, and laws that do not implicate the central self-defense concern of the Second Amendment, may be more easily justified.

*Skoien,* 587 F.3d at 813-14.

Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller*-the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense-by virtue of Chester's criminal history as a domestic violence misdemeanant. *Heller,* 128 S.Ct. at 2821. Accordingly, we conclude that intermediate scrutiny is more appropriate than strict scrutiny for Chester and similarly situated persons. *See Marzzarella,* 614 F.3d at 97; *cf. Skoien,* 614 F.3d at 641 (en banc) ("The United States concedes that some form of strong showing ('intermediate scrutiny,' many opinions say) is essential, and that § 922(g)(9) is valid only if substantially related to an important governmental objective.... The concession is prudent, and we need not get more deeply into the 'levels of scrutiny' quagmire ..."). Accordingly, the government must demonstrate under the intermediate scrutiny standard that there is a "reasonable fit" between the challenged regulation and a "substantial" government objective. *Fox,* 492 U.S. at 480; *see Marzzarella,* 614 F.3d at 98 ("Although [the various forms of intermediate scrutiny] differ in precise terminology, they essentially share the same substantive requirements. They all require the asserted governmental end to be more than just legitimate, either 'significant,' 'substantial,' or 'important' ... [and] require the fit between the challenged regulation and the asserted objective be reasonable, not perfect."). Significantly, intermediate scrutiny places the burden of establishing the required fit squarely upon the government. *See Fox,* 492 U.S. at 480-81.

**\*9** We cannot conclude on this record that the government has carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of all domestic-violence misdemeanants. The government has offered numerous plausible *reasons* why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient *evidence* to establish a substantial relationship between § 922(g)(9) and an important governmental goal. Having established the appropriate standard of review, we think it best to remand this case to afford the government an opportunity to shoulder its burden and Chester an opportunity to respond. Both sides should have an opportunity to present their evidence and their arguments to the district court in the first instance.

## IV.

For the foregoing reasons, we vacate the order of the district court and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*
DAVIS, Circuit Judge, concurring in the judgment:

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 5396069 (C.A.4 (W.Va.))
**(Cite as: 2010 WL 5396069 (C.A.4 (W.Va.)))**

I concur in the judgment.

In light of the highly persuasive decision of the Seventh Circuit in *United States v. Skoien,* 614 F.3d 638 (7th Cir.2010) (en banc), *pet. for cert. pending,* sustaining the constitutionality of 18 U.S.C. § 922(g)(9), the district court should have no difficulty in concluding that the application of § 922(g)(9) to offenders such as Chester passes Second Amendment scrutiny, exactly as district courts have already concluded. *See United States v. Smith,* 2010 WL 3743842 (S.D.W.Va. Sept.20, 2010) (applying *Skoien* and sustaining statute); *United States v. Staten,* 2010 WL 3476110 (S.D.W.Va. Sept.2, 2010) (same).

## I.

On April 26, 2004, Chester savagely attacked his 22-year-old daughter, Meghan Chester ("Meghan"). Apparently, their dispute arose over what Meghan had eaten for lunch that day. In this attack, Chester slammed his daughter on the kitchen table. Meghan attempted to leave but Chester followed her, threatened her, and punched her in the face. Meghan fell to the floor in pain, but Chester continued to attack her. He began kicking her as she lay on the ground, and also dumped buckets of water over his daughter's head. After her father "beat her up and assault[ed] her" for some time, J.A. 41, Meghan escaped from her father and locked herself in the bathroom. Eventually, Chester left the residence and Meghan's mother took Meghan to the hospital. Meghan had a swollen nose and a knot on her forehead. Based on his physical abuse of his daughter, on February 4, 2005, Chester was convicted in state court in Kanawha County, West Virginia for the misdemeanor crime of domestic battery and domestic assault in violation of W. Va.Code § 61-2-28(a) & (b).

