ORAL ARGUMENT HELD NOVEMBER 15, 2010

No. 10-7036

# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

DICK ANTHONY HELLER, ET AL.,

*Plaintiff-Appellants*,

v.

DISTRICT OF COLUMBIA, ET AL.,

*Defendants-Appellees*.

**On Appeal From the United States District Court
for the District of Columbia, Hon. Ricardo M. Urbina**

**CORRECTED SUPPLEMENTAL BRIEF FOR AMICI CURIAE
BRADY CENTER TO PREVENT GUN VIOLENCE, HISPANIC
AMERICAN POLICE COMMAND OFFICERS ASSOCIATION,
INTERNATIONAL BROTHERHOOD OF POLICE OFFICERS, AND
NATIONAL BLACK POLICE ASSOCIATION
IN SUPPORT OF APPELLEES AND AFFIRMANCE**

| | |
|---|---|
| JONATHAN E. LOWY | PAUL R.Q. WOLFSON |
| DANIEL R. VICE | *Counsel of Record* |
| BRADY CENTER TO PREVENT | A. STEPHEN HUT, JR. |
|   GUN VIOLENCE | JOSHUA M. SALZMAN |
| LEGAL ACTION PROJECT | LAURA MORANCHEK HUSSAIN |
| 1225 Eye Street, N.W., Suite 1100 | FRANCESCO VALENTINI |
| Washington, D.C. 20005 | WILMER CUTLER PICKERING |
| (202) 289-7319 |   HALE AND DORR LLP |
| | 1875 Pennsylvania Avenue, N.W. |
| | Washington, D.C. 20006 |
| | (202) 663-6000 |
| | paul.wolfson@wilmerhale.com |

January 18, 2011

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

## Parties and Amici

Except for the Hispanic American Police Command Officers Association, the International Brotherhood of Police Officers, and the National Black Police Association, all parties, intervenors, and amici appearing before the district court and in this Court are listed in the brief for Appellees.

## Rulings Under Review

References to the rulings at issue appear in the briefs for Appellants and Appellees.

## Related Cases

To the best of counsel's knowledge, this case was not previously before this Court or any court other than the district court below. Counsel are unaware of any related cases currently pending in this Court or any other court.

## Statutes and Regulations

All applicable constitutional provisions, statutes, and regulations are set forth in the Addendum to the briefs for Appellants.

# DISCLOSURE STATEMENT

*Heller et al. v. District of Columbia et al.*, No. 10-7036

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, the Brady Center to Prevent Gun Violence states that it is a § 501(c)(3) non-profit corporation dedicated to reducing gun violence through education, research, and legal advocacy. The Brady Center to Prevent Gun Violence has no parent corporation, and no publicly held corporation holds ten percent or more of its stock.

The Hispanic American Police Command Officers Association states that it has no parent corporation, and no publicly held corporation holds ten percent or more of its stock.

The International Brotherhood of Police Officers states that it has no parent corporation, and no publicly held corporation holds ten percent or more of its stock.

The National Black Police Association states that it has no parent corporation, and no publicly held corporation holds ten percent or more of its stock.

Amici Curiae are represented herein by Paul R.Q. Wolfson, who is counsel of record, A. Stephen Hut, Jr., Joshua M. Salzman, Laura Moranchek Hussain, and Francesco Valentini of Wilmer Cutler Pickering Hale and Dorr LLP, 1875

Pennsylvania Avenue N.W., Washington, D.C. 20006; and Jonathan E. Lowy and Daniel R. Vice of the Brady Center To Prevent Gun Violence, Legal Action Project, 1225 Eye Street, N.W., Suite 1100, Washington, D.C. 20005.

