# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

        *Plaintiff - Appellee,*

        v.

SEAN MASCIANDARO,

        *Defendant - Appellant.*

No. 09-4839

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, Senior District Judge.
(1:09-cr-00238-TSE-1)

Argued: December 8, 2010

Decided: March 24, 2011

Before WILKINSON and NIEMEYER, Circuit Judges,
and Patrick Michael DUFFY, Senior United States District
Judge for the District of South Carolina,
sitting by designation.

———————————————————

Affirmed by published opinion. Judge Niemeyer wrote the
opinion for the court, in which Judge Wilkinson and Senior
Judge Duffy joined except as to Part III.B. Judge Wilkinson
wrote the opinion for the court as to Part III.B, in which
Senior Judge Duffy joined. Judge Niemeyer wrote a separate
opinion as to Part III.B.

———————————————————

## COUNSEL

**ARGUED:** Antigone Gabriella Peyton, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, D.C., for Appellant. Jeffrey Zeeman, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** Michael S. Nachmanoff, Federal Public Defender, Rachel S. Martin, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Alexandria, Virginia; Matthew Levy, FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER, LLP, Washington, D.C., for Appellant. Neil H. MacBride, United States Attorney, Alexandria, Virginia, for Appellee.

---

## OPINION

NIEMEYER, Circuit Judge, writing for the court except as to Part III.B:

Sean Masciandaro was convicted of carrying or possessing a loaded handgun in a motor vehicle within a national park area, in violation of 36 C.F.R. § 2.4(b). He challenges his conviction on two grounds: (1) that he was improperly charged under § 2.4(b), because after he was arrested but before he was tried, that regulation was superseded by a more lenient regulation that provided for state law to govern the legality of his actions; or alternatively (2) that section 2.4(b) violates the Second Amendment as applied to him and facially.

Because we conclude that the holding in *United States v. Hark*, 320 U.S. 531 (1944), as well as the general federal savings statute, 1 U.S.C. § 109, denies defendants an automatic entitlement to the benefit of post-arrest changes in the law, we find that Masciandaro was properly tried under the law as it existed on the date of his arrest.

On Masciandaro's constitutional challenge, we conclude that Masciandaro's Second Amendment claim to a right to carry or possess a loaded handgun for self-defense is assessed under the intermediate scrutiny standard, and, even if his claim implicates the Second Amendment, a question we do not resolve here, it is defeated by applying that standard. We conclude that the government has amply shown that the regulation reasonably served its substantial interest in public safety in the national park area where Masciandaro was arrested. Thus, we hold that 36 C.F.R. § 2.4(b) is constitutional as applied to Masciandaro's conduct.

Although Masciandaro has also mounted a separate facial challenge to § 2.4(b), we conclude that this challenge is foreclosed by our determination that the regulation is constitutional on an as-applied basis.

Accordingly, we affirm.

I

On June 5, 2008, at about 10:00 a.m., United States Park Police Sergeant Ken Fornshill, who was conducting a routine patrol of Daingerfield Island, near Alexandria, Virginia, observed a Toyota hatchback parked illegally. The vehicle was parked parallel to the side of the parking lot, in violation of the sign indicating "Front End Parking Only." As Sgt. Fornshill approached the vehicle, he saw Masciandaro and his girlfriend sleeping inside and awoke them by tapping on the window. He asked Masciandaro for his driver's license, which Masciandaro produced from a messenger bag located in the vehicle's rear compartment. While Masciandaro was retrieving his license, Sgt. Fornshill noticed a large "machete-type" knife protruding from underneath the front seat, prompting him to ask Masciandaro whether there were any other weapons in the vehicle. When Masciandaro replied that he had a loaded handgun in the same bag, Sgt. Fornshill placed Masciandaro under arrest. Following a search, Fornshill uncov-

ered a loaded 9mm Kahr semiautomatic pistol, and at the police station, Masciandaro produced an expired Virginia concealed weapon carry permit.

Daingerfield Island, where Masciandaro was arrested, is not an island but an outcropping of land extending into the Potomac River near Alexandria. The area, which is managed by the National Park Service, is used for recreational purposes and includes a restaurant, marina, biking trail, wooded areas, and other public facilities.

Masciandaro was charged with "carrying or possessing a loaded weapon in a motor vehicle" within national park areas, in violation of 36 C.F.R. § 2.4(b), and failing to comply with a traffic control device (the parking sign), in violation of 36 C.F.R. § 4.12. These regulations were promulgated by the Secretary of the Interior under 16 U.S.C. § 3, which authorizes the Secretary to "make and publish such rules and regulations as he may deem necessary or proper for the use and management of the parks, monuments, and reservations under the jurisdiction of the National Park Service." Violations of these regulations are punishable by a fine of not more than $500 or imprisonment not exceeding six months, or both. *Id.*

At trial, Masciandaro explained that he carried the handgun for self-defense, as he frequently slept in his car while traveling on business, and that while traveling, he often kept cash, a laptop computer, and other valuables on hand. The place where Masciandaro was arrested on June 5, 2008, was 20 miles from his residence in Woodbridge, Virginia.

On April 30, 2008, slightly more than a month before Masciandaro was arrested, the Secretary of the Interior proposed a revision to 36 C.F.R. § 2.4, which was designed to harmonize the regulation of firearms in national parks with that by the States. *See* General Regulations for Areas Administered by the National Park Service and the Fish and Wildlife Service, 73 Fed. Reg. 23,388 (Apr. 30, 2008). The proposal

advocated adding a new provision to § 2.4 which would allow individuals to possess loaded, operable firearms within national parks whenever it was legal to do so under the laws of the state in which the park was located, so long as the individual was not otherwise prohibited from doing so by federal law. *Id.* On December 10, 2008 — six months after Masciandaro's arrest but less than two months before his trial — the Secretary published a final version of the regulation, to take effect January 9, 2009, which provided:

> Notwithstanding any other provision in this Chapter, a person may possess, carry, and transport concealed, loaded, and operable firearms within a national park area in accordance with the laws of the state in which the national park area, or that portion thereof, is located, except as otherwise prohibited by applicable Federal law.