On October 10, 2007, the Kanawha County police returned to the Chester family home in response to a second domestic violence call. This time, the call was placed by Mrs. Linda Guerrant-Chester ("Guerrant-Chester"), Chester's then-wife. When the officers arrived, Guerrant-Chester told them that she awoke at 5:00 a.m. and discovered her husband outside the house, receiving oral sex from a prostitute. When Chester realized that Guerrant-Chester had seen him, he yelled, "[s]o you fucking caught me" and proceeded to drag Guerrant-Chester inside the house. Once inside, Chester grabbed Guerrant-Chester's face and throat and strangled her while repeatedly shouting "I'm going to kill you!" Chester's daughter, Samantha Chester, heard Chester repeatedly threaten to kill Guerrant-Chester and came to the kitchen. She attempted to calm Chester down, and while she distracted him, Guerrant-Chester called the police. When the police arrived, they located a loaded 12-gauge shotgun in the kitchen pantry and a 9mm pistol in the defendant's bedroom. Both firearms belonged to Chester.

## II.

**\*10** On May 6, 2008, a federal grand jury indicted Chester for violating 18 U.S.C. § 922(g)(9). Chester moved to dismiss the indictment, and after considering the parties' arguments in light of the Supreme Court's opinion in *Heller v. District of Columbia,* 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the district court denied Chester's motion. In the district court's brief written opinion, it cited *Heller's* observation that "nothing in our opinion

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill...." J.A. 60 (citing *Heller,* 128 S.Ct. at 2816-17). The court then drew an analogy between non-violent felons and domestic violence misdemeanants, finding that the *Heller* language could, and in this case, should, be read to include both. The court analyzed the issue as follows:

> The thrust of the majority opinion in *Heller* leaves ample room for the government to control the possession of firearms by misdemeanants found guilty of domestic violence. Indeed, the need to bar possession of firearms by domestic violence misdemeanants in order to protect family members and society in general from potential violent acts of such individuals is quite often far greater than that of the similar prohibition of § 922(g)(1) on those who commit nonviolent felonies.

J.A. 61.

Chester then entered a conditional guilty plea, preserving his right to appeal the district court's denial of his motion to dismiss. He was sentenced to five months in prison, followed by a three-year term of supervised release. J.A. 5. Chester timely appealed; we have jurisdiction pursuant to 28 U.S.C. § 1291.

### III.

#### A.

The majority holds that, "[a]lthough Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller*-the right of a law-abiding, responsible citizen to possess and carry a weapon for self-defense." Maj. Op. at 16. I agree. The majority further notes, however, "We cannot conclude on this record that the government has carried its burden of establishing a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of domestic-violence misdemeanants." *Id.* at 17. I do not agree that the issue presented is whether § 922(g)(9), on its face, properly regulates "domestic-violence misdemeanants" as a group. This case is only about a congressional prohibition imposed on Appellant William Samuel Chester, Jr. More generally, I have concerns about the majority's invitation to import First Amendment doctrines into Second Amendment jurisprudence. But in any event, I am confident that the district court will have no difficulty satisfying the majority's mandate.

#### B.

Section 922(g)(9) was enacted in 1996 along with 18 U.S.C. § 922(g)(8) as part of the so-called Lautenberg Amendment to the Gun Control Act. It states, in pertinent part:

> **\*11** (g) It shall be unlawful for any person-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

....

(9) who has been convicted in any court of a misdemeanor crime of domestic violence, to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

18 U.S.C. § 922(g)(9). The term "misdemeanor crime of domestic violence" is defined as follows:

(A) Except as provided in subparagraph (C), the term "misdemeanor crime of domestic violence" means an offense that-

(i) is a misdemeanor under Federal, State, or Tribal law; and

*(ii) has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon,* committed by a current or former spouse, parent, or guardian of the victim, by a person with whom the victim shares a child in common, by a person who is cohabiting with or has cohabited with the victim as a spouse, parent, or guardian, or by a person similarly situated to a spouse, parent, or guardian of the victim.

(B)(i) A person shall not be considered to have been convicted of such an offense for purposes of this chapter, unless-

(I) the person was represented by counsel in the case, or knowingly and intelligently waived the right to counsel in the case; and

(II) in the case of a prosecution for an offense described in this paragraph for which a person was entitled to a jury trial in the jurisdiction in which the case was tried, either

(aa) the case was tried by a jury, or

(bb) the person knowingly and intelligently waived the right to have the case tried by a jury, by guilty plea or otherwise.