/s/ Paul R.Q. Wolfson

PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
paul.wolfson@wilmerhale.com
*Counsel for Amici Curiae*

# TABLE OF CONTENTS

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............C-1

DISCLOSURE STATEMENT ........................................................................C-2

TABLE OF AUTHORITIES ............................................................................. ii

INTEREST OF AMICI CURIAE .......................................................................1

SUMMARY OF ARGUMENT ..........................................................................1

ARGUMENT .....................................................................................................1

    A.    The Assault-Weapons Ban Is "Usual" ...................................................2

    B.    The Assault-Weapons Ban Is "Reasonable" .........................................6

CONCLUSION ................................................................................................10

# TABLE OF AUTHORITIES*

## CASES

Page(s)

**Navegar, Inc. v. United States*, 192 F.3d 1050 (D.C. Cir. 1999)..............................8

*Olympic Arms v. Buckles*, 301 F.3d 384 (6th Cir. 2002) ...........................................8

*\*Springfield, Inc. v. Buckles*, 292 F.3d 813 (D.C. Cir. 2002)............................5, 6, 7

## STATUTES AND RULES

18 U.S.C. § 925(d)(3).....................................................................................................4

Act of July 8, 1932, ch. 465, 47 Stat. 650..................................................................4

Public Safety and Recreational Firearm Use Protection Act, Pub. L. No.
    103-322, tit. IX, 108 Stat. 1796, 1996 .............................................................6

Aurora, Ill., Code of Ordinances § 29-49(a)...............................................................3

Buffalo, N.Y., City Code § 180-1(F)........................................................................3

Cal. Penal Code
    §§ 12275-12290 ...............................................................................................2
    § 12020(a)(2), (c)(25) .......................................................................................9

Chi., Ill., Code of Ordinance §§ 8-20-040, 8-20-050(e), 8-20-170(d) ......................3

Conn. Gen. Stat. §§ 53-202a-53 to -202o ..................................................................2

Denver, Colo., Municipal Code § 38-130(e) .............................................................3

D.C. Code
    § 1-303.43 ..................................................................................................1, 2, 6
    § 7-2501.01(3A) ..........................................................................................2, 4
    § 7-2502.02(a)...................................................................................................2
    § 7-2506.01(b) ..................................................................................................2

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

Haw. Rev. Stat.
    §§ 134-1, 134-4, 134-8 ............................................................................... 2
    § 134-8(c) ................................................................................................... 9

Md. Code. Ann., Crim. Law
    §§ 4-301 to 4-306 ...................................................................................... 3
    § 4-305(d) .................................................................................................. 9

Mass. Gen. Laws ch. 140
    §§ 121, 122, 123, 131, 131M .................................................................... 3
    §§ 121, 131M ............................................................................................ 9

Minn. Stat. §§ 624.712-624.7141 ........................................................................ 3

N.J. Stat. Ann.
    §§ 2C:39-1(w), 2C:39-5, 2C:58-5, 2C:58-12, 2C58:13 ............................... 3
    §§ 2C:39-1(y), 2C:39-9(h) ........................................................................ 9

N.Y. Penal Law
    §§ 265.00(22), 265.02(7), 265.10 .............................................................. 3
    §§ 265.00(23), 265.02(8) ........................................................................... 9

N.Y.C., N.Y., Admin. Code § 10-303.1 ................................................................ 3

Rochester, N.Y., City Code § 47-5(F) ................................................................... 3

Va. Code. Ann. §§ 18.2-287.4, 18.2-308.2:01, 18.2-308.2:2, 18.2-308.7,
    18.2-308.8 .................................................................................................. 3

## OTHER AUTHORITIES

*ATF, *Assault Weapons Profile* (Apr. 1994) ................................................. 6, 10

ATF, *National Firearms Registration and Transfer Record* (June 2007),
    http://www.justice.gov/oig/reports/ATF/e0706/back.htm ........................ 10

ATF, *Report and Recommendation of the ATF Working Group on the
    Importability of Certain Semiautomatic Rifles* (July 1989) ..................... 4, 5

ATF & Department of the Treasury, *Department of the Treasury Study
    on the Sporting Suitability of Modified Semiautomatic Assault
    Rifles* (Apr. 1998) ....................................................................................... 7

Brady Center to Prevent Gun Violence, *On Target: The Impact of the 1994 Federal Assault Weapons Act* (Mar. 2004), http://www.bradycenter.org/xshare/pdf/reports/on_target.pdf ............................................. 6