73 Fed. Reg. 74,966, 74,971-72 (codified at 36 C.F.R. § 2.4(h)).

When 36 C.F.R. § 2.4(h) took effect, Masciandaro had not yet been tried, and he promptly filed a motion with the magistrate judge to dismiss the charges against him, arguing that § 2.4(h) had effectively superseded § 2.4(b). He also argued that, in any event, § 2.4(b) violated the Second Amendment, as applied to him and facially. The magistrate judge denied the motion to dismiss, and, on February 3, 2009, found Masciandaro guilty on both counts. The judge imposed a $150 fine on the handgun violation and a $50 fine on the parking violation. Masciandaro appealed only the conviction on the handgun charge to the district court.

On March 19, 2009, while Masciandaro's appeal to the district court was pending, the District Court for the District of Columbia issued a preliminary injunction, blocking enforcement of newly promulgated § 2.4(h), because the Department of the Interior had failed to conduct the required environmen-

tal impact analysis. *See Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C. 2009). Responding to this ruling, Congress promptly added language to an unrelated piece of legislation, which in essence reinstated § 2.4(h) by statute. *See* Credit Card Accountability Responsibility and Disclosure Act of 2009 ("Credit CARD Act"), codified at 16 U.S.C. § 1a-7b(b). Section 512 of the Credit CARD Act provides:

> The Secretary of the Interior shall not promulgate or enforce any regulation that prohibits an individual from possessing a firearm including an assembled or functional firearm in any unit of the National Park System or the National Wildlife Refuge System if —
>
> > (1) the individual is not otherwise prohibited by law from possessing the firearm; and
> >
> > (2) the possession of the firearm is in compliance with the law of the State in which the unit of the National Park System or the National Wildlife Refuge System is located.

16 U.S.C. § 1a-7b(b).

On appeal, the district court rejected Masciandaro's argument for application of § 2.4(h) in lieu of § 2.4(b) and affirmed the magistrate judge's ruling. *United States v. Masciandaro*, 648 F. Supp. 2d 779 (E.D. Va. 2009). Relying mainly on *United States v. Hark*, 320 U.S. 531 (1944), the court held that it was proper to try Masciandaro under the law as it existed at the time of his arrest. *Id.* at 784-85. Addressing the constitutionality of § 2.4(b), the court did not decide what level of scrutiny to apply but held that even applying strict scrutiny, the provision was narrowly tailored to serve the compelling governmental interest in public safety and thus was constitutional on an as-applied basis. *Id.* at 788-91. The

court rejected Masciandaro's facial challenge because he had not "demonstrat[ed] *from actual fact*" that a substantial number of instances exist in which § 2.4(b) could not be applied constitutionally. *Id.* at 792-94.

From the judgment of the district court, dated August 26, 2009, Masciandaro filed this appeal.

## II

Masciandaro contends first that he should not have been prosecuted under 36 C.F.R. § 2.4(b) because that provision was effectively superseded first by 36 C.F.R. § 2.4(h), a more permissive regulation making state law applicable, and then by § 512 of the Credit CARD Act, which effectively codified § 2.4(h). Section 2.4(h) was thus in effect when Masciandaro was tried before the magistrate judge and § 512 of the Credit CARD Act is in effect now. He maintains that a court must "apply the law in effect at the time it renders its decision." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 277 (1994) (quoting *Bradley v. Sch. Bd. of Richmond*, 416 U.S. 696, 711 (1974)).

Masciandaro does not dispute the fact that on June 5, 2008, he carried or possessed a loaded weapon in a motor vehicle within a national park. Nor does he dispute the fact that at the time he was arrested, 36 C.F.R. § 2.4(b) was in effect and prohibited such conduct. The question that arises is whether legal developments postdating his arrest undermined the government's ability to prosecute him under § 2.4(b).

The district court applied the Supreme Court's decision in *United States v. Hark*, 320 U.S. 531 (1944), to reject Masciandaro's argument. In *Hark*, the defendants violated beef pricing regulations promulgated during World War II pursuant to the Emergency Price Control Act of 1942. But after the defendants committed their acts and before they were arrested, the regulations were revoked. The Supreme Court

nonetheless rejected the defendants' argument that they were entitled to the benefit of the change in the law, holding that "revocation of [a] regulation d[oes] not prevent indictment and conviction for violation of its provisions at a time when it remained in force." 320 U.S. at 536. As it explained:

> The reason for the common law rule that the repeal of a statute ends the power to prosecute for prior violations is absent in the case of a prosecution for violation of a regulation issued pursuant to an existing statute which expresses a continuing policy, to enforce which the regulation was authorized. Revocation of the regulation does not repeal the statute; and though the regulation calls the statutory penalties into play, the statute, not the regulation, creates the offense and imposes punishment for its violation.

*Id.* (citing *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936)) (footnote omitted). The Court held that because the Emergency Price Control Act had remained in effect, the fact that the beef pricing regulations promulgated under the Act had been revoked did not preclude the prosecution for an offense that occurred while the regulations were in force.

As in *Hark*, the regulation at issue here was promulgated pursuant to an enabling statute that permitted the Secretary of the Interior to issue rules in furtherance of a specific objective. In *Hark*, the Emergency Price Control Act authorized the Price Administrator to establish "by regulation . . . maximum prices" of a variety of goods so as to prevent profiteering, *see* Emergency Price Control Act of 1942, § § 1(a), 2(a), 56 Stat. 23, 23-24 (1942), whereas the enabling statute here, 16 U.S.C. § 3, provided the Secretary of the Interior with the power to issue regulations "necessary . . . for the use and management of the parks . . . under the jurisdiction of the National Parks Service." Both statutes made it a crime to violate the regulations, and both set forth specific penalties for violations. *Com-*

*pare* Emergency Price Control Act of 1942, § 4(a), 56 Stat. 23, 28 ("It shall be unlawful . . . for any person to sell or deliver any commodity . . . in violation of any regulation or order under section 2"), and *id.* § 205(a)-(b), 56 Stat. 23, 33 (authorizing fines of up to $5,000 or imprisonment for up to two years for willful violations), *with* 16 U.S.C. § 3 ("[A]ny violation of any of the rules and regulations authorized by this [Act] shall be punished by a fine of not more than $500 or imprisonment for not exceeding six months, or both . . .").