(ii) A person shall not be considered to have been convicted of such an offense for purposes of this chapter if the conviction has been expunged or set aside, or is an offense for which the person has been pardoned or has had civil rights restored (if the law of the applicable jurisdiction provides for the loss of civil rights under such an offense) unless the pardon, expungement, or restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms.

18 U.S.C. § 921(a)(33) (emphasis added). Thus, a defendant must use or attempt to use force before he is convicted of "a misdemeanor crime of domestic violence" under 18 U.S.C. § 922(g)(9).

C.

As has been amply discussed, in *Heller,* the Supreme Court invalidated a gun ban in the District of Columbia, holding that the Second Amendment guarantees to law-abiding citizens the right to possess handguns for the purposes of self-defense. The Court identified the right to self-defense as "the central component of the right itself," *Heller,* 128 S.Ct. at 2802, and it declared that the "core right" preserved by the Second Amendment was the right for "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 2821. *Heller* failed, however, to identify the proper standard of scrutiny for analyzing whether a statute that regulates gun possession infringes on Second Amendment rights, instead finding that the D.C.'s outright ban on possession would fail to survive under any "of the standards of scrutiny that we have applied to enumerated constitutional rights." *Id.* at 2817.

**\*12** The Court acknowledged the existence of limits on the scope of the individual right protected by the Second Amendment, and explained that certain so-called "longstanding prohibitions" were "presumptively lawful regulatory measures." *Id.* at 2816-17 & n. 26; *id.* at 2816 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."). The Court provided a non-exclusive, illustrative list of such "presumptively lawful" exceptions, including but not limited to "longstanding prohibitions on the possession of firearms by felons and the mentally ill," *id* . at 2816-17, but did not explain how lower courts were to identify other such "presumptively lawful" exceptions. More recently, the Court restated its belief in the existence of "presumptively lawful" regulations but again declined to provide any guidance to lower courts in our efforts to identify them. *McDonald v. Chicago,* --- U.S. ----, ----, 130 S.Ct. 3020, 2047, 177 L.Ed.2d 894, ---- (2010) (holding that the Second Amendment constrains state and local laws through its incorporation under the Fourteenth Amendment Due Process Clause).[FN1] Post-*Heller,* and now, post-*McDonald,* lower federal courts have theorized about the meanings of a "longstanding prohibition[ ]" and a "presumptively lawful regulatory measure [ ]," but, as the majority candidly concedes, no consensus has emerged.

### D.

The majority, on the basis of "the [*Heller* ] Court's frequent references to First Amendment doctrine, ... look[s] to the First Amendment as a guide" in its analysis. Maj. Op. at 15. To be sure, *Heller* does refer to the First Amendment, but only for several quite limited purposes: (1) to compare its language, along with that of other amendments in the Bill of Rights, to the language of the Second Amendment, *see, e.g., Heller,* 128 S.Ct. at 2790; (2) to establish that constitutional rights are not limited to the use of equipment available at the time of ratification, but extend to modern analogues, *see id.* at 2791 (citing to First Amendment's protection of "modern forms of communication"); (3) to make the simple point that unqualified constitutional language does not imply an "unlimited" right, *id.* at 2799; (4) to note that initial recognition of a right sometimes comes long after ratification, *see id.* at 2816; and finally, (5) to remind its audience that our constitutional rights are "the very *product* of an interest-balancing by the people" and thus that balancing them away in the manner ascribed to Justice Breyer would be inappropriate, *id.* at 2821. Certainly the First Amendment, as a fount of rights the dissenting Justices have frequently championed, was a useful source for the *Heller* majority.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2010 WL 5396069 (C.A.4 (W.Va.))
**(Cite as: 2010 WL 5396069 (C.A.4 (W.Va.)))**

But these limited references are hardly an invitation to import the First Amendment's idiosyncratic doctrines wholesale into a Second Amendment context, where, without a link to expressive conduct, they will often appear unjustified. To the extent some commentators and courts, frustrated with *Heller's* lack of guidance, have clung to these references and attempted to force unwieldy First Amendment analogies, they muddle, rather than clarify, analysis.