Cook, Philip J., & Jens Ludwig, National Institute of Justice, *Guns in America: National Survey on Private Ownership and Use of Firearms* (May 1997), http://www.ncjrs.gov/pdffiles/165476.pdf ............... 10

Isikoff, Michael, *Tucson shooting with high-capacity magazines reignites gun debate*, http://openchannel.msnbc.msn.com/_news/2011/01/09/5801374-tucson-shooting-with-high-capacity-magazines-reignites-gun-debate (last visited Jan. 14, 2011) ....................... 8, 9

Koper, Christopher S., et al., *An Updated Assessment of the Federal Assault weapons-ban* (June 2004), http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf ............................................................. 9, 10

Palmer, Brian, *How many times can you shoot a handgun in seven minutes? More than a thousand,* Slate, Nov. 9, 2009, http://www.slate.com/id/2235051/ ................................................................ 8

*Porous laws help lunatics get their hands on deadly weapons,* USA Today, Jan. 22, 2011, *available at* http://www.usatoday.com/printedition/news/20110111/editorial11_st.art.htm ........................................ 8

Schwartz, Jeremy, *Witness: Hasan spent weeks before Fort Hood shooting at local range*, Austin American-Statesman, Oct. 21, 2010, *available at* http://www.statesman.com/news/local/witnesses-hasan-spent-weeks-before-fort-hood-shooting-985470.html ........................... 8

*The Attack and Aftermath*, *available at* http://www.washingtonpost.com/wp-srv/special/politics/giffords-shooting-timeline/ (last visited Jan. 14, 2011) ............ 9

*The Gun Digest Book of Assault Weapons* (1st ed., Jack Lewis, ed., 1986) ............. 5

U.S. Census Bureau, *State & County QuickFacts*, http://quickfacts.census.gov/qfd/index.html (last visited Jan. 12, 2011) ................................. 3

Violence Policy Center, *Ten Examples of High-Profile Mass Shootings in the United States Involving High-Capacity Ammunition Magazines*, *available at* www.vpc.org/fact_sht/VPCshootinglist.pdf (last visited Jan. 14, 2011) .................................................................. 9

## INTEREST OF AMICI CURIAE

The interests of the amici curiae, the Brady Center to Prevent Gun Violence, the Hispanic American Police Command Officers Association, the International Brotherhood of Police Officers, and the National Black Police Association are stated in the amici's initial brief in this case, which was filed on September 20, 2010.

## SUMMARY OF ARGUMENT

The District's restrictions on assault weapons and high-capacity ammunition magazines are both "usual" and "reasonable" within the meaning of D.C. Code § 1-303.43, even on the assumption that this section were read to impose an independent limit on the District's regulatory authority. The District's statute is "usual" because it is similar to other laws enacted in several other jurisdictions facing similar problems of gun violence; and it is "reasonable" because it is narrowly focused on weapons that are not legitimate self-defense firearms, but rather are military-style weapons and ammunition magazines that present an extraordinary danger to the public.

## ARGUMENT

In its Order of November 16, 2010, this Court directed the parties to address four issues concerning the application of D.C. Code § 1-303.43 to this case. The District of Columbia, in its supplemental brief filed in response to that Order, explains, among other things, that (a) § 1-303.43, which empowers the District to

enact "usual and reasonable" regulations of firearms, does not operate as an independent limit on the District's power to regulate firearms, beyond the limits imposed by the Second Amendment, and (b) even if § 1-303.43 does impose such independent limits, it nonetheless gives the District ample room to regulate the possession and use of firearms, including both the licensing and registration requirements challenged in this case and the District's prohibition on the possession of certain "assault weapons," as defined in D.C. Code §§ 7-2501.01(3A), 7-2502.02(a). As explained below, the prevalence of restrictions on assault weapons and high-capacity magazines, and the significant public safety risks these weapons pose, confirm that the District's ban is "usual and reasonable."