Masciandaro claims that *Hark* is distinguishable because 16 U.S.C. § 3 does not "contain substantive provisions directly restricting or prohibiting certain conduct," as did the Emergency Price Control Act. This argument, however, is unpersuasive because it treats what are actually differences in degree as differences in kind. Both laws attach specific criminal penalties to actions that violate regulations issued by an Executive Branch official. They differ, however, in the specificity with which they describe the offending conduct — the Emergency Price Control Act made it unlawful to *sell or deliver commodities* in violation of a regulation's terms, as specified by the Price Administrator, while 16 U.S.C. § 3 makes it unlawful to violate a regulation adopted *for the use and management of national parks*, as specified by the Secretary of the Interior. Thus, both create an offense and both depend on implementing regulations to "call[ ] the statutory [offense] into play." *Hark*, 320 U.S. at 536. We thus conclude, as did the district court, that Masciandaro's effort to distinguish *Hark* falls short and that *Hark* is controlling.

Masciandaro suggests that *Hark* is also distinguishable insofar as it depended on the continuing vitality of the underlying enabling statute. *See Hark*, 320 U.S. at 536 ("Revocation of [a] regulation does not repeal the statute; and though the regulation calls the statutory penalties into play, the statute, not the regulation, creates the offense and imposes punishment for its violation"). He claims that in this case, with the enactment of the Credit CARD Act, "Congress

expressly withdrew the authority to enforce the superseded [National Parks Service] regulation against Mr. Masciandaro and other citizens who are similarly situated." He explains, the Credit CARD Act "states that the Secretary of the [Interior] (through the Park Police and local United States Attorneys' offices) *shall* not '*enforce any regulation* that prohibits an individual from possessing a firearm including an assembled or functional firearm in any unit of the National Parks System' if that individual is acting in conformance with state laws regulating that weapon." Thus, he argues, while *Hark* applies when a regulation, but not the authorizing statute, has been revoked, it does not apply when *both* the regulation *and* the authorizing statute have been eliminated, as, he asserts, occurred here.

While it is true that the Credit CARD Act prohibited the Secretary of the Interior from enforcing a regulation such as § 2.4(b) in certain circumstances, that Act did not modify or revoke 16 U.S.C. § 3, which authorized, and continues to authorize, the Secretary of the Interior generally to issue national park regulations that are enforceable by a fine or imprisonment or both. If we accept the argument that the Credit CARD Act somehow repealed a portion of 16 U.S.C. § 3 by implication by limiting the Secretary of the Interior's authority, the original form of the authorizing statute would nonetheless be saved under the general savings statute, 1 U.S.C. § 109, which provides:

> The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

This provision reversed the common-law rule, under which the repeal of a criminal law "preclude[d] punishment for acts

antedating the repeal." *Landgraf*, 511 U.S. at 271; *see also Yeaton v. United State*s, 9 U.S. (5 Cranch) 281, 283 (1809) (holding that when a criminal statute expires or is repealed, "no penalty can be enforced, nor punishment inflicted, for violations of the law committed while it was in force, unless some special provision be made for that purpose by statute").

Accordingly, "unless [a] repealing statute explicitly provides otherwise, the repeal of a criminal statute neither abates the underlying offense nor affects its attendant penalties with respect to acts committed prior to repeal." *United States v. Bradley*, 455 F.2d 1181, 1190 (1st Cir. 1972), *aff'd* 410 U.S. 605 (1973). This principle extends to criminal laws as well as to regulations which implement them. *Allen v. Grand Cent. Aircraft Co.*, 347 U.S. 535, 554-55 (1954) (interpreting the savings statute to "prevent the expiration of a . . . statute from cutting off appropriate measures to enforce the expired statute in relation to violations of it, *or of regulations issued under it*, occurring before its expiration" (emphasis added)). Thus, even if it were the case that both the criminal regulation and its enabling act were found to have been repealed, the savings statute would nonetheless preserve the government's authority to prosecute pre-repeal conduct covered by the regulation. *Id.*

While Masciandaro does argue that Congress eliminated the Secretary's power to restrict firearm possession under 16 U.S.C. § 3 by enacting § 512 of the Credit CARD Act, he has not pointed to any language in § 512 "explicitly provid[ing]," as required by *Bradley*, that the savings statute does not apply. Indeed, the new law makes no mention of 1 U.S.C. § 109 or existing prosecutions. Because there is no explicit language in § 512 of the Credit CARD Act avoiding application of the savings statute, the savings statute's default rule applies. *See Bradley*, 455 F.2d at 1190. And under that rule, the government retains the ability to prosecute previous violations of 16 U.S.C. § 3 or of any "regulations issued under" that provision, such as 36 C.F.R. § 2.4(b). *Allen*, 347 U.S. at 554.

In sum, we conclude that Masciandaro was properly prosecuted under 36 C.F.R. § 2.4(b), the law applicable at the time of his arrest.

### III

We now turn to Masciandaro's constitutional challenge to 36 C.F.R. § 2.4(b). Masciandaro contends that the Second Amendment, as construed by the Supreme Court in its "watershed" decision in *Dist. of Columbia v. Heller*, 128 S. Ct. 2783 (2008), guaranteed to him the right to possess and carry weapons in case of confrontation and thus protected him from prosecution under § 2.4(b) for exercising that right in a national park area. He explains that

> [H]e travels extensively because of his small business and is frequently forced to sleep in his car while he is on the road. He has a Second Amendment right to keep a loaded handgun in the back of his car for the purpose of self-defense and defense of the valuable business property, cash, and personal property he carries with him in the car.

Masciandaro points out that his handgun is the "quintessential self-defense weapon" and that he is exactly the type of "law-abiding citizen" who is the primary intended beneficiary of the Second Amendment's protections.