1.

**\*13** Most problematic is the majority's suggestion that the government must show "a reasonable fit between the important object of reducing domestic gun violence and § 922(g)(9)'s permanent disarmament of domestic-violence misdemeanants" as a class. Maj. Op. at 17. Chester can plainly challenge the statute as applied to him. And insofar as any legislative enactment may be attacked on its face on the grounds "that no set of circumstances exists under which the Act would be valid," *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987); *see also Greenville Women's Clinic v. Bryant,* 222 F.3d 157, 164 (4th Cir.2000) (quoting *Salerno* and applying this rule in the abortion-regulation context), Chester may raise that claim as well. But Chester *cannot* simply complain that, while the statute is permissible as applied to him, there may be different sets of facts under which its application would be invalid.

This "second type of facial challenge," *United States v. Stevens,* ---U.S. ----, ----, 130 S.Ct. 1577, 1587, 176 L.Ed.2d 435 (2010), which presumes "a species of third party (*jus tertii* ) standing," *City of Chicago v. Morales,* 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (Stevens, J., concurring), has not been permitted outside of the First Amendment context, *see Salerno,* 481 U.S., at 745 ("The fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."). As the Supreme Court taught in *Broadrick v. Oklahoma,* 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973),

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.... [These principles] rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.

*Id.* at 610-11.

One of the only exceptions to this rule is the First Amendment's overbreadth doctrine, which is justified on grounds unique to the regulation of expressive conduct. Concerned about the chilling effect of overly broad regulations-the fear that a "statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression," *id.* at 612-the Supreme Court has "long ... recognized that the First Amendment needs breathing space," *id.* at 611; and the overbreadth doctrine is the Court's solution to this speech-specific problem, *id.* at 611-12. With free expression, the classes of protected speech that are unduly

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

burdened may be quite particularized-e.g., unpopular expression that has "serious literary, artistic, politics, or scientific value," *Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). And as expression is, by its very nature, so mutable, overbroad regulations can easily encourage speakers to modify their speech, shifting it away from controversy. No analogous arguments obtain in the Second Amendment context. As there can be little doubt that advocates of a robust individual right to bear arms will continue to challenge *all* firearm regulations, importing the over-breadth doctrine, an "extraordinary" exception to prudential standing requirements, *Ward v. Rock Against Racism,* 491 U.S. 781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), into the Second Amendment context would be inappropriate.

2.

**\*14** As for the majority's observation that here "we are seeking to determine whether a person, rather than the person's conduct, is unprotected by the Second Amendment," Maj. Op. at 12, I am dubitante. This seems to invite a comparison to the First Amendment's application to expressive conduct and to suggest that, because here we would exclude a "person, rather than the person's conduct," from constitutional immunity, the government should bear a heavier burden in establishing that Chester's claim is outside the purview of the Second Amendment. Again, however, the First Amendment analogy breaks down. The law has long believed that "no danger flowing from speech can be deemed clear and present, unless the incidence of the evil apprehended is so imminent that it may befall before there is opportunity for full discussion," and that "the remedy to be applied is more speech, not enforced silence." *Whitney v. California,* 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). This principle has no application to gun violence, and prohibiting violent criminals from owning guns cannot fairly be compared to permanently silencing some class of persons.

E.