### A. The Assault-Weapons Ban Is "Usual"

The District of Columbia's ban on military-style assault weapons and high-capacity ammunition magazines[1] is similar to legislation that has been enacted at federal, state, and local levels. Several other states and localities currently restrict assault weapons and high-capacity ammunition magazines; with the District of Columbia, these jurisdictions account for roughly one third of the nation's population. *See* Cal. Penal Code §§ 12275-12290 (banning assault weapons and high-capacity ammunition magazines); Conn. Gen. Stat. §§ 53-202a-53 to -202o (prohibiting assault weapon possession); Haw. Rev. Stat. §§ 134-1, 134-4, 134-8

---

[1] D.C. Code §§ 7-2502.02(a)(6), 7-2506.01(b).

(criminalizing manufacture, possession and sale of assault pistols and high-capacity ammunition magazines); Md. Code. Ann., Crim. Law §§ 4-301 to 4-306 (regulating sale of assault weapons and high-capacity ammunition magazines); Mass. Gen. Laws ch. 140, §§ 121, 122, 123, 131, 131M (prohibiting sale, transfer and possession of assault weapons and large capacity feeding devices); N.J. Stat. Ann. §§ 2C:39-1(w), 2C:39-5, 2C:58-5, 2C:58-12, 2C58:13 (prohibiting possession of assault firearms unless licensed and high-capacity ammunition magazines); N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10 (prohibiting manufacture, disposal, transport, possession of assault weapons and high-capacity ammunition magazines); Minn. Stat. §§ 624.712-624.7141 (regulating possession and sale of assault weapons); Va. Code. Ann. §§ 18.2-287.4, 18.2-308.2:01, 18.2-308.2:2, 18.2-308.7, 18.2-308.8 (restricting possession of certain assault weapons and carrying of assault weapons in public places); U.S. Census Bureau, *State & County QuickFacts*, http://quickfacts.census.gov/qfd/index.html (last visited Jan. 12, 2011) (2009 population data).[2]

---

[2] *See also* Aurora, Ill., Code of Ordinances § 29-49(a) (prohibits transfer or possession of assault weapons); Buffalo, N.Y., City Code § 180-1(F) (persons will not possess assault weapons or ammunition-feeding devices); Chi., Ill., Code of Ordinance §§ 8-20-040, 8-20-050(e), 8-20-170(d) (makes assault weapons unregisterable, and possession of unregisterable firearms unlawful); Denver, Colo., Municipal Code § 38-130(e) (possession of assault weapons unlawful); N.Y.C., N.Y., Admin. Code § 10-303.1 (prohibits possession and disposition of assault weapons); Rochester, N.Y., City Code § 47-5(F) (no person shall possess an assault weapon or an ammunition feeding device in the city).

These state and local restrictions parallel regulatory activity at the federal level. As early as 1932, Congress prohibited semi-automatic firearms using large capacity magazines within the District; this ban included later models of assault weapons. Act of July 8, 1932, ch. 465, 47 Stat. 650.

The evolution of federal firearms regulation reflects increasing awareness of the severe dangers presented by assault weapons. The Gun Control Act of 1968 prohibited importation of firearms not "generally recognized as particularly suitable for or readily adaptable to sporting purposes." 18 U.S.C. § 925(d)(3). Assault weapon imports at that time were rare, as long-gun imports were generally "conventional rifles and shotguns." *See* ATF, *Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles* 4 (July 1989) ("*ATF Working Group*"), http://www.atf.gov/firearms/guides/importation-verification/documents/report-on-importability-of-semi-automatic-rifles.pdf. In 1984, the Bureau of Alcohol Tobacco and Firearms (ATF) "was faced with a new breed of imported shotgun," the Striker-12 shotgun. *Id.* ATF quickly barred the import of this assault weapon, determining that it was a "military/law enforcement weapon" designed for "riot control" and was not a "sporting purpose" weapon. *Id.* & attachment 4; *see also* D.C. Code § 7-2501.01(3A)(A)(i)(III)(bb) (restricting Striker-12 as an assault weapon).