The government maintains that the holding of *Heller* is inapplicable here. It argues:

> In *Heller*, the Supreme Court held that the District of Columbia law that "totally ban[ned] handgun possession in the home" and prohibit[ed] rendering any lawful firearm in the house operable for the purpose of immediate self-defense violated the Second Amendment. Because the Supreme Court's decision is limited to the possession of firearms in the home,

it does not invalidate the regulation at issue, which narrowly involves only the possession of a loaded firearm in a motor vehicle on National Park Service land.

Both parties are correct, albeit incomplete, in their descriptions of the holding in *Heller*, yet both disagree on the scope of the constitutional right articulated there. Thus, in resolving Masciandaro's constitutional challenge, we will begin with a discussion of *Heller*'s holding and then proceed to address, *seriatim*, the scope of the Second Amendment right to keep and bear arms; the scrutiny that is applied in determining whether a regulation of firearms in national parks is justified; the question of whether a national park is a "sensitive place" where prohibiting firearms is a presumptively lawful regulatory measure; and the application of our conclusions to Masciandaro's circumstances.

## A

The Second Amendment states, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

Resolving the longstanding issue whether the Second Amendment guarantees an *individual* right to keep and bear arms or a *collective* right to do so in connection with militia service, the Supreme Court in *Heller* held, based on "the historical background of the Second Amendment," that the Amendment guarantees the "pre-existing" "individual right to possess and carry weapons in case of confrontation." *Heller*, 128 S. Ct. at 2797 (emphasis omitted). Because the right predated the Constitution, the Court looked to the historical record when articulating its nature, noting that the right was secured to individuals according to "'libertarian political principles,' not as members of a fighting force," to "protect[ ] against both public and private violence." *Id.* at 2798-99. It

also observed that throughout the country's history, Americans have valued the right not only to be able to prevent the elimination of militia, but "even more important[ly], for self-defense and hunting." *Id.* at 2801.

Considering the constitutionality of a District of Columbia statute that prohibited private citizens from possessing handguns and required other legal firearms, such as long guns, to be stored in a fashion that rendered them inoperable, the Court held that the statute violated the Second Amendment, stating:

> The handgun ban amounts to a prohibition of an entire class of arms that is overwhelmingly chosen by American society for that lawful purpose. The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute. Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home the most preferred firearm in the nation to keep and use for protection of one's home and family, would fail constitutional muster.
>
> * * *
>
> We must also address the District's requirement (as applied to respondent's handgun) that firearms in the home be rendered and kept inoperable at all times. This makes it impossible for citizens to use them for the core lawful purpose of self-defense and is hence unconstitutional.

*Heller*, 128 S. Ct. at 2817-18 (internal quotation marks, footnote, and citation omitted).

But in reaching its holding, the Court did not define the outer limits of the Second Amendment right to keep and bear

arms. It did point out, however, that the right was "not unlim-
ited, just as the First Amendment's right of free speech was
not." *Id.* at 2799; *see also id.* at 2816 (noting that the right
was not "a right to keep and carry any weapon whatsoever in
any manner whatsoever and for whatever purpose"). Illustrat-
ing this point, the Court related that a majority of the
19th-century courts that considered prohibitions on carrying
concealed weapons held them to be lawful under the Second
Amendment. *Id.* at 2816. It summarized:

> Although we do not undertake an exhaustive histori-
> cal analysis today of the full scope of the Second
> Amendment, nothing in our opinion should be taken
> to cast doubt on longstanding prohibitions on the
> possession of firearms by felons and the mentally ill,
> or laws forbidding the carrying of firearms in sensi-
> tive places such as schools and government build-
> ings, or laws imposing conditions and qualifications
> on the commercial sale of arms.

*Id.* at 2816-17. The Court explained in a footnote that it was
identifying these "presumptively lawful regulatory measures
only as examples." *Id.* at 2817 n.26.

Not only did the *Heller* Court not define the outer limits of
Second Amendment rights, it also did not address the level of
scrutiny that should be applied to laws that burden those
rights. It found it unnecessary to do so because the District of
Columbia law under consideration would violate the Second
Amendment "[u]nder any of the standards of scrutiny that we
have applied to enumerated constitutional rights." *Id.* at 2817.

Two years after deciding *Heller*, the Supreme Court revis-
ited the Second Amendment in *McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010), holding that the Second Amendment
was applicable to the States by incorporation into the Four-
teenth Amendment. Explaining *Heller* further, the *McDonald*
Court stated that "self-defense is the central component" of

the individual right to keep and bear arms and that this right is "fundamental." *Id.* at 3036, 3038 n.17 (plurality opinion) (emphasis omitted). *McDonald* also reaffirmed that Second Amendment rights are far from absolute, reiterating that *Heller* had "assur[ed]" that many basic handgun regulations were presumptively lawful. In a similar vein, the *McDonald* Court noted that the doctrine of "incorporation does not imperil every law regulating firearms." *Id.* at 3047.

The upshot of these landmark decisions is that there now exists a clearly-defined fundamental right to possess firearms for self-defense within the home. But a considerable degree of uncertainty remains as to the scope of that right beyond the home and the standards for determining whether and how the right can be burdened by governmental regulation.

NIEMEYER, Circuit Judge, writing separately on this Part III.B:

## B

Invoking *Heller*'s direct holding, Masciandaro argues that because he regularly slept in his car, as much as three to five days a week while traveling on business, his arrest for carrying or possessing a handgun ran afoul of *Heller*'s core protection of the right "to use arms in defense of hearth and home." *Heller*, 128 S. Ct. at 2821. Alternatively, he contends that if his car is found not to be his home, his arrest nonetheless violated a more general right to carry or possess a handgun outside of the home for self-defense.

I would reject Masciandaro's argument that his car, even when he slept in it frequently, was his "home" so as to fall within the core protection articulated in *Heller*. In the circumstances where Masciandaro had a residence in Woodbridge, Virginia, which was only 20 miles from where he was found sleeping by Sgt. Fornshill, and the place where he was found sleeping was a *public* parking place, we need not explore fur-

ther the factors essential to making a place a person's home for *Heller*'s core protection. I would conclude, in the circumstances of this case, that Masciandaro's car was not his home.