*Heller* has left in its wake a morass of conflicting lower court opinions regarding the proper analysis to apply to challenged firearms regulations. Many courts have upheld provisions of § 922(g) under the "presumptively lawful regulatory measure[ ]" or the "longstanding prohibition[ ]" language in *Heller.* These courts generally affirm a particular provision of § 922(g) either because *Heller* specifically stated the particular regulations were constitutional, as regarding felons and the mentally ill, §§ 922(g)(1) & (4), or, as did the district court here, via analogy to the so-called "presumptively lawful regulatory measures." [FN2] Other federal courts have individually analyzed the specific statutory provision at issue, determined the appropriate level of constitutional scrutiny, and then analyzed the statute in light of the factual circumstances before the court.[FN3]

Recognizing that an attempt to operationalize the *Heller* Court's "longstanding" language would lead to "weird" results unconnected even to any court's divination of the ratifiers' original intent, the Seventh Circuit simply read this language to acknowledge that "exclusions [from *Heller's* qualified right to bear arms] need not mirror limits that were on the books in 1791." *Id.* at 641. I, too, find this the most persuasive interpretation of that passage in *Heller.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

The *Skoien* court then conducted a further analysis to determine whether the statute was constitutional. The court did not explicitly adopt a level of constitutional scrutiny, however. Instead, the court embraced the government's concession that "some form of strong showing ('intermediate scrutiny,' many opinions say) is essential, and that § 922(g)(9) is valid only if substantially related to an important governmental objective." *Skoien,* 614 F.3d at 641. Then, after disavowing involvement in the " 'levels of scrutiny' quagmire," the court concluded that § 922(g)(9) satisfied the appropriate test, a test that appears to any discerning eye identical to intermediate scrutiny. *Id.* at 641-42 ("[F]or no one doubts that the goal of § 922(g)(9), preventing armed mayhem, is an important government objective. Both logic and data establish a substantial relation between § 922(g)(9) and this objective."). The court went on to explain why the statute satisfied intermediate scrutiny, identifying three distinct justifications for the constitutionality of § 922(g)(9): domestic abusers often commit acts that would be charged as felonies if the victim were a stranger, but that are charged as misdemeanors because the victim is a relative; (2) firearms are deadly in domestic strife; and (3) persons convicted of domestic violence are likely to offend again. *Id.* at 643-44. Distilled to its essence, *Skoien* holds that § 922(g)(9) passes muster under the Second Amendment as applied to recidivist violent offenders.

IV.

**\*15** Despite its hesitation to do so explicitly (in contrast to the majority in this case), the Seventh Circuit correctly applied intermediate scrutiny in *Skoien* and correctly sustained § 922(g)(9) against constitutional attack.

A.

Intermediate scrutiny is the proper level of scrutiny for § 922(g)(9). *Heller* eliminated rational basis scrutiny and Justice Breyer's proposed balancing test as possibilities. *Heller,* 128 S.Ct. at 2817 n. 27; *id.* at 2821. The Court also made it clear that strict scrutiny is unwarranted in Second Amendment analysis. *See id.* at 2851 (Breyer, J., dissenting). Moreover, it is clear here that § 922(g)(9) does not even burden the core right of the Second Amendment as established by the Supreme Court in *Heller,* namely, the right for "law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 2821. Undisputedly, those convicted for having committed violent assaults against cohabitants and family members in general, and Chester in particular, are not law-abiding, responsible citizens. Chester had been convicted of a serious crime in which violence is an element, 18 U.S.C. § 922(g)(9); W. Va.Code § 61-2-28(a) & (b), and in which the facts indicate that he acted particularly violently: he lashed out at his daughter, kicking and punching her, at times while she was on the ground. Further, our own precedent dictates that an individual who assaulted a family member thereby " 'removed himself from the class of ordinary citizens' to the point where he could not 'reasonably expect to be free from regulation when possessing a firearm,' " *United States v. Mitchell,* 209 F.3d 319, 323 (4th Cir.2000) (quoting *United States v. Bostic,* 168 F.3d 718, 722 (4th Cir.1999)), separately suggesting that strict scrutiny is inapplicable to Chester because of his previous criminal activity. For all these reasons, intermediate scrutiny is the proper ap-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

proach for the district court's analysis.

Intermediate scrutiny queries whether a statute is substantially related to an important governmental interest. *See Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) ("To withstand constitutional challenge, previous cases establish that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives."); *see also Lehr v. Robertson,* 463 U.S. 248, 265-66, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) ("The sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective .... when there is no substantial relation between the disparity and an important state purpose") (internal citations omitted); *Adkins v. Rumsfeld,* 464 F.3d 456, 468 (4th Cir.2006) (for facially neutral gender-based classifications we demand "at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives."); *cf. Skoien,* 614 F.3d at 642.