Similar interest by other manufacturers in importing semi-automatic assault

weapons in the 1980s led ATF to examine questions involving the importation of semi-automatic assault weapons. At the time, a new "element of the civilian population" was beginning to show an interest in acquiring "assault-type weapons limited to semiautomatic fire,"[3] and manufacturers were seeking to import assault weapons such as the semi-automatic AK-47 and Uzi (described in 1986 in the first edition of *The Gun Digest Book of Assault Weapons* as "an unusual, but functional weapon" with sights "like those of the sub-machine gun"[4]). The ATF working group concluded that firearms with "the ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights" contained "characteristics of the modern military assault rifle," and that "large capacity magazines are indicative of military firearms." *See Springfield, Inc. v. Buckles*, 292 F.3d 813, 815-816 (D.C. Cir. 2002) (citing *ATF Working Group* 6-8). Based on those conclusions, ATF decided to ban the import of many semi-automatic assault weapons, a decision upheld by this Court in *Springfield*.

Further investigation by ATF of assault weapons reached similar conclusions. Thus, in 1994, ATF concluded:

---

[3] *The Gun Digest Book of Assault Weapons* 5 (1st ed., Jack Lewis, ed., 1986).
[4] *Id.* at 107.

> Assault weapons were designed for rapid fire, close quarter shooting at human beings. That is why they were put together the way they were. You will not find these guns in a duck blind or at the Olympics. They are mass produced mayhem.[5]

That same year, Congress enacted the federal assault-weapons ban, which prohibited for a decade the manufacture and sale of new assault weapons defined by name and military feature, and high-capacity ammunition magazines. *See* Public Safety and Recreational Firearm Use Protection Act, Pub. L. No. 103-322, tit. IX, 108 Stat. 1796, 1996. The federal assault-weapons ban was particularly effective; nearly a decade after its enactment, assault weapons made up only 1.61% of guns traced to crime, a drop of 66% from the pre-ban rate.[6] In addition to the decade-long federal ban, the ATF expanded restrictions in 1998 to prohibit imports of additional models of semi-automatic assault weapons. This Court upheld ATF's import ban. *See Springfield, Inc.*, 292 F.3d 813.

The District's assault-weapons ban falls well within a tradition of strict regulation of such weapons and high-capacity magazines at the federal, state, and local level. The District's statute is therefore "usual" under § 1-303.43.

**B.     The Assault-Weapons Ban Is "Reasonable"**

The District's regulation of assault weapons is also "reasonable." That ban

---

[5] ATF, *Assault Weapons Profile* 19 (Apr. 1994).

[6] Brady Center to Prevent Gun Violence, *On Target: The Impact of the 1994 Federal Assault Weapons Act* (Mar. 2004), http://www.bradycenter.org/xshare/pdf/reports/on_target.pdf (examining 1.4 million traces of crime guns from 1990 to 2001).

applies only to a narrow set of weapons that have no legitimate self-defense function but that nonetheless present a severe danger to the public. Just as such a ban satisfies Second Amendment scrutiny, so too does it satisfy any requirement under District law that a firearms regulation be reasonable.

The District's assault weapons-ban does *not* reach all semi-automatic weapons, but only a small subcategory of them. Although semi-automatic assault weapons have made up only 0.5% to 1% of guns in circulation in the United States, they have long been recognized as particularly dangerous and unusual weapons. Unlike other semi-automatic firearms, semi-automatic assault weapons with high-capacity ammunition magazines have a "distinctively military configuration" and are "designed for killing and disabling the enemy," which has "distinguished the[se] rifles from traditional sporting rifles."[7] In light of the severe risk they pose and their disproportionate use in crime, this Court has upheld regulation of semi-automatic assault weapons as a "reasonable"[8] regulation that addresses the "grave

---

[7] ATF & Department of the Treasury, *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 1 (Apr. 1998), http://www.atf.gov/publications/download/treas/treas-study-on-sporting-suitability-of-modified-semiautomatic-assault-rifles.pdf.