Masciandaro also argues that he possessed a constitutional right to possess a loaded handgun for self-defense outside the home. I would agree that there is a plausible reading of *Heller* that the Second Amendment provides such a right, at least in some form.

The *Heller* Court began by noting that the right predated the Constitution and always was an important part of individual freedom — one of "the fundamental rights of Englishmen." *Heller*, 128 S. Ct. at 2798. It found that the right included the right to "protect[] [oneself] against both *public* and private violence," *id.* at 2799 (emphasis added), thus extending the right in some form to wherever a person could become exposed to public or private violence. *See also id.* at 2797 (finding that the Second Amendment's operative clause "guarantee[s] the individual right to possess and carry weapons in case of confrontation"). Because "self-defense has to take place wherever [a] person happens to be," it follows that the right extends to public areas beyond the home. *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 U.C.L.A. L. Rev. 1443, 1515-18 (2009) [hereinafter "*Implementing the Right for Self-Defense*"]. Moreover, the right to keep and bear arms was found to have been understood to exist not only for self-defense, but also for membership in a militia and for hunting, *id.* at 2801, neither of which is a home-bound activity. Indeed, one aspect of the right, as historically understood, was "to secure the ideal of a *citizen* militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.* at 2801 (emphasis added).

Consistent with the historical understanding of the right to keep and bear arms outside the home, the *Heller* Court's

description of its actual holding also implies that a broader right exists. The Court stated that its holding applies to the home, where the need "for defense of self, family, and property *is most acute*," *Heller*, 128 S. Ct. at 2817 (emphasis added), suggesting that some form of the right applies where that need is not "most acute." Further, when the Court acknowledged that the Second Amendment right was not unlimited, it listed as examples of regulations that were presumptively lawful, those "laws forbidding the carrying of firearms in sensitive places such as *schools and government buildings*." *Id.* If the Second Amendment right were confined to self-defense *in the home*, the Court would not have needed to express a reservation for "sensitive places" outside of the home.

What the *Heller* Court describes as the general preexisting right to keep and bear arms for participation in militias, for self-defense, and for hunting is thus not strictly limited to the home environment but extends in some form to wherever those activities or needs occur, just as other Amendments apply generally to protect other individual freedoms. But I would not conclude that the right is all-encompassing such that it extends to all places or to all persons, as the Supreme Court has explicitly recognized. *See Heller*, 128 S. Ct. at 2816-17. The complex question of where it may apply outside the home, and what persons may invoke it, is, however, not one that we need to fully answer, because it appears sufficiently clear that, *in this case*, Masciandaro's claim to self-defense — asserted by him as a law-abiding citizen sleeping in his automobile in a public parking area — does implicate the Second Amendment, albeit subject to lawful limitations. And any analysis of it, therefore, requires review of the government's interest in regulating firearms through 36 C.F.R. § 2.4(b) under the appropriate level of scrutiny, which we now address.*

---

*In his opinion for the court, my good colleague concludes that we need not decide whether Masciandaro's Second Amendment rights were impli-

NIEMEYER, Circuit Judge, writing for the court:

## C

Masciandaro argues that § 2.4(b) should be analyzed under strict scrutiny, because at the time of his arrest, he was a law-abiding citizen who was simply seeking to exercise his "fundamental" right to self-defense.

Without responding to Masciandaro's argument directly, the government asserts that § 2.4(b) satisfies the strict scrutiny standard, as it is narrowly tailored to advance a compelling government interest in public safety. In making this argument, however, we do not understand the government to be taking a specific position on the level of scrutiny to apply.

---

cated outside the home. But, I respectfully note, this is not the type of case where constitutional avoidance is appropriate. First, we are confronted directly with the contention that 36 C.F.R. § 2.4(b) violated Masciandaro's Second Amendment right to possess a firearm for self-defense purposes, and, having found that § 2.4(b) applies, we cannot duck the issue. *See Bowers v. NCAA*, 475 F.3d 524, 550 (3d Cir. 2007) (observing that the court was "squarely presented with [a] constitutional question" and thus "obliged to enter the fray," despite the "prudential concerns" expressed by Justice Brandeis' concurrence in *Ashwander v. TVA*, 297 U.S. 288, 347 (1936)). Applying intermediate scrutiny to reject Masciandaro's claim does not avoid the constitutional question — it presumes the existence of the constitutional right and conducts a constitutional analysis to defeat it. As I have written, I would acknowledge that Masciandaro's claim, in the particular circumstances of this case, implicates the Second Amendment, leading us to reject the claim under the intermediate scrutiny standard.

Second, I believe that application of the broader Second Amendment right discussed in *Heller* to factual settings arising outside the home involves precisely the kind of "difficult issue[ ]" the Supreme Court prefers to "mature through full consideration by the courts of appeals." *E. I. Du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 135 n.26 (1977); *see United States v. Mendoza*, 464 U.S. 154, 160 (1984). Thus, while determining when and where the Second Amendment applies is every bit as complex as Judge Wilkinson suggests, I feel it both necessary and important to address the circumstances presented here.

In *Heller*, the Supreme Court expressly avoided deciding what level of scrutiny should be applied when reviewing a law burdening the right to keep and bear arms, *see Heller*, 128 S. Ct. at 2817, 2821, because it concluded that the District of Columbia's handgun ban under consideration before it "would fail constitutional muster" "[u]nder *any* of the standards of scrutiny [traditionally] applied to enumerated constitutional rights," *id.* at 2817-18 (emphasis added). The Court did, however, rule out a rational basis review, because that level of review "would be redundant with the separate constitutional prohibitions on irrational laws." *Id.* at 2817 n.27. Moreover, by listing several "presumptively lawful regulatory measures," *id.* at 2816-17 & n.26, the Court provided a hint as to the types of governmental interests that might be sufficient to withstand Second Amendment challenges, as well as the contexts in which those interests could be successfully invoked.