**\*16** The government contends that the governmental interests at stake here, and, indeed, the very purpose of § 922(g)(9), include, *inter alia,* to "keep [ ] firearms away from presumptively risky persons." Appellee's Br. at 9. I readily agree. *Mitchell,* 209 F.3d at 321 ("Congress determined that the possession of a gun by one convicted of domestic violence put the possessor's partner at undue risk."). In enacting legislation which prohibits certain classes of persons from possessing firearms, "Congress sought to rule broadly to keep guns out of the hands of those who have demonstrated that 'they may not be trusted to possess a firearm without becoming a threat to society.' " *Scarborough v. United States,* 431 U.S. 563, 572, 97 S.Ct. 1963, 52 L.Ed.2d 582 (1977) (quoting 114 Cong. Rec. 14773 (1968)).

More specifically, the government argues that the purpose of § 922(g)(9) is to keep firearms away from presumptively risky individuals with a demonstrated history of actual or attempted violence. Appellee's Br. at 10-13. Again, the government's argument is persuasive. In 1996, Congress recognized that existing felon-in-possession prohibitions were not keeping firearms out of the hands of domestic abusers, because such individuals, although dangerous, were often charged with misdemeanors instead of felonies. 142 Cong. Rec. S2646-02 (1996) (statement of Sen. Lautenberg) (explaining that "many people who engage in serious spousal or child abuse ultimately are not charged with convicted of felonies ... and these people are still free under Federal law to possess firearms"). Thus, Congress enacted § 922(g)(9) to deny these violent offenders the right to possess guns. *Hayes,* 129 S.Ct. at 1087 (finding that "[f]irearms and domestic strife are a potentially deadly combination nationwide."); 142 Cong. Rec. at S2646-02 (explaining that adding domestic violence misdemeanants to the Gun Control Act of 1968 in 1996 was intended to "close this loophole, and will help keep guns out of the hands of people who have proven themselves to be violent and a threat to those closest to them."); *see also United States v. Beavers,* 206 F.3d 706, 710 (6th Cir.2000) ("[I]t should not surprise anyone that the government has enacted legislation in an attempt to limit the means by which persons who have a history of domestic violence might cause harm in the future").

Under intermediate scrutiny, the governmental purpose must be *important.* But who could possibly dispute the importance of the governmental interest in keeping firearms away from individuals with a demonstrated history of actual or attempted assaultive violence? The need

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

to protect victims of assaultive domestic violence from further, more lethal harm from gun violence is unquestionable; its unfortunate and horrifying effects are well-documented. As the government argues:

> Domestic violence misdemeanants, even more so than most convicted felons, have demonstrated a specific propensity for violence and thus pose and unacceptable risk of firearm misuse. Such persons have demonstrated an unwillingness or inability to resolve domestic disputes without threats of physical violence. Just because a domestic abuser does not employ a firearm in this first instance does not mean he will refrain from using a firearm the next time. Further, because victims of domestic violence often seek assistance from law enforcement agencies, domestic violence misdemeanants are likely to encounter law enforcement officers. The United States interest includes eliminating firearm possession by domestic violence misdemeanants during adverse encounters with law enforcement officers.

*17 Appellee's Br. at 12. And sound research of unquestionable reliability (much of it empirical) indicates that the presence of firearms greatly increases the risk of death for women suffering from domestic abuse. For example, in 2006, 1,905 women were murdered with guns and 4,772 women were treated in emergency rooms for gunshot wounds stemming from an assault. [FN4] On average, more than three women in the United States are murdered by their husbands or boyfriends every day. [FN5] *Abused women living in homes with firearms are six times more likely to be killed than other abused women.* [FN6] Women are more than twice as likely to be shot to death by their male partner as killed in any way by a stranger. [FN7] And women living in homes with guns are more than three times as likely to be victims of homicide. [FN8] Although it is the government's role to provide these data, courts have long taken judicial notice of dispositive facts in constitutional cases; judicial notice of the data underlying the government's interests is entirely appropriate.