[8] *Springfield, Inc.*, 292 F.3d at 818 (upholding ATF ban on imports of assault weapons under doctrine of judicial deference to reasonable agency interpretations of statutes).

dangers posed by such weapons."[9]

Similarly, high-capacity ammunition magazines are designed to shoot mass numbers of people quickly and efficiently. They can hold 30, 50 or even 100 rounds, enabling shooters to fire more than three times the rounds of a standard magazine before needing to reload. Semi-automatic handguns with high-capacity magazines can fire at a rate of more than 6 shots per second or about 30 shots every 5 seconds.[10] High-capacity ammunition magazines have been used in numerous mass shootings, including in Tucson, Arizona in January 2011[11]; and at the massacres at Virginia Tech,[12] Fort Hood,[13] and Columbine High School.[14]

---

[9] *Navegar, Inc. v. United States*, 192 F.3d 1050, 1061 (D.C. Cir. 1999) (upholding federal Assault weapons-ban); *see also Olympic Arms v. Buckles*, 301 F.3d 384, 390 (6th Cir. 2002) (upholding federal assault weapons-ban as "a legitimate exercise of congressional authority to regulate a significant threat to public health and safety").

[10] Brian Palmer, *How many times can you shoot a handgun in seven minutes? More than a thousand,* Slate, Nov. 9, 2009, http://www.slate.com/id/2235051/.

[11] Michael Isikoff, *Tucson shooting with high-capacity magazines reignites gun debate*, http://openchannel.msnbc.msn.com/_news/2011/01/09/5801374-tucson-shooting-with-high-capacity-magazines-reignites-gun-debate (last visited Jan. 14, 2011).

[12] *Porous laws help lunatics get their hands on deadly weapons,* USA Today, Jan. 22, 2011, *available at* http://www.usatoday.com/printedition/news/20110111/editorial11_st.art.htm.

[13] Jeremy Schwartz, *Witness: Hasan spent weeks before Fort Hood shooting at local range*, Austin American-Statesman, Oct. 21, 2010, *available at* http://www.statesman.com/news/local/witnesses-hasan-spent-weeks-before-fort-hood-shooting-985470.html.

According to law enforcement, "There's absolutely no doubt the magazines increased the lethality and the body count of [the Tucson] attack."[15] The Tucson shooter was able to rapidly fire at least 30 shots from one magazine, hitting 19 people, including Rep. Giffords, and killing six persons, including a nine-year-old girl and a federal judge. The shooter was stopped when he ran out of bullets and attempted to reload.[16] Six states also limit the capacity of ammunition magazines.[17]

    Semi-automatic assault weapons have remained rare, making up only 0.5% to 1% of the guns in circulation in the United States,[18] similar to the approximately 0.95% of firearms that are registered in the National Firearms Registration and Transfer Record, listing weapons regulated under the National Firearms Act of

---

[14] Violence Policy Center, *Ten Examples of High-Profile Mass Shootings in the United States Involving High-Capacity Ammunition Magazines* (Jan. 2011), www.vpc.org/fact_sht/VPCshootinglist.pdf.

[15] Isikoff, *supra* n.11.

[16] *The Attack and Aftermath*, *available at* http://www.washingtonpost.com/wp-srv/special/politics/giffords-shooting-timeline/ (last visited Jan. 14, 2011).

[17] *See* Cal. Penal Code § 12020(a)(2), (c)(25); Haw. Rev. Stat. § 134-8(c); Md. Code. Ann., Crim. Law § 4-305(d); Mass. Gen. Laws ch. 140, §§ 121, 131M; N.J. Stat. Ann. §§ 2C:39-1(y), 2C:39-9(h); N.Y. Penal Law §§ 265.00(23), 265.02(8).

[18] Christopher S. Koper et al., *An Updated Assessment of the Federal Assault weapons-ban* 10 (June 2004), http://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf (citing estimate of 0.5% of firearms in circulation before the Assault weapons-ban); *Assault Weapons Profile* 19 (stating 1% of firearms in circulation).