We have held that intermediate scrutiny should be applied when reviewing a Second Amendment challenge to 18 U.S.C. § 922(g)(9), which prohibits the possession of firearms by a person convicted of a misdemeanor crime of domestic violence. *United States v. Chester*, 628 F.3d 673, 677 (4th Cir. 2010). In *Chester*, officers searching Chester's home in West Virginia uncovered a 12-gauge shotgun and a 9mm handgun, both of which Chester was prohibited from possessing under § 922(g)(9) because he had a prior misdemeanor conviction for domestic violence. In response to Chester's challenge, we concluded that the scope of the Second Amendment extended to Chester's activity in possessing firearms in the home for self-defense and that the burden on possession of the firearms imposed by § 922(g)(9) was subject to intermediate scrutiny. We explained:

> Although Chester asserts his right to possess a firearm in his home for the purpose of self-defense, we believe his claim is not within the core right identified in *Heller* — the right of a *law-abiding*, *responsible* citizen to possess and carry a weapon for

self-defense — by virtue of Chester's criminal his-
tory as a domestic violence misdemeanant. Accord-
ingly, we conclude that intermediate scrutiny is more
appropriate than strict scrutiny for Chester and simi-
larly situated persons.

*Id.* at 682-83; *see also United States v. Marzzarella*, 614 F.3d
85, 97 (3d Cir. 2010) (applying intermediate scrutiny under
the Second Amendment to 18 U.S.C. § 922(k), which prohib-
its the possession of firearms with obliterated serial numbers).

In the case before us, Masciandaro was a law-abiding citi-
zen at the time of his arrest, without any criminal record,
whereas in *Chester*, the defendant was a domestic violence
misdemeanant. On the other hand, Chester was in his home,
where the core *Heller* right applies, whereas Masciandaro was
in a public park. These different contexts might call for differ-
ent judicial approaches. *See United States v. Yancey*, 621 F.3d
681, 683 (7th Cir. 2010). Indeed, as has been the experience
under the First Amendment, we might expect that courts will
employ different types of scrutiny in assessing burdens on
Second Amendment rights, depending on the character of the
Second Amendment question presented. Under such an
approach, we would take into account the nature of a person's
Second Amendment interest, the extent to which those inter-
ests are burdened by government regulation, and the strength
of the government's justifications for the regulation. *See
United States v. Skoien*, 587 F.3d 803, 809 (7th Cir. 2009),
*vacated*, 614 F.3d 638 (7th Cir. 2010) (en banc), *pet. for cert.
filed*, No. 10-7005 (U.S. Oct. 12, 2010). As we stated in *Ches-
ter*:

The Second Amendment is no more susceptible to a
one-size-fits-all standard of review than any other
constitutional right. Gun-control regulations impose
varying degrees of burden on Second Amendment
rights, and individual assertions of the right will
come in many forms. A severe burden on the core

Second Amendment right of armed self-defense should require strong justification. But less severe burdens on the right, laws that merely regulate rather than restrict, and laws that do not implicate the central self-defense concern of the Second Amendment, may be more easily justified.

*Chester*, 628 F.3d at 682 (quoting *Skoien*, 587 F.3d at 813-14).

As we observe that any law regulating the content of speech is subject to strict scrutiny, *see, e.g.*, *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 813 (2000), we assume that any law that would burden the "fundamental," core right of self-defense in the home by a law-abiding citizen would be subject to strict scrutiny. But, as we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense. *See Heller*, 128 S. Ct. at 2816 (noting that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues"). Since historical meaning enjoys a privileged interpretative role in the Second Amendment context, *see id.* at 2816; *Skoien*, 587 F.3d at 809, this longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable. Indeed, one of the principal cases relied upon in *Heller* upheld a state concealed carry ban after applying review of a decidedly less-than-strict nature. *See Nunn v. State*, 1 Ga. 243, 249 (1846) ("But a law which is merely intended to promote personal security, and to put down lawless aggression and violence, and to this end prohibits the wearing of certain weapons in such a manner as is calculated to exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others, does not come in collision with the Constitution").

Were we to require strict scrutiny in circumstances such as those presented here, we would likely foreclose an extraordinary number of regulatory measures, thus handcuffing lawmakers' ability to "prevent[ ] armed mayhem" in public places, *see Skoien*, 614 F.3d at 642, and depriving them of "a variety of tools for combating that problem," *Heller*, 128 S. Ct. at 2822. While we find the application of strict scrutiny important to protect the core right of the self-defense of a law-abiding citizen in his home ("where the need for defense of self, family, and property is most acute," *Heller*, 128 S. Ct. at 2817), we conclude that a lesser showing is necessary with respect to laws that burden the right to keep and bear arms outside of the home. Accordingly, we hold that 36 C.F.R. § 2.4(b) will survive Masciandaro's as-applied challenge if it satisfies intermediate scrutiny — *i.e.*, if the government can demonstrate that § 2.4(b) is reasonably adapted to a substantial governmental interest. *See Chester*, 628 F.3d at 683; *cf. Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (applying intermediate scrutiny to content-neutral time, place, and manner restrictions on speech); *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989) (applying intermediate scrutiny to commercial speech in light of its "subordinate position in the scale of First Amendment values").

### D

Perhaps to avoid being required to carry any burden to justify its firearms regulations in national parks, which are properties owned and managed by the government, the government contends that 36 C.F.R. § 2.4(b) is a law regulating firearms in "sensitive places," as identified in *Heller*, 128 S. Ct. at 2816-17, and therefore is *presumptively* constitutional, *see id.* 2817 n.26. Arguing that Daingerfield Island is a sensitive place, the government states that

> a large number of people, including children, congregate in National Parks for recreational, educa-

tional and expressive activities. Park land is not akin to a gun owner's home and is far more analogous to other public spaces, such as schools, municipal parks, governmental buildings, and appurtenant parking lots, where courts have found firearms restrictions to be presumptively reasonable. Furthermore, as the district court noted, the locations within the National Parks where motor vehicles travel are even more sensitive, given that they are extensively regulated thoroughfares frequented by large numbers of strangers, including children.