It is also quite clear that § 922(g)(9) is substantially related to the government's important interests, as the statute directly prohibits the possession of firearms by those with a demonstrated history of actual or attempted violence. *See American Life League, Inc. v. Reno,* 47 F.3d 642, 651-52 (4th Cir.1995). Section 922(g)(9) is not merely intended to accomplish bureaucratic shortcuts or administrative convenience. *Craig v. Boren,* 429 U.S. 190, 198-99, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), *reh'g denied,* 429 U.S. 1124, 97 S.Ct. 1161, 51 L.Ed.2d 574 (1977); *Reed v. Reed,* 404 U.S. 71, 76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), *mandate conformed to,* 94 Idaho 542, 493 P.2d 701 (1972). This statute, simply stated, is substantially related to the goal proffered by the government: to keep firearms from individuals with a demonstrated history of violence. This statute was intended to prevent individuals like William Samuel Chester, Jr., a violent man who has attacked and assaulted his own daughter and wife, from purchasing or possessing guns. Thus, based on readily available data of undoubted reliability, § 922(g)(9) satisfies intermediate scrutiny and is therefore constitutional.

## V.

I can foresee no difficulty for the district court in sustaining the constitutional validity of the application of § 922(g)(9) in this case. Nevertheless, under the circumstances of the law's un-

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

derstandably slow evolutionary course of development, I am content to give Appellant Chester a full opportunity to offer evidence and argument showing the district court how and why he escapes the law's bite.

FN1. There are two basic manifestations of the collective-right view of the Second Amendment. The first model understands the Second Amendment simply to "empower state governments to arm militias," while the second model "argues that individuals have a right to own and possess firearms under the Second Amendment, but only insofar as it is connected with state militia service." *See* Kenneth A. Klukowski, *Armed By Right: The Emerging Jurisprudence of the Second Amendment,* 18 Geo. Mason U. Civ. Rts. L.J. 167, 175-76 (2008).

FN2. The collective versus individual right debate turned largely on the relationship between the two clauses. "[I]ndividual right theorists say that the operative clause's effect is unmodified by the civic purpose announced in the prefatory clause, ... while collective right theorists claim that the prefatory clause limits the scope of the Amendment ... [to] the perpetuation of the militia system." *See* Klukowski, *Armed by Right, supra,* at 180-81.

FN3. The Supreme Court reiterated, without further explanation, these presumptively valid limitations in *McDonald v. City of Chicago,* ---U.S. ----, ----, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010).

FN4. For purposes of 18 U.S.C. § 922(g)(9), a "misdemeanor crime of domestic violence" is defined as an offense that "is a misdemeanor under Federal, State, or Tribal law" and "has, as an element, the use or attempted use of physical force, or the threatened use of a deadly weapon, committed by a current or former spouse ... of the victim." 18 U.S.C. § 921(a)(33)(a).

FN5. Other courts have found *Heller's* list of "presumptively lawful" firearm regulations susceptible to two meanings. *See United States v. Marzzarella,* 614 F.3d 85, 91 (3rd Cir.2010) ("We recognize the phrase 'presumptively lawful' could have different meanings under newly enunciated Second Amendment doctrine. On the one hand, this language could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because they pass muster under any standard of scrutiny."); *Skoien,* 587 F.3d at 808 ("[I]t is not entirely clear whether this language should be read to suggest that the listed firearms regulations are presumed to fall outside the scope of the Second Amendment right as it was understood at the time of the framing or that they are presumptively lawful under even the highest standard of scrutiny applicable to laws that encumber constitutional rights.").

FN6. We do not address any issue with respect to possession of firearms for lawful hunting purposes under the Second Amendment as neither party has raised that as an issue in this case.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN1. The Court stated:

We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." We repeat those assurances here.

*McDonald,* 130 S.Ct. at 3047 (internal citations omitted).