1934[19] and described by appellants as a "narrow class of firearms."[20] Estimates have also shown that about 88% of firearms in the United States were not equipped with high-capacity ammunition magazines.[21] But even though assault weapons have made up only a small percentage of firearms in circulation, they have been disproportionately used by criminals, ranking "in the top ten of all guns traced in relation to crime." ATF, *Assault Weapons Profile* 19 (Apr. 1994).

Thus, as ATF, the expert agency on firearms has concluded, assault weapons are *not* legitimate self-defense or sporting weapons, but they *are* particularly dangerous to the public. ATF's experience with and analysis of assault weapons significantly validates the District's decision to ban possession of similar weapons. It is "reasonable" for a jurisdiction such as the District to protect the public by restricting possession of weaponry that does not play a legitimate role in securing the right of self-defense within the home as guaranteed by the Second Amendment.

## CONCLUSION

The judgment of the district court should be affirmed.

---

[19] ATF, *National Firearms Registration and Transfer Record* (June 2007), http://www.justice.gov/oig/reports/ATF/e0706/back.htm (1,906,786 weapons in NFRTR as of November 2006); Philip J. Cook & Jens Ludwig, National Institute of Justice, *Guns in America: National Survey on Private Ownership and Use of Firearms* 1 (May 1997), http://www.ncjrs.gov/pdffiles/165476.pdf ("nearly 200 million guns in private hands").

[20] Appellants' Supp. Br. 15.

[21] *See* Koper, *supra* n.18, at 10 (estimate 25 million guns take large capacity magazines); Cook & Ludwig, *supra* n.19 (200 million guns in private hands).

Dated: January 18, 2011　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　/s/ Paul R.Q. Wolfson

JONATHAN E. LOWY　　　　　　　　　PAUL R.Q. WOLFSON
DANIEL R. VICE　　　　　　　　　　　　*Counsel of Record*
BRADY CENTER TO PREVENT　　　　A. STEPHEN HUT, JR.
　GUN VIOLENCE　　　　　　　　　　JOSHUA M. SALZMAN
LEGAL ACTION PROJECT　　　　　　LAURA MORANCHEK HUSSAIN
1225 Eye Street, N.W., Suite 1100　　FRANCESCO VALENTINI
Washington, D.C. 20005　　　　　　WILMER CUTLER PICKERING
(202) 289-7319　　　　　　　　　　　　HALE AND DORR LLP
　　　　　　　　　　　　　　　　　　　1875 Pennsylvania Avenue, N.W.
　　　　　　　　　　　　　　　　　　　Washington, D.C. 20006
　　　　　　　　　　　　　　　　　　　(202) 663-6000
　　　　　　　　　　　　　　　　　　　paul.wolfson@wilmerhale.com

# CERTIFICATE OF SERVICE

I hereby certify that, on this 18th day of January, 2011, I electronically filed the foregoing Corrected Supplemental Brief for Amici Curiae Brady Center to Prevent Gun Violence, Hispanic American Police Command Officers Association, International Brotherhood of Police Officers, and National Black Police Association in Support of Appellees and Affirmance using the Court's CM/ECF system. I certify that the following counsel for the parties or *amici* are registered as ECF Filers and that they will be served electronically by the CM/ECF system:

Stephen P. Halbrook
Richard E. Gardiner
3925 Chain Bridge Road, Suite 403
Fairfax, VA 22030

Todd Sunhwae Kim
Donna M. Murasky
D.C. Office of the Solicitor General
441 4th Street, N.W.
One Judiciary Square, Sixth Floor
Washington, D.C. 20001

William J. Olson
Herbert W. Titus
John S. Miles
William J. Olson, P.C.
370 Maple Avenue W. Suite 4
Vienna, VA 22180

Matthew MacKinnon Shors
O'Melveny & Myers LLP
1625 Eye Street, NW, 10th Floor
Washington, D.C. 20006

/s/ Paul R.Q. Wolfson
PAUL R.Q. WOLFSON
WILMER CUTLER PICKERING
  HALE AND DORR LLP
1875 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
(202) 663-6000
paul.wolfson@wilmerhale.com
*Counsel for Amici Curiae*