It argues that in these circumstances, the law is presumptively "narrowly tailored to advance the compelling government interest" in public safety.

Masciandaro contends that the parking lot at Daingerfield Island was not a "sensitive place" like a school or governmental building, as referenced to in *Heller*. He argues:

The George Washington Memorial Parkway, where [he] was charged with violation of the superseded [National Park Service] weapons regulation, is a public road and a major traffic thoroughfare in the Washington metropolitan area and is not a sensitive place . . . .

* * *

There is a patchwork of regulations that allow people to use and possess weapons on NPS land, including parkways and remote forests and parks across the United States. Those regulations reflect the [Department of Interior's] determination that NPS land is not sensitive, as a general matter. Indeed, the very same NPS regulation [36 C.F.R. § 2.4] that prohibits possession of loaded weapons in motor vehicles indicates that it is lawful to hunt with weapons, use

> them for target practice, have them in residential
> dwellings, use them for research activities, and carry
> them for protection in "pack trains" or on trail rides,
> all on NPS land.

(*Citing* 73 Fed. Reg. 74,966, 74,971 (Dec. 10, 2008)). Masciandaro points out that the National Park Service itself "has explicitly distinguished between the sorts of 'sensitive places' mentioned in *Heller* (schools and government buildings) on one hand and national parks on the other" when it explained that "nothing in [36 C.F.R. § 2.4] shall be construed to authorize concealed carry of firearms in any *Federal facility or Federal court facility* as defined in 18 U.S.C. § 930." 73 Fed. Reg. at 74,971 (emphasis added).

These arguments raise the question whether the "sensitive places" doctrine limits the scope of the Second Amendment or, instead, alters the analysis for its application to such places.

The Supreme Court in *Heller* did state twice that the Second Amendment's right to bear arms was "not unlimited." *See* 128 S. Ct. at 2799, 2816. For example, it stated:

> Like most rights, *the right* secured by the Second
> Amendment *is not unlimited*. . . . Although we do
> not take an exhaustive historical analysis today of
> the *full scope* of the Second Amendment, nothing in
> our opinion should be taken to cast doubt on . . .
> laws forbidding the carrying of firearms in sensitive
> places such as schools and government buildings.

*Id.* at 2816-17 (emphasis added). Because of the relation between the first statement and the examples, one might conclude that a law prohibiting firearms in a sensitive place would fall *beyond the scope* of the Second Amendment and therefore would be subject to no further analysis. But the Court added a footnote to its language, calling these regula-

tory measures "*presumptively* lawful." *Id.* at 2817 n.26 (emphasis added). The Court's use of the word "presumptively" suggests that the articulation of sensitive places may not be a limitation *on the scope* of the Second Amendment, but rather on the analysis to be conducted with respect to the burden on that right.

The arguments of counsel about the meaning of the "sensitive places" language raise difficult questions about the scope of the Second Amendment and the scrutiny to be given to government regulations in sensitive places. In *Chester*, we explained the ambiguity inherent in these questions:

> Having acknowledged that the scope of the Second Amendment is subject to historical limitations, the Court cautioned that *Heller* should not be read "to cast doubt on longstanding prohibitions" such as . . . "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." [*Heller*, 128 S. Ct.] at 2816-17. *Heller* described its exemplary list of "longstanding prohibitions" as "presumptively lawful regulatory measures," *id.* at 2817 n.26, without alluding to any historical evidence that the right to keep and bear arms did not extend to . . . the conduct prohibited by any of the listed gun regulations. It is unclear to us whether *Heller* was suggesting that "longstanding prohibitions" such as these were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason.

*Chester*, 628 F.3d at 679. In *Marzzarella*, the Third Circuit labored over the same ambiguity:

> We recognize the phrase "presumptively lawful" could have different meanings under newly enunciated Second Amendment doctrine. On the one hand,

this language could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because they pass muster under any standard of scrutiny.

*Marzzarella*, 614 F.3d at 91.

We need not, however, resolve the ambiguity in the "sensitive places" language in this case, because even if Daingerfield Island is not a sensitive place, as Masciandaro argues, 36 C.F.R. § 2.4(b) still passes constitutional muster under the intermediate scrutiny standard.

## E

In reaching this result, we conclude first that the government has a substantial interest in providing for the safety of individuals who visit and make use of the national parks, including Daingerfield Island. Although the government's interest need not be "compelling" under intermediate scrutiny, cases have sometimes described the government's interest in public safety in that fashion. *See Schenck v. Pro-Choice Network*, 519 U.S. 357, 376 (1997) (referring to the "significant governmental interest in public safety"); *United States v. Salerno*, 481 U.S. 739, 745 (1987) (commenting on the "Federal Government's compelling interests in public safety"). The government, after all, is invested with "plenary power" to protect the public from danger on federal lands under the Property Clause. *See* U.S. Const. art. IV, § 3, cl. 2 (giving Congress the power to "make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States"); *Utah Div. of State Lands v. United States*, 482 U.S. 193, 201 (1987); *Camfield v. United States*, 167 U.S. 518, 525 (1897); *see also United States v. Dorosan*, 350 Fed. App'x 874, 875 (5th Cir. 2009) (per curiam) (noting that U.S. Postal Service is authorized under the Property Clause to

exclude firearms from its property); Volokh, *Implementing the Right for Self-Defense*, 56 U.C.L.A. L. Rev. at 1529-33. As the district court noted, Daingerfield Island is a national park area where large numbers of people, including children, congregate for recreation. *See Masciandaro*, 648 F. Supp. 2d at 790. Such circumstances justify reasonable measures to secure public safety.

We also conclude that § 2.4(b)'s narrow prohibition is reasonably adapted to that substantial governmental interest. Under § 2.4(b), national parks patrons are prohibited from possessing *loaded* firearms, and only then within their motor vehicles. 36 C.F.R. § 2.4(b) ("Carrying or possessing a loaded weapon in a motor vehicle, vessel, or other mode of transportation is prohibited"). We have no occasion in this case to address a regulation of unloaded firearms. Loaded firearms are surely more dangerous than unloaded firearms, as they could fire accidentally or be fired before a potential victim has the opportunity to flee. The Secretary could have reasonably concluded that, when concealed within a motor vehicle, a loaded weapon becomes even more dangerous. In this respect, § 2.4(b) is analogous to the litany of state concealed carry prohibitions specifically identified as valid in *Heller*. *See* 128 S. Ct. at 2816-17.

By permitting park patrons to carry unloaded firearms within their vehicles, § 2.4(b) leaves largely intact the right to "possess and carry weapons in case of confrontation." *Heller*, 128 S. Ct. at 2797. While it is true that the need to load a firearm impinges on the need for armed self-defense, *see* Volokh, *Implementing the Right for Self-Defense*, 56 U.C.L.A. L. Rev. at 1518-19, intermediate scrutiny does not require that a regulation be the least intrusive means of achieving the relevant government objective, or that there be no burden whatsoever on the individual right in question. *See United States v. Baker*, 45 F.3d 837, 847 (4th Cir. 1995). Moreover, because the United States Park Police patrol Daingerfield Island, the Sec-

retary could conclude that the need for armed self-defense is less acute there than in the context of one's home.

Accordingly, we hold that, on Masciandaro's as-applied challenge under the Second Amendment, § 2.4(b) satisfies the intermediate scrutiny standard.

## IV

In view of our determination that 36 C.F.R. § 2.4(b) is constitutional under the Second Amendment as applied to Masciandaro, *a priori* we reject his facial overbreath challenge to § 2.4(b).

Without entertaining the novel notion that an overbreath challenge could be recognized "outside the limited context of the First Amendment," *Salerno*, 481 U.S. at 745, we conclude that a person, such as Masciandaro, to whom a statute was constitutionally applied, "will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973). This conclusion "reflect[s] the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws." *Id.* at 610-11; *see also Gonzales v. Carhart*, 550 U.S. 124, 167-68 (2007) ("It is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop. . . . For this reason, '[a]s-applied challenges are the basic building blocks of constitutional adjudication'" (quoting Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 Harv. L. Rev. 1321, 1328 (2000))); *Skoien*, 614 F.3d at 645 ("[a] person to whom a statute properly applies [cannot] obtain relief based on arguments that a differently situated person might present"). Accordingly, we reject his facial challenge.

* * *

Because we conclude that 36 C.F.R. § 2.4(b) was properly applied to Masciandaro's conduct and that § 2.4(b) is constitutional as applied to the circumstances in this case, we affirm the judgment of the district court.

*AFFIRMED*

WILKINSON, Circuit Judge, with whom DUFFY, Senior District Judge, joins, writing for the court as to Part III.B:

We are pleased to join Judge Niemeyer's fine opinion with the exception of Part III.B. In our view it is unnecessary to explore in this case the question of whether and to what extent the Second Amendment right recognized in *Heller* applies outside the home.

This case underscores the dilemma faced by lower courts in the post-*Heller* world: how far to push *Heller* beyond its undisputed core holding. On the question of *Heller*'s applicability outside the home environment, we think it prudent to await direction from the Court itself. *See Williams v. State*, 10 A.3d 1167, 1177 (Md. 2011) ("If the Supreme Court, in [*McDonald*'s] dicta, meant its holding to extend beyond home possession, it will need to say so more plainly."); *see also Sims v. United States*, 963 A.2d 147, 150 (D.C. 2008).

There may or may not be a Second Amendment right in some places beyond the home, but we have no idea what those places are, what the criteria for selecting them should be, what sliding scales of scrutiny might apply to them, or any one of a number of other questions. It is not clear in what places public authorities may ban firearms altogether without shouldering the burdens of litigation. The notion that "self-defense has to take place wherever [a] person happens to be," Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a*

*Research Agenda*, 56 UCLA L. Rev. 1443, 1515 (2009), appears to us to portend all sorts of litigation over schools, airports, parks, public thoroughfares, and various additional government facilities. And even that may not address the place of any right in a private facility where a public officer effects an arrest. The whole matter strikes us as a vast *terra incognita* that courts should enter only upon necessity and only then by small degree.

There is no such necessity here. We have no reason to expound on where the *Heller* right may or may not apply outside the home because, as Judge Niemeyer ably explains, intermediate scrutiny of any burden on the alleged right would plainly lead the court to uphold the National Park Service regulation.

The trend toward constitutional avoidance seems, finally, to be taking hold. *Ashwander*, at long last, is back. *See Ashwander v. TVA*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring). The seminal case seems to be *Pearson v. Callahan*, 129 S. Ct. 808 (2009), which cut back on *Saucier v. Katz*, 533 U.S. 194 (2001), and relieved the circuit courts of the need and burden of deciding constitutional questions in cases that could be resolved on narrower grounds. Just as the qualified immunity inquiry in that case could assume arguendo the violation of a constitutional right, so too can the application of intermediate scrutiny in this case assume arguendo the existence of a right. Courts take this approach routinely in harmless error determinations as well.

Sometimes saying a little less, rather than a little more, is a nice way to discharge our primary responsibility to the parties before us of deciding their case. At other times, of course, the need for clarity and guidance in future cases is paramount, but in this instance we believe the most respectful course is to await that guidance from the nation's highest court.

There simply is no need in this litigation to break ground that our superiors have not tread. To the degree that we push

the right beyond what the Supreme Court in *Heller* declared to be its origin, we circumscribe the scope of popular governance, move the action into court, and encourage litigation in contexts we cannot foresee. This is serious business. We do not wish to be even minutely responsible for some unspeakably tragic act of mayhem because in the peace of our judicial chambers we miscalculated as to Second Amendment rights. It is not far-fetched to think the *Heller* Court wished to leave open the possibility that such a danger would rise exponentially as one moved the right from the home to the public square.

If ever there was an occasion for restraint, this would seem to be it. There is much to be said for a course of simple caution.