FN2. We have upheld the statutory prohibitions on possession by felons and the mentally ill after *Heller* in unpublished, non-precedential, cases. *United States v. Brunson,* No. 07-4962, 292 Fed.Appx. 259, *261 (4th Cir. Sept.11, 2008) (upholding § 922(g)(1)); *United States v. McRobie,* No. 08-4632, 2009 WL 82715, *1 (4th Cir. Jan.14, 2009) (upholding § 922(g)(4)). Other circuits concluded similarly. *See, e.g., United States v. Anderson,* 559 F.3d 348, 352 (5th Cir.2009) (upholding § 922(g)(1)); *United States v. McCane,* 573 F.3d 1037, 1047 (10th Cir.2009) (same); *United States v. Stuckey,* No. 08-0291, 317 Fed.Appx. 48, 50 (2d Cir. March 18, 2009) (same).

We have also previously analogized between perpetrators of domestic violence and felons. *United States v. Bostic,* 168 F.3d 718, 722 (4th Cir.1999). There, Bostic challenged the constitutionality of his conviction under § 922(g)(8). We upheld the statute, explaining:

We disagree, however, with Bostic's premise that he remained an "ordinary citizen" after the [final protection] Order was entered against him. By engaging in abusive conduct toward Kelly and Ryan which led to the entry of the Order, Bostic removed himself from the class of ordinary citizens we discussed in *Langley. Like a felon, a person in Bostic's position cannot reasonably expect to be free from regulation when possessing a firearm.*

*Id.* at 722 (emphasis added).

Other federal courts *have* upheld § 922(g)(9) based on analogies between domestic violence misdemeanants and felons. *E.g ., United States v. White,* 593 F.3d 1199, 1205 (11th Cir.2010); *United States v. Booker,* 570 F.Supp.2d 161, 163-64 (D.Me.2008) ("if anything, as a predictor of firearm misuse, the definitional net cast by 922(g)(9) is tighter than the net cast by 922(g)(1) .... [and] the manifest need to protect the victims of domestic violence and to keep guns from the hands of the people who perpetuate such acts is well-documented and requires no further elaboration.").

FN3. *See, e.g., United States v. Miller,* 604 F.Supp.2d 1162, 1171 (W.D.Tenn.2009); *United States v. Engstrum,* 609 F.Supp.2d 1227, 1231-34 (D.Utah 2009).

FN4. CDC, Nat'l Ctr. for Injury Prevention & Control, *Injury Mortality Reports,* http:// webappa.cdc.gov/sasweb/ncipc/mortrate10_sy.html (query for "Homicide" and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

"Firearm" and "Females" and "2006"); *Id., Nonfatal Injury Reports,* http://webappa.cdc.gov/sasweb/ncipc/ nfirates2001.html (query for "Assault-All" and "Firearm" and "Females" and "2006").

FN5. U.S. Dep't of Justice, Bureau of Justice Statistics Crime Data Brief, *Intimate Partner Violence,* 1976-2001 (Feb.2003), available at http://www.endabuse.org/userfiles/file/Children_and_Families/Children.pdf.

FN6. Jacquelyn C. Campbell et al., *Assessing Risk Factors for Intimate Partner Homicide,* Nat'l Inst. Just. J., Nov. 2003, at 15, 16, available at http://www.ncjrs.gov/pdffiles1/jr000250e.pdf. In another study, it was found that access to firearms increases the risk of intimate-partner homicide more than five-fold. Arthur L. Kellerman et al., *Gun Ownership as a Risk Factor for Homicide in the Home,* 329 New Eng. J. Med. 1084-91 (1993).

FN7. Arthur L. Kellerman & James A. Mercy, Men, Women, and Murder: Gender-Specific Differences in Rates of Fatal Violence and Victimization, 33 J. Trauma 1, 1 (1992).

FN8. James E. Bailey et al., *Risk Factors for Violent Death of Women in the Home,* 157 Archives of Internal Med. 777, 777 (1997).

C.A.4 (W.Va.),2010.
U.S. v. Chester
--- F.3d ----, 2010 WL 5396069 (C.A.4 (W.Va.))

